UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| CITY OF SOUTH BEND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 3:12-cv-475 |
| | ) | |
| SOUTH BEND COMMON COUNCIL, | ) | |
| *ET AL.,* | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| BRIAN YOUNG, SANDY YOUNG | ) | |
| TIMOTHY CORBETT, DAVID WELLS, | ) | |
| And STEVE RICHMOND | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 3:12-cv-532 JVB-CAN |
| | ) | |
| THE CITY OF SOUTH BEND, Acting | ) | |
| Through its Police Department, DARRYL | ) | |
| BOYKINS, Individually and in his Official | ) | |
| Capacity as Chief of Police, KAREN | ) | |
| DEPAEPE, and SCOTT DUERRING, | ) | |
| | ) | |
| Defendants. | ) | |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The plaintiff, the City of South Bend (the "City"), by counsel, respectfully submits this brief in support of its Motion for Summary Judgment for the City determining that the recordings, summaries thereof, and cassette tape copies violate the Federal Wiretap Act, 15 U.S.C. § 2501 *et seq.*

## INTRODUCTION

The City of South Bend seeks a declaratory judgment concerning its obligation to respond to a subpoena issued from the South Bend Common Council. The Subpoena commands

the City to turn over cassette tapes made of captured telephone conversations conducted by

Investigative Division Captain Brian Young ("Capt. Young").  Compliance with the subpoena,

however, creates a risk that the City would violate the Wiretap Act, a federal law which prohibits

the capture and disclosure of certain wire communications without the user's consent.  This

declaratory judgment action seeks a ruling on whether the Wiretap Act applies and whether the

City must comply with the subpoena.  The City now files its Motion for Summary Judgment

arguing that the Wiretap Act protects the recordings at issue based on undisputed facts which

show that the South Bend Police Department:

> •  had no policy of recording all calls on all lines;
> •  gave a choice to the command staff to record their assigned telephone lines if they chose;
> •  inadvertently began to capture Capt. Young's line in 2010 without his (or anyone's) request and without his (or anyone's) knowledge and therefore without any purpose related to his duties as an Investigative Division Captain;
> •  discovered in early 2011 that Capt. Young's line was being recorded but failed to inform him and continued to record his calls without his request and without his knowledge and therefore without any purpose related to his duties as an Investigative Division Captain.

Based on these (and additional) undisputed facts designated with the City's Motion, the capture

of the Capt. Young telephone calls and the creation of the cassette tapes must be considered an

"interception" under the Wiretap Act, and, therefore a violation of the Act.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

This consolidated case turns on the legality of recordings made by the South Bend

Police Department (the "Police Department") of conversations involving Investigative Division

Capt. Young.  The Recordings at issue in this case were made by the Police Department's

Dynamic Instruments Reliance ("DIR") recording system, a server-based analog recording

system capable of recording radio channels and telephone lines.  Exhibit A:  DePaepe Dep. Tr.

19:4-9, 11-13; 21:3, 20-23.  To record a particular telephone line, the Police Department would

2

have to contact a third-party vendor that would run wiring to the telephone closet where the DIR

server was housed and maintained.  DePaepe Dep. Tr. 20:7-15; Exhibit B:  Horvath Dep. Tr.

52:23-53:13.  The hard wire from the telephone line was affixed to the wall in the telephone

closet and then fed into the server.  DePaepe Dep. Tr. 20:7-15.  Once a line was hard-wired into

the DIR system, the system would record every conversation that occurred on that line to a hard

drive and a backup DVD system.  Horvath Dep. Tr. 53:24-54:7

The DIR system was managed by Police Department Communications Director

Karen DePaepe, who began serving in that position on July 1, 1998.  DePaepe Dep. Tr. 12:11-12.

Included among her primary job functions was, among other things, "to compile and maintain all

. . . audio recordings created and housed within the Communications Center as they pertain to the

normal daily operations of the department" and to "manage and maintain all physical resources

used within the Communications Center to ensure that . . . equipment failures are properly

identified, repaired, and restored to full operation."  Exhibit C:  Position Description; Exhibit D:

Fautz Dep. Tr. 26:18-27:2.  DePaepe was not an officer of the Police Department and her

authorization to retrieve and listen to recordings from the DIR system was limited to quality

control for emergency operators and troubleshooting, unless she was specifically directed

otherwise.  Horvath Dep. Tr. 27:5-28:18, 30:9-14; Fautz Dep. Tr. 30:3-8.

Despite having recording equipment, at all relevant times the Police Department

had no policy regarding which lines within the Police Department would be wired into the DIR

system or otherwise recorded.  Horvath Dep. Tr. 47:12-16; Exhibit E:  Hammerlein Dep. Tr.

21:8-21; Fautz Dep. Tr. 15-23.  The Board of Public Safety, which has exclusive jurisdiction to

establish policies for the Police Department, had not issued a written policy regarding the recording of telephone lines.[1]  Fautz Dep. Tr. 24:4-9; *see also* Ind. Code § 36-8-3-2.  Thus, the Police Department had no policy or practice of recording all of the incoming and outgoing lines into the Police Department.  Horvath Dep. Tr. 47:12-16; Hammerlein Dep. Tr. 21:8-21; Fautz Dep. Tr. 15-23.  The DIR system had a limited capacity for the number of lines that could be recorded, so that <u>all</u> lines could never have been recorded on this system.  However, certain lines, over time, had been routinely recorded, including the front desk, the police chief's lines, the communications center, and emergency lines.  Hammerlein Dep. Tr. 11:15-12:5; Fautz Dep. Tr. 5:22-6:3; 7:7-21.  The rationale for recording these lines was to "record conversations from the public calling in to, 911, reporting of a crime that could potentially become evidence at some point" and to "document calls as an investigative tool and documentation."  Fautz Dep. 9:21-10:2.

No standard practice or policy existed at any relevant time regarding the recording of other lines within the Police Department, including lines that were assigned to individual members of the Police Department.  Hammerlein Dep. Tr. 7:20-23; 12:12-15; Fautz Dep. Tr. 24:17-22.  Rather, the Police Department utilized an *ad hoc* approach to determining which lines would be recorded, pursuant to which individual members of the Police Department could elect and consent to the recording of their lines at their own option.  Fautz Dep. Tr. 13:3-19; 24:17-24; Horvath Dep. Tr. 56:17-57:4; Exhibit F:  Boykins Dep. Tr. 52:16-21.  For instance, in late 2004, Chief Fautz authorized certain lines to be recorded in response to public scrutiny over the Police

---

[1] The City also had no written retention policy for recordings aside from a verbal directive from former city attorney Tom Bodnar to store recordings for three years.  Fautz Dep. Tr. 21:15-17.

dms.us.53315944.01

Department's handling of complaints.  Fautz Dep. Tr. 10:7-24.  As a result, Investigative

Division Chief Eugene Kyle, Uniform Division Chief Jim Hassig, and John Collins of Internal

Affairs requested that their lines be recorded.  Fautz Dep. Tr. 11:9-15;11:22-12:1.  But this was

not a blanket decision to record the lines of all Division Chiefs.  Fautz Dep. Tr. 26:4-7; DePaepe

Dep. Tr. 29:11-17.  This *ad hoc* approach was individual in nature, with each individual

requesting the recording of their line.  Fautz Dep. Tr. 26:4-7.  It did not constitute a practice of

recording lines of specific types of personnel or specific ranks within the Police Department.

Fautz Dep. Tr. 24:17-24; 25:16-20.  And even these anecdotal and *ad hoc* events did not include

recording of the lines of all Captains or all Chiefs.  Fautz Dep. Tr. 11:9-15;11:22-12:1; DePaepe

Dep. Tr. 28:19-22.  Rather, an individual could request their line be recorded as "a useful tool for

that individual person whose office it was at to use to be able to document conversations and

anyone that called in, to show that we were responsive."  Fautz Dep. Tr. 11:18-21.

In late December of 2007, Darryl Boykins succeeded Faust as Chief of Police.

Boykins Dep. Tr. 7:21-8:5.  Within his first year of becoming Chief of Police, Boykins learned

of the prior decisions on recording from either DePaepe or Barb Holleman, Secretary to the

Chief of Police.  Boykins Dep. Tr. 33:13-15; 34:2-3; 37:19-23.  Boykins made no changes to any

of the lines that were recorded, specifically adopted the approach of Fautz, and no written policy

was implemented during his tenure.  Boykins Dep. 34:10-17; 35:16-17; 36:2-9; 52:16-21.

DePaepe created a list of the lines recorded by the DIR system and either DePaepe or Holleman

would ask Boykins each year if there were any changes to the lines to be recorded.  DePaepe

Dep. Tr. 39:13-14; Boykins Dep. Tr. 36:19-25; 38:5-17.  DePaepe believed she was only

permitted to intercept and record a telephone line at the direction of the Chief of Police.

DePaepe Dep. Tr.19:24; Horvath Dep. Tr. 8:19-25.

Around February 12, 2010, during Boykins tenure as Chief of Police, Steve Richmond was promoted from a Captain in the Investigative Division to Investigative Division Chief.  Richmond Dep. Tr. 6:23-24; Doc. Entry No. 13:  City's Answer to Compl., ¶ 21. Richmond succeeded Rick Bishop in the position, who had succeeded Kyle.  Both of the prior Investigative Division Chiefs had consented to their lines being recorded.  Fautz Dep. Tr. 11:9-15; 35:6-9.  Upon receiving his promotion, Richmond moved into the office that had been occupied by Bishop as the former Investigative Division Chief.  Richmond Dep. Tr. 7:11-13. Because Richmond wanted to keep the individual phone number that had been assigned to him as Captain—574-235-7473 (the "7473 Number")—he contacted Holleman and asked her to switch the 7473 Number so that it would follow him to the new office he would occupy as Division Chief.  Richmond Dep. Tr. 8:5-12.

At the same time, Capt. Young was promoted to Richmond's former position as a Captain in the Investigative Division.  Richmond Dep. Tr. 7:14-17; Exhibit H:  Affidavit of Capt. Young ("Young Aff."), ¶ 3.  Upon receiving the promotion to Captain, Young moved into Richmond's former office.  Richmond Dep. Tr. 7:18-19.  Because Holleman was moving Richmond's 7473 Number away from that office to Richmond's new office, she decided (without discussing it with Richmond or Capt. Young) to move Bishop's former number of 574-245-6031 (the "6031 Number") from Richmond's new office[2] to Capt. Young's new office. Young Aff., ¶ 4; Richmond Dep. Tr. 36:11-13; 88:21-89:8.  The 6031 Number formerly belonged to Kyle and then Bishop, and some years before had been wired to the DIR system pursuant to their individual requests that the lines be recorded.  Fautz Dep. Tr. 11:9-15; 35:6-9;

Officer's Report.  When Holleman made the switch, she did not disconnect the copper wire carrying the 6031 Number to the DIR system (that connection was at a different punch block location), which meant that the line continued to be connected to the DIR system, and therefore recording calls, after the 6031 Number was assigned to Capt. Young.  No one intended to record Capt. Young.  DePaepe Dep. Tr. 44:2-8.

Later that year, between October and December of 2010, the DIR system experienced a series of periodic crashes.  DePaepe Dep. Tr. 33:12-15.  As a result, some of the DIR system hardware was replaced and DePaepe was instructed by the vendor to check the system to make sure anything that was stored on the server was properly downloading to the DVD backups.  DePaepe Dep. Tr. 32:19-33:5.  According to DePaepe, on February 4, 2011, she began checking the DIR system by comparing the recordings for the radio channels and telephone lines that were housed on the server with what was being recorded on the backup drive.  DePaepe Dep. Tr. 43:3-6; 44:10-11.  When she was checking the 6031 Number, DePaepe "heard a conversation with Capt. Young's voice, and it disturbed [her]" because she "believed that Steve Richmond should be the one speaking on this line."  DePaepe Dep. Tr. 43:20-25. DePaepe listened to at least "a couple" additional recorded conversations associated with the 6031 Number at that time and discovered that Capt. Young "was still speaking on it."  DePaepe Dep. Tr. 43:25-44:2.

She then returned to her office to pull up a computer personnel record for Richmond "and saw that for a telephone number they now listed 245-7473" and it "dawned on [her] that somehow this line had been switched."  DePaepe Dep. Tr. 44:2-8.  DePaepe then

---

[2] Recall that Richmond's new office was Bishop's old office.

returned to the DIR system to "go backward" through the recordings of the 6031 Number to determine when the switch occurred.  DePaepe Dep. Tr. 44:11-13.  She proceeded to listen to "several" or around "[a] dozen" recorded conversations going back from February to late October, which took her approximately an hour.  DePaepe Dep. Tr. 44:23-45:1-2; 47:21-22; 51:22-52:3.  During the process of checking the recordings, DePaepe became "alarmed" by the substance of certain recordings and continued listening to additional recordings because she "did not want to make an accusation against an officer unless I had documented fact."  DePaepe Dep. Tr. 45:24-46:6.  DePaepe did not inform Capt. Young or anyone else at this time that Capt. Young's line was being recorded.  Young Aff., ¶ 7.  If, in fact, she heard some type of serious wrong doing reflected in the captured conversations, by failing to act, she also violated standard Police Department procedure of reporting her concerns up through the chain of command or to the Office of Professional Standards.  Horvath Dep. Tr. 65:12-20.

According to DePaepe, in March 2011, DePaepe informed Boykins that, in checking the recording equipment, she had discovered information that she "felt was either conduct unbecoming an officer or possibly illegal, and that [she] felt he had a need to know about it."  DePaepe Dep. Tr. 66:19-67:3.  Between May and July 2011, DePaepe listened to additional recordings of Capt. Young's 6031 Number "a couple different times."  DePaepe Dep. Tr. 61:11-25.  One of those times occurred in July 2011, when DePaepe was responding to two Freedom of Information Act ("FOIA") requests for "any conversations and photos and some other information regarding two internal affairs investigations" that did not involve Capt. Young. DePaepe Dep. Tr. 48:3-14; 69:8-13.  In response to the FOIA request, DePaepe checked recordings of several lines, including Capt. Young's.  DePaepe Dep. Tr. 58:12-19.  DePaepe informed Boykins in August of further information that she had learned listening to these

recordings.  DePaepe Dep. Tr. 68:16-22.  Neither Boykins nor DePaepe took any action at any

time to inform Capt. Young that his line was being recorded.  Boykins Dep. Tr. 53:5-10; Young

Aff. ¶ 7.

       In October 2011, while DePaepe was on medical leave, a meeting occurred

regarding the City's potential upgrade to a new phone system.  Horvath Dep. Tr. 12:16-13:16;

15:24-16:3.  Diana Scott, who was assuming DePaepe's responsibilities in her absence, brought

to the meeting a list of the Police Department lines that were being recorded.  Horvath Dep. Tr.

12:8-15.  The 6031 Number appeared on the list and the meeting's participants were able to

determine, after some deliberation, that the number belonged to Capt. Young.  Horvath Dep. Tr.

17:2-12.  Captain Phil Trent, who was present at the meeting, informed Capt. Young that same

month that Capt. Young's line was being recorded.  Young Aff., ¶ 5; Richmond Dep. Tr. 76:24-

77:5.  Capt. Young was not aware that his line was being recorded and had not provided his

consent to the recording of his line.  Young Aff., ¶ 7.  He immediately requested that  Phil Trent

take all necessary steps to have the recording of his phone line stopped and to destroy any

recordings in existence.  Young Aff., ¶ 5; Richmond Dep. Tr. 77:6-16.

       In late December 2011, DePaepe and Boykins had a conversation during which

Boykins requested audio cassettes and written descriptions of the recordings DePaepe mentioned

to him in March and August.  DePaepe Dep. Tr. 65:16-66:4.  On January 4, 2012, DePaepe

submitted an Officer's Report to Boykins.  *See* Officer's Report; Boykins Dep. Tr. 73:5-8.  The

Officer's Report detailed the background of her actions, provided written summaries of the

recordings, and enclosed cassettes containing certain recordings of Capt. Young's 6031 Number

from February 4, 2011 through August 31, 2011.  *See* Officer's Report.  After receiving the

Recordings and the memorandum, around January 10, 2012, Boykins listened to at least one of

9

the Recordings in his office, which consisted of a conversation between Capt. Young and David

Wells.  Boykins Dep. Tr. 48:19-23; 59:22-25; 67:24-68:4; Exhibit J:  Walters Dep. Tr. 11:24.

Jeffrey Walters, the Uniform Division Chief of the Police Department at the time, was present

when Boykins listened to the cassette.  Boykins Dep. Tr. 94:6-8; Walters Dep. Tr. 5:25-6:1;

16:18-17:3.  Boykins and Walters were concerned with "people within the department trying to

undermine [Boykins'] position of authority," including Richmond and Capt. Young.  Walters

Dep. Tr. 20:11-20; 25:19-26:21.

   The recordings and related events have precipitated multiple lawsuits against the

City as well as myriad requests for production of the recordings, including a subpoena from the

South Bend Common Council (the "Council").  As a result, the City filed a declaratory judgment

action.  The purpose of the action was to determine the rights and obligations of the City with

respect to the Recordings, determine whether such Recordings violated the Federal Wiretap Act,

18 U.S.C. § 2510 *et seq.* (the "Wiretap Act"), and determine whether the Recordings may be

disclosed pursuant to a valid subpoena.  The Court has bifurcated proceedings to first determine

the legality of the Recordings under the Act, and the City now files its motion for summary

judgment on that issue.

## SUMMARY JUDGMENT STANDARD

   Summary judgment is proper when there exists "no genuine dispute as too any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Once the movant has shown facts entitling it to judgment in its favor, the burden shifts to the

non-movant to identify evidence that establishes a triable factual issue.  *Trentadue v. Redmon*,

619 F.3d 648, 652 (7th Cir. 2010).  In responding to a motion for summary judgment, the non-

movant must come forward with affirmative evidence setting forth specific facts demonstrating

that there is a genuine issue for trial.  *Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir.

2001).   "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party."   *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640–41 (7th Cir. 2008) (internal quotation marks omitted).

## ARGUMENT

The Wiretap Act serves "the dual purpose of protecting the privacy of wire and oral communications, and delineating the conditions under which such communications may be intercepted."   *Abbott v. Village of Winthrop Harbor*, 205 F.3d 976, 980 (7th Cir. 2000) (quoting *Jandak v. Village of Brookfield*, 520 F.Supp. 815, 819 (N.D. Ill. 1981).   The Act contains a definitional exclusion located at 18 U.S.C. § 2510(5) and exceptions located at 18 U.S.C. § 2511(2).   The undisputed facts reveal that the SBPD's capture of the telephone calls of Capt. Young constitute an "interception" under the Act for which no exception applies.   Accordingly, the recordings are subject to and violate the Act as a matter of law and the City is entitled to summary judgment.

### I.    The capture of Capt. Young's telephone calls constituted an interception under the Act because the undisputed facts show that the recording was not done in the ordinary course or for a law enforcement purpose.

The recordings are not excluded from the scope of the Wiretap Act by any of the Act's exclusions.   All Parties agree that the recordings at issue were captured off of the 6031 Number assigned to Capt. Young.   Young Aff., ¶ 4; Richmond Dep. Tr. 36:11-13; 88:21-89:8. And, the Parties agree that Capt. Young received that assigned line as part of a re-shuffling of positions and offices in 2010.   Young Aff., ¶ 4; Richmond Dep. Tr. 36:11-13; 88:21-89:8. Furthermore, the Parties agree that, no one requested or even knew that Capt. Young's assigned line had become part of the automatic recording that was, at that time, being performed on certain unassigned lines, such as the front desk, the police chief's lines, the communications center, and emergency lines.   Hammerlein Dep. Tr. 11:15-12:5; Fautz Dep. Tr. 5:22-6:3; 7:7-21.

11

Consequently, because no one knew of that outcome, no one could have intended that outcome and no one could have been acting with any specific purpose that related to the work of Capt. Young.  Thus, it is undisputed that when Capt. Young took over the assigned line of 6031, neither he, nor anyone else associated with the Police Department, had any regular police purpose associated with the recording of his assigned line.

The Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device"  18 U.S.C. § 2510(4).  The Act goes on to define "electronic, mechanical or other device" in a way that allows an exclusion for an "investigative or law enforcement officer in the ordinary course of his duties."  To qualify for the exclusion contained in (5)(a)(ii), the recording must have been made by an investigative or law enforcement officer as part of "routine non-investigative recording" of communications.  *Amati v. City of Woodstock*, 176 F.3d 952, 955 (7th Cir. 1999).[3]  Thus, as *Amati* makes clear, only "routine taping of *all* telephone calls made to and from a police station" has been held to fall within the law enforcement exception.  *Id. (emphasis added)*; *see also Adams v. City of Battle Creek*, 250 F.3d 980, 984 (6th Cir. 2001) (noting that the exception was most likely carved out for systems that "*routinely and indiscriminately recor[d] all phone activity* in and out of the police department.").  Communications recorded to "further a particular investigation or target a particular individual" expressly do not fall within the exception.  *Amati*, 176 F.3d 952, 955.

---

[3] There is also an "ordinary course of business" exclusion under 2510(5)(a)9i), which does not apply to law enforcement.  *Amati*, 176 F.3d at 954.

The exclusion fails to justify the recording of calls on Capt. Young's assigned line because it could not have been made in the "ordinary course" of his or any officer's duties. Indeed, DePaepe was the first person to become aware that the specific line assigned to Capt. Young was advertantly being recorded.  It is undisputed that she was not an investigative or law enforcement officer.  18 U.S.C. § 2510(7).[4]  As Director of Communications, it was not within the scope of her job duties to conduct any investigation into the conduct of the Investigative Division Captain.

The presence of a policy specifying which lines are recorded is one indication of whether the Police Department's action were pursuant to an "ordinary course."  Here, it is undisputed and has been repeatedly testified to that *no* policy existed which established the "routine taping of all telephone calls made to and from a police station."[5]  Furthermore, no policy existed which established the routine tapping of specific assigned lines or of specific personnel, such as "all division chiefs."[6]  Even the lines *normally* recorded (including the front desk, the police chief's lines, the communications center, and emergency lines) were not done pursuant to any formal written policy but were simply a practice established at some point by a Chief's personal decision.  Hammerlein Dep. Tr. 7:20-23; 12:12-15; Fautz Dep. Tr. 24:17-22. Thus, at most, the practice was *ad hoc* and permissive, *i.e.*, the recording of any assigned line

---

[4] Defining "Investigative or law enforcement officer" as "any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter . . ."

[5] This fact was confirmed by the investigation conducted by the U.S. District Attorney, David Capp.  *See* Capp letter.

[6] Fautz testified that he did not intend to establish a practice of recording lines of specific types of personnel or specific ranks within the Police Department.  Fautz Dep. Tr. 24:17-24; 25:16-20. . *Also see*, DePaepe Dep. Tr. 28:19-22.

dms.us.53315944.01

came about from an oral instruction by the Chief to DePaepe at the request of the individual to be recorded.  Fautz Dep. Tr. 13:3-19; 24:17-24; Horvath Dep. Tr. 56:17-57:4; Exhibit F:  Boykins Dep. Tr. 52:16-21.

The City's *ad hoc* policy distinguishes this case from the facts in *Amati v. City of Woodstock*, 176 F.3d 952, 955 (7th Cir. 1999).  In *Amati*, the police department policy was to record *all calls from all lines*.  *Id.* at 954-55.  An exception developed for a single unrecorded line.  *Id.*  Eventually, the police department made a decision which brought that one exceptional line back under the general department policy and it too began to be recorded for official police purposes.  *Id.* at 955.  In contrast, as noted above, no policy of recording all calls from all lines existed for the South Bend Police Department.  And, in fact, *no decision* to record Capt. Young's assigned line ever took place.  Indeed, the recording of Capt. Young's line initially occurred by mistake.  Thus, *Amati*, which involved a policy for *all* calls and a specific decision for a single line, cannot control the outcome of this situation involving *no policy* and *no decision*.  An assigned line, recorded by mistake could not have been recorded pursuant to any policy or practice of the Police Department and therefore simply could not have been part of the "ordinary course" of its officer's duties.  *Abraham v. City of Greenville*, 237 F.3d 386, 389 (4th Cir. 2001) (holding that the law enforcement exclusion does not apply to lines that were recorded by mistake).

Put another way, there was nothing "routine" about the fact that Capt. Young's assigned line was being recorded.  To the extent there was any "routine" for the recording of assigned line at the Police Department, that routine included the officers making a specific request for their lines to be recorded.  As has been established by the undisputed facts, no one (least of all Capt. Young) conformed with that putative routine.  *Amati*, supports the City's

contention that the actions which occurred in this case cannot support the ordinary law enforcement exception.  As Judge Posner says in *Amati*:

> What would not be routine would be if the police, in order to trick people into making damaging admissions over the phone, announced that calls to and from the police department were not being recorded, and then recorded them anyway.

*Amati*, 176 F.3d at 956.

In the case at bar, the Police Department did indeed "announce" that calls to and from the police department were *not* being recorded.  That announcement came by virtue of an administrative approach that allowed officers with assigned lines to choose whether to be recorded at their own specific time and for their own specific purpose. Such an approach functioned as an "announcement" to Capt. Young that "calls to and from" his office in the police department "were not being recorded."   But, as is undisputed, the Police Department "then recorded them anyway."   As the *Amati* Court says:

> Such a scheme would not be in the "ordinary" course of law enforcement; it would be extraordinary. . . . In the absence of a warrant, the practice that we have just described would *not . . . be protected by the law-enforcement exemption*.  The boundary is between routine noninvestigative uses of electronic eavesdropping and its use either as a tool of investigation (which requires a warrant) or as a device for intimidation, suppression of criticism, blackmail, embarrassment, or other improper purposes.

*Amati*, 176 F.3d at 956 (internal citations omitted).

The undisputed facts establish that the capture of Capt. Young's telephone calls, as a matter of law, constitute an "interception" under 18 U.S.C. 2510.  As such, all the protections and restrictions of the Wiretap Act apply to the recordings.

## II.     The recordings of Capt. Young's conversations violated the Wiretap Act.

The undisputed evidence demonstrates that Capt. Young's telephone calls were intercepted intentionally in violation of the Act.  As established above, Capt. Young's phone calls were "intercepted" as that term is used in the Act.  *Pascale v. Carolina Freight Carriers Corp.,* 898 F. Supp. 276 (D.N.J. 1995) (recording of a telephone conversation constitutes interception under the Act).  And although the interception and recording of his line was initially inadvertent, the undisputed facts establish that the cassette tape recordings at issue in this case (and the subject of the Subpoena) all occurred *after* Karen DePaepe's conduct established the requisite intent for a violation of the Act.

According to DePaepe's own account, on February 4, 2011, when DePaepe was performing troubleshooting on the 6031 Number, she immediately "heard a conversation with Capt. Young's voice, and it disturbed [her]" because she "believed that Steve Richmond should be the one speaking on this line."  DePaepe Dep. Tr. 43:20-25.  Admittedly on notice that something was awry—and that it "dawned on [her] that somehow this line had been switched" —DePaepe nevertheless failed to act in an appropriate manner to preserve Capt. Young's privacy rights.  Indeed, her first reaction was to *continue* listening to recordings that she knew were obtained inadvertently in a fashion that was far beyond the scope of her troubleshooting duties. *Cf. Berry v. Funk*, 146 F.3d 1003, 1010 (D.D.C. 1998) (interpreting the switchboard operator exception and noting that the "operator is authorized to overhear (and disclose and use) only that part of a conversation 'which is a necessary incident to the rendition of his service.'").

More significantly, however, is that DePaepe *failed to take any action whatsoever* to inform Capt. Young of the mistake or to ensure that the error was rectified.  She failed to report the error she had discovered up the appropriate chain of command or to inform Capt.

16

Young that his line was recorded.  Because of DePaepe's inaction, the line continued to be recorded for another *eight months* after she discovered the line had been switched -until October 2011.  Each of the conversations placed on cassettes that are at issue in this case occurred many months after she first learned of the mistake.  The presence of Capt. Young's conversations on the system occurred as a direct result of DePaepe's inaction.  Her failure to Act upon becoming aware that Capt. Young's line was being recorded carried the recordings over the boundary from inadvertent to intentional.  *See Narducci v. Moore*, 444 F. Supp. 2d 924, 935-936 (N.D. Ill. 2006) ("Nor is an affirmative act, rather than an omission, required. It is enough *to be aware that such interception is occurring and to fail to stop it*.") (emphasis added).  Accordingly, the interceptions constitute a violation of the Wiretap Act as a matter of law.

          And because the recordings themselves violate the Act, the written summaries and cassette tape copies containing the contents of the recordings do as well.  The Wiretap Act forbids the disclosure of "the contents of any wire, oral, or electronic communication [that was] obtained through the interception of a wire, oral, or electronic communication in violation of" the Act. 18 U.S.C. § 2511(c).  Accordingly, a separate violation of 18 U.S.C. § 2511 occurs each time a person discloses illegally intercepted communications to "any other person."  *Fields v. Atchison, Topeka, and Santa Fe Ry. Co.*, 985 F. Supp. 1308, 1314 (D. Kan. 1997), reconsideration granted on other grounds, 5 F. Supp. 2d 1160 (D. Kan. 1998).  By failing to take appropriate action after becoming aware Capt. Young's line was intercepted, DePaepe compounded the harm by further disclosing the contents of the subsequently obtained recordings.  In addition to discussing the contents of the recordings with Boykins on multiple occasions in March 2011 and August 2011, DePaepe provided Boykins with an Officer's Report summarizing the contents of the improperly obtained recordings along with five cassette tapes containing

copies of the recordings.  These disclosures of recordings obtained after DePaepe had knowledge of the inadvertent interception violated the Act, and further disclosures of the summary of the contents of the recordings or the cassette tapes would similarly run afoul of the Act.  *See Deal v. Spears*, 780 F.Supp. 618, 624 (W.D. Ark. 1991) (finding liability for disclosure when only the "nature" of the communications was disclosed), *aff'd*, 980 F.2d 1153 (8th Cir. 1992).

III.    **No exception applies that could excuse the Wiretap Act violation.**

The Act contains an exception that applies when a person "acting under color of law" intercepts a recording "where such person is a party to the recording or one of the parties to the communication has given prior consent to such interception."  18 U.S.C. § 2511(2)(c).  But, it is undisputed that DePaepe was not "acting under color of law" when she permitted the continued intentional recording of Capt. Young's line by her inaction. *Cf. Thomas v. Pearl*, 998 F.2d 447, 451 (7th Cir. 1993); Horvath Dep. Tr. 27:5-28:18, 30:9-14; Fautz Dep. Tr. 30:3-8. Moreover, it is undisputed that Capt. Young did not consent to the recording of his line.  In fact, all of the conversations that Capt. Young had on his assigned line and which were put on the cassettes by DePaepe occurred between February and August of 2011, long before Capt. Young discovered that his line was being recorded in October of 2011.  And, when Capt. Young did finally discover that his line was being recorded, he demanded that the recording immediately cease and all recordings be destroyed.  Thus, the exception for acting under the color of law cannot justify the recordings here. *Cf. Amati*, 176 F.3d at 955 (7th Cir. 1999) (consent requires either explicit consent or actual notice plus continued use).  And because the recordings

contravene the Wiretap Act and no exception applies, the recordings along with the summaries of their contents and subsequent cassette copies are in violation of the Act.[7]

**IV.     Because the recordings Violate the Wiretap Act, the City cannot be compelled to release the recordings, summaries thereof, or cassette tape copies.**

Because the recordings violate the Act, they cannot be disclosed without exposing the City to potential civil and criminal liability.  As noted above, the Wiretap Act forbids the *disclosure or use* of "the contents of any wire, oral, or electronic communication [that was] obtained through the interception of a wire, oral, or electronic communication in violation of" the Act. 18 U.S.C. § 2511(c).  With its subpoena, the Council seeks "[c]opies of any and all tapes and/or digital recordings related to the Mayor's news release of March 29th & March 30, 2012 regarding the demotion of former Police Chief Darryl Boykins; as well as the tapes and/or digital recordings cited by the Mayor in the termination of Communications Director Karen DePaepe." Doc. Entry No. 1, Compl., Ex. A.  Because those recordings were intentional interceptions in violation of the Act, they cannot be disclosed or used in any way without further violating the provisions of the Act.   Indeed, any disclosure of the recordings would constitute additional violations of 18 U.S.C. § 2511(1).  Accordingly, the City cannot be compelled to respond to requests for the recordings, summaries of the contents of the recordings, or cassette tape copies of the recordings.

---

[7] It cannot be argued that any "ordinary course" of the Police Department would permit the recording of Young's line to continue after it was discovered his line was inadvertently recorded in contravention of the Police Department's routine practices.  *Cf. Abbott*, 205 F.3d at 977 (holding the law enforcement exception does not apply to the surreptitious recording of telephone calls made from what the callers had reason to believe "was an untapped line at the police department."); *Abraham v. City of Greenville*, 237 F.3d 386, 389 (4th Cir. 2001) (holding defendant violated the Act when it "did not have an established policy of monitoring the plaintiffs' calls.").

dms.us.53315944.01

## <u>CONCLUSION</u>

The undisputed facts demonstrate that DePaepe's awareness that Capt. Young's line was being inadvertently recorded and failure to stop it such that Capt. Young's line was recorded for several more months constitute a violation of the Wiretap Act as a matter of law. Accordingly, the City is entitled to summary judgment and cannot be required to disclose the contents of the Recordings in any form.

Respectfully Submitted,

/s/ Edward A. Sullivan, III
Edward A. Sullivan, III (17577-71)
J.P. Hanlon (21230-71)
Ryan G. Milligan (28691-71)
FAEGRE BAKER DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, Indiana 46601
Phone:  574.234.4149
Facsimile:  574.239.1900

Aladean DeRose (4495-71)
City Attorney
227 West Jefferson Blvd., Suite 1400
South Bend, Indiana 46601
Phone:  574.235.9241
Facsimile:  574.235.7670

*Counsel for the City of South Bend*

20

## CERTIFICATE OF SERVICE

I certify that on the 13th day of December, 2013, a copy of the foregoing was served upon the following parties and counsel of record through either the Court's electronic filing system or by U.S. Mail, postage prepaid:

Jeffrey S. McQuary
BROWN TOMPKINS LORY & MASTRIAN
608 East Market Street
Indianapolis, IN  46202
jmcquary@brown-tompkins-lory.com
*Counsel for Respondents Brian Young, Tim Corbett, Dave Wells, Sandy Young, Steve Richmond*

Daniel H. Pfeifer
Jeffrey J. Stesiak
PFEIFER MORGAN & STESIAK
53600 N. Ironwood Drive
South Bend, IN  46635
dpfeifer@pilawyers.com
jstesiak@pilawyers.com
*Attorney for Respondents*

Robert J. Palmer
E. Spencer Walton
Christopher M. Lerner
MAY · OBERFELL · LORBER
4100 Edison Lakes Parkway, Suite 100
Mishawaka, IN  46545
rpalmer@maylorber.com
ewalton@maylorber.com
Clerner@maylorber.com
*Counsel for South Bend Common Council*

Marielena Duerring
Duerring Law Offices
61191 US 31 South
South Bend, IN  46614
(574) 968-0250
attymduerring@aol.com
*Counsel for Karen DePaepe and Scott Duerring*

Thomas M. Dixon
Dixon, Wright & Associates, P.C.
55255 Birchwood Court
Osceola, IN  46561
574-315-6455
Fax:  574-675-7783
Email:  tdixon3902@comcast.net
*Counsel for Darryl Boykins*

s/ Edward A. Sullivan III

dms.us.53315944.01