Deposition Excerpts

KAREN DePAEPE

April 15, 2013

**Rough Draft** 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CITY OF SOUTH BEND,                    )
                      Plaintiff,       )
        vs                             )
                                       )
SOUTH BEND COMMON COUNCIL, TIM         )
CORBETT, DAVE WELLS, STEVE             )
RICHMOND, BRIAN YOUNG, and SANDY       )  Case No.
YOUNG,                                 )  3:12-CV-475
                      Defendants.      )
-------------------------------        )
BRIAN YOUNG, SANDY YOUNG,              )
TIMOTHY CORBETT, DAVID WELLS,          )
and STEVE RICHMOND,                    )
                      Plaintiffs,      )
        vs                             )
                                       )
THE CITY OF SOUTH BEND Acting          )
through its Police Department,         )
DARRYL BOYKINS, Individually and       )
in his Official Capacity as            )
Chief of Police, KAREN DePAEPE,        )
and SCOTT DUERRING,                    )
                      Defendants.      )
-------------------------------        )

CONFIDENTIAL
The Videotaped Deposition of KAREN DePAEPE

        Date:       Monday, April 15, 2013

        Time:       9:12 a.m.

        Place:      Pfeifer, Morgan & Stesiak
                    53600 North Ironwood Drive
                    South Bend, Indiana 46635

    Called as a witness by the Defendants/Plaintiffs
    in accordance with the Federal Rules of Civil
    Procedure for the United States District
    Court, Northern District of Indiana, South Bend
    Division, pursuant to Notice.

Reported by
Angela J. Galipeau, RPR, CSR
Notary Public, State of Indiana

**Rough Draft**                                                                12

1    Q.   What did you move into after that?

2    A.   I was requested to apply as the communications supervisor.

3    Q.   And you did?

4    A.   Yes, I did.

5    Q.   And you got the job?

6    A.   Yes, I did.

7    Q.   When did you get that job?

8    A.   That was January 2 of 1996.

9    Q.   And is that the final position you held at the South Bend

10        Police Department?

11   A.   No.  I was promoted to the director of communications on

12        July 1st of 1998.

13   Q.   Okay.  So the supervisor reports to the director?

14   A.   Correct.

15   Q.   So how long total did you put into the South Bend Police

16        Department?

17   A.   Oh, a little over 25 years.

18   Q.   Could you tell me what your duties were as the director of

19        communications?

20   A.   Well, I had many duties.  My main duty was to oversee the

21        daily operations of the communications center and the

22        personnel.  I was also added to take responsibility of the

23        front desk personnel and the operations of the front desk.

24        That occurred around 2010.  I was the IDEX NCIC

25        coordinator for our department.

1   Q.   During most of your tenure at South Bend Police Department

2        was the Centrex system I presume?

3   A.   That's correct.

4   Q.   Was in place.  Under the Centrex system did you are the

5        about if you so chosed to intercept or record a telephone

6        line?

7   A.   Not off of the Centrex system.  I managed the dynamic

8        instruments audio recording system point they're two

9        completely separate systems.

10  Q.   Explain -- could you repeat what that is?

11  A.   The dynamics reliance system is an audio recorder.  And it

12       can record anything that such as a radio channel or a

13       telephone line or a telephone workstation.

14  Q.   And as director of communications, you controlled that?

15  A.   I monitored and maintained it for the South Bend Police

16       Department.

17  Q.   And using -- I'm sorry, could you repeat that again,

18       dynamics information?

19  A.   Yes, it called the dynamic instrument reliance system.

20  Q.   Die that mix instrument reliance system?

21  A.   Yes.

22  Q.   Using the dynamic instrument reliance system, you could

23       intercept and record a telephone line?

24  A.   As directed by the chief of police.

25  Q.   Well, as this stage I'm just asking what's possible?

**Rough Draft** 20

1  A.  Yes, it's possible.

2  Q.  And was, in fact, done?

3  A.  Yes.

4  Q.  In using this system, how would you do that?  So the chief

5      tells you I want to record this certain line, what do you

6      do?

7  A.  Well, first of all, you would have to contact either the

8      vendor, who was Steven Campbell & Associates, or their

9      subcontractor which was Telerap, here in South Bend.  They

10      would have to run wiring from the D Mark or the telephone

11      closet.  That was generally done through the ceiling of

12      the police department into the communications center where

13      the server itself, the dynamic instrument server was

14      housed and maintained.  The wires were affixed to a wall

15      in the communications center and then fed into the server.

16  Q.  How long does that take?

17  A.  It would depend on the technician and their ability to

18      provide that service.  Some were more skilled than others.

19      Generally, within about maybe three hours.

20  Q.  But it's not something you could -- so it could be done

21      the same day you requested it?

22  A.  Yes.

23  Q.  But it does require more than just typing a few commands

24      into a computer?

25  A.  Much more.

1   Q.   Once a line is being recorded, is it stored on a magnetic

2        tape, on a hard drive, digitally?

3   A.   It was first of all stored on a data card ridge, with

4        dynamic I understandments and then there was an upgrade to

5        the system with a new server and then it was stored on

6        DVD.

7   Q.   How long would the call be stored?

8   A.   Well, it's stored automatically for approximately a year

9        and a half on the server itself and it would automatically

10       purge information as the severabler got full.  On the DVD

11       themselves it just depended how busy times were.

12       Generally you would get six weeks of data, three weeks on

13       each side of a DVD would be stored.

14  Q.   I'm still not clear on how long it's kept though?

15  A.   I'm sorry.  I had a verbal director Tom Bodnar, there was

16       no written policy but a verbal directive that he wanted

17       things stored for three years.

18  Q.   And who is Tom Bodnar?

19  A.   Tom Bodnar was the city attorney.

20  Q.   And if a line is recorded absolutely everything gets

21       recorded so there's wrong numbers, personal calls, urgent

22       department business, it's all the same?

23  A.   That's correct.

24  Q.   Is it possible for someone to listen to a call in real

25       time as it's happening, perhaps --

1       distinction between a phone number and a phone line?

2   A.  Well, I'm not a phone technician.  I would say then a line

3       would be actually a telephone number assigned to that

4       line.  I think it would be easier to describe that some

5       phones were workstations and might have several lines

6       coming in on one phone apparatus versus some telephones

7       only had one line assigned to them.

8   Q.  To your knowledge, did Chief Fautz inform a division chief

9       when his line was being recorded?

10  A.  I have no information on that.

11  Q.  Did you inform a division chief when his line was being

12      recorded?

13  A.  I had.

14  Q.  Just as a matter of general policy or did you just do that

15      in one or two cases?

16  A.  No.  It wasn't a matter of general policy.  It was just in

17      a random conversation.

18  Q.  Okay.  Well, could you tell me about that conversation.

19  A.  Yes.  I was talking with division chief Hassig one day.

20      We were talking about changes within the police station.

21  Q.  Can you just give me an approximate timeframe, maybe month

22      and year or just year?

23  A.  I believe it was in 2004.

24  Q.  And what did you state in this conversation?

25  A.  We were discussing the changes to the police department.

1   Q.   She did not have access to it?

2   A.   Not at all.

3   Q.   Could the Chief record calls without your assistance,

4        record any calls without your assistance?

5   A.   No.

6   Q.   Did Chief Fautz ever specifically ask you to go record a

7        certain line?

8   A.   There were two instances that I can recall the changes.

9        And the changes his own line.  The line that was housed in

10       the uniform division office, chief's office, the line that

11       was housed in the investigative bureau bureau chief's

12       office.  He then later requested the records bureau

13       incoming line.

14  Q.   How about Chief Boykins, did he ever request a line be

15       recorded?

16  A.   Never.

17  Q.   Did it ever come to your attention that Brian Young's line

18       was being recorded?

19  A.   I discovered that there were conversations of Brian Young

20       on one of the recorded telephone lines, 450-6031, when our

21       recorder had malfunctioned.  We were having ongoing

22       problems with it.  And I went back to check to make sure

23       that lines were actually recording correctly because we

24       had had three drives go down within the system.  And when

25       the third drive was put in, the technician that came out

**Rough Draft**                                                    33

1      to put it in told me it was going to take quite some time

2      for anything that was stored on the server to down load on

3      to the DVD back-ups.  So he told me to give it some time

4      and then to check to make sure that it was doing exactly

5      that.

6   Q.  And the data was recorded calls?

7   A.  No.  There was quite a bit that was lost.

8   Q.  But the lost data, and the data that was not lost was --

9      what consisted of all recorded phone calls?

10  A.  Yes.

11  Q.  And when did this happen?

12  A.  Well, the back-up drive on the dynamic I understand

13     reliant started to malfunction sometime in October and

14     continued on through late December.  So in that time we

15     had three drives switched out.  What would happen on the

16     first two drives was the company Steven Campbell and

17     associate overnighted them to our department and would

18     request that our own computer from services division

19     install them and that was done by Sal Parisi.  On the

20     third and final one, it was approximately the last week of

21     December.  And Sal Parisi and actually everyone from

22     computer services was on vacation.  I was a bit frustrated

23     that this was the third drive failure.  So I requested

24     that they send a technician from the company.  And it was

25     approximately the last week of December.

**Rough Draft** 39

1          record?  Please continue.  I'm sorry.

2    Q.   Ma'am, before I ask you questions about this document, I

3          do want to go back and clarify one thing.  You mentioned

4          the problems that you discovered with the hard drive and

5          which eventually led you to Mr. Or to Mr. Young's recorded

6          conversations were in October of which year?

7    A.   It started in October of 2010 and went through until

8          December of 2010.

9    Q.   Thank you.  Now I'd like you to turn your attention to

10         Exhibit 5.  Have you seen this document before?

11   A.   Yes, I created it.

12   Q.   What is it?

13   A.   It's a list of the recorded telephone lines maintained by

14         the South Bend Police Department audio recording system.

15   Q.   Okay.  I'd just like to go through it briefly with you.

16         These on page 1 plant equipment Centrex and rain down

17         lines, what are these phone numbers?

18   A.   Well, these would be phone lines captured on the plant

19         equipment 911 workstations housed within the City of South

20         Bend's communication center.  Some are Centrex line and

21         some are direct ring down line.  A direct ring down line

22         would mean if I were to punch in the button it would

23         contact me only with Mishawaka police department.  So it

24         was a line between South Bend Police Department and the

25         Mishawaka police department within our communications

1    time of calls you had to listen to in order to understand

2    what had happened?

3 A.  Well, at the time I was checking all of the radio channels

4    and all of the telephone lines that we recorded.  And I

5    was checking what was housed on the server versus what was

6    being recorded on the back-up drive.  I had gone through

7    everything in communications.  I had gone through the rest

8    of the department.  I was working on the detective bureau.

9    If I, for instance, heard Donna Stevens speaking on the

10   detective bureau incoming line on the server and it

11   matched what was on the back-up drive, I would move on.  I

12   got to 245-6031 --

13 Q.  Before you go on, and this is just to confirm that the

14   line being recorded was the one you believed was to be

15   recorded?

16 A.  No.  It was to confirm that the information that we were

17   storing on the hard drive was actually being transferred

18   accurately to the back-up drive.

19 Q.  Okay.  Thanks for that clarification.  And please proceed.

20 A.  Okay.  I got to 2456031 and I heard conversation with

21   Brian Young's voice, and it disturbed me.  However, what

22   disturbed me was I believed that Steve Richmond should be

23   the one speaking on this line.  I wasn't sure whether it

24   was just a one time fluke maybe he was in there using the

25   phone.  I went and checked the next phone after that and

1   he was still speaking on it.  Went and checked a couple

2   others, he was still speaking on the line.  And so I went

3   back to my office because I was checking this in the

4   communications center, and I pulled up the CAD, which is

5   the computer-aided dispatch system, to check personnel

6   record for Steven Richmond.  And I saw that for a

7   telephone number they now listed 245-7473.  So it dawned

8   on me that somehow this line had been switched.  I wasn't

9   sure when this occurred.  Steve Richmond had become the

10  division chief in 2010, February 2010.  And I was making

11  my checks the end of February 2011.  So/went back to the

12  communications center to see -- trying to go backward just

13  when this occurred.  When did this switch occur.  And so

14  that's when I checked other phone conversation and found

15  that it went back quite some time.  So it was apparent to

16  me that a change had been made and I was not made aware of

17  it.

18  Q.  Okay.  About how many hours worth of conversations did you

19      listen to in order to make that determination?

20  A.  It wasn't hours.

21  Q.  Or minutes or seconds.  I don't mean to put words in your

22      mouth?

23  A.  I really can't recall the exact.  I would say most

24      conversations were of a five-minute duration,

25      approximately and probably -- well, I was checking

1    February, January, December, November.  So several, but I

2    can't tell you exactly.

3  Q.  Okay.  While doing this confirmation to make sure that the

4    data was being accurately backed up, did you listen to the

5    substance of any of the conversations?

6  A.  Initially when I heard the first conversation and the

7    second conversation, yes, those alarmed me.

8  Q.  What alarmed you?

9         MS. DUERRING:  At this point in time, I want to

10        interpose an objection because obviously that's going

11        to be getting into the content.  I just want to refer

12        everybody to the scheduling order that was entered by

13        the Court with respect to the bifurcation of

14        discovery.  Everybody agreed that stages of discovery

15        would be helpful and appropriate in this case, and

16        the Court ordered that the preliminary determination

17        would be made at this juncture was going to be

18        whether or not the recordings were actually a

19        violation of the Wiretap Act.  Anything that's going

20        beyond that preliminary determination is beyond the

21        scope of discovery and the court order; and I would

22        object at this point in time.

23         MR. McQUARY:  Okay.  I'll rephrase the question.

24  Q.  Were you alarmed by something in the conversation that you

25    heard?

1   A.   Yes.

2   Q.   That did not relate to the accuracy of the data back-up?

3   A.   That's correct.

4   Q.   Did that prompt you to -- did your alarm prompt you to

5        listen to any other conversations?

6   A.   Yes.

7   Q.   Do you know about how many other conversations you

8        listened to?

9   A.   Pertaining to this incident, I only found one other.

10  Q.   Did you have to look at multiple or excuse me, listen to

11       multiple conversations in order to find that one other

12       one?

13  A.   Yes, and my determination was I did not want to make an

14       accusation against an officer unless I had documented

15       fact.

16  Q.   Well, what did you do to make sure that you were

17       documenting in fact?

18  A.   I was -- again, I would have to reveal the content of the

19       information.  I was looking for any calls regarding

20       information from the Indiana state police.

21  Q.   And really I don't want you to reveal the substance of the

22       conversations, ma'am.  So instead I'll ask how many

23       conversations you listened to in order to find ones that

24       you considered valuable?

25  A.   A dozen, maybe less.

1   Q.  And this would be over -- that occurred over multiple
2       days?
3   A.  No.
4   Q.  On one day on that line?
5   A.  Yes.
6   Q.  And this would be the line being used by Brian Young?
7   A.  Correct.
8   Q.  Did you listen to any conversations on any other lines in
9       order to make sure that an accusation that you might make
10      was documented in fact?
11  A.  Not relevant to this incident, no.
12  Q.  But of course you've listened to other recordings on other
13      occasions?
14  A.  Yes.
15  Q.  But in order to make sure that you had any accusation
16      against Brian Young properly documented, did you listen to
17      any other lines?
18  A.  No.
19  Q.  Approximately how long did it take you to listen to the
20      number of conversations that you listened to?
21  A.  Not long.  I would believe maybe on this particular
22      incident, it was an hour.
23  Q.  Okay.  Were there any other incidents that you wanted to
24      document and, therefore, listened to recorded
25      conversations regarding officer misconduct?

Rough Draft                                          48

1   A.   Yes.

2   Q.   Could you tell me about those -- who were the officers?

3   A.   Well, it wasn't pertaining to any particular officer at

4        that time.  I received a telephone call from Nancy Bruce

5        from ABC 57.  She stated that she had received a letter

6        from Aladean DeRose.  And in the letter it stated to

7        contact me and my telephone number and that I was,

8        according to the legal department, to disclose any

9        conversations and photos and some other information

10       regarding two internal affairs investigations.  And so I

11       somewhat argued with Nancy Bruce stating that I had no

12       information or letter saying to the fact.  Kelly

13       Stopzinski and Nancy Bruce had both filed a Freedom of

14       Information requests, and this was in July of 2011.

15   Q.   Okay.  I'm not asking about information that you gave up

16       pursuant to a Freedom of Information Act request or

17       something that the city administration asked you to do.  I

18       mean, based on your own personal investigation and the

19       information that you learned about Brian Young while

20       repairing the hard drive or working on the hard drive,

21       were there any other incidents that you wanted to document

22       and, therefore, listen to recorded phone calls?

23   A.   Yes.

24   Q.   What incidents were those?

25   A.   It was an incident -- again, I would have to disclose the

Rough Draft                                          51

1   Q.   You wrote this?

2   A.   Yes, I did.

3   Q.   But you did not make the redactions obviously?

4   A.   No, I did not.

5   Q.   And I'd like to direct your attention to the first

6        paragraph.  You mentioned in the middle of that paragraph

7        that you were troubleshooting some lines due to a DVD

8        drive failure and had lost some back-up data.

9   A.   Correct.

10  Q.   Is that the problem you mentioned earlier in the

11       deposition before the break when you were working on some

12       problem DVDs?

13  A.   Yes.

14  Q.   And here you list the date of that troubleshooting as

15       February 4, 2011.  Is that -- is that accurate?

16  A.   Yes.

17  Q.   You mentioned October, the month of object through

18       November previously.

19  A.   Of 2010.

20  Q.   2010.  Okay.  So this is -- is this a separate incident of

21       problems?

22  A.   No.  On February 4, 2011, I was checking the lines on the

23       server compared to the back-up drive.  And I found that

24       Brian Young was speaking on 2356031.  I was trying to

25       determine whether this was -- how this had occurred and

1      to be reported.

2              MR. DIXON:   Jeff, you just said February 4, 2012.

3          I thought this would be an opportunity to get that

4          cleared up because that document has that on there,

5          but I think we all -- we talked about February 4,

6          2011.

7              MR. McQUARY:   Yes, thank you.

8   Q.  Ms. DePaepe, do you think that the date at the top of page

9       2, February 4th, 2012, could actually be 2011?

10  A.  Yes, that's a type error on my part.

11  Q.  Okay.   Thank you.

12          Did you listen to any other incidents, phone calls

13      relating to any other incidents of what you've confeared

14      might be police misconduct by Captain Young?

15  A.  I had a situation in July, as I had stated, where I

16      received an access to public records, actually two, and in

17      checking all of the lines because it was approved by

18      Aladean DeRose to provide that information, I checked all

19      lines.  And, yes, that included his.

20  Q.  You mentioned -- and I'm only asking about investigations

21      of police misconduct on your own initiative, not ones that

22      Ms. Rose may have asked you to investigate.  I'm talking

23      about any incidents that you uncovered while in the course

24      of your own activities of maintaining this system?

25  A.  I guess the best way I could describe it is if someone

1           answered I believe twice at this point.  You can go

2           ahead and answer a third time.

3    A.    I believe I stated on this date there were approximately

4          12 calls.

5    Q.    And that's the same number of calls you listened to

6          regarding the first incident?

7    A.    We are speaking about the first incident.

8    Q.    Okay.  I was asking you about the second incident.

9    A.    Right.  The second incident was discovered while I was

10         investigating the first incident.

11   Q.    Did you listen to any additional telephone calls in

12         addition to adequately inform yourself about the second

13         incident?

14   A.    Yes, I did.

15   Q.    How many additional calls?

16   A.    I don't recall exactly.

17   Q.    Do you recall about how long it took you to listen to

18         them?

19   A.    It was over a time period between May and July.  So there

20         were a couple different times that I had listened.  I

21         can't give you an exact amount of time.  Some

22         conversations can range in two minutes, some can range for

23         five minutes.  Part of it, again, as I stated, was

24         discovered when I was looking for information regarding

25         two F O I A requests.

```
 1        can find anything on X.
 2   Q.   But do you have any training on what constitutes probable
 3        cause or what right 4th amendment rights suspects have and
 4        so on?
 5   A.   No, I don't.
 6   Q.   I'd like to move on with Exhibit 1.  If you look down to
 7        roughly the bottom third of the page, you write it was at
 8        this point I made a decision as keeper of records to check
 9        further conversations to see if there was more information
10        in regard to the incident.  Is that the further
11        investigation that you just described?
12   A.   Pertaining to this incident.
13   Q.   To the incident that you learned about on February 4th,
14        2011?
15   A.   Correct.
16   Q.   At the very bottom you state, "Enclosed are a set of
17        recordings and written descriptions of the audio
18        recordings previously discussed that you had requested."
19        Did Chief Boykins request audio cassettes and written
20        descriptions?
21   A.   Yes, he did.
22   Q.   When did he make that request?
23   A.   The last week of December 2011.
24   Q.   And did you -- what prompted him to make that request?
25   A.   We were talking in the back hallway.  It was right after
```

1    Christmas.  He stated, by the way, I may need to speak to

2    the mayor regarding some incidents that you had, you know,

3    informed me of.  And so I will need you to pull that

4    information.

5  Q. Okay.  The information in Exhibit 1, I believe that it's

6    dated January 4th, 2012, did you present this information

7    to Chief Boykins prior to writing the memo?

8  A. No.

9  Q. So you never discussed any -- discussed this with him

10    before writing the memo?

11  A. No.

12  Q. Well, then what did he -- how did he have the opportunity

13    to request recordings of it?

14  A. Well, we didn't talk -- I didn't present this to him.  We

15    had verbal discussions.

16  Q. Okay.  And when were those verbal discussions?

17  A. My first discussion with him, I believe, regarding this

18    incident, I believe it was sometime in March, 2011.

19  Q. And what exactly had you told him that you had uncovered

20    tapes and that he had -- or rather had listened to the

21    tapes and found this information, you brought this to him;

22    is that correct?

23  A. I advised him that in checking the equipment and we'd had

24    several maintenance problems, one of the issues was I'd

25    like to see it get replaced, I told him that I discovered

Rough Draft                                                              67

1          information that I felt was either conduct unbecoming an

2          officer or possibly illegal, and that I felt he had a need

3          to know about it.

4    Q.    And what did he say to you in response?

5    A.    Well, he listened to what I had to say, and pertaining to

6          some of the information that's not in this particular

7          memo, he couldn't hardly believe it.  He was crushed.

8                    MR. SULLIVAN:  Objection, non-responsive of what

9               he asked you.

10   Q.    My question was not how did he react emotionally.  The

11         question is what did he say?  What words came out of his

12         mouth?

13                   MR. DIXON:  Can we just get a specific

14              restriction here on not talking about anything

15              specific as to the content?

16   Q.    Yes.  But you can't mention -- other than any references

17         to what's on those tapes?

18   A.    Then it's somewhat hard to explain.

19   Q.    That's the problem.  Did he say anything other than --

20         other than referring to what was on those tapes, did he

21         say anything?

22   A.    He said I'll get back to you.

23   Q.    Did he ask you to listen to anymore tapes?

24   A.    No, he did not.

25   Q.    Did you tell him that you were going to listen to

**Rough Draft**                                                          68

1      additional conversations?

2   A.   No, because I wasn't planning to do that at that

3        particular point.

4   Q.   Although you ultimately did?

5   A.   Yes.  I discovered things when I was looking for

6        information for the Freedom of Information Act.

7   Q.   And did you report that to Chief Boykins?

8   A.   Yes, verbally.

9           MR. McQUARY:  What -- and, by the way, I am

10          terribly sorry that I keep mispronouncing your last

11          name, Aladean.

12          MS. DeROSE:  DeRose.  That's fine.

13          MR. McQUARY:  DeRose.  I am so sorry.

14          MR. PFEIFER:  I wrote it right there.

15  BY MR. McQUARY:

16  Q.   When did you report to Boykins the additional information?

17  A.   We had one conversation, I believe, we had one

18       conversation in August.  I may have gone back and spoke to

19       him sometime in May regarding the incidents.  And my

20       reasoning in August was when I discovered further

21       information I wanted him to be aware because I was going

22       on a medical leave of absence.  One of the things I

23       discovered, I had taken that information to Chief

24       Richmond.  And I just matter of fact asked Chief Boykins

25       did chief Richmond tell you this?  And he stated no.  So

**Rough Draft**                                                    69

1       245 that's when I explained it to him.

2   Q.  Just for clarification, is all the information that you've

3       discovered, this additional information, was that on the

4       telephone line being used by Captain Young?

5   A.  Yes.

6   Q.  Were there any additional lines that you were listening to

7       that formed the basis of that information?

8   A.  I listened to all of the telephone lines trying to find

9       where this had first begun and occurred.  As in relation

10      to a complaint that was made against an officer.  Again,

11      it was an allegation made against an officer, and I was --

12      it was signed off as disclosable information, so I was

13      checking all the lines at that time, including his.

14  Q.  Including his.  When you say you listened to all lines,

15      surely you don't mean you listened to every line in the

16      South Bend Police Department?

17  A.  No.  Just the recorded lines of the front desk, 2

18      communications center, the incoming chief's office line,

19      the detective incoming line.  It was -- the particular

20      thing I was looking for was someone that was making an

21      allegation against an officer.  So I was waiting to try to

22      see if I could find.  I went and checked the server to see

23      if this call which included a manager of a business, I

24      tried to see if I could track it that way by the phone

25      number of the business which I could not.  I knew that the