UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| CITY OF SOUTH BEND, BY ITS CORPORATION COUNSEL ALADEAN M. DEROSE. | ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | 3:12-CV- 475 |
| UNITED STATES OF AMERICA, ERIC H. HOLDER, JR., IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STAES, SOUTH BEND COMMON COUNCIL, TIM CORBETT, DAVE WELLS, STEVE RICHMOND, BRIAN YOUNG, AND SANDY YOUNG, | ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

**SOUTH BEND COMMON COUNCIL'S RESPONSE IN OPPOSITION TO THE CITY OF SOUTH BEND'S MOTION FOR SUMMARY JUDGMENT AND THE MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS TIM CORBETT, STEVE RICHMOND, DAVE WELLS, BRIAN YOUNG, AND SANDY YOUNG.**

Comes now Defendant, the South Bend Common Council, by counsel, pursuant to F.R.C.P. 56 and files its Response in Opposition to the City of South Bend's Motion for Summary Judgment and the Motion for Summary Judgment filed by Defendants Tim Corbett, Steve Richmond, Dave Wells, Brian Young, and Sandy Young (collectively, the "South Bend Officers"). The undisputed evidence establishes that the recorded telephone conversations at issue were recorded in the ordinary course of the business of the South Bend Police Department and, therefore, are not subject to the Federal Wiretap Act. Therefore, the City of South Bend's Motion for Summary Judgment and the South Bend Officers' Motion for Summary Judgment

should be denied.[1] Furthermore, the Court should grant the South Bend Common Council's Motion for Summary Judgment.

## INTRODUCTION

The City of South Bend (the "City") was informed at the end of July 2012 that the South Bend Common Council would serve it with a subpoena for copies of tapes and/or digital recordings recorded at the South Bend Police Department. The actual subpoena was issued pursuant to Ind. Code 36-4-6-21(b)(2) on August 14, 2012. This subpoena requested the recordings within seven days. The City failed to respond within seven days. Instead of responding, or filing objections to the subpoena, the City, on August 30, 2012, filed a Complaint for Declaratory Judgment in this Court. (*See* DE# 1). In its Complaint for Declaratory Judgment, the City took a *neutral* position. Specifically, the City alleged that:

> The City does not wish to unnecessarily withhold the Recordings from the Council and wishes to comply with any subpoena duly authorized under state or federal law. But the City also cannot violate federal law and subject itself or Mayor Buttigieg to potential civil and criminal liability by disclosing the Recordings in violation of the Federal Wiretap Act. Accordingly, the City will not disclose the Recordings to the Council absent a declaration from this Court that disclosure of the Recordings would not violate the Federal Wiretap Act or any other Applicable federal law.

(DE #1, pp. 5-6, ¶ 20).

Although the City filed the above captioned declaratory judgment action from a purported neutral position, on December 13, 2013, the City filed the Motion for Summary Judgment underlying the present Response, along with a supporting Brief, in which the City abandons its neutral position and argues that the recordings at issue should not be disclosed to

---

[1] The South Bend Officers filed their Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment on December 13, 2013. (*See* DE# 94 and 94-1). In their supporting brief, the South Bend Officers "join[ed] in the City of South Bend's 'Statement of Undisputed Material Facts'" and the South Bend Officers make essentially the same arguments as the City of South Bend. (*See* DE# 94-1, p. 2). Therefore, all of the arguments set forth below are asserted collectively against both the City of South Bend and the South Bend Officers.

2

the South Bend Common Council. Specifically, the City wrongfully argues the recordings at issue are subject to and violate the Wiretap Act. (DE# 96, p. 11). As such, the City concludes that "the City is entitled to summary judgment and cannot be required to disclose the contents of the Recordings in any form." (DE# 96, p. 20). Not coincidentally, four days after filing its Motion for Summary Judgment, the City filed a Stipulation to Dismiss Certain Claims (DE# 97) after settling with all of the individuals involved in this lawsuit except Karen DePaepe. Ironically, the City settled these claims before giving this Court an opportunity to rule on the City's Complaint for Declaratory Judgment.

Accordingly, the central issue underlying the above captioned declaratory judgment action (and the Motions for Summary Judgment filed by the City and the South Bend Officers) is whether the recordings at issue are excluded from Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (the "Wiretap Act"). On December 13, 2013, the South Bend Common Council filed a Motion for Summary Judgment, along with a supporting memorandum, in which the South Bend Common Council argued that summary judgment in its favor is appropriate because the undisputed material facts establish that the recordings of the phone lines of the South Bend Police Department are not illegal or barred by the Federal Wiretap Act. (DE# 91, p. 21). For the reasons set forth below, and for the reasons set forth in the South Bend Common Council's Motion for Summary Judgment and supporting memorandum, which are incorporated herein by reference, the City's motion for summary judgment should be denied and the South Bend Common Council's Motion for Summary Judgment should be granted.

## STATEMENT OF MATERIAL FACTS

The material facts in this case are not disputed. The South Bend Common Council asserts that the following undisputed facts are material and mandate the denial of the City's Motion for

Summary Judgment and the entry of summary judgment in favor of the South Bend Common Council:

1. Karen DePaepe was hired by the South Bend Police Department on January 25, 1987 as a Communications Specialist. She was promoted to Communications Supervisor in 1995. As the Communications Supervisor, Karen's duties included pulling tapes off of the Dictaphone reel-to-reel recording system. (Affidavit of Karen DePaepe, attached as Exhibit "A," at ¶ 1.)

2. Karen was promoted to Director of Communications in 1998. At that time, Darrell Gunn was the Chief of Police and Rick Kilgore was Division Chief of Services. Gary Horvath was Captain of Planning and Research and replaced the Dictaphone reel-to-reel recording system with a Dynamic Instrument Reliant Recording System. The installation of the Dynamic Instrument Reliant Recording System occurred between July and December 1998. (Affidavit of Karen DePaepe at ¶ 2.)

3. Between 1987 and through 1998 while the Dictaphone reel-to-reel system was in place, a number of telephone lines were being recorded on a 24-hour basis. These lines were the front-desk lines (three), the communication center lines (nine workstations), and the lines assigned to the uniform commander (three). The purpose for the recording of these lines was to insure that the calls being received were handled correctly and to be able to have a record of phone conversations if in fact a member of the public complained about not being treated appropriately, as well as preserving any information regarding ongoing investigations received from anonymous tips. (Affidavit of Karen DePaepe at ¶ 3.)

4. The Dictaphone reel-to-reel recording system was replaced by the Dynamic Instrument Recording System between July and December 1998. (Affidavit of Karen DePaepe at ¶ 4.)

5. After the Dynamic Instrument Reliant Recording System was installed in the second half of 1998, the Chief of Police, Darrell Gunn, directed that additional phone lines were to be added as lines to be recorded lines. These lines were the Chief of Police's, two incoming lines, two incoming lines to the Detective Bureau and the line that was assigned to the Internal Affairs Division. Karen was advised that the purpose of adding these additional lines was to insure that calls were being handled correctly and also to be able to preserve any type of anonymous information being received by the police department as well as to preserve information received by the public regarding complaints referencing police personnel. (Affidavit of Karen DePaepe at ¶ 5.)

6. The phone line for the Captain of the Records Bureau was added as a recorded line in 1999. (Affidavit of Karen DePaepe at ¶ 6.)

7. Around 2003, Thomas Fautz became the South Bend Police Department's Chief of Police. Police Chief Fautz directed Karen to add the above-stated lines to be recorded and added the following lines to be recorded: The private line in the office of the Chief of Police, the phone line assigned to the Uniform Division Chief, and the phone line assigned to the Detective Bureau Chief. The reason again was to preserve information that was coming in through anonymous tips as well as to preserve information received from the public to insure that any complaints be made or handled correctly. (Affidavit of Karen DePaepe at ¶ 7.)

8. In approximately 2006, Chief Fautz directed Karen to add the incoming lines of the Records Bureau to be recorded because of complaints by the public that they were getting incorrect information regarding vehicular impounds. (Affidavit of Karen DePaepe at ¶ 8.)

9. In 2007, when Chief Darryl Boykins was appointed Chief of Police, the same phone lines being recorded under Chief Fautz continued to be recorded. (Affidavit of Karen DePaepe at ¶ 9, 10.)

10. As part of Karen's normal procedures, she advised Chief Boykins that the above-stated lines were currently being recorded on a 24-hour basis. From the time Chief Boykins assumed command to the date that Karen was terminated from the police department, there were no additions or deletions of the lines that were being recorded by the Dynamic Instrument Reliant recording system. (Affidavit of Karen DePaepe at ¶ 11.)

11. Any telephone line that was designated as a recorded line was recorded continually, 24 hours a day, seven days a week. (Affidavit of Karen DePaepe at ¶ 12.)

12. At no time during her tenure as Director of Communications was Karen ordered to place a particular individual's phone line on the recording system. The phone lines placed on the recording system were the lines assigned to a particular office and once placed on the recording system, all calls placed on that particular phone line were recorded regardless of the individuals who were assigned to that office. (Affidavit of Karen DePaepe at ¶ 13.)

13. During Karen's time as Director of Communications, she was routinely requested by police officers, City attorneys, and outside law enforcement agencies to listen and look for certain recorded conversations that were recorded by the system for a wide variety of reasons, including criminal investigations, internal affairs investigations, citizen complaints regarding

6

police personnel, as well as Freedom of Information Act requests. At no time were the recording practices questioned by anyone. (Affidavit of Karen DePaepe at ¶ 14.)

14. At no time while he was Chief of Police did Chief Boykins order Karen to listen to phone conversations that were recorded. (Boykins dep., attached as Exhibit "B," p. 58, ll. 5-12.)

15. From October 2010 to January 2011, the Dynamic Instrument Reliant Recording System began to have multiple DVD drive failures. It was discovered that some of the audio recordings were lost due to the system failures. As part of Karen's duties as Director of Communications, she was required to maintain the system. As part of those requirements, Karen had to check the entire recording system after the final replacement of the DVD drive in January 2011. (Affidavit of Karen DePaepe at ¶ 15.)

16. It was during the period in January 2011 when Karen was checking to see if the system was operating after numerous repairs that she discovered the first of the conversations which was subsequently recorded and given to Chief Boykins. (Affidavit of Karen DePaepe at ¶ 16.)

17. In July 2011, the City attorney, Aladean DeRose, in response to a Freedom of Information Act request, advised one of the requestors, Nancy Bruce of ABC 57, to contact Karen at her office and that Karen was to cooperate with her in locating any recordings of telephone conversations concerning the request. Pursuant to the request from the City attorney, Karen began to look for the recordings that Nancy Bruce insisted existed. Karen checked all telephone lines looking for anything related to the information requested by the Freedom of Information Act request. It was during this search of the phone lines that Karen located

additional conversations which she subsequently reported to Chief Boykins and which are the subject of the lawsuit. (Affidavit of Karen DePaepe at ¶ 17.)

18. On December 30, 2011, Chief Boykins requested Karen to make copies of the recorded conversations that she had earlier advised him of, indicating that he might need to discuss them with the mayor. (Affidavit of Karen DePaepe at ¶ 18.)

19. On January 6, 2012, Karen provided Chief Boykins with five cassette tapes containing nine recorded telephone conversations and one recorded voice mail. Karen also provided Chief Boykins with a document entitled "Tape 1, Tape 2, Tape 3, Tape 4, and Tape 5." The document had a short synopsis explaining each recording with the time, date, how many seconds of audio traffic and a brief narrative of what was discussed. The document was not an actual transcript, but would provide Chief Boykins with enough information to determine if he wanted to discuss these individual recordings with the mayor. (Affidavit of Karen DePaepe at ¶ 19.)

20. Karen informed Chief Boykins that she listened to some conversations because there was a malfunction in the system. (Boykins dep., p. 57, l. 17 – p. 58, l. 4, p. 58, ll. 13-16.)

21. Karen DePaepe had the responsibility for maintaining the recording system. (Dep. of Thomas Fautz, attached as Exhibit "C," p. 8, ll. 16-18.).)

22. Any adding or deleting recorded lines would have to be done through Karen and the Chief of Police would have the authority to approve or authorize the changes. (Dep. of Thomas Fautz, p. 8, l. 24 – p. 9, l. 11.)

23. If Karen, as the Director of Communications, was listening to tapes within the scope of her employment and heard something that she believed was related to illegal conduct, it

would be within the course and scope of her employment to inform someone higher up in the chain of command. (Dep. of Thomas Fautz, p. 64, ll. 6-16.)

24. It would also be within the scope of the Director of Communications' employment to inform someone higher in the chain of command if she heard information regarding unethical conduct. (Dep. of Thomas Fautz, p. 64, ll. 17-20.)

25. Chief Fautz testified that the purpose of the recording system was to document complaints and to use as a tool as a legitimate business purpose. (Dep. of Thomas Fautz, p. 20, ll. 19-22.)

26. In Chief Fautz's opinion, the recording of lines into a police station is something that is ordinarily done by other police stations around the country. According to Chief Fautz, recording lines is just a good business practice and is common practice. In the South Bend Police Department, recording telephone lines was to document complaints from the public and to be transparent with the public. (Dep. of Thomas Fautz, p. 20, l. 19 – p. 22, l. 25.)

27. Under Chief Fautz, the recording system was never used to intimidate, embarrass or harass anyone, but rather, was used as a tool to gather evidence and to serve as a tool for the individuals who had their lines taped to either defend themselves or document what had taken place. (Dep. of Thomas Fautz, p. 20, ll. 4-18.)

28. When Chief Boykins assumed command, he continued recording the same lines as had been recorded under Chief Fautz. (Boykins dep., p. 98, ll. 15-18.)

29. In making the decision to record the same lines, Chief Boykins assumed that Chief Fautz had the system recording lines for legitimate business purposes of the South Bend Police Department. (Boykins dep., p. 98, ll. 19-23.)

30.     The same phone lines that were recorded under Chief Fautz continued to be recorded under Chief Boykins with no changes during Chief Boykins' entire time as Chief. (Boykins dep., p. 98, l. 24 – p. 99, l. 4.)

## ARGUMENT

The City's principal argument in support of its Motion for Summary Judgment is that:

> The capture of Capt. Young's telephone calls constituted an interception under the [Wiretap] Act because the undisputed facts show that the recording was not done in the ordinary course or for a law enforcement purpose…[and as such]…the recordings are subject to and violate the Act as a matter of law and the City is entitled to summary judgment.

(DE# 96, p. 11). Contrary to this argument, the South Bend Common Counsel's Memorandum in Support of its Motion for Summary Judgment explains, in detail, how the recordings at issue are excluded from the Wiretap Act by virtue of the "Ordinary Course Exclusion" contained in 18 U.S.C. § 2510(5)(a)(ii).[2] That explanation, which is incorporated herein by reference, is currently pending before the Court and it will not be repeated here. Rather, the purpose of this Response is to dispel the legal and factual inaccuracies of the City's Brief that are not addressed by the South Bend Common Counsel's Memorandum in Support of its Motion for Summary Judgment.

In that regard, in support of its argument that the Ordinary Course Exclusion does not apply, the City points to the fact that the South Bend Police Department does not record *all* incoming and outgoing telephone calls. Specifically, the City asserts that "[t]hus, as *Amati* makes clear, only 'routine taping of *all* telephone calls made to and from a police station' has been held to fall within the law enforcement exception." (DE# 96, p. 12). Contrary to the City's argument, nothing in *Amati* suggests that all telephone calls must be recorded for the Ordinary Course Exclusion to apply. In other words, the issue of whether a recording is done in the "ordinary"

---

[2] The Ordinary Course Exclusion provides that recordings captured by "any telephone or telegraph instrument, equipment or facility, or any component thereof…being used…by an investigative or law enforcement officer in the ordinary course of his duties" are not subject to the Wiretap Act. 18 U.S.C. § 2510(5)(a)(ii).

10

course of a law enforcement officer's duties does not depend on whether all calls to and from the police department are being recorded. Rather, whether the Ordinary Course Exclusion applies depends on whether the nature of the recordings at issue can be "reasonably interpreted to refer to *routine noninvestigative recording of telephone conversations*." *Amati v. City of Woodstock*, 176 F.3d 952, 955 (7th Cir. 1999) (emphasis added).

Here, although it is true that not *all* of the calls to and from the South Bend Police Department were being recorded, that does not refute the undisputed evidence that the recordings at issue are properly characterized as "routine noninvestigative recording of telephone conversations." Indeed, the lines were recorded 24 hours a day, seven days a week. The lines were recorded in the ordinary business of the South Bend Police Department to document the calls for legitimate business purposes, including: documenting complaints against the police department and police personnel; recording and preserving information from anonymous tips; and insuring that calls being received were handled correctly. Such recordings are common place among police departments nationwide and, as the Seventh Circuit noted in *Amati*, are well known and well established. The phone lines were not recorded in order to trick people in making damaging admissions over the phone or as a device for intimidation, suppression of criticism, blackmail, embarrassment or other improper motives.

Moreover, courts sitting in the Seventh Circuit have held that the Ordinary Course Exclusion can apply regardless of whether all calls to and from a police station are being recorded. *See Jandak v. Brookfield*, 520 F. Supp. 815 (N.D. Ill. 1981). In *Jandak*, Fred Jandak ("Fred") found out his wife, Susan ("Susan"), was having an affair with Officer Thomas J. Capaccio of the Brookfield Police Department ("department"). *Id*. at 817. Fred informed the police chief of the affair, and subsequently, the police chief initiated an investigation into the

situation. *Id*. During the course of this investigation, the police chief listened to a telephone conversation between Officer Capaccio and Susan that had been recorded by the department's telephone recording system. *Id*. at 818. The department's telephone system consisted of ten lines total, nine of which were recorded. *Id*. at 817-18. In holding that the Ordinary Course Exclusion applied, the court explained that:

> Police departments commonly have recording systems like that of defendants, due to the need to preserve and be capable of accurately recalling messages pertaining to emergencies or to official police business. To further these purposes, defendants engaged a communications common carrier to install a recording system, to record emergency and investigative calls, as an integral component of the communications system used by the police department in performing its duties to the public. Such a system indiscriminately and routinely records all activities on established designated lines, and is not comparable to the selective use of recording equipment to eavesdrop on a normally unmonitored telephone system in order to record specifically selected communications. There is little doubt that Congress did not intend the statute to apply to routine recording of emergency and investigative calls as an integral component of a police station telephone system like that of defendants. Accordingly, the court concludes that the recording device used by defendants falls within the definition of telephone equipment or component as used in [the Ordinary Course Exclusion].

*Id*. at 822. Thus, similar to *Amati*, the court's rationale in *Jandak* indicates that the issue of whether the Ordinary Course Exclusion applies depends on the police station's underlying reasons for recording the calls in the first place. Whether all lines are being recorded is not dispositive to this analysis.

Also in support of its argument that the Ordinary Course Exclusion does not apply, the City asserts that "[t]he presence of a policy specifying which lines are recorded is one indication of whether the Police Department's action were pursuant to an 'ordinary course.'" (DE# 96, p. 13). Notably, the City admits that a policy existed at the South Bend Police Department with respect to recording telephone conversations—it was just an "*ad hoc*" policy as opposed to a formal written policy. (DE# 96, p. 14). However, the City goes on to assert that "[h]ere it is

12

undisputed…that *no* policy existed which established the 'routine taping of all telephone calls made to and from a police station'" and that the recordings "were not done pursuant to any formal written policy but were simply a practice established at some point by a Chief's personal decision." (DE# 96, p. 13).

The City cites no authority in support of its proposition that Ordinary Course Exclusion should not apply in this case because the South Bend Police Department did not record the calls at issue pursuant to some sort of formal policy. Nothing in the Ordinary Course Exclusion (18 U.S.C. § 2510(5)(a)(ii)), *Amati*, *Jandak*, or any other interpreting case law suggests that a formal policy is a prerequisite to the applicability of the Ordinary Course Exclusion. The argument that a formal written policy is necessary for the ordinary course exclusion to apply is tantamount to the argument made by the unsuccessful plaintiffs in *Amati* —that "wiretapping cannot be in the ordinary course of law enforcement unless there is express notice to the people whose conversations are being listened to"— because requiring a formal written policy would be the same as requiring notice. *Amati*, 176 F.3d at 955. However, as explained in *Amati*:

> The plaintiffs argue that wiretapping cannot be 'in the ordinary course of law enforcement' unless there is express notice to the people whose conversations are being listened to. The statute does not say this, and it cannot be right. If there is actual notice…there will normally be implied consent. So if the "ordinary course" exclusion required proof of notice, it would have no function in the statute because there is a separate statutory exclusion for cases in which one party to the communication has consented to the interception.

*Id*. (internal citations omitted).

Moreover, the fact that the South Bend Police Department was not recording the calls at issue pursuant to a formal written policy does not defeat the fact that the calls were "routine noninvestigative recording of telephone conversations," which is the operative inquiry with respect to the Ordinary Course Exclusion.

13

The City also alleges that the Ordinary Course Exclusion does not apply because "there was nothing 'routine' about the fact that Capt. Young's assigned line was being recorded" because the assigned line was being recorded by mistake. (DE #96, p. 14). (*See also* DE# 96, p. 11) (alleging that "All parties agree that the recordings at issue were captured off [Capt. Young's line]" and that "Young received that line as part of a re-shuffling of positions and offices.")). This argument fails because the recordings at issue were not being recorded by mistake. The fact that Captain Young (or anyone else at the South Bend Police Department) did not consent to having his telephone line recorded does not mean that the recording of his line was a mistake. Rather, the practice of recording telephone calls at the South Bend Police Department was well known and well established. When the decision was made to record a given telephone line at the South Bend Police Department, that decision was based on the *physical office* to which that line was routed, not the particular individual who would be using that line. (Affidavit of Karen DePaepe at ¶ 13.). "The phone lines placed on the recording system were the lines assigned to a particular office and once placed on the recording system, all calls placed on that particular phone line were recorded *regardless of the individuals who were assigned to that office*." (Affidavit of Karen DePaepe at ¶ 13.) (emphasis added). Thus, the South Bend Police Department intended to record every call made on the telephone line assigned to Captain Young's physical office. The fact that Captain Young "received that line as part of a re-shuffling of positions and offices" is wholly irrelevant; there was no question that the telephone line in Captain Young's office was being recorded.

On an related note, the City cites *Abraham v. County of Greenville*, 237 F.3d 386, 389 (4th Cir. S.C. 2001) for the proposition that: "[a]n assigned line, recorded by mistake could not have been recorded pursuant to any policy or practice of the Police Department and therefore

simply could not have been part of the 'ordinary course' of its officer's duties." (DE# 96, p. 14). The recordings at issue in *Abraham* are distinguishable from the present matter because the recorded phone calls in *Abraham* were between county judges, whereas the recordings at issue in the present matter involved law enforcement officers. Moreover, in *Abraham*, the court made the following distinction between recorded conversations involving law enforcement officers versus conversations involving county judges:

> [C]ourts have considered different categories of phone calls recorded by a single recording system separately for application of the law enforcement exception. Such an approach is necessary to prevent the law enforcement exception from swallowing the rule. Very often, judges, attorneys, and other administrators share the same facilities with law enforcement personnel. If the law enforcement exception looked only to the wiretapping device, then law enforcement agencies could record all of the telephone lines in a building so long as some lines were monitored in the ordinary course of the law enforcement officers' duties. This cannot be what Congress meant. The law enforcement exception may not be read to allow a single recording device to deconstruct the whole system of separation of powers and permit law enforcement officers to routinely record the daily conversations of judges who may sit in cases to which law enforcement is a party.

*Id*. at 390-91 (internal citations and quotation marks omitted). The court also distinguished between the question of whether the law enforcement exception applied and whether the County intentionally intercepted the judges' communications. *Id*. at 391. Significantly, the court noted that civil liability only attaches to intentional interceptions not inadvertent ones. See *Id*. (citing 18 U.S.C. § 2511(1)(a) and *Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 742-43 (4th Cir. 1994).

Accordingly, as explained above, the telephone calls at issue in the present matter were not recorded by mistake. Moreover, *Abraham* would not be instructive on this matter because the dispositive factor in that case was that it was not a legitimate police objective to record judge's telephone lines. Here, unlike in *Abraham*, the recordings at issue involved law enforcement officers and were recorded in the ordinary course of business of the South Bend Police Department for the legitimate law enforcement purposes of documenting complaints against the

15

y

w

police department, recording information from anonymous tips, and insuring calls received by the police department were handled correctly.

Finally, the City points to Judge Posner's statement in *Amati* that:

> What would not be routine would be if the police, in order to trick people into making damaging admissions over the phone, announced that calls to and from the police department were not being recorded, and then recorded them anyway.

*Amati*, 176 F.3d at 956. The City then goes on to allege that "[I]n the case at bar, the Police Department did indeed 'announce' that calls to and from the police department were *not* being recorded." (DE #96, p. 15). According to the City, "[t]hat announcement came by virtue of an administrative approach that allowed officers with assigned lines to choose whether to be recorded at their own specific time and for their own specific purpose." (DE #96, p. 15).

This argument is unpersuasive because the "announcement" alluded to by the City is not the type of "announcement" referenced by Judge Posner in the above quoted passage of *Amati*. The "announcement" referenced by Judge Posner is a type of announcement intended to "trick people into making damaging admissions over the phone." Here, there is simply no allegation that the South Bend Police Department made any sort of announcement with the *intention* to "trick people into making damaging admissions over the phone."

### ADDITIONAL ARGUMENT BY THE SOUTH BEND OFFICERS

Although the Motions for Summary Judgment filed by the City and the South Bend Officers make identical arguments in almost all respects, there is one difference between the two Motions that should be brought to the Court's attention. Namely, in addition to the arguments above, in their Brief in Support of Motion for Summary Judgment, the South Bend Officers assert that:

> From the filing of its Answer, the City of South Bend admitted that the interception and recording of the telephone lines was not authorized by a court

16

> order, nor conducted in the ordinary course of business…The Common Council's stance that the recordings fell under the ordinary course of business exclusion under the definition section of the Wiretap Act conflicted with the City's Answer. The City, of course, was in a better position to know whether the exclusion applied.

(DE# 94-1, p. 6).

This assertion by the South Bend Officers deserves special attention for two reasons. First, contrary to the South Bend Officers' allegation, the City was not, in fact, "in a better position to know whether the [Ordinary Course Exclusion] applied." If the City knew whether the Ordinary Course Exclusion applied, the City would not have filed its Complaint for Declaratory Judgment. Second, the South Bend Common Council does not adopt, and expressly rejects, the City's admission that the recordings at issue were not conducted by the South Bend Police Department in the ordinary course of business. *See Keller v. United States*, 58 F.3d 1194, 1198, n.8 (7th Cir. 1995) ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, *that are binding upon the party making them*.") (emphasis added); *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 680 (7th Cir. 2002) (same).

## CONCLUSION

The recordings at issue in this case do not violate the Wiretap Act because they are excluded from the Wiretap Act by the Ordinary Course Exclusion. (*See* South Bend Common Council's Motion for Summary Judgment and supporting memorandum, DE# 90-91). As observed by Judge Poser in *Amati*, "[t]he invasion of privacy was regrettable, but if all Congress had cared about was the protection of privacy it would not have written an exception for electronic eavesdropping in the ordinary course of law enforcement into the statute." *Amati*, 176 F.3d at 956. For the reasons set forth above, the City's arguments in support of its Motion for

Summary Judgment are unpersuasive and unsupported by applicable statutory and judicial authority. Therefore, the Motion for Summary Judgment filed by the City of South Bend and the Motion for Summary Judgment filed by the South Bend Officers should be denied. Furthermore, the Court should grant the South Bend Common Council's Motion for Summary Judgment.

/s/Robert J. Palmer
E. Spencer Walton, Jr. (1000-71)
Robert J. Palmer (6316-71)
Attorneys for South Bend Common Council

**MAY • OBERFELL • LORBER**
4100 Edison Lakes Parkway, Suite 100
Mishawaka, IN  46545
Phone: (574) 243-4100
Fax: (574) 232-9789
rpalmer@maylorber.com

**CERTIFICATE OF SERVICE**

I certify that a copy of the forgoing was served upon all attorneys of record via the Court's ECF system on January 27, 2014.

/s/Robert J. Palmer
Robert J. Palmer

F:\Clients\S1060\12001\Pleadings - Fed Ct\Response to City of South Bend's MSJ\2014-1-27 Response to City of South Bend's MSJ.docx
1/27/14