```
                                            UNITED STATES DISTRICT COURT
                                            NORTHERN DISTRICT OF INDIANA
                                                 SOUTH BEND DIVISION
CITY OF SOUTH BEND,              )
    Plaintiff,                   )
        vs.                      )
SOUTH BEND COMMON COUNCIL,       ) CAUSE NO.:
ET AL.,                          ) 3:12:cv-475
    Defendants.                  )
BRIAN YOUNG, SANDY YOUNG,        )
TIMOTHY CORBETT, DAVID WELLS,    )
and STEVE RICHMOND,              ) CAUSE NO.:
    Plaintiffs,                  ) 3:12-cv-532-JVB-CAN
        vs.                      )
THE CITY OF SOUTH BEND, Acting   )
Through its Police Department,   )
DARRYL BOYKINS, Individually     )
and in his Official Capacity as  )
Chief of Police, KAREN DEPAEPE,  )
and SCOTT DUERRING,              )
    Defendants.                  )

            The deposition of: THOMAS FAUTZ.
            DATE:   Tuesday, April 16, 2013.
            TIME:   4:36 p.m.   EST.
            PLACE:  May, Oberfell and Lorber
                    4100 Edison Lakes Parkway
                    Mishawaka, Indiana 46545
            Called as a witness by the defendants, Scott
Duerring and Karen Depaepe, pursuant to notice of deposition
as to date, place and time, and in accordance with the
Indiana Rules of Civil Procedure, and as reported by
MICHELLE A. WHITAKER, Notary Public, RPR, Associate
Reporter.
                 MARILYN M. JONES & ASSOCIATES, LTD.
                    COMPUTER-ASSISTED REPORTERS
                         1416 FRANKLIN STREET
                    MICHIGAN CITY, INDIANA 46360
                          (219) 879-4077
```

Page 2

```
 1          APPEARANCES:
 2          FAEGRE BAKER DANIELS
         BY: EDWARD A. SULLIVAN, III
 3   202 S. Michigan Street, Suite 1400
        South Bend, Indiana 46601-2020
 4          (574) 234-4149
         ed.sullivan@faegrebd.com
 5
     Appearing on behalf of the plaintiff
 6          City of South Bend
 7
            CITY OF SOUTH BEND
 8       BY: ALADEAN M. DeROSE
          County-City Building
 9       South Bend, Indiana 46601
10          (574) 235-5866
     Appearing on behalf of the plaintiff
11          City of South Bend
12
         PFEIFER MORGAN & STESIAK
13        BY: DANIEL PFEIFER
        53600 North Ironwood Drive
14       South Bend, Indiana 46635
            (574) 272-2870
15       dpfeifer@pilawyers.com
16   Appearing on behalf of the plaintiffs
   Brian Young, Sandy Young, Timothy Corbett, David Wells and
17          Steve Richmond
18     DIXON, WRIGHT & ASSOCIATES, P.C.
          BY: THOMAS M. DIXON
19        55255 Birchwood Court
          Osceola, Indiana 46561
20          (574) 315-6455
         tdixon3902@comcast.net
21
     Appearing on behalf of the defendant
22          Darryl Boykins
23
24
25
```

Page 3

```
 1  APPEARANCES CONTINUED:
 2  DUERRING LAW OFFICES
     BY: MARIELENA DUERRING
 3      Colonia Place
      61191 US 31 South
 4    South Bend, Indiana 46614
        (574) 968-0250
 5     attymduerring@aol.com
 6  Appearing on behalf of the defendants
      Scott Duerring and Karen Depaepe
 7
 8      MAY, OBERFELL, LORBER
        BY: ROBERT J. PALMER
 9      4100 Edison Lakes Parkway
        Mishawaka, Indiana 46545
10         (574) 243-4100
         ewalton@maylorber.com
11
12  Appearing on behalf of the South Bend Common Council
13
14      ALSO PRESENT:
15
         Scott Duerring
16       Darryl Boykins
         Brian Young
17
18      THOMAS FAUTZ DEPOSITION EXHIBITS:
19  2 - Sworn statement of Thomas Fautz
20  4 - Office of professional standards, seven-page document
21  (Exhibits Two and Four marked in a previous deposition and
22  utilized herein.)
23  6 - Position description
24            ---oOo---
25
```

Page 4

1 Tuesday, April 16, 2013 --
2        (All parties present in the conference room
3        at or about 4:36 p.m.  Witness sworn.)
4  THOMAS FAUTZ
5     Having been first duly sworn, then testified as
6  follows:
7  DIRECT EXAMINATION
8  BY MS. DUERRING:
9     Q.  Can you go ahead and state your name.
10    A.  Thomas Fautz.  F as in Frank, a-u-t-z as in zebra.
11    Q.  How do you prefer I refer to you today?
12    A.  "Tom" is fine.
13    Q.  Okay.  Tom, have you ever been deposed before?
14    A.  Yes.
15    Q.  Just a couple ground rules before we get started.
16 Obviously, you need to answer out loud for purposes of the
17 court reporter.  Try to avoid nodding the head or shaking
18 the head or um-hums or huh-ums, 'cause they don't go down
19 very clearly on the record.  And I'll try to remind you if
20 you have that tendency.
21       If I ask a question that you don't understand,
22 please indicate that to me so I can rephrase it or repeat
23 it.  Otherwise, I'm going to assume that you understood the
24 question that I asked and your response reflects that
25 understanding.

1 (Pages 1 to 4)

EXHIBIT C

Page 5

1  And lastly, if you need a break, just let me know.
2  All right?
3  A. Thank you.
4  Q. Are you currently employed?
5  A. Yes.
6  Q. And where do you work?
7  A. Martin's Supermarket Corporation.
8  Q. What is your position with Martin's?
9  A. Director of security.
10 Q. How long have you worked for Martin's?
11 A. A little over five years.
12 Q. What was your previous employment?
13 A. City of South Bend Police Department.
14 Q. How long did you work for the City of South Bend
15 Police Department?
16 A. A little over -- about thirty-four and a half
17 years.
18 Q. And what was the highest position that you reached
19 during your tenure at the City of South Bend Police
20 Department?
21 A. I retired as the chief of police.
22 Q. How long were you in the position of chief of
23 police?
24 A. I always get this confused. It's 2002 --
25 September of 2002. Don't know the exact date. Sometimes I

Page 6

1  get confused at 2001, but it was 2002.
2  Q. And your retirement date was when?
3  A. December 28th, 2007.
4  Q. Who was the chief prior to you?
5  A. Larry Bennett.
6  Q. I'd like you to think specifically to the time
7  period of 2002 through 2007, when you were the chief of
8  police. At some point during your tenure as chief of
9  police, did you become aware that there was a system in
10 place that allowed you to record phone lines?
11 A. Yes, I did.
12 Q. And when did you become aware of said system?
13 A. Well, over -- over many years, I knew there was
14 lines recorded. Having worked homicide and other
15 investigations, I knew 911 lines and certain lines at the
16 front desk were recorded.
17     When I became chief of police, I gained a little
18 more knowledge on specifics about the taping system.
19 Q. Who educated you with respect to the specifics?
20 A. Karen Depaepe.
21 Q. Now, at the beginning of your time period as
22 chief, were you ever presented information with respect to
23 lines that had been typically recorded?
24 A. Not that I can recall.
25 Q. Okay. Did you become aware of which lines were

Page 7

1  recorded?
2  A. Yes.
3  Q. And how did that happen?
4  A. Can't say specifically. It was either through the
5  division chief Kilgore or through Karen. I really can't say
6  specifically.
7  Q. Thinking about this time period right at the
8  beginning of your time as chief of police, what lines were
9  recorded at that time?
10 A. It's my understanding, but I had no firsthand
11 knowledge, that at that time, the front desk, the radio
12 room, the detective bureau chief's office -- not office, but
13 the secretary, I should say, the chief of police's
14 secretary.
15     Let me think here. I believe -- I believe that
16 was it.
17     I think there was a phone in the -- what would be
18 called the uniform supervisor's office, that the line rolled
19 over to that -- from the front desk. Those phones weren't
20 being asked.
21     I think that's it, as far as I can remember.
22 Q. Were you familiar with the mechanics of that
23 system?
24 A. I knew that the old system prior to me becoming
25 chief -- and I'm not sure when it changed over -- was

Page 8

1  reel-to-reel. Like I say, being involved in investigations,
2  at times you would -- you would seek evidence, especially in
3  homicide. And at some point, it changed to digital. When
4  that happened, I can't say for sure.
5  Q. When the change was made to digital, did you have
6  a specific understanding of how that system worked to
7  actually capture phone calls?
8  A. I knew it was -- it was a lot easier for Karen to
9  obtain specific times. And I think the retention of tapes
10 was longer. But as far as getting into the mechanics of it,
11 no, I was never briefed or was involved in that.
12 Q. During the entire time that you were chief of
13 police, was Karen the individual that administered that
14 system?
15 A. Yes.
16 Q. Did she also have the responsibility for
17 maintaining that system?
18 A. Yes.
19 Q. Now, if changes were to be made to the system, did
20 that have to be approved by you?
21 A. I would say either myself or one of the division
22 chiefs. Services chief specifically. There was no specific
23 protocol, so to speak.
24 Q. And let me be a little bit more specific. When I
25 say "changes," I mean in the sense of adding any additional

Page 9

1 lines or subtracting lines that were recorded lines under
2 the system.
3   A. Again, it would have to be done through Karen.
4 However, there was no specifics on that the chief had to do
5 it or that the division chief in services who oversaw that
6 division was in charge of that. But I would expect that it
7 would be something that the chief would have the major
8 say-so on approving or authorizing.
9   Q. And when you say "chief," you mean chief of
10 police --
11   A. Yes.
12   Q. -- and not just a division chief?
13   A. Yes.
14   Q. Were you familiar with the mechanics of how a line
15 was actually recorded?
16   A. No.
17   Q. Now, you had testified that when you first became
18 chief, that you were aware that certain lines were being
19 recorded. Were you aware of the rationale behind why those
20 lines were recorded?
21   A. The rationale simply would be to record
22 conversations from the public calling in to, say, 911,
23 reporting of a crime that could potentially become evidence
24 at some point. The front desk, same thing. Some people
25 call that number instead of the 911 system, for police

Page 10

1 assistance. And it's used to document -- document calls as
2 an investigative tool and documentation.
3   Q. Did there ever come a point in time that you
4 authorized additional lines to be added to the recording
5 system itself?
6   A. Yes.
7   Q. And can you tell me specifically what lines were
8 added.
9   A. It was -- and again, this is about eight years
10 ago. So, it was I would say sometime in late 2004,
11 mid-2004, in that time frame. As we were transitioning
12 from -- the police department was going through a remodel
13 process, and we were transitioning into the remodeled
14 section to where there was better office space. Internal
15 affairs had their own suite of rooms. There were some
16 changes made in that way.
17       And at that time, we were under a lot of scrutiny
18 by the public, being accused, especially being attacked, on
19 how we handled complaints and that we did not adequately
20 document complaints or respond to them. So, we wanted --
21 there was open discussion amongst the command staff on, you
22 know, how do we improve on this and how do we protect
23 ourselves. Because we really felt like we were doing an
24 adequate job in handling complaints.
25       In fact had -- had extended to -- as an example,

Page 11

1 some people were claiming that they didn't want to come down
2 to the police station, they felt intimidated. So, we --
3 through the park department, human rights commission, we
4 obtained space over there on a bus line, handicap
5 accessible, allowing people to go there for complaints. So,
6 we really felt -- we added IA pro to track individual
7 officers. We were trying to do everything we could to be as
8 transparent with the public yet document what we were doing.
9       At that time, Chief Eugene Kyle, who was the
10 detective chief, had requested that his line be taped.
11 Based on that conversation, it opened the door of what other
12 lines do we want to tape. Decided that my line would be
13 taped, Chief Kyle's line would be taped, and that Jim
14 Hassag, who was the uniform chief at the time, that his line
15 would be taped, all with everybody's knowledge.
16       And Chief Kyle's specific request, he asked that
17 it be taped. The rest of us said, "Well, yeah, that's the
18 way to document." It would be a useful tool for that
19 individual person whose office it was at to use to be able
20 to document conversations and anyone that called in, to show
21 that we were responsive.
22       At the same time, because internal affairs was
23 moving into their suite and John -- Lieutenant John Collins
24 was the investigator for that section, one of the lines in
25 internal affairs was taped as well. And John Collins was

Page 12

1 made aware of that.
2       So, as far as -- as far as I can relect --
3 recollect, the only time I requested that any changes be
4 made that was -- was that one time. And that was to add
5 those particular lines.
6   Q. Okay. Now, it sounds like you basically were
7 designating lines that were associated with the officers
8 that were in positions of authority. Is that fair to say?
9   A. Positions of authority, we didn't -- like the
10 services chief or the community relations chief, they really
11 didn't deal with a whole lot of specific complaints about
12 not investigating properly or internal-affairs-type things
13 or complaints against officers, so theirs were not included.
14       But Chief Kyle, who was in the investigative
15 division, and Chief Hassag, who ran the uniform division,
16 which is usually the most high-profile area, and myself,
17 those were the ones, you know, that we designated.
18   Q. So, if I understand you correctly, these chiefs
19 that were in positions that frequently dealt with the
20 public?
21   A. Correct.
22   Q. And these were the individuals that, I guess for
23 lack of a better word, would be subjected to potential
24 complaints?
25   A. Correct. And it provided them with a tool that

Page 17

1 the lead -- leading expert there, and anything you would
2 want done or you requested something for a case, you would
3 have to go through Karen, who has the ability to monitor or
4 make copies of tapes.
5    Q. Okay. Now, Karen's position was communications
6 director while you were there. Is that correct?
7    A. Yes.
8    Q. And is it fair to say that you were in Karen's
9 direct chain of command?
10    A. Well, she reported directly to Chief Kilgore, but
11 then I was in charge of the department.
12        THE DUERRING: Pass the witness.
13 CROSS EXAMINATION
14 BY MR. DIXON:
15    Q. You gave a sworn statement, right, to Mr. Pfeifer,
16 at his law firm in October of 2012, right?
17    A. Yes.
18    Q. Did you review that in anticipation of this
19 deposition?
20    A. Yes, I did. And I did find one mistake.
21    Q. I'm not --
22    A. Oh, okay.
23    Q. I'll let you go to that, but you'll knock me off
24 stride.
25    A. Sure.

Page 18

1    Q. Do you have it with you now?
2    A. I have just been handed a copy.
3    Q. Okay. Turn to page four. Let's look at lines
4 nine through eleven. I'll just read it and you can confirm
5 if I've read it correctly. Okay? "There was one line in
6 that section that belonged to Chief Eugene Kyle, and upon
7 his request, that line was, on my authority taped." Right?
8 That's what it says?
9    A. Yes.
10    Q. Is that the mistake that you're talking about?
11    A. No.
12    Q. Okay. So, that's a correct statement? All --
13 everything I read there is a correct statement of yours?
14    A. Chief Kyle requested his line be taped, and it
15 was.
16    Q. On your authority?
17    A. Yes.
18    Q. In other words, you were ultimately the one who
19 said yes, that's okay to do?
20    A. Yes.
21    Q. And if you would have said no, then it wouldn't
22 have been done?
23    A. No, it wouldn't have.
24    Q. And if Kyle had come to you and said I want to get
25 some dirt on my neighbor who keeps calling in on me for --

Page 19

1 you know, I sold him a car and it's a lemon, can you tape my
2 line, you would have said no?
3    A. I can't say definitely no. I'd have to hear
4 everything about it, and I would probably consult the city
5 attorney on it.
6    Q. From my description, would that -- would that
7 appear to you -- just in your opinion. I'm not asking you
8 to make a legal judgment. But from my description -- and
9 I'll repeat it. He says I want my line recorded because I
10 sold a car to my neighbor that's a lemon and now he's giving
11 me a hard time about it.
12    A. Well, giving a hard time --
13        MR. PFEIFER: Objection. Asked and answered,
14    first of all. And secondly, I don't even know
15    that there's a question.
16        MR. DIXON: I didn't -- well, I want to
17    finish the question.
18        MR. PFEIFER: Okay.
19    Q. So, would that appear -- would recording that line
20 based just on that information that I gave to you -- would
21 that appear to you to be a law enforcement purpose?
22    A. On what you said right there, if there's no
23 threats, "I'm gonna kill you," those kinds of things, I
24 would probably say no.
25        MR. DIXON: Okay. I don't have any further

Page 20

1    questions. Thank you.
2 CROSS EXAMINATION
3 BY MR. PALMER:
4    Q. Under your command, was the recording system ever
5 used to intimidate anyone?
6    A. Not -- not to my knowledge.
7    Q. Was that a motivation for implementing the
8 recording system?
9    A. No. It was -- it was to gather evidence and --
10 and serve as a tool for those individuals who had their
11 lines taped to either defend themselves or document what had
12 taken place.
13    Q. And that would be the same answer if I asked you
14 if the motivation was to embarrass or harass anyone?
15    A. I would not put up with that.
16    Q. The answer would be the same, that that was not a
17 motivation?
18    A. Yes.
19    Q. Would you consider the purposes to document
20 complaints and to use as a tool to be a legitimate business
21 purpose?
22    A. Yes.
23    Q. In your opinion or to your knowledge, is the
24 recording of lines into a police station something that's
25 ordinarily done by other police stations around the country?

Page 21

1    MR. PFEIFER: Object to the form of the
2    question unless you identify which lines you're
3    talking about. Are you talking about all lines or
4    certain lines. So, I'll object to the form of the
5    question.
6    MR. PALMER: All lines.
7    MR. SULLIVAN: Objection. Lack of
8    foundation.
9    Go ahead.
10   A. Could you repeat the question. I want to --
11   Q. To your knowledge, is it ordinary and customary
12   for police departments around the country in the United
13   States to record at least some lines coming into the
14   office -- into the station?
15   A. Yes.
16   MR. SULLIVAN: Same objection.
17   Q. And what do you base that answer on?
18   A. Just good business practices. I mean, in this day
19   and age, you certainly -- in a 911 call, it happens so
20   quick, sometimes you want to go back and hear exactly what's
21   said. Provides evidence. I'm sure smaller agencies maybe
22   don't. But agencies the size of South Bend would certainly
23   have some type of a recording system, I would think. Can't
24   say specifically, but I would think.
25   Q. How did you come about this knowledge? Was it

Page 22

1    through discussions with other police chiefs? through
2    reading? Your knowledge about use of recorded lines in
3    other police stations.
4    A. I guess I would just be speculating, because I
5    can't say for sure. I mean, I have worked investigations
6    with other departments where, you know, they had evidence,
7    or just watching on TV, you know, when they play 911 tapes
8    and those kind of -- type of things. I would assume that
9    most police departments would, you know, capture that.
10   Q. And it's not simply for 911 calls, if I understand
11   your testimony. It's also to document complaints about
12   individual officers or procedures that the police department
13   have employed in following up?
14   A. I really can't speak for --
15   Q. For your --
16   A. I'm trying to act as an expert here talking about
17   other departments.
18   Q. Let me rephrase the question.
19   A. But I think it's common practice.
20   Q. Let me rephrase the question. In your
21   department -- in the South Bend Police Department, it was
22   not simply for 911 calls that you taped lines, but it was
23   also to document complaints from the public and to, as you
24   said -- used the word, be transparent with the public?
25   A. Yes.

Page 23

1    MR. PALMER: That's all the questions I have.
2    CROSS EXAMINATION
3    BY MR. SULLIVAN:
4    Q. Chief, who followed you in the position of South
5    Bend Police Department chief?
6    A. Chief Darryl Boykins.
7    Q. Chief Boykins. And was he a division chief under
8    you before that?
9    A. Yes, he was.
10   Q. What --
11   A. He was the uniform division chief.
12   Q. Okay. Was he in that position when -- if memory
13   serves me, I think you were describing conversations that
14   you had to establish this practice of recording some of
15   these lines. Was he a part of those conversations?
16   A. No.
17   Q. Okay. Why not?
18   A. He wasn't in that position at that time.
19   Q. Do you recall what position he was in at that time
20   those conversations took place?
21   A. He would have been a captain. I believe he might
22   have been with internal affairs, but I -- I can't say for
23   sure.
24   Q. That's fine.
25        Now, when you were chief of police, it was one of

Page 24

1    your responsibilities to establish practices and procedures
2    for the department?
3    A. Yes.
4    Q. Okay. Is the policies for the South Bend Police
5    Department contained in the duty manual?
6    A. Yes.
7    Q. If the duty manual is changed, does that have to
8    be approved by the board of public safety?
9    A. Yes.
10   Q. But as far as the practice that occurs in the
11   department, you don't go to the board of public safety for
12   that?
13   A. No.
14   Q. That was under your authority to develop and
15   establish practices and procedures?
16   A. Yes. Yes.
17   Q. Was it ever the practice of the South Bend Police
18   Department, while you were the chief, to designate certain
19   division chiefs as having telephone lines to be recorded at
20   all times? That is, the position rather than the person who
21   happened to be in the position? Was it ever the practice?
22   A. No.
23   Q. Did you ever intend to establish that practice?
24   A. No.
25   Q. Was it ever the practice of the South Bend Police

**Page 61**

1 know about it. And we weren't out there to broadcast it or
2 put on the news that anybody calling in to internal affairs
3 would be taped.
4 Q. I'm not talking about making a press release. I'm
5 talking about letting police officers -- all the police
6 officers on the department know which lines are recorded.
7     MR. SULLIVAN: Objection. Argumentative.
8     Asked and answered.
9 Q. Well, I mean, that's what my -- that's what my
10 question is. Is that -- is it the same answer with that
11 question?
12 A. Yeah. I mean, you know, I guess there's a lot of
13 ways -- in looking back on things, could you have done
14 things differently? Certainly. Did what we thought was
15 best at the time, and, you know, that's pretty much it.
16 Q. Well, I'm just trying to understand this
17 expectation of privacy. And it's an important issue in this
18 case. And I'm also trying to understand what procedures you
19 implemented in order to presumably protect that expectation
20 of privacy. I'm not trying to second-guess you. I'm just
21 trying to understand how things went on back then.
22     Did -- do you believe that a police officer had an
23 expectation of privacy in their own -- just in the space of
24 their own office?
25     MR. SULLIVAN: Objection. Vague. And it

**Page 62**

1     calls for a legal conclusion.
2     Go ahead.
3 A. I mean, you know, could you be a little more
4 specific what -- like, searching their desk or those --
5 those kinds of things? I mean -- or peeking in the window
6 or -- you know, I'm not --
7 Q. Just anything. If they -- if an officer goes into
8 his private office and closes the door, does he have an
9 expectation of privacy?
10     MR. SULLIVAN: Objection. Vague. Calls for
11     a legal conclusion.
12     Go ahead.
13 A. I don't know the legal conclusion. I would say
14 out of just common courtesy, yes.
15 Q. I've been informed that when you became chief of
16 police you had your office searched for bugs. Is that
17 correct?
18 A. I think --
19     MR. PFEIFER: Objection. Relevance.
20     MR. SULLIVAN: Lack of foundation.
21     MR. PFEIFER: And outside the scope of what
22     these depositions are intended to encompass.
23     MR. DIXON: No. It's right within the -- the
24     whole issue is the expectation of privacy. If he
25     didn't -- if the chief didn't have an expectation

**Page 63**

1 of privacy in his own office when he became the
2 chief of police, that runs directly to the issue
3 of whether or not a police officer has an
4 expectation of privacy on the telephone line.
5 That's the equipment of the city.
6     MR. PFEIFER: I made my objection.
7 Q. So, did you have your office searched for bugs
8 when you became the chief of police?
9 A. I think all the chiefs did. It's kind of a
10 common-type thing.
11     MR. DIXON: All right. Thank you. I don't
12     have any other questions.
13 RECROSS EXAMINATION
14 BY MR. PALMER:
15 Q. Tom, you -- you testified at great length your
16 practices regarding what you would do when you either added
17 or if a situation would come up where you were terminating a
18 line that was being taped, that you would have an officer
19 consent to it. You've testified as to your -- what your
20 practices were?
21 A. Yes.
22 Q. Were those practices ever reduced to writing?
23 A. No.
24 Q. Were those practices ever passed on from a prior
25 police chief to you?

**Page 64**

1 A. No.
2 Q. Were those practices ever passed on from you to
3 Chief Boykins?
4 A. No. Other than the conversation about, you know,
5 it's your option.
6 Q. You also testified as to director of
7 communications having, within the scope of that job,
8 listening to tapes in -- in respect to maintaining the
9 system or if the state police requested or if there was a
10 FOIAR -- FOIA request. If the director of communications
11 was listening to the tapes within the scope of her
12 employment and heard something that he or she believed was
13 relating to illegal contact -- illegal conduct, would it be
14 within the course and scope of her employment to inform
15 someone higher up the chain of command?
16 A. Yes.
17 Q. The same question regarding unethical conduct.
18 Would it be within her scope and course of employment to
19 relay that to someone higher in the chain of command?
20 A. Yes.
21     MR. PALMER: That's all the questions I have.
22 RECROSS EXAMINATION
23 BY MR. SULLIVAN:
24 Q. Chief, appreciate your patience a little more. Do
25 you recall the questions from -- I think it was Attorney