# In The Matter Of:

*City of South Bend, et al -v-*
*South Bend Common Council, et al*

*Karen DePaepe*
*April 15, 2013*
*Rough Draft*

*Midwest Reporting, Inc.*
*1448 Lincolnway East*
*South Bend, Indiana 46613*
*574-288-4242*
*reporters@midwestreporting.net*

Original File DePaepe Karen Rough.txt

**Rough Draft**                                                    1

DISCLAIMER

You have requested an unedited, non-certified transcript.  This rough-draft transcript has been requested in the form of either a realtime hookup to your computer or an ASCII file delivered after the close of the proceedings.

This realtime transcript is available only to counsel who order a certified original or a certified copy of today's proceedings.

The realtime draft may contain untranslated stenographic symbols, an occasional reporter's note, a misspelled proper name and/or nonsensical word combinations.  All such entries will be corrected on the final certified transcript and final ASCII file.

Due to the need to correct entries prior to certification, you agree to use this realtime draft only for the purpose of augmenting counsel's notes and not to use or cite it in any court proceeding or to distribute it to any other parties.

**Rough Draft**                                                    2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CITY OF SOUTH BEND,                    )
                    Plaintiff,         )
                                       )
        vs                             )
                                       )
SOUTH BEND COMMON COUNCIL, TIM         )
CORBETT, DAVE WELLS, STEVE             )
RICHMOND, BRIAN YOUNG, and SANDY       )   Case No.
YOUNG,                                 )   3:12-CV-475
                    Defendants.        )
- - - - - - - - - - - - - - - - - - -  )
BRIAN YOUNG, SANDY YOUNG,              )
TIMOTHY CORBETT, DAVID WELLS,          )
and STEVE RICHMOND,                    )
                    Plaintiffs,        )
                                       )
        vs                             )
                                       )
THE CITY OF SOUTH BEND Acting          )
through its Police Department,         )
DARRYL BOYKINS, Individually and       )
in his Official Capacity as            )
Chief of Police, KAREN DePAEPE,        )
and SCOTT DUERRING,                    )
                    Defendants.        )
- - - - - - - - - - - - - - - - - - -  )

CONFIDENTIAL
The Videotaped Deposition of KAREN DePAEPE

        Date:        Monday, April 15, 2013

        Time:        9:12 a.m.

        Place:       Pfeifer, Morgan & Stesiak
                     53600 North Ironwood Drive
                     South Bend, Indiana 46635

    Called as a witness by the Defendants/Plaintiffs
    in accordance with the Federal Rules of Civil
    Procedure for the United States District
    Court, Northern District of Indiana, South Bend
    Division, pursuant to Notice.

Reported by
Angela J. Galipeau, RPR, CSR
Notary Public, State of Indiana

**Rough Draft**                                                           3

1   APPEARANCES:

2   MR. EDWARD A. SULLIVAN, III
          Faegre Baker Daniels, LLP
3         1400 Key Bank Building
          202 South Michigan Street
4         South Bend, Indiana 46601
          (574) 239-1930
5         edward.sullivan@faegreBD.com

6   MS. ALADEAN M. DEROSE
          City Attorney
7         227 West Jefferson Boulevard, Suite 1400
          South Bend, Indiana 46601
8         (574) 234-5091

9         For the Plaintiff/Defendants, The City of South
          Bend;
10
    MR. DANIEL H. PFEIFER
11  MR. JEFFREY J. STESIAK
          Pfeifer, Morgan & Stesiak
12        53600 North Ironwood Drive
          South Bend, Indiana 46635
13        (574) 272-2870

14  MR. JEFFREY S. McQUARY
          Brown, Tompkins, Lory & Mastrian
15        608 Market Street
          Indianapolis, Indiana 46202
16        (317) 631-6866

17        For the Defendants/Plaintiffs, Tim Corbett, Dave
          Wells, Steve Richmond, Brian Young, and Sandy
18        Young;

19  MR. E. SPENCER WALTON, JR.
          May Oberfell Lorber
20        4100 Edison Lakes Parkway
          Mishawaka, Indiana 46545
21        (574) 243-4100
          ewalton@maylorber.com
22
          For the Defendant, South Bend Common Council;
23

24

25

**Rough Draft**                                                          4

```
1     MR. THOMAS M. DIXON
            Dixon, Wright & Associates, P.C.
2           55255 Birchwood Court
            Osceola, Indiana 46561
3           (574) 315-6455

4           For the Defendant, Darryl Boykins;

5     MS. MARIELENA DUERRING
            Duerring Law Offices
6           61191 U.S. 31 South
            South Bend, Indiana 46614
7           (574) 968-0250

8           For the Defendants, Karen DePaepe and Scott
            Duerring;

9
      ALSO PRESENT
10          Ms. Laura Switalski, CLVS, Midwest Reporting
            Mr. Brian Young
11          Ms. Sandy Young
            Mr. Timothy Corbett
12          Mr. David Wells
            Mr. Scott Duerring.

13                    *         *         *

14

15

16

17

18

19

20

21

22

23

24

25
```

**Rough Draft**                                                          5

1    VIDEOGRAPHER:  Please swear in the deponent.

2                   KAREN DePAEPE

3    called as a witness by the Defendants/Plaintiffs, having

4    first been duly sworn, was examined and testified as

5    follows:

6                   DIRECT EXAMINATION

7    BY MR. McQUARY:

8    Q.  Ms. DePaepe, my name is Jeff McQuary.  I represent the

9        plaintiffs in this lawsuit who, as you probably know, have

10       brought a lawsuit against the City of South Bend and

11       several other individuals, including you.  We are here to

12       take your deposition.  Have you been deposed before?

13   A.  Yes, I have.

14   Q.  How many times?

15   A.  Once.

16   Q.  Was that in a civil case or a criminal case?

17   A.  Criminal case.

18   Q.  Were you a witness in the -- or a victim in the criminal

19       case?

20   A.  A witness.

21   Q.  Well, this will be very similar.  Let me just explain

22       briefly what we're going to do.  A deposition is just like

23       testifying in court, except obviously you're not in a

24       courtroom today.  We have our court reporter, Angela, is

25       who is going to use that equipment to take down what --

1    all the words that everyone says.  It is very powerful,

2    but it does have some limitations.

3        The most important are that it cannot take down --

4    she cannot take down gestures.  So even though it's very

5    natural to speak with your hands or to say uh-huh and

6    huh-uh, try to speak your words in English, even though

7    you might not do that in ordinary conversation.  Also, in

8    normal conversation, people speak on top of each other.

9        It's very common for one person to begin answering a

10   question before the other person has even asked it.

11   Please don't do that because then Angela will not be able

12   to know who is talking.  And also, please, don't be

13   offended if I remind you from time to time.  I'm not

14   trying to get on your case or make your nervous.  I just

15   want to make sure that there's a record that everyone can

16   understand a year from now when people don't quite

17   recollect.

18       I'll be asking you a series of questions.  If at any

19   time you don't understand one of my questions, please let

20   me know.  I and the other attorneys who may also ask you

21   questions will be happy to repeat it or rephrase it.  If

22   you don't let us know that you don't understand, we will

23   assume that you understand the question; is that fair?

24 A.  Yes.

25 Q.  And also you're not a prisoner here.  If you need to take

Rough Draft                                                                7

1    a break at any time, whether it's to go to the bathroom or

2    get a drink of water or because you would like to confer

3    with your attorney, Ms. Duerring, you are free to do so.

4    Just let me know and we will take the break.  The only

5    exception to that is that if there is a question pending,

6    you must answer the question before you take a break.  Do

7    you have any questions for me about what we're going to do

8    today?

9  A.  No, I do not.

10 Q.  All right.  Well, could you please state your name, full

11     legal name for the record?

12 A.  My name is Karen Marie DePaepe.

13 Q.  And could you spell that?

14 A.  Yes.  It's K-a-r-e-n, M-a-r-i-e, D-e, capital P-a-e-p-e.

15 Q.  And what's your age today?  You don't have to tell me your

16     birthday, just your age as of today?

17 A.  54.

18 Q.  What's your address?

19 A.  3205 Spring Brook Drive.

20 Q.  Did you --

21 A.  South Bend, Indiana 46614.

22 Q.  Did you grow up in South Bend?

23 A.  Yes, I did.

24 Q.  Did you go to high school in South Bend?

25 A.  Yes, I did.

Rough Draft                                                                    8

1   Q.  Where did you go?

2   A.  To James Whitcomb Riley High School.

3   Q.  Are you married?

4   A.  Yes, I am.

5   Q.  To whom are you married?

6   A.  To Rick McGee.

7   Q.  Is he a police officer?

8   A.  Yes, he is.

9   Q.  Which police agency employs him?

10  A.  The South Bend Police Department.

11  Q.  Could you tell me if you looked at any documents in order

12      to prepare for this deposition?

13  A.  Yes, I did.

14  Q.  Okay.  What documents were those?

15  A.  I believe I looked at some e-mails at my attorney's

16      office.

17  Q.  Who were the e-mails to and from?

18  A.  One in particular was an e-mail I sent to Division Chief

19      Gary Horvath.

20  Q.  What did that e-mail say?

21  A.  It was an e-mail that I sent him on August 29th of 2011.

22      He had verbally requested that I send him a list of the

23      audio recorded lines of the South Bend Police Department,

24      of which I sent him an attachment with that list.

25  Q.  Was that e-mail a part of your initial disclosures that

Rough Draft                                                          9

1          your attorney sent out?

2    A.    Yes.

3    Q.    Any other documents that you looked at?

4    A.    We looked at the list of the recorded audio telephone

5          lines.

6    Q.    What you sent Horvath, in other words?

7    A.    Right.

8    Q.    Okay.  Anything else?

9    A.    I know we looked at other documents per se.  I can't

10         remember exactly which ones.  We had several meetings.

11   Q.    Of course.  Did you look at any reports you may have

12         written or memos?

13   A.    Briefly I looked at an officer's report, just briefly.

14   Q.    Okay.  Is this one that you wrote?

15   A.    Yes.

16   Q.    Was it directed to then Chief Boykins?

17   A.    Yes, it was.

18   Q.    Any other documents?

19   A.    There may have been, but I do not recall.

20   Q.    How about conversations you may have had with anyone other

21         than Ms. Duerring, Mrs. Duerring.  I don't want to know

22         about that.  Anyone else?

23   A.    What type of conversations.

24   Q.    Conversations to prepare for this deposition?

25   A.    No.

1   Q.  Okay.  What did you do after graduating from high school?

2   A.  I worked for the St. Joseph bank and trust company for

3      approximately a little over a year in the installment loan

4      department, and I attended Indiana university at South

5      Bend.

6   Q.  Did you graduate from South Bend?

7   A.  From Indiana university.

8   Q.  Yeah, from I U in South Bend?

9   A.  No, I did not.

10  Q.  What did you do when you left that?

11  A.  Well, I was offered a job.  I had interned in humane

12     education while in college and I was offered a job with

13     the humane society of St. Joseph County to work as a human

14     educator.

15  Q.  How long did you do that?

16  A.  A little over three years, I believe.

17  Q.  Did you eventually become employed by the South Bend

18     Police Department?

19  A.  Yes, I did.

20  Q.  When did that happen?

21  A.  January 25 of 1987.

22  Q.  What brought you to the South Bend Police Department?

23  A.  I enjoyed by job at St. Joseph County humane society

24     however they had cut the benefits and no longer paid into

25     Social Security.  So at the age of 27 I had actually no

1    retirement plans and I was looking for something that

2    offered better benefits and retirement.

3  Q.  What was your position initially with the police

4    department?

5  A.  Communications specialist.

6  Q.  And what does a communications specialist do in I guess in

7    1987?

8  A.  That would be often referred to as a dispatcher.  You

9    receive incoming calls and dispatch calls for service for

10   police, fire and emergency medical services.

11 Q.  Okay.  How long were you a dispatcher?

12 A.  Approximately nine years.

13 Q.  What did you move into after that?

14 A.  I had temporarily transferred into the records bureau data

15   division while I was attending Indiana university, excuse

16   me, Ivy Tech.

17 Q.  And so you moved into what position?

18 A.  As a data operator.

19 Q.  And what does a data operator do?

20 A.  They would enter information pertaining to cases,

21   investigative cases.

22 Q.  After they were over?

23 A.  Correct.

24 Q.  How long were you in that position?

25 A.  Less than a year.

1   Q.   What did you move into after that?

2   A.   I was requested to apply as the communications supervisor.

3   Q.   And you did?

4   A.   Yes, I did.

5   Q.   And you got the job?

6   A.   Yes, I did.

7   Q.   When did you get that job?

8   A.   That was January 2 of 1996.

9   Q.   And is that the final position you held at the South Bend

10       Police Department?

11  A.   No.  I was promoted to the director of communications on

12       July 1st of 1998.

13  Q.   Okay.  So the supervisor reports to the director?

14  A.   Correct.

15  Q.   So how long total did you put into the South Bend Police

16       Department?

17  A.   Oh, a little over 25 years.

18  Q.   Could you tell me what your duties were as the director of

19       communications?

20  A.   Well, I had many duties.  My main duty was to oversee the

21       daily operations of the communications center and the

22       personnel.  I was also added to take responsibility of the

23       front desk personnel and the operations of the front desk.

24       That occurred around 2010.  I was the IDEX NCIC

25       coordinator for our department.

Rough Draft                                                          13

1   Q.   And could you just explain what that is?

2   A.   Certainly it's the Indiana data and communications system

3        and the national crime information center.  That would be

4        pertaining to all of the records stored by the FBI, the

5        state and the bureau of motor vehicles and the rules and

6        regulations pertaining to their use.

7   Q.   Is that the database and criminal history of --

8   A.   Yes.

9   Q.   -- individuals?

10  Q.   And to whom did you report when you were the director of

11       communications?

12  A.   I reported to several different persons.  If it had to do

13       with a fire incident, I would refer myself to the fire

14       chief or the chief of operations.  If it was Emergency

15       Medical Services, I reported to the chief of EMS.  If it

16       was a police matter, I would report to the Chief of

17       Police.  If it was a services matter or a personnel issue,

18       I would report to the division chief.

19  Q.   So your office serviced a number of different public

20       safety agencies?

21  A.   Correct.

22  Q.   Of which the South Bend Police Department was only one?

23  A.   That's correct.

24  Q.   In the course of your -- and one other question along that

25       lines, how many people reported to you as director?

Rough Draft                                            14

1  A.  It varied.  When I left it was 37 full-time employees.

2  Q.  Most of these were dispatchers?

3  A.  Dispatchers, communications supervisors, an assistant

4      director and then front desk personnel.

5  Q.  Ma'am, in the course of your almost 25 years with the

6      agency, did you come to know professionally Darryl

7      Boykins?

8  A.  Yes, I did.

9  Q.  How did you get to know him?  First of all, when did you

10     first get to meet him?

11 A.  Well, he was -- as I recall, he was a K 9 officer for many

12     years.  I didn't have much communication with him at that

13     time.  My first initial really working with him was when

14     he was the chief of uniform.  And then I had more

15     interaction as he became the Chief of Police.

16 Q.  When he was chief of police did you have daily interaction

17     with him?

18 A.  No.

19 Q.  Weekly?

20 A.  No.

21 Q.  Monthly?

22 A.  Sometimes monthly.

23 Q.  Would you socialize with Darryl Boykins?

24 A.  No.

25 Q.  Do you consider him a friend?

1   A.   I consider him a work acquaintance.

2   Q.   Okay.  How about Brian Young?

3   A.   I had interaction with Brian Young very periodically.  He

4        was assigned to different divisions of the police

5        department from time to time.  I can recall having some

6        conversations with him when he was the -- I believe the

7        lieutenant on the midnight shift.  And then I think the

8        next time I really had any interaction with him is when he

9        became the captain of the investigative bureau.

10  Q.   Did you have frequent interaction with him or just

11       occasionally?

12  A.   Just occasionally.

13  Q.   Did you ever socialize with him?

14  A.   No.

15  Q.   Have you met Sandy Young his wife?

16  A.   No.

17  Q.   Of course you've had professional acquaintance with her

18       either I assume?

19  A.   That's correct.

20  Q.   How about Steve Richmond.

21  A.   I knew Steve Richmond when he was assigned to the major

22       crimes division.  He and my husband were assigned in major

23       crimes in the same time, and as I recall he went into the

24       arson investigation and I didn't have too much

25       communication with him unless he requested information

1  from a 911 call or phone calls.

2      And then I had communication with him when he was the

3  captain of investigative bureau and as the division chief.

4  Q.  How about Tim Corbett?

5  A.  Yes.  When I was the afternoon communications supervisor,

6  he was the afternoons commander of the uniform division.

7  I worked with him periodically, usually calling him up

8  when he also became commander of the metro county homicide

9  unit.

10  Q.  How about David Wells?

11  A.  Yes, I knew David Wells when he was in patrol with South

12  Bend Police.  He was on the afternoon shift when I was the

13  afternoon communications supervisor.  And the same, I also

14  worked with him periodically if he called into the

15  communications center both as a supervisor and when I was

16  the director.

17  Q.  Would you socialize with any of these individuals?

18  A.  No.

19  Q.  Would you husband have any professional interaction with

20  any of those individuals?

21  A.  Yes.

22  Q.  Do you know which ones?

23  A.  I believe all.

24  Q.  Would he socialize with any of them?

25  A.  No, I do not believe so.

1   Q.   Ms. DePaepe, I'd like to ask you some questions about

2        South Bend Police Department's phone system.  I understand

3        that a new phone system has just been put in place; is

4        that correct?

5   A.   A VoIP telephone system was put in place.  Became

6        activated the first week of January, 2012.

7   Q.   Were you -- you were present when that was put into place?

8   A.   Yes, I was.

9   Q.   Were you heavily involved in the transition to doing the

10       new system?

11  A.   No, I was not.

12  Q.   Are you knowledgeable about the new system?

13  A.   Yes, I am.

14  Q.   Could you just describe -- and you were presumably

15       knowledgeable about the old system?

16  A.   Yes.

17  Q.   What was the old system?  If it's not VoIP, it was?

18  A.   It was a Centrex system.

19  Q.   And what does that mean?

20  A.   A Centrex would be a system that a business would use in

21       which they had certain numbers assigned to them such as a

22       prefix of 235 or 245.  Those lines were actually monitored

23       and handled through the Department of Information

24       Technology.  And the person that was the liaison for the

25       South Bend Police was Barb Holiman, the administrative

Rough Draft                                                                      18

1        assistant to the chief of police.

2   Q.   What was her role as liaison?

3   A.   She was the administrative assistant.  However, if someone

4        needed a phone line or if they needed a new telephone say

5        there's was mall fun assuming they would usually make

6        their request through her and she would make the request

7        through information technology.

8   Q.   How is VoIP different from that?

9   A.   Well, VoIP is managed by information technology.  The

10       difference in the phones from what it's been explained to

11       me is it's less costly.  It had more features than the

12       Centrex system did.  It is digital versus an analog

13       system.

14  Q.   Do the systems require a separate carrier such as AT&T

15       though, don't they?

16  A.   AT&T was a Meridian Centrex system.  The VoIP that I

17       believe at the time the city contracted was through a

18       company called net racks.  They're since merged with

19       another company and I do not know that name.

20  Q.   Does the city own the telephone lines themselves?

21  A.   I do not know that.

22  Q.   And was this the Centrex and VoIP systems for all of city

23       government or just for the police department or just

24       public safety?

25  A.   For all of city government.

1    Q.   During most of your tenure at South Bend Police Department

2         was the Centrex system I presume?

3    A.   That's correct.

4    Q.   Was in place.  Under the Centrex system did you are the

5         about if you so chosed to intercept or record a telephone

6         line?

7    A.   Not off of the Centrex system.  I managed the dynamic

8         instruments audio recording system point they're two

9         completely separate systems.

10   Q.   Explain -- could you repeat what that is?

11   A.   The dynamics reliance system is an audio recorder.  And it

12        can record anything that such as a radio channel or a

13        telephone line or a telephone workstation.

14   Q.   And as director of communications, you controlled that?

15   A.   I monitored and maintained it for the South Bend Police

16        Department.

17   Q.   And using -- I'm sorry, could you repeat that again,

18        dynamics information?

19   A.   Yes, it called the dynamic instrument reliance system.

20   Q.   Die that mix instrument reliance system?

21   A.   Yes.

22   Q.   Using the dynamic instrument reliance system, you could

23        intercept and record a telephone line?

24   A.   As directed by the chief of police.

25   Q.   Well, as this stage I'm just asking what's possible?

Rough Draft                                                  20

1   A.   Yes, it's possible.

2   Q.   And was, in fact, done?

3   A.   Yes.

4   Q.   In using this system, how would you do that?  So the chief

5        tells you I want to record this certain line, what do you

6        do?

7   A.   Well, first of all, you would have to contact either the

8        vendor, who was Steven Campbell & Associates, or their

9        subcontractor which was Telerap, here in South Bend.  They

10       would have to run wiring from the D Mark or the telephone

11       closet.  That was generally done through the ceiling of

12       the police department into the communications center where

13       the server itself, the dynamic instrument server was

14       housed and maintained.  The wires were affixed to a wall

15       in the communications center and then fed into the server.

16  Q.   How long does that take?

17  A.   It would depend on the technician and their ability to

18       provide that service.  Some were more skilled than others.

19       Generally, within about maybe three hours.

20  Q.   But it's not something you could -- so it could be done

21       the same day you requested it?

22  A.   Yes.

23  Q.   But it does require more than just typing a few commands

24       into a computer?

25  A.   Much more.

Rough Draft                                                    21

1  Q.  Once a line is being recorded, is it stored on a magnetic

2      tape, on a hard drive, digitally?

3  A.  It was first of all stored on a data card ridge, with

4      dynamic I understandments and then there was an upgrade to

5      the system with a new server and then it was stored on

6      DVD.

7  Q.  How long would the call be stored?

8  A.  Well, it's stored automatically for approximately a year

9      and a half on the server itself and it would automatically

10     purge information as the severabler got full.  On the DVD

11     themselves it just depended how busy times were.

12     Generally you would get six weeks of data, three weeks on

13     each side of a DVD would be stored.

14 Q.  I'm still not clear on how long it's kept though?

15 A.  I'm sorry.  I had a verbal director Tom Bodnar, there was

16     no written policy but a verbal directive that he wanted

17     things stored for three years.

18 Q.  And who is Tom Bodnar?

19 A.  Tom Bodnar was the city attorney.

20 Q.  And if a line is recorded absolutely everything gets

21     recorded so there's wrong numbers, personal calls, urgent

22     department business, it's all the same?

23 A.  That's correct.

24 Q.  Is it possible for someone to listen to a call in real

25     time as it's happening, perhaps --

Rough Draft                                                      22

1    A.  Yes, yes, it is.

2    Q.  Was that done?  And let me be clear, I mean someone that's

3        not a party to the call to tap into that line and listen

4        to the conversation as it's happening?

5    A.  It could be done.  There were times that we would monitor

6        front desk activity, especially if we had a new employee.

7    Q.  Any other times that that happened, that you can recall?

8    A.  Not to my knowledge.

9    Q.  If a line is being recorded, is some record kept of the

10       interception?  Is there always maintained a list of which

11       lines are being recorded?

12   A.  I would be the only person that would make a list.  I had

13       a list that was ongoing.  On the system itself, there may

14       have been a list.  However, I was not privy to that.  That

15       was -- at least I was not trained in how to access that.

16   Q.  How about this vendor, would the vendor keep a list of

17       what lines are recorded?

18   A.  No.

19   Q.  Then is there no log or something where someone can look

20       back in the past and see whether his calls were recorded?

21   A.  If you went into the dynamic instruments and you wanted to

22       do a search on a particular line or lines, you would put

23       in a date parameter and perhaps a channel.  You would

24       search on a particular channel, and it would list of log

25       of calls.  It would give a date and a time, and a sue doe

1    number.

2  Q.  What do you mean by a sue doe number?

3  A.  It would attach an ID to that particular data string.

4  Q.  Would this be a print out like my cell phone bill who

5      lists who I called or who called me and the number of

6      minutes and, you know, the time and the date of the call?

7  A.  It wasn't a print out.  It was something that was stored

8      within the server itself.  You could go in and

9      managerially make a print out of that.

10 Q.  But the information is available?

11 A.  Yes.

12 Q.  If you were -- it just depends on what form you wanted it?

13 A.  Correct.

14 Q.  In order to -- well, I guess the question next is -- do

15     you have to listen to a conversation to know that you

16     found the right one?  If someone or if you're going back

17     and looking for a recorded call, and the chief tells you I

18     want to know if John doe called on such and such a

19     recorded line because John doe is the subject of a

20     criminal investigation, would there be any way to find

21     out -- figure out and hone in on just John doe's call

22     without listening to the whole record?

23 A.  No.

24 Q.  Okay.  At any time while you were employed by the City of

25     South Bend, was there an additional written policy about

Rough Draft                                                                    24

1       which lines could be intercepted or recorded?

2    A.  No.

3    Q.  Well, who could order that a telephone line be

4        intercepted?

5    A.  The Chief of Police that had been the standard protocol.

6    Q.  Anyone besides the chief?

7    A.  No.

8    Q.  Say the chief had already ordered a certain line be

9        recorded.  Was there anyone besides the chief who could

10       come to you and say I know that this line is recorded.  I

11       want you to give me records of some conversation on that

12       line?

13   A.  There was no policy in place.  It depended on who was

14       asking and what they were asking for.

15   Q.  Well, so if someone came to you and said I'm doing a

16       criminal investigation and I think a snatch called in on

17       this certain line, can you go check, would any place men

18       in the department be able to get that?

19   A.  Usually if it was something such as a patrol officer

20       calling in and say they said they wanted a copy of a

21       pursuit or they wanted a copy of a certain call, myself

22       and my supervisor as I instructed them would tell them

23       they need to contact their commander so they could make

24       that request.

25   Q.  To your knowledge, were employees of the department told

1      what lines were routinely recorded?

2  A.  No.

3  Q.  Was there any disclosure or warning anywhere that -- given

4      to officers that their departmental lines might be

5      recorded?

6  A.  There was a general policy that was instilled in 2009 that

7      stated that there was no expectation of privacy on any

8      department equipment.

9  Q.  But it didn't mention telephones specifically?

10 A.  It didn't mention any equipment.  It just said any

11     department equipment.

12 Q.  Did you tell anyone that their lines were recorded?

13 A.  If they asked me.

14 Q.  Who asked you?

15 A.  Sometimes I would have detectives ask is my line recorded.

16     Sometimes it's because they actually wanted to have

17     recordings of certain conversations.  If patrol officers

18     wanted to use a phone call, phone they'd say is this line

19     recorded.  But there was nothing indicated on the phone

20     devices themselves.

21 Q.  And no general warning at a roll call that you're aware

22     of, you never put out a memo to anyone saying this is

23     what's recorded?

24 A.  No.  I don't write the policy for the South Bend Police

25     Department.

1   Q.  Fair enough.  During your employment at the department,

2       what lines were routinely recorded?

3   A.  It would vary depending on who the Chief of Police was.

4   Q.  Under Chief of Police Tom Fautz, let's say as of the month

5       before he departed, what lines were routinely -- and by

6       departed I mean retired.  What lines were recorded.

7   A.  There were several Centrex lines, there were the

8       workstations of the 911 center, the front desk telephone

9       workstations.

10  Q.  Anything else?

11  A.  Just certain Centrex lines that he had requested to be

12      recorded.

13  Q.  Do you know which Centrex lines he requested?

14  A.  I believe I have a list of them.

15  Q.  And, ma'am, I do have the list that you wrote, and I will

16      show that to you in a few minutes.  But I would like you

17      to answer from memory at the moment, if you can.

18  A.  There was 235-9311, 235-9312, 235-9313.  I believe it was

19      235 -- well, there were two lines incoming to the

20      investigative bureau.  There was 245-6031.  There was

21      235-9212.  There was the director of the records bureau.

22      I can't recall that line offhand.

23  Q.  Well, I'm impressed.  Could you tell me who those numbers

24      are associated with?  Who or which person or which

25      function?

1           MS. DUERRING:  If we could clarify the timeframe

2      that you you're asking.

3  Q.  One month before Tom Fautz retired as chief of police?

4  A.  At that point, it could have been incoming lines to the

5      Chief of Police, a private line of the chief of police, I

6      do not recall exactly what that number was.  That was a 74

7      or 75 number.  The uniform division chief office, the

8      detective of the investigative bureau, division chief

9      office.  The at the time it was the captain of the records

10      department.  The records bureau incoming line was added

11      just shortly before he left.  The front desk telephone

12      lines, the internal affairs investigator's line, all lines

13      incoming to the communication center.

14  Q.  And those would be the 911 calls?

15  A.  Yes, however, we also had approximately 40 other lines

16      that rang in to the communications center.  That was all

17      recorded by workstation and not particular phone line.

18  Q.  Okay.  You mentioned chief's private line.  Is that the

19      phone on the chief's desk?

20  A.  Yes.

21  Q.  Is there some other phone in his office besides that?

22  A.  I believe he had different lines that rang in.

23  Q.  So were all the lines recorded or just one?

24  A.  The lines at the time were recorded with the exception of

25      that.  And Chief Fautz asked to have it added on.

Rough Draft                                                                 28

1   Q.  So at some point in Chief Fautz tenure every line into his

2       office became recorded?

3   A.  I can't say every line.  I know that several lines.  I'm

4       not sure what all lines he had in there.

5   Q.  Do you know that the chief had the ability to make

6       unrecorded calls if he wanted to?

7   A.  I don't know that.

8   Q.  And you mentioned a division chief?

9   A.  Uh-huh.

10  Q.  Is it one division chief or were all division chiefs

11      recorded?

12  A.  Division chief of uniform and the division chief of the

13      investigative bureau, he did not request the division

14      chief of the services division to be recorded.

15  Q.  How many division chiefs are there?

16  A.  It varied.  At one point under his command there were four

17      division chiefs.  It then went down to three division

18      chiefs.

19  Q.  Was it ever the case under Tom Fautz that there was a

20      blanket rule that all division chiefs lines would be

21      recorded?

22  A.  No.

23  Q.  He would have to specify which ones would be recorded?

24  A.  He would specify which lines he wanted recorded.

25  Q.  Just by way of some background, could you explain the

1        distinction between a phone number and a phone line?

2   A.   Well, I'm not a phone technician.  I would say then a line

3        would be actually a telephone number assigned to that

4        line.  I think it would be easier to describe that some

5        phones were workstations and might have several lines

6        coming in on one phone apparatus versus some telephones

7        only had one line assigned to them.

8   Q.   To your knowledge, did Chief Fautz inform a division chief

9        when his line was being recorded?

10  A.   I have no information on that.

11  Q.   Did you inform a division chief when his line was being

12       recorded?

13  A.   I had.

14  Q.   Just as a matter of general policy or did you just do that

15       in one or two cases?

16  A.   No.  It wasn't a matter of general policy.  It was just in

17       a random conversation.

18  Q.   Okay.  Well, could you tell me about that conversation.

19  A.   Yes.  I was talking with division chief Hassig one day.

20       We were talking about changes within the police station.

21  Q.   Can you just give me an approximate timeframe, maybe month

22       and year or just year?

23  A.   I believe it was in 2004.

24  Q.   And what did you state in this conversation?

25  A.   We were discussing the changes to the police department.

1   Things were -- the building was being remodeled, and they

2   were doing it in segments.  And we were talking -- I

3   believe we were standing close to the front desk, talking

4   about certain things that Chief Fautz had requested.  And

5   I was talking and asking him if he knew his line was being

6   recorded, that the chief had stated he wanted to make some

7   changes.  I don't recall all of what he said to me, but I

8   do know that they had meetings pertaining to it.

9   Q.  Did he tell you that he knew his line was being recorded

10      or not?

11  A.  No.  He did not.

12  Q.  So it came as a surprise to him?

13  A.  From what I recall, he acted very surprised.

14  Q.  Any other division chiefs that you told their lines were

15      being recorded?

16  A.  I spoke with Eugene Kyle at one point and asked him.  We

17      were talking in his office.  And same thing, it was right

18      after the change-over.  All of the investigative bureau

19      had been working in the street department for some time.

20      They came back into the police department.  It was -- I

21      can't say for sure.  It had to be sometime in 2004.  And I

22      asked him if he was aware his line was recorded, and he

23      too acted shocked and said no.

24  Q.  Did either of them request that their line not be

25      recorded?

Rough Draft                                                                  31

1   A.   No.

2   Q.   Did they ever ask to get copies of any of their

3        conversations that had been recorded?

4   A.   No, neither of them did.

5   Q.   Okay.  If the line is recorded, who would have access to

6        the recording?

7   A.   It depends on who you would give that privilege to.  There

8        was no policy.  I made a determination based on a belief

9        that things should be -- remain confidential.  So I

10       allowed access to certain lines to the communications

11       supervisors or certain channels.  And also I restricted

12       certain lines.  For instance, I was the only person who

13       had access to the division chief or the chief's line at

14       one point, as well as the internal affairs investigator.

15  Q.   I assume the communications supervisors would have access

16       to the 911 calls, perhaps the front desk?

17  A.   Yes, and the radio channels.

18  Q.   Did anyone besides you have access to the chief's calls or

19       the division chief calls?

20  A.   I provided access to my assistant director Diana Scott.

21       That's when I went on FMLA and was going to be out for two

22       months and there had been requests for information from

23       the internal affairs investigator.

24  Q.   How about Barb Holleman, the Chief's secretary?

25  A.   No.

Rough Draft                                                          32

1   Q.  She did not have access to it?

2   A.  Not at all.

3   Q.  Could the Chief record calls without your assistance,

4       record any calls without your assistance?

5   A.  No.

6   Q.  Did Chief Fautz ever specifically ask you to go record a

7       certain line?

8   A.  There were two instances that I can recall the changes.

9       And the changes his own line.  The line that was housed in

10      the uniform division office, chief's office, the line that

11      was housed in the investigative bureau bureau chief's

12      office.  He then later requested the records bureau

13      incoming line.

14  Q.  How about Chief Boykins, did he ever request a line be

15      recorded?

16  A.  Never.

17  Q.  Did it ever come to your attention that Brian Young's line

18      was being recorded?

19  A.  I discovered that there were conversations of Brian Young

20      on one of the recorded telephone lines, 450-6031, when our

21      recorder had malfunctioned.  We were having ongoing

22      problems with it.  And I went back to check to make sure

23      that lines were actually recording correctly because we

24      had had three drives go down within the system.  And when

25      the third drive was put in, the technician that came out

1      to put it in told me it was going to take quite some time

2      for anything that was stored on the server to down load on

3      to the DVD back-ups.  So he told me to give it some time

4      and then to check to make sure that it was doing exactly

5      that.

6  Q.  And the data was recorded calls?

7  A.  No.  There was quite a bit that was lost.

8  Q.  But the lost data, and the data that was not lost was --

9      what consisted of all recorded phone calls?

10 A.  Yes.

11 Q.  And when did this happen?

12 A.  Well, the back-up drive on the dynamic I understand

13     reliant started to malfunction sometime in October and

14     continued on through late December.  So in that time we

15     had three drives switched out.  What would happen on the

16     first two drives was the company Steven Campbell and

17     associate overnighted them to our department and would

18     request that our own computer from services division

19     install them and that was done by Sal Parisi.  On the

20     third and final one, it was approximately the last week of

21     December.  And Sal Parisi and actually everyone from

22     computer services was on vacation.  I was a bit frustrated

23     that this was the third drive failure.  So I requested

24     that they send a technician from the company.  And it was

25     approximately the last week of December.

1   Q.   Okay.   And what did the technician discover or tell you

2        about the problem?

3   A.   Well, it took a bit of looking.   But what he had stated

4        was that the original drive was no longer available,

5        back-up drive.   It was manufactured by Panasonic.   They no

6        longer made that drive.   So they were having to get a

7        substitute that was manufactured in Mexico.   He did not

8        give the brand name.   He also stated that the original

9        back-up drives for the DVD were not blue ray.   And that

10       these particular backup drives were Blue Ray drives.   At

11       that point, it was -- I noticed that the equipment was

12       still freezing after he had left.   And he had an idea that

13       one of the problems we may have been having was not

14       actually with the drives themselves but with the DVD's.

15       And since we were installing blue ray drives we weren't

16       using blue ray DVD's.

17  Q.   You mentioned that you found out that Brian Young's line

18       was being recorded?

19  A.   Yes.

20  Q.   To your knowledge was Brian Young's line supposed to be

21       recorded?

22  A.   To my knowledge, I did not know that.   May made decisions

23       periodically in meetings that I was not a part of.

24  Q.   So you just assumed that Brian Young's line was being

25       recorded because someone with the appropriate authority

1      had ordered that?

2   A.  Not at that time.  I didn't know why it was being

3       recorded.

4   Q.  So my question is you -- did you believe that this was --

5       had been ordered by someone with an prior to authority?

6   A.  My initial belief was that there might have been some sort

7       of malfunction.  My second belief was that he may have

8       been making phone calls on division Chief Richmond's

9       telephone.

10  Q.  So you thought -- you believed that Division Chief

11      Richmond's line was recorded?

12  A.  That's correct.

13  Q.  And that's because it had been ordered to be recorded?

14  A.  It had -- 245-6031 had been ordered to be recorded under

15      Chief Fautz while Chief Kyle had the office.

16  Q.  Was there every an order directed specifically to Steve

17      Richmond that his line be recorded?

18  A.  None that I would know of.

19  Q.  The order was simply to record the division chief's line?

20  A.  As per the direction of Chief Fautz.

21  Q.  Okay.  So when you discovered Brian Young's conversations

22      you thought he might be calling -- first you thought it

23      was a malfunction?

24  A.  Uh-huh.

25  Q.  And a then when you realized it wasn't a malfunction you

1   thought they were there because he was talking on Steve

2   Richmond's phone?

3   A.   At first.

4   Q.   And eventually you concluded that that was not the case?

5   A.   That's correct.

6   Q.   What led you to that conclusion?

7   A.   Because I kept checking backward on the system to see, you

8        know, were there other calls and there were.   And it

9        continued on through December calls and November calls.

10  Q.   Other calls by Brian Young?

11  A.   Right.

12  Q.   So you eventually realized that bring's line is being

13       recorded?

14  A.   I eventually realized that it seemed like some how he was

15       given the recorded line.

16  Q.   Did Brian Young ever ask you if his line was being

17       recorded?

18  A.   No, he did not.

19  Q.   Did Steve Richmond ever ask you if his line was being

20       recorded?

21  A.   Yes, he did.

22  Q.   Do you know about when he asked that question?

23  A.   January 6, 2012.

24  Q.   What did you tell him?

25  A.   He came to my office and he stated may I speak with you

Rough Draft                                                          37

1    for a moment?  And I stated yes.  He had a seat.  At the

2    time we were doing a conversion from the Centrex phone

3    line telephone to the VoIP phone and so anyone that had

4    telephones assigned to them or their office had both,

5    information technology had kept both phones life so that

6    people could practice on the new phone yet use the old

7    phone if they weren't comfortable with all the features.

8  A.  When he sat down he said can I ask you some questions

9    regarding the phone.  I said yes.  He pointed to the the

10   VoIP phone and stated is my VoIP phone recorded?  And I

11   said yes.  And he goes who authorized that?  I said Chief

12   Boykins did.  However, for yourself, for chief Walters and

13   for himself he only wanted on demand recording.  He asked

14   me what that was.  I said on demand recording means you

15   hit a couple of buttons it takes you back to the beginning

16   of your telephone conversation, it records that and when

17   you end that conversation you hit a couple of buttons and

18   it stops the recording.  Therefore the user himself could

19   determine what calls they wanted recorded and which ones

20   they did not.  Chief Richmond stated that he did not want

21   that feature.  He wanted to put his own personal device on

22   the phone.  I stated you'll have to see Chief Boykins

23   about that because I do not manage the VoIP system or the

24   new recording system.  And information technology does.

25   And the only changes they'll take is from chief B.  He

1   stated may I ask you another question and I stated yes.

2   And he pointed to the Centrex phone and he stated, "Is my

3   Centrex phone recorded?" And I go, "No." And he goes,

4   "It's not?" I go, "No. The line that always has been

5   recorded is 245-6031. And somehow you have 235-7473."

6   And he stated that he had requested Barb Holleman to

7   switch those lines. So he asked me has 235-7473 ever been

8   recorded? And I said no.

9   Q.  Okay. But the number used by Brian Young was?

10  A.  Yes.

11  Q.  Did he ask who had ordered that number to be recorded?

12  A.  Yes, he did.

13  Q.  And what did you tell him?

14  A.  I told him Chief Fautz.

15  A.  Did you ever tell Steve Richmond that chief B had ordered

16      his lines recorded the day he became division chief.

17  A.  I did not. There was no such conversation.

18  Q.  Ma'am, I'm going to show you an exhibit, can you?

19          MR. McQUARY:  Let's go off the record for a

20      minute.

21          (Exhibit 5 marked for identification.)

22  Q.  Ms. Duerring, before I ask you questions about Exhibit

23      5 -- I'm sorry. Mrs. DePaepe, before I ask you questions

24      about this document, I do want to --

25          VIDEOGRAPHER:  Did you want to go back on the

Rough Draft                                                                39

1        record?  Please continue.  I'm sorry.

2   Q.  Ma'am, before I ask you questions about this document, I

3        do want to go back and clarify one thing.  You mentioned

4        the problems that you discovered with the hard drive and

5        which eventually led you to Mr. Or to Mr. Young's recorded

6        conversations were in October of which year?

7   A.  It started in October of 2010 and went through until

8        December of 2010.

9   Q.  Thank you.  Now I'd like you to turn your attention to

10       Exhibit 5.  Have you seen this document before?

11  A.  Yes, I created it.

12  Q.  What is it?

13  A.  It's a list of the recorded telephone lines maintained by

14       the South Bend Police Department audio recording system.

15  Q.  Okay.  I'd just like to go through it briefly with you.

16       These on page 1 plant equipment Centrex and rain down

17       lines, what are these phone numbers?

18  A.  Well, these would be phone lines captured on the plant

19       equipment 911 workstations housed within the City of South

20       Bend's communication center.  Some are Centrex line and

21       some are direct ring down line.  A direct ring down line

22       would mean if I were to punch in the button it would

23       contact me only with Mishawaka police department.  So it

24       was a line between South Bend Police Department and the

25       Mishawaka police department within our communications

1      centers.  This way there were no incoming or outgoing

2      calls from any other parties.

3  Q.  And these lines listed there at the top of page 1, they're

4      not associated with any individual police officer, I would

5      assume?

6  A.  No.

7  Q.  They are in the 911 call area?

8  A.  That's correct.

9  Q.  And how about the two lines listed under fire, what are

10      those?

11  A.  Those are the two Centrex lines that are assigned to the

12      communications center 245 are to be answered as South Bend

13      fire department.

14  Q.  And like wise, I take it all these -- the direct ring down

15      lines are all associated with the office listed there?

16  A.  Correct.

17  Q.  I'd like to turn to the second page where it says

18      administrative phones.  Then the front desk lines are

19      recorded.  And then the internal -- correct?

20  A.  Yes.

21  Q.  And the internal affairs, is that a front desk for

22      internal affairs or detective?

23  A.  No.  It's the internal affairs investigator's office

24      phone.

25  Q.  And then these four lines for the chief's office.  And are

Rough Draft                                                    41

1        these all going on to the phone on the chief's desk?

2   A.   That I would not know.  I know that they're all assigned

3        within the chief's orders.

4   Q.   And the two -- there are two recorded lines for the

5        records department?

6   A.   Yes.

7   Q.   And then three lines in the detective's bureau, and the

8        number -- is that correct, three lines for the detective's

9        bureau?

10  A.   Yes.

11  Q.   And then the one listed at the bottom of the page 2456031,

12       you've got the note was division chief, now division

13       captain's line?

14  A.   Yes I modified the document when I discovered that the

15       line was now being assigned to the division captains.

16  Q.   To your knowledge, was iter roan previously given to the

17       captain when it should have been the recorded line should

18       have been given to the division chief?

19  A.   Not to my knowledge.  I wasn't privy to any such

20       information.

21  Q.   Then on the last -- on the last page where it says,

22       "Administrative VoIP phones currently on call recs managed

23       by IT," could you explain what that means?

24  A.   I created this document so that we would have a record of

25       under the new VoIP phones what was going the be recorded

Rough Draft                                          42

1       at the South Bend Police Department under the new audio

2       recorder that the information technology department was

3       going to house and maintain.

4   Q.  And then so to list the lines that are always recorded,

5       meaning every call on those lines is recorded?

6   A.  Correct, 247-2365.

7   Q.  To your knowledge did the people associated with those

8       lines know they're being recorded 24/7?

9   A.  I do not know.  No one asked me.

10  Q.  And then at the bottom of the page are listed the lines

11      that the user of the phone has to specifically request or

12      specifically program the phone to be recorded?

13  A.  That's correct.

14  Q.  And those go to VoIP Jeff Walters and Steve Richmond?

15  A.  Correct.

16  Q.  All right.  Okay.  You mentioned earlier that you found

17      while investigating a problem with the hard drives, you

18      found that Steve -- excuse me Brian Young's line was being

19      recorded; is that correct?

20  A.  I found that 2456031 was being recorded and Brian Young

21      was speaking on it.

22  Q.  To make that determination, you had to listen to calls on

23      the line?

24  A.  Correct.

25  Q.  Do you know about how many -- you know, what period of

1  time of calls you had to listen to in order to understand

2  what had happened?

3  A.  Well, at the time I was checking all of the radio channels

4  and all of the telephone lines that we recorded.  And I

5  was checking what was housed on the server versus what was

6  being recorded on the back-up drive.  I had gone through

7  everything in communications.  I had gone through the rest

8  of the department.  I was working on the detective bureau.

9  If I, for instance, heard Donna Stevens speaking on the

10  detective bureau incoming line on the server and it

11  matched what was on the back-up drive, I would move on.  I

12  got to 245-6031 --

13  Q.  Before you go on, and this is just to confirm that the

14  line being recorded was the one you believed was to be

15  recorded?

16  A.  No.  It was to confirm that the information that we were

17  storing on the hard drive was actually being transferred

18  accurately to the back-up drive.

19  Q.  Okay.  Thanks for that clarification.  And please proceed.

20  A.  Okay.  I got to 2456031 and I heard conversation with

21  Brian Young's voice, and it disturbed me.  However, what

22  disturbed me was I believed that Steve Richmond should be

23  the one speaking on this line.  I wasn't sure whether it

24  was just a one time fluke maybe he was in there using the

25  phone.  I went and checked the next phone after that and

1   he was still speaking on it.  Went and checked a couple

2   others, he was still speaking on the line.  And so I went

3   back to my office because I was checking this in the

4   communications center, and I pulled up the CAD, which is

5   the computer-aided dispatch system, to check personnel

6   record for Steven Richmond.  And I saw that for a

7   telephone number they now listed 245-7473.  So it dawned

8   on me that somehow this line had been switched.  I wasn't

9   sure when this occurred.  Steve Richmond had become the

10  division chief in 2010, February 2010.  And I was making

11  my checks the end of February 2011.  So/went back to the

12  communications center to see -- trying to go backward just

13  when this occurred.  When did this switch occur.  And so

14  that's when I checked other phone conversation and found

15  that it went back quite some time.  So it was apparent to

16  me that a change had been made and I was not made aware of

17  it.

18  Q.  Okay.  About how many hours worth of conversations did you

19      listen to in order to make that determination?

20  A.  It wasn't hours.

21  Q.  Or minutes or seconds.  I don't mean to put words in your

22      mouth?

23  A.  I really can't recall the exact.  I would say most

24      conversations were of a five-minute duration,

25      approximately and probably -- well, I was checking

1      February, January, December, November.  So several, but I

2      can't tell you exactly.

3  Q.  Okay.  While doing this confirmation to make sure that the

4      data was being accurately backed up, did you listen to the

5      substance of any of the conversations?

6  A.  Initially when I heard the first conversation and the

7      second conversation, yes, those alarmed me.

8  Q.  What alarmed you?

9          MS. DUERRING:  At this point in time, I want to

10         interpose an objection because obviously that's going

11         to be getting into the content.  I just want to refer

12         everybody to the scheduling order that was entered by

13         the Court with respect to the bifurcation of

14         discovery.  Everybody agreed that stages of discovery

15         would be helpful and appropriate in this case, and

16         the Court ordered that the preliminary determination

17         would be made at this juncture was going to be

18         whether or not the recordings were actually a

19         violation of the Wiretap Act.  Anything that's going

20         beyond that preliminary determination is beyond the

21         scope of discovery and the court order; and I would

22         object at this point in time.

23         MR. McQUARY:  Okay.  I'll rephrase the question.

24 Q.  Were you alarmed by something in the conversation that you

25     heard?

1   A.   Yes.

2   Q.   That did not relate to the accuracy of the data back-up?

3   A.   That's correct.

4   Q.   Did that prompt you to -- did your alarm prompt you to

5        listen to any other conversations?

6   A.   Yes.

7   Q.   Do you know about how many other conversations you

8        listened to?

9   A.   Pertaining to this incident, I only found one other.

10  Q.   Did you have to look at multiple or excuse me, listen to

11       multiple conversations in order to find that one other

12       one?

13  A.   Yes, and my determination was I did not want to make an

14       accusation against an officer unless I had documented

15       fact.

16  Q.   Well, what did you do to make sure that you were

17       documenting in fact?

18  A.   I was -- again, I would have to reveal the content of the

19       information.  I was looking for any calls regarding

20       information from the Indiana state police.

21  Q.   And really I don't want you to reveal the substance of the

22       conversations, ma'am.  So instead I'll ask how many

23       conversations you listened to in order to find ones that

24       you considered valuable?

25  A.   A dozen, maybe less.

1   Q.   And this would be over -- that occurred over multiple

2        days?

3   A.   No.

4   Q.   On one day on that line?

5   A.   Yes.

6   Q.   And this would be the line being used by Brian Young?

7   A.   Correct.

8   Q.   Did you listen to any conversations on any other lines in

9        order to make sure that an accusation that you might make

10       was documented in fact?

11  A.   Not relevant to this incident, no.

12  Q.   But of course you've listened to other recordings on other

13       occasions?

14  A.   Yes.

15  Q.   But in order to make sure that you had any accusation

16       against Brian Young properly documented, did you listen to

17       any other lines?

18  A.   No.

19  Q.   Approximately how long did it take you to listen to the

20       number of conversations that you listened to?

21  A.   Not long.  I would believe maybe on this particular

22       incident, it was an hour.

23  Q.   Okay.  Were there any other incidents that you wanted to

24       document and, therefore, listened to recorded

25       conversations regarding officer misconduct?

1    A.   Yes.

2    Q.   Could you tell me about those -- who were the officers?

3    A.   Well, it wasn't pertaining to any particular officer at

4         that time.  I received a telephone call from Nancy Bruce

5         from ABC 57.  She stated that she had received a letter

6         from Aladean DeRose.  And in the letter it stated to

7         contact me and my telephone number and that I was,

8         according to the legal department, to disclose any

9         conversations and photos and some other information

10        regarding two internal affairs investigations.  And so I

11        somewhat argued with Nancy Bruce stating that I had no

12        information or letter saying to the fact.  Kelly

13        Stopzinski and Nancy Bruce had both filed a Freedom of

14        Information requests, and this was in July of 2011.

15   Q.   Okay.  I'm not asking about information that you gave up

16        pursuant to a Freedom of Information Act request or

17        something that the city administration asked you to do.  I

18        mean, based on your own personal investigation and the

19        information that you learned about Brian Young while

20        repairing the hard drive or working on the hard drive,

21        were there any other incidents that you wanted to document

22        and, therefore, listen to recorded phone calls?

23   A.   Yes.

24   Q.   What incidents were those?

25   A.   It was an incident -- again, I would have to disclose the

1    content of what's on the recordings.  But it was something

2    I considered illegal.

3  Q.  How many incidents altogether were there that you thought

4    you should investigate?

5  A.  At that point, two.

6  Q.  And was Brian Young involved in both of them?

7  A.  Yes.  He was the receiver of information.

8  Q.  Okay.  Were -- how about Steve Richmond, was he involved

9    in it at all?

10 A.  Steve Richmond's line 235-7473 was never recorded and he

11   is not on any recordings.

12 Q.  How about -- and, again, I'm not asking if -- to tell --

13   asking you to tell me what's on those recordings.  Just

14   was Steve Richmond involved in either of the two

15   incidents?

16 A.  No.

17 Q.  Was Brian Young, excuse me, David Wells involved in either

18   of the two incidents?

19 A.  Yes.

20 Q.  How about Tim Corbett was he involved in either of them?

21 A.  His name is mentioned.

22 Q.  How about Sandy Young?

23 A.  No.

24 Q.  Any other -- were any other parties to this lawsuit

25   involved in the incident?

1   A.   Parties as in pertaining to myself or the --

2   Q.   The people here in this room?

3             MS. DUERRING:   I'm going to ask that you clarify

4        that.   There's a lot of people here in this room.

5   Q.   Other than the lawyers and the court reporters.

6   A.   I can't recall at that particular time.   I do know that

7        Tim Corbett's name was mentioned.   I do not recall if

8        there was a conversation with him on the lines at that

9        time.

10  Q.   Ma'am, I'm going to show you what's already been marked as

11       Exhibit 1.

12            MR. PFEIFER:   Let's go off the record.

13            (Exhibit 1A marked for identification.)

14            (Recess taken.)

15            VIDEOGRAPHER:   Please continue.

16  Q.   Ms. DePaepe, we're back on the record after a short break.

17       I'm going to ask you to look at what has been previously

18       marked as Exhibit 1 and tell me if you could identify that

19       document?

20  A.   Are we referring to Exhibit 1A?

21  Q.   Yes.

22  A.   Okay.   That is an officer's report, which I've directed to

23       Chief Darryl Boykins on January 4th of 2012.

24  Q.   So you wrote this?

25  A.   Pardon?

1   Q.  You wrote this?

2   A.  Yes, I did.

3   Q.  But you did not make the redactions obviously?

4   A.  No, I did not.

5   Q.  And I'd like to direct your attention to the first

6       paragraph.  You mentioned in the middle of that paragraph

7       that you were troubleshooting some lines due to a DVD

8       drive failure and had lost some back-up data.

9   A.  Correct.

10  Q.  Is that the problem you mentioned earlier in the

11      deposition before the break when you were working on some

12      problem DVDs?

13  A.  Yes.

14  Q.  And here you list the date of that troubleshooting as

15      February 4, 2011.  Is that -- is that accurate?

16  A.  Yes.

17  Q.  You mentioned October, the month of object through

18      November previously.

19  A.  Of 2010.

20  Q.  2010.  Okay.  So this is -- is this a separate incident of

21      problems?

22  A.  No.  On February 4, 2011, I was checking the lines on the

23      server compared to the back-up drive.  And I found that

24      Brian Young was speaking on 2356031.  I was trying to

25      determine whether this was -- how this had occurred and

Rough Draft                                                      52

1    when it had occurred.  And that is when I was working

2    backward through the data all the way through December of

3    2010, November of 2010 to the very end of October 2010.

4    Q.   Okay.  At the bottom of the memo, you listen -- you list

5         the reasoning behind the decision to record telephone --

6         certain telephone lines.  Where did you learn the

7         reasoning for those recordings?

8    A.   I'm not clear on your question.

9    Q.   The very last sentence on page 1, "The reasoning behind

10        this decision was," did someone tell you that reasoning or

11        did you deduce it yourself?

12   A.   Yes, Chief Fautz told me that.

13   Q.   I'd like to direct your attention to the top of page 2.

14        I'll just read that first sentence for you.  When I heard

15        the conversation on February 4, 2012 at 12:11 and 59

16        second hours between captain Brian Young and Prosecutor

17        Eric Tamashesky I became alarmed.

18             MR. DIXON:  Did you want to strike that?  Isn't

19        that the stuff we agreed question were going to seal.

20             MR. McQUARY:  So we're not even going to refer to

21        it in the course of deposition.

22             MR. DIXON:  If the deposition is public, then --

23             MR. McQUARY:  Well.

24             MR. SULLIVAN:  I think we have to move to seal

25        the deposition now.

1          MR. PFEIFER:  I mean, I have no problem asking

2     about it to with the understanding we will agree to

3     sell the deposition and then the court can order it

4     unsealed for whatever purpose it wants to utilize it.

5          MS. DUERRING:  Then I think you need to give us a

6     clean copy of the statement because we're now

7     entirety and we're going to eliminate the issue of

8     having to seal that then we might as well work from

9     the Exhibit 1 and eliminate 1A.

10         MR. McQUARY:  I think he thought she had one in

11    front of him.

12         MR. SULLIVAN:  It still makes sense to have 1 and

13    1A to the extent that 1A may be used for other

14    depositions that are not sealed.

15         MR. DIXON:  If we seal this deposition, does that

16    allow us to use it as part of our summary judgment

17    motion.

18         MR. McQUARY:  You can but references to it will

19    also have to be sealed.

20         MR. SULLIVAN:  Or we can come to an agreement

21    about what portions of it shall remain confidential

22    and what portions might be able to be used and if we

23    disagree we go to court and ask if there's some

24    portion that we have to use and some party believes

25    that --

1      MR. WALTON:  I think if anybody's going to use

2    portions of depositions that go into any of the

3    redacted material are going to need to seek either an

4    agreement or petition the court in advance.

5      MR. PFEIFER:  I agree with that completely and I

6    think that's the way that we could operate without

7    compromising anything.

8      MR. WALTON:  Right.

9      MR. DIXON:  So we don't have to seal the

10   deposition.  We just seal that portion of it.

11     MR. PFEIFER:  We're talking about sealing the

12   deposition.  But what we're also saying is if anybody

13   is going to want to use a part of the deposition that

14   goes into the redacted portions of 1A that before he

15   or she does that, we need to make that disclosure to

16   all counsel that we're going to make that part and

17   parcel and probably take it one step further agree

18   that we can't do it without court approval.

19     MR. WALTON:  At least at this phase.

20     MR. PFEIFER:  At this phase, sure.

21     MR. McQUARY:  I think it's going to be very

22   difficult to brief this issue without making some

23   reference to the portions that have been redacted.  I

24   don't see how it's possible to get to the meet of the

25   legal issue without revealing some of the substance.

1       MR. SULLIVAN:  Can we go off the record a moment?

2       MR. PFEIFER:  Sure.

3       (Discussion held off the record.)

4       (Recess taken.)

5       VIDEOGRAPHER:  Please continue.

6   Q.  Ma'am, I'm looking at Exhibit 1A and I have a few

7       questions for you about that.  Duty that?

8   A.  Yes, I do.

9   Q.  I'm looking at the top.  The first paragraph on the second

10      page, the unredacted portion is, "When I heard the

11      conversation on February 4, 2012, at 11 hours between

12      Captain Brian Young," I'm going to ask you a few questions

13      about that.  You obviously you listened to a conversation

14      on February 4th to which Brian Young was a party?

15  A.  Yes.

16  Q.  And did you hear something on that conversation that led

17      you to investigate further?

18  A.  Yes, I did.

19  Q.  And the investigation concerned not problems with the

20      communications system but rather something else?

21  A.  Something I believe to be possibly illegal.

22  Q.  And that would -- in other words a form of police

23      misconduct?

24  A.  Correct.

25  Q.  And as a result of your concern about potential police

1    misconduct, did you listen to additional conversations?

2  A.  Yes, I did.

3  Q.  Additional conversations on Brian Young's telephone line?

4  A.  Additional conversations on 2456031, which is the line

5      that rang into Brian Young's office.

6  A.  At the time I didn't know that.

7  Q.  But it was the line on which you had previously heard

8      captain Young?

9  A.  That's correct.

10  Q.  Do you know approximately how many conversations you

11      listened to in the --

12  A.  I believe you asked me that and I said it was probably

13      less than a dozen.

14  Q.  And were they all -- did all those conversations take

15      place on the same day?

16  A.  No.  As I stated, I was going back through the system and

17      I was trying to find out, first of all, when this

18      occurred, when did he start making calls on this line.

19      And were there any such other calls related to this

20      particular incident.

21  Q.  In order to find the calls related to the incident that

22      alarmed you, did you have to listen to a wide variety of

23      calls that had nothing to do with that incident?

24  A.  Not particularly.  There wasn't a whole lot of work

25      activity.

1    Q.   So Brian Young wasn't making many calls on that line, in

2         other words?

3    A.   Not compared to other telephone lines that we maintain.

4    Q.   Did you listen to calls on any line other than the one,

5         the number that Brian Young was speaking on?

6    A.   Yeah, I believe you asked me that question before and not

7         related to this incident, no.

8    Q.   Did you listen to calls on another line in the course of

9         an investigation of something else that you considered to

10        be police misconduct?

11   A.   Yes, I have.

12   Q.   On your own initiative?

13            MS. DUERRING:   I think again you need to clarify

14        the timeframe and whether or not it relates to this

15        situation at all or if it's a completely different

16        situation.

17   Q.   Okay.   Fair enough.   Ms. DePaepe, did what you heard on

18        February 4th 2012, prompt you you to listen to any other

19        lines in order to investigate police misconduct or what

20        you were worried might be police misconduct?

21   A.   Not regarding this particular incident.

22   Q.   How about any other incidents?

23   A.   I've listened to other lines per se, such as the front

24        desk lines where sometimes light duty officers were

25        assigned.   And would find inappropriate behaviors that had

**Rough Draft**                                                                        58

1      to be reported.

2              MR. DIXON:   Jeff, you just said February 4, 2012.

3          I thought this would be an opportunity to get that

4          cleared up because that document has that on there,

5          but I think we all -- we talked about February 4,

6          2011.

7              MR. McQUARY:   Yes, thank you.

8  Q.  Ms. DePaepe, do you think that the date at the top of page

9      2, February 4th, 2012, could actually be 2011?

10 A.  Yes, that's a type error on my part.

11 Q.  Okay.  Thank you.

12         Did you listen to any other incidents, phone calls

13     relating to any other incidents of what you've confeared

14     might be police misconduct by Captain Young?

15 A.  I had a situation in July, as I had stated, where I

16     received an access to public records, actually two, and in

17     checking all of the lines because it was approved by

18     Aladean DeRose to provide that information, I checked all

19     lines.  And, yes, that included his.

20 Q.  You mentioned -- and I'm only asking about investigations

21     of police misconduct on your own initiative, not ones that

22     Ms. Rose may have asked you to investigate.  I'm talking

23     about any incidents that you uncovered while in the course

24     of your own activities of maintaining this system?

25 A.  I guess the best way I could describe it is if someone

1        asked me for some information and said can you go back and

2        find any phone calls related to X and in my looking for

3        that information, if I came upon information which was

4        improper behavior, misconduct, I would report it.  It

5        might not be what I was initially looking for, but if I

6        discovered it, I reported it.

7    Q.  So at any time in the course of maintaining the

8        communication system at South Bend Police Department, if

9        you listened to a conversation and heard what you believed

10        to be misconduct of some sort you would report that to the

11        authorities?

12    A.  That's correct.

13    Q.  How often did you do that besides this incident that's

14        described in the memo, in the officer's report to Chief

15        Boykins?

16    A.  I was the keeper of the record, the custodian and we would

17        get numerous requests for information.

18    Q.  Again, I'm referring only to those to misconduct that you

19        discovered yourself on your own initiative.  I'm not

20        asking about things that police investigators or city

21        administrators ask you to look up.  I'll rephrase the

22        question.

23            Did you report any other misconduct or suspected

24        misconduct based on your own independent listening to

25        recorded conversations that you listened to in the course

1      of your -- of maintaining the telephone system?

2  A.  Yes, I did.

3  Q.  How often did that happen?

4  A.  It wasn't often.  I can't give you a particular number.  I

5      know that sometimes I would have officers assigned to me.

6      And they would be grudgingly be placed in jobs they did

7      not want to do and if I found the behavior inappropriate

8      when I was listening or auditing our records, I reported

9      it.

10 Q.  And this is based on telephone conversations on department

11     lines that you listened to?

12 A.  Correct.

13 Q.  Did the conversation of Brian Young that you overheard on

14     February 4, 2011, prompt you to investigate Brian Young

15     for any other incidents?

16 A.  When I first heard the call, I wanted to make sure that I

17     had all of my facts correct before making an allegation

18     against an officer.  And as I was listening to see if

19     there was anything in particular, any calls coming from

20     the Indiana state police department, that would verify

21     that it was okay for this behavior, I came across other

22     information pertaining to a separate incident.

23 Q.  How many telephone calls did you listen to to adequately

24     inform yourself about the second incident?

25              MS. DUERRING:  Objection.  That's been asked and

Rough Draft                                                           61

1         answered I believe twice at this point.  You can go

2         ahead and answer a third time.

3   A.   I believe I stated on this date there were approximately

4         12 calls.

5   Q.   And that's the same number of calls you listened to

6         regarding the first incident?

7   A.   We are speaking about the first incident.

8   Q.   Okay.  I was asking you about the second incident.

9   A.   Right.  The second incident was discovered while I was

10        investigating the first incident.

11  Q.   Did you listen to any additional telephone calls in

12        addition to adequately inform yourself about the second

13        incident?

14  A.   Yes, I did.

15  Q.   How many additional calls?

16  A.   I don't recall exactly.

17  Q.   Do you recall about how long it took you to listen to

18        them?

19  A.   It was over a time period between May and July.  So there

20        were a couple different times that I had listened.  I

21        can't give you an exact amount of time.  Some

22        conversations can range in two minutes, some can range for

23        five minutes.  Part of it, again, as I stated, was

24        discovered when I was looking for information regarding

25        two F O I A requests.

1           MR. SULLIVAN:   Excuse me counsel, what year was

2       that made, July.

3   Q.  What year would that have been?

4   A.  That would have been 2011.

5   Q.  Okay.  Why was the second incident not mentioned in

6       Exhibit 1?

7   A.  I don't know.  I believe because this is what first

8       transpired into why I took the information to the chief.

9   Q.  When did you learn of the second incident?

10  A.  Well, the beginning of it I learned on February 4th.

11  Q.  But it took you months to find out additional details

12      about it?

13  A.  It didn't take me months.  I discovered more information

14      when I was checking lines for other things.

15  Q.  When you say checking lines for other things, what are you

16      checking them for?

17  A.  I was looking for the information that Aladean DeRose had

18      signed off for on the FOIA requests.

19  Q.  So while you were attempting to satisfy Ms. DeRose's

20      request, you're listening to a variety of conversations?

21  A.  Correct.

22  Q.  I assume you have to listen to more than are relevant in

23      order to find the ones that are relevant?

24  A.  True.

25  Q.  And then you found information out about the second

**Rough Draft**                                                        63

1        incident?

2   A.   That's correct.

3   Q.   And that's why --

4   A.   Additional information.

5   Q.   Additional information.  And that's why it took several

6        months?

7   A.   Correct.

8   Q.   For you to become adequately informed about the second

9        incident?

10  A.   Correct.

11  Q.   In the course of satisfying requests like Ms. DeRose's, do

12       you regularly or occasionally come across information that

13       leads you to believe that there is misconduct?

14  A.   I believe I answered that, that question, there's

15       sometimes I look for things and I may come across in that

16       investigation information that's improper and I report it.

17  Q.   Is there an officer's report like Exhibit 1 that deals

18       with that second incident that you wrote?

19            MS. DUERRING:  And again we've talked about a lot

20         of incidents.  I just want to make sure we're talking

21         about the second accident with Brian Young and not

22         anything else that she's discussed; is that.

23  Q.   Correct, correct.

24  A.   I don't believe so.  And the reason being was when I

25       produced this document, and gave it to the chief, I was

**Rough Draft**                                                                64

```
 1        providing information at a time if you could see was the

 2        beginning of January, which is the end of the year, I have

 3        to have reports ready.  We were hiring three new

 4        employees.  I advised the chief that I would get

 5        information as I had time.  I would, you know, provide the

 6        information regarding the incident as I had time.  In the

 7        outcome of this, I was contacted by two federal

 8        investigators.  So I ceased what I was doing.

 9   Q.   I understand.

10   Q.   When Ms. Rose asked you to get the information for the F O

11        I A request, did she ask you to look through those

12        conversations to find other possible misconduct?

13   A.   She did not ask me anything.  She signed off that the

14        information was disclosable.  She wrote a letter to Nancy

15        Bruce stating to contact me and put my number in it

16        stating that if there were any such recordings or

17        photographs, that I was to release them to her.

18   Q.   Do you have any training in law enforcement?

19   A.   No, I do not.

20   Q.   Do you normally do criminal investigations?

21   A.   I assist internal affairs investigators.  I assist

22        officers with their investigations if they request me to

23        find information for them.  I've assisted legal.

24   Q.   And what form of assistance do you normally provide?

25   A.   They may ask me to go back and say search and see if you
```

```
 1        can find anything on X.
 2   Q.   But do you have any training on what constitutes probable
 3        cause or what right 4th amendment rights suspects have and
 4        so on?
 5   A.   No, I don't.
 6   Q.   I'd like to move on with Exhibit 1.  If you look down to
 7        roughly the bottom third of the page, you write it was at
 8        this point I made a decision as keeper of records to check
 9        further conversations to see if there was more information
10        in regard to the incident.  Is that the further
11        investigation that you just described?
12   A.   Pertaining to this incident.
13   Q.   To the incident that you learned about on February 4th,
14        2011?
15   A.   Correct.
16   Q.   At the very bottom you state, "Enclosed are a set of
17        recordings and written descriptions of the audio
18        recordings previously discussed that you had requested."
19        Did Chief Boykins request audio cassettes and written
20        descriptions?
21   A.   Yes, he did.
22   Q.   When did he make that request?
23   A.   The last week of December 2011.
24   Q.   And did you -- what prompted him to make that request?
25   A.   We were talking in the back hallway.  It was right after
```

1    Christmas.  He stated, by the way, I may need to speak to

2    the mayor regarding some incidents that you had, you know,

3    informed me of.  And so I will need you to pull that

4    information.

5  Q.  Okay.  The information in Exhibit 1, I believe that it's

6    dated January 4th, 2012, did you present this information

7    to Chief Boykins prior to writing the memo?

8  A.  No.

9  Q.  So you never discussed any -- discussed this with him

10    before writing the memo?

11  A.  No.

12  Q.  Well, then what did he -- how did he have the opportunity

13    to request recordings of it?

14  A.  Well, we didn't talk -- I didn't present this to him.  We

15    had verbal discussions.

16  Q.  Okay.  And when were those verbal discussions?

17  A.  My first discussion with him, I believe, regarding this

18    incident, I believe it was sometime in March, 2011.

19  Q.  And what exactly had you told him that you had uncovered

20    tapes and that he had -- or rather had listened to the

21    tapes and found this information, you brought this to him;

22    is that correct?

23  A.  I advised him that in checking the equipment and we'd had

24    several maintenance problems, one of the issues was I'd

25    like to see it get replaced, I told him that I discovered

Rough Draft                                                  67

1      information that I felt was either conduct unbecoming an

2      officer or possibly illegal, and that I felt he had a need

3      to know about it.

4   Q.  And what did he say to you in response?

5   A.  Well, he listened to what I had to say, and pertaining to

6      some of the information that's not in this particular

7      memo, he couldn't hardly believe it.  He was crushed.

8           MR. SULLIVAN:  Objection, non-responsive of what

9           he asked you.

10  Q.  My question was not how did he react emotionally.  The

11     question is what did he say?  What words came out of his

12     mouth?

13          MR. DIXON:  Can we just get a specific

14          restriction here on not talking about anything

15          specific as to the content?

16  Q.  Yes.  But you can't mention -- other than any references

17     to what's on those tapes?

18  A.  Then it's somewhat hard to explain.

19  Q.  That's the problem.  Did he say anything other than --

20     other than referring to what was on those tapes, did he

21     say anything?

22  A.  He said I'll get back to you.

23  Q.  Did he ask you to listen to anymore tapes?

24  A.  No, he did not.

25  Q.  Did you tell him that you were going to listen to

Rough Draft                                                68

1      additional conversations?

2   A.  No, because I wasn't planning to do that at that

3       particular point.

4   Q.  Although you ultimately did?

5   A.  Yes.  I discovered things when I was looking for

6       information for the Freedom of Information Act.

7   Q.  And did you report that to Chief Boykins?

8   A.  Yes, verbally.

9           MR. McQUARY:  What -- and, by the way, I am

10          terribly sorry that I keep mispronouncing your last

11          name, Aladean.

12          MS. DeROSE:  DeRose.  That's fine.

13          MR. McQUARY:  DeRose.  I am so sorry.

14          MR. PFEIFER:  I wrote it right there.

15  BY MR. McQUARY:

16  Q.  When did you report to Boykins the additional information?

17  A.  We had one conversation, I believe, we had one

18      conversation in August.  I may have gone back and spoke to

19      him sometime in May regarding the incidents.  And my

20      reasoning in August was when I discovered further

21      information I wanted him to be aware because I was going

22      on a medical leave of absence.  One of the things I

23      discovered, I had taken that information to Chief

24      Richmond.  And I just matter of fact asked Chief Boykins

25      did chief Richmond tell you this?  And he stated no.  So

1        245 that's when I explained it to him.

2   Q.   Just for clarification, is all the information that you've

3        discovered, this additional information, was that on the

4        telephone line being used by Captain Young?

5   A.   Yes.

6   Q.   Were there any additional lines that you were listening to

7        that formed the basis of that information?

8   A.   I listened to all of the telephone lines trying to find

9        where this had first begun and occurred.  As in relation

10       to a complaint that was made against an officer.  Again,

11       it was an allegation made against an officer, and I was --

12       it was signed off as disclosable information, so I was

13       checking all the lines at that time, including his.

14  Q.   Including his.  When you say you listened to all lines,

15       surely you don't mean you listened to every line in the

16       South Bend Police Department?

17  A.   No.  Just the recorded lines of the front desk, 2

18       communications center, the incoming chief's office line,

19       the detective incoming line.  It was -- the particular

20       thing I was looking for was someone that was making an

21       allegation against an officer.  So I was waiting to try to

22       see if I could find.  I went and checked the server to see

23       if this call which included a manager of a business, I

24       tried to see if I could track it that way by the phone

25       number of the business which I could not.  I knew that the

1      initial call probably would come through to maybe the

2      front desk or the communications center asking to speak to

3      someone regarding this incident.  So that's why I was

4      checking those things.

5  Q.  And that necessarily entails listening to a lot of

6      conversations that in fact have nothing to do with the

7      incident that you were looking for?

8  A.  That's correct.

9  Q.  Going back back to the very last paragraph on page 2, you

10     gave Chief Boykins cassette recordings of the

11     conversations that you felt were relevant?

12 A.  Yes.

13 Q.  And he asked you for the cassettes?

14 A.  Yes.

15 Q.  Did -- prior to giving him the cassettes, did he listen to

16     any of those recordings?

17 A.  No.

18 Q.  To your knowledge?

19 A.  No.  He had no means to.

20 Q.  He didn't come to your office?

21 A.  No, he did not.

22 Q.  And use the equipment there?

23 A.  No.

24 Q.  When you presented him with the cassettes, did he listen

25     to them at that time?

1  A.  No, he did not.

2  Q.  Do you know when he listened to them?

3  A.  No, I do not.

4  Q.  How do you know he didn't listen to them after you -- when

5      you gave them to him?

6  A.  He could have listened to them after I gave them to him,

7      but when I presented them to him, I with was not there

8      while he listened to them.

9  Q.  So you just handed them to him and he left?

10  A.  Correct.

11  Q.  Or excuse me, you left?

12  A.  Correct.

13  Q.  Okay.  I would like to show you what has previously been

14      marked as Exhibit 3.  Anyone else need one?

15          MS. DUERRING:  I got it.

16  Q.  Ms. DePaepe, I assume you have not seen Exhibit 3 before?

17  A.  No, I have not.

18  Q.  I'm going to represent to you that this is a receipt from

19      the FBI for the cassettes that you gave to Chief Boykins.

20      I'd like you to look down where it says description of

21      items where it says five cassette tapes from Darryl

22      Boykins.  Do you see that?

23  A.  Yes.

24  Q.  And then below that amongst the redactions it lists

25      cassette numbers and dates.  Do those dates correspond to

Rough Draft                                             72

1        the dates of the telephone conversations?

2   A.   Yes, they do.

3   Q.   Let me just complete my question before you answer.   Of

4        Captain Young that you listened to and recorded?

5   A.   Yes, I believe they do.

6   Q.   Are there -- but you listened to a number of other

7        conversations besides these in the course of investigating

8        those incidents, if I understand your previous testimony?

9   A.   Correct.

10  Q.   But they're not listed here because those conversations

11       contain no information relevant to the incidents that

12       alarmed you?

13  A.   What would occur is when you were listening to the audio

14       recorder, it's pretty much like a mouse point and click.

15       So if you're looking for information on something, it's

16       somewhat like a needle in a hay stack.   So if you were to

17       click on something -- say I'm looking for information on a

18       phone call related to a burglary and I hear information

19       regarding loud music.   The initial call to me would be

20       that this is not related, I would move on.   So, yes, you

21       do listen to other things.   Not in whole but partially to

22       determine if it is in fact related to the incident.

23  Q.   Okay.   I don't think I have any further questions about

24       that exhibit.

25                MR. McQUARY:   Let's take a short break while the

**Rough Draft**

73

1   court reporter changes the tape.

2        VIDEOGRAPHER:  Off the record.

3        (Recess taken.)

4

5        MS. DUERRING:  Counsel for Karen DePaepe

6   specifically agrees that the deposition transcript of

7   Captain Boykins will not be provided to my client

8   prior to the resumption of her deposition.

9        (The deposition concluded and witness excused at

10  ^ TIME ^ a.m. ^ p.m.)

11                    *        *        *

12

13

14

15

16

17

18

19

20

21

22

23

24

25