UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CITY OF SOUTH BEND,                        )
               Plaintiff,          )
                           )
      vs                                  )
                           )
SOUTH BEND COMMON COUNCIL, TIM             )
CORBETT, DAVE WELLS, STEVE                 )
RICHMOND, BRIAN YOUNG, and SANDY           )  Case No.
YOUNG,                                     )  3:12-CV-475
             Defendants.          )
-----------------------------------        )
BRIAN YOUNG, SANDY YOUNG,                   )
TIMOTHY CORBETT, DAVID WELLS,              )
and STEVE RICHMOND,                        )
              Plaintiffs,         )
      vs                                  )
                           )
THE CITY OF SOUTH BEND Acting              )
through its Police Department,             )
DARRYL BOYKINS, Individually and           )
in his Official Capacity as                )
Chief of Police, KAREN DePAEPE,            )
and SCOTT DUERRING,                        )
              Defendants.          )
-----------------------------------        )

The Videotaped Deposition of DARRYL BOYKINS

Date:       Monday, April 15, 2013

Time:       9:12 a.m.

Place:      Pfeifer, Morgan & Stesiak
            53600 North Ironwood Drive
            South Bend, Indiana 46635

Called as a witness by the Defendants/Plaintiffs
in accordance with the Federal Rules of Civil
Procedure for the United States District
Court, Northern District of Indiana, South Bend
Division, pursuant to Notice.

Reported by
Angela J. Galipeau, RPR, CSR
Notary Public, State of Indiana

COPY

MIDWEST REPORTING, INC.
1448 Lincolnway East
South Bend, Indiana 46613

```
 1    APPEARANCES:

 2        MR. EDWARD A. SULLIVAN, III
                Faegre Baker Daniels, LLP
 3              1400 Key Bank Building
                202 South Michigan Street
 4              South Bend, Indiana 46601
                (574) 239-1930
 5              edward.sullivan@faegreBD.com

 6        MS. ALADEAN M. DEROSE
                City Attorney
 7              227 West Jefferson Boulevard, Suite 1400
                South Bend, Indiana 46601
 8              (574) 234-5091

 9              For the Plaintiff/Defendants, The City of South
                Bend;
10

11        MR. DANIEL H. PFEIFER
          MR. JEFFREY J. STESIAK
12              Pfeifer, Morgan & Stesiak
                53600 North Ironwood Drive
13              South Bend, Indiana 46635
                (574) 272-2870

14        MR. JEFFREY S. McQUARY
                Brown, Tompkins, Lory & Mastrian
15              608 Market Street
                Indianapolis, Indiana 46202
16              (317) 631-6866

17              For the Defendants/Plaintiffs, Tim Corbett, Dave
                Wells, Steve Richmond, Brian Young, and Sandy
18              Young;

19        MR. E. SPENCER WALTON, JR.
                May Oberfell Lorber
20              4100 Edison Lakes Parkway
                Mishawaka, Indiana 46545
21              (574) 243-4100
                ewalton@maylorber.com
22
                For the Defendant, South Bend Common Council;
23

24              . . .

25
```

```
 1        MR. THOMAS M. DIXON
               Dixon, Wright & Associates, P.C.
 2             55255 Birchwood Court
               Osceola, Indiana 46561
 3             (574) 315-6455

 4             For the Defendant, Darryl Boykins;

 5        MS. MARIELENA DUERRING
               Duerring Law Offices
 6             61191 U.S. 31 South
               South Bend, Indiana 46614
 7             (574) 968-0250

 8             For the Defendants, Karen DePaepe and Scott
               Duerring;

 9
          ALSO PRESENT
10             Ms. Laura Switalski, CLVS, Midwest Reporting
               Mr. Brian Young
11             Ms. Sandy Young
               Mr. Timothy Corbett
12             Mr. David Wells
               Mr. Scott Duerring.

13                        *       *       *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              I N D E X
                THE VIDEOTAPED DEPOSITION OF DARRYL BOYKINS
 2
     DIRECT EXAMINATION
 3       By Mr. Pfeifer........................  Page 5

 4   CROSS-EXAMINATION
         By Mr. Walton........................  Page 97
 5
     CROSS-EXAMINATION
 6       By Ms. Duerring......................  Page 100

 7   CROSS-EXAMINATION
         By Mr. Sullivan......................  Page 101
 8
     CROSS-EXAMINATION
 9       By Mr. Dixon.........................  Page 144

10   REDIRECT EXAMINATION
         By Mr. Pfeifer.......................  Page 152
11
     RECROSS-EXAMINATION
12       By Mr. Sullivan......................  Page 167

13   REDIRECT EXAMINATION
         By Mr. Pfeifer.......................  Page 172
14
     RECROSS-EXAMINATION
15       By Mr. Sullivan......................  Page 174
                        *        *        *
16
                           E X H I B I T S
17   NO.      DESCRIPTION                          PAGE
      1       Officer's Report, 1-4-12              65
18   (Exhibit 1 is sealed.)

19    1A      Redacted Officer's Report, 1-4-12    174

20    2       Sworn Statement of Tom Fautz          97

21    3       FBI Receipt                          113

22    4       General Order, Office of Professional
              Standards                            124
23                      *        *        *

24           ATTORNEY'S EYES ONLY:  Pages 122 and 133
                        *        *        *
25
```

1             VIDEOGRAPHER:  Please swear in the deponent.

2                      DARRYL BOYKINS

3    called as a witness by the Defendants/Plaintiffs, having

4    first been duly sworn, was examined and testified as

5    follows:

6                 DIRECT EXAMINATION

7  BY MR. PFEIFER:

8  Q.  Tell me your name, please.

9  A.  Darryl Boykins.

10  Q.  I'm Dan Pfeifer.  We just met a few minutes ago.  Have you

11      ever had your deposition taken before?

12  A.  Yes, sir.

13  Q.  I'm going to go through some ground rules.  You probably

14      heard them.  They may be old information to you, but I'm

15      just going to repeat them so that we have a clear

16      understanding as to the process today.  Fair enough?

17  A.  Fair.

18  Q.  This is being videotaped, and there's a court reporter

19      seated to your right.  Her job is to take down everything

20      that is spoken, and the key to what I just said is spoken.

21      She cannot take down a nod of the head up and down or left

22      and right.  Okay?

23  A.  Yes.

24  Q.  Uh-huh, huh-uh, hum-hum, um-hum is frequently used in

25      everyday conversation.  For purposes of today, the

```
 1        transcript may not come out accurately.  So instead if you
 2        could just say yes or no.  Fair enough?
 3   A.   Fair enough.
 4   Q.   At any point in time if you are asked a question by any of
 5        the attorneys that you do not understand, please let us
 6        know and the attorney asking the question will then do his
 7        or her best job to rephrase it so you do understand it.
 8        Is that fair?
 9   A.   That's fair.
10   Q.   So if you answer the question, we're going to assume if
11        you don't tell us otherwise that you understood what was
12        being asked.  Is that fair?
13   A.   That's fair.
14   Q.   Okay.  In everyday conversation, it is very common for
15        people to speak on top of each other.  For purposes of
16        this process today, that doesn't work out real well.  The
17        court reporter has to take down everything that is spoken,
18        as I just said; and if two people are talking at the same
19        time, her fingers cannot go fast enough.  So I will let
20        you finish answering the question before I start asking
21        the next one, if you would let me finish asking before you
22        start answering.  Is that fair?
23   A.   That's fair.
24   Q.   Finally, this is not intended to be a marathon session.
25        So if at any point in time you need to take a break,
```

```
 1        please say something and we can take a break.  The only
 2        thing that we ask is if there is a question that has been
 3        asked, that you answer the question before we take a
 4        break.  Is that fair?
 5   A.   That's fair.
 6   Q.   Okay.  Are you employed, sir?
 7   A.   Yes, I am.
 8   Q.   Where is that at?
 9   A.   South Bend Police Department.
10   Q.   How long have you been employed there?
11   A.   28 years.
12   Q.   What is your current position there?
13   A.   Captain.
14   Q.   How long have you been a captain?
15   A.   In this present position?
16   Q.   Yes.
17   A.   About almost a year.
18   Q.   What are your job responsibilities currently?
19   A.   I'm in charge of the SROs, the street crime unit, the
20        crossing guards, and the summer youth program.
21   Q.   Before being a captain, what was your position with the
22        South Bend Police Department?
23   A.   I was the Chief of Police.
24   Q.   How long were you the Chief of Police?
25   A.   From December the 7th until, I think, May 2013 -- '12.
```

1      Yeah, '12.  '12, sorry.

2   Q.  So all of 2008, all of 2009, 2010, 2011, and part of 2012?

3   A.  '12, yeah.

4   Q.  Is that fair?

5   A.  Yes.

6   Q.  During the course of this questioning today, you may be

7       asked questions about your -- certain things when you were

8       the Chief of Police.  Can we have an understanding if we

9       refer to your position as Chief of Police, we're referring

10      to questions that would pertain to that time period as

11      long as you were the Chief of Police.  Okay?

12  A.  Yes.

13  Q.  Okay.  When you were first hired in with the South Bend

14      Police Department, what was your position?

15  A.  Patrol officer.

16  Q.  How long were you a patrol officer?

17  A.  About seven years.

18  Q.  Then I assume you got a promotion?

19  A.  I went to K9 unit and then got a promotion.

20  Q.  Okay.  After being in the K9 unit, what was your promotion

21      to?

22  A.  Sergeant III, midnights, street sergeant.

23  Q.  And what were your responsibilities as street sergeant?

24  A.  I was in charge of a unit on midnight/afternoon, and I was

25      in charge of all the midnight officers, just responsible

Page 9

```
 1    as a supervisor.
 2  Q. How long were you a sergeant holding that position,
 3     approximately?
 4  A. Approximately about four years.
 5  Q. So from what year to what year, just so we have a general
 6     idea?
 7  A. Oh, man, probably somewhere in '90, '92 or something.  I
 8     can't be real precise on that.
 9  Q. We're going back in time, so I'm not asking you a lot of
10     precision in that area.  Okay.
11        After that position, what was your next position?
12  A. I got promoted to a lieutenant.
13  Q. As a lieutenant, what were your responsibilities?
14  A. Just a little bit higher up with the detail.  I was second
15     in charge of the detail, beyond the captain; and it was on
16     midnight shift.
17  Q. Okay.  And was that a lieutenant for patrol division?
18  A. Yes, patrol division.  Sorry.
19  Q. And the sergeant position, was that in the patrol division
20     also?
21  A. Yes, sir.
22  Q. When you were sergeant in the patrol division or a
23     lieutenant in the patrol division, did you have a specific
24     office that was assigned to you?
25  A. No.  We have one office that the sergeants and lieutenants
```

```
 1        shared behind the front desk.

 2   Q.   Okay.  So all the patrol officers, sergeants, and

 3        lieutenants would operate out of that area behind the

 4        front desk?

 5   A.   Yes.

 6   Q.   Okay.  After the position of lieutenant in the patrol

 7        division, what was your next position?

 8   A.   Captain.

 9   Q.   In the patrol division still?

10   A.   Yes, sir.

11   Q.   Okay.  How long approximately were you the captain in the

12        patrol division?

13   A.   Probably for three years, four.

14   Q.   Then what was your next position?

15   A.   Division chief.

16   Q.   Okay.  Division chief of what division?

17   A.   Of uniform.

18   Q.   Okay.  Tell me, if you would, the responsibilities for the

19        division chief of uniform.

20   A.   I was in charge of all street uniform divisions, and that

21        was on the police department.  I regulated the supervisors

22        and captains on each shift, and that was my responsibility

23        reporting directly to the Chief of Police.

24   Q.   When you were the division chief of the uniform officers,

25        who was the Chief of Police?
```

```
 1   A.  Chief Fautz.

 2   Q.  So at least in terms of your tenure at the South Bend

 3       Police Department, we're now up to that period of time

 4       when Tom Fautz was the Chief of Police, correct?

 5   A.  Yes, correct.

 6   Q.  How long did you remain division chief over the patrol

 7       officers?

 8   A.  You mean until -- almost four-and-a-half years.

 9   Q.  Okay.  From that position, what was your next position?

10   A.  Chief of Police.

11   Q.  Okay.  So you went from division chief over all of the

12       patrol officers to the Chief of Police?

13   A.  Yes.

14   Q.  Okay.  When you were the division chief over all the

15       patrol officers, did you have a particular office?

16   A.  Yes.

17   Q.  That was assigned to you?

18   A.  Yes.

19   Q.  Did you have your own phone?

20   A.  Yes.

21   Q.  Do you remember specifically what your dedicated phone

22       number was when you were the division chief?

23   A.  No, no.

24   Q.  Do you have any knowledge or information as to when you

25       were the division chief whether your phone was recorded?
```

Page 12

```
 1   A.   No.  Nobody said unless it was Jim Hassig, the Uniform

 2        Division chief who might have said something about the

 3        phone; but I can't be sure if he did.

 4   Q.   So is it fair, as you sit here, you don't know whether

 5        your phone, when you were the division chief, was or was

 6        not recorded?

 7   A.   No.  I knew it recorded later.  I learned that later, but

 8        not at the beginning when I first took the job.

 9   Q.   Okay.  When did you learn that your phone while you were

10        the division chief was being recorded?

11   A.   Probably six months after I was in there, maybe a little

12        longer.

13   Q.   Can you give me an approximate time period?

14   A.   No.  I know it had to be a year after whatever time I got

15        hired or put into that position to a year and a half

16        afterwards to that, but I haven't got the direct dates and

17        -- and dates on that.

18   Q.   How is it that you learned that your phone as a division

19        chief was being recorded?

20   A.   I think Barb, the secretary.

21   Q.   Barb, does Barb have a last name?

22   A.   Holleman.

23   Q.   And whose secretary was she?

24   A.   Chief Fautz.

25   Q.   How is it that it came about that Barb told you that your
```

```
 1         phone was being recorded?

 2    A.   I think they were going around checking on phones.  I

 3         think the chiefs were checking to see if phones were

 4         recorded, like every year they check and find out whether

 5         you have a phone or a line.  I think that's how that came

 6         about.

 7    Q.   Okay.  You've said a couple of different times, "I think."

 8         What I want to make sure that we're doing is you're

 9         telling us what you know and not what you think or what

10         you are guessing.  Fair enough?

11    A.   Fair enough.

12    Q.   Okay.  So if you know something for sure, answer the

13         question that is asked.  If you don't know, then tell us

14         your don't know.  Is that fair?

15    A.   Right.

16    Q.   Okay.  So do you have now an independent recollection as

17         to how you became aware of the fact --

18    A.   No.

19    Q.   Okay.  Do you even know if your phone was being recorded?

20    A.   Yes.

21    Q.   How is it that you know?

22    A.   I was told.

23    Q.   By?

24    A.   Barb Holleman.

25    Q.   Approximately six months to a year after you became the
```

```
 1        division chief?

 2   A.   Yes.

 3   Q.   Tell me, if you would, what you remember about the

 4        conversation between you and Barb Holleman where you tell

 5        us that you learn that the phone for the division chief of

 6        patrol unit was being recorded.

 7   A.   I think -- there I go again.  Barb must have said

 8        something in the relationship that your phone line is

 9        recorded.

10   Q.   Is that -- when this conversation took place, as you're

11        telling us, would that have been the first time that you

12        became aware that your phone was being recorded?

13   A.   Yes.

14   Q.   When you learned that your phone was being recorded, were

15        you told how long it had been recorded?

16   A.   No.

17   Q.   Did you have any problems or concerns that your phone had

18        been recorded without you knowing it?

19   A.   No.

20   Q.   Why not?

21   A.   It didn't faze me.  I didn't look at it that way.

22   Q.   Did Barb ever indicate to you that the recording of your

23        phone generated or resulted in tapes of the recording

24        being kept?

25   A.   No.
```

```
 1   Q.   So if I understand what you're saying is Barb Holleman
 2        told you at some point in time, approximately 6 to 12
 3        months after you became division chief, that your phone
 4        was being recorded?
 5   A.   Yes.
 6   Q.   Did she tell you if there were any other phones being
 7        recorded?
 8   A.   No.
 9   Q.   And do you have an independent recollection as to what
10        your phone number was when you were the division chief?
11   A.   No.
12   Q.   When you took the position of Chief of Police, going from
13        division chief to Chief of Police, did you keep the same
14        phone number that you had when you were the division
15        chief, or did your phone number change?
16   A.   No, my phone number changed.
17   Q.   Okay.  So you did not keep the same number.  Whenever you
18        went to become the Chief of Police, you got a new phone
19        number?
20   A.   Yes.
21   Q.   Okay.  Did you ever have any conversation with Tom Fautz
22        about your phone line being recorded?
23   A.   No.
24   Q.   Did you ever ask Tom Fautz why is my phone being recorded?
25   A.   No.
```

```
 1   Q.  Were you ever told whether there were any other phone

 2       lines that were being recorded besides yours?

 3   A.  No, not at that time.

 4            MR. DIXON:  Can we clarify what time you're

 5       talking about?

 6            MR. PFEIFER:  When he learned from Barb --

 7            MR. DIXON:  When he became Chief?

 8            MR. PFEIFER:  No.  When he learned from Barb

 9       Holleman that his phone line was being recorded.

10            MR. DIXON:  As the division -- as the chief of

11       the division, of the Uniform Division?

12            MR. PFEIFER:  As the division chief of the patrol

13       division.

14            MR. DIXON:  I think patrol and uniform are the

15       same thing.  Right?

16            THE WITNESS:  Uh-huh.

17            MR. PFEIFER:  That's my understanding.

18            MR. DIXON:  Thank you.

19   BY MR. PFEIFER:

20   Q.  Let's go back just to make sure that we're clear.  When

21       you learned from Barb Holleman that your line was being

22       recorded as division chief of patrol or the uniform

23       officers, did you at that point in time go to Tom Fautz

24       and inquire or question why the phone was being recorded?

25   A.  No.
```

1   Q.  Were you told by Barb Holleman why the phone line was

2       being recorded?

3   A.  No.

4   Q.  When you were the division chief, where was your office

5       located?

6   A.  It was on the west side of the building, right next to

7       Chief Fautz' office.

8   Q.  Okay.  Same general area where the Chief of Police office

9       is?

10   A.  Yes.

11   Q.  Okay.  When you were the division chief, did you have a

12       secretary?

13   A.  We shared the secretary.  I didn't have one personally,

14       no.

15   Q.  Okay.  Who did you share a secretary with?

16   A.  Chief Fautz, Barb Holleman.

17   Q.  So Barb Holleman was not only Chief Fautz' secretary, but

18       your secretary?

19   A.  No, not exactly that way.  She was in our secretarial

20       pool.  She was the Chief's secretary, and I didn't have a

21       personal secretary.  We just kind of -- when there was

22       something she needed, she serviced the whole west side of

23       the office area, but not particularly, say, my secretary.

24   Q.  Okay.

25   A.  She was the Chief's secretary.

1    Q.   When Barb told you that your phone line was being

2         recorded, about 6 to 12 months after you became division

3         chief, did she tell you how long your phone line had

4         been -- yeah -- was being recorded?

5    A.   No.

6    Q.   When you were the division chief, would you use your phone

7         for private conversations?

8    A.   Sometimes.

9    Q.   Tell me, if you would, the circumstances which would cause

10        you to use your phone as division chief for private phone

11        conversations?

12   A.   Well, my daughter may have called, "Hey, Dad, I'm going to

13        basketball practice," or, "playing tennis," and I would

14        say, "Fine."  It was just general conversation.

15   Q.   When you would have these private conversations with your

16        daughter, as you've indicated to me, or other people, and

17        the conversations were private in nature, did you have an

18        expectation of privacy?

19   A.   I really didn't think about it, didn't even cross my mind.

20   Q.   While you were the division chief, were you married?

21   A.   No.

22   Q.   Other than Barb telling you about 6 to 12 months after you

23        became division chief that your phone was being recorded,

24        do you have any knowledge or information as to whether

25        Barb told other people that their phone lines were being

1       recorded?

2   A.  No.

3   Q.  Did you ever question Barb or Tom Fautz at all as to

4       whether other individual phone lines were being recorded

5       besides yours?

6   A.  No.

7   Q.  Before being told by Barb Holleman that your phone was

8       being recorded, while you were the division chief, did you

9       have any knowledge or information as to whether there were

10      other phone lines in the South Bend police station that

11      were being recorded?

12  A.  Yes.

13  Q.  Tell me, if you would, what your knowledge and

14      understanding was before Barb Holleman told you your line

15      was being recorded as to lines that were recorded.

16  A.  I think there was a lot of lines rumored to be recorded

17      around the police department.  I think there were front

18      desk phones.

19  Q.  Okay.  Let me interrupt you.  Don't talk to me at all

20      about -- or don't tell me for right now --

21  A.  Okay.

22  Q.  -- what was rumored to have been true in terms of the

23      recording of phone lines.  Tell me, first of all, what you

24      knew in terms of the recording of other phone lines.

25  A.  As the division chief?

1   Q.  While you were the division chief, yes.

2   A.  Front desk.

3   Q.  Okay.

4   A.  Front desk at the records department or front area.

5   Q.  Are those two different areas or just one?

6   A.  No.  There's another area, records department.

7   Q.  So the front desk, records, the front desk?

8   A.  The front desk.  There's front desk.  Then you have

9      records right next to it.

10  Q.  Okay.

11  A.  Okay.  Those two I knew for sure.  I also knew that we had

12     the capabilities of taping lines like mine and, I believe,

13     the division chief.  I don't really -- sure about the

14     service chief, didn't know.  Knew that we had the

15     capabilities, or I believe we had the capabilities of

16     taping other lines.  And I think those impressed those

17     other 20 lines we have at the police department.

18  Q.  Were there any other lines that you knew were being

19     recorded when you became the division chief?

20  A.  I believe I was told Jim Kyle -- or Eugene Kyle.

21  Q.  Any other lines that you knew were being recorded when you

22     became division chief?

23  A.  No.

24  Q.  What about the 911 calls?

25  A.  Yes, yes, the 911s.

Page 21

1   Q.   Okay.  So when you became division chief, you knew the 911

2        calls were recorded, correct?

3   A.   Yes.

4   Q.   You knew the front desk calls were recorded, correct?

5   A.   Yes.

6   Q.   You knew the records calls were being recorded?

7   A.   Yes.

8   Q.   And you knew what the capabilities were of recording

9        calls, and that was approximately 20 lines could be

10       recorded, correct?

11  A.   Yes.

12  Q.   And you knew that Gene Kyle's phone line was being

13       recorded?

14  A.   Yes.

15  Q.   Okay.  How did you know the front desk lines were being

16       recorded?

17  A.   That was throughout years of working, I would just -- said

18       to everybody, the phone lines are recorded from one place

19       to another place, the phone lines are recorded.

20  Q.   Okay.  How did you know the records lines were recorded?

21  A.   Same thing.

22  Q.   How did you know the capabilities of recording up to 20

23       lines existed?

24  A.   That was learned later as I became a division chief and a

25       Chief.

1   Q.  Okay.  Did you learn that once you became a division

2       chief, or did you learn it once you became the Chief of

3       Police?

4   A.  Once I became the Chief of Police.

5   Q.  So in terms of the capabilities of the recording of phones

6       at the South Bend Police Department, if I understand what

7       you're saying, you first learned the capabilities when you

8       became the Chief of Police?

9   A.  Yes.

10  Q.  How did you know Gene Kyle's line was being recorded?

11  A.  That was later learned back when Jim -- later back when

12      Jim had switched our phone -- when Jim was leaving the

13      police department, we had, I believe, a conversation where

14      he said his phone line -- your phone line may be -- or he

15      talked about Kyle's phone being taped, I believe.  I

16      believe that's where it come.

17  Q.  Okay.  Help me understand what you just said.  Jim who?

18  A.  Hassig.

19  Q.  Okay.

20  A.  He took my spot.  And then once we had a conversation, I

21      don't know whether it was before or after he had left, I

22      had learned that Gene Kyle's phone had been taped.

23  Q.  He took your spot as division chief of --

24  A.  No.  He left.  We were -- me and Jim are very good

25      friends.

1  Q.  Okay.

2  A.  And I think he mentioned that Gene Kyle's phone had been

3      taped or was recorded, taped, recorded.

4  Q.  This conversation that you're telling me, did this

5      conversation occur when Jim Hassig was leaving?

6  A.  I believe so.

7  Q.  When Jim Hassig was leaving, what position did you hold?

8      Were you a division chief, or were you --

9  A.  Division chief, I was division chief.

10 Q.  You've been doing a good job so far.  Let me finish asking

11     before you start answering.  Okay?

12 A.  I'm sorry.

13 Q.  So when Jim Hassig left and you had this conversation

14     where you say that he told you that Gene Kyle's line was

15     being recorded, that occurred when you were the division

16     chief?

17 A.  Yes.

18 Q.  Okay.  What was Jim Hassig's position right before he

19     left?

20 A.  Division chief.

21 Q.  Okay.  Of what?

22 A.  Of the department, Uniform Division.

23 Q.  So he -- you took his spot?

24 A.  Yes.

25 Q.  All right.  And that's when you learned of Kyle's line

```
 1        being recorded?

 2   A.   A little bit later.

 3   Q.   Okay.  Did Jim Hassig tell you why Gene Kyle's line was

 4        being recorded?

 5   A.   I believe for investigative reasons.

 6   Q.   Did Jim Hassig tell you who requested that Gene Kyle's

 7        line be recorded?

 8   A.   I think it was Chief Fautz.

 9   Q.   So if I understand what you're saying, Jim Hassig told you

10        that Chief Fautz requested that Gene Kyle's line be

11        recorded?

12   A.   Yes, as I remember.

13   Q.   For investigation purposes?

14   A.   I think for investigative purposes, for complaints, people

15        calling in complaining, those type of things, that they

16        would record those conversations if there was any problems

17        with officers, any problems with anything back there, it

18        would be recorded.

19   Q.   Well, what was Gene Kyle's position at the time his line

20        was being recorded?

21   A.   Detective chief.

22   Q.   So correct me if I'm wrong in understanding what you're

23        saying.  Jim Hassig is leaving as the division chief.  He

24        tells you, either when he's leaving or sometime after

25        that, that Gene Kyle, his line is being recorded.  Gene
```

1    Kyle was the detective chief, and Tom Fautz is the one

2    that said that Gene Kyle's line is being recorded for

3    investigation purposes in the event -- or because people

4    were calling and complaining?

5    A.   No --

6              MR. DIXON:  Hold on just a minute.  I'm going to

7        object to that question because it calls for

8        speculation and there's lack of foundation as to

9        whether or not Darryl Boykins heard conversations

10       with Tom Fautz about the reasons that Tom Fautz put

11       the recording on the line.

12            So I'm going to ask you to rephrase the question

13       as it deals directly with conversations that Boykins

14       may have had with Fautz as to Fautz's reasons for

15       putting the line on.  Otherwise, it calls for

16       speculation and hearsay.  And we've made it very

17       clear earlier on that nobody wants speculative

18       answers.  We want answers that are based on

19       first-hand knowledge.

20            MR. PFEIFER:  Go ahead.  You can answer.

21            MR. DIXON:  No.  I'm going to instruct him not to

22       answer that question.  I'm going to ask you to re- --

23       to ask -- if you're going to ask him what Tom Fautz's

24       reasons were, you need to establish a foundation for

25       it.  If you're going to ask him what Jim Hassig told

1 him Tom Fautz's reasons are, I'm going to instruct

2 him not to answer because it's hearsay and it lacks

3 foundation.

4  MR. PFEIFER:  Are you refusing to answer that

5 question?

6  MR. DIXON:  I've instructed him not to answer the

7 question.

8  MR. PFEIFER:  Are you refusing to --

9  MR. DIXON:  If you want to certify it, go ahead

10 and certify it.

11  MR. PFEIFER:  Are you refusing to answer that

12 question?

13  MR. DIXON:  Yes, he's refusing to answer the

14 question.

15  MR. PFEIFER:  He has to say he's refusing --

16  MR. DIXON:  I don't think he even understands

17 what it means to refuse to answer a question in this

18 context.  So I'm going to explain it to my client.

19  What it means is that he's going to certify the

20 question for a judge to take a look at the question

21 and make that determination.  So I'm instructing my

22 client not to answer the question.  If you want to

23 have it certified, certify it and let's move on.

24 BY MR. PFEIFER:

25 Q.  Are you refusing to answer that question?

```
 1   A.  Upon my attorney's advice, he advised me not to.
 2              MR. PFEIFER:  Okay.  Would you certify that
 3          question.
 4              MR. DIXON:  I'm going to ask for a five-minute
 5          break.  We're between questions.  Thanks.
 6              (Recess taken.)
 7              VIDEOGRAPHER:  Please continue.
 8   BY MR. PFEIFER:
 9   Q.  When Barb Holleman told you that your phone as the
10       division chief in charge of uniform and patrol officers
11       was being recorded, did she tell you that that was being
12       recorded for investigative purposes?
13   A.  No.
14   Q.  When you heard about Gene Kyle's phone being recorded,
15       were you told that his line was being recorded for
16       investigative purposes?
17   A.  Yes.
18   Q.  Were you told who was being investigated?
19   A.  No.
20   Q.  What did you understand in terms of who was being
21       investigated?
22   A.  I don't believe it was who being investigated.  It was
23       complaints and calls that would come in, that would come
24       in where, let's say, someone called somebody and reported
25       something against an officer, that's what that phone was
```

```
 1        used for, to record it, to make sure it was accurate what

 2        the person was saying, not to investigate a particular

 3        officer.

 4   Q.   So if I understand what you're saying, and correct me if

 5        I'm inaccurate in my understanding, you were told that

 6        Gene Kyle's phone was being recorded.  He was the

 7        detective chief or the chief of detectives?

 8   A.   Yes.

 9   Q.   And there were complaints that were coming in about --

10        from people about the way detectives were or weren't doing

11        their job?

12   A.   No.  I don't want to speculate on part.  I said it was for

13        investigative purposes because of that, not particularly.

14        There was a lot of things that could be related to that.

15        But it wasn't particularly because of this complaint or

16        this complaint.  They set it up so if someone called,

17        someone called and there was some kind of complaint, or

18        even if it was something else, a call-in and they said,

19        "Did you ever get a call on this person," there would be a

20        recording device that he could go back to and reflect it.

21   Q.   Okay.  At that time, that is when you were the division

22        chief, the Detective Bureau had their own secretary,

23        correct?

24   A.   Yes.

25   Q.   And if the public wanted to call and talk to a detective,
```

```
 1        the number that was in the phone book for them to call was
 2        the Detective Bureau, and that call would go through to
 3        the secretary of the Detective Bureau, correct?
 4   A.   Yes.
 5   Q.   So the only way someone could call Gene Kyle directly is
 6        if that someone who is making the call knew Gene Kyle's
 7        direct personal phone line, correct?
 8   A.   I believe you had front desk, you had a lot of people that
 9        could go through there and get your phone number.  I can't
10        be for sure, but I know there was other ways to get your
11        phone number directly, besides going through the
12        secretary.
13   Q.   Okay.
14   A.   We had a voicemail system.
15   Q.   So if someone called the front desk and said, "Can I have
16        Gene Kyle's direct phone line," would the front desk then
17        be authorized to give that phone number out?
18   A.   I don't have all that thing.  I don't have that
19        information.  You'd have to talk to somebody on the policy
20        of that.
21   Q.   Okay.  When you were division chief, did you ever -- after
22        you learned that your phone was being recorded, did you
23        ever inquire as to whether anyone was listening to the
24        recordings of your phone conversations?
25   A.   No.
```

```
 1  Q.  Did you have any fears or concerns that someone might be

 2      listening to a recording of your phone conversation?

 3  A.  No.

 4  Q.  Why not?

 5  A.  Just didn't -- I just didn't -- we've been in the police

 6      department for almost 29 years.  A lot of phones you walk

 7      around you believe might have been, that you just talk;

 8      you don't think about it.  You just pick up the phone and

 9      talk.

10  Q.  Okay.  You then became the Chief of Police, I think it was

11      December of 2007?

12  A.  Yes, sir.

13  Q.  Tell me, if you would, the circumstances that led you to

14      become the Chief of Police.

15  A.  I was selected by the mayor to take that position.

16  Q.  And was that following Tom Fautz's retirement?

17  A.  Yes, sir.

18  Q.  When you were selected by the mayor to become the Chief of

19      Police, did you sit down with Tom Fautz, who was the then

20      Chief or the retiring Chief, and talk about any procedures

21      or protocols that the Chief of Police followed since you

22      were going to become the Chief of Police?

23  A.  No.  There were some things he mentioned, but I couldn't

24      tell you.  You'd have to ask him.

25  Q.  I'm asking what he told you.
```

```
 1   A.   What he told me is -- what I can remember, I don't

 2        remember we sitting down talking in a very long period of

 3        time about the different parts of the job a little bit.

 4   Q.   When you became the Chief of Police --

 5   A.   Yes.

 6   Q.   -- were you provided a list of the phone lines that were

 7        being recorded, at least as of your first day of being the

 8        Chief of Police?

 9   A.   No.

10             MR. DIXON:  Just a clarification of that, I think

11        what he's understanding is was that presented to him

12        on his first day of Chief of Police.  So I just want

13        to clarify that for you because I think that

14        everybody knows that there was -- there did come a

15        point where there was a presentation of that

16        information.

17             MR. PFEIFER:  Everybody doesn't know that.  And I

18        guess if you want to be sworn in, Tom, we can

19        question you too.

20             MR. DIXON:  Just trying to help you out, Dan.

21   BY MR. PFEIFER:

22   Q.   Did you understand my question?

23   A.   Okay.  Now, rephrase the question, yes.  Could you repeat

24        it again?

25   Q.   When you became the Chief of Police, were you provided a
```

1       list of phone lines that were being recorded, at least as

2       of your first day of being the Chief?

3  A.   Yes.

4            MR. DIXON:  I'm going to ask for clarification on

5       that.  Are you talking about was he presented that

6       information on his first day, or was he presented

7       with the information of the lines that were being

8       recorded as of the first day?

9  BY MR. PFEIFER:

10  Q.   Did you understand my question?

11           MR. DIXON:  I'm asking for clarification of it.

12  Q.   Captain Boykins, did you understand the question?

13  A.   Yes, I think I understand part of the question.  Could you

14       repeat it again?

15  Q.   Sure.

16  A.   For clarification.

17  Q.   Certainly.

18  A.   So me and my attorney can agree to what you're saying.

19  Q.   You seem to be understanding --

20  A.   I'm here -- this is my legal representation, sir.

21  Q.   When you became the Chief of Police, were you provided a

22       list of phone lines that were being recorded, at least as

23       of the first day that you were the Chief of Police?

24  A.   As far as for the first day?  I later was given that

25       information, but not on the first day --

1   Q.   Okay.

2   A.   -- of me taking my position as the Chief.

3   Q.   At some point in time after becoming the Chief of Police,

4        were you provided a list of phone lines that were being

5        recorded?

6   A.   I don't know if I was provided a list, but I was told.  I

7        probably did get a list, but I can't be sure.  So, again,

8        I can't answer that correctly.

9   Q.   When were you told, approximately?

10  A.   I can't answer that.  I don't ---

11  Q.   Was it within the first week of becoming the Chief of

12       Police?

13  A.   I can't be that precise.  It was at some time during the

14       course of the first year I was presented with that.  I'm

15       pretty sure I was.

16  Q.   Okay.  So within the first year of you becoming the Chief

17       of Police, you were provided information as to the phone

18       lines that were being recorded, correct?

19  A.   Yes.

20  Q.   Okay.  Was that information in the form of a written piece

21       of paper identifying the phone numbers that were being

22       recorded?

23  A.   No, not that I --

24  Q.   Was that information given to you verbally?

25  A.   Yes.

1   Q.   Who gave you that information?

2   A.   That would be Karen DePaepe or Barb Holleman could have

3        relayed it, depending on how busy I was when that came up.

4   Q.   So sometime within the first year, either Karen DePaepe or

5        Barb Holleman gave you information which told you the

6        phone lines that were being recorded, correct?

7   A.   Yes.

8   Q.   Okay.  Was there a reason why they gave you that

9        information?

10  A.   I think it was policy that was set up through Chief Fautz

11       that there would be -- that information would come

12       directly to the Chief's office.

13  Q.   When you say policy that was set up by Chief Fautz, tell

14       me what you mean by that.

15  A.   It's not a written policy.  I think it was more or less a

16       verbal policy, something past practice more or less than

17       actually something that was written down directed.

18  Q.   Okay.  So what was the verbal policy or the past practice

19       that you were told in terms of what Chief Fautz had set up

20       while he was the Chief?

21  A.   Well, there wasn't no policy written.  It was verbal, as I

22       said.  And it was nothing setting down that this person is

23       going to do it or this person was doing it and I was going

24       to do it next.  It was just a policy that he said they

25       just checked.  And that's what I got from it.  You'd have

```
 1        to ask Chief Fautz that.  I can't answer that question for
 2        him.
 3   Q.   What is your understanding as to what the policy was is
 4        what I'm asking.
 5   A.   The policy was that the Chief makes the decision on which
 6        taped lines.
 7   Q.   So if I understand what you're saying, and tell me if I'm
 8        wrong, at some point in time, within the first year of you
 9        being the Chief of Police, either Karen DePaepe or Barb
10        Holleman come to you and tell you phones that are being
11        recorded, phone lines that are being recorded; and that
12        was because of a verbal policy or past practice that was
13        set up by Chief Fautz where the Chief makes the decision
14        as to which lines are going to be recorded.  Is that what
15        you're telling me?
16   A.   Yes.  But it was Chief Fautz's pattern that I was
17        following.  I don't know what the Chiefs before that had
18        done.  This is just what I'd done.  I followed what he had
19        set up as far as verbal policy from what I was instructed
20        or what I was learned to do.
21   Q.   Okay.  So what you're telling me, if I understand what
22        you're saying, is Chief Fautz had this policy in place.
23        And it was Chief Fautz who set this up or Chief Fautz who
24        did this.  His policy was to make a decision as to which
25        phone lines were going to be recorded.  That was his
```

```
 1        policy or practice?
 2   A.   This was a policy that was followed from Chief Fautz.
 3        What I'm saying is when Chief Fautz left, this was the
 4        policy I followed.  It was exactly the same thing that he
 5        did verbal, or whatever, verbatim, that's what we
 6        followed.  I can't say he created that.  But this is the
 7        pattern that we followed, and that's what I did.  This is
 8        what he did the last year.  This is what I did when I
 9        became my first year.  I followed that same pattern.
10   Q.   So if I understand what you're saying, Chief Fautz
11        followed this practice.  Whether he set it up or not, you
12        don't know.  But Chief Fautz followed a practice of making
13        a decision as to which phone lines would be recorded.  And
14        when you became the chief, you followed that policy?
15   A.   Yes.
16   Q.   Did you learn that policy, that is the Chief -- the policy
17        that Chief Fautz followed, from Chief Fautz, Karen
18        DePaepe, or Barb Holleman?
19   A.   I think it was just a pattern through Karen and the Chiefs
20        and back and forth.  It wasn't no standard.  It was this
21        is what we do.  I think they came by every year and asked
22        do you want anything changed.  Now sometimes it was Karen.
23        Sometimes Barb would come in and say something.  Chief
24        Fautz never came in and say, "Darryl, this is what we're
25        going to do," and back and forth.
```

```
 1              He had his own -- this is what his verbal policy was.
 2         And you'd have to ask Karen what the radio communication
 3         policy was.  She could actually have a policy that could
 4         have defined that, but I never seen it.
 5    Q.   My question to you, Captain, is this:  You have told me
 6         that at some point in time within the first year of you
 7         becoming the Chief of Police, you were approached either
 8         by Karen or Barb and given a verbal list of phone lines
 9         that were being recorded; and this was being done based
10         upon the practice that Chief Fautz followed as to making
11         decisions which lines were being taped, correct?
12    A.   Correct.
13    Q.   Did you know what Chief Fautz's policy -- this policy that
14         you're talking about -- was because Chief Fautz told you,
15         Karen DePaepe told you, or Barb Holleman told you?  Who
16         told you about this policy?
17    A.   The policy, it came towards me between Karen and probably
18         Barb.  They presented it to me.
19    Q.   So one of the two of them, or both, would have said to you
20         here is the policy or practice that Chief Fautz followed,
21         and we're going to give to you the phone lines that are
22         being recorded.  Is that fair?
23    A.   Yes, I believe that's fair.
24    Q.   Okay.  And that all occurred sometime within the first
25         year of your being the Chief of Police?
```

1   A.   Yes, sir, I believe so.

2   Q.   Okay.  When that occurred, what did you learn at that time

3        as to the phone lines that were being recorded, which

4        ones?

5   A.   We learned that there was possibly 20 lines in the

6        department.  There was a set of recording lines that was

7        recorded of phones with, I believe -- I believe the front

8        desk was recorded.  I believe 911 lines was recorded.  I

9        believe there was a line in records that was recorded.  I

10       believe both secretaries' lines were recorded.  I believe

11       Gene Kyle's was recorded, and I believe there was on some

12       demand the Chief's and maybe the division chiefs was

13       recorded; but it was on demand only.

14            I don't believe the service chief's was recorded, and

15       I'm not sure -- those are the ones I remember of being

16       recorded at that time.  And, like I said, the Detective

17       Bureau phone.

18  Q.   When you say the division chiefs' lines were recorded on

19       demand, what do you mean by that?

20  A.   If you wanted your own line recorded.  If you wanted your

21       own line recorded, you could say, yes, I want that

22       recorded for whatever reason.  So you might have came up

23       to -- you could ask.

24  Q.   Okay.  And if I understand what you're saying, you learned

25       this information that you've just told me from Karen

1    and/or Barb or both of them because that was the policy or

2    practice that Chief Fautz followed?

3  A.  Yes.

4  Q.  Okay.  Were you told anything by Barb or Karen as it

5    pertains to Chief Fautz's policy that you followed that

6    any private line coming into the South Bend Police

7    Department could be recorded without telling the person

8    who used the private line?

9  A.  No.  That conversation never came up.

10 Q.  As the Chief of Police, do you believe that you had the

11   authority to record any phone line at the South Bend

12   Police Department?

13 A.  I believe we had a policy that there was no exception of

14   privacy and that for investigative purposes or information

15   that was needed, we could record.  That was not so much

16   the person who had the phone in their line, but other

17   people who were calling in and possibly making a complaint

18   or in that such matter.

19 Q.  I believe my question was this:  As the Chief of Police,

20   when you were the chief, did you believe that you had the

21   authority to record any phone line coming into the South

22   Bend Police Department?

23 A.  No.  I never had that question, never thought of do I have

24   the power to put everybody's phone on.  No, I didn't even

25   come across that.

```
 1   Q.  I'm not talking about everybody's phone line.  I'm talking

 2       about anybody's phone line.

 3   A.  Only if there was some kind of investigative or criminal

 4       need for it.

 5   Q.  Okay.  So if I understand what you're saying, as Chief of

 6       Police, the only way that you could direct someone to

 7       record a phone line is if there was some type of criminal

 8       investigation that was ongoing internally?

 9   A.  Yes, something where I'd have to investigate, State Police

10       come in and want something, something where a crime or

11       something had been committed, not just to listen just to

12       listen.

13   Q.  Okay.

14             MR. DIXON:  I need to take another break.  Sorry.

15             (Recess taken.)

16             VIDEOGRAPHER:  Please continue.

17   BY MR. PFEIFER:

18   Q.  And if there was an investigation that was being

19       undertaken by the South Bend Police Department which would

20       cause an officer's private line to be recorded, then that

21       officer would have to be told that there was an ongoing

22       investigation; isn't that correct?

23             MR. DIXON:  I'm going to object that that assumes

24       facts that are not in evidence and lacks foundation.

25             It hasn't been established that a particular line
```

```
 1              would need to be --- that the policy was that a

 2              particular line would need to be taped or would be

 3              permitted to be taped for a criminal investigation,

 4              for a specific criminal investigation.

 5    BY MR. PFEIFER:

 6    Q.   You can answer the question.

 7    A.   Could you repeat it again?

 8    Q.   Sure.  And if, in fact, a line was going to be recorded

 9         because of a criminal investigation that was going to be

10         undertaken, as it relates to the person who was using the

11         line, one of the officers, then you would agree, would you

12         not, that you would have to tell the officer that there

13         was an ongoing investigation that was going on and that

14         the line was going to be recorded; isn't that true?

15              MR. DIXON:  Sorry.  I have to lodge my objection

16              again.  That misstates his testimony.  He never

17              testified that a line would be investigated of a

18              police officer.

19    Q.   You can answer.

20    A.   I'm going to go with my attorney.

21              MR. DIXON:  Well, you can answer.  He's

22              misstating your testimony.  So you can answer the

23              question as best you understand his question, but

24              I've already lodged the objection that he's misstated

25              your testimony.  That's not what you said.
```

1    Therefore, his question assumes facts that are not in

2    evidence and it lacks foundation.  But if you

3    understand his question, even though it misstates

4    your testimony, you can try to answer the question as

5    best you can.

6 BY MR. PFEIFER:

7 Q.  You can answer the question.

8 A.  It's such a long question.  Could you repeat it one more

9    time?

10     MR. DIXON:  Why don't you have it read back.

11 A.  Yeah, read it back.

12 Q.  I know what I asked.  You would agree, would you not, that

13    if you were going to record an officer's line because

14    there was a criminal investigation that was being

15    undertaken as to that officer, you would have to tell the

16    officer of the existence of the criminal investigation.

17    Do you agree with that?

18 A.  Yes.

19 Q.  When you were told by either Barb or Karen or both of them

20    the lines that were being recorded, you've told me one of

21    the lines that was being recorded was the front desk,

22    correct?

23 A.  Yes.

24 Q.  You've told me one of the lines that was being recorded

25    was the 911 calls?

```
 1    A.   The 911 calls, yes.

 2    Q.   You've told me that one of the lines that was being

 3         recorded was records, correct?

 4    A.   Yes.

 5    Q.   Were you told that one of the lines that was being

 6         recorded was Internal Affairs?

 7    A.   Yes, I knew that.

 8    Q.   Were you told that one of the lines that was being

 9         recorded was then Chief of Detectives, Gene Kyle?

10    A.   Yes.

11    Q.   Were you told of any other lines that were being recorded,

12         or have we covered them all?

13    A.   Are you talking about with my line as the division chief

14         and then the Chief was recorded or not?

15    Q.   No.   What I'm talking about is when Karen DePaepe or Barb

16         Holleman told you about a year after -- sometime within

17         the first year of you becoming the Chief of Police that

18         certain lines were being recorded.

19    A.   Yes.

20    Q.   I went through the lines that I thought you had said to

21         me --

22    A.   Right.

23    Q.   --- were being recorded, or at least what you learned?

24    A.   Yes.

25    Q.   Did I miss any?
```

1    A.   I don't think so.

2    Q.   Okay.  When you had the conversation with Karen or Barb or

3         both of them, is that when you learned how the phone

4         system operated and what the capacity or capabilities were

5         of the recording of phone calls?

6    A.   No, we didn't go that detailed at that time.

7    Q.   At some point in time, had you learned that the

8         capabilities or capacity of recording phone lines when you

9         first became the Chief was that 20 lines could be

10        recorded?

11   A.   Yes.

12   Q.   Approximately when was it that you learned that that was

13        the capacity of the recording?

14   A.   Probably -- just probably lately when we was going through

15        it as to almost the last year or so.  I would have to say

16        within a year.

17   Q.   Okay.  What, if anything, do you know about how it is that

18        a phone line of a police officer can be recorded?

19   A.   Repeat that again.

20   Q.   Certainly.  What, if anything, do you know as to the

21        capabilities or how it is -- let me start over.

22             What is it, if anything, that you know as to how one

23        goes about recording a phone line of a police officer?

24   A.   No, I don't know that.  I don't have the knowledge of

25        that.

```
 1   Q.   You don't have any knowledge as to how that happens?

 2   A.   How that would actually go in there and process and do it,

 3        I don't knowledge of.

 4   Q.   Who does have that knowledge?

 5   A.   Karen.

 6   Q.   Okay.

 7   A.   Maybe.

 8   Q.   I'm sorry?

 9   A.   Never mind.  Go ahead.

10   Q.   Anybody else besides Karen?

11   A.   I think probably Gary Horvath.

12   Q.   Anybody else?

13   A.   I'm not really sure.  You'd have to ask them.

14   Q.   Okay.  So if you wanted to record somebody's phone line,

15        as the Chief of Police, how would you go about making sure

16        that something like that happened?

17   A.   I don't know.  I never did.

18   Q.   Do you have any knowledge or information as to how it is

19        that you would do that if you wanted to, when you were the

20        Chief of Police?

21   A.   No.

22   Q.   Okay.  Is it your testimony that Karen knows that

23        information?

24   A.   She's more knowledgeable about that than I am, the

25        procedures to go through that.
```

1  Q.  At any point in time, did you direct Karen DePaepe to

2      record phone lines of any officers?

3  A.  No.

4  Q.  At any point in time, did you direct Karen DePaepe to

5      continue to record phone lines of police officers after

6      officers requested that their phone line not be recorded?

7  A.  No.

8  Q.  At any point in time, have you ever listened to recordings

9      of any phone conversations that were recorded at the South

10     Bend Police Department?

11 A.  Yes.

12 Q.  Okay.  Tell me about those circumstances.

13         MR. DIXON:  I'm going to object to that.  I think

14     that we're getting into some -- I'm going to instruct

15     my client not to answer that question because of the

16     concerns that were brought to my attention by the

17     U.S. Attorney's office about revealing information

18     with regard to what's on recorded tapes.  So I'm

19     going to instruct him for that reason not to answer

20     the question.  And if you have to certify it, go

21     ahead and certify it.

22         MR. PFEIFER:  Just so you're clear, the question

23     is not what was the substance of the conversation.

24     The question was a follow-up question, have you ever

25     listened to phone conversations.

1          MR. DIXON:  Right.  And he answered yes to that.

2          MR. PFEIFER:  And then the next question was tell

3     me about that.  And I've not asked him to tell me

4     about the substance of the conversation.  Let me do

5     this:  Let me rephrase it and I'll get more -- I'll

6     be narrow in my questioning.

7          MR. DIXON:  Okay.

8  BY MR. PFEIFER:

9  Q.  You've told me that you have listened to conversations

10     that were recorded, correct?

11  A.  Yes.

12  Q.  Okay.  Whose phone line was it that you listened to in

13     terms of the recording?

14  A.  It was, I believe, the DB division chief's phone.

15  Q.  DB division chief?

16  A.  Yeah, captain phone -- captain's phone.  Excuse me.

17  Q.  Okay.  The Detective Bureau division chief?

18  A.  No, captain's phone.

19  Q.  The captain of the Detective --

20  A.  There was a switch.  The phone line I listened to was

21     supposed to go -- was to the captain, the captain's phone.

22  Q.  Okay.

23  A.  The division chief really, division chief, but the

24     captain.  It was a switch in phone lines.

25  Q.  Let me ask you this:  Do you know the phone number of the

1    recording that you listened to?

2  A.  No.

3  Q.  Okay.  At any point in time, did you ever listen to

4      recordings of phone line conversations for Brian Young?

5  A.  Yes.

6  Q.  Okay.  At any point in time, did you ever listen to phone

7      conversations of recordings of Steve Richmond's phone

8      line?

9  A.  No.

10 Q.  When you listened to the recordings of the phone

11     conversations of Brian Young -- and I don't want to know

12     what the substance is -- what I want to know is who was a

13     party to the conversations that you listened to.

14 A.  I believe Wells.

15 Q.  Okay.  Dave Wells?

16 A.  Yes.

17 Q.  Is that the only person?

18 A.  I only listened to one tape.  That was it.

19 Q.  Okay.  So if I understand your testimony, you listened to

20     one tape.  It was Brian Young's phone line that was being

21     recorded, and it involved conversations between Dave Wells

22     and Brian Young.  Is that fair?

23 A.  Yes.

24 Q.  And is it your testimony that you did not listen to any

25     other recorded phone conversations?

1   A.   Yes.

2   Q.   Now, Brian Young at the time the line was being recorded

3        held what position?

4   A.   Captain.

5   Q.   He was not the chief of detectives, was he?

6   A.   No.

7   Q.   You would agree, would you not, that his phone line should

8        not have been recorded?

9   A.   No.

10  Q.   No, you wouldn't agree with that?

11  A.   No.   I'm just saying it was for the division chief's phone

12       to be recorded.   Division chief phone to be recorded.

13  Q.   When you listened --

14            MR. SULLIVAN:   I'm confused.   I don't know -- can

15         you go back through that?

16  BY MR. PFEIFER:

17  Q.   Yeah.   When you listened to the phone conversation, you

18       knew that Brian Young was not the division chief?

19  A.   Yes.

20  Q.   When you listened to the conversation and you knew it was

21       Brian Young and you knew he wasn't the division chief,

22       what, if anything, did you do to stop the recording of his

23       phone line?

24  A.   At what time?   It changed what we already had set up.

25  Q.   Once you listened -- actually, that raises a good

```
 1      question.  Let me ask you this:  When did you listen to
 2      the recorded conversation between Brian Young and Dave
 3      Wells?
 4   A. It had to be late 2011, like I think sometime in November
 5      or December or sometime in that area there.
 6   Q. Was it -- excuse me.  I interrupted you, and I'm sorry.
 7      Were you done?
 8   A. No.  Go ahead.
 9   Q. Okay.  Was it during the period of time in between when
10      Mayor Buttigieg was elected, but before he was sworn in?
11   A. I think before he was sworn in, and I can't be sure.
12   Q. But the election had already taken place, and he had been
13      elected mayor?
14   A. Close to it, close to it.  I can't be certain of that, the
15      timetable.
16   Q. So at that point in time, when you listened to the
17      recording of the conversation between Brian Young and Dave
18      Wells in the November/December timeframe of 2010 or '11 --
19   A. No.
20   Q. Excuse me, '11?
21   A. No, '11.
22   Q. Okay.  You knew at that point in time that Brian Young was
23      not a division chief, and he wasn't the Chief of
24      Detectives, correct?
25   A. Yeah, correct.
```

1  Q.  When you listened to the phone recording, did you reach,

2      in your mind, a conclusion that Brian Young's phone line

3      is being recorded and it shouldn't be recorded?

4  A.  No.

5  Q.  Should Brian Young's phone line have been recorded?

6  A.  If it's in our policy the way we had it set up, no, his

7      line shouldn't have been recorded.

8  Q.  Okay.

9  A.  I think there was a mixup somewhere in the lines.

10 Q.  So what you're saying is there was a mixup somehow

11     somewhere in the lines, and Brian Young's --

12 A.  Well, I probably shouldn't --

13          MR. DIXON:  Let him finish his question.

14 BY MR. PFEIFER:

15 Q.  And Brian Young's phone line should not have been

16     recorded.  It was Steve Richmond's phone line that should

17     have been recorded.  Is that what you're saying to me?

18 A.  I'm saying the division chief phone line, that phone

19     number should have been recording to the division chief.

20     That's where it was set up.  That's the way it was set up.

21 Q.  Okay.  And Steve Richmond was a division chief?

22 A.  Yes.

23 Q.  So if I understand what you're saying, Brian Young's phone

24     should not have been recorded.  Instead, it should have

25     been Steve Richmond's phone recorded?

1   A.   Yes.

2   Q.   And that's based upon what policy?

3   A.   That's where Chief Fautz had set up for the investigative

4        unit, DB.

5   Q.   When you realized that Brian Young's phone line was being

6        recorded and it should not have been recorded, what if any

7        steps did you take to tell Karen DePaepe, Gary Horvath, or

8        whoever, hey, stop recording this line, this line should

9        not be recorded?

10  A.   No, I didn't do that.

11  Q.   You took no steps?

12  A.   No steps on that.

13  Q.   Why not?

14  A.   Well, not at that time.  Why not?

15  Q.   Yeah.

16  A.   Because really I didn't understand the process of it, the

17       process of it.  I knew there was a detective chief's

18       position that we recorded.  That came through Chief Fautz.

19       But they had already switched numbers and changed.  So I

20       kept it remaining the same as it was, and I didn't change

21       it.  No one requested it to be changed.

22  Q.   Well, when you realized that Brian Young's phone line was

23       being recorded, did you say to Karen DePaepe, hey, we're

24       recording the wrong phone line here, we're supposed to be

25       recording Steve Richmond's phone line based upon your

```
 1        understanding of Tom Fautz' policy?

 2   A.   No.  We never had that conversation.

 3   Q.   Why not?

 4   A.   We just never did.

 5   Q.   Once you realized that his phone was being recorded and it

 6        was not the line that should have been recorded, did you

 7        go and tell him that, hey, your line's been recorded and

 8        it shouldn't have been recorded, we'll stop if you want us

 9        to?

10   A.   No.

11   Q.   Why not?

12   A.   Again, I would say simply because we didn't get to that

13        point with it.  We -- from my understanding, the line had

14        broke down.  Without getting into any detail, the line had

15        broke down.  And that's what I was getting the information

16        from, the information of what we was talking about, not to

17        the point of whether I was going to record his phone or

18        his phone.  We kept that same policy that we've had

19        before.  Now, maybe I should have caught it, but I didn't.

20   Q.   Why had the line broken down?

21   A.   I have no idea.  You'd have to --

22   Q.   What broke down on the line?

23   A.   Karen would have to answer that question.  She's more in

24        that.  I don't have the knowledge of that.

25   Q.   Well, Karen told you something's wrong with the line or
```

1      the line broke down?

2   A. That's all, yeah, simply, and that was it.

3   Q. Did she tell you the line broke down here, you should come

4      listen to this?

5   A. No.  She contacted me later.

6   Q. Okay.  So I guess my question then is what is it that

7      caused you to go listen to the recording of Brian Young's

8      phone line in conversations that he had with Dave Wells?

9   A. It was brought to my attention.

10  Q. What was brought to your attention?

11  A. The conversation.  I did not order the conversation.  I

12     mean, excuse me, it was brought to my attention of these

13     recordings.

14          MR. DIXON:  I have to -- again, I have to -- I

15       think we're getting into this area where you're

16       talking about the potential conduct -- or content of

17       the tapes.

18          MR. PFEIFER:  I'm staying away from the content.

19          MR. DIXON:  But I think the question you're

20       asking him is basically going to that issue, what is

21       it that caused you to listen to the tapes.

22          MR. PFEIFER:  Well, he can say that.  He doesn't

23       need you to say that.

24          MR. DIXON:  No, I don't need to say it, but we

25       need to make sure that we're not walking into

1       territory where we have to shut down for Title 18

2       purposes.  So I'm just trying to make sure that we go

3       in the right direction so that you can get the

4       information that you're asking, but that he's not

5       answering questions in a way that isn't what you're

6       asking or is inadvertently getting into that area.

7               MR. PFEIFER:  You mean walking into the territory

8       of disseminating --

9               MR. DIXON:  The content of the tapes.

10              MR. PFEIFER:  --- the content of an illegally

11      recorded phone conversation?

12              MR. DIXON:  Well, no.  I'm not saying that they

13      were illegally recorded.  I'm just saying that we

14      don't want to get into that area at this juncture.

15      We want the federal court to answer that question for

16      us.

17  BY MR. PFEIFER:

18  Q.  My question to you is this -- and I think I understand

19      what you're saying, so I'm going to kind of preface this

20      to keep this very narrowly defined.

21          Are you telling me that what caused you to listen to

22      the conversation between Brian Young and Dave Wells,

23      someone saying to you, hey, you should listen to this?

24  A.  Not so much as listen to this.  No, I'd have to disagree

25      with you on that.

```
 1   Q.  Okay.  What then caused you to listen to the conversation
 2       between Brian Young and Dave Wells that had been recorded
 3       when Brian Young's phone line shouldn't have been
 4       recorded?
 5   A.  There were -- let me see how to say this.  There were
 6       things on that taped line, or what you call the phone
 7       line, that was disturbing.  This was told to me, was
 8       disturbing.
 9   Q.  Okay.  And --
10   A.  You know, without getting -- it's kind of hard to say
11       without telling you what --
12   Q.  I don't want you to tell me what you were told was said.
13       Someone brought to your attention someone's belief that
14       there was something disturbing on a phone line.  Is that
15       what you're saying?
16   A.  Yes.
17   Q.  Who is the "someone"?
18   A.  Karen.
19   Q.  Okay.  Why was Karen listening to the conversations?
20            MR. DIXON:  I'm going to object.  That calls for
21         speculation.  He can't -- if you want to ask him if
22         he ordered her to listen to the conversations, you
23         can.  But other than that, that's a question for
24         Karen to answer.
25            MR. PFEIFER:  You can answer the question.
```

```
 1              MR. DIXON:  If you know the answer.

 2              MR. STESIAK:  He should only answer any question

 3         he knows the answer to.

 4              MR. DIXON:  Well, that's fine.  We're getting

 5         back to --

 6              MR. PFEIFER:  He doesn't need coaching from you,

 7         Tom.

 8              THE WITNESS:  Repeat it again so I make sure

 9         we're understanding, we're doing the right question

10         again.

11              MR. PFEIFER:  Sorry, brain freeze.  Can you

12         repeat it?

13              (Read back.)

14    A.   I can't answer that for you.  Karen would have to answer

15         the question.

16    BY MR. PFEIFER:

17    Q.   Did Karen ever tell you why she was listening to the

18         conversations?

19    A.   She said the line -- there was a malfunction in the line.

20    Q.   Okay.  And was it this particular line that there was a

21         malfunction in, or was there a malfunction in all of the

22         lines?

23    A.   I can't tell you that.  Karen would have to testify on

24         that.

25    Q.   Okay.  But at least there was a malfunction in this line,
```

1    and that's why she was listening to the tapes?

2  A.  What I was told.

3  Q.  That's what she told you?

4  A.  Yes.

5  Q.  Okay.  At any point in time while you were the Chief of

6    Police, did you ever order her to listen to phone

7    conversations that were recorded?

8  A.  No.

9  Q.  At any point in time while you were the Chief of Police,

10    did you ever order her to listen to recordings of phone

11    conversations where the phone lines were being recorded?

12  A.  No.

13  Q.  As the Chief of Police, you said that you were told that

14    there was some type of malfunction or breakdown in the

15    phone lines, or words to that effect, correct?

16  A.  Yes.

17  Q.  Okay.  But as the Chief of Police, what, if anything, was

18    ever done to repair any malfunction that had taken place

19    on these phone lines?

20  A.  Again, that's not my expertise, and that was Karen's

21    division.

22  Q.  As the Chief of Police, didn't you want to know what was

23    going on?

24  A.  Yes, I do.  But I do not have the knowledge to answer that

25    question the way you're asking me.

1   Q.   At any point in time, did Karen ever tell you what the
2        malfunction was?
3   A.   She said in phone lines.
4   Q.   Did she tell you specifically what the malfunction was?
5   A.   No.
6   Q.   Did she -- did you direct her or order her to have the
7        phone lines repaired?
8   A.   I'm assuming she was -- that's what she was doing,
9        repairing the lines.
10  Q.   Okay.  Is that -- that's not my question.  My question is
11       at any point in time did you direct her to get the phone
12       lines repaired?
13  A.   No.
14  Q.   At any point in time, did you learn that not only was
15       Brian Young's phone being recorded, but Steve Richmond's
16       line was also being recorded?
17  A.   No.
18  Q.   As we sit here today, do you have any knowledge or
19       information as to whether his line was being recorded?
20  A.   As far as I understood, no, his line was not -- was not
21       taped.
22  Q.   You've told me in the one recording that you listened to
23       was a conversation between Brian Young and Dave Wells,
24       correct?
25  A.   Yes.

1   Q.   Was there anybody else besides those two that were on the

2        conversation that you listened to?

3   A.   Are you talking about -- please explain that a little bit

4        further.

5   Q.   Sure.

6   A.   Explain that a little bit further.

7   Q.   That's an example if you don't understand the question,

8        tell me, and I'll rephrase it.

9              You told me that you listened to a recording of a

10       conversation between Brian Young and Dave Wells, correct?

11  A.   Right.

12  Q.   And then it was Brian Young's phone that had been

13       recorded, correct?

14  A.   Correct.

15  Q.   Other than while you were listening to the recording,

16       other than hearing Brian Young's voice and Dave Wells'

17       voice, did you hear any other persons on the recording?

18  A.   No.

19  Q.   Before Steve Richmond became the division chief in charge

20       of the Detective Bureau -- that's the proper title,

21       correct?

22  A.   Yes, sir.

23  Q.   I think Rick Bishop held that position?

24  A.   Yes.

25  Q.   Why did you remove Rick Bishop from that position?

```
 1            MR. DIXON:  Objection, irrelevant.  Doesn't have
 2        anything to do with this lawsuit.
 3  BY MR. PFEIFER:
 4  Q.  You can answer.
 5  A.  I have to do what my attorney --
 6            MR. DIXON:  No, you can answer that question.  If
 7        I have to instruct you not to answer, I'll instruct
 8        you not to answer.  It's just irrelevant, but you can
 9        answer it.
10  A.  He was caught lying about an incident, not being truthful.
11      And there were some other incidents with him just as well.
12  Q.  Did you ever tell Steve Richmond that the reason you
13      removed Rick Bishop as the division chief in charge of the
14      Detective Bureau was because Bishop was backstabbing you?
15            MR. DIXON:  Objection, irrelevant.  If you want,
16        I can just make a standing objection to all of the
17        questions relating to Rick Bishop; or I can lodge an
18        objection with each question.  So, your preference.
19            MR. PFEIFER:  I don't care.
20            MR. DIXON:  Okay.  Then I'll just keep continue
21        -- I'll continue to object at that as being
22        irrelevant.
23  Q.  Did you ever tell Steve Richmond that Rick Bishop was
24      talking about you behind your back?
25  A.  No.
```

1   Q.   When Steve Richmond became the division chief in charge of

2        the Detective Bureau, if you know, did he take the phone

3        line that he had from his prior position and take it with

4        him into the Detective Bureau?

5   A.   I can't answer that.  No, I don't know.

6   Q.   You don't know one way or the other?

7   A.   No.  I know there was a phone line switch, but I don't

8        know which phone; and I learned that later.

9   Q.   Do you know enough about the phone system at the South

10       Bend Police Department to know that if a person has a

11       particular line assigned to them, and then that person

12       receives a promotion or goes to a different position, even

13       in a different part of the building, that the person could

14       actually take with them their assigned phone line

15       regardless of where they are in the building?

16  A.   Yes.

17            MR. WALTON:  Excuse me.  For clarification, Dan,

18        and I think it's going to help down the road, if you

19        would -- are you referring to the assigned telephone

20        number as opposed to the design -- to the line

21        because that can be significant later in terms of

22        terminology?

23            MR. PFEIFER:  I'm talking -- thank you.

24  BY MR. PFEIFER:

25  Q.   I'm talking about the assigned telephone number.

1  A.  And your question again?

2  Q.  Would your answer be the same if the question dealt with

3      an assigned telephone number?

4  A.  Yeah, we all have assigned telephone numbers in our

5      positions.

6  Q.  Okay.  So Steve Richmond, before he became the division

7      chief in charge of the Detective Bureau, had an assigned

8      phone number to him in his position, correct?

9  A.  Yes.

10  Q.  Then when he became the division chief in charge of the

11      Detective Bureau, he could take his previously assigned

12      phone number with him to a different location in the

13      police department?

14  A.  Yes.

15  Q.  Do you know the procedure that has to be undertaken to

16      make that happen, or is that something that is outside of

17      your knowledge?

18  A.  Outside of my knowledge.

19  Q.  Okay.  Have you learned that when Steve Richmond became

20      the division chief, he in fact -- in charge of the

21      Detective Bureau, he in fact took with him his previously

22      assigned telephone number?

23  A.  Yes, I learned that later.  Yes, I did.

24  Q.  When Rick Bishop was the division chief in charge of the

25      Detective Bureau?

```
 1   A.   Yes.

 2   Q.   If you know, was his phone line recorded?

 3   A.   If it was a standard phone that was used that recorded,

 4        yes, it was.

 5   Q.   His private phone, the line -- the number that was

 6        assigned to him?

 7   A.   There was a number assigned to the chiefs.  That phone

 8        line was the phone line that was recorded.  Not the

 9        person, but the phone number and the division.  That's

10        what that number was.

11   Q.   Okay.  Let me ask if you agree with this statement when

12        you were the Chief of Police:  If there's no criminal

13        investigation going on about a particular officer, you

14        just want to record a particular person's phone line, do

15        you believe as the Chief of Police you had the authority

16        to record that phone line without telling the person that

17        the phone line was being recorded?

18   A.   Just for lawful purposes, what we call law enforcement

19        purposes.  That's the only reason I would do that.  It

20        would have to fall within that scope.

21   Q.   And that's the criminal investigation component?

22   A.   Not all of it.  It's not just the criminal complaints.

23        It's a law enforcement component.  I could get a call

24     -- about I didn't like to see Officer Joe-Joe somewhere or we

25        got a criminal somewhere.  It would be set up for law
```

1      enforcement purposes.

2  Q.   But there's no written policy to that effect, correct?

3  A.   No.

4           MR. PFEIFER:  We've got ten minutes on the tape,

5      so let's take a break so she can switch the tapes.

6           MR. DIXON:  Okay.

7           (Recess taken.)

8           (Exhibit 1 marked for identification.)

9           MR. SULLIVAN:  Before the video gets started,

10     Angela, let's go back on the record.  I just wanted

11     to clarify scope issues and the fact that there's

12     other claims and, of course, damage issues, etc.,

13     that are not going to be part of the scope of today's

14     deposition, but will be subject to further discovery.

15     And I wanted to make sure we were all on the same

16     page on that.  I guess if we are, great.  I just

17     thought we might put it on the record.  I didn't

18     think that needed to be video'd.

19          MR. DIXON:  Yeah, I mean, I think that's part of

20     my objecting to the -- to anything that was going to

21     the issue of the content of what's on the tapes is

22     that that's an issue that we're bifurcating discovery

23     to determine the legitimacy of the taping itself.

24          MR. SULLIVAN:  Right.

25          MR. DIXON:  And if that -- depending on the

1          ruling of that, then we get into those other issues.

2               MR. SULLIVAN:  I'd just be more comfortable if

3      that was on the record.  So are we on the record?

4               REPORTER:  Yes.

5               MR. SULLIVAN:  Was that all on the record?

6               REPORTER:  That was all on the record.

7               MR. SULLIVAN:  Good.  Then I think we've done

8      that.

9               MR. PFEIFER:  I think we all need to acquiesce in

10     your statement.  And I do.

11              MR. WALTON:  I agree.

12              MS. DUERRING:  I agree.

13              VIDEOGRAPHER:  Please continue.

14  BY MR. PFEIFER:

15  Q.  Just so I'm clear, when Brian Young's phone line was being

16      recorded, he was not under any criminal investigation; is

17      that correct?

18  A.  Correct.

19  Q.  There was no court order that anyone had obtained

20      authorizing the recording of his phone line; is that

21      correct?

22  A.  That's correct.

23  Q.  There was no lawful enforcement purpose that was being

24      undertaken in the recording of his phone line; is that

25      correct?

1    A.   Correct.

2             MR. DIXON:   I'm going to have to again ask for

3         clarification.  Are you asking about Brian Young's

4         phone itself, or the phone line that had been

5         previously --

6             MR. PFEIFER:   I said phone line in my question.

7             MR. DIXON:   Well, that -- see, that's a very

8         important distinction in all of this litigation.  So

9         it has to continually be parsed out that you're

10        referring to it as Brian Young's phone line when, in

11        fact, the line that he was on was a line designated

12        for the chief of the Detective Bureau.  And he was

13        not the chief of the Detective Bureau.  So I think

14        that makes a big difference in the understanding of

15        the question that you're asking and also the

16        interpretation of the answers.

17   BY MR. PFEIFER:

18   Q.   At some point in time, after you listened to the phone

19        conversation that you've told us about that was recorded

20        between Brian Young and Dave Wells, did you direct Karen

21        DePaepe to prepare cassette tapes of the recordings?

22   A.   Yes.

23   Q.   Why?

24   A.   I felt I needed it for possibly later to confer with the

25        mayor.  We talked about some things.  And take a look at

1    it myself and actually listen it to myself because I

2    didn't listen to it when Karen had.  I didn't -- this was

3    in my office.  I felt I needed to have the privacy to look

4    at it, listen to it myself.

5  Q.  Okay.  I'm not tracking with you there.

6  A.  You asked me about the tapes.  Again, why did I make

7    copies of the tape?

8  Q.  Right.

9  A.  The copies of the tape was made so I could review them at

10   that point.  And that's all that was at the beginning, to

11   review them; and that's what it was.

12 Q.  Why did you need to take a copy to review them?

13 A.  Unless I went down to where Karen was at and she played it

14   over whatever her apparatus she would to let me listen to,

15   that was the only way I would be able to hear it.

16 Q.  Did you direct Karen to only prepare a cassette of this

17   one conversation that you've told us about that you

18   listened to?

19 A.  No.  I think there were other things that Karen had ran

20   across during her course of her job where the lines had

21   broke down.

22 Q.  Well, okay.  You've been -- you've told me that you only

23   listened to one conversation.

24 A.  That's all I listened to.

25 Q.  Okay.  If you only listened to one conversation, then help

Page 69

1     me understand why it is you directed her to prepare

2     cassettes of other conversations that you hadn't even

3     listened to.

4  A.  No.  That wasn't -- that's the thing there.  There was

5     four or five tapes all at the same time.  I listened to

6     one.  I would not listen to the others at that point.

7  Q.  Okay.  Why wouldn't you listen to the others?

8  A.  Probably --

9          MR. DIXON:  Again, we're going to be getting into

10             the content of what he knows the content of those

11             tapes was.  And I think at this juncture, it's

12             premature to get into that.

13  BY MR. PFEIFER:

14  Q.  You can answer.

15          MR. DIXON:  No, I don't want him to answer with

16             regard to anything dealing with the content of those

17             tapes.

18          MR. PFEIFER:  I didn't ask him about the content

19             of the tape.  I asked him why he didn't listen to the

20             other tapes.

21          MR. DIXON:  You can answer that.

22  A.  Okay.  Because it probably would have bothered me a lot

23     worse than just one.  I didn't want to take the chance of

24     reacting and getting upset and making a mistake by hearing

25     the other contents of what was on the tapes.

1   Q.   So if I understand what you're saying, even though you

2        just listened to one tape or one recording of one

3        conversation between Brian Young and Dave Wells, you

4        directed Karen DePaepe to prepare cassettes of other

5        conversations --

6   A.   No.  Sorry.  I interrupted you.  I'm sorry.

7   Q.   What am I missing, what you just said to me?

8   A.   This was all at one time.  It wasn't give me one more,

9        give me another one.  It was all at one time that was

10       presented to me, that I was presented.  It wasn't at

11       separate times.

12  Q.   You're presented with tape-recordings?

13  A.   Yes.

14  Q.   You listened to one of them?

15  A.   Yes.

16  Q.   But you directed Karen to prepare cassettes of all of

17       them?

18  A.   No.  You're missing the point.  They all came at the same

19       time.  When I asked for the tapes, they all was done at

20       the same time.  It wasn't give me more.  It was all done

21       at one time.

22  Q.   Well, let me ask you, when you listened to the tapes, or

23       the tape that you've told me about, did you listen to that

24       on a cassette?

25  A.   Yes.

1  Q.  So by the time you first listened to any conversation,

2      cassettes had already been prepared?

3  A.  Yes.

4          MR. SULLIVAN:  Dan, I apologize for interrupting.

5      I'm confused.  Would you mind if I try and clarify?

6          MR. PFEIFER:  Go right ahead.

7          MR. SULLIVAN:  How else can you listen to

8      recorded conversations other than being made as a

9      separate cassette?

10         THE WITNESS:  As far as I know, that was the only

11     way I can listen to it.

12         MR. SULLIVAN:  So the only listening of

13     recordings you ever did was after it was placed on a

14     cassette?

15         THE WITNESS:  Yes.

16         MR. SULLIVAN:  Okay.

17 BY MR. PFEIFER:

18 Q.  All right.  Now I'm confused because -- help me

19     understand.  You said earlier that the reason that you

20     requested the cassettes was so you could listen to them in

21     the privacy of your office, or words to that effect, as

22     opposed to having to go down to the radio room and listen

23     to them in the radio room?

24 A.  No.  I did them in my office.  I did not listen to them

25     down at the radio room.  I listened to them in the privacy

1      of my office when they were brought up to me.

2   Q.  And when you listened to them, you listened to them on a

3      cassette?

4   A.  Yes.

5   Q.  Okay.  So you had directed Karen DePaepe to prepare

6      cassettes of recordings that she wanted you to listen to,

7      or that you wanted to listen to?

8   A.  Yes.

9   Q.  Okay.  But it's your testimony you only listened to one?

10  A.  Yes.

11  Q.  Did Karen DePaepe ever tell you about the substance of the

12     conversations that she had listened to?

13  A.  Yes.

14  Q.  And she did that in the form of an officer's report to

15     you, correct?

16  A.  Yes, I believe so.

17  Q.  You have in front of you -- or what the court reporter

18     will put in front of you as -- I think we have enough

19     copies -- Exhibit 1.  Do you recognize that document?

20          MR. PFEIFER:  Do you need one more?

21          THE WITNESS:  Yes.

22          MR. STESIAK:  She's got two.

23          MS. DUERRING:  There's two different things here.

24          MR. STESIAK:  That's just the second page.

25          MS. DUERRING:  Okay.

```
 1                MR. PFEIFER:  Did we not get enough copies?  Just
 2           give him that one.
 3                MR. DIXON:  Thanks.
 4  BY MR. PFEIFER:
 5  Q.  Have you had a chance to read Exhibit 1?
 6  A.  Yes.
 7  Q.  That is a report that you received from Karen DePaepe?
 8  A.  Yes.
 9  Q.  Is the information that's on Exhibit 1, that is -- let me
10      start over.
11          Exhibit 1 is actually a report that you would have
12      received after Karen DePaepe told you about the
13      recordings.  Is that fair?
14  A.  I don't think so.  I think we had a previous conversation
15      with this before.  I'm trying to remember.  I think we had
16      previous conversation.  I think it even says down here,
17      "...previously discussed that you had requested."
18                MR. DIXON:  I think that's exactly what he asked
19           you.
20                THE WITNESS:  Was it?
21                MR. DIXON:  Yeah.
22  BY MR. PFEIFER:
23  Q.  So your answer is?
24                MR. WALTON:  Can we go off the record for a
25           second?
```

```
 1              (Discussion held off the record.)

 2    BY MR. PFEIFER:

 3    Q.   Is Exhibit 1 the only officer's report that you would have

 4         ever received regarding someone listening to recordings of

 5         phone conversations from lines that were recorded?

 6    A.   Yes.  This is the only thing I've got of what Karen gave.

 7    Q.   I'm sorry?

 8    A.   Of what Karen presented.

 9    Q.   Okay.  Now, let me direct your attention to the timeframe

10         of about August of 2011.  I'm just trying to give you a

11         general timeframe.  At some point in time in the

12         August/September timeframe of 2011, Phil Trent -- you know

13         Phil, don't you?

14    A.   Yes.

15    Q.   Has told us -- because everyone has a copy of this

16         statement -- that he went to Karen DePaepe and requested

17         that Brian Young's phone line no longer be recorded.

18         You're aware of that, aren't you?

19    A.   No.

20    Q.   You're not aware of that?

21    A.   I remember there was a VoIP -- there was a meeting about

22         the new system, and it was discovered that there was --

23         there was a recorded line.  And he had asked to get it

24         erased and take care of the line.  I did hear that.

25    Q.   Okay.  And I assume you're aware that through Phil Trent's
```

1    statement, Karen DePaepe indicated to him that she was not

2    allowed to remove the recording because of an order from

3    you; is that accurate?

4  A.  No.  I don't know if she said that.  That was something

5    you'd have to ask her.

6  Q.  Let me ask you, did you ever order Karen DePaepe to not

7    remove the recording of the telephone line that was being

8    used by Brian Young?

9  A.  No, I never ordered her not to.  I was looking just --

10    here's what I'm getting confused with you again.  Are you

11    talking about the line, the investigative line on that,

12    that's onto the phone for the investigative purposes that

13    we had already did, or to continue to listen to Brian

14    Young's phone without a change or without anything there?

15    Because that's what the whole point of the VoIP system was

16    coming in for, on demand.  All that was changing, and

17    that's why they had the meeting.

18  Q.  I'm talking about the recording of Brian Young's phone

19    line, 235-6031.

20  A.  Right.

21        MR. WALTON:  Well, that's a phone number, not a

22      phone line, just to clarify.

23  BY MR. PFEIFER:

24  Q.  The recording of the phone line that is assigned the

25    number 235-6031, did you ever order Karen DePaepe to not

1  stop recording that phone line with that phone number

2  after Brian Young requested that the phone line with that

3  phone number not be recorded?

4  A.  No.  I would say no.

5  Q.  Did you ever tell Phil Trent that you as the Chief of

6  Police were the only person with the authority to change

7  or initiate recording of telephone lines within the police

8  department?

9  A.  I didn't tell Phil that.  I told Phil that he had to go

10  through the chain of command whenever we was going to

11  erase the line.  He had came in, and I'd have got

12  notification that he has to go through Karen, he has to go

13  through Gary, and he has to go through me before a change

14  or anything can be erased from the lines.

15  Q.  My question is did you ever tell Captain Phil Trent that

16  you, the Chief of Police, Darryl Boykins, was the only

17  person with the authority to change or initiate recording

18  of telephone lines within the police department?

19  A.  As I mentioned before, if you want me to give a yes or no,

20  that's not a yes or no answer.  I did explain to Phil why,

21  the procedure he had to go to.  Do I take the

22  responsibility of it?  Yes, I would say yes in that case.

23  Q.  Do you believe that you were the only person with the

24  authority to change or initiate recording of telephone

25  lines within the police department?

1    A.  No, not without permission from me.  I was the final

2        person, but they had to go through their chain of command.

3        It had to go through Karen.  It had to go through -- had

4        to go through Gary.  And then he would come back and

5        probably, I guess, would confer with me and let me know.

6    Q.  Well, okay.  Let's go up this chain of command.  So Brian

7        Young, assume for the sake of my question in the

8        August/September 2011 timeframe, asks Phil Trent to stop

9        recording the phone line that is his private line bearing

10       number 235-6031.  If I understand what you're saying, that

11       request has to go up the chain of command, correct?

12   A.  It would have had to get that way.  It had to follow that

13       course to get to me.  I don't think nobody just came to

14       me.

15   Q.  Tell me what the chain of command is.

16   A.  It's not so much the chain of command.  It's people with

17       the responsibility of the particular problem.  Gary and

18       Karen are the people in charge of that program back there

19       in the communication room.  That's why there's a division

20       chief a head of it.  He also has the authority to change

21       and do that.  It does not necessarily have to come to me

22       and follow that Gary/Barb thing there.

23            Gary can make that same decision because he is a

24       chief and he's a head of that room.  I said if Gary wasn't

25       there and it came to me, yes, it would probably be my

1    decision to make.

2  Q.  Well, you told me a minute ago, a few minutes ago, that

3      any request had to follow the proper chain of command.

4  A.  Perhaps I was not properly explaining that at that point.

5  Q.  Okay.  So Phil Trent -- if Brian Young says to Phil Trent,

6      I want the phone number 235-6031, which is my private line

7      and number, I want that to no longer be recorded, what

8      does Phil Trent do?

9  A.  Phil Trent could go to Gary and Karen and say I'm going to

10     put in a request for Brian Young's phone to be -- thing

11     there.  She would say you're going to have to confer to

12     the Chief.  And then Brian would have to go to Gary.  Gary

13     is a head of them.  Gary is a head of it, and he's also

14     Phil Trent's boss at that time.

15        If there was an issue with it, that Gary would

16     probably brought it to me and say do you have a problem

17     with this, they want this removed off their line.  Then it

18     would be my decision to say yes or no.

19  Q.  Okay.  So based upon what you just said, you as the Chief

20     of Police have the final say as to whether a line will or

21     will not be recorded.  Is that what you're telling me?

22  A.  As well as I can explain it, yes.

23  Q.  Did you ever tell Steve Richmond that you were waiting for

24     copies of recorded telephone conversations of the phone

25     number and phone line that were assigned to him?

1  A.  No.

2  Q.  Did you ever tell Steve Richmond that based upon listening

3      to phone conversations that had been recorded, you felt

4      like there were people that were backstabbing him?

5  A.  No.

6  Q.  Did you ever tell Steve Richmond that you felt like he was

7      backstabbing you based upon your listening to recorded

8      phone conversations?

9  A.  No.

10 Q.  Did you ever tell Steve Richmond that after four to six

11     weeks of Mayor Buttigieg taking office, you were going to

12     fire him because of listening to phone conversations that

13     caused you to believe that he was backstabbing you?

14 A.  No.

15 Q.  At any point in time, did you ever tell Brian Young that

16     his phone line bearing the phone number 235-6031 was being

17     recorded?

18 A.  No.  He came down to my office and talked about it, and it

19     might have been brought up.  But as far as Brian is

20     concerned, we didn't have an in-depth conversation about

21     the phone lines.

22 Q.  At any point in time, did you tell Steve Richmond that the

23     phone number for the phone line that was assigned to him

24     was being recorded?

25 A.  No, not at that time, no.

1   Q.   At any time did you tell him?

2   A.   At any time we didn't have a conversation.  Richmond was

3        not even in the taped line.  He was not being taped.  We

4        had very little conversation, if any.  I don't -- we had

5        none, which is what you asked me.

6   Q.   So is it your testimony that you had very little

7        conversation with Steve Richmond about the recording of

8        phone lines, either the line that was assigned to Brian

9        Young or the line that was assigned to Steve Richmond?

10  A.   Right, we had very little conversation of that at all.

11  Q.   Other than the one occasion that we've talked about so far

12       where you told us that you listened to a conversation that

13       was recorded, and the conversation was between Brian Young

14       and Dave Wells, did you listen to any other recorded

15       conversations?

16  A.   No.

17  Q.   You already told me -- and I'm not getting into the

18       substance of the conversation.  But you've already told me

19       that Karen DePaepe told you about conversations that she

20       listened to, and that's what caused you to tell her to

21       give you the cassette tapes, correct?

22  A.   Yes.

23  Q.   Apart from Karen DePaepe telling you what she listened to

24       in the phone conversations, did any other person tell you

25       that he or she had listened to recordings of phone lines?

Page 81

1    A.   No, just Karen.

2    Q.   Did you ever request Karen DePaepe to record Steve

3         Richmond's phone line?

4    A.   No.  No, sir.

5    Q.   The day he became the division chief of the Detective

6         Bureau?

7    A.   Not that I remember.

8    Q.   Did you ever give Karen DePaepe a direct order to not

9         discuss with any person what she had heard or claims to

10        have heard in the recordings that she shared with you?

11   A.   No.

12   Q.   Do you have any knowledge or information as to any

13        officers that might have been applying for the Chief of

14        Police position after Mayor Buttigieg was elected, but

15        before he took office?

16   A.   If any other police officers --

17   Q.   Yes.

18   A.   Who applied?

19   Q.   Yes.

20   A.   I think Richmond did.  I heard Tim Corbett did.  Now, all

21        this is rumor.  I don't know whether this is sure or not.

22        This is all rumor.  But that's what I had heard.  Can you

23        hear me now?

24             And I believe I also heard -- that was pretty much

25        it.  I don't think there was anybody else that was

1      supposed to get an interview besides Richmond.  And I'm

2      going by basically just information I had heard.  That's

3      it.  Nothing I knew.

4   Q.  Who had you heard that information from?

5              MR. DIXON:  I'm going to object to this line of

6           questioning.  This goes to the issue of the use of --

7           beyond the tapes, and that's a -- we're bifurcated.

8           We're focusing on the issue of the legality of the

9           taping itself, not on the use of the tapes.  If the

10          taping itself is legal, then the use is legal.  And

11          this is going into the second phase of the case,

12          which I believe has been set aside for a later time

13          for discovery.  So I'm just going to object to that

14          and make an objection, and we can move forward.

15  BY MR. PFEIFER:

16  Q.  I don't want to know substance of the tapes, the

17      conversations, what you heard or what you were told, the

18      substance.  You've told me that you heard rumors that

19      Richmond and maybe Wells --

20  A.  No.  Go ahead.  Sorry.

21  Q.  Corbett --

22  A.  I got confused.  Go ahead.

23  Q.  It's my understanding, I thought you said maybe Wells,

24      Corbett, and Richmond.  Did I misunderstand you?

25  A.  I didn't say Wells.

Page 83

```
 1  Q.  Okay.  Corbett and Richmond?

 2  A.  Uh-huh.

 3  Q.  Yes?

 4  A.  Yes.

 5  Q.  Okay.  Did you learn of that fact from any person -- let

 6      me start over because I got to ask the question in such a

 7      way.

 8          Who, if anyone, told you, apart from tapes, that

 9      Richmond and Corbett were applying for the Chief's

10      position?

11  A.  As far as for Corbett, none, if you're not counting the

12      tape.  From that, Richmond, yes.

13  Q.  Who told you that Richmond was applying for the Chief of

14      Police position?

15  A.  That came up through gossip and also through a rollcall.

16  Q.  Tell me what happened at rollcall.

17          MR. DIXON:  I'm just going to make this a

18      standing objection to this line of inquiry so you can

19      just get done with it as soon as you can.  I just

20      want to make sure it's on the record.

21  A.  Anyway, it's not a particular person.  It was just

22      somebody who simply said, hey, I heard Richmond is getting

23      an interview.  Rumors are always around, floating around

24      the department.  They have no way of -- they just fly like

25      that.  That's how I heard it, through a rumor.
```

1   BY MR. PFEIFER:

2   Q.   Okay.  When you heard the rumor that Richmond was going to

3        apply for the Chief's position, did you confront him?

4   A.   Yes, we talked about it.  No, not when he was applying for

5        it, no.  We never even talked.  I didn't know he was

6        applying for it.

7   Q.   At any point in time, did you talk to Steve Richmond about

8        his application to become the Chief of Police?

9   A.   Yes.

10  Q.   Tell me about that.

11  A.   When earlier -- earlier when it was coming to a new

12       election, there was rumors that I was going to go to the

13       Kroc Center, that I was leaving the police department and

14       going to the Kroc.  Steve had asked me if I could help him

15       prepare for a possible Chief position.  I said fine.  And

16       this was earlier, way before this even came close.  It was

17       the earlier part of the year.

18            I said fine.  He said I want to learn what you want

19       -- what you learned, and I want to get a variety from

20       reality because I would like to be Chief, if you're not

21       going to be the Chief, if you decide to leave.  I told him

22       I wasn't leaving, but I said I had no problem.  I would

23       have did the same thing to Gary.  I would have did the

24       same thing to Walters if they had asked me.  So I wasn't

25       surprised that Richmond wanted to become a Chief.  That

1   didn't bother me.

2      He stated -- he came to my face.  I didn't have no

3   problem with it.  I wind up -- he wind up -- we wind up

4   talking hours in our office.  Barb would actually call in

5   and try to get him out of the office because we been there

6   too long.  We even became a standing joke that Barb, she

7   wants you out of the office.  It almost became a standing

8   joke.

9      I took him to the Martin Luther King Center.  He got

10   in front of the Men's Senior Club and gave a speech.  I

11   went with him on that.  He would show up at the boxing

12   center and tell me that if I don't become chief, he was

13   going to make sure the program goes because he likes the

14   program.  We even went out to dinner to Outback and ate

15   and discussed it further.

16      So I had no problem with Richmond becoming the Chief

17   or thinking about becoming the Chief.  He asked me would I

18   even give him a nod if it came up, if I left.  And I said,

19   "Yeah, you do a great job."  I didn't have any problem

20   with that.  It wasn't until later when we went through all

21   this, all the time we had spent together talking about it.

22   I didn't have no problem if he had to sit there and say,

23   "Chief, guess what, I got an interview."

24      I felt very betrayed a little bit and very what you

25   call disillusioned of why didn't you say something.  After

1    all this, you don't even say anything.  I have to hear it

2    from somebody off the street or rumors.  So that's where

3    we had our little talking conversation at because nothing

4    else pertained to it.

5         This is the only incident I really had with him, in

6    my mind, that we had that was related to anything.  I was

7    just disappointed.  I can't -- you know, after, you know,

8    I took him this, you asked me to do this; I didn't turn

9    you down, and I wouldn't have turned the other guys down.

10   But that's what happened.

11   Q.   This conversation that you said that you had with Steve

12        Richmond where you told him that you were disillusioned,

13        when approximately did that conversation take place?

14             MR. DIXON:  I'm going to object that that

15             misstates his testimony.  I think he said he felt

16             disillusioned.  I don't think he testified that he

17             said that he told Steve Richmond that he was

18             disillusioned.

19   A.   No, I didn't tell him that.

20   BY MR. PFEIFER:

21   Q.   The conversation that you had with Steve Richmond, when

22        you felt disillusioned, when did that take place?

23   A.   I think just in January, I think early January possibly.

24        I'm not really a hundred percent sure of the date, but

25        early January.

1  Q.  And did that conversation, was that one conversation,

2      multiple conversations?

3  A.  I think it was twice we had the conversation.

4  Q.  Did you ever have conversation with Lieutenant Lanchswerdt

5      about whether you could terminate Steve Richmond for being

6      what you perceived to be disloyal to him?

7  A.  No.  I cannot -- I cannot terminate anybody as far as it's

8      concerned.  There's a chain that you have to go through.

9      I cannot terminate anyone.

10 Q.  Did you ever tell Lieutenant Lanchswerdt that you were the

11     Chief of Police, you didn't need approval or permission

12     from the mayor, you could do what you wanted?

13 A.  No, no.

14          MR. DIXON:  Just want to make sure my continuing

15          objection is noted as continuing in this whole line

16          of inquiry.

17 BY MR. PFEIFER:

18 Q.  Are you aware of the fact that Tom Fautz has said under

19     oath that at no point in time while he was the Chief of

20     Police that he ever ordered a division chief's phone lines

21     to be recorded?

22 A.  No, I don't know.

23 Q.  I'm going to read to you a question and an answer given by

24     Tom Fautz.  And at the end I'm going to ask you whether

25     you agree or disagree with what Tom Fautz has said.  Okay?

1   A.   Yes, sir.

2   Q.   There's a question:  "Now, while you were the Chief of

3        Police, were you aware of the fact that there were certain

4        privacy rights that the police officers would have as

5        employees of the South Bend Police Department?"  And his

6        answer was, "Yes."  Next question:  "Okay.  While you were

7        the Chief of Police, was there ever any time when

8        telephones -- excuse me -- when police officers were told

9        that telephones were the property of South Bend Police

10       Department and that there was no right of privacy as it

11       relates to the use of phones?"  Answer:  "Not by me."

12       Question:  "And you were the Chief of Police?"  Answer:

13       "Yes."  "And, again, I'm talking while you were the Chief

14       of Police."  Answer:  "No, not by me.  I've never heard

15       that stated to anybody."

16            Do you agree or disagree with the testimony of Tom

17       Fautz?

18  A.   With what Tom said for hisself, yes.  But we had a policy

19       that was typed up in there that stated there was no

20       exception of -- no exception of privacy that was made

21       through code of conduct through Internal Affairs that

22       covered the same -- that covered -- we thought covered

23       that.  But I guess it didn't, from what I learned later.

24       This was later, and that's what I had went by.

25  Q.   While you were the Chief of Police, if you were going to