1   record a phone line that was assigned to a particular

2   individual, would you tell that individual that the phone

3   line was going to be recorded?

4   A.   Yes.

5   Q.   Why?

6   A.   Because that's his right.  It's no different when people

7   come in and want to get information from your file.  I'm

8   going to tell that officer that there's been a request for

9   information and that his file has been given.

10  Q.   So it's a privacy right?

11  A.   Right.

12  Q.   I think you've answered this, and I'm not trying to repeat

13  myself.  I just want to make sure.

14       Do you have any understanding as to how it is that

15  Gene Kyle's telephone line and phone number was recorded?

16  A.   I've heard it from the information, from, I think, Jim and

17  other people that there was a request by Chief Fautz.  He

18  wanted to have the phone line for law enforcement

19  purposes, that he wanted to use that.  And that's why Gene

20  Kyle's phone was basically, I guess, recorded.

21  Q.   Chief -- or Tom Fautz has testified when he was the Chief,

22  Gene Kyle requested that his line be recorded, that it was

23  a request made by Gene Kyle to assist him in him

24  conducting his investigations.  If Tom Fautz has testified

25  to that, do you have any knowledge or information other

1   than this conversation you had with Jim Hassig to dispute

2   that?

3   A.  No.

4   Q.  Okay.  Have you read the sworn statement of Tom Fautz?

5   A.  Yes, to some degree, yes, I did.

6   Q.  Okay.  Is there anything as you were reading the sworn

7   statement of Tom Fautz that you remember thinking to

8   yourself, boy, I disagree with that?

9   A.  I think there was some few points, but the points to it

10  might have been just a memory thing, not remembering one

11  way or the other back and forth.

12  Q.  Okay.  What type of points?

13  A.  Let me see.  If I could look at it again, I could probably

14  --

15  Q.  Certainly.

16  A.  Just not from memory.

17          MR. DIXON:  Are you going to have him read the

18      whole thing through again?

19          MR. PFEIFER:  He's the one that wanted to look at

20      it.

21          THE WITNESS:  If you don't have time --

22          MR. DIXON:  I think his answer to the question is

23      he doesn't know specifically what points and,

24      therefore, he would have to go back in and look at it

25      to figure out which points they were.  So my question

1    is are you going to have him read the whole

2    deposition again to ask him which points they were?

3        MR. PFEIFER:  He said -- I believe he said if I

4    could see the statement.

5        MR. DIXON:  Right.  So, I mean, I just think --

6    let's take a break and let him --

7        MR. PFEIFER:  Sure.

8        MR. DIXON:  Are you going to read the whole

9    statement?

10       THE WITNESS:  No.  I'm trying to be quicker.

11       MR. PFEIFER:  We can take a break.

12       MR. DIXON:  If you're going to start reading it,

13   then I want you to read the whole thing.

14       MR. WALTON:  We're off the record, right?

15       VIDEOGRAPHER:  We're off the record.

16       MR. WALTON:  Why don't you ask him if there's

17   anything he disagrees with.

18       MR. DIXON:  Huh?

19       MR. WALTON:  I asked if there's anything he

20   disagrees with.

21       THE WITNESS:  No, I don't disagree with pretty

22   much anything.  That was just -- it'd be fine.

23       MR. DIXON:  No, that's --

24       MR. PFEIFER:  Okay.  We need to get that on the

25   record.

1       MR. DIXON:  I need a break with my client.

2       MR. STESIAK:  There's a question pending.  So you

3  need to read the statement and then answer the --

4       MR. PFEIFER:  Why don't we take a break so he can

5  read the statement.

6       MR. DIXON:  All right.  Fine.  No.  Let's go back

7  and figure out what the question is that's pending

8  and see where we are with it.

9       MR. SULLIVAN:  We're on the record now, right?

10       VIDEOGRAPHER:  No.

11       REPORTER:  I've been typing just in case.

12       MR. SULLIVAN:  Don't take that personally.

13       VIDEOGRAPHER:  I don't.

14       MR. DIXON:  Can I just for purposes of

15  clarification have her read back what is the question

16  that's pending?

17       MR. PFEIFER:  Sure.

18       MR. STESIAK:  And then his answer.

19       (Read back.)

20       MR. DIXON:  So if you're not going to withdraw

21  that question, then we're going to take a break and

22  he's going to read the whole deposition.

23       MR. PFEIFER:  Okay.  But we can't have

24  conversations.

25       MR. DIXON:  Right.

```
 1                  (Recess taken.)

 2   BY MR. PFEIFER:

 3   Q.   Okay.   Captain, during the break, you had a chance to read

 4        Tom Fautz's statement?   Yes?

 5   A.   Yes.   As far as I know, yes.

 6   Q.   And the question I think that was asked that caused you to

 7        want to see it was whether there was anything that you

 8        disagreed with in terms of his statement.   Now that you've

 9        had a chance to review his statement, let me ask you the

10        same question.

11             Is there anything that you disagreed with in terms of

12        what you read in his statement?

13   A.   No.

14   Q.   Okay.

15   A.   There's not anything.

16   Q.   We've talked about you listening to a tape involving a

17        conversation between Young and Richmond, correct?

18   A.   Yes.

19   Q.   Okay.   And that's the only one --

20   A.   No, no, no, no, no.   Now, you --

21   Q.   I'm sorry.   My bad.   Between Young and Wells?

22   A.   Yes.

23   Q.   And that's the only one that you listened to?

24   A.   Yes.

25   Q.   Okay.   What you learned on that tape, and I don't want to
```

```
 1        know the substance of it, but what you learned on that

 2        tape did you tell anybody what you had heard on that tape?

 3   A.   There was only one other officer that was there.

 4   Q.   Who is that?

 5   A.   That was Walters.

 6   Q.   So while you were listening to the tape, Walters was

 7        listening to the tape?

 8   A.   Yes.

 9   Q.   Why did you have him there listening to the tape?

10   A.   To get a second opinion, really.

11   Q.   Okay.  All right.  My question then still is other than

12        you and Walters who listened to the tape, after you

13        listened to it, did you tell anybody what you had heard on

14        the tape?

15   A.   No.

16   Q.   Did you instruct Walters not to tell anybody what he and

17        you had heard on the tape?

18             MR. WALTON:  Wait a minute.  I think we're

19             getting outside the line of the scope of why we're

20             here.  So you can continue, but it's getting close.

21             Go ahead.

22   A.   No.  We never had that conversation about not speaking

23        about it, whatever, if it was inferred.

24   BY MR. PFEIFER:

25   Q.   Okay.  To your knowledge, did anyone have access to the
```

```
 1        cassette tapes that you had ordered to be produced?

 2   A.   No, I don't believe so.

 3   Q.   You may or may not know the answer to these questions, but

 4        I'm going to ask you; and if you don't know, just tell me.

 5             The phone line with a phone number of Steve Richmond,

 6        that being 235-7473, that phone line with that phone

 7        number, which Steve Richmond had had when he was at the

 8        South Bend Police Department with a private line, is that

 9        the line that was intended to be recorded when he became

10        the Division Chief of Detectives?

11   A.   I can't answer that, no.

12   Q.   The former Division Chief of Detectives, Rick Bishop, he,

13        if you know, had the line bearing a phone number of

14        245-6031; is that correct?

15   A.   I don't know.

16   Q.   Okay.  Let me ask you a more general statement.  When

17        Richmond became the division chief in charge of the

18        Detective Bureau, is it your testimony that it was the

19        intent of the South Bend Police Department under your

20        direction as Chief of Police to record the division

21        chief's phone line?

22   A.   I followed what the prior Chief had had, Chief Fautz, I

23        kept up with the same thing he -- same lines he taped, I

24        taped.  I did not change one thing different.

25   Q.   Well, if Fautz told us he did not record the division
```

```
 1          chief's phone lines, then can you help me understand how
 2          it is that Richmond's phone line when he was the division
 3          chief was ever recorded?
 4                    MR. DIXON:  I'm going to -- that assumes facts
 5               that aren't -- have never been testified to.  It's
 6               not in evidence.  So I'm going to object to that.
 7     A.   Could you repeat that again?
 8     BY MR. PFEIFER:
 9     Q.   Sure.
10     A.   One more time so I can catch it.
11     Q.   Sure.  If Fautz has testified that he never ordered the
12          recording of division chiefs' phone lines --
13     A.   Right.
14     Q.   -- then can you help me understand when Steve Richmond
15          became the Division Chief of Detectives, how it is that
16          his phone line was recorded?
17     A.   It was just left the same way.  There was no change, and
18          it didn't get caught.  It just didn't get caught, and that
19          was not questioned.  Bishop never said anything, him about
20          recording lines.  I don't think any of them talked about
21          recording lines, that my phone was recorded.  It just got
22          -- it just was something that just got slipped.
23     Q.   I'm going to have the court reporter mark as Exhibit 2 the
24          statement of Tom Fautz.  And if you would just confirm
25          that what we've marked as Exhibit 2 is, in fact, the
```

```
 1        statement that you reviewed while we took a break?

 2   A.   Yes.

 3   Q.   Okay.  It is?

 4   A.   Yes, it is.

 5             (Exhibit 2 marked for identification.)

 6             MR. PFEIFER:  I'll pass the witness at this

 7        point.

 8             MR. DIXON:  Anybody else?

 9             MR. PFEIFER:  Who's going second, third, fourth?

10             MR. SULLIVAN:  Spence, do you want to go?

11             MR. WALTON:  Doesn't matter to me.  Do I need

12        that?

13                       CROSS-EXAMINATION

14   BY MR. WALTON:

15   Q.   Okay.  Chief, I'm Spence Walton.  I just have a couple of

16        areas to clarify.  And let's start where Mr. Pfeifer just

17        left off.

18             It's my understanding from your testimony that, to

19        your knowledge, Steve Richmond -- Steve Richmond's line

20        was never recorded; is that correct?

21   A.   No, because he changed his phone number.

22   Q.   And he changed his physical office?

23   A.   Yes.

24   Q.   Okay.  Is it your understanding that the phone line that

25        was recorded, the physical line and the number that was
```

1   recorded went into Bishop's office, and that Officer Young

2   took over Bishop's office?

3   A.   Yes.

4   Q.   Okay.  Is it my understanding then when you took over, you

5        indicated that whatever lines were previously being

6        recorded by Chief Fautz that you wanted to continue to

7        record?

8   A.   Yes.

9            MR. PFEIFER:   Object.   That mischaracterizes his

10           testimony.   He said the policy that had been followed

11           by Chief Fautz is the policy that he followed.

12           MR. WALTON:   I'm asking the questions my way.

13       You can have your objection noted.

14   BY MR. WALTON:

15   Q.   Is it my understanding that you indicated when you took

16        office that the same lines that were being recorded by

17        Chief Fautz you wanted to continue to record?

18   A.   Yes.

19   Q.   Okay.  And did you assume in making that decision that

20        Chief Fautz had in place a system of recording telephone

21        calls that were necessary for legitimate business purposes

22        by the South Bend Police Department?

23   A.   Yes.

24   Q.   And to your knowledge, the same lines continued to be

25        recorded by Chief Fautz as were being recorded under your

```
 1        tenure as Chief of the department?
 2   A.   Yes.
 3   Q.   Did that ever change, to your knowledge?
 4   A.   No.
 5   Q.   When you read Chief Fautz' statement, did you believe that
 6        his decision making with regard to which lines would be
 7        recorded, that he would record certain lines in the
 8        ordinary course of business by the South Bend Police
 9        Department for purposes of obtaining -- investigative
10        purposes and for purposes of also handling things such as
11        complaints to the office?
12              MR. SULLIVAN:  Objection, lack of foundation.
13           You can go ahead.
14   A.   I believe, yes.  I believe -- you're talking about his
15        following -- back and forth, yes.
16   BY MR. WALTON:
17   Q.   You were asked some questions about a statement being made
18        by Phil Trent.  Have you ever read that statement?
19   A.   No.
20   Q.   Did Officer Young ever request of you that his line not be
21        recorded?
22   A.   Not that I remember, no.
23   Q.   Did he request it of anybody else, to your knowledge?
24   A.   I don't know.
25   Q.   No one else that you know of?
```

1    A.   No, not that I know of.

2    Q.   When you continued with the recording of the same lines as

3         were being recorded by Chief Fautz, did you assume that

4         that policy would be continued?

5    A.   Yes.

6              MR. SULLIVAN:  Spence, can I ask that be read

7         back?  I didn't quite hear the question.

8              (Read back.)

9              MR. WALTON:  That's all the questions I have.

10        Thanks.

11             MR. DIXON:  I think I'll ask questions of him

12        after everybody else is done, so rather than going

13        one by one.  So...

14                      CROSS-EXAMINATION

15   BY MS. DUERRING:

16   Q.   Captain Boykins, I'm Mari Duerring, and I just have a

17        couple questions.  As your communications director, Karen

18        DePaepe oversaw the telephone system.  Would you agree

19        with that?

20   A.   Yes.

21   Q.   And so would you also agree that in terms of the specific

22        knowledge of the capabilities of that system that Karen is

23        the individual that possesses --

24   A.   Yes.

25   Q.   -- that?  You've been asked a lot of questions in terms of

1    some of the breakdowns in the system or some of the errors

2    that occurred.  And, again, in terms of the individual

3    that would have the specific knowledge of what had

4    occurred in that situation, is that again Karen DePaepe?

5  A.  Yes, it is.

6           MS. DUERRING:  That's all I have.

7                    CROSS-EXAMINATION

8  BY MR. SULLIVAN:

9  Q.  Captain Boykins, my name is Ed Sullivan, and I represent

10    the City of South Bend, City Administration.  And I'd like

11    to ask you some questions now.  Okay?

12  A.  Yes.

13  Q.  Prior to coming here today, what did you do to prepare for

14    today's deposition?

15  A.  Really just talked to my attorney.

16  Q.  When you spoke with your -- I assume you mean Mr. Dixon?

17  A.  Yes, sir.

18  Q.  When you spoke with your attorney, was there anyone else

19    present?

20  A.  No.

21  Q.  Did you review any documents with Mr. Dixon?

22  A.  I think there was a file or something like the deposition.

23  Q.  And you're pointing to Exhibit 2 --

24  A.  Yes.

25  Q.  -- in front of you?

```
 1            And do you recall which deposition or statement that

 2       you reviewed with Mr. Dixon?

 3   A.   Yes, I believe it was this one that we talked about.

 4        (Indicating.)  We didn't go through page by page.

 5            MR. DIXON:  Wait.  Object.  I'm not going to have

 6            you talking about what we talked about.  That's an

 7            attorney/client privileged communication.  All he's

 8            asking about is what documents did you review as part

 9            of our communicate -- as part of us sitting down,

10            what documents did you review.

11   BY MR. SULLIVAN:

12   Q.   I don't want to know what you discussed with Mr. Dixon.

13        But it looks to me like you're pointing to Exhibit 2.

14   A.   Right.

15   Q.   And that was one of the documents you reviewed with

16        Mr. Dixon?

17   A.   Yes.

18   Q.   Was there any other documents that you reviewed with

19        Mr. Dixon?

20   A.   No.

21   Q.   Other than your conversations with your counsel,

22        Mr. Dixon, did you talk about your deposition here today

23        with anyone else?

24   A.   No.  I had to go -- excuse me.  I had to let people know

25        I'm going to the city to give a deposition for my work.  I
```

```
 1        talked with that.

 2   Q.   There was some reference you had with folks just about the

 3        logistics of it?

 4   A.   Okay.

 5   Q.   Is that what you mean?

 6   A.   Yeah.

 7   Q.   So telling people that you were --

 8   A.   I'm going to be gone today; I'm going to be giving a

 9        statement, a deposition, yes.

10   Q.   Have you ever discussed the cassette recordings that you

11        listened to with Karen DePaepe after the point that you

12        received them?

13   A.   No.

14   Q.   When you were Chief of Police, Karen DePaepe reported to

15        you?

16   A.   Yes.

17   Q.   You were her supervisor?

18   A.   No.  Gary Horvath was her supervisor, Chief Horvath.

19   Q.   That was her direct report?

20   A.   Yes.

21   Q.   But you were the Chief --

22   A.   But I also was the Chief too.  She could directly report

23        to me just as well.

24   Q.   Right.  Okay.  And I'm just going to remind you that we

25        need to let each other finish.
```

1    A.   Okay.  Sorry.

2    Q.   You don't have to apologize.  It's sort of done in normal

3         life, but this isn't normal life.  So we have to go one at

4         a time.  As Chief of Police, that you would have been

5         aware of what her responsibilities were?

6    A.   Yes.

7    Q.   Was she a sworn officer --

8    A.   No.

9    Q.   -- of the police department?

10   A.   No.  No.

11   Q.   I'll ask it again just to clean it up.  Was she a sworn

12        officer of the police department?

13   A.   No.

14   Q.   Did she have any responsibilities to investigate crimes?

15   A.   No.

16   Q.   Did she have any responsibilities to investigate

17        wrongdoing within the department?

18   A.   No.

19   Q.   Do you have Exhibit 1 in front of you, sir?

20   A.   Yes.

21            MR. DIXON:  Are we going to -- before we go, are

22        we going to agree on the record to seal this

23        document?

24            MR. SULLIVAN:  I have a preface to my question on

25        this, so we can talk about that later.  Let me just

```
 1              put this on the record.
 2   BY MR. SULLIVAN:
 3   Q.   I'm not asking questions probably that refer to Exhibit 1,
 4        but I want to be clear with you that I am not asking you
 5        to reveal any of the content in Exhibit 1 that comes from
 6        the recordings referred to by Exhibit 1.  Did you
 7        understand what I just said?
 8   A.   Yes.  Exhibit 1 referenced the recording.
 9   Q.   Right.  And any questions I ask you, I want to be sure
10        that you do not reveal the contents of Exhibit 1 that
11        refer to the contents of the cassette.
12   A.   Of the tape.
13   Q.   Okay.  And if it comes to a point that you think you can't
14        answer my question without that, just tell me that.  Do
15        you agree?
16   A.   I agree.
17   Q.   Okay.  And if it sounds like you're going to reveal
18        something, I'll try and stop you.  Is that okay with you?
19   A.   That's okay.
20   Q.   Okay.  There on the first page of Exhibit 1 -- I'm sorry.
21        On the second page of Exhibit 1, there's a reference to a
22        particular conversation.  And I don't want you to tell me
23        anything about it or the parties.
24              I want you to indicate to me whether you see the
25        reference to a particular conversation starting with the
```

1     page -- starting on page 2 of Exhibit 1.

2  A.  Yes.

3  Q.  Okay.  That conversation that's referenced in Exhibit 1 of

4     the start of page 2 is not the conversation recorded and

5     placed on a cassette that you listened to between Young

6     and Wells, correct?

7  A.  Right.

8  Q.  The conversation that was recorded by the system and then

9     placed on a cassette between Young and Wells is not

10    referenced in Exhibit 1, is it?

11 A.  No.

12 Q.  Does the South Bend Police Department assign equipment to

13    officers?

14 A.  Yes.

15 Q.  What equipment do they assign?

16 A.  Well, you get a radio.  You have a laptop computer.  You

17    have weapons.  Sometimes even cell phones could be

18    partially paid for through the City, for the officer to

19    maintain, car, various type of equipment that goes along

20    with that just as well.  And I think that's pretty much

21    it.

22 Q.  All right.  You could be assigned a car and equipment that

23    goes with the car?

24 A.  (Nodding.)

25 Q.  Yes?

```
 1   A.   Yes.

 2   Q.   You could be assigned a cell phone?

 3   A.   Yes.

 4   Q.   But not all officers are assigned cell phones?

 5   A.   Right.

 6   Q.   You could be -- well, you'd be assigned a weapon?

 7   A.   Yes.

 8   Q.   You'd be assigned a laptop?

 9   A.   Yes.

10   Q.   You'd be assigned a radio?

11   A.   Yes.

12   Q.   And that is the assigned equipment?

13   A.   Yes.  But most uniform officers and DB officers may not be

14        assigned a laptop computer.  The Uniform Division will

15        probably have a laptop computer and maybe even a rifle.

16        Sometimes some detectives may have rifles and some

17        detectives may have laptops, but that's a general --

18        generality of equipment.

19   Q.   Okay.  What you've given me is the complete list, but not

20        all officers have the complete list?

21   A.   Right.

22   Q.   Okay.  Again, Exhibit 1, during the period of time when

23        you were the police chief, did you ever receive from Karen

24        DePaepe an officer's report from her?

25   A.   Yes.
```

1  Q.  And what were the circumstances -- what are the

2      circumstances under which Karen DePaepe would give you an

3      officer's report?

4  A.  Probably very little, unless something really came up and,

5      you know, where she was -- where something came up where I

6      needed to be involved or being asked questions on.

7  Q.  Do you recall any in your period of being Chief of Police?

8  A.  Yes.

9  Q.  Can you tell me what circumstances you recall?

10 A.  I was contacted by Karen that she had during the repair of

11     tapes -- or repair of a line, excuse me, repair of a

12     line --

13 Q.  Let me hold you up for a minute because I want to make

14     sure we don't drift -- and maybe I didn't ask the question

15     properly.  Other than Exhibit 1, do you have any

16     recollection of --

17 A.  No.

18 Q.  -- a specific officer's report from Karen DePaepe?

19 A.  No.

20 Q.  Okay.  Thank you.  I apologize that I was confused with my

21     earlier question.

22         In Exhibit 1, on page 1, the last paragraph of page

23     1 --

24             MR. SULLIVAN:  And I'd like counsel to refer to

25     that, and I'd like to know if anybody has any problem

1          if I read the last paragraph of page 1 into the

2          record.

3                  MR. PFEIFER:  Plaintiffs have no objections.

4                  MR. DIXON:  I don't have any objection to it.

5                  MR. SULLIVAN:  Mr. Walton?

6                  MR. WALTON:  No.

7                  MS. DUERRING:  No objection.

8     BY MR. SULLIVAN:

9     Q.  Do you see where I'm referring to on the bottom of page 1

10         of Exhibit 1, Captain?

11    A.  Yes, sir.

12    Q.  All right.  "Initially when the recording system was set

13         up; then Police" -- "then Chief of Police Thomas Fautz had

14         ordered that all incoming telephone lines answered by the

15         Front Desk, Communications, the Chief of Police's

16         telephone line, all division chiefs' telephone lines, and

17         the Internal Affairs' telephone lines be recorded.  The

18         reasoning behind this decision was that should anyone

19         receive telephone calls with information regarding any

20         criminal cases or allegations of misconduct by officers,

21         we would have audio documentation of lead information or

22         allegations."  Did I read that correctly?

23    A.  Yes.

24    Q.  You had testified earlier that you did not review the

25         practice of Chief Fautz when you became chief.  You simply

Page 110

1      allowed it to continue.  Do I have that right?

2   A.   Yes.

3   Q.   If Karen DePaepe is correct in her description on the last

4      paragraph of page 1 of Exhibit 1, then that is the

5      reasoning behind the practice, right?

6   A.   Yes.

7   Q.   But you never discussed that with Karen DePaepe?

8   A.   No.

9   Q.   And you never discussed that with Chief Fautz?

10  A.   No.

11  Q.   You did not conduct a review of that practice while you

12     were chief?

13  A.   No.

14  Q.   Okay.  Based upon the last paragraph of page 1 of Exhibit

15     1, then the practice of the police department would have

16     been to record Officer Young's telephone line because he

17     was the division chief, investigative division chief,

18     right?

19  A.   No.  He wasn't the investigative division chief.

20  Q.   I'm sorry.  I got that wrong.

21  A.   The phone line -- the phone line that was being recorded

22     was supposed to go to the division chief.  Because there

23     was a phone mixed up, it went to Young instead.

24  Q.   Right.

25          MR. PFEIFER:  Richmond was the division chief.

1       MR. SULLIVAN:  Did I say Young?

2       MR. PFEIFER:  You did.

3       MR. SULLIVAN:  Off the record.

4       (Discussion held off the record.)

5       VIDEOGRAPHER:  Go ahead.

6  BY MR. SULLIVAN:

7  Q. Based upon the last paragraph of page 1 of Exhibit 1,

8     Officer Richmond's telephone line was intended to be

9     recorded as division chief?

10 A. Yes.

11 Q. Based upon paragraph -- the last paragraph of page 1 of

12    Exhibit 1, it was not the intent to take Officer Young?

13 A. No, it wasn't the intent.

14 Q. It was not the intent to take --

15 A. No.

16 Q. It was done by mistake?

17 A. Yes.

18 Q. Before you were Chief of Police, you were -- what was your

19    title before chief?

20 A. Division chief.

21 Q. Division chief?

22 A. Uniform Division.

23 Q. Of the Uniform Division.  During the period of time you

24    were division chief of the Uniform Division, did you ever

25    -- were you ever part of any effort to create a formal

1     policy in writing regarding which lines would be recorded?

2 A.  Not as division chief, no.

3 Q.  As Chief of Police, were you ever part of that effort?

4 A.  Yes, later at the very end.

5 Q.  When?

6 A.  I think it was in March -- not March.  I take that back.

7     Close to March.  Yes, it was March 2012, after a lot of

8     this had kind of exploded or whatever in the media and

9     thing.  I decided before the investigation was over by the

10     Feds that I would make a difference and change -- change

11     some of the -- change some of the policies and start

12     working on a policy, basically working on a policy.

13         I contacted Lanchswerdt.  He did some research.  I

14     think the City Attorney was later advised just as well and

15     that we was going to issue forward to change the line

16     because we was coming up with a new telephone system I

17     call VoIP line, VoIP system.  And it was going to be

18     something different than the phone line that we previously

19     had before.

20 Q.  Okay.  And best of your recollection is March 2012 that --

21 A.  Yeah.

22 Q.  -- that you were part of -- you initiated that effort?

23 A.  Yes.

24 Q.  Because you believed as Chief of Police that would have

25     fallen under your duty?

1  A.  Yes.

2  Q.  Prior to that initiation of the effort, there was no

3      policy?

4  A.  No.

5  Q.  And the investigation by the U.S. Attorney's office is

6      what prompted you to begin that effort?

7  A.  Yes.

8          MR. SULLIVAN:  Can we go off the record for a

9      second?

10          VIDEOGRAPHER:  Okay.

11          (Discussion held off the record.)

12          (Exhibit 3 marked for identification.)

13          VIDEOGRAPHER:  Please continue.

14  BY MR. SULLIVAN:

15  Q.  You have in front of you Exhibit 3, Captain.  And you see

16      that it's "United States Department of Justice, Federal

17      Bureau of Investigation Receipt for Property

18      Received/Returned/Released or Seized," June 4, 2012.  Do

19      you see that?

20  A.  Yes.

21  Q.  And under the "Description of Items," it describes five

22      cassette tapes from Darryl Boykins on the very first line.

23      Do you see that, sir?

24  A.  Yes, sir.

25  Q.  And then when you move all the way down below the redacted

```
 1        portion, there's another line that says, "8 cassette tapes

 2        received from Boykins' attorney."  Do you see that?

 3   A.   Yes.

 4   Q.   You made -- you received five cassette tapes from Karen

 5        DePaepe?

 6   A.   Yes.

 7   Q.   Is that correct?

 8   A.   Yes.

 9   Q.   You then made copies of those?

10   A.   Yes.

11   Q.   And that's what the eight cassette tapes received from

12        Boykins' attorney describes --

13   A.   Yes.

14   Q.   -- the line on Exhibit 3?

15   A.   Yes.

16   Q.   You see that under the portion of description of items of

17        Exhibit 3, it's cassette 1, cassette 2, cassette 3,

18        cassette 4, cassette 5, each of them with dates

19        associated?

20   A.   Yes.

21   Q.   And do I have this right?  Some of the cassettes have more

22        than one date associated with them, for example, cassette

23        4?

24   A.   Yes.

25   Q.   Is that correct?
```

Page 115

```
1    A.   I'm looking at cassette 4.

2    Q.   Yeah.  And so I'm reading that right, that it has

3         conversations from both June 3, 2011, and June 6, 2011?

4    A.   Yes.

5    Q.   What's your knowledge about how these particular

6         conversations of these dates were placed on the cassettes?

7    A.   Karen put the dates -- and the dates and times on there.

8    Q.   Okay.  What I'm asking is do you have any knowledge about

9         why, for example, in cassette 4 a conversation that

10        occurred on June 3rd and a conversation that occurred on

11        June 6th were placed on the cassette?

12   A.   No, I have no idea.

13   Q.   All right.  Why did you make copies that are described

14        under the heading "8 cassette tapes received from Boykins'

15        attorney"?

16   A.   When -- they had requested me -- requested me to bring the

17        tapes to their office, which I did.  I made copies -- I

18        made the copies for him, for our own records to keep, for

19        whatever law enforcement purposes, and have a decision to

20        keep in case I had to show them to Mayor or something at

21        that point.

22   Q.   Let me back up and make sure we're clear.  When did you

23        make the eight cassette tapes that are referred to in

24        Exhibit 3?

25   A.   That was before I went to the Federal Bureau, or Justice
```

```
 1        Department.

 2   Q.   I'd like you to tell me as close as you can in your

 3        recollection --

 4   A.   I was --

 5   Q.   Hold on.  The rough month that you made the eight cassette

 6        tapes.

 7   A.   Had to be somewhere between February -- in February.

 8   Q.   In February of 2012?

 9   A.   Yes, close as I can remember, yes.

10   Q.   Was that before or after you were asked to produce the

11        original cassette tapes by the U.S. Attorney?

12   A.   It was before.

13   Q.   All right.  So why did you make the eight cassette tape

14        copies?

15   A.   This is when -- make sure I understand right so I answer

16        this right for you.  Is that when we made the tapes, when

17        they contacted me and said we'd like to have a statement

18        from you, could you come out, could you bring the five

19        tapes, before I left, I said -- Barb made a copy of these

20        five tapes so I can -- so we have it later in case we need

21        it for any type of -- not investigation, but anything for

22        what I call the purpose of just keeping those tapes in

23        case I had to show the mayor or my boss what was this all

24        about.

25            And that's why.  That was the purpose of it.  That
```

```
 1         was the only purpose of it.  It wasn't for any -- at that
 2         point it was made partially to look at it a little bit
 3         more, but not for -- I hadn't made a determination.  It
 4         was just like I kept the tapes, I better keep them and
 5         just hold on to have some kind of evidence, if that sounds
 6         right.  That's what it was for.
 7    Q.   You testified earlier that you became aware of the
 8         recording that had a conversation between Young and Wells
 9         through Ms. DePaepe?
10    A.   Yes.
11    Q.   I want to talk about that conversation with Ms. DePaepe.
12         Okay.  Where did it occur?
13    A.   In her office.  And I think she might have sent me an
14         e-mail, a brief e-mail, and might have been sent in to
15         her.  I called the office and I met down with her in her
16         office.
17    Q.   Okay.  Your recollection is that it may be an e-mail that
18         requested you to come talk to her?
19    A.   Right.
20    Q.   Did the e-mail refer to the recordings at all?
21    A.   I don't remember on that.  I really don't.
22    Q.   Did you go down to her office?
23    A.   Yes.
24    Q.   When you got to her office, was there anyone else there?
25    A.   You're talking about the tapes, right?
```

```
 1   Q.   I want to be careful because I still might be a little
 2        confused.   There's a system that captures digital
 3        recordings --
 4   A.   Right.
 5   Q.   -- of conversations.
 6   A.   Right.
 7   Q.   Do I have that right?
 8   A.   Digital recordings of conversations, I assume.  I do not
 9        know.
10   Q.   Okay.   Then let me clarify.   You are aware there's a
11        system that captures --
12   A.   Right, recordings.
13   Q.   -- the conversations?
14   A.   Yes.
15   Q.   And those are -- those conversations are then housed
16        within some apparatus at the police department?
17   A.   Right.   I understand that.
18   Q.   Okay.   I'm asking.   Is that your understanding?
19   A.   As far as my loose understanding, yes.
20   Q.   Yes.   And that Karen DePaepe, when you're in her office,
21        can use that apparatus to play those recordings out loud
22        to be listened to?
23   A.   Yes, she can.
24   Q.   All right.   And then there can be a further recording onto
25        cassette tapes of what you listened to from the original
```

1      apparatus, right?

2   A.  As I understand.

3   Q.  That's your understanding?

4   A.  Yeah.

5   Q.  Okay.  So you're down in her office.  She's asked you to

6       come.  You get there.  Is there anyone else in the office

7       when you got there?

8   A.  No, not that I remember, no.

9   Q.  Did anyone else come in later while you were --

10  A.  Not that I remember, no.

11  Q.  And you'd probably remember if there was anybody else,

12      right?  This is an important issue?

13  A.  I would hope so.

14  Q.  Okay.  Did she ever play the recordings directly from the

15      original apparatus that captures the conversations?

16  A.  No.

17  Q.  Okay.  Now, I want you to try and remember the different

18      topics that came up with Ms. DePaepe, all the different

19      subjects that came up.  What are they?

20          MR. DIXON:  Well, I think now we're getting into

21          content.

22          MR. SULLIVAN:  Okay.  I'm sorry.

23  BY MR. SULLIVAN:

24  Q.  I don't want to know the content.  Let's put it this way:

25      The content of at least one conversation came up, right?

1    A.   Yes.

2    Q.   Did the content of other conversations come up?

3    A.   Content, no.  I didn't listen to any other tape.

4    Q.   I know you didn't listen.  I'm talking about your

5         conversation with Karen DePaepe.

6    A.   No.  It was simply about the tapes, what was on the one

7         tape.

8    Q.   At this point there were no cassette tapes?

9    A.   No.

10   Q.   All right.

11             MR. DIXON:  If you'll give me just a little bit

12        of latitude, I might be able to --

13             MR. SULLIVAN:  That's all right.

14             MR. DIXON:  -- clarify with him in a way that

15        will help you with your examination.

16             MR. SULLIVAN:  That's okay.  I'll just struggle

17        through.

18             MR. DIXON:  Okay.

19   BY MR. SULLIVAN:

20   Q.   So when you first arrived at her office, there were no

21        cassette tapes?

22   A.   No.

23   Q.   All right.  And without telling me the content of any

24        conversation, tell me how she started the conversation

25        with you.

1   A.   She explained why she had the tapes and how she discovered

2        it.  That was the first thing she said.  This is first

3        thing while she was doing her job, something, checking

4        lines, it came up.

5   Q.   All right.

6   A.   Then she went from there to some of the things that she

7        had heard on the recording that she said was very

8        alarming.  She then went into, I wouldn't say detail, but

9        generally giving me what was on it in reference to myself

10       or others.  After she did that, the discussion, I went

11       back to my office.

12  Q.   What did you say in response to her when she described

13       these things?

14  A.   I was surprised.  I was surprised.

15  Q.   I appreciate you offering how you felt.  I want to know

16       what you said to her.

17  A.   I said to her -- I said -- really there wasn't a whole lot

18       to really say.  There wasn't a whole lot of conversation.

19              (Page 122 is designated as Attorneys' Eyes Only.)

20

21

22

23

24

25

Page 122



PAGE 122 HAS BEEN DESIGNATED

ATTORNEYS' EYES ONLY

1              MR. SULLIVAN:  You can finish your answer,

2        Captain Boykins, without revealing the content.  I

3        did not ask you the content.  I'm asking what you

4        said to Karen DePaepe.

5              MR. DIXON:  As long as it doesn't deal with

6        anything specific to the content of any of the tapes,

7        then you can answer.

8   BY MR. SULLIVAN:

9   Q.   That's correct.  Go ahead.

10  A.   Well, like I say, I relayed some of my feelings of how I

11       felt.  That was when she told me some of this, and I was

12       quite surprised to some degree.  And I said very shortly

13       after that, I said thank you and I left.

14  Q.   Okay.  If I understand your testimony correctly, you left

15       before asking her to take any of those conversations and

16       make cassettes of them?

17  A.   That came later.

18  Q.   So the answer to my question is yes?

19  A.   Yes.

20  Q.   Okay.  When you got back to your office, what did you do?

21  A.   I thought about what had just transpired.  I was kind of

22       surprised.  I was kind of figuring what should I -- should

23       I confront these individuals, what should I do, should I

24       just not say nothing.  I left it at that.

25            And my bottom line at the beginning of that, I was --

1      I think I let it go for quite a while before -- at that

2      point before I made a decision what to do.

3  Q.  I ask that that be passed to the witness.

4          (Exhibit 4 marked for identification.)

5  Q.  Captain Boykins, this is Exhibit 4.  And it's the South

6      Bend Police Department General Order, Office of

7      Professional Standards.  Do you see that?

8  A.  Yes, sir.

9  Q.  You're familiar with this?

10  A.  (Nodding.)

11  Q.  Is that right?

12  A.  Yes.

13  Q.  You may take some time to flip through it if you'd like to

14      familiarize yourself with it, and let me know when you've

15      finished with that.

16  A.  No, you can go ahead.

17  Q.  Okay.

18  A.  I can read the thingy.

19  Q.  After you got back to your office after talking to Karen

20      DePaepe and she relayed some of the conversations you

21      heard, did you take any actions related to what you

22      learned that are called for under Exhibit 4?

23  A.  No.

24  Q.  After thinking about the situation, what did you

25      ultimately do?

1  A.  Well, I basically did nothing at the point.  I didn't -- I

2       looked at it.  I listened to it, but I did nothing.

3  Q.  Hold on.  I think you jumped ahead of me.

4  A.  Okay.

5  Q.  Because I've got you back in your office, and there are

6       no --

7  A.  Okay.

8  Q.  -- not yet a cassette.  All right.  And that's where I'd

9       like you to pick up from, right.  What did you do next

10      that led to the creation of cassettes?

11  A.  Okay.  I asked Karen after a while -- I thought about it,

12      and I asked Karen could you give me a copy of the tapes so

13      I can review.

14  Q.  All right.  Did you call her or walk back down to her

15      office?

16  A.  I think I called her.  I think I'm pretty sure I called

17      her on the phone.

18  Q.  What did she say to you in response?

19  A.  She said fine, and that was it.  And she said, "I'll make

20      sure I have the tapes to you and they'll be marked."  I

21      think she said something like that.  And I said thank you,

22      and that was it.

23  Q.  Did you indicate to her specific conversations that you

24      wanted her to record?

25  A.  No.  I didn't know specific conversations, all of them,

1      specific conversations at that time.

2  Q.  How did -- what did you think that she would do to

3      determine which conversations to take out of the system

4      and place onto a cassette?

5  A.  She had contacted me and explained this is something she

6      had overheard and was very alarmed about it.  And then

7      that's when the conversation saying I will send you what I

8      have heard, because she had said it was very alarming and

9      back and forth.  And so she sent all those to me.

10 Q.  Okay.  So on Exhibit 3, the dates of the different

11     conversations that are indicated by cassette 1, 2, 3, 4,

12     and 5, did Karen describe for you in that first meeting

13     with her all these different conversations?

14 A.  Not all the conversations and descriptions.  She made a

15     general overview.

16 Q.  Okay.  At the time that you heard her general overview in

17     her office, did you have an understanding of all the

18     different individuals who would -- that she was referring

19     to in her general description?

20 A.  No.

21 Q.  Did you have any understanding of the scope of time that

22     was covered by the recordings, February, April, July, and

23     June --

24 A.  No.

25 Q.  -- of 2011?

1  A.  No.

2  Q.  Is it your testimony that you had no role and, in fact, no

3      knowledge of what Karen DePaepe had done to determine

4      which conversations gave her concerns?  We could have the

5      court reporter read that back because it was a long

6      question, if you'd like.

7  A.  No, no.  I was just thinking on that part.  I think Karen

8      had related, you know, these were some of the issues; but

9      there was no dates on it when we talked about it.  When

10     she talked about it, it wasn't any dates on it.

11 Q.  Did she describe to you when you met with her in the

12     office that first time her process to determine --

13 A.  Yes.

14 Q.  Okay.

15 A.  Sorry.

16 Q.  And the rest my question was her process to determine

17     which conversations were important for you to know about,

18     did she describe her process that she went through to

19     determine which conversations you should know about?

20 A.  No.

21 Q.  Did she describe what her criteria was?

22 A.  No, just that the line was under repair.  They was working

23     on the lines and that was her function.  That's how this

24     was brought to her.

25 Q.  When you received the cassettes, do you recall how long it

1      was between the time you first met with Karen and she

2      described the conversations and you received the

3      cassettes?

4  A.  I think several weeks.

5  Q.  Several weeks?

6  A.  I think so.  Not sure, but I believe it was several weeks,

7      or maybe closer to that.  I can't really be for sure.

8  Q.  It wasn't that day?

9  A.  No.

10  Q.  It wasn't the next day?

11  A.  No.

12  Q.  Okay.  How did she deliver them to you?

13  A.  They was in a package.

14  Q.  Did she hand the package to you?

15  A.  Yes.

16  Q.  In your office?

17  A.  I believe so, yes, sir, in my office.

18  Q.  When did you open the package?

19  A.  I think I opened it right then when I -- after she left.

20  Q.  After she left.  Okay.  Were the tapes labeled in any way?

21  A.  Yes.

22  Q.  Without reference to anything that might indicate content,

23      can you describe the labeling of the individual cassettes?

24  A.  They had a very short piece of tape on it with a very

25      short description.

1  Q.  Did the description indicate content in any way?

2  A.  To some degree, yes.

3  Q.  Okay.  Did they indicate dates?

4  A.  I don't -- can't remember on that.

5  Q.  As you look at Exhibit 3, does that refresh your

6     recollection of whether the cassettes were labelled with

7     dates?

8  A.  It might have been with the time and dates on it, but I

9     can't be a hundred percent sure.

10  Q.  Okay.  However, you were -- there was some kind of

11     indication of content to a certain degree?

12  A.  Yes.

13  Q.  Was there an indication of who the participants were in

14     the conversation on the cassettes?

15  A.  I'm trying to think.  Yes, I believe so.  I believe so.

16     I'm not sure, again, but I believe so.

17  Q.  Do you know as we look at cassette 1, 2, 3, 4, 5, are you

18     able to tell me which one you listened to?

19  A.  Not on this, no.  Not with this, no.

20  Q.  Why did you choose -- how did you happen to choose a

21     particular cassette to listen to?

22  A.  It was the one that was discussed -- she had discussed

23     with me where it was more directly towards me.

24  Q.  Okay.

25  A.  That caught my eye, to look at that first.

Page 130

```
 1   Q.   And so there was some kind of labeling that you recognized
 2        as what Karen had described to you?
 3   A.   Yes.
 4   Q.   And that's why you listened to that one?
 5   A.   Yes.
 6   Q.   Okay.  Where did you listen to the recording?
 7   A.   My office.
 8   Q.   How long did it take you to listen to that recording?
 9   A.   15 minutes, 10 minutes.
10   Q.   Did anybody come in during that period of time?
11   A.   Walters came in.
12   Q.   You described that earlier, didn't you?
13   A.   Yes.
14   Q.   You had asked him to come?
15   A.   Yes.
16   Q.   Did you ask him before you started listening or after you
17        started listening?
18   A.   He came in and listened.  When I turned it on, he
19        listened.
20   Q.   But you asked him to come for the specific purpose?
21   A.   Yes.
22   Q.   And you didn't listen to anything until he got there?
23   A.   No.
24   Q.   Okay.  Was he with you for the entire time --
25   A.   Yes.
```

1    Q.   -- you listened?

2    A.   Yes.

3    Q.   Did he view the cassettes and the labeling at all?

4    A.   Yes, I believe he might have.

5    Q.   Without revealing any of the content of the conversations

6         on the cassette tapes, what did -- Captain Walters, right?

7    A.   No, Division Chief Walters.

8    Q.   I'm sorry, that's right, Division Chief Walters.  What did

9         Division Chief Walters say to you after listening to the

10        recordings?

11   A.   "Wow."

12   Q.   Let me back up and say this:  How long did you and Chief

13        Walters talk about that cassette after you listened to it?

14   A.   We finished the cassette.  And he listened and we both

15        looked at each other and we said, "Wow."  And that's just

16        what we basically said.  I said there's others.  And he

17        said -- and I think I said, "Do you want to listen to

18        them?"  He said, "No."  I was done.

19   Q.   What about -- I'm going to get right to what you're

20        saying.  But I wanted to know how long a period of time --

21   A.   It was a very short conversation after we got --

22   Q.   Ten minutes?

23   A.   Less than that.

24   Q.   Five minutes?

25   A.   Yeah.  Yes.

Page 132

1    Q.   All right.   And other than the initial wows, right, what

2         were the things that -- the topics that you discussed,

3         without telling me the contents of the tapes?

4              (Page 133 is designated Attorneys' Eyes Only.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 133

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          PAGE 133 HAS BEEN DESIGNATED

16              ATTORNEYS' EYES ONLY

17

18

19

20

21

22

23

24

25

```
 1   BY MR. SULLIVAN:
 2   Q.  Okay.  What else?
 3   A.  I think we asked what, you know, where is this going to
 4       go, what are we going to do.
 5   Q.  All right.  What else?
 6   A.  I asked -- I'm going to have to eventually listen to the
 7       rest of the tapes.
 8   Q.  There was discussion about the eventuality of listening to
 9       the others?
10   A.  Yeah.
11   Q.  What else?
12   A.  And pretty much -- that was pretty much it.
13   Q.  So I've got speculation on why people said what they said,
14       right?
15   A.  Right.
16   Q.  Discussion about what do we do next?
17   A.  Uh-huh.
18   Q.  Right?
19   A.  Right.
20   Q.  And discussion about listening to the other recordings on
21       cassette?
22   A.  Right.
23   Q.  And those are all the subjects that you and Chief Walters
24       discussed after listening to the cassette?
25   A.  Yes.
```

1   Q.  Did you ever discuss taking any action that would be

2       consistent with the policy of Exhibit 4?

3   A.  No, not at that time.

4   Q.  Did you discuss with Chief Walters at that time whether

5       there was any other law enforcement personnel who should

6       be involved in the listening of the recordings?

7   A.  No.

8   Q.  Of the cassettes?

9   A.  No.

10  Q.  All right.  So you finished talking with Chief Walters.

11      He left?

12  A.  (Nodding.)

13  Q.  Is that correct?

14  A.  Yes.

15  Q.  What did you do with the cassettes then?

16  A.  I locked them up in my closet in my office.

17  Q.  And how long did they stay in there?

18  A.  Stayed in there for quite a while.

19  Q.  The recording you -- the cassette you did listen to

20      contained a conversation between Officers Young and Wells,

21      correct?

22  A.  Yes.

23  Q.  What were their positions with the South Bend Police

24      Department at that time?

25  A.  I think Wells worked for Metro Homicide as a lieutenant

Page 136

1           and Young was a captain in the Detective Bureau.

2     Q.    When you became Chief of Police, there was no practice in

3           the South Bend Police Department to regularly record

4           discussions between a Metro Homicide officer and the

5           captain in the South Bend Police Department; isn't that

6           right?

7     A.    No.  We didn't have no –– we didn't record them, no.

8     Q.    There was no practice for that?

9     A.    No.

10    Q.    There was no procedure for it?

11    A.    No.

12    Q.    There was no policy for it?

13    A.    No.

14    Q.    I'll refer you back to Exhibit 1.  I'm not going to talk

15          about any of the content of the conversations in Exhibit

16          1.

17                When you received Exhibit 1 physically, did you

18          receive a physical copy or an electronic copy?

19    A.    Physical copy.

20    Q.    Did Ms. DePaepe hand it to you physically or send it to

21          you with some kind of interoffice ––

22    A.    It was in the envelope with the rest of the tapes.

23    Q.    Oh, this came when the cassettes came?

24    A.    I believe they all came at the same time.

25    Q.    All right.  Physically what did you do with Exhibit 1 when

```
 1        you received it with the cassettes?

 2   A.   Well, like I say, Chief Walters came in and listened to

 3        it.  We listened to it after a while.  This probably, the

 4        date, time, was maybe a day or two.  And then I filed it

 5        and just put it with the envelope with the rest of the

 6        tapes.  I kept everything all together, the officer's

 7        report and the tapes all together.

 8   Q.   I thought I heard you say something about the date.

 9        Ms. DePaepe has a date on Exhibit 1 of January 4th, 2012?

10   A.   Uh-huh.

11   Q.   Is that right?

12   A.   Yes.

13   Q.   Is that the date you received the cassettes?

14   A.   Close to it.  I can't be certain, but close to it.  They

15        was all together when I got it.

16   Q.   All right.  And, Captain Boykins, when you said you filed

17        it, people have lots of different meanings of that phrase.

18        I'd like you to describe to me what you did with it to

19        file it.

20   A.   I put it back in the package and then put -- and locked it

21        up.

22   Q.   So it was with the cassettes?

23   A.   Yes.

24   Q.   Did you make a photocopy?

25   A.   No, not -- no, not at the time, no.
```

Page 138

1   Q.   So there should have been the original copy of Exhibit 1

2          with the cassettes the entire time?

3   A.   Should have been, yes.

4   Q.   Did you ever do anything else with the original copy of

5          Exhibit 1?

6   A.   I took it out when I took the other tapes up to the Fed.

7          I didn't include this in there.  I removed it.

8   Q.   Why?

9   A.   They asked for the cassette tapes.  They didn't say they

10         wanted an officer report.  Gary had already -- supposedly

11         they asked for any information from us, whether officer's

12         reports, e-mails, the whole lot to be given in to.  Gary

13         had already collected all that, all this information,

14         officer's report and whatever and had gave it to him.

15   Q.   Do you know independently, your own knowledge, whether

16         Officer Gary Horvath came and got the original Exhibit 1

17         and gave that to the U.S. Attorney in response to their

18         request?

19   A.   I believe he did.

20   Q.   You believe he did?

21   A.   Yeah.

22   Q.   Did you give it to Gary Horvath?

23   A.   Yes.  I gave a copy.  I don't know if I gave him the

24         original.  I can't really be sure.

25   Q.   So you did make a photocopy?

1   A.   I think I made a photocopy, but I can't be sure.  I can't

2        be sure if I did on that or not.  I can't recall.  I can't

3        recall that for certain, so I don't want to say.

4   Q.   When you left as Chief of Police, did you take any files

5        out of your office with you?

6   A.   No.

7   Q.   Are you aware of whether Ms. DePaepe made any copies of

8        Exhibit 1?

9   A.   No.

10  Q.   Captain Boykins, you referred several times to a meeting

11       you had with the U.S. Attorney's office.

12  A.   Yes.

13  Q.   Let's start with your recollection of when that occurred.

14  A.   That was sometime, I think, in February maybe, end of

15       February, March.

16  Q.   Who was at that meeting?

17  A.   It was two agents and myself.

18  Q.   Do you recall the names of the agents?

19  A.   No, I don't.

20  Q.   No clue, first names even?

21  A.   No.

22  Q.   Okay.  What was the -- what was discussed with these

23       agents?

24  A.   Just generally how we come about with the tapes, how the

25       tapes came about.

1  Q.  Did the agents express to you any concerns about whether

2      either the original recording, listening to or making

3      cassettes, was a violation of the law?

4  A.  They didn't say.  They said they was here just to

5      investigate.  They did not make any conclusions.

6  Q.  Okay.  So they never shared any conclusions with you?

7  A.  No.

8  Q.  But you knew that's what they were investigating?

9  A.  Yes.

10 Q.  If I can refer you back to Exhibit 3 again, the bottom

11     portion where it says, "8 cassette tapes received by

12     Boykins'" -- "from Boykins' attorney," do you see that,

13     sir?

14 A.  Yes.

15 Q.  Okay.  Why were two copies of cassette 1 made, two copies

16     of cassette 2, and two copies of cassette 5 made, but only

17     one copy of cassettes 3 and 4?

18 A.  Because they shouldn't have.  Barb -- I mean, we probably

19     shouldn't have.  But Barb was making the copies, and she

20     was making another copy.  Chief Walters actually went back

21     and told her we only need one copy.  But we had already

22     made the other cassettes, so we put it all together in a

23     bag.

24 Q.  So when you made the second set of cassettes, you had

25     asked the secretary, Barb -- I forget her last name.

1   A.  Holleman.

2   Q.  Holleman.

3   A.  I didn't ask Walters.  Walters told her we didn't anymore.

4       We just needed one copy, and that was it.

5   Q.  Well, let me get this straight.  You went to Chief Walters

6       and said let's make back-up copies of the cassettes, and

7       then he went to Ms. Holleman?

8   A.  No.  We have a back -- you can go to DB, and you can get

9       copies, real quick copies of cassette tapes, what they

10      call high speed.  Barb, I gave Barb to go ahead and do

11      that with Walters because he was there.

12  Q.  All right.  Was that on the same day that Walters listened

13      to cassette 1 with you?

14  A.  No, no.

15  Q.  Okay.  But you're the one that asked Ms. Holleman to make

16      the back-up cassettes?

17  A.  Yes.

18  Q.  And then at some point, people realized she was making

19      two, and you said we only need one?

20  A.  Yes, Walters did.

21  Q.  Walters did that?

22  A.  Yes.

23  Q.  If I asked you this already, I apologize.  But did I hear

24      you say earlier that you reviewed the general descriptions

25      that were placed on the cassettes and chose based upon

```
 1        that to listen to the one that she had discussed with you

 2        in your original meeting?

 3   A.   Yes.

 4   Q.   Thank you.  I think I asked that before, but I wanted to

 5        be sure.

 6             Is there a regular practice or procedure for

 7        distribution of officer's reports?

 8   A.   It depends on if they make it directly toward you, if your

 9        name's on it.  If they wrote out "Chief Boykins, Division

10        Chief," thing, there would be a sign-off, a little thing.

11        You initial, when you put initial date and notes on your

12        officer's --

13   Q.   And you're referring to the top portion of Exhibit 1?

14   A.   Yeah.  This is how this would establish and go through

15        the -- go through it.  If someone else's name had been on

16        it, it would have been given to the other person's name as

17        well.

18   Q.   All right.  So you're telling me that the upper right-hand

19        portion of page 1 of Exhibit 1 shows who else got one?

20   A.   Yes.  But we also was basically supposed to get one sent

21        to it.

22   Q.   And I'm asking, is there -- so it's kind of a yes or no

23        question.  I just need to know is there a practice or a

24        procedure that tells the author of an officer's report who

25        they should give it to?
```

1   A.   No, I don't think so, no, if I'm understanding you right.

2        Like this one, Exhibit 1 you give me, this should have

3        came to me because Karen wrote it and it came to me.  Is

4        that what you're talking about?

5   Q.   Well, I didn't know if that any time an officer's report

6        is compiled, whether there might be a regular procedure to

7        always send a copy to your direct superior.  So, for

8        example --

9   A.   He'd have to put the direct superior's name on it.

10  Q.   But should Ms. DePaepe have copied Chief Horvath when she

11       authored Exhibit 1 under the regular practice, procedure,

12       or policy of South Bend Police Department?

13  A.   I don't think that's been followed because I've received

14       numerous reports from other people without their

15       commanders or --

16  Q.   Based on that, you think there is no direction to that?

17  A.   I'm not saying we don't have a directive on that.  I can't

18       remember.  But I know doing officer's reports and

19       different information on the force, since I've been on,

20       they can direct that to the attention of whoever they

21       want, Internal Affairs, whoever they want to do that.

22  Q.   Captain Boykins, the one recording cassette that you

23       listened to, isn't it the case that it did not involve the

24       investigation of a crime?  That conversation did not

25       involve the investigation of a crime?

1   A.   No, it didn't.

2                MR. SULLIVAN:  Thank you, Captain.

3                MR. DIXON:  Are you done?

4                MR. SULLIVAN:  Yes, sir.

5                MR. DIXON:  So it's my turn, right?

6                MR. PFEIFER:  Your turn, then I have more.

7                MR. DIXON:  Okay.

8                        CROSS-EXAMINATION

9   BY MR. DIXON:

10  Q.   You mentioned, Chief, that there was no policy with regard

11       to the phone lines.  But it would be fair to say, more

12       accurate to say there was no written policy that

13       specifically delineated which lines would be recorded and

14       which lines wouldn't?

15               MR. SULLIVAN:  Objection, leading.

16               MR. PFEIFER:  Object to the form of the question.

17               MR. DIXON:  You can answer the question.  It's

18       cross-examination.  It's cross-examination.

19               MR. SULLIVAN:  Mr. Dixon, it's your client.

20               MR. DIXON:  He can answer the question.

21               MR. SULLIVAN:  I'm not telling him he can't.

22               THE WITNESS:  Okay.  Could you read it for me one

23       more time?

24               MR. DIXON:  Can you read it back?

25               (Read back.)

```
 1   A.  Yes.

 2   BY MR. DIXON:

 3   Q.  When you took over the position of Chief of Police, what

 4       was the position you held just previous to that?

 5   A.  I was division chief.

 6   Q.  And was your line recorded when you were the division

 7       chief?

 8   A.  I believe it was.

 9   Q.  Did you -- were you told that when you came on to become

10       the division chief?

11   A.  Not that I remember, no.

12   Q.  Did Chief Fautz come to you and seek your permission to

13       record your line as a division chief?

14              MR. SULLIVAN:  Object to the form, all of these

15          as leading.  Go ahead.

16   A.  No.

17              MR. DIXON:  You can have a standing objection to

18          leading questions if you want so we can get through

19          it quicker.

20   BY MR. DIXON:

21   Q.  And who would have been in the position of division chief

22       before you, Jim Hassig?

23   A.  Yes.

24   Q.  And did he have a conversation with you, when the

25       transition from him to you as the division chief, about
```

```
 1        the line being recorded?
 2                MR. SULLIVAN:  Objection, leading.
 3                MR. DIXON:  Why don't you just have a standing
 4           objection?  I'm recognizing a standing objection.
 5                MR. SULLIVAN:  That all your questions are
 6           leading?  I mean --
 7                MR. DIXON:  That every question, you can come in
 8           later on and say that's a leading question, Judge.
 9                MR. SULLIVAN:  Okay.  That's fine.
10   A.  Yes, we had a brief conversation about the lines.
11   BY MR. DIXON:
12   Q.  Okay.  When you transferred from -- when you became the
13       division chief?
14   A.  Yes.
15   Q.  In that conversation, did he tell you that the line was
16       taped?
17   A.  Yes.
18   Q.  I thought you just testified that you said you learned
19       later on that --
20   A.  I later learned, but it was also from Jim Hassig.  It
21       wasn't right then when I first became.  It was after he
22       had left, and he would visit me constantly or a lot of
23       times; or even after he left, he stayed around and we
24       would talk.
25   Q.  Who on the department in your career as a police officer
```

Page 147

1    did you understand to be the person to have the authority

2    to order lines recorded?

3  A.  I believe the Chief of Police.

4  Q.  When was the new phone system coming into place?

5  A.  2012.  I think they were starting to get ready after the

6    first of the year, I think the new VoIP systems.

7  Q.  In the beginning of 2012?

8  A.  Yeah, maybe a little bit further up, maybe about January

9    or February.

10  Q.  Were there discussions about that system, about it being

11    implemented prior to 2012?

12  A.  Yes, I was aware there was discussions and meetings that

13    was going on discussing that system.

14  Q.  Did that -- you mentioned something earlier, I think when

15    Mr. Pfeifer was asking you questions about a person's -- a

16    person being able to record a line on demand.  Do you

17    remember that conversation?

18  A.  Yes.

19  Q.  Did that exist under the prior system before the new

20    system came into place?

21  A.  No.

22  Q.  So that discussion, to put that into proper perspective, a

23    timeframe, the on demand capacity of the telephone system

24    of the South Bend Police Department was with the new

25    system coming into place at the end of 2011 or into 2012?

Page 148

```
 1   A.   Yes.

 2   Q.   When that new phone system came in -- or was coming into

 3        place in either the fall of 2011 or the beginning of 2012,

 4        what is your understanding as to which lines were going to

 5        be recorded on that new system?

 6   A.   Well, I think that they were the same ones that we always

 7        had, the 911, the records desk, the two front desks,

 8        Barb's desk, the Chief's desk, division chiefs' desks, and

 9        somebody else.  And I believe the phone system had a

10        different type of system where you could make on demand

11        type, and you wouldn't need to have to have those lines

12        taped again.

13   Q.   Was it your understanding that the detective bureau chief,

14        Chief's line would continue to be -- or would be recorded

15        under the new system?

16   A.   Yeah, only on demand though.  It would be on the demand

17        system.  He could actually put it on and take it off if he

18        wanted to.

19   Q.   Is that why you didn't take -- when you learned about

20        Captain Young's line being recorded, his phone number

21        being recorded, is that why you didn't take any action

22        with regard to that?

23   A.   Well, I knew a new system was coming in, and I was in a

24        rush to get it through here with the City Attorney.  And

25        that's what we was doing.  They was working to get a new
```

1   line, new things come up, policy, you know, because I had

2   went to do the old way of just putting tape on the top of

3   the phone and saying this line is recorded, this line

4   recorded, this line recorded.

5        But I think that got changed, and it never went

6   through; but I was going to do that until we got the new

7   system where everybody who had a recorded phone would know

8   the phone is recorded.

9        MR. DIXON:  Okay.  I'd just like to take a

10       two-minute break, if you guys don't mind, maybe a

11       five-minute break.

12       MR. PFEIFER:  Are you done?

13       MR. DIXON:  No.

14       VIDEOGRAPHER:  Off the record.

15       (Recess taken.)

16       VIDEOGRAPHER:  Please continue.

17  BY MR. DIXON:

18  Q.  When Mr. Sullivan was asking you about equipment that

19      belonged to the City, I want to ask you about when you

20      became division chief, did you have an assigned office?

21  A.  Yes.

22  Q.  And was there a phone in there?

23  A.  Yeah.

24  Q.  And who did that phone belong to?

25       MR. PFEIFER:  Objection, leading.  I take it

```
 1              back.  It's not leading.
 2   BY MR. DIXON:
 3   Q.  Who did that phone belong to?
 4   A.  The City.
 5   Q.  They didn't ask you to bring your own personal phone in or
 6       anything like that?
 7   A.  No.
 8   Q.  And I think I just want to make sure I understand your
 9       prior testimony was that when you took over as division
10       chief, at the time that you took over, you were not aware
11       that your line was recorded?
12   A.  Not at the beginning, no.
13   Q.  Did Chief Fautz ever come to you and seek your permission
14       to have the line recorded when you were the division
15       chief?
16   A.  No, not that I'm aware of, no.
17   Q.  How long have you been on the department?
18   A.  About 29 years, coming up to 29 years.
19   Q.  Did you in your 29 years on the department, just you
20       personally, believe that you had an expectation of privacy
21       on any phone line that you were on at the South Bend
22       Police Department?
23   A.  No.
24   Q.  Did you receive training as to how to comport yourself
25       when you were on the City's phone system?
```

1   A.   No.

2   Q.   Well, let's look at this Exhibit 4.   Let me ask just you

3        this question:   Do you know if there were procedures in

4        place that dealt with how police officers are supposed to

5        communicate on the telephone, on the City's telephone

6        system?

7   A.   No, none.

8   Q.   With your understanding of the policy or -- we've already

9        established it wasn't a written policy.   But the standard

10        operating procedure with regard to the recording of lines,

11        what was your understanding of that with regard to the

12        issue of whether or not you needed to obtain -- as the

13        Chief of Police, you needed to obtain the consent of

14        individuals to record specific lines?

15   A.   I think there was -- my understanding was that there was

16        no exception of privacy with the phone because any -- your

17        phone line could be recorded, and there was no exception

18        of privacy on that part.   It was notified if there was

19        something, if it was -- however you put it -- if there was

20        something that for clients who called up and made

21        complaints and people like that for law enforcement

22        purposes, that's what a lot of the phones were used for.

23        And that's where I expected when I got on the phone or if

24        I was making a call, you sometimes forget when you're

25        talking on the phone that it's recorded; but generally

1         that's what's going to happen.

2    Q.   Well, let's take it back to when you were the division

3         chief.  Sometime after you became the division chief, you

4         learned that your phone line was being recorded?

5    A.   Yes.

6    Q.   Did you file a grievance for that phone line being

7         recorded without your consent?

8    A.   No.

9    Q.   Did you go to Chief Fautz and tell him you wanted the line

10        not recorded because he had not obtained your consent?

11   A.   No.

12   Q.   Did you believe consent was required in order for your

13        phone line to be -- in order for your phone line to be

14        recorded as a division chief?

15   A.   No, not at the -- no.

16             MR. DIXON:  I don't have any further questions.

17                      REDIRECT EXAMINATION

18   BY MR. PFEIFER:

19   Q.   You were asked some questions about whether you'd ever

20        talked about this case with anyone other than your lawyer,

21        and I think you said, no, you hadn't; is that correct?

22   A.   Yes.

23             MR. DIXON:  I'm going to object.  We're getting

24        past -- I should have objected earlier, but we're

25        getting past what the purpose of these depositions

1    is, which is to determine the legal validity of the

2    taping system and the policies and procedures that

3    were in place pursuant to the Court's order.

4  BY MR. PFEIFER:

5  Q.  Have you ever had conversations with your lawyer when

6    other individuals were present, such as Ms. Duerring,

7    Mr. Duerring, or Mr. Walton, or Karen DePaepe?

8         MR. DIXON:  I'm going to object to that question.

9    I'm going to -- again, it's beyond the scope, and I'm

10   going to instruct my client not to answer it.  Are

11   you talking about the phone system itself, the

12   policies and procedures with regard to the taping

13   system?  Is that what your question deals with or is

14   it broader than that?

15        MR. PFEIFER:  The question speaks for itself.

16        MR. DIXON:  Okay.  Then I'm going to instruct my

17   client not to answer as being beyond the scope of

18   what the Court's order is with regard to our purposes

19   for discovery at this juncture.

20  BY MR. PFEIFER:

21  Q.  Are you refusing to answer that question?

22        MR. DIXON:  Yes, he is.

23  Q.  Are you refusing to answer --

24  A.  Only by advice --

25        MR. DIXON:  It's asked and answered, yes.  We're

```
 1              moving on.  You want to certify it, certify it.  We

 2              don't need to be two hours here.  When I tell him not

 3              to answer a question, just certify it.

 4   BY MR. PFEIFER:

 5   Q.  Captain Boykins, are you refusing to answer that question?

 6   A.  On my advice of my attorney -- or what he just advised on,

 7       I'm not going to answer the question.

 8              MR. PFEIFER:  Thank you.  Now you can certify the

 9              question.

10   Q.  Have you ever had conversations in the presence of your

11       lawyer and any other person about the policies and

12       procedures of the South Bend Police Department as it

13       pertains to recording of phone conversations?

14   A.  Not that I remember, no.

15   Q.  Have you ever had conversations in the presence of your

16       lawyer with any other individual, Mr. Walton, Ms. DePaepe,

17       Mr. Duerring, and Mrs. Duerring, about any matter

18       pertaining to your deposition today?

19   A.  I haven't with Duerring and -- no, I haven't talked to

20       Karen since this started, or Mr. Duerring during this

21       whole time.

22   Q.  Did you have any conversation today in my office during

23       one of the breaks of the deposition where Ms. Duerring and

24       your attorney were present?

25   A.  Yes, they were both present.
```

Page 155

1   Q. Was the topic of the conversation pertaining to matters

2      that were -- you were being questioned about?

3          MR. DIXON:  You haven't established that we

4      haven't made a joint defense agreement in our case.

5      So I'm going to object to that question being asked

6      and as being violative of the purview of the

7      attorney/client privilege, and I'm going to instruct

8      my client not to answer.

9          MR. PFEIFER:  Have you, in fact, established a

10     written joint defense agreement?

11         MR. DIXON:  No.

12         MR. PFEIFER:  Now you can answer the question.

13  A. In the office they were talking.  They were just generally

14     talking and talking with my lawyer, not to me.

15  BY MR. PFEIFER:

16  Q. The question is when you were in one of the offices during

17     one of the breaks today, your lawyer, Ms. Duerring, and

18     you were present, correct?

19  A. Yes.

20  Q. What was discussed?

21  A. Just different things.  I mean, it wasn't a big thing.  It

22     was, hey, when are we going to go to lunch or -- they also

23     talked about, you know, if you're going to answer it, when

24     my lawyer advised me don't get rattled, don't get upset,

25     that type of stuff, calm yourself down, you know, don't

1      let nothing get to you, answer my questions; if I tell you

2      not to answer, I won't answer.  Those types of

3      instructions.

4  Q.  Were there any other conversations other than that when

5      Ms. Duerring, your lawyer, and you were present during one

6      of the breaks today?

7  A.  Not that I remember.  It's just what I told you.  I can't

8      remember every precise thing, but that was the general

9      thing, as I mentioned before.

10 Q.  Go ahead.  You can finish.  Or are you finished?

11 A.  No.  I'm thinking back what you said, and that's what was

12     said.  We talked about how to answer if he tells me don't

13     answer or if there was an objection or if I felt like I

14     was being intimidated by you or anything like that, those

15     type of things.  Don't let that bother you.  It was just

16     general analogies of questions that they asked.

17         They didn't say not -- they didn't say I want you to

18     answer this way to this question here or this question

19     here.  It was generality, prepare yourself for what you're

20     going to get questioned in here.  Don't get rattled, don't

21     get tired.  You're going to be sitting here for a long

22     time.

23 Q.  Have you ever had any conversations with your lawyer

24     present and Mr. Walton?

25 A.  No.  You mean here today?  No.

Page 157

1    Q.  Any time.

2    A.  I believe maybe once, and that's it, I think.

3    Q.  When did that conversation take place, approximately?

4    A.  A couple months ago, months ago.

5    Q.  What was the general topic of that conversation?

6    A.  Same thing what the lawyer was talking about.  We were

7        going to have a hearing.  Tell me some legal things that I

8        was going to have to -- that I would have to give a

9        deposition.  We don't know when the deposition is.  This

10       is going to federal court.  This is going to be -- the

11       legal aspect of it, nothing in detail because there was

12       nothing, questions asked of me.

13   Q.  Okay.  So you had a conversation with your lawyer,

14       Mr. Walton, and you, but it was just about depositions,

15       nothing specific --

16   A.  Nothing --

17   Q.  -- is that what you're saying?

18   A.  Nothing really deep down specific, no, just general

19       getting me ready for court.

20   Q.  What about the City Attorney's office, did you ever

21       consult with the City Attorney's office about any of the

22       matters pertaining to why we're here, the subject of why

23       we're here?

24           MR. DIXON:  I'm going to have to object to that.

25           MR. SULLIVAN:  Let me go first.

1        MR. DIXON:  Go ahead.

2        MR. SULLIVAN:  Yeah.  I would object to the

3    extent there was any conversation with the City

4    Attorney's office in his capacity as an employee

5    seeking legal advice.  That would be a privileged

6    communication.

7        MR. DIXON:  They would also be privileged

8    communications about any potential that deal with

9    this case, but the broader issues that deal with any

10   potential settlement negotiations that may have gone

11   on at the time when he was demoted.  So all of those

12   things pertain to the case, but are not producible.

13  BY MR. PFEIFER:

14  Q.  Fair enough.  I don't want to know about any settlement

15      negotiations that may or may not have taken place whenever

16      you were demoted from the Chief of Police to captain.  And

17      I don't want to know about any discussions you had with

18      anybody at the City Attorney's office pertaining to any

19      legal advice in the capacity of you being an employee of

20      the South Bend Police Department.  Okay?  You understand?

21  A.  Yes.

22  Q.  Apart from that, did you ever have any conversation with

23      the City Attorney's office pertaining to the recording of

24      the conversations?

25  A.  No.

1 Q. Did you ever have any conversation with the City

2   Attorney's office about any other matter other than those

3   two that I've said I don't want to hear about?

4 A. No, I don't think so.

5 Q. Okay.  You were asked questions about going to the U.S.

6   Attorney's office.  Do you remember that line of

7   questioning?

8 A. Yes.

9 Q. What did the FBI agents say to you after they had

10   completed their questioning of you?

11 A. They never said anything.

12 Q. If I understand what you are saying to us, you only

13   listened to one cassette, and that involved a conversation

14   between Brian Young and Dave Wells, correct?

15 A. Correct.

16 Q. And you've not listened to any of these other tapes,

17   correct?

18 A. Correct.

19 Q. So it would be a fair statement, would it not, that you

20   have no personal knowledge or information based upon

21   listening to those tapes who may or may not be

22   participants in the conversation?

23 A. That's true.

24 Q. So if there's any knowledge or information that has been

25   circulated about Steve Richmond or Tim Corbett being on

1    those conversations, those recordings, the only person

2    that that information could have come from is Karen

3    DePaepe; is it not?

4  A.  I have -- no, I have no idea how that information could

5      have came out and Karen DePaepe.  I did not listen, and I

6      can't speak for Karen.

7  Q.  Well, I understand.  But Karen DePaepe is the one that

8      recorded these conversations, correct?

9  A.  Yes.

10 Q.  And Karen DePaepe is the one that actually hand chose the

11     conversations to record to provide to you, correct?

12 A.  Yes.

13 Q.  And what you're saying is you have only listened to one

14     tape, correct?

15 A.  Yes.

16 Q.  It doesn't involve Corbett, correct?

17 A.  Yes.

18 Q.  It doesn't involve Richmond, correct?

19 A.  Yes.  Are you speaking -- I didn't -- their names might

20     have been mentioned, but they're not talking on --

21 Q.  They're not talking.  Walters, Division Chief Walters

22     listened with you to one tape, correct?

23 A.  Yes.

24 Q.  That one tape only included a conversation between Young

25     and Wells, correct?

1    A.   Yes.

2    Q.   So at least from your perspective, we eliminated anybody

3         who would have any knowledge or information about the

4         content of the tape apart from you and Karen DePaepe?

5    A.   The way the police department is, you can get rumors

6         starting wherever things would go.  I would have no idea

7         how things would get started or what was being said or

8         what was known because it's just a rumor mill.  When

9         things happen, it just goes that way.

10   Q.   Is there anything that prevents -- let's just -- I'm going

11        to pick Officer Doe, an officer of the South Bend Police

12        Department.  Is there anything that would prevent an

13        officer from going into the communications section of the

14        police department and -- sitting down with Karen DePaepe

15        and listening to the recordings?

16   A.   I would not think -- I've known Karen for a long time, and

17        I don't believe she has the quality or her ethics would do

18        that.  I think she's been very professional for her 24 or

19        26 years here, and I don't see her doing that.  Now, is it

20        possible?  Could that happen?  I suppose.

21   Q.   So do you have any personal knowledge or information as to

22        how Corbett and Richmond's name became involved in all of

23        this?

24   A.   Probably just rumors and gossip that people start

25        sometime.  There's a grapevine that sit there saying stuff

1      all the time.

2  Q.  I'm sorry?

3  A.  There's guys that will always make up stuff; even if

4      there's not even stuff there, they would make up.

5  Q.  In response to one of Mr. Sullivan's questions, you

6      basically said that the recording of Brian Young's

7      telephone line and telephone number was a mistake,

8      correct?

9  A.  Yes, it was a wrong phone number that was taped.

10  Q.  Okay.  Once the mistake was learned, was there anything

11      done to correct the mistake and stop the recording?

12  A.  Not right then.  But, yes, we was getting a new VoIP

13      system, and I had put in for a change.  That was going to

14      be corrected.

15  Q.  Once you realized as the Chief of Police that someone's

16      phone line is being recorded and it shouldn't be recorded,

17      didn't you as the Chief of Police take immediate action to

18      stop the recording by telling Karen DePaepe, Karen, you

19      know what to do, you know how to do it, stop recording

20      Brian Young's phone line?

21  A.  No, I didn't give her that.  I didn't give her that order.

22  Q.  Don't you think you should have as the Chief of Police?

23          MR. DIXON:  Objection.  That's argumentative.

24  BY MR. PFEIFER:

25  Q.  Go right ahead.

Page 163

1    A.  Well, as I said before, as soon as I learned we had this

2        system, we had some flaws in our the system, I had started

3        to work with the City and to get it changed.  I wasn't

4        told to do that.  I wasn't ordered to do that.  I wasn't

5        this.  Nobody said hurry up and do this.  I did that on my

6        own.

7    Q.  As the Chief of Police?

8    A.  As the Chief of Police.

9    Q.  As the Chief of Police --

10            MR. DIXON:  Wait.  Would you stop pointing at him

11        like that?  That's a little bit aggressive.

12   BY MR. PFEIFER:

13   Q.  As the Chief of Police, once you realized that one of your

14       officer's phone lines is being taped and recorded and it

15       shouldn't be, don't you think you owe it to that officer

16       to have that situation immediately remedied?

17   A.  Well, that might have been my mistake not to get it

18       immediately done right away.  But in my process, that's

19       what I was doing.

20   Q.  Karen DePaepe came to you sometime, I think you said, and

21       I want to make sure I understand the timeframe, sometime

22       in the November/December 2011 timeframe, and told you

23       about what she had heard, correct?

24   A.  Yes.

25   Q.  And she told you she heard it accidentally because of a

1   malfunction in the phone lines, correct?

2   A.   Yes, there was a breakdown of the lines.

3   Q.   Okay.   Did she tell you when that breakdown had occurred?

4   A.   No.

5   Q.   Did she tell you how long the breakdown had been going on?

6   A.   No.

7   Q.   Were you left with the impression that the breakdown had

8   just happened and she just listened to these phone

9   conversations, and that's why she was telling you at that

10   moment in time?

11   A.   Honestly, it never crossed my mind one way or the other.

12   It just didn't.

13   Q.   Did you get the impression that based upon this breakdown

14   in the phone system, that Karen DePaepe said to you caused

15   her to inadvertently or accidentally listen to a

16   conversation, that that then caused her to go and attempt

17   to listen to other conversations that had taken place?

18   A.   No.   I think from my understanding, from what I got from

19   her, is that the line broke down.   And that's when she

20   learned about the conversations, not to go look for other

21   conversations.   Just when that line broke down, she was

22   checking whatever she does to repair it, to look at it.

23   Q.   So whenever that line broke down, whenever that was,

24   that's when she, in the process of repairing the breakdown

25   on that line, learned about these conversations and

Page 165

1       brought it to your attention?

2   A.  Again, Karen --

3           MR. DIXON:  Hold on.  I'm going to object to that

4       because I think you're asking him what he understands

5       Karen to have done and what was motivating her, as

6       opposed to whether he knows what was motivating her.

7       And I think you need to clear that up.  If she's told

8       him that information, then you can ask that.  But

9       your previous questions have all been about what he

10      understands when Karen acted and why Karen contacted.

11      This question avoided that, and I just need to make

12      sure that that's still clear that that's what you're

13      asking him is his understanding of what was

14      motivating Karen.

15  BY MR. PFEIFER:

16  Q.  You can answer.

17  A.  As I said, I don't -- Karen checked the lines.  She said

18      the line -- there was a breakdown in the line.  That's

19      what she would investigate and that's what she would work

20      on.  I don't know.  You'd have to ask Karen about the

21      other particulars of what she does when she checked the

22      line.  I do not know that.

23  Q.  Taking a look, if you would, at Exhibit 1, I believe it

24      is, and that's the officer's report.  Do you see it?

25  A.  Yes, sir.

Page 166

1  Q.  If you remember, the bottom paragraph is the paragraph --

2     on the first page, is the paragraph that Mr. Sullivan read

3     into the record, correct?

4  A.  Yes.

5  Q.  And as I understand what you're saying in your deposition

6     testimony, the recording of lines were only based upon

7     what Chief Fautz had ordered, and that is that all

8     incoming telephone lines answered by the front desk would

9     be recorded, the communications would be recorded, the

10    Chief of Police telephone lines, all division telephone

11    lines, division chiefs' telephone lines, and the Internal

12    Affair lines were being recorded, correct?

13 A.  Yes.

14 Q.  So this question that Mr. Walton asked you about the

15    policy of the normal operation of the South Bend Police

16    Department having lines recorded, there was no policy

17    about having the lines recorded.  All that you knew was

18    what you understood Fautz to have done in his previous

19    reign as Chief of Police, correct?

20 A.  I followed his verbal policy that he had.  That was it.

21    There was no written policy.

22        MR. PFEIFER:  I don't have anything else.

23        MR. SULLIVAN:  Just a couple of follow-ups.  I'm

24    going to need your mic.

25

Page 167

1                        RECROSS-EXAMINATION

2    BY MR. SULLIVAN:

3    Q.   Captain, I'd like to refer you to Exhibit 1 again, the

4         second page and the first line, "When I heard the

5         conversation on February 4th, 2012..."  Did I read those

6         first words correctly?

7    A.   Yes.

8    Q.   And now if you go look at Exhibit 3, you'll see the

9         cassette 1 is dated February 4th, 2011.  Do you see that?

10   A.   2-4 of '11?

11   Q.   Right.

12   A.   Yeah.

13   Q.   In fact, there's no conversations on Exhibit 3 that are

14        dated on the 12th, are there?  That are dated in 2012, are

15        there?  Do you see that?

16   A.   You're talking about cassette number 3?

17   Q.   I mean any -- let's start again.  I'm sorry if I'm a

18        little confusing.

19             None of the cassettes labeled and described on

20        Exhibit 3 have dates in 2012.  Do they?

21   A.   No.

22   Q.   But on page 2 of Exhibit 1 in the first line, Ms. DePaepe

23        describes a conversation on February 4th, 2012.  That must

24        be a typo based upon the fact that her memo is January

25        4th, 2012.  Would you agree with that?

Page 168

1  A.  Yes.

2  Q.  Okay.  So when you read Exhibit 1 and she describes the

3      conversation on February 4th, 2012, did you understand

4      that reference to really be the conversation on cassette

5      1, February 4th, 2011?

6  A.  Now that you draw my attention to it, yes.  That's what

7      I'm looking at, yeah.

8  Q.  All right.  Safe to say that you believe in reading

9      Exhibit 1 that the conversation of February 4th that she

10     listed, Exhibit 1, was contained on cassette 1?  Is that

11     what you believed when you read Exhibit 1?

12  A.  Yes.  And it was dated 2-4 of '11.

13  Q.  Okay.  Now you see on the very next line of Exhibit 1,

14     there's a phrase where Ms. DePaepe says, "I became

15     alarmed."  Do you see that?

16  A.  Yes.

17  Q.  Okay.  And that's what you've described to us, that she

18     became alarmed and then followed up to listen to other

19     conversations, right?

20  A.  Yes.

21  Q.  All right.  I want you to go now to the paragraph on page

22     2 of Exhibit 1 which starts off, "In checking audio

23     recordings..."  Do you see that paragraph?

24  A.  No.

25  Q.  It's toward the bottom.  It's the second to last

1    indentation.

2  A.  On the second page?

3  Q.  Page 2, sir, yes.

4  A.  Yeah.

5  Q.  Okay.  "In checking audio recordings on this same date,"

6    do you see that?

7  A.  Yes, I see that.

8  Q.  All right.  And I read that correctly?

9  A.  Yes, you did.

10  Q.  All right.  Now go back to Exhibit 3.  Right?  And you see

11    that there are cassettes, 2, that has the date of April

12    5th, 2011.  Do you see that on Exhibit --

13  A.  Yes.

14  Q.  -- 3?  And below that is cassette 3 on July 14.  Do you

15    see that?

16  A.  Yes.

17  Q.  And cassette 4 is June 3 and June 6.  Do you see that?

18  A.  Yes.

19  Q.  And cassette 5 is June 16, on cassette 5.  Do you see

20    that?

21  A.  Yes.

22  Q.  All right.  So whatever Ms. DePaepe did to create the

23    officer report, Exhibit 1, she must have done something

24    after that and listened to further conversations.  Would

25    you agree?

Page 170

1      MR. WALTON: Are you asking him if he knows --

2      THE WITNESS: I can't really --

3      REPORTER: I'm sorry. I can't hear --

4      MR. WALTON: I asked the question are you asking

5      if he knows what she did, or are you asking him to

6      guess what she did?

7   BY MR. SULLIVAN:

8   Q. You can answer my question, sir.

9   A. I don't know. I'd be making a guess to say that I have no

10     idea.

11  Q. Ms. DePaepe never discussed with you that she was going to

12     listen to conversations on a date other than February 4th?

13  A. Listen to her conversation, no. She said she never was

14     listening -- I mean, these tapes came off the repairs when

15     she got called in. She never said I'm going to go listen

16     to some taped line. She never said that. That never

17     occurred.

18  Q. Okay. I'd like to refer you -- I'd like to refer you to

19     the paragraph on page 2 of Exhibit 1. Okay.

20     MR. DUERRING: Did you say paragraph 2?

21     MR. SULLIVAN: No. I want him just to be on page

22     2 of Exhibit 1.

23  Q. Are you there?

24  A. I'm on page 2.

25  Q. Now you go down to the different paragraphs, and there's

MIDWEST REPORTING, INC.
1448 Lincolnway East
South Bend, Indiana 46613

Page 171

1    one -- the third one says, "At this point" --

2  A.   Yes.

3  Q.   Do you see that?

4  A.   Uh-huh.

5  Q.   Okay.  And if you look at the last sentence of that

6       paragraph -- just let me know when you're there.

7  A.   Yes, I got that.

8  Q.   Okay.  It says, "It was at this point I made a decision as

9       keeper of the records to check further conversations to

10      see if there was more information."  Did I read that

11      portion correctly?

12 A.   Yes, you did.

13 Q.   Okay.  So when you read Exhibit 1, you knew that she had

14      checked other conversations, not just the one that came to

15      her during the course of checking the lines that were

16      malfunctioning?

17 A.   True.

18 Q.   All right.  And when you look at Exhibit 3, isn't it

19      obvious that the other conversations were on dates other

20      than February 4th?

21           MR. WALTON:  Counsel, he didn't author this

22      document.  You can get at it quicker with Karen.

23 A.   Like I say, I can't -- you know, I can't give you an

24      explanation.

25 Q.   I'm not asking you for an explanation.

1   A.   Okay.   What are you asking for?

2            MR. DIXON:   We will stipulate that the document,

3       Exhibit 3, speaks for itself, that it includes

4       cassette recordings of conversations that occurred on

5       dates other than February 4, 2011.

6   BY MR. SULLIVAN:

7   Q.   When you read Exhibit 1 then, you knew that she checked

8       other conversations?

9   A.   Yes.

10           MR. SULLIVAN:   Okay.   I'm done.

11           MS. DUERRING:   I have nothing.

12           MR. WALTON:   I have nothing further.

13                    REDIRECT EXAMINATION

14  BY MR. PFEIFER:

15  Q.   Continuing in that next to the last paragraph of Exhibit

16      1, again, without getting into the substance of the

17      conversation, at least Karen DePaepe indicated to you that

18      she was concerned that your reputation was being

19      sabotaged, correct?

20  A.   Yes.

21  Q.   Then she went on to say in the very next line, "As I

22      reviewed some of the audio," so she at least in her report

23      indicates that after hearing this February 4th, 2011,

24      tape, she went on to review some other audio, correct?

25           MR. DIXON:   Are you asking him if that's what the

Page 173

1       document says, or if he knows, he has first-hand

2       knowledge that that's what she did?

3              MR. PFEIFER:  Go ahead.  You can answer.

4              MR. DIXON:  No, he can't because the question is

5       subject to two different interpretations, and I'm

6       asking you to clarify your -- I'm asking you to

7       clarify the question.

8   BY MR. PFEIFER:

9   Q.  You can answer.

10             MR. DIXON:  No, he can't.  I'm going to instruct

11      him not to answer as being confusing and as not being

12      a clearly stated question.

13  Q.  Are you refusing to answer that question?

14  A.  On advice of my attorney, I can't answer the question.

15             MR. PFEIFER:  Certify that question.

16  Q.  Did Karen DePaepe, if, in fact, she went to listen to

17      other tapes after she had the opportunity to hear the tape

18      of February 4th, 2011, if that happened, did she do it on

19      her own initiative or did she do it because she was

20      ordered to do so by you?

21  A.  She was not ordered to do it by me.

22  Q.  Was she asked to do it by you?

23  A.  She was not asked to do it by me.

24  Q.  So if it happened, if I understand what you're saying, it

25      would have been strictly on her own initiative?

Page 174

1   A.  If it happened.

2               MR. PFEIFER:  I'm done.

3                   RECROSS-EXAMINATION

4   BY MR. SULLIVAN:

5   Q.  One more follow-up based on that.

6           When you read Exhibit 1 originally, then you were

7   aware that she did that?

8   A.  Aware she did what?

9   Q.  What she describes herself doing in Exhibit 1?

10  A.  You mean in paragraph, checking --

11  Q.  Second to last paragraph of page 2 of Exhibit 1.

12  A.  Where you said, hard drive, do not access -- "Most of

13  these audio recordings are maintained"?

14  Q.  No, where she said, "I reviewed some of the audio," you

15  read that when you received Exhibit 1?

16  A.  Yes.

17              MR. SULLIVAN:  Okay.  Thank you.

18              MR. DIXON:  We will not waive signature.

19              VIDEOGRAPHER:  We're off the record.

20              (Exhibit 1A marked for identification.)

21              (The deposition concluded and witness excused at

22          2:01 p.m.)

23                      *       *       *

24

25

Page 175

CERTIFICATE

1
2
3

    I, Angela J. Galipeau, a Notary Public, in and for the County of Porter and State Of Indiana, do hereby certify:

4
5

    That DARRYL BOYKINS appeared before me on Monday, April 15, 2013, and was duly sworn or affirmed to testify the truth, the whole truth, and nothing but the truth to questions propounded at the taking of the foregoing deposition in a cause now pending and undetermined in said court;

6
7
8

    That I further certify that I then and there reported stenographically the proceedings at the said time and place; that the proceedings were then transcribed from my original shorthand notes; and that the foregoing typewritten transcript is a true and correct record thereof;

9
10
11
12

    That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I interested directly or indirectly in the outcome of this action;

13
14

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of April, 2013.

15
16
17
18
19
20
21
22
23
24
25

ANGELA J. GALIPEAU
Porter County
My Commission Expires
April 23, 2017

Angela J. Galipeau, RPR, CSR
Notary Public, State of Indiana
Residence:  Porter County
Commission Expires:  4-23-17

MIDWEST REPORTING, INC.
1448 Lincolnway East
South Bend, Indiana 46613

Page 176

1
2
3  
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CITY OF SOUTH BEND,
                          Plaintiff,        )
          vs                                )
                                            )
SOUTH BEND COMMON COUNCIL, TIM              )
CORBETT, DAVE WELLS, STEVE                  )  Case No.
RICHMOND, BRIAN YOUNG, and SANDY            )  3:12-CV-475
YOUNG,                                      )
                          Defendants.       )
-------------------------------------       )
And related case.                           )
-------------------------------------       )

DARRYL BOYKINS

     I hereby acknowledge that I have read the foregoing
transcription regarding the case of *City of South Bend vs
South Bend Common Council, et al.,* taken Monday, April 15,
2013, and that the same is a true and correct
transcription of the answers given by me to the questions
propounded, except for the additions or changes, if any,
as noted on the attached errata sheet.


                    _____
                    DARRYL BOYKINS

                    SUBSCRIBED AND SWORN to
                    before me this _____ day
                    of _____ A.D. _____.


                    _____
                    Notary Public, State of Indiana
                    County of Residence:_____
                    My Commission Expires:_____

MIDWEST REPORTING, INC.
1448 Lincolnway East
South Bend, Indiana 46613