Page 1

```
          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF INDIANA
               SOUTH BEND DIVISION
CITY OF SOUTH BEND,            )
    Plaintiff,                 )
    vs.                        )
SOUTH BEND COMMON COUNCIL,     )CAUSE NO.:
ET AL.,                        )3:12-cv-475
    Defendants.                )
BRIAN YOUNG, SANDY YOUNG,      )
TIMOTHY CORBETT, DAVID WELLS,  )
and STEVE RICHMOND,            )CAUSE NO.:
    Plaintiffs,                )3:12-cv-532-JVB-CAN
    vs.                        )
THE CITY OF SOUTH BEND, Acting )
Through its Police Department, )
DARRYL BOYKINS, Individually   )
and in his Official Capacity as)
Chief of Police, KAREN DEPAEPE,)
and SCOTT DUERRING,            )
    Defendants.                )
```

The deposition of: STEVE RICHMOND.
DATE: Tuesday, April 16, 2013.
TIME: 2:07 p.m. EST.
PLACE: May, Oberfell and Lorber
4100 Edison Lakes Parkway
Mishawaka, Indiana 46545
        Called as a witness by the defendant, Darryl
Boykins, pursuant to notice of deposition as to date, place
and time, and in accordance with the Indiana Rules of Civil
Procedure, and is reported by MICHELLE A. WHITAKER, Notary
Public, RPR, Associate Reporter.
        MARILYN M. JONES & ASSOCIATES, LTD.
              COMPUTER-ASSISTED REPORTERS
                  1416 FRANKLIN STREET
               MICHIGAN CITY, INDIANA 46360
                    (219) 879-4077

---

Page 3

1      APPEARANCES CONTINUED:
2      DUERRING LAW OFFICES
       BY: MARIELENA DUERRING
3          Colonia Place
           61191 US 31 South
4          South Bend, Indiana 46614
           (574) 968-0250
5          attymduerring@aol.com
6      Appearing on behalf of the defendants
       Scott Duerring and Karen Depaepe
7
8      MAY, OBERFELL, LORBER
       BY: E. SPENCER WALTON, JR.
9          4100 Edison Lakes Parkway
           Mishawaka, Indiana 46545
10         (574) 243-4100
           ewalton@maylorber.com
11
12     Appearing on behalf of the South Bend Common Council
13
14     ALSO PRESENT:
15
       Scott Duerring
16     Darryl Boykins
       Brian Young
17     Sandy Young
18
19     STEVE RICHMOND DEPOSITION EXHIBITS:
20     4 - Office of professional standards, seven-page document
21     (Exhibit marked in a previous deposition and utilized
22     herein.)
23
24             ---o0o---
25

---

Page 2

1      APPEARANCES:
2      FAEGRE BAKER DANIELS
       BY: EDWARD A. SULLIVAN, III
3          202 S. Michigan Street, Suite 1400
           South Bend, Indiana 46601-2020
4          (574) 234-4149
           ed.sullivan@faegrebd.com
5
6      Appearing on behalf of the plaintiff
       City of South Bend
7
8      CITY OF SOUTH BEND
       BY: ALADEAN M. DeROSE
9          County-City Building
           South Bend, Indiana 46601
10         (574) 235-5866
11     Appearing on behalf of the plaintiff
       City of South Bend
12
       PFEIFER MORGAN & STESIAK
13     BY: DANIEL PFEIFER
           53600 North Ironwood Drive
14         South Bend, Indiana 46635
           (574) 272-2870
15         dpfeifer@pilawyers.com
16     Appearing on behalf of the plaintiffs
       Brian Young, Sandy Young, Timothy Corbett, David Wells and
17     Steve Richmond
18     DIXON, WRIGHT & ASSOCIATES, P.C.
19     BY: THOMAS M. DIXON
           55255 Birchwood Court
20         Osceola, Indiana 46561
           (574) 315-6455
21         tdixon3902@comcast.net
22     Appearing on behalf of the defendant
       Darryl Boykins
23
24
25
```

COPY

---

Page 4

1   Tuesday, April 16, 2013 --
2            (All parties present in the conference room
3            at or about 2:07 p.m. EST. Witness sworn.)
4   STEVE RICHMOND
5      Having been first duly sworn, then testified as
6   follows:
7   DIRECT EXAMINATION
8   BY MR. DIXON:
9      Q.  Can you tell me your name, please.
10     A.  Steven Richmond.
11     Q.  And where do you live?
12     A.  I live in Grosse Point Woods, Michigan.
13     Q.  Retired there?
14     A.  Yes. Well, I'm -- I am employed, but I retired
15  from the police department and moved there.
16     Q.  Okay. And how long did you work for South Bend
17  Police Department?
18     A.  Twenty-nine years, I think, three months.
19     Q.  How long ago did you retire?
20     A.  I retired in June of last year, in 2012.
21     Q.  What rank did you retire at?
22     A.  Investigative division chief.
23     Q.  Just by way of background, first of all, have you
24  been deposed before?
25     A.  Yes.

1 (Pages 1 to 4)

City of South Bend vs. South Bend Common Council, et al                    /Young, et al vs. The City of South Bend, et al                    DEPOSITION OF: STEVE RICHMOND

## Page 5

1    Q.   Several times?
2    A.   Yes, I would imagine.
3    Q.   And I'm sure you've given live testimony in court
4   as well?
5    A.   Yes, I have.
6    Q.   So, do you think we need to go through the ground
7   rules about not interrupting each other and all that kind of
8   stuff?  Are you pretty comfortable with that?
9    A.   Yes.
10   Q.   Okay.  You heard the ground rules I went through
11  with -- with Sandy Young?
12   A.   Yes.
13   Q.   The same apply.  If you need a break or if you
14  don't understand a question or if your counsel doesn't
15  understand a question, just let me know.  Okay?
16   A.   Yes.
17   Q.   Also, if your counsel lodges an objection, I would
18  recommend that you just -- you let him finish lodging his
19  objection before you try to -- pause and then answer and get
20  instruction from him as to answer or not to answer.  Okay?
21   A.   I understand.
22   Q.   Now, when you retired as the investigative
23  division chief, how many -- I'm gonna -- this is also by way
24  of background -- how many divisions were there on the South
25  Bend Police Department?

## Page 6

1    A.   There are three divisions.
2    Q.   Okay.  Can you -- Records?  Was records one of
3   'em?
4    A.   No.
5    Q.   Tell me the divisions.
6    A.   There's the uniform patrol division.
7    Q.   Okay.
8    A.   There is the investigative division and then there
9   is the services division.
10   Q.   Is the investigative -- Would it be fair to say
11  the investigative serv- -- the investigative division
12  includes the detective bureau?
13   A.   Yes.
14   Q.   And so when you retired, you were the -- were you
15  the chief of the investigative services division?  Did
16  people also call you chief of the detective bureau?
17   A.   Yeah.  Investigative -- it wasn't called the
18  investigative services division.  It was investigative
19  division.  The "services" is a separate division.
20   Q.   Right.  Okay.
21   A.   But they had also referred to me as the detective
22  bureau chief.
23   Q.   How -- how long did you hold that position?
24   A.   I began that position February 2010.
25   Q.   Just a little under two and a half years, then?

## Page 7

1    A.   Yes.
2    Q.   And what position did you hold before that?
3    A.   I was a captain in the investigative division.
4    Q.   Who was the chief when you were the captain?
5    A.   Rick Bishop.
6    Q.   Did Rick Bishop have his own office?
7    A.   Yes, he did.
8    Q.   Did you -- When you were a captain and he was a
9   chief, did you have your own office as captain?
10   A.   Yes, I did.
11   Q.   And when you became the chief, did you move into
12  Rick's office or the office that Rick had had?
13   A.   Yes, I did.
14   Q.   And did -- did you then appoint -- or did -- was
15  Brian Young then appointed to the position that you were
16  vacating?
17   A.   Yes, he was.
18   Q.   And he went into your old office?
19   A.   Yes, he did.
20        MR. WALTON:  Excuse me by asking you again.
21  Did you say you moved into Rick Bishop's office?
22        THE DEPONENT:  When they promoted me to
23  division chief, yes, I did.
24        MR. WALTON:  You moved into his physical
25  office?

## Page 8

1         THE DEPONENT:  Yes, I did.
2    Q.   Now, when you made that move, that was in February
3   of 2010?
4    A.   Yes, sir.
5    Q.   When you made that move, you kept the phone number
6   that you had had as the captain?
7    A.   Yes, I did.
8    Q.   And was that on your impetus or was that on
9   Captain Young's impetus?
10   A.   That was on my request.
11   Q.   Okay.  And who did you request that of?
12   A.   Barb Halaman (phonetic).
13   Q.   At the time you became the division chief, did
14  anyone tell you that the phone lines -- the phone line that
15  was hardwired into that office, the chief's office, was a
16  recorded line?
17   A.   No.
18   Q.   Were you aware that it was a recorded line?
19   A.   No, I was not.
20   Q.   Rick Bishop never talked to you about it -- about
21  his line being recorded?
22   A.   No, he did not.
23   Q.   And did Jim Hassag have that position before Rick
24  Bishop?
25   A.   I don't remember Jim Hassag being a investigative

2  (Pages 5 to 8)

Marilyn M. Jones & Associates          Computer-Assisted Reporters & Videographers                    (888) 810-4077

Page 9

1  chief.
2      Q.  Okay.  Who -- do you know who was before Rick
3  Bishop?
4      A.  Oh, gosh.  Yes.  Eugene Kyle.
5      Q.  Gene Kyle.  Okay.
6          And you were -- you were appointed to the position
7  of chief by then-chief Boykins?
8      A.  Yes, I was.
9      Q.  Would you have called Brian Young on his line?
10     A.  Yes.
11     Q.  In his office?
12     A.  Yes, I did.
13         MR. PFEIFER:  By "his line," are you talking
14     about Brian Young's private line?
15         MR. DIXON:  I'm talking about the line that
16     was in -- on the phone that was in Brian --
17     Q.  Would you have called him on the 6031 number that
18  was Brian Young's number?
19     A.  245-6031, yes, I did.
20     Q.  Okay.  And you weren't here yesterday.
21     A.  No.
22     Q.  But one of the -- one of the things that was
23  testified to yesterday is that your phone number was not a
24  line that was ever recorded.  Are you -- were you aware of
25  that?

Page 10

1      A.  I had heard rumor to that effect.  I have nothing
2  to verify that.
3      Q.  Did you have conversations with Chief Boykins
4  after it became known that Brian Young's line was a recorded
5  line?  Did you have conversations with Chief Boykins
6  about -- where you expressed concern about your line being
7  recorded?
8      A.  Yes.
9      Q.  Do you have any evidence that you're -- that
10  you're on any conversations where the conversations are
11  recorded on -- in the police department?
12         MR. PFEIFER:  Object to that question,
13     because again we are outside the scope of the
14     first wave of questioning.
15         MR. DIXON:  I thought it was real similar to
16     the question I asked her, and I'm just trying to
17     figure out exactly how I asked her that question.
18     I'm just trying to get at the same thing, which we
19     allowed to have happen.  So, tell me what you
20     remember me saying in that last one.
21         MR. PFEIFER:  Tom, it's not my job to phrase
22     the questions for you.  I'm not trying to --
23         MR. DIXON:  And I'm just asking you to clear
24     it up so that you don't think that -- that I'm
25     trying to get into standing issues.

Page 11

1          MR. PFEIFER:  Well, I can't -- If you want to
2      ask the question, then I'll make a decision as to
3      whether or not it is a standing question or it is
4      a question that is contemplated as a part of this
5      first wave of discovery.  I mean, I don't think
6      it's appropriate for me to sit here and tell you
7      how I think the question should be phrased.
8          MR. DIXON:  No.  I agree.  I'm just -- I'm
9      trying not to get into that issue.  And since we
10     already went through it, I thought you might have
11     a recollection better than mine of how I asked the
12     question which didn't get an objection to it.  So,
13     I'll just --
14         Can you read back my question right up to
15     where he gets to his objection.
16         (Record read.)
17         MR. DIXON:  And he objected to that.
18     Are you instructing him not to answer it,
19     then?
20         MR. PFEIFER:  Yes, I'm instructing him not to
21     answer that.
22         THE REPORTER:  Are you certifying that
23     question?
24         MR. DIXON:  No, I'm not gonna worry about
25     certifying that question.  I'm just gonna try to

Page 12

1      remember how I asked it before when it wasn't
2      problematic.
3  DIRECT EXAMINATION CONTINUED
4  BY MR. DIXON:
5      Q.  Do you have any firsthand knowledge of the phone
6  recording system on South Bend Police Department when you
7  were an officer?
8      A.  Firsthand knowledge?
9      Q.  Right.
10     A.  I do not know how the system operates.
11     Q.  Did you receive any training on it or any
12  instructions or anything like that?
13     A.  My knowledge of the system is that there are
14  certain areas of the police department that the phone lines
15  were recorded, and I was told of those areas.
16     Q.  Okay.  And what -- what's your knowledge of the
17  areas that were recorded?
18     A.  Initially when I became an officer or a cadet back
19  in 1973, I was told that the phone lines at the front desk
20  and in the radio room were recorded lines.  Later, after the
21  remodel -- and I'm not certain what year the new police
22  department opened -- but I was told there was one other
23  area, that would have been the front desk, the radio room,
24  and the patrol sergeant's command office, were the only
25  three areas in the police department where the phone lines

3  (Pages 9 to 12)

**Page 13**

1  were recorded.
2  Q. Do you as a -- as a chief -- By the time you get
3  to the level of chief, are you presumed to -- to know both
4  the policies and the standard operating procedures of the
5  police department sort of across the board?
6  MR. PFEIFER: Tom, if we could just clarify.
7  You keep saying "chief." Are you talking about
8  the division chief --
9  MR. DIXON: Right. Division chief.
10  MR. PFEIFER: -- or are you talking about a
11  chief of police?
12  MR. DIXON: Yeah, division chief.
13  A. I think as an officer you're -- you're challenged
14  to know most of the policies so you can abide by them. I
15  think as a chief, I think that there's a belief that we have
16  a somewhat better understanding.
17  There are -- were certain areas as a division
18  chief that I requested to become more a part of, that I was
19  not allowed to participate in by the other two division
20  chiefs. And I was -- I also had discussions with the chief
21  about that.
22  Q. I forgot to ask you, how do you prefer that I
23  refer to you in the deposition?
24  A. Steve.
25  Q. Just Chief Richmond?

**Page 14**

1  A. No. Well --
2  Q. Chief.
3  Okay. Is it your testimony, Chief, that you were
4  never made aware that Gene Kyle's line when he was the
5  detective bureau chief or the investigative chief -- that
6  his line was recorded?
7  A. I would not say never. I was told sometime after
8  this all came to light that it may have been, but not
9  before.
10  Q. Okay. Are you aware of a written policy on -- on
11  recording telephone lines in the South Bend Police
12  Department?
13  A. There is none.
14  Q. So, you're aware that there is not a policy?
15  A. I know there's not a policy.
16  Q. You're aware there's a policy related to internal
17  affairs that indicated that there's no privacy rights on any
18  equipment of South Bend Police Department; right?
19  A. I'm aware of a section of the duty manual that's
20  known as the "Office of Professional Standards," and
21  subsection 4(b). I think it refers to a right to privacy of
22  issued equipment but did not ever pertain to phone lines or
23  any phone.
24  Q. I didn't ask you what it -- I didn't ask your
25  interpretation what it pertained to.

**Page 15**

1  A. I'm sorry.
2  Q. I just asked you if you're aware of the policy.
3  MR. SULLIVAN: I'll object that it's vague.
4  A. It doesn't pertain to phone lines.
5  Q. Okay. That's your -- that was gonna be my next
6  question, is do you -- is it your understanding that that
7  policy pertained to phone lines. And you're saying no, it
8  does not?
9  A. It's my understanding that the policy does not
10  pertain to phones or phone lines at the police department.
11  Q. I've had a lot of South Bend police officers, as a
12  result of this case, tell me that they thought all of the
13  lines on the department were taped. Did you ever have that
14  understanding?
15  A. No.
16  Q. Or I -- it's better to say "recorded," because
17  "taped" I think means reducing 'em down.
18  But did you ever have that understanding?
19  A. Like I said a minute ago, the only areas that I
20  knew were recorded were the three areas: The front desk,
21  the command area in the patrol division, and the radio room.
22  Q. I'm sorry. Could you either have that -- read
23  back the answer or just answer it again. What were the
24  three areas you said?
25  A. The front desk, the patrol command area by the

**Page 16**

1  front desk, and the radio room.
2  Q. Okay.
3  MR. DIXON: I think I'll probably just take a
4  five-minute break. I don't think I have a lot
5  more to ask. I just want to consult with my
6  client a little bit.
7  MR. PFEIFER: Okay.
8  (Brief recess taken.)
9  MR. DIXON: Okay. Back on the record.
10  Q. You're still under oath.
11  A. Yes, sir.
12  Q. Just very quickly. I'm gonna make a statement,
13  and tell me if you agree with me on this statement. Okay.
14  Ultimately it's the -- it's the authority of the chief of
15  police -- not the division chiefs but the chief of police --
16  to set policy on the department?
17  A. I would imagine he has the ultimate decision.
18  MR. DIXON: All right. Thanks. I don't have
19  any further questions.
20  Do you have any questions?
21  MS. DUERRING: Yeah, I do.
22  CROSS EXAMINATION
23  BY MS. DUERRING:
24  Q. Mr. Richmond, I'm Mari Duerring. I'm here to ask
25  you some questions. First of all, I'd like to get kind of

## Page 17

1  the sequence of your progression through the department
2  clarified a little bit. When did you first start with the
3  South Bend Police Department?
4    A. June of 1973.
5    Q. And what was your position at that time?
6    A. I was a police cadet.
7    Q. How long were you a police cadet?
8    A. Roughly three and a half years.
9    Q. And what was your next position following that?
10    A. An officer in training.
11    Q. How long did you maintain that position?
12    A. The ten weeks while I was at the law enforcement
13  academy in October through December 1976.
14    Q. Once you completed the training phase, what
15  position did you assume?
16    A. I was a patrolman. That was in January 1977.
17    Q. And how long did you remain a patrolman?
18    A. Until I was automatically promoted to the rank of
19  corporal three years later.
20    Q. Did any of your duties or responsibilities change
21  when you went from patrolman to corporal?
22    A. Just a leadership role out on the road. I think
23  the younger officers -- patrol officers looked to corporals
24  sometimes when there needed to be a decision made and there
25  wasn't a sergeant available.

## Page 18

1    Q. How long did you maintain the rank of corporal?
2    A. Just -- my rough -- roughly -- not less than a
3  year, because I resigned in June of 1980.
4    Q. Okay. And was there some point that you came back
5  on to the department?
6    A. Yes. I came back in -- around March -- actually,
7  March I hired back on, in 1987.
8    Q. Okay. So, you were gone for about seven years?
9    A. Yes.
10    Q. Is that correct?
11    When you came back on in 1987, what was your
12  position at that point in time?
13    A. Initially it was a patrolman until they reinstated
14  me as a corporal retroactive.
15    Q. And how long did you remain as a corporal?
16    A. Oh, until -- I think it was May 1996, when I was
17  promoted to sergeant.
18    Q. When you became a sergeant, what were your
19  responsibilities that was associated with that position?
20    A. By that time, I had been transferred into the
21  detective bureau and I was working at the St. Joseph County
22  special crimes unit. It's now known as metro homicide.
23    Q. And how long were you assigned to the metro
24  homicide unit?
25    A. I began in 1994 and I left in 1999, and then I

## Page 19

1  returned back there in 2003 and left August of 2006.
2    Q. Now, when you left the -- what is now known as the
3  metro homicide unit in August of 2006, what position did you
4  assume at that point in time?
5    A. While -- in the interim, in that little hiatus
6  between '99 and 2003, I worked -- I was promoted to
7  lieutenant. I was working in the arson division at that
8  point. When I returned to metro homicide unit in 2003, I
9  was a lieutenant. When I left, I was a lieutenant and I
10  sought I guess a transfer back to the detective bureau as a
11  supervisor. And I -- on a day shift, I was a case
12  assignment lieutenant.
13    Q. How long did you work in that capacity?
14    A. Roughly two months, a little over two months, when
15  then-chief Thomas Fautz promoted me to captain in the
16  investigative division October 2006.
17    Q. When you were promoted to captain of the
18  investigative decision -- or division, can you explain for
19  me how your duties differentiated from your former position.
20    A. Just more, again, leadership responsibility.
21  Instead of going from a lieutenant in charge of detectives,
22  I was now the captain in charge of lieutenants who were in
23  charge of detectives.
24    Q. Now, did you have a physical office within the
25  South Bend Police Department at the time you were the

## Page 20

1  captain of the investigative division?
2    A. Yes.
3    Q. And did you have a physical office in the police
4  department in your prior position?
5    A. Yes, I did.
6    Q. Okay.
7    A. As a lieutenant.
8    Q. Now, at all times that you actually had a physical
9  office in the South Bend Police Department, did you have a
10  particular number that was associated with your office?
11    A. The later part, yeah. I had a private office
12  earlier in my career, before being transferred to the St.
13  Joe County metro, or the special crimes unit. I don't
14  remember the number then. But when I returned to the South
15  Bend Police Department in August of '06 as a lieutenant, I
16  was given the 235-7473.
17    Q. 7473. Was that the number that you carried over
18  when you were promoted to captain of the investigative
19  division?
20    A. Yes, I had that when I moved.
21    Q. How long did you have that number altogether?
22    A. From August of 2006 'til the day that I retired.
23    Q. Now, you indicated at the time of your promotion
24  that you talked to Barb Halaman about transferring that
25  number. Is that correct?

Page 21

1      A.  Yes.

2      Q.  All right.  Can you tell me when that conversation

3   took place.

4      A.  Initially took place when I went back to the

5   day-shift lieutenant.

6      Q.  If you could tell me the time frame, if you could.

7      A.  Right.  When I went in as a day-shift lieutenant,

8   the office they put me in was a vacant office, and that had

9   the number in there, 7473, at that time.

10         When they promoted me to captain in October, I

11  went to her and asked her -- for her to have the phone

12  company come in and transfer the line because I didn't want

13  to have to let everybody in the world know that my number

14  had changed.  And she said she didn't need to contact the

15  phone company, that she was quite capable of doing that

16  herself.

17         And she sent me back to both of the offices.  On

18  the wall plates, there are little tags that have numbers

19  that designate it as to, like, ports, I guess, and she

20  needed the port number that my phone was plugged into in my

21  lieutenant office.  And I had to get under the desk in the

22  captain's office and get that port number and give those to

23  her.

24         And it took her like 15, 20 minutes, and she came

25  back and said she had done the switch.  It was that fast.

Page 22

1      Q.  Now, other than talking to Barb -- is it Hulaman

2   or Holdeman?

3      A.  I think it's Halaman.

4      Q.  Halaman.  Thank you.

5         Other than talking to Miss Halaman, did you seek

6   authorization from anyone else in the department to have

7   this line switched?

8      A.  I think at that time I think I asked Chief Kyle --

9   it's his division -- if I could do that, if he had any

10  objections to that.

11     Q.  Did he?

12     A.  No.

13     Q.  Anybody else that you consulted with or sought

14  approval from?

15     A.  No.

16     Q.  Other than relaying these numbers back to Miss

17  Halaman in order for the change to be made, was there any

18  other documentation that you provided to any other

19  individual with respect to the change that had occurred?

20     A.  There wasn't any documentation whatsoever ever.

21  It was word of mouth between me and Barb Halaman and my

22  request of the chief.

23     Q.  And by "chief," you're referring to Chief Kyle?

24     A.  Gene Kyle.  I'm sorry.

25     Q.  And Chief Fautz was the chief of police at the

Page 23

1   time?

2      A.  Yes, he was.

3      Q.  Was this switch ever communicated to Chief Fautz,

4   to your knowledge?

5      A.  No, I don't know if it was or not.

6      Q.  Okay.  At the time this switch occurred, Karen

7   Depaepe was employed by the department.  Correct?

8      A.  Yes.

9      Q.  Do you recall what her position was at that

10  particular point in time?  And I'm referring to the time

11  that the switch in lines was being -- was made.

12     A.  I think she was communications director in the

13  radio room.

14     Q.  What was your understanding of the

15  responsibilities that Karen had as communication director?

16     A.  She was a supervisor over the radio room.

17         MR. PFEIFER:  Excuse me.  Objection.  Lack of

18  foundation.

19         You can go ahead and answer.

20         MS. DUERRING:  I asked what his understanding

21  was.

22     Q.  But go ahead and answer.

23     A.  What her responsibilities were?

24     Q.  Uh-huh.

25         MR. PFEIFER:  Your understanding of her

Page 24

1   responsibilities.

2      Q.  Correct.

3      A.  My understanding was that she was in charge of the

4   communications radio room.  She supervised the supervisors

5   and personnel in the radio room.

6      Q.  Did it ever occur to you that any changes in phone

7   lines needed to be communicated to Miss Depaepe for any

8   reason?

9      A.  No.

10     Q.  Now, you had testified previously that there had

11  been some knowledge on your part that certain lines were

12  recorded at the South Bend Police Department as early as

13  your entry into the department.  Is that correct?

14     A.  That is correct.

15     Q.  All right.  And again, if you can tell me what

16  your understanding was or your belief was with respect to

17  the recorded lines that existed at the time you came on to

18  the department.

19     A.  That the lines at the front desk were recorded

20  initially and that -- on those in the radio room, which were

21  the same -- in the same area at that point.  The old radio

22  room was right behind the front desk.  They had what they

23  called the 9361 numbers before 9-11 -- or before 9-1-1, I

24  should say, not September 11th.

25         And then later, after the building was removed,

Page 25

```
 1   the -- the phone lines at the front desk continued to be
 2   recorded, along with the patrol division command area, which
 3   is right behind the front desk, and those in the radio
 4   room/communications center. And I -- I'll stop there.
 5       Q.  Okay.  Now, we've talked about the change that
 6   occurred from when you first started with the department
 7   until after -- to the time period after the remodel, that
 8   there were some additional recordings added at that point in
 9   time.  Is that a fair synopsis?
10       A.  Yes.
11       Q.  Okay.  Were there any other changes that you
12   became aware of at any point during your tenure with the
13   department, in terms of recorded lines?
14       A.  After all of this came to light, I was made aware.
15       Q.  But during the time frame when you were actually
16   at the department, was that the only change that you knew
17   of, that being the change at the time of the remodel of the
18   department?
19       A.  To clarify it, when I learned of this, I was still
20   employed at the police department, so . . .
21       Q.  I want to talk first about the period of time when
22   you were, you know, first coming on at the department.  You
23   said that the front desk and the radio room were recorded.
24   How did you get that information?
25       A.  I believe when I was a cadet, my first sergeant
```

Page 26

```
 1   was a Charles Kusky (phonetic).  I think Charles -- the
 2   sergeant would have told me that, as well as the other
 3   cadets that worked the desk area.
 4       Q.  So, word of mouth?
 5       A.  Yeah.
 6       Q.  Did you ever go and inquire to anybody else or
 7   have any conversations with respect to recordings that were
 8   occurring at the time you first came on the department?
 9       A.  No.
10       Q.  What was your understanding of the reason behind
11   recording these lines?  That being the front desk and the
12   radio room.
13       A.  I guess they wanted the lines recorded in case
14   they needed to play 'em back if there was something that
15   they wanted to listen to.
16       Q.  Did you ever have the opportunity to make a
17   request -- and again, I'm just talking about the initial
18   time on the department.  Did you ever have the opportunity
19   to make a request for any recordings that were generated by
20   either the front desk or the radio room?
21       A.  The radio room all the time when we were in
22   homicide.
23       Q.  And what would your purposes be for requesting
24   those recordings?
25       A.  Investigative purposes.
```

Page 27

```
 1       Q.  So, would you agree with me that there was a
 2   legitimate law enforcement reason behind the recordings that
 3   were occurring at the front desk and the radio room?
 4       A.  Yes.
 5       Q.  You found it helpful in your role as an officer.
 6   Is that correct?
 7           MR. SULLIVAN:  Objection.  Vague.
 8           MS. DUERRING:  I'll rephrase.
 9       Q.  Were you able to gain information from these
10   recordings which was of assistance to you as a police
11   officer?
12       A.  Not so much gain but document information.
13       Q.  Which is a critical role?
14       A.  Verification -- you know, like in a homicide case,
15   we'd ask for the calls that come to verify, you know, what
16   information was given and -- and the time that the calls
17   came in.  That sort of thing.  Not so much gaining but
18   documenting and verifying.
19       Q.  Now, you had indicated, that after the remodel,
20   the changes that you were aware of was, that in addition to
21   the front desk and the radio room, that the patrol division
22   and then the communication center lines were also recorded.
23   Is that correct?
24       A.  Front desk; that room behind the front desk, the
25   patrol commander's office; and radio room.
```

Page 28

```
 1       Q.  How did you become aware of the additions to the
 2   recording system?
 3           MR. PFEIFER:  At what time?
 4           MS. DUERRING:  At the time of this change,
 5       when there was a remodel.
 6       A.  Again, I think it was word of mouth.
 7       Q.  Word of mouth from whom?
 8       A.  I think -- specifically, I don't -- I can't tell
 9   you who.
10       Q.  Was this something that was ever discussed at, for
11   example, a roll call?
12       A.  Not with me.
13       Q.  Is that something that you would have remembered
14   if it would have happened?
15       A.  Oh, absolutely.
16       Q.  Were there any memos generated with respect
17   to these changes that occurred after the remodel?
18       A.  Not to my recollection.
19       Q.  And again, thinking about this time frame after
20   the remodel, did you ever have the opportunity to request
21   recordings that were made from any of these lines?
22       A.  Yeah.
23           MR. SULLIVAN:  I'm sorry to interrupt.  But
24       I'm not quite sure what you mean by "any of these
25       lines," because we had two different periods of
```

## Page 29

1    time. You mean after the additional lines?
2        MS. DUERRING: After the additional lines.
3        MR. SULLIVAN: Thank you.
4    A. I believe I was still working as an investigator
5    at the metro homicide unit as well as in the arson division
6    when I would ask for 9-1-1 calls to be recorded to become
7    part of our case investigation. But never -- I cannot
8    recall ever asking for a recording from the front desk or
9    from the commander's office.
10   **Q. Now, correct me if I'm wrong. Did you indicate**
11   **earlier that you were aware that the phone lines to internal**
12   **affairs were recorded?**
13   A. No. I was not.
14   **Q. Okay. When you would request recordings that were**
15   **generated from any of the lines at any period of time, who**
16   **did you make the request to?**
17   A. It's usually a communications supervisor. And
18   that could vary whoever -- whatever time of day. If I
19   wanted to go in and -- you know, it could be Jim Moreland,
20   it could have been, you know, anybody who was a supervisor
21   in the radio room. And I said to him; I'd say, you know, "The
22   call that just happened, I need a recording"; and I'd have
23   to fill out a request; and then they'd make a cassette tape.
24   **Q. Did you ever have to make a request to Karen**
25   **Depaepe?**

## Page 30

1    A. I'm sure I did over time, because there was times
2    she was a -- she was the supervisor in there.
3    **Q. Okay. And again, when you would make these**
4    **requests, were they for law enforcement reasons or personal**
5    **reasons?**
6    A. Oh, never personal. It was always law
7    enforcement.
8    **Q. Do you have personal knowledge with respect to how**
9    **these lines are actually recorded?**
10   A. No. I don't know the equipment or -- no.
11   **Q. Do you have personal knowledge with respect to who**
12   **authorizes the lines to be recorded?**
13   A. I would assume it would be the chief or the
14   chief's staff.
15   **Q. And on what do you base that assumption?**
16   A. Just I guess the same -- hearsay. That's what my
17   understanding would be. But again, if I might add that this
18   just goes -- my understanding was the chief designated those
19   three areas and none other.
20   **Q. And again, who -- what is your understanding of**
21   **who administers the system or maintains the system with**
22   **respect to the recordings?**
23       MR. SULLIVAN: Objection. Compound.
24   **Q. Who administers the system with respect to the**
25   **recordings?**

## Page 31

1    A. Well, prior to this, I would have assumed it would
2    have fallen under probably the -- Chief Horvath, who was in
3    charge of services division, and potentially Karen Depaepe.
4    **Q. During the course of your employment with the**
5    **South Bend Police Department, did you ever have a laptop**
6    **assigned to you?**
7    A. Yes, I did.
8    **Q. Whose equipment was that?**
9    A. It was -- belonged to the police department.
10   **Q. Did you have an expectation of privacy with**
11   **respect to your laptop?**
12   A. The laptop, no.
13   **Q. Did you ever have a cell phone assigned to you?**
14   A. At one point I did.
15   **Q. Whose equipment was the cell phone?**
16   A. That cell phone that I had was the property of the
17   St. Joseph County prosecutor's office.
18   **Q. Did you have an expectation of privacy with**
19   **respect to that cell phone?**
20       MR. SULLIVAN: Objection. It calls for a
21   legal conclusion.
22       MR. PFEIFER: And objection to the relevance.
23   Any cell phone that was property of the St. Joseph
24   County prosecutor's office would not be relevant
25   to this particular case as it relates to

## Page 32

1    expectation of privacy.
2        MS. DUERRING: Are you instructing him not to
3    answer?
4        MR. PFEIFER: No. I didn't say that.
5    **Q. Go ahead.**
6    A. The St. Joseph County prosecutor's office, when
7    they issued us the cell phones, they also came with a piece
8    of paper that we had to sign acknowledging the fact that we
9    had no right to privacy on those phones.
10   **Q. You testified earlier that there was no written**
11   **policy with respect to phone lines, that you were aware of.**
12   **Is that correct?**
13   A. That's correct.
14   **Q. What is the basis for your belief that there is --**
15   **that there is -- or excuse me -- that the policy with**
16   **respect to an individual's expectation of privacy does not**
17   **apply to the phone lines?**
18   A. Phone lines were never considered to be issued
19   equipment.
20   **Q. Well, you've already testified for us that there**
21   **was no written policy. Is that correct?**
22   A. Yes.
23   **Q. And so what's the basis for your belief that a**
24   **phone line is not issued equipment?**
25       MR. PFEIFER: Objection. Asked and answered.

8 (Pages 29 to 32)

## Page 33

1    He just said. He just gave the answer to the very
2  same question.
3         MS. DUERRING: It's a different question.
4         MR. PFEIFER: No, it isn't.
5         MR. DIXON: Yeah. He -- his answer was
6  that --
7         MR. PFEIFER: It's the same question.
8         MS. DUERRING: Read it back. Actually, read
9  the last two back.
10        (Record read.)
11   **Q. Why do you believe that phone lines are not issued**
12 **equipment?**
13   A. My belief is because I'm capable of using any
14 telephone in that building and they all come with different
15 numbers. So, none -- no one particular phone line is issued
16 to me.
17   **Q. Did you ever have any discussions with Karen**
18 **Depaepe with respect to recorded lines at any point?**
19   A. Yes, I did.
20   **Q. When did that conversation occur?**
21   A. The conversation occurred approximately at 11,
22 11:15, January 17th, 2012.
23   **Q. What were the circumstances surrounding that**
24 **conversation?**
25   A. Information had come to me that -- from my

## Page 34

1  captain, Brian Young, that he had just had a conversation
2  with an individual who indicated to him that his phone line
3  was being recorded. And I -- he wasn't able to get an
4  answer pertaining to his question, and I then went to see
5  Karen to clarify.
6      Because it was my understanding that there were no
7  detective bureau lines -- that was, I guess, the basis of
8  the conversation, that there was phone lines in my detective
9  bureau being recorded. And I had no -- absolutely no
10 knowledge of any phone line in that detective bureau that
11 was being recorded, and I was gonna get to the bottom of it.
12     So, I went to see her around 11, 11:15, 17th of
13 January 2012. And I flat-out asked her if she would tell me
14 if there were lines in my detective bureau -- and I'd hate
15 to refer to it that way, but that was my bureau, that was my
16 division. And I wanted to know if there were being --
17 recordings being done. And she said yes, there were.
18     And I asked her to identify the lines for me. And
19 she told me that the secretary Donna Stevens' line at the
20 front desk in the detective bureau was being recorded.
21     And I said -- and she told me why. Because some
22 people call in there or are transferred from the front desk
23 for whatever reason; for the same reason the front desk was
24 recorded. Apparently somebody at some point made a
25 determination in recording that line. But I never knew

## Page 35

1  that. And once she explained it to me, I had actually told
2  her -- I said, "That actually makes sense."
3      And then I asked her who else was being recorded,
4  who was the second line. And she told me my line was being
5  recorded. And that was the request of Chief Boykins the day
6  he promoted me to division chief.
7      And I said, "Who is the third line?" And she told
8  me it was Captain Brian Young.
9      And when I asked her if there were requests for
10 recording of those calls from any of those three lines, she
11 said, at the specific order of Chief Boykins, she was no
12 longer able to discuss the matter with me. And our
13 conversation ended.
14   **Q. And the phone number that you had at that point in**
15 **time was 235-7473. Correct?**
16   A. That is correct.
17        MR. SULLIVAN: I'm sorry, Counsel. Would you
18   say that number again.
19        MS. DUERRING: 235-7473.
20        MR. SULLIVAN: Right. That's what I thought.
21        MR. PFEIFER: Can I take a break?
22        (Recess taken.)
23   **Q. Just a couple more things. I wanted to make sure**
24 **I understood. Did you actually change the lines or have**
25 **Barb change the lines for you on two occasions, or was there**

## Page 36

1  **just one occasion?**
2    A. She did it twice.
3    **Q. Two times. Okay. And the first time was when you**
4  **went from lieutenant to captain, or there was the time**
5  **before that?**
6    A. No. Lieutenant -- from my lieutenant's office to
7  the captain's office.
8    **Q. Okay.**
9    A. And then it was a little more challenging the
10 second time because I had to use a mirror to get in behind
11 equipment to get that -- the code number. But she did it
12 again when I moved into the chief's office in the detective
13 bureau.
14   **Q. Now, other than getting the code number and**
15 **providing it to Barb, was there anything else that you did**
16 **with respect to this line change?**
17   A. I liked my phone, so I unplugged it and took that
18 with me too.
19   **Q. What did Barb have to do?**
20   A. My understanding, she went back to a telephone
21 equipment room, which would -- I think is in the back part
22 of the building, which used to be like an old typing room in
23 the old building, where the telephone lines and that into
24 the building are -- are in place. And my understanding, as
25 she described it, is unplugging a module off of some pins

Marilyn M. Jones & Associates      Computer-Assisted Reporters & Videographers      (888) 810-4077

Page 37

1   with the designated number and unplugging -- and then just
2   basically switching 'em and replugging 'em.
3       Q.  Did you actually see her do that, or that's just
4   what she communicated to you?
5       A.  Well, again, I guess based on my past experience
6   as an electrician, we also used to install phone lines from
7   time to time, and I -- it was at one -- I don't know.  I was
8   back there one day with Barb on another problem, and I was
9   in that room and I actually saw the board, and I could see
10  that it was a modular type of a thing.  And when she
11  described what she did, it made sense.
12          MS. DUERRING:  Pass the witness.
13  CROSS EXAMINATION
14  BY MR. WALTON:
15      Q.  Okay.  Can you tell me again the date of your
16  conversation with Karen Depaepe.
17      A.  January 17th, 2012.
18      Q.  Okay.  And based upon that conversation, she told
19  you that the front-desk girl's lines were being recorded?
20          MR. PFEIFER:  I'm gonna object.  That's --
21      the conversation of January 17th, 2012 -- Oh,
22      you're talking about detective bureau?
23          MR. WALTON:  Yeah.
24          MR. PFEIFER:  Okay.  As long as you're
25      talking about detective bureau front desk.

Page 38

1           MR. WALTON:  Right.  Because I think you
2       asked -- I'll start over.
3           MR. PFEIFER:  Thank you.
4       Q.  When you talked to her on January 17th, 2012, you
5   wanted to know whose lines in the detective bureau were
6   being recorded, right?
7       A.  Yes, sir.
8       Q.  It's my understanding she told you that the
9   front-desk girl's lines were being recorded?
10      A.  Donna Stevens, the detective bureau secretary,
11  yes.
12      Q.  Okay.  And that your phone was being recorded?
13      A.  Yes, sir.
14      Q.  And that Brian Young's line was being recorded?
15      A.  Yes, that's correct.
16      Q.  Okay.  In terms of actually technically
17  transferring a number or changing a recording, you wouldn't
18  know how to do that technically, would you, in your
19  department?
20      A.  Changing the phone line?
21      Q.  Yes.
22      A.  I am -- as I said, I was an electrician.  If I was
23  given access to it, I probably could do it.  But I never did
24  it.  Okay?
25      Q.  All right.  Do you know what was involved in

Page 39

1   actually changing a line that was being recorded?
2       A.  I have no idea.
3       Q.  Okay.  Would you know from a technical point of
4   view how to change a telephone number going into one office
5   versus a telephone number going to the other office as
6   opposed to changing the recording -- changing the recorded
7   line?
8           That's a terrible question.  I'm gonna start
9   again.
10      A.  Yeah, I agree.
11          I can answer that by saying by changing the wires
12  physically --
13      Q.  I'm gonna start over.
14          MR. SULLIVAN:  I'm sorry.  Spence, one of the
15      things I'm a little confused by.  We talked
16      yesterday about numbers versus lines.  And I
17      wasn't sure which thing you were asking about.
18          MR. WALTON:  I'm getting to that.
19          MR. SULLIVAN:  Okay.
20      Q.  If you asked Barb, I think you said, to change
21  your telephone number you kept your number -- And you
22  described what she did.  Right?
23      A.  Yes.
24      Q.  So, that would change -- physically change a
25  number from one office to another, correct, as far as you're

Page 40

1   aware?
2       A.  Yes.
3       Q.  And you said you may or may not be able to do that
4   yourself.  But you haven't done it, have you?
5       A.  I have not done anything physically to the
6   equipment.
7       Q.  Do you know if -- if there's any difference at all
8   if you asked Barb to change a recorded line from going from
9   one office to another in terms of what you would have to do?
10      A.  I have no idea how that's done.
11      Q.  Okay.  And you wouldn't know technically how it's
12  done at all either?
13      A.  I've never done that ever.
14      Q.  Fair enough.
15          From your experience as a -- as an electrician,
16  would you think that would be more involved than that?
17      A.  It would depend on the equipment.
18      Q.  Fair enough.
19          When you moved into your new office, was there
20  certain equipment in that office that was assigned to you?
21      A.  Which new office?
22      Q.  When you moved into your -- your last office --
23  when you -- when you moved in the office of Rick Bishop.
24      A.  Okay.
25      Q.  Was there certain equipment in that office that

10  (Pages 37 to 40)

Page 41

1  was assigned to that office already?
2       MR. SULLIVAN: Objection. Vague as to what
3  you mean by "assigned."
4       You can answer.
5  A. The thing that main- -- was remaining in there was
6  the computer.
7  Q. Okay.
8  A. As I said earlier, I physically liked my phone
9  better than the one that was there, and I unplugged it from
10 my captain's office and carried it in and moved that one in
11 the chief's office to -- Brian Young inherited it.
12 Q. Okay. So, certain equipment, like the computer,
13 would have been assigned to the office you were assigned to,
14 in Rick Bishop's office?
15 A. Yes.
16 Q. Okay. Were you generally aware that the chief
17 makes the determination of what lines were to be recorded?
18 A. I just -- the only ones I knew that -- as I said
19 earlier, I think -- my understanding was whereas he
20 designated three areas on that police department, and
21 those -- earlier it was just two, and then later it became
22 the three.
23 Q. Yeah. I guess my question's more simplistic than
24 that. Were you generally aware that it was the chief of
25 police that made the decision as to what lines would be

Page 42

1  recorded in the department?
2       MR. SULLIVAN: Objection. Assumes facts,
3  lack of foundation.
4       Go ahead.
5       MR. PFEIFER: Which department are you
6  talking about? Any department?
7       MR. WALTON: Yes. South Bend Police
8  Department.
9  A. I didn't know -- to answer your question, I didn't
10 know other than those three areas that he -- any chief had
11 designated any other areas a recorded area.
12 Q. Fair enough.
13      In terms of the policy of recording lines in the
14 department, do you agree that recording lines in police
15 departments is a routine police practice, based upon your
16 experience?
17      MR. PFEIFER: Object to the form of the
18 question unless you identify which lines you're
19 talking about. Are you talking about every line
20 in the police department or lines in certain
21 areas?
22      MR. WALTON: I'm talking about recording
23 lines generally.
24 Q. Are you aware, based upon your -- your training
25 and experience, that it's a routine practice for police

Page 43

1  departments to record telephone lines?
2       MR. PFEIFER: I'm gonna object to the form of
3  the question unless you narrow it down and talk
4  about which telephone lines.
5       MS. DeROSE: I'll object on the grounds that
6  it assumes facts that are not in evidence.
7       MR. WALTON: I can't get the facts from him
8  unless I ask him.
9       I'll ask it again. They've made their
10 objection. It's a pretty simple question.
11 Q. Are you aware from your training and experience
12 that it's a routine practice for police departments
13 generally to record telephone calls coming into the office?
14      MR. PFEIFER: Object to the form of the
15 question unless you narrow it down to which
16 telephone lines, number one, and you identify
17 which police department you're talking about. Now
18 you're talking about law enforcement generally.
19      MS. DeROSE: Generally.
20      MR. WALTON: I'm entitled to do that. I've
21 asked as far as his training and experience.
22 Q. You can answer the question.
23      MR. PFEIFER: You can answer.
24 A. All right. Based on my training and experience,
25 it will vary from -- as I have attended, for example,

Page 44

1  Northwestern's staff and command school. There were 24 law
2  enforcement administrators in my Class 282. And it would
3  vary from one department to the other. Some did it similar
4  to South Bend, where they had their front desk and their
5  comm center recorded. Other agencies said every dog-gone
6  phone in their building was recorded.
7  Q. My question was much simpler than that. It's
8  simply, were you aware that it is a routine practice for
9  police departments to record telephone calls coming in to an
10 office, based upon your training and experience?
11      MS. DeROSE: Asked and answered.
12      MR. PFEIFER: And again, I will object to the
13 form of that question.
14 Q. And is your answer the same? You are aware of
15 that?
16      MS. DeROSE: He answered the question, that
17 it varies from one to another.
18 A. Into an office, I can't be specific there. It
19 varies. It's a common practice for police departments to
20 record telephones calls incoming, but it varies how they do
21 it.
22 Q. Thank you.
23      And that's based upon your training and
24 experience, right?
25 A. Yes, sir.

11 (Pages 41 to 44)

Page 45

```
 1      Q.  And are you aware that the -- from your training
 2  and experience, that the recording of telephone lines that
 3  come in are generally done for legitimate reasons for the
 4  police department in the ordinary course of their business
 5  to conduct investigations?
 6          MR. PFEIFER:  Object to the form of the
 7      question unless you specify which telephone lines
 8      that you're talking about that are being recorded.
 9      Q.  You can answer the question.
10      A.  Generally for investigative purposes.  Other
11  departments use 'em for other purposes.  And I know for --
12  from, again, casual conversation with officers from those
13  departments there, explained the reasons why those
14  recordings are being done.
15      Q.  Okay.  Are you aware that police departments
16  generally record lines also to investigate complaints about
17  officers?
18          MR. PFEIFER:  Object to the form of the
19      question unless you talk about and identify which
20      lines you're talking about.
21          But you can answer, if you know.
22      A.  I would imagine if there -- the call comes in on a
23  taped line, they could use those.  Again, I would have been
24  aware that if I talked on the line at the front desk and
25  there was a complaint, they may listen to the call.
```

Page 46

```
 1      Q.  Okay.  The policy you made reference to earlier,
 2  which had been previously admitted as Exhibit Four, I'm
 3  gonna hand you a copy and ask you if that's the policy you
 4  were making reference to in your earlier testimony.
 5          MR. SULLIVAN:  And I'm just gonna object
 6      that -- vague.  There was a lot of discussion of
 7      earlier testimony that it touched on policy.
 8          But you can answer.
 9      A.  Yes.
10      Q.  Okay.  Can you identify the policy that you're
11  looking at?
12      A.  It's the Office of Professional Standards, City of
13  South Bend Department, general order.
14      Q.  Is that -- I'm sorry.  Is that the number of the
15  policy that you were talking about before in your earlier
16  testimony?
17      A.  I was actually referring to subsection -- I think
18  4(d).
19      Q.  Okay.  So, that's the same one you were talking
20  about earlier?
21      A.  Yeah.
22      Q.  Okay.  This policy, Exhibit Four, deals with
23  providing for procedures for receiving, investigating, and
24  processing complaints against employees of the South Bend
25  Police Department.  Is that right?
```

Page 47

```
 1      A.  It's the Office of Professional Standards, yes.
 2      Q.  Okay.  The policy stated in this policy identified
 3  is, quote, The South Bend Police Department will investigate
 4  all complaints against the department or its employees, to
 5  include third-party and anonymous complaints.  Is that
 6  right?
 7      A.  Yes.
 8      Q.  Okay.  And you referred to the -- page five of
 9  seven, under Section Roman Numeral (IIII)(d), in your
10  testimony, indicating, quote, Employees do not have a right
11  to privacy for assigned equipment.  The department may enter
12  and inspect any assigned equipment.  Is that right?
13      A.  Yes.
14          MR. WALTON:  I think that's all the questions
15      I have.  Thank you.
16  CROSS EXAMINATION
17  BY MR. SULLIVAN:
18      Q.  Chief, I'm Ed Sullivan.  I represent the City of
19  South Bend.  I have a few questions for you.
20      A.  Yes, sir.
21      Q.  And I'm gonna stay with Exhibit Four that
22  Mr. Walton was talking to you about.  On looks like page
23  five of seven, under Roman Number IIII, paragraph (d), in
24  that first sentence, based upon your experience with the
25  South Bend Police Department and in your prior positions
```

Page 48

```
 1  there, what does the phrase "assigned equipment" mean?
 2      A.  Assigned equipment would be a patrol car; our
 3  uniforms; our hand -- our weaponry, whether that's shotgun,
 4  handgun, Tasers; handcuffs, our ammunition; the equipment
 5  they would issue us for our hazmat in the patrol division.
 6          I think in the detective bureau that would also go
 7  to a -- assigned cubicle and a detectives car, which has
 8  various different equipment than what patrol would have.
 9  Actually, less equipment.  We still have a right to
10  examine and inspect detectives' cars.
11      Q.  Staying with that same paragraph (d) in Exhibit
12  Four, the last sentence there says, "The department may
13  enter and inspect any assigned equipment."  Did I read that
14  correctly?
15      A.  "May enter and inspect any assigned equipment,"
16  yes, you did.
17      Q.  Would you explain what the phrase "enter and
18  inspect" means.
19      A.  Open -- for example, a squad car.  We can have
20  them open the car, open the trunk, open up the assigned
21  equipment in there, the bags, the duffle bags, glove box.
22  And the detective bureau would be open up their -- their --
23  their drawers, their -- and their tubs above their -- in
24  their cubicle.
25      Q.  Are you aware of any other meaning for the phrase
```

Page 49

1  "assigned equipment" under the policy in Exhibit Four?
2      A.  I guess I will add as I'm sitting here thinking
3  about it, would also be a computer.  You know, we understand
4  that we -- e-mail would not be -- that's something that they
5  can look at too.
6      Q.  Okay.  In your capacity as a chief of the
7  investigative division --
8      A.  Yes, sir.
9      Q.  -- were you a part of any efforts to draft and
10 create a written policy that deals with recording of
11 telephone lines in the department?
12     A.  No.  When this came to light, I requested one.
13     Q.  You had requested that of who?
14     A.  I requested that of Mr. Schmuhl in the mayor's
15 office, and the city attorney's office.
16     Q.  There's been some discussion about Miss Depaepe,
17 Karen Depaepe, her role as director of communications?
18     A.  Yes.
19     Q.  Is that your understanding of what her title was?
20     A.  Yes.
21     Q.  In your experience as chief of the investigative
22 division or as a captain before that or at any time before
23 that, are you aware of any director of communications having
24 investigative duties?
25     A.  Well, they're not policemen.

Page 50

1      Q.  If anyone in the department, whether a sworn
2  officer or not, becomes aware of any kind of inappropriate
3  behavior by an officer, is there a procedure for dealing
4  with that?
5      A.  Yes.
6      Q.  Would you describe that.
7      A.  Well, it's ethics.  We have a code of ethics that
8  we do not violate.  If I were to encounter an officer -- it
9  depends on the situation.  If it's something that's -- I
10 don't need to immediately intervene and stop as an officer.
11 If it is something I would need to intervene and stop, I
12 would, then I would enter as a chain of command and I would
13 follow the protocols.
14     Q.  Okay.  What about a civilian employee of the
15 department?  Is there a procedure or protocol or policy that
16 tells a civilian employee how to handle a situation similar,
17 where they may become aware of an inappropriate behavior?
18     A.  I think they have a code of ethics as well.  I'm
19 remiss in not knowing that policy better than my own as a
20 sworn officer, but I think they are held to the same or
21 similar standard.  If they see something that's going on, as
22 a civilian, inappropriate, they need to report that.  Or,
23 you know, depending on the situation, I guess, I don't know
24 that they need to necessarily intervene, but they
25 would need to properly report that.

Page 51

1      Q.  Are you aware of -- I asked you before about any
2  investigative duties.  Are you aware of whether in the
3  ordinary course of the -- of Miss Depaepe's duties she has
4  any responsibility for determining inappropriate behavior on
5  the part of officers?
6          MS. DUERRING:  Objection.  There's no
7          foundation.
8      Q.  You can answer.
9      A.  I guess I'll answer to this regard:  As a -- as a
10 supervisor in the radio room, if she were to be made aware
11 of some officer's misconduct, I think she would be obligated
12 to also report that through the chain of command, if that's
13 what you're asking me.
14     Q.  Yeah, that's what I'm getting at.
15          And her report, under the chain of command, would
16 be to whom?
17     A.  I think her immediate supervisor would have been
18 the services division chief.  At the time, would have been
19 Gary Horvath.
20     Q.  By "at the time," you're talking about 2011, 2012?
21     A.  Yeah.  In recent history.
22     Q.  Recent history?
23     A.  Yeah.
24     Q.  Going back, may have been somebody else?
25     A.  Yeah.  It may have been.  I don't -- I can't

Page 52

1  remember for sure how long Karen's been in that position.
2      Q.  But --
3      A.  Gary's been in that same position.
4      Q.  The title that -- of the person she would report
5  to is the chief of the services division?
6      A.  Services division, yes.
7      Q.  If I go back to Exhibit Four, in the first page --
8  I'm on the very first page, under the portion that says
9  "Purpose."  Do you see that?
10     A.  For the purpose?
11     Q.  Yes.  The purpose of the -- of this policy, right
12 at the top.  Are you -- do you have that in front of you,
13 sir?
14     A.  Yeah.
15     Q.  Okay.  "Provide procedures for receiving,
16 investigating, and processing complaints against employees
17 at the South Bend Police Department."  Did I read that
18 correctly?
19     A.  Yes.
20     Q.  Would this policy cover communications between an
21 officer and his spouse?
22     A.  In what -- I guess in what regard?  I mean --
23     Q.  That's what I'm asking.  Is there any way that
24 anybody would be authorized under this policy to listen to
25 communications between an officer and their spouse?

## Page 53

1    MS. DUERRING: Objection again. Lack of
2    foundation.
3        A.  I had no -- I guess to give an example, maybe I
4    can maybe answer that question.  But I think generally this
5    in place, if it was a call placed by an officer to his
6    spouse on a recorded line, with the right authority to
7    obtain that recording without violating anyone's
8    constitutional rights, I think that that would be proper.
9        Q.  Well, how -- describe the process, as you
10   understand it, for somebody in the police department to
11   investigate a complaint against an employee of the South
12   Bend Police Department for receiving, investigating, and
13   processing complaints against employees at South Bend Police
14   Department.  What -- Can you describe that process for me.
15       A.  There's a complaint that comes in; it's normally
16   received however it is received, whether it be a supervisor
17   in patrol, whether detective, civilian; it can be then -- it
18   was placed on an advisory form, which is then sent in to the
19   Office of Professional Standards.  And from there, the
20   investigation -- and they look at the information and
21   proceed as -- accordingly.
22       Q.  Okay.  Would you be aware of the filing of that
23   complaint when you were the chief of investigative division?
24       A.  Not necessarily initially, no, and I may not --
25   unless it pertained to one of my personnel, I may not know,

## Page 54

1    again, for some time.  But it may then boil down to the end
2    when the chief calls his command staff in looking for
3    recommendations, I may become aware of it.
4        But a lot of times -- like for example, Jeff
5    Walters fielded many complaints on his patrol officers, that
6    I had no knowledge of or dealings with.
7        Q.  If there was an investigation pursuant to the
8    policy that's in Exhibit Four, would there be any record
9    created of that complaint?
10       A.  There should be a record in internal affairs.
11       Q.  Okay.  Prior to investigating a complaint, then,
12   under Exhibit Four, would we expect to find a written
13   complaint that would trigger the investigation?
14       A.  Yes.  Either an internal or external complaint.
15   But there would be something that would have to initiate an
16   investigation.
17       Q.  And who would have records like that?
18       A.  Yes, we do.
19       Q.  No.  Who -- who -- where in the police department
20   would you find those records?
21       A.  Two places.  One in the Office of Professional
22   Standards, or internal affairs, as well as possibly the
23   chief's -- chief of police --
24       Q.  Okay.
25       A.  -- office.

## Page 55

1        Q.  In the Office of Professional Standards, is there
2    a -- someone who heads up the Office of Professional
3    Standards?
4        A.  Yes.  At the time -- I don't know if he's still
5    there or not, but at the time I was there and I'm not
6    retired, it was Lieutenant Lee Ross.
7        Q.  Lee Ross?
8        A.  Yes.
9        Q.  And who does Lieutenant Lee Ross -- who did
10   Lieutenant Lee Ross answer to?
11       A.  The chief of police.
12       Q.  Directly to the chief.
13       And finally, Chief, back to this question of
14   assigned equipment.  In your experience, is the phrase
15   "assigned equipment" that we talked about in Exhibit Four --
16   in that last paragraph of Exhibit Four, did you ever come
17   across anyone who interpreted "assigned equipment" to be --
18   under Exhibit Four, to be the telephones or the telephone
19   lines in the office you worked in?  Did you ever come across
20   anybody who had that interpretation?
21       A.  Yes.
22       Q.  Who?
23       A.  Division Chief Gary Horvath.
24       Q.  And when did you become aware of that
25   interpretation?

## Page 56

1        A.  During this investigation on December -- I'm
2    sorry -- in January -- I'm trying to think -- in the
3    afternoon in January, Lieutenant Lanchswerdt came to my
4    office -- it was after the delivery of a subpoena -- and
5    informed me that Division Chief Horvath was in his office --
6    Lieutenant Lanchswerdt wrote the policies on our police
7    department.  Okay?  He's the one that drafted these.  And I
8    sought his counsel and some clarification of what we've been
9    talking about.  And he never interpreted, nor did anyone
10   that he drafted the policy for, interpret "assigned
11   equipment" to mean telephones in the police department.
12       Chief Horvath attempted to manipulate Lieutenant
13   Lanchswerdt by having him agree with him that telephones in
14   our police department were assigned equipment, and
15   Lieutenant Lanchswerdt stood -- stood his ground and said
16   no, it was never meant to be and never interpreted to be.
17       Now, there may be other officers that thought
18   that, but that was not --
19       Q.  Well, but -- and my question, I wanted to know
20   prior -- in your prior experience with the department.  And
21   I appreciate you telling me about the experience you had.
22   That was in 2012?
23       A.  Yes.
24       Q.  Okay.  So, prior to that, is there -- are you
25   aware of or have you experienced anyone who's interpreted

City of South Bend, Indiana Common Council vs. City of South Bend, et al.

Page 57

1 that to mean the phones or phone lines?

2   A. No. Not in my --

3   Q. Not in your experience?

4   A. No.

5     MR. SULLIVAN: Okay. No further questions.

6 CROSS EXAMINATION

7 BY MR. PFEIFER:

8   Q. Steve, you were asked -- Steve, you were asked

9 some questions about the recording of certain phone lines as

10 being for legitimate law enforcement purposes. Do you

11 remember a line -- a series of questions about that?

12   A. Yes, I do.

13   Q. With respect to the recording of phone lines, from

14 your perspective, that would be for a legitimate law

15 enforcement purpose, would that be the front-desk phone

16 lines?

17   A. Yes.

18   Q. Would that be the 9-1-1 lines?

19   A. Yes, it would.

20   Q. Would that be the lines that you knew were the

21 recorded lines at the South Bend Police Department?

22     MR. DIXON: I'm gonna go ahead and object to

23     all of these leading questions based on the fact

24     that I got a firestorm of objections yesterday on

25     the leading questions of my own witness.

Page 58

1     So, I'm gonna ask you not to lead your

2     witness.

3   Q. You can answer.

4     MR. DIXON: Well, please stop leading your

5     witness.

6     MR. PFEIFER: Are you instructing my client

7     not to answer?

8     MR. DIXON: I don't have the authority to do

9     that.

10     MR. PFEIFER: I didn't think so.

11     MR. DIXON: I'm just asking -- I'm just

12     objecting to all of your leading questions.

13     MR. WALTON: My only objection is lack of

14     foundation. I think it's been established that

15     only the police chief can determine which lines to

16     be recorded. So, unless you can establish a

17     foundation that this witness has that authority, I

18     object on that basis.

19     MS. DUERRING: And I want to interpose an

20     objection as well, that I believe you're asking

21     him to draw a legal conclusion with respect to

22     whether or not there's a legitimate law

23     enforcement purpose associated with each of those

24     individual lines.

25     MR. PFEIFER: Anybody else? Brian, you want

Page 59

1     to interpose an objection?

2     MR. YOUNG: No, sir.

3 DIRECT EXAMINATION CONTINUED

4 BY MR. PFEIFER:

5   Q. Do you remember the question, or do you want me to

6 ask you again?

7   A. I believe I remember the question.

8   Q. I thought you might. Go ahead. You can answer

9 it.

10   A. Yes. For legitimate investigative purposes.

11   Q. Just those phone lines that were being recorded

12 that you knew of?

13   A. Had to have authority and a legitimate reason for

14 requesting calls.

15   Q. As far as you were concerned, while you were

16 employed at the South Bend Police Department, when you had a

17 telephone line assigned to you, to your knowledge, did

18 you -- or did you ever ask to have your phone line recorded?

19   A. No. And I didn't think it was possible. I

20 actually provided my own recording device that I purchased

21 equipment on my own and affixed to my phone with a recorder

22 that stayed by my phone so if there was a time that I needed

23 to record a call that came in that I thought I wanted

24 recorded, I did so.

25   Q. So, you would do that with the equipment that you

Page 60

1 purchased to assist you in whatever investigation you were

2 undertaking. Correct?

3   A. Yes.

4     MR. DIXON: I'm just gonna -- a standing

5     objection to all your leading questions rather

6     than doing it every question. I'm just gonna have

7     a standing objection to all leading questions.

8   Q. At any point in time, were you ever told that your

9 phone line and the phone number that was assigned to that

10 phone line was being recorded?

11   A. No, I was not.

12   Q. That is, before the conversation on January 17th,

13 2012, with Karen Depaepe?

14   A. There was evidence, I was told, of my -- of

15 recordings by the chief, that he was waiting for recordings

16 of my telephone, on January the 6th.

17   Q. So, on January 6th of 2012, were you told by

18 Chief Boykins that your phone line had been recorded?

19   A. He told me he was waiting recorded conversations,

20 and I asked him if they were of me, and he responded by

21 telling me, "They were not necessarily just of you."

22   Q. Tell, if you would, me about that conversation.

23 How did it come about? When was it? How did it come about?

24   A. I started it actually on January the 3rd, our

25 first day back to work in January, at roll call after the

15 (Pages 57 to 60)

Page 61

1  general roll call.  Normally the command staff, which would
2  consist of the chief, Division Chief Walters, Division Chief
3  Horvath, and myself, we would remain behind and discuss
4  whatever we needed to discuss.
5     Once the room cleared, I was asked -- Chief
6  Boykins asked Chief Walters first if he had had an interview
7  with the mayor.  He responded no.  He then asked the same
8  question of Division Chief Horvath, who responded that he
9  had not had an interview with the mayor.  And then he asked
10 me if I had had an interview with the mayor.  And I was kind
11 of astonished at the belief that he knew that I had an
12 interview with the mayor-elect, Pete Buttigieg, and I said
13 yes.  And he appeared angry and he said that we needed to
14 talk about that following the roll call.
15    Q.  So, what happened?
16    A.  I attempted to see him after the roll call.  He
17 was busy.  He sent me away.  He told me to come back on
18 Wednesday.  I tried to visit him on Wednesday.  He would
19 send me away.  Kept telling me to come back Thursday.  I
20 went back Thursday.  The same sequence.  He told me on
21 Friday that I -- he needed to see me and I was to remain in
22 his office.  I was down there at nine o'clock, and he had me
23 seated in his lobby for a little over an hour while he had a
24 conversation with the city attorney.  And then he called me
25 in to his office.

Page 62

1     Q.  Which city attorney?  Was it --
2     A.  I think at the time it would have been Andrea.
3     Q.  Okay.  One of the deputy city attorneys?
4     A.  I'll take that back.  It was -- it was -- I can't
5  remember his name.  It was a male.  It was Chuck Leone.
6     Q.  Okay.
7     A.  Once he left, I was called into the office.  Chief
8  Boykins asked me a couple of general questions about what
9  kind of high-profile cases were being investigated in the
10 detective bureau, that sort of thing.  And then he said on a
11 personal note he no longer considered me to be a loyal
12 employee.
13    As a matter of fact, he said I was a disloyal
14 employee.  He considered me a backstabber.  He said that he
15 felt that he had arrows in his back.  And as he made the
16 comment, he leaned forward and did this with his right hand
17 and said that he had been told by individuals that I had
18 been disrespectful to him during the interview process with
19 the mayor-elect.
20    I proceeded to tell him that my interview with the
21 mayor was -- there was nothing negative about the police
22 department.  That's why -- I wasn't there to paint the
23 police department in a bad light.  I presented him with a
24 strategy plan -- all chiefs -- as I was trained at
25 Northwestern, we have strategy plans as chiefs of police --

Page 63

1  and what my strategies might be if named the next chief.
2     And I actually praised Chief Boykins to the mayor
3  for his work in the community with the youth, the boxing
4  program, conversations I had had with Chief Boykins prior to
5  that about wanting to continue those and possibly expand
6  those programs in the community because I thought they were
7  very beneficial.
8     He -- we talked for nearly probably 45 minutes to
9  an hour about all of our previous conversations, how he made
10 it possible for me to go to Northwestern to attain that
11 training for potentially succeeding him as chief of police,
12 whether he'd be replaced or whether he would step down as
13 chief and take another job, which was rumored back in the
14 later part of 2011.
15    And again, that's what led to my surprise that he
16 wasn't aware that I had had an interview.  He said that --
17 again, that's when he disclosed to me that he was waiting
18 for a recorded conversation to be given to him.  And that's
19 when I -- again, as I'll repeat myself, I asked him if those
20 conversations were of me, and he told me not necessarily
21 just of me.
22    I asked him who he had talked to, who had told him
23 that I had been disrespectful to him in the interview with
24 the mayor-elect.  I asked him if he had talked to the mayor
25 or Mr. Schmuhl or a lady named Catherine who was present in

Page 64

1  the interview with me.  There was just the four of us.  And
2  he said no, he hadn't talked to any one of those
3  individuals.  And I asked him if he would tell me, please,
4  who had told him I was disrespectful towards him in the
5  interview, and he told me he'd rather not disclose that
6  information.
7     And I asked him plant -- flat-out, I said, "Do you
8  find these people that are telling you this information
9  about me to be credible?"  And he said no.  And I asked him,
10 "Why are you listening to them?  I'll give you my strategy
11 plan.  I will show you that there is nothing that I
12 presented the mayor that was disrespectful.  It was all
13 positive."  We needed to make changes on the police
14 department in a positive way.
15    We talked about how Jeff Walters is his division
16 chief in the uniform division, his disappointment with
17 Walters, who didn't carry his message, who knew full well
18 what kind of changes needed to be made in the uniform
19 division to make the department run smoother, to probably
20 decrease the type of complaints that we would get and make
21 the lives of detectives a little better because we'd have
22 better information to work with in the investigative
23 division, and Walters chose to turn a blind eye to those
24 problems and not address those.
25    We also talked about Horvath, how his

Page 65

1  disappointment in Horvath -- how he wanted to get rid of
2  Horvath when he became chief of police, but the former
3  mayor, Lickey, would not allow him to remove him as part of
4  the command staff so he ended up stuck with him, and how he
5  believed Horvath to be an elitist type of an attitude. And
6  we bucked -- we kind of bucked horns because I wanted to be
7  involved in more policy decision-making and Horvath, for
8  one, was resistant to that.
9      And when -- simple -- for an example, we get new
10  police cars every year. So, we get so many for the
11  detective bureau and so many for services division and so
12  many for the patrol division. I just asked to be one of the
13  three chiefs that would help -- have an input into the
14  number of cars we purchased and the type, but I wasn't
15  allowed to.
16      And I asked the chief why wasn't I allowed to.
17  "I'm one of your command staff. Why can't I enter into
18  these conversations, especially if you're pushing me to be
19  your successor? I need to know these things. I need to be
20  involved in the decisions the departments are making as a
21  whole, and they shut me out."
22      **Q. This is -- You're talking about the conversation**
23  **that you had with the chief?**
24      A. That happened on Friday, January the 6th.
25      **Q. Okay. Was there anything else in that**

Page 66

1  **conversation that was mentioned about recordings that**
2  **Chief Boykins -- then-chief Boykins was waiting for**
3  **pertaining to you and others?**
4      A. Well, yes. He was waiting for those to be
5  delivered to him. The what -- his language didn't suggest
6  to me that he had listened to anything at that point, but
7  then he said that he was going to -- once those recordings
8  were delivered to him, he was going to wait a matter of four
9  to six weeks after the mayor settled into his new office
10  before he would begin airing dirty laundry of the police
11  department, and then he would decide whether or not that he
12  was going to demote me, whether he would discipline me or
13  even terminate me as a police officer on the police
14  department.
15      So, I was simply astonished. And -- as again back
16  and forth and I had tried repeatedly to reassure him that I
17  had not been disrespectful, that I was surprised that he was
18  not aware of the conversation and maybe that I was remiss,
19  maybe I should have come to tell him specifically.
20      But again, in those earlier conversations in the
21  months -- in the two years that I was chief with him, he
22  made it very well aware, unless he wanted to talk about
23  certain subjects with me or any of his command staff, unless
24  he brought that up, we weren't to really go there with him.
25      So, again trying to be respectful of him and not

Page 67

1  wanting to make him angry, and assuming -- I got wrongfully
2  so -- and I apologized to him that day. I again repeatedly
3  said, "I thought you were very well aware of my interview
4  with the mayor, and I'm sorry I didn't come to you." But
5  again, "Thinking you were well aware, I offer you my
6  apologies."
7      **Q. Was there any other conversation after the**
8  **conversation of January 6th?**
9      A. Yes, there was.
10      **Q. Tell us about the next conversation that you had.**
11      A. Well, on the weekend, I disclosed to my wife what
12  had taken place, obviously upset. I returned to see him on
13  Monday the 9th of January. And basically -- it was in the
14  morning. And basically it was a repeat of what I've just
15  explained to you that happened on January the 6th.
16      Again, I apologized and I tried to convey that,
17  you know, the interview was positive and all of what I've
18  just said. And he still maintained that he -- I was
19  disrespectful, that I was -- I was a backstabber. It wasn't
20  pleasant for him to be named -- renamed chief of police
21  because of what I had done and others that he had heard on
22  these recordings.
23      And I went away, and I returned to him again on
24  January the 12th, and -- in the afternoon. I asked if I
25  could speak with him again. I wanted to try to clear the

Page 68

1  air. And still astonished that he was still telling me he
2  was waiting for recordings to be delivered to him of me and
3  others, that we were backstabbers and disloyal, that he was
4  gonna continue with this four-to-six-week regimen of waiting
5  for the new mayor to settle in before he would either
6  discipline me, demote me, or terminate me. And again, it
7  was just a repeat of January 6th and January 9th.
8      **Q. Was the next conversation that you had with anyone**
9  **after January 12th pertaining to recordings -- was that the**
10  **conversation of January 17th with Karen Depaepe?**
11      A. Actually, the next conversation I had about
12  recordings was with my captain when he came in in the
13  morning and told me that he had heard rumors of these
14  recordings of his phone line, that he had gone to see Diana
15  Scott, who is Karen Depaepe's assistant.
16      **Q. And your captain, just for the record, was Brian**
17  **Young?**
18      A. Was Captain Brian Young.
19      **Q. Okay.**
20      A. Captain Young -- Brian Young explained to me that
21  he had been hearing the same rumors. I had talked to him on
22  the 16th -- or actually, the 9th, I had told him -- I
23  disclosed to him before my conversation with Chief Boykins
24  that -- what I had been told on the 6th.
25      And from information that we had learned on the --

17 (Pages 65 to 68)

## Page 69

1  on January the 16th, when Brian entered my office on the
2  17th, he said he had gone to talk to Diana Scott and asked
3  her if his line was being recorded. He told me that she
4  confirmed his line was being recorded. And when the captain
5  asked Diana Scott if anyone had requested recordings of his
6  recorded conversations, Diana -- the captain told me that
7  her response to that question was, "That request has not
8  been made of her" -- or "of me."
9       The captain came into the office and said he had
10 just -- he wasn't happy, he was upset. He said he had just
11 been told by her that his line was being recorded. And
12 again, as I said earlier, I was -- I was gonna get to the
13 bottom of it, because it was my understanding that there
14 were no lines in my detective bureau recorded and now he's
15 coming, telling me that she's saying that there were. And
16 that's when I went to see Karen.
17     Q.  And that is what then led you to go see Karen on
18 January 17th of 2012. And you've told us about that?
19     A.  That is correct.
20     Q.  Now, did you become aware of a situation from
21 Captain Young that in August of 2011 there was some
22 indication that Captain Young's line was being recorded?
23     MR. DIXON: I'm gonna interrupt, not
24 necessarily object. What I need at this point, is
25 Dan, is confirmation from you, recognition of

## Page 70

1  my -- of my ongoing objections to your leading
2  questions. Otherwise, I'll have to object each
3  time.
4       But if you're okay with me just doing a
5  standing objection on the record, then I won't
6  need to object each time you ask a leading
7  question.
8       MR. PFEIFER: That --
9       MR. DIXON: I thought I had your
10 confirmation. But I just want to make sure on the
11 record that I do.
12      MR. PFEIFER: Yeah. I mean, that question
13 right there was a preliminary question, which
14 leading questions are permissible as preliminary
15 to get into a particular topic.
16      MR. DIXON: I'm just -- I'm just asking
17 generally, as a matter of form for us to expedite
18 the deposition, if you're gonna allow me to
19 preserve my "leading question" objections or if
20 you want me to interpose 'em every time I believe
21 that you're inappropriately asking him a leading
22 question.
23      MR. PFEIFER: I --
24      MR. DIXON: I just need your confirmation
25 that I don't have to --

## Page 71

1       MR. PFEIFER: I understand what you're
2  asking, Tom. I -- I've been doing this for 34
3  years and I --
4       MR. DIXON: It's a simple question. Yes or
5  no?
6       MR. PFEIFER: I don't understand what you
7  mean by a standing objection.
8       MR. DIXON: So it's preserved.
9       MR. PFEIFER: I've never heard of it.
10      MR. DIXON: My objections are preserved so
11 that if we come -- if the issues come up down the
12 road, I can raise the objection with the court
13 that that answer should be stricken because the
14 question was leading -- was inappropriately
15 leading.
16      It's the same thing as if I -- if every time
17 you ask a leading question I interpose an
18 objection that it's leading. And eventually it
19 gets to the court. The court's gonna rule on that
20 objection. And if it sustains my objection, the
21 answer's not gonna be read into evidence.
22      MR. PFEIFER: Only because -- and I'm not
23 real experienced in this whole arena. So maybe
24 it's my lack of knowledge. I don't know what a
25 standing objection is. I've never heard of that

## Page 72

1  phrase before. I know you talked about it
2  yesterday. But I just -- is a standing objection
3  different than a sitting objection? I just -- I
4  don't know.
5       MR. DIXON: Maybe somebody else -- maybe
6  somebody else -- maybe this is a concept that I
7  know that comes from my prior practice of law. I
8  don't know. Maybe somebody else --
9       MR. SULLIVAN: Off the record real quick.
10      (Discussion held off the record.)
11      MR. DIXON: Just to go back on the record.
12 My understanding is that at the time I raised that
13 issue before, that my objections to the form
14 specifically only though, because that was all I
15 raised was to leading questions, that I was
16 preserving my right to raise those objections in
17 the future. And I didn't have any opposition from
18 you and then --
19      MR. PFEIFER: Well, you said that. I
20 don't -- you know, I didn't agree to anything,
21 Tom. I'm not trying to be difficult, but I didn't
22 agree to anything. You made an objection. I
23 listened and then -- then I went on. I mean, I --
24      MR. DIXON: Well, okay. I didn't stipulate
25 to anything with my client with regard to his

18 (Pages 69 to 72)

Page 73

1  deposition either, yesterday, so . . .
2      MR. SULLIVAN: That's not true, Tom. You --
3  you said that -- you showed a standing objection
4  or that you preserved all objections.
5      MR. DIXON: No, no, no. I'm talking about my
6  client's use of his deposition when I give it to
7  him to read. I didn't -- I didn't enter into any
8  stipulations about that either.
9      MR. SULLIVAN: Sorry. I thought you meant on
10  this issue.
11      MR. PFEIFER: The issue -- I don't care if
12  your -- I don't care what your client does with
13  your deposition. The whole issue yesterday that
14  came up about use of deposition was that Karen
15  Depaepe would not review Chief -- or Darryl
16  Boykins' deposition prior to the resumption of her
17  testimony.
18      MR. DIXON: I didn't stipulate to that on
19  behalf of my client. If my client reads the
20  deposition and wants to share it with Karen
21  Depaepe, I never stipulated to that. That was
22  something that now it's kind of the same thing,
23  because I understand that's what you were seeking
24  from Mari, and that's the stipulation that you got
25  from Mari, but you never got that -- I was

Page 74

1  silenced during that whole period of time.
2      MR. PFEIFER: Tom, I am perfectly fine. If
3  you want to play that game, have at it.
4      MR. DIXON: You're the one who -- you're the
5  one who started this game, Dan.
6      MR. PFEIFER: I didn't start anything.
7      MR. DIXON: You're the one who said I'm
8  sitting here silent; "therefore, I'm not
9  recognizing that you had a" -- "you had a standing
10  objection to the form of my questions when they
11  were leading."
12      MR. PFEIFER: I have no --
13      MR. DIXON: And you said, "No, I've never
14  heard of that before. I didn't comment on it. I
15  just moved forward. I didn't have anything to do
16  with that."
17      MR. PFEIFER: I don't even know why we're
18  involved in this dialogue, quite frankly. I have
19  no obligation to respond to an objection that you
20  make. Show me someplace in the trial rule that
21  says I have an obligation to respond to an
22  objection you make. I don't.
23      MS. DUERRING: Do we want to keep this on the
24  record? Because we're burning up pages and pages
25  of transcript with this discussion.

Page 75

1      MR. SULLIVAN: Mr. Dixon asked to be on.
2  That's fine. For purposes of moving forward, I
3  think that counsel -- Mr. Pfeifer has stated that
4  he's gonna follow the rules. And so you need to
5  object at the time the question is.
6      MR. DIXON: That's fine.
7      MR. SULLIVAN: Then let's move forward.
8      MR. DIXON: And the only record I need to
9  make at this point is that I'm -- that it's my
10  understanding that my -- that I preserved my
11  objections. You don't have to agree to that. I
12  just need to make that on the record, that I
13  preserved my objections to leading questions when
14  I raised 'em last time.
15      I know you don't agree with that. So at this
16  point -- from this point forward, we're gonna --
17  I'll object every time I think you have a leading
18  question.
19      MR. PFEIFER: That's fine.
20      (Brief recess taken.)
21      MR. DIXON: Are we back on the record?
22      MR. PFEIFER: Yes.
23      MR. DIXON: Then I would like to, at this
24  juncture, lodge my objection to every question
25  that Mr. Pfeifer has asked that has been a leading

Page 76

1  question up to this point.
2      (Record read.)
3      MR. DIXON: Objection. Leading.
4  Q.  You can answer the question.
5  A.  Yes, I was made aware of a situation.
6  Q.  Tell us about that.
7      MS. DUERRING: And I guess just -- I'm going
8  to object that these discussions about
9  conversations are beyond the scope of the question
10  that we are here to address at this phase in
11  discovery, which is the legality of the
12  recordings. And I don't see that the
13  conversations have any relevance to that
14  preliminary determination.
15  Q.  You can answer the question.
16  A.  Okay. The conversation between Captain Young and
17  I consisted of -- he told me of an incident back in August
18  of 2011. It was also something that Karen referred to in my
19  conversation with her on the 17th of January, about an
20  equipment failure. At that point in August 2011, apparently
21  the recording system had malfunctioned or there was a
22  problem. I'm not certain what that problem was or what it
23  took to fix it.
24      But Captain Young said that Captain Phil Trent had
25  visited him during this breakdown of equipment and asked

City of South Bend vs. South Bend Common Council, et al.                     Brian Young vs. ....... City of South Bend, et al.               DePaepe vs. City of South Bend

## Page 77

1  him, apparently, if he had knowledge that his phone line was
2  being recorded or if he had requested his phone line to be
3  recorded, and Captain Young -- Brian Young's response to
4  both was no, he was not aware and "I did not make the
5  request."
6       He asked Captain Trent if the con- -- if the
7  recording could stop immediately and if any and all of his
8  conversations that had been stored could be destroyed. And
9  Captain Young said that Captain Trent returned to his office
10 some point in time later -- I don't know if that was that
11 same day or within a 48-hour time frame -- I'm not sure
12 when -- but Captain Young said that Captain Trent did return
13 to his office and said that he had made certain that the
14 recording that was being done at that point prior to the
15 breakdown had been stopped and that the conversations that
16 were stored had been destroyed.
17      Q.  With respect to the phone number and phone line
18 that you used as the division chief of the investigative
19 division, did you have an expectation of privacy as it
20 pertains to that particular phone line?
21      A.  Yes, I did.
22      Q.  At any point in time when you had a private
23 number, this 7473 number, and line that you utilized with
24 the South Bend Police Department, did you ever ask that the
25 line be recorded?

## Page 78

1       A.  No, I did not, because I did not believe it was
2  possible.
3       Q.  If, in fact, you knew it was being recorded, what
4  would you have done?
5            MR. DIXON:  Objection.  Leading.
6       Q.  You can answer.
7       A.  I would have allowed it to continue.  First I
8  would have sought clarification as to why and who ordered it
9  recorded.  And once I had an understanding of that, I would
10 have had no objection to it, because I do not conduct
11 business or say things that I don't -- are afraid for anyone
12 else to hear.
13      Q.  Who is Barb Halaman?
14      A.  Barb Halaman is -- was Chief Boykins' secretary in
15 the front office.
16      Q.  So, when you went to have the 7473 line switched
17 from location to location depending upon where you were
18 working, why did you go to her?
19      A.  It's my understanding from her that she had
20 control of the telephone system, that any repairs that
21 needed to be made, extra equipment that we wanted to be
22 ordered, everything telephone-related to the equipment had
23 to go through her.
24           And as I think I said earlier, I initially went to
25 her to ask her to make the contact with the phone company to

## Page 79

1  make the change, but she had informed me that she was quite
2  capable of doing that herself.
3       Q.  You mentioned in response to one of the questions
4  that was asked that if a recorded phone conversation -- if
5  you wanted to request a recorded phone conversation, you
6  would have to go to the communication division and talk to
7  one of the supervisors and fill out a form.  Correct?
8       A.  Yes.
9            MR. DIXON:  Objection.  Leading.
10      Q.  What is your understanding as to why a form needed
11 to be completed?
12      A.  It documents the purpose and the reason for
13 requesting that conversation.
14      Q.  Who was Karen Depaepe's supervisor while you were
15 the division chief of the investigative division?
16      A.  To my knowledge, her immediate supervisor was
17 Division Chief Gary Horvath.
18      Q.  I believe it was Mr. Sullivan or one of the
19 attorneys asked you whether or not you believed Karen
20 Depaepe had the authority to investigate a particular
21 situation if she learned of police misconduct.  Do you
22 remember that line of questioning?
23      A.  Yes, I do.
24      Q.  From your perspective, did or didn't Karen Depaepe
25 have the authority to conduct an investigation if, in fact,

## Page 80

1  she believed a police officer had been guilty of misconduct?
2            MR. DIXON:  Objection.  Leading.
3       Q.  You can answer.
4       A.  She did not.  As I said, the proper channels would
5  have to be followed.  She would have to bring that
6  misconduct to the proper authority, and that would be the
7  Office of Professional Standards, who would conduct the
8  investigation.  She may be called upon to provide them
9  information requested of her with authority and legitimacy,
10 say a recorded conversation or something of that nature.
11 But she was not ever charged -- that's not her capacity to
12 perform investigations.
13      Q.  And the Office of Professional Standards was also
14 called what?
15      A.  Internal affairs.
16           MR. PFEIFER:  I don't have anything else.
17 REDIRECT EXAMINATION
18 BY MR. DIXON:
19      Q.  I'm gonna bring us way back to early on.
20      A.  Okay.
21      Q.  You had indicated, when you were talking about
22 when you came on, your understanding of what phone lines
23 were recorded.  And then at some point, you said "And then
24 he added" -- "he designated the third lines" -- or "line to
25 be recorded."  Do you remember that testimony?

Marilyn M. Jones & Associates          Computer-Assisted Reporters & Videographers          (888) 810-4077

Page 81

1    A.  Yes.
2    Q.  So, the first -- the third line was what?  The
3  records division?
4    A.  The third line's never -- I don't know of any of
5  the phone lines in the records division.  I said there was
6  the command staff office, the front desk, and communications
7  center.
8    Q.  So, the communications was the third one you were
9  referring to?
10    A.  Communications would have been all along.  The
11  communications/radio room.
12    Q.  Well, let me ask this:  When you said he added
13  the -- he added third -- when you were talking about
14  somebody designating a line or additional lines to be
15  recorded and that was the -- you're referring to the third,
16  what -- first of all, what line or lines were you talking
17  about there?
18    A.  The lines in the patrol command -- commander's
19  office.
20    Q.  Okay.  And who is the person who designated that?
21    A.  I would assume it would be the chief of police at
22  the time.
23    Q.  And who was that?
24    A.  At the time of the remodel, I believe it was
25  Chief Fautz.

Page 82

1    Q.  And when you were working for the -- When you had
2  a telephone with the county -- with the prosecutor's office,
3  they had a piece of paper that you signed that said you have
4  no privacy rights in this telephone?
5    A.  Yes, I remember.
6    Q.  There's no such similar piece of paper that
7  occurred with anything with South Bend Police Department;
8  right?
9    A.  To my knowledge, there was never -- I was never
10  presented a South Bend Police Department phone.
11    Q.  Well, let me ask this question:  You did have a
12  South Bend Police Department computer, right?
13    A.  Desktop or laptop?
14    Q.  Well, you had -- you testified earlier that you
15  believed that when -- this no right of privacy per this
16  Exhibit Four included computers.  Right?
17    A.  Correct.
18    Q.  And you had a computer that was -- that you agreed
19  was equipment of the South Bend Police Department.  Right?
20    A.  Right.  I had a desktop and a laptop.
21    Q.  Okay.  And were you required to sign a piece of
22  paper, when you were given either one of those, that said
23  there -- similar to the piece of paper you had with the
24  county with a -- the cell phone, that said you recognized
25  you have no right of privacy in this?

Page 83

1    A.  No.
2    Q.  In fact, people can disagree or have different
3  understandings of what that policy means with regard to
4  equipment, but nobody can disagree that nobody -- that it
5  was never required that anybody sign a piece of paper with
6  regard to any specific piece of equipment saying --
7  acknowledging they had no right of privacy?
8      MR. PFEIFER:  Object to the form of the
9      question.
10    Q.  Do you understand my question?
11    A.  What we had to do is this -- we had to sign for
12  acknowledging this policy.
13    Q.  Okay.  Let me -- I'll ask it -- It was very --
14    A.  Yeah.
15    Q.  It's always bad for an attorney halfway into his
16  question to try to remember what the question was that he
17  was gonna ask, so I'll make it much simpler.
18      You were assigned a police vehicle.  Correct?
19    A.  Yes, I was.
20    Q.  And that's equipment of the South Bend Police
21  Department?
22    A.  Yes, it is.
23    Q.  When that -- when you were assigned a police
24  vehicle, you didn't have to sign a piece of paper that said,
25  "I acknowledge being assigned this particular vehicle and I

Page 84

1  acknowledge that I have no right of privacy in this
2  vehicle"?
3    A.  I signed for this policy.
4    Q.  That policy in general?
5    A.  Yes.
6    Q.  As to each specific individual piece of equipment
7  that belongs to the city, you didn't have to sign
8  recognizing that you didn't have a right of privacy.  Right?
9    A.  No, I didn't.
10    Q.  And neither -- as far as you know, neither did
11  anybody else?
12    A.  No.  We all had to sign for this policy.
13    Q.  You also testified that when -- when the system --
14  the recording system changed, the only way that people
15  became aware of a phone going from an unrecorded to a
16  recorded status was by word of mouth.  Do you remember that?
17    A.  Uh-huh.  For me.
18    Q.  Well, if the -- if the South Bend Police
19  Department had a -- a policy that said, Every time we record
20  a new phone line or every time a new phone line is recorded,
21  we're going to have everybody sign off on it, you would know
22  of that policy, right, during your tenure?
23    A.  I would have, yes.
24    Q.  And you never saw anything like that?
25    A.  No.

21 (Pages 81 to 84)

Page 85

1    Q. It's your understanding it was within the chief's
2 authority to designate which lines were to be -- are to be
3 recorded?
4    A. It's my understanding that he designated three
5 areas. I don't -- as I said earlier, I don't believe I have
6 any knowledge that there are any other phones, besides those
7 three areas of the police department, that were recorded.
8    Q. But that was his authority to do, the chief's?
9    A. I would imagine. But again, I -- other than -- I
10 just want to make it clear that I did not know of any other
11 lines other than the three areas.
12    Q. And I don't think that you're alone on that. I
13 think there are other division chiefs whose lines were
14 recorded -- Actually, yours wasn't -- but others whose lines
15 were recorded, and they were not aware of that.
16        MR. PFEIFER: I'm gonna object and move to
17    strike the comments, testimony, statement.
18        MR. DIXON: Well, let me just rephrase it in
19    the form of a question so we don't have to go
20    through the whole striking.
21    Q. But are you aware that there were other division
22 chiefs whose lines were recorded and they were unaware of
23 that?
24    A. No, I was not.
25    Q. When you picked up that telephone and moved from

Page 86

1 the lieutenant's office into the captain's office --
2    A. Yes, sir.
3    Q. -- whose phone was that?
4    A. The piece of equipment belonged -- actually, it
5 belongs to AT&T. I guess it's rented by the City of South
6 Bend, and it belonged -- and left at the police department
7 for us to use.
8    Q. If you had to walk into somebody else's office to
9 check your e-mail on their computer, you could have done
10 that. Correct?
11    A. I guess.
12    Q. If you were out on a call and your car wasn't
13 working and you had to get -- in an emergency and you had to
14 jump in somebody else's car, you could do that. Right?
15    A. Yes.
16    Q. You testified earlier that Lieutenant Lanchswerdt
17 wrote the policies?
18    A. Yes, he did.
19    Q. Is it fair to say that the policy is set by the
20 chief? That's what you testified to earlier?
21    A. Yes.
22    Q. And that Lanchswerdt is the one who had put the
23 policy in writing?
24    A. Yes.
25    Q. But he didn't set policy, did he?

Page 87

1    A. No.
2    Q. So, his interpretation of policy would be no
3 different than your interpretation of policy?
4        MR. PFEIFER: Objection. Argumentative.
5    Q. In terms of its authority, I guess, is the right
6 way to ask that question.
7        MR. PFEIFER: Same objection. Still
8    argumentative.
9    Q. You can answer it.
10    A. The honest answer is, that's why I sought his
11 counsel, is he does have a better understanding and he has
12 had specific training as to the writing of our policies.
13 And that's why I sought his advice, his clarification on
14 this one.
15    Q. But the ultimate authority in your chain of
16 command, in terms of policy, is the chief of police?
17    A. Oh, yeah. Absolutely.
18        MS. DeROSE: Just for point of clarification.
19    The final determiner of policy in the police
20    department is the board of public safety; isn't
21    that right?
22        MR. DIXON: Wait. You can -- it's not -- I'm
23    still asking questions.
24        MS. DeROSE: Well, your question contained an
25    incorrect, so I want to clarify the question.

Page 88

1        MR. DIXON: But that's okay. You can --
2    Well, I'll let it slide. We're --
3    You can go ahead and answer that question.
4        THE DEPONENT: Yes, you're absolutely
5    correct.
6    Q. Within the police department itself, who's the
7 ultimate -- as your understanding in 29 years on the
8 department, who's the party --
9    A. Most offices recognize that position to be the
10 chief of police.
11    Q. Thank you.
12    You later learned that your line was never
13 recorded?
14    A. I have been told that.
15    Q. Let me strike that. Let me make it more accurate.
16    -- that your phone number, the phone number that
17 you used, was never recorded?
18    A. I've been told that it was -- there was -- but
19 that I am probably on the line of Captain Brian Young's
20 line, which was recorded.
21    Q. It's fair to say that had you not done the
22 getting up under the desk and doing the codings so that you
23 could keep your phone number from, first, lieutenant to
24 captain, then captain to chief, that it actually would have
25 been your phone line -- when you became chief, it would have

22 (Pages 85 to 88)

## Page 89

1  been your phone line that was recorded because you would
2  have had the 6031 exchange. Right?
3      A.  It wasn't so much what I did under the desk. If I
4  hadn't asked Barb that switch in the telephone room,
5  on the terminals -- that's where the jacks were actually
6  controlled from.
7      Q.  Yeah. But you --
8      A.  -- I would have -- I would have had that line.
9      Q.  Somebody needed to get up under there to read the
10  code so that she would know where to switch those?
11      A.  Yeah.
12          MR. DIXON: I think -- let me -- give me just
13      one minute to look through this real quickly,
14      because I think those were the only questions I
15      had. I was gonna clarify the board of public
16      safety, but Aladean beat me to it.
17      Q.  You did say that Chief Boykins was grooming you to
18  be his successor?
19      A.  Yes.
20      Q.  And, in fact, he took you out to the boxing
21  program on your request. Right?
22      A.  Yes.
23      Q.  And he showed you some of the other programs that
24  he was involved in that you wanted to know about when --
25  when you became his successor or if you became his

## Page 90

1  successor. Right?
2      A.  Yes.
3      Q.  And you guys went out to dinner and had a
4  conversation about the types of things that you would be
5  interested in learning more about to become the chief of
6  police. Right?
7      A.  Yes, I did.
8      Q.  And then when you had this conversation with him
9  in January -- or these conversations in January, it sounds
10  like he confided in you quite a bit about Chief Horvath and
11  Chief Walters?
12      A.  That's what he told me.
13      Q.  So, even at that point after -- after all that and
14  you said he was very angry with you and upset with you, he
15  was still confiding in you in what he thought of some of the
16  other --
17      A.  Maybe to clarify, we had talked about our previous
18  discussions. As I said, we had two years of conversations,
19  and we discussed those conversations in those discussions in
20  January. And that's why I was trying to convince him that
21  obviously, you know, what -- our relationship, the way it
22  was, why would he think that I had backstabbed him and I was
23  now the disloyal employee.
24      Q.  And you also testified that you would -- you would
25  not have had any problem with your phone line being recorded

## Page 91

1  in the police department?
2      A.  Why would I?
3          MR. DIXON: I don't have any further
4      questions.
5  CROSS EXAMINATION
6  BY MS. DUERRING:
7      Q.  I'd like to direct your attention back to the line
8  of questioning that dealt with Karen's ability to
9  investigate information that came to her attention. Okay?
10  I believe you testified previously that your position is, is
11  that Karen does not have any investigative responsibilities.
12  Is that a --
13      A.  That's my understanding.
14      Q.  Do you supervise Karen Depaepe in any capacity?
15      A.  No, I do not.
16      Q.  Have you ever been present or asked to evaluate
17  her in any capacity?
18      A.  No. But a clarification. I guess if push were to
19  come to shove, as a staff command officer on the South Bend
20  Police Department, if given the -- I guess a proper event,
21  if I were to be the -- in the absence of the chief of police
22  or her immediate supervisor, if I were the officer in
23  charge, I could -- then basically, then, yeah, I would be
24  her supervisor. But --
25      Q.  Were you ever -- Go ahead and finish.

## Page 92

1      A.  -- in that capacity only.
2      Q.  Were you ever called upon to act as a supervisor
3  of Karen Depaepe?
4      A.  Not to my knowledge.
5      Q.  Are you directly in her chain of command?
6      A.  No, I'm not.
7      Q.  Are you familiar with the position description of
8  communications director?
9      A.  Per -- No.
10      Q.  Is it fair to say that you are not familiar with
11  the communications director's responsibilities or job
12  functions?
13      A.  Each and every one of her functions, no.
14      Q.  Would you agree that the chief of police is in the
15  communications director's chain of command?
16      A.  Yes, he is.
17      Q.  You agree that you did not personally own the
18  phone that sat on your desk. Correct?
19      A.  I did not.
20      Q.  You did not own the lines that ran to that phone.
21  Correct?
22      A.  I did not.
23      Q.  You would agree with me that those phones and
24  those lines are the resources of the department?
25          MR. PFEIFER: I'm gonna object to the form of

23  (Pages 89 to 92)

Page 93

1     the question unless you define what "resources"
2  means.
3     Q.  They are either owned by the department or paid
4  for by the department.
5     MR. PFEIFER:  Objection.  Compound question.
6     Q.  Would you agree that the phone and the lines are
7  owned by the department?
8     A.  I would not agree they're owned by the department.
9     Q.  Would you agree that they are paid for by the
10 department?
11    A.  I believe they're rented or -- if you will, from
12 AT&T.  They're property of that company.
13    Q.  And you are not responsible for any portion of
14 that bill.  Correct?
15    A.  No.
16    Q.  Now, with respect to Exhibit Four, there isn't a
17 definition section attached to Exhibit Four.  Is that
18 correct?
19    A.  I believe there is.
20    Q.  Is there a specific definition as far as "assigned
21 equipment"?
22    A.  Not that I'm aware of.
23    Q.  Now, you have provided us with your interpretation
24 of what "assigned equipment" consists of.  Is that correct?
25    A.  Yes, I have.

Page 94

1     Q.  And you have also indicated that another officer,
2  specifically Gary Horvath, would disagree with your
3  interpretation.  Correct?
4     A.  Yes.
5     Q.  Now, you indicated that the chief of police was
6  the one that was responsible for the policy.  Correct?
7     A.  Yes, I have.  And I've been corrected.
8     Q.  Well, ultimately the board of public safety and
9  the chief of police.  Would you agree with that?
10    MR. PFEIFER:  Object to the form of that
11    question.  It's one or the other.
12    Q.  The chief of police is the individual within your
13 department that acts out the directives of the board of
14 public safety with respect to department policy.  Would you
15 agree with that?
16    A.  Yes.
17    Q.  All right.  Lanchswerdt was the one that drafted
18 the policy.  Correct?
19    A.  Yes.
20    Q.  So, in essence, he was acting as the chief's court
21 reporter when that was drafted.  Correct?
22    MR. WALTON:  Objection.  Argumentative.
23    Object to the form of the question.
24    Q.  You can go ahead and answer.
25    A.  I don't know if he would be a court reporter per

Page 95

1  se.  I think he was acting at the direction of the chief to
2  draft the policy.
3     Q.  Okay.  Fair enough.
4     Did you ever go to the chief to determine what his
5  interpretation was of the policy that's been discussed at
6  length today?
7     A.  After this came to light, no, we weren't --
8     Q.  Did you ever go to the board of public safety to
9  determine what their interpretation is of the policy
10 specifically with respect to this notion of assigned
11 equipment?
12    A.  No, I did not.
13    Q.  So, the information that you've provided today is
14 your interpretation of that policy?
15    A.  Yes.
16    Q.  You had indicated that you needed to fill out a
17 form when you requested a recording of a phone call.  Where
18 did you get the forms?
19    A.  The form is usually in the communication center.
20    Q.  And was there a particular individual that you had
21 to obtain those forms from?
22    A.  They are -- to my recollection, they were on a
23 clipboard in the supervisor's office in the comm center.
24 And you went in -- you could call ahead.  They could get
25 started on the request.  But once you got there, whoever

Page 96

1  sent in your stead to pick up the tape had to complete that
2  form.
3     Q.  What were they called?
4     A.  Pardon?
5     Q.  What were they called?
6     A.  The forms?
7     Q.  Uh-huh.
8     A.  I think they're requests for 9-1-1 calls.  I'm not
9  sure of the specific title.
10    Q.  What information did you have to provide on those
11 forms?
12    A.  Case number, victim's name oftentimes, the time
13 and date of the request, and type of -- my recollection is
14 the type of incident you're investigating.
15    Q.  Would you maintain a copy of those forms in your
16 individual file that related to the request?
17    A.  No, I wouldn't.
18    Q.  If you needed to make a phone call, could you go
19 into anyone's office to make the phone call?
20    A.  Yes.
21    Q.  After this conversation with Karen that you've
22 discussed where you were informed that your phone line was
23 recorded, did you request, after learning that information,
24 for the recording on your line to be stopped?
25    A.  I didn't.  No, I did not.  And the reason being,

24  (Pages 93 to 96)

Page 97

1  as I said, the reason our conversation ended is that she
2  said, at that point, due to the specific orders given to her
3  by Chief Boykins, she could no longer discuss the situation
4  with me, and our conversation ended.
5     **Q. Did you follow up with anybody, in terms of your**
6  **chain of command, to make a request to stop recordings on**
7  **your line?**
8     A. From my chain of command would have been the
9  chief. And the next step would have been with the -- went
10  to Mr. Schmuhl at the mayor's office.
11    **Q. So, is the answer to my question no?**
12    A. "No."
13        MR. SULLIVAN: Thank you. Pass the witness.
14        MR. DIXON: Could I get a clarification of
15    just that last answer.
16        THE DEPONENT: No, I did not make a request
17    of anybody at the police department.
18        MR. WALTON: I have no questions.
19        MR. SULLIVAN: No questions.
20        MR. PFEIFER: We'll read and sign. I'll take
21    a copy.
22        (Deposition concluded at 4:33 p.m.)
23
24            ---o0o---
25

Page 98

1            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF INDIANA
2              SOUTH BEND DIVISION
   CITY OF SOUTH BEND,          )
3      Plaintiff,               )
       vs.                      )
4  SOUTH BEND COMMON COUNCIL,   )CAUSE NO.:
   ET AL.,                      )3:12:cv-475
5      Defendants.              )
   BRIAN YOUNG, SANDY YOUNG,    )
6  TIMOTHY CORBETT, DAVID WELLS, )
   and STEVE RICHMOND,          )CAUSE NO.:
7      Plaintiffs,              )3:12-cv-532-JVB-CAN
       vs.                      )
8  THE CITY OF SOUTH BEND, Acting )
   Through its Police Department, )
9  DARRYL BOYKINS, Individually  )
   and in his Official Capacity as )
10 Chief of Police, KAREN DEPAEPE, )
   and SCOTT DUERRING,          )
11     Defendants.              )
12        DEPONENT'S CERTIFICATE
13    I, STEVE RICHMOND, do hereby certify that I have
14 read my deposition consisting of 97 pages, and that it is a
15 complete transcription of my deposition;
16    Any corrections to my deposition are reflected on
17 the attached errata sheet(s). There are _____ errata
18 sheet(s) attached;
19    Dated this _____ day of _____,
20 2013.
21
22        _____
          STEVE RICHMOND
23 Subscribed and sworn to before me this _____ day of
24 _____, 2013.
25

Page 99

1    _____
2    Notary Public
     County of Residence:
3    _____
     My commission expires:
4    _____
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 100

1  STATE OF INDIANA   )
                      )SS:
2  COUNTY OF LAPORTE  )
3           COURT REPORTER'S CERTIFICATE
4      I, Michelle A. Whitaker, RPR and duly authorized
5  to administer such oath, do hereby certify that on the 16th
6  day of April, 2013, at May, Oberfell, Lorber, 4100 Edison
7  Lakes Parkway, Mishawaka, Indiana, commencing at or about
8  the hour of 2:07 p.m., there appeared before me Steve
9  Richmond, who was thereupon first duly sworn by me to
10 testify the truth, the whole truth and nothing but the truth
11 during the taking of his deposition;
12     I further certify that I reported said deposition
13 proceedings by the means of machine shorthand, and that I
14 have transcribed my original shorthand notes through the use
15 of computer-aided transcription into the typewritten form;
16 and that the foregoing and attached pages, or parts of
17 pages, numbered inclusively one through 97 comprise a true,
18 correct, complete and accurate transcript of said deposition
19 proceedings;
20     I further certify that present during the taking
21 of the deposition were the following attorneys:  Edward A.
22 Sullivan, III; Aladean M. DeRose; Daniel Pfeifer; E. Spencer
23 Walton; Thomas M. Dixon, Marielena Duerring;
24     I further certify that I am not employed by, nor

25  (Pages 97 to 100)

City of ...

Page 101

1   am I related to, any of the parties herein, nor their
2   attorneys; nor do I hold any guaranteed contracts with any
3   financially interested third parties or entities;
4           IN WITNESS WHEREOF, I have hereunto set my hand
5   and official seal this 28th day of April, 2013.
6
7
            MICHELLE A. WHITAKER, RPR
8           ASSOCIATE REPORTER
9
10          ---o0o---
11
12
13
14  THIS CERTIFICATE APPLIES ONLY TO THE ORIGINAL TRANSCRIPT
15  HEREOF AND DOES NOT APPLY TO ANY XEROX COPIES MADE OF THIS
16  TRANSCRIPT.
17
18
19
20
21
22
23
24
25