## Page 3

```
                                              1        APPEARANCES CONTINUED:
        UNITED STATES DISTRICT COURT          2        DUERRING LAW OFFICES
        NORTHERN DISTRICT OF INDIANA                   BY: MARIELENA DUERRING
           SOUTH BEND DIVISION                3           Colonia Place
CITY OF SOUTH BEND,              )                      61191 US 31 South
     Plaintiff,                  )            4        South Bend, Indiana 46614
         vs.                     )                      (574) 968-0250
SOUTH BEND COMMON COUNCIL,       )CAUSE NO.:  5        attymduerring@aol.com
ET AL.,                          )3:12-cv-475           Appearing on behalf of the defendants
     Defendants.                 )            6        Scott Duerring and Karen Depaepe
BRIAN YOUNG, SANDY YOUNG,        )            7
TIMOTHY CORBETT, DAVID WELLS,    )            8        MAY, OBERFELL, LORBER
and STEVE RICHMOND,              )CAUSE NO.:           BY: ROBERT J. PALMER
     Plaintiffs,                 )3:12-cv-532-JVB-CAN  9    4100 Edison Lakes Parkway
         vs.                     )                      Mishawaka, Indiana 46545
THE CITY OF SOUTH BEND, Acting   )           10         (574) 243-4100
Through its Police Department,   )                      ewalton@maylorber.com
DARRYL BOYKINS, Individually     )           11
and in his Official Capacity as  )           12        Appearing on behalf of the South Bend Common Council
Chief of Police, KAREN DEPAEPE,  )           13
and SCOTT DUERRING,              )           14        ALSO PRESENT:
     Defendants.                 )           15
                                             16        Scott Duerring
      The deposition of:  THOMAS FAUTZ.               Darryl Boykins
  DATE:  Tuesday, April 16, 2013.                    Brian Young
  TIME:  4:36 p.m.  EST.                     17
  PLACE:  May, Oberfell and Lorber           18        THOMAS FAUTZ DEPOSITION EXHIBITS:
          4100 Edison Lakes Parkway          19    2 - Sworn statement of Thomas Fautz
          Mishawaka, Indiana 46545           20    4 - Office of professional standards, seven-page document
      Called as a witness by the defendants, Scott  21   (Exhibits Two and Four marked in a previous deposition and
  Duerring and Karen Depaepe, pursuant to notice of deposition  22   utilized herein.)
  as to date, place and time, and in accordance with the  23   6 - Position description
  Indiana Rules of Civil Procedure, and as reported by  24             ---oOo---
  MICHELLE A. WHITAKER, Notary Public, RPR, Associate  25
  Reporter.
      MARILYN M. JONES & ASSOCIATES, LTD.
      COMPUTER-ASSISTED REPORTERS
           1416 FRANKLIN STREET
      MICHIGAN CITY, INDIANA 46360
           (219) 879-4077
```

## Page 2

```
 1        APPEARANCES:
 2        FAEGRE BAKER DANIELS
          BY: EDWARD A. SULLIVAN, III
 3           202 S. Michigan Street, Suite 1400
          South Bend, Indiana 46601-2020
 4           (574) 234-4149
          ed.sullivan@faegrebd.com
 5
          Appearing on behalf of the plaintiff
 6        City of South Bend
 7
 8        CITY OF SOUTH BEND
          BY: ALADEAN M. DeROSE
 9           County-City Building
          South Bend, Indiana 46601
10           (574) 235-5866
11        Appearing on behalf of the plaintiff
          City of South Bend
12
          PFEIFER MORGAN & STESIAK
13        BY: DANIEL PFEIFER
          53600 North Ironwood Drive
14        South Bend, Indiana 46635
             (574) 272-2870
15        dpfeifer@pilawyers.com
16        Appearing on behalf of the plaintiffs
          Brian Young, Sandy Young, Timothy Corbett, David Wells and
17        Steve Richmond
18        DIXON, WRIGHT & ASSOCIATES, P.C.
          BY: THOMAS M. DIXON
19           55255 Birchwood Court
          Osceola, Indiana 46561
20           (574) 315-6455
          tdixon3902@comcast.net
21
          Appearing on behalf of the defendant
22        Darryl Boykins
23
24
25
```

## Page 4

```
 1   Tuesday, April 16, 2013 --
 2            (All parties present in the conference room
 3            at or about 4:36 p.m.  Witness sworn.)
 4   THOMAS FAUTZ
 5        Having been first duly sworn, then testified as
 6   follows:
 7   DIRECT EXAMINATION
 8   BY MS. DUERRING:
 9        Q.  Can you go ahead and state your name.
10        A.  Thomas Fautz.  F as in Frank, a-u-t-z as in zebra.
11        Q.  How do you prefer I refer to you today?
12        A.  "Tom" is fine.
13        Q.  Okay.  Tom, have you ever been deposed before?
14        A.  Yes.
15        Q.  Just a couple ground rules before we get started.
16   Obviously, you need to answer out loud for purposes of the
17   court reporter.  Try to avoid nodding the head or shaking
18   the head or um-hums or huh-ums, 'cause they don't go down
19   very clearly on the record.  And I'll try to remind you if
20   you have that tendency.
21            If I ask a question that you don't understand,
22   please indicate that to me so I can rephrase it or repeat
23   it.  Otherwise, I'm going to assume that you understood the
24   question that I asked and your response reflects that
25   understanding.
```

COPY

## Page 5

1    And lastly, if you need a break, just let me know.
2  All right?
3    A.  Thank you.
4    Q.  Are you currently employed?
5    A.  Yes.
6    Q.  And where do you work?
7    A.  Martin's Supermarket Corporation.
8    Q.  What is your position with Martin's?
9    A.  Director of security.
10   Q.  How long have you worked for Martin's?
11   A.  A little over five years.
12   Q.  What was your previous employment?
13   A.  City of South Bend Police Department.
14   Q.  How long did you work for the City of South Bend
15  Police Department?
16   A.  A little over -- about thirty-four and a half
17  years.
18   Q.  And what was the highest position that you reached
19  during your tenure at the City of South Bend Police
20  Department?
21   A.  I retired as the chief of police.
22   Q.  How long were you in the position of chief of
23  police?
24   A.  I always get this confused.  It's 2002 --
25  September of 2002.  Don't know the exact date.  Sometimes I

## Page 6

1  get confused at 2001, but it was 2002.
2    Q.  And your retirement date was when?
3    A.  December 28th, 2007.
4    Q.  Who was the chief prior to you?
5    A.  Larry Bennett.
6    Q.  I'd like you to think specifically to the time
7  period of 2002 through 2007, when you were the chief of
8  police.  At some point during your tenure as chief of
9  police, did you become aware that there was a system in
10  place that allowed you to record phone lines?
11   A.  Yes, I did.
12   Q.  And when did you become aware of said system?
13   A.  Well, over -- over many years, I knew there was
14  lines recorded.  Having worked homicide and other
15  investigations, I knew 911 lines and certain lines at the
16  front desk were recorded.
17    When I became chief of police, I gained a little
18  more knowledge on specifics about the taping system.
19   Q.  Who educated you with respect to the specifics?
20   A.  Karen Depaepe.
21   Q.  Now, at the beginning of your time period as
22  chief, were you ever presented information with respect to
23  lines that had been typically recorded?
24   A.  Not that I can recall.
25   Q.  Okay.  Did you become aware of which lines were

## Page 7

1  recorded?
2    A.  Yes.
3    Q.  And how did that happen?
4    A.  Can't say specifically.  It was either through the
5  division chief Kilgore or through Karen.  I really can't say
6  specifically.
7    Q.  Thinking about this time period right at the
8  beginning of your time as chief of police, what lines were
9  recorded at that time?
10   A.  It's my understanding, but I had no firsthand
11  knowledge, that at that time, the front desk, the radio
12  room, the detective bureau chief's office -- not office, but
13  the secretary, I should say, the chief of police's
14  secretary.
15    Let me think here.  I believe -- I believe that
16  was it.
17    I think there was a phone in the -- what would be
18  called the uniform supervisor's office, that the line rolled
19  over to that -- from the front desk.  Those phones weren't
20  being asked.
21    I think that's it, as far as I can remember.
22   Q.  Were you familiar with the mechanics of that
23  system?
24   A.  I knew that the old system prior to me becoming
25  chief -- and I'm not sure when it changed over -- was

## Page 8

1  reel-to-reel.  Like I say, being involved in investigations,
2  at times you would -- you would seek evidence, especially in
3  homicide.  And at some point, it changed to digital.  When
4  that happened, I can't say for sure.
5    Q.  When the change was made to digital, did you have
6  a specific understanding of how that system worked to
7  actually capture phone calls?
8    A.  I knew it was -- it was a lot easier for Karen to
9  obtain specific times.  And I think the retention of tapes
10  was longer.  But as far as getting into the mechanics of it,
11  no, I was never briefed or was involved in that.
12   Q.  During the entire time that you were chief of
13  police, was Karen the individual that administered that
14  system?
15   A.  Yes.
16   Q.  Did she also have the responsibility for
17  maintaining that system?
18   A.  Yes.
19   Q.  Now, if changes were to be made to the system, did
20  that have to be approved by you?
21   A.  I would say either myself or one of the division
22  chiefs.  Services chief specifically.  There was no specific
23  protocol, so to speak.
24   Q.  And let me be a little bit more specific.  When I
25  say "changes," I mean in the sense of adding any additional

City of South Bend et al vs. DePaepe et al (Karen DePaepe vs City of South Bend)                    DEPOSITION OF THOMAS FAUTZ

**Page 9**

```
 1   lines or subtracting lines that were recorded lines under
 2   the system.
 3       A.  Again, it would have to be done through Karen.
 4   However, there was no specifics on that the chief had to do
 5   it or that the division chief in services who oversaw that
 6   division was in charge of that.  But I would expect that it
 7   would be something that the chief would have the major
 8   say-so on approving or authorizing.
 9       Q.  And when you say "chief," you mean chief of
10   police --
11       A.  Yes.
12       Q.  -- and not just a division chief?
13       A.  Yes.
14       Q.  Were you familiar with the mechanics of how a line
15   was actually recorded?
16       A.  No.
17       Q.  Now, you had testified that when you first became
18   chief, that you were aware that certain lines were being
19   recorded.  Were you aware of the rationale behind why those
20   lines were recorded?
21       A.  The rationale simply would be to record
22   conversations from the public calling in to, say, 911,
23   reporting of a crime that could potentially become evidence
24   at some point.  The front desk, same thing.  Some people
25   call that number instead of the 911 system, for police
```

**Page 10**

```
 1   assistance.  And it's used to document -- document calls as
 2   an investigative tool and documentation.
 3       Q.  Did there ever come a point in time that you
 4   authorized additional lines to be added to the recording
 5   system itself?
 6       A.  Yes.
 7       Q.  And can you tell me specifically what lines were
 8   added.
 9       A.  It was -- and again, this is about eight years
10   ago.  So, it was I would say sometime in late 2004,
11   mid-2004, in that time frame.  As we were transitioning
12   from -- the police department was going through a remodel
13   process, and we were transitioning into the remodeled
14   section to where there was better office space.  Internal
15   affairs had their own suite of rooms.  There were some
16   changes made in that way.
17       And at that time, we were under a lot of scrutiny
18   by the public, being accused, especially being attacked, on
19   how we handled complaints and that we did not adequately
20   document complaints or respond to them.  So, we wanted --
21   there was open discussion amongst the command staff on, you
22   know, how do we improve on this and how do we protect
23   ourselves.  Because we really felt like we were doing an
24   adequate job in handling complaints.
25       In fact had -- had extended to -- as an example,
```

**Page 11**

```
 1   some people were claiming that they didn't want to come down
 2   to the police station, they felt intimidated.  So, we --
 3   through the park department, human rights commission, we
 4   obtained space over there on a bus line, handicap
 5   accessible, allowing people to go there for complaints.  So,
 6   we really felt -- we added IA pro to track individual
 7   officers.  We were trying to do everything we could to be as
 8   transparent with the public yet document what we were doing.
 9       At that time, Chief Eugene Kyle, who was the
10   detective chief, had requested that his line be taped.
11   Based on that conversation, it opened the door of what other
12   lines do we want to tape.  Decided that my line would be
13   taped, Chief Kyle's line would be taped, and that Jim
14   Hassag, who was the uniform chief at the time, that his line
15   would be taped, all with everybody's knowledge.
16       And Chief Kyle's specific request, he asked that
17   it be taped.  The rest of us said, "Well, yeah, that's the
18   way to document."  It would be a useful tool for that
19   individual person whose office it was at to use to be able
20   to document conversations and anyone that called in, to show
21   that we were responsive.
22       At the same time, because internal affairs was
23   moving into their suite and John -- Lieutenant John Collins
24   was the investigator for that section, one of the lines in
25   internal affairs was taped as well.  And John Collins was
```

**Page 12**

```
 1   made aware of that.
 2       So, as far as -- as far as I can  relect --
 3   recollect, the only time I requested that any changes be
 4   made that was -- was that one time.  And that was to add
 5   those particular lines.
 6       Q.  Okay.  Now, it sounds like you basically were
 7   designating lines that were associated with the officers
 8   that were in positions of authority.  Is that fair to say?
 9       A.  Positions of authority, we didn't -- like the
10   services chief or the community relations chief, they really
11   didn't deal with a whole lot of specific complaints about
12   not investigating properly or internal-affairs-type things
13   or complaints against officers, so theirs were not included.
14       But Chief Kyle, who was in the investigative
15   division, and Chief Hassag, who ran the uniform division,
16   which is usually the most high-profile area, and myself,
17   those were the ones, you know, that we designated.
18       Q.  So, if I understand you correctly, these chiefs
19   that were in positions that frequently dealt with the
20   public?
21       A.  Correct.
22       Q.  And these were the individuals that, I guess for
23   lack of a better word, would be subjected to potential
24   complaints?
25       A.  Correct.  And it provided them with a tool that
```

| Page 13 | Page 15 |
|---|---|

**Page 13**

1 they could use, again for their protection and to aid in an
2 investigation.
3   Q.  Okay.  Now, say, for example, if Jim Hassag had
4 **left his position as a chief and a new individual was**
5 **assigned to that position.  Would the policy that you**
6 **implemented with respect to taping that line continue based**
7 **upon the philosophy that you've articulated for me?**
8       MR. SULLIVAN:  Just interpose an objection.
9   Mischaracterizes.
10      Go ahead.
11   A.  Yes, in a certain way, with a stipulation.  The
12 person coming into that position would be told that that
13 line was taped.
14   Q.  Uh-huh.
15   A.  And they had the option of continuing to tape it
16 or discontinuing it.  It was their own personal preference.
17 Again, these were not tools for anybody but them.  And if
18 they felt that that was something that, you know, they
19 wanted to have, then that was their prerogative.
20      I can say one hundred percent that at no time did
21 I ever ask to listen to any tapes regarding those -- those
22 lines.
23   Q.  Would you agree with me that those tools were
24 **provided to these officers that we've discussed with the**
25 **specific idea that they were resources to be used in the**

**Page 14**

1 **course of their employment?**
2       MR. PFEIFER:  Objection.  Leading.
3   Q.  You can go ahead and answer.
4   A.  They worked there.  It's part of their employment.
5 It was for their -- for their use as a tool.
6   Q.  Now, you indicated that this discussion was
7 **initiated by Eugene Kyle.  Is that correct?**
8       MR. PFEIFER:  I'm gonna object to form.  What
9   discussion are you talking about?
10      MS. DUERRING:  The discussion with respect to
11   the recorded lines.
12      MR. PFEIFER:  Okay.
13      MS. DUERRING:  Thank you.
14   A.  He brought up the subject, and that kind of
15 started the conversations.  These conversations were in open
16 staff meetings.  It wasn't like anybody was trying to
17 covertly spy on anyone or anything like that.  Again, it was
18 a personal tool for the peoples whose offices were taped.
19   Q.  And you were satisfied, after these discussions
20 **and these meetings, that the purposes behind recording these**
21 **lines were law-enforcement related?**
22      MR. PFEIFER:  Objection.  Leading.
23   Q.  What did you feel the basis was for recording the
24 **lines?**
25   A.  For the individual whose person's office who that

**Page 15**

1 was, it was a tool for them to use in the scope of their
2 employment as -- you know, as a division chief.
3   Q.  It wasn't put there for personal reasons.  Is that
4 **fair to say?**
5   A.  No.
6   Q.  If an individual officer would come to you and
7 **request that a line be recorded because of some personal**
8 **motivation, would you have authorized that?**
9   A.  I -- I can't speculate.  I'd have to hear
10 everything involved in the situation and make a decision
11 based on that.
12   Q.  Suppose an officer had some sort of a personal
13 **vendetta and they wanted to record any conversations that**
14 **occurred on their -- on their phone lines to pursue that.**
15   A.  So, somebody was threatening them or something
16 along those lines?
17   Q.  Not job-related.  Personal.
18   A.  I'd probably consult with the city attorney first.
19   Q.  When you made the decision to place these lines on
20 **the recording system, who did you go to?**
21   A.  Karen Depaepe.
22   Q.  Did you order her to place those lines on the
23 **recording system?**
24   A.  I asked her to.  I explained -- actually, I
25 explained to Karen what our motivation was behind it and

**Page 16**

1 said that, you know, we're under a lot of scrutiny, we get
2 calls and everything else, and we want to be able to
3 document, and here's the lines I would like to add.
4   I told her, "While I'd like this kept discreet, we
5 don't want to broadcast to everybody that my line's taped or
6 their lines are taped.  The people have been made aware that
7 their lines are being taped and that these people may at
8 times ask you, you know, to access these tapes."
9   Q.  I believe you had indicated in your statement that
10 **you provided back on October 23rd, 2012, that you believed**
11 **the capacity of the recording system was a 20-line system?**
12   A.  That's -- I -- that sounds right.  Am I hundred
13 percent correct, I don't know.  But that's my belief.
14   Q.  Would you be surprised to know that the system
15 **actually has the capacity of recording up to 48 channels?**
16   A.  I had no -- I mean, that -- that was my belief.  I
17 can remember Karen saying one thing to me.  I said, I don't
18 know how big this system is or whatever, if you can -- if
19 this can happen to add these lines.  She said, "Oh, yeah,
20 there's plenty more."
21   Q.  Okay.  So again, it's fair to say that Karen
22 **Depaepe is the individual that has the most intimate**
23 **knowledge about the capacity of the system and how it**
24 **operates?**
25   A.  Yeah.  As far as I know, she's -- she's probably

Marilyn M. Jones & Associates    Computer-Assisted Reporters & Videographers    (888) 810-4077

**Page 17**

1 the lead -- leading expert there, and anything you would
2 want done or you requested something for a case, you would
3 have to go through Karen, who has the ability to monitor or
4 make copies of tapes.
5     Q. Okay. Now, Karen's position was communications
6 director while you were there. Is that correct?
7     A. Yes.
8     Q. And is it fair to say that you were in Karen's
9 direct chain of command?
10     A. Well, she reported directly to Chief Kilgore, but
11 then I was in charge of the department.
12         THE DUERRING: Pass the witness.
13 CROSS EXAMINATION
14 BY MR. DIXON:
15     Q. You gave a sworn statement, right, to Mr. Pfeifer,
16 at his law firm in October of 2012, right?
17     A. Yes.
18     Q. Did you review that in anticipation of this
19 deposition?
20     A. Yes, I did. And I did find one mistake.
21     Q. I'm not --
22     A. Oh, okay.
23     Q. I'll let you go to that, but you'll knock me off
24 stride.
25     A. Sure.

**Page 18**

1     Q. Do you have it with you now?
2     A. I have just been handed a copy.
3     Q. Okay. Turn to page four. Let's look at lines
4 nine through eleven. I'll just read it and you can confirm
5 if I've read it correctly. Okay? "There was one line in
6 that section that belonged to Chief Eugene Kyle, and upon
7 his request, that line was, on my authority taped." Right?
8 That's what it says?
9     A. Yes.
10     Q. Is that the mistake that you're talking about?
11     A. No.
12     Q. Okay. So, that's a correct statement? All --
13 everything I read there is a correct statement of yours?
14     A. Chief Kyle requested his line be taped, and it
15 was.
16     Q. On your authority?
17     A. Yes.
18     Q. In other words, you were ultimately the one who
19 said yes, that's okay to do?
20     A. Yes.
21     Q. And if you would have said no, then it wouldn't
22 have been done?
23     A. No, it wouldn't have.
24     Q. And if Kyle had come to you and said I want to get
25 some dirt on my neighbor who keeps calling in on me for --

**Page 19**

1 you know, I sold him a car and it's a lemon, can you tape my
2 line, you would have said no?
3     A. I can't say definitely no. I'd have to hear
4 everything about it, and I would probably consult the city
5 attorney on it.
6     Q. From my description, would that -- would that
7 appear to you -- just in your opinion. I'm not asking you
8 to make a legal judgment. But from my description -- and
9 I'll repeat it. He says I want my line recorded because I
10 sold a car to my neighbor that's a lemon and now he's giving
11 me a hard time about it.
12     A. Well, giving a hard time --
13         MR. PFEIFER: Objection. Asked and answered,
14 first of all. And secondly, I don't even know
15 that there's a question.
16         MR. DIXON: I didn't -- well, I want to
17 finish the question.
18         MR. PFEIFER: Okay.
19     Q. So, would that appear -- would recording that line
20 based just on that information that I gave to you -- would
21 that appear to you to be a law enforcement purpose?
22     A. On what you said right there, if there's no
23 threats, "I'm gonna kill you," those kinds of things, I
24 would probably say no.
25         MR. DIXON: Okay. I don't have any further

**Page 20**

1 questions. Thank you.
2 CROSS EXAMINATION
3 BY MR. PALMER:
4     Q. Under your command, was the recording system ever
5 used to intimidate anyone?
6     A. Not -- not to my knowledge.
7     Q. Was that a motivation for implementing the
8 recording system?
9     A. No. It was -- it was to gather evidence and --
10 and serve as a tool for those individuals who had their
11 lines taped to either defend themselves or document what had
12 taken place.
13     Q. And that would be the same answer if I asked you
14 if the motivation was to embarrass or harass anyone?
15     A. I would not put up with that.
16     Q. The answer would be the same, that that was not a
17 motivation?
18     A. Yes.
19     Q. Would you consider the purposes to document
20 complaints and to use as a tool to be a legitimate business
21 purpose?
22     A. Yes.
23     Q. In your opinion or to your knowledge, is the
24 recording of lines into a police station something that's
25 ordinarily done by other police stations around the country?

City of [illegible] ... Young, et al. vs. The City of South Bend, et al.    DEPOSITION OF: THOMAS FAUTZ

**Page 21**

1    MR. PFEIFER: Object to the form of the
2 question unless you identify which lines you're
3 talking about. Are you talking about all lines or
4 certain lines. So, I'll object to the form of the
5 question.
6    MR. PALMER: All lines.
7    MR. SULLIVAN: Objection. Lack of
8 foundation.
9    Go ahead.
10   A. Could you repeat the question. I want to --
11   Q. To your knowledge, is it ordinary and customary
12 for police departments around the country in the United
13 States to record at least some lines coming into the
14 office -- into the station?
15   A. Yes.
16   MR. SULLIVAN: Same objection.
17   Q. And what do you base that answer on?
18   A. Just good business practices. I mean, in this day
19 and age, you certainly -- in a 911 call, it happens so
20 quick, sometimes you want to go back and hear exactly what's
21 said. Provides evidence. I'm sure smaller agencies maybe
22 don't. But agencies the size of South Bend would certainly
23 have some type of a recording system, I would think. Can't
24 say specifically, but I would think.
25   Q. How did you come about this knowledge? Was it

**Page 22**

1 through discussions with other police chiefs? through
2 reading? Your knowledge about use of recorded lines in
3 other police stations.
4    A. I guess I would just be speculating, because I
5 can't say for sure. I mean, I have worked investigations
6 with other departments where, you know, they had evidence,
7 or just watching on TV, you know, when they play 911 tapes
8 and those kind of -- type of things. I would assume that
9 most police departments would, you know, capture that.
10   Q. And it's not simply for 911 calls, if I understand
11 your testimony. It's also to document complaints about
12 individual officers or procedures that the police department
13 have employed in following up?
14   A. I really can't speak for --
15   Q. For your --
16   A. I'm trying to act as an expert here talking about
17 other departments.
18   Q. Let me rephrase the question.
19   A. But I think it's common practice.
20   Q. Let me rephrase the question. In your
21 department -- in the South Bend Police Department, it was
22 not simply for 911 calls that you taped lines, but it was
23 also to document complaints from the public and to, as you
24 said -- used the word, be transparent with the public?
25   A. Yes.

**Page 23**

1    MR. PALMER: That's all the questions I have.
2 CROSS EXAMINATION
3 BY MR. SULLIVAN:
4    Q. Chief, who followed you in the position of South
5 Bend Police Department chief?
6    A. Chief Darryl Boykins.
7    Q. Chief Boykins. And was he a division chief under
8 you before that?
9    A. Yes, he was.
10   Q. What --
11   A. He was the uniform division chief.
12   Q. Okay. Was he in that position when -- if memory
13 serves me, I think you were describing conversations that
14 you had to establish this practice of recording some of
15 these lines. Was he a part of those conversations?
16   A. No.
17   Q. Okay. Why not?
18   A. He wasn't in that position at that time.
19   Q. Do you recall what position he was in at that time
20 those conversations took place?
21   A. He would have been a captain. I believe he might
22 have been with internal affairs, but I -- I can't say for
23 sure.
24   Q. That's fine.
25   Now, when you were chief of police, it was one of

**Page 24**

1 your responsibilities to establish practices and procedures
2 for the department?
3    A. Yes.
4    Q. Okay. Is the policies for the South Bend Police
5 Department contained in the duty manual?
6    A. Yes.
7    Q. If the duty manual is changed, does that have to
8 be approved by the board of public safety?
9    A. Yes.
10   Q. But as far as the practice that occurs in the
11 department, you don't go to the board of public safety for
12 that?
13   A. No.
14   Q. That was under your authority to develop and
15 establish practices and procedures?
16   A. Yes. Yes.
17   Q. Was it ever the practice of the South Bend Police
18 Department, while you were the chief, to designate certain
19 division chiefs as having telephone lines to be recorded at
20 all times? That is, the position rather than the person who
21 happened to be in the position? Was it ever the practice?
22   A. No.
23   Q. Did you ever intend to establish that practice?
24   A. No.
25   Q. Was it ever the practice of the South Bend Police

6 (Pages 21 to 24)

## Page 25

1 Department, while you were the chief, to tap all lines used
2 by captains and chiefs in the department?
3      A. No.
4      Q. Did you ever intend to establish that practice?
5      A. No.
6      Q. Was it ever the practice, while you were chief, to
7 randomly tap lines?
8      A. No.
9      Q. Did you ever intend to establish that practice?
10      A. No.
11      Q. Was it ever your practice, while you were chief,
12 to tap any given line at your own discretion?
13      A. No.
14      Q. Did you ever intend to establish that practice?
15      A. No.
16      Q. Was it ever your practice to tap lines without
17 anyone else's knowledge?
18      A. No.
19      Q. Did you ever intend to establish that practice?
20      A. No.
21      Q. Was it ever your practice to use the recordings
22 that came from the tapped lines for purposes of determining
23 the loyalty of your division chiefs?
24      A. No.
25      Q. Did you ever use it for that purpose?

## Page 26

1      A. No.
2      Q. Did you ever intend anyone to use it for that
3 purpose?
4      A. No. It was a tool for the individual person.
5      Q. And that was the practice that you intended to
6 establish?
7      A. Yes.
8      MR. SULLIVAN: I'm gonna approach the court
9 reporter for purposes of marking an exhibit.
10      (Reporter marked Exhibit Number Six.)
11      Q. Chief, the court reporter has given you Exhibit
12 Six, which is a position description. Do you see that?
13 Have you looked through Exhibit Six, Chief?
14      A. I'm looking at it.
15      Q. Sure. Just give me the hi sign when you've
16 completed your review. Just take whatever time you need.
17      A. Yes, sir.
18      Q. You ready to answer questions about Exhibit Six,
19 Chief?
20      A. Yes.
21      Q. You see that it's the position description for the
22 director of communications?
23      A. Yes.
24      Q. And you're familiar with this position description
25 because the director of communications ultimately answered

## Page 27

1 to you as chief. Is that correct?
2      A. Yes.
3      Q. And that was the position held by Karen Depaepe?
4      A. Yes.
5      Q. Is the director of communications a position in
6 the South Bend Police Department filled by a sworn officer?
7      A. No. It's a civilian position.
8      Q. Does the civilian position of director of
9 communications have law enforcement responsibility?
10      A. No.
11      Q. Investigative responsibilities?
12      A. No.
13      Q. Any training as an investigator of criminal -- of
14 crime -- investigations for crime -- Let me start over.
15      Is the director of communications given any
16 training to be an investigative personnel?
17      A. No.
18      Q. So, is the director of communications for the
19 South Bend Police Department responsible for any review of
20 recorded conversations to determine if there was
21 inappropriate or illegal conduct of any officer?
22      A. No. That would be internal affairs.
23      Q. Is the director of communications responsible for
24 reviewing and listening to recorded conversations to
25 determine if there was any inappropriate or illegal conduct

## Page 28

1 of a captain?
2      A. No.
3      Q. Is the director of communications responsible to
4 review and listen to recorded conversations to determine if
5 there was any inappropriate or illegal conduct of a division
6 chief?
7      A. No.
8      Q. Is it the regular -- Does the director of
9 communications for the South Bend Police Department in their
10 regular course of business have any responsibility for
11 reviewing and listening to recorded conversations within the
12 South Bend Police Department to determine any kind of
13 wrongdoing or inappropriate behavior?
14      A. I would say the only place where that would --
15 would apply is there was a complaint and somebody did not,
16 you know, dispatch a 911 call or something along those
17 lines. But that would be initiated with a complaint and a
18 request to have that information pulled.
19      Q. And is there a form that is filled out when that
20 complaint is initiated or that investigation is initiated?
21      A. Internal affairs would -- you know, an intake
22 form. I really can't remember, you know, the forms. But
23 something would be document on a complaint before we would
24 take it to the level of requesting tapes and those types of
25 things.

Page 29

```
 1     Q.  Is the director of communications responsible to
 2  take her cue from internal affairs to locate the recording
 3  that's needed in the investigation?
 4     A.  Yes.  It's to locate the recording and to provide
 5  a copy for the investigation.
 6     Q.  Did she have any responsibility of her own
 7  initiative to review and search recorded conversations to
 8  determine wrongdoing, inappropriate behavior, or illegal
 9  behavior, of her own initiative?
10     A.  Not that I'm aware of.
11     Q.  Okay.  And if you were the chief of police and you
12  found out that the director of communications, of her own
13  initiative, without being asked by any investigative
14  officer -- you found out that she was reviewing
15  conversations between your officers, of her own initiative,
16  to determine if there was misconduct, how would you handle
17  that?
18     A.  It would be -- I think it would be misconduct on
19  the authority they have.  That's not her position, in
20  private conversations.
21     But, you know, going back to, like, 911 calls or
22  things like that, I mean, there -- it's hard to just draw a
23  hard, fast line.  If somebody called in saying, Hey, they
24  botched this call, you had a horren- -- horrendous crime in
25  progress and nobody dispatched it, I think she would be
```

Page 30

```
 1  asked to review that section and give us, you know, a copy
 2  and her opinion as the supervisor.
 3     But listening to private conversations, no, that
 4  isn't her position.
 5     Q.  Would you say, if she had done that, that she was
 6  acting outside of the regular course of conduct for the
 7  director of communications?
 8     A.  Yes.
 9     Q.  Was the establishment of the practice of recording
10  phone calls meant to be a tool for the director of
11  communications?  You used the phrase it's a tool for -- for
12  the division chiefs.  You said it's a tool for them.  Right?
13     A.  Yes.
14     Q.  My question to you is, when you established that
15  practice, did you intend for it to be a tool for the
16  director of communications to take it on -- on their own
17  initiative to listen to conversations internal to the South
18  Bend Police Department?
19     A.  No, that's not what I intended.
20     MR. SULLIVAN:  Thank you, Chief.  I have no
21  further questions.
22     MR. PFEIFER:  Chief, I have a couple of
23  questions.
24  CROSS EXAMINATION
25  BY MR. PFEIFER:
```

Page 31

```
 1     Q.  With respect to the statement that you have given,
 2  a copy of which is in front of you -- and, I'm sorry, I'm
 3  drawing a blank on the number.
 4     MS. DUERRING:  It was Exhibit Two.
 5     Q.  Exhibit Two.  We --
 6     MS. DUERRING:  From yesterday.
 7     Q.  Okay.  From yesterday.  We're marking the exhibits
 8  sequentially.  And we have a different court reporter, so we
 9  don't have the exhibits from yesterday.
10     But Exhibit Two, I'm just gonna represent -- your
11  statement is Exhibit Two.  You had indicated earlier that
12  when you reviewed it prior to coming here today, you saw
13  something that was a change.  Do you remember saying that?
14     A.  Yes.
15     Q.  Why don't you tell us what the change is since
16  nobody else asked.
17     A.  Well, it may seem insignificant, but I like this
18  to be correct.  And it's not that the court reporter made a
19  mistake.  It was -- might have something to do with my age.
20  I don't know.  But I said 2001 I became police chief,
21  instead of 2002.
22     MS. DUERRING:  I actually noticed that but I
23  thought --
24     THE DEPONENT:  It's like birthdays.  They
25  just keep coming.  You know, you can't keep track,
```

Page 32

```
 1  I guess.
 2     Q.  So, the change is not a smoking gun in terms of
 3  your testimony?
 4     A.  No.
 5     Q.  Okay.  Basically, you -- 2001 in the
 6  statement, in terms of when you were chief, should be 2002?
 7     A.  Correct.
 8     Q.  Any other changes that you felt like you needed to
 9  make with respect to Exhibit Two?
10     A.  No.
11     Q.  Okay.  When you started this practice of recording
12  additional lines, if I understand what you said, the
13  practice kind of started by Gene Kyle asking to have his
14  phone line recorded.  Correct?
15     A.  Yes.
16     Q.  Now, at the time, what was Gene Kyle's position?
17     A.  He was the division chief for the detective
18  bureau.
19     Q.  Okay.  So, the recording of his line was at his
20  request?
21     A.  Yes.
22     Q.  And authorized by you?
23     A.  Yes.
24     Q.  If Gene Kyle had never requested his line be
25  recorded, would you as the chief of police have recorded his
```

8 (Pages 29 to 32)

Page 33

1   phone line?
2       A.  No.
3       Q.  Why not?
4       A.  It's his -- it's his office.
5       Q.  As the chief of police, do you believe that
6   officers that had individual phone lines assigned to them
7   had an expectation of privacy in terms of the use of those
8   lines?
9           MR. DIXON:  Objection.  Calls for speculation
10          as to what other officers believed.
11      Q.  You can answer.
12      A.  No, I wouldn't -- I wouldn't tape that line,
13  because they -- they make personal phone calls and, you
14  know, it's their own phone.
15      Q.  From your perspective as the chief of police, did
16  you believe that officers who were using their own phone
17  making private phone calls had an expectation of privacy
18  that their phone line would not be recorded unless they knew
19  it was being recorded?
20      A.  Yes, it's -- it's my understanding that for a line
21  like that, that one person has to have -- give permission to
22  have the line taped.  Has to be with their knowledge.
23      Q.  You indicated that when you were the chief of
24  police, any of the individual lines that were recorded, you
25  yourself never listened to those.  Correct?

Page 34

1       A.  Correct.
2       Q.  And I believe we've established, but I want to
3   make sure.  Would Karen Depaepe have had the authority on
4   her own to listen to any of those recordings?
5       A.  No.
6           And you're talking about the division chief's
7   phones --
8       Q.  Yes.
9       A.  -- not 911?
10          Yes, she didn't have permission to do that.
11      Q.  Okay.  When Gene Kyle was no longer the division
12  chief of the investigative -- investigation division or the
13  detective bureau as we know it, who took his place?
14      A.  Rick Bishop.
15      Q.  When Rick Bishop took Gene Kyle's place, what, if
16  any, discussion did you have with him about the phone line
17  that Gene Kyle had been using in terms of it being recorded?
18      A.  I talked to Rick.  I didn't know -- sometimes
19  people keep their old number when they transfer.  I asked
20  him if he was gonna keep the old number or the -- you know,
21  take Chief Kyle's number.  He said he had to have new
22  business cards made anyway, so he would just, you know, keep
23  the existing number.
24          And that -- I said, "Well, I want to tell you that
25  that line is taped.  It's up to you if you want to continue

Page 35

1   to have it taped."
2           He said, "That's fine.  I'll still help out with
3   some internal affairs cases, you know, for any sensitive
4   cases."  He agreed to help do that.  And he's -- you know,
5   he said, "I use my cell phone for my personal calls."
6       Q.  So, whenever Rick Bishop took Gene Kyle's
7   position, you advised him of the fact that that phone line
8   was being recorded.  Correct?
9       A.  Yes.
10      Q.  Would you have ever as the chief of police allowed
11  Rick Bishop to take that position with the phone being
12  recorded and not tell him?
13      A.  No.  No.
14      Q.  Why not?
15      A.  Well, again, it's -- it's his own personal phone.
16  Not personal phone, but it's his phone in his office that is
17  just for him.  It's not like the general phones coming into
18  the police station.  So, no, I wouldn't tape it without his
19  knowledge.
20      Q.  Going back to Karen Depaepe.  If I understand, the
21  only way she would have been authorized to listen to a tape
22  is if she was specifically asked by an officer to do so.  Is
23  that fair?  By certain officers to do so.
24      A.  Well, again, I think we have to break this down in
25  between 911 tapes and the tapes that we're talking about are

Page 36

1   internal affairs tapes.
2       Q.  Fair enough.
3       A.  Because on a 911 tape, things can happen, you
4   know, that -- "What did that person say?  We didn't hear
5   it."  I mean, she may -- she's authorized to get in there
6   and play it back.  I think the radio operators, some of
7   them, I mean, had cassette recorders that they would tape
8   calls right then at that time just for that purpose.
9           So, I can't say one hundred percent she never had
10  the ability -- or the right to get in there and listen.
11          But when it came to internal affairs tapes and
12  those individuals' offices, including my office, that she
13  didn't have the authorization to get in there without a
14  request.
15      Q.  Okay.  If Karen Depaepe was ordered by the chief
16  of police to listen to tapes and make recordings or
17  cassettes of the tapes that she listened to, would she be
18  obligated, from your perspective as the chief of police, to
19  follow that order?
20      A.  Yes.
21      Q.  Going back to the recording of Gene Kyle's line.
22      A.  Yes.
23      Q.  If Gene Kyle wanted Karen Depaepe to retrieve a
24  phone conversation that he had that had been recorded, would
25  he have the right to go and ask her to do that?

9 (Pages 33 to 36)

Page 37

```
 1       A.  Yes.  It's his phone.
 2       Q.  Would anyone else, short of a criminal
 3  investigation being undertaken, as to Gene Kyle?
 4       A.  Well, I think as -- as chief of police, if I asked
 5  for a copy of it, she would provide it, simply because I'm
 6  a -- I was, you know, superior.  But that never happened.  I
 7  mean, I never asked for those.
 8       Q.  But short of the chief of police, no one else
 9  would have been -- from your perspective at -- when you were
10  the chief, no one else would have been authorized to go and
11  request a copy of a recorded conversation on Gene Kyle's
12  line other than you and Gene Kyle?
13       A.  Correct.
14       Q.  If while you were the chief of police it was
15  learned that a phone line of an individual was being
16  recorded --
17       A.  Uh-huh.
18       Q.  -- and that individual did not know that the phone
19  line was being recorded, once the individual realized that
20  his or her phone line was being recorded, would that person
21  have the ability and the right to have the recordings of his
22  or her phone line stopped?
23            MR. DIXON:  Objection.  Compound.
24       Q.  You can answer.
25       A.  I would think so.  I think it would -- you would
```

Page 38

```
 1  have a duty to report it to them, tell them, "However this
 2  happened, we're making you aware of it," and, you know, deal
 3  with it that way.
 4       Q.  And if -- I guess let's stop beating around the
 5  bush and put a name.  If in August of 2011, Brian Young, who
 6  was the captain of the detective bureau, investigative
 7  division at that time, learned for the very first time that
 8  his phone line was being recorded without his knowledge and
 9  he requested that the recording of that phone line stop,
10  would he have the right to make that request?
11            MR. DIXON:  Objection.  Compound sentence and
12       asked and answered.
13       A.  If I was the chief, I would terminate it
14  immediately.
15       Q.  Why is that?
16       A.  He has a right to privacy on his phone.
17       Q.  And if his phone line had been recorded without
18  his knowledge and he requested that the recordings of his
19  phone line that had taken place without his knowledge be
20  destroyed, would he have the right to do that?
21       A.  Again, I don't know about that.  I would probably
22  defer to the city attorney to find out.  I don't know how
23  public records -- I mean, I don't know.  I don't know.
24       Q.  Okay.
25       A.  I can't give you an honest answer on that one.
```

Page 39

```
 1       Q.  Fair enough.
 2            If -- Continuing with my illustration.  If Brian
 3  Young, having learned that his phone line was being recorded
 4  without his knowledge, requested that the recording stop,
 5  would either Karen Depaepe or Barb Halaman have the right to
 6  refuse his request?
 7       A.  If -- if I was the chief, no, they wouldn't.  I
 8  would -- I would terminate it immediately.
 9       Q.  With respect to Exhibit Two, rather than me sit
10  here and ask you all the questions that were asked in
11  Exhibit Two, if you were asked all those questions that are
12  in Exhibit Two again on the record, would your answers that
13  you gave at the time you were sworn in be the same now?
14       A.  Yes, they would, with the exception of that 2001.
15            MR. PFEIFER:  Okay.  I don't have anything
16       else.
17            MS. DUERRING:  A slight break, if we could.
18            (Brief recess taken.)
19  REDIRECT EXAMINATION
20  BY MS. DUERRING:
21       Q.  All right.  Chief, directing your attention to
22  what I believe was marked as Exhibit Six today, the position
23  description.
24       A.  Yes.
25       Q.  Am I right about that exhibit number?
```

Page 40

```
 1            I'd like you to direct your attention to the very
 2  bottom paragraph.  If you could just review that for a
 3  second and let me know when you're done.
 4       A.  On the first page?
 5       Q.  On the first page.  Thank you.  Yes.
 6       A.  "Manages and maintains all physical resources
 7  housed and used within the communications center to ensure
 8  that all subordinates are properly equipped and equipment
 9  failures are properly identified, repaired, and restored to
10  full operations."
11       Q.  Okay.  Having reviewed that paragraph, if your
12  communications director was listening to phone calls in the
13  scope of trying to determine whether the equipment was
14  functioning properly, would that be within the scope of that
15  individual's duties?
16       A.  I guess if there was a problem with it, yes.
17       Q.  Okay.  Say, for example, if there had been a
18  breakdown in hard drives and equipment that was maintained
19  on those hard drives and an effort was being made to
20  determine whether or not that information was being properly
21  transferred.  Would that be in the scope of the director of
22  communications' responsibility as spelled out by this
23  position description?
24       A.  Yes.
25       Q.  Okay.  Now, during the course of your tenure as
```

Marilyn M. Jones & Associates          Computer-Assisted Reporters & Videographers          (888) 810-4077

**Page 41**

1 chief, were there ever any independent Indiana State Police
2 investigations that would request or that requested
3 recordings that were made?
4     A.   I can't specifically say so.  But if they -- if
5 they had, we would certainly provide them.
6     Q.   Okay.  So, if there was an ISP investigation and
7 they were seeking recordings of phone conversations, would
8 it be within the scope of the director of communications'
9 responsibility to locate those recordings to provide to the
10 ISP?
11     A.   Yes.
12     Q.   Would you agree, if you know, that that may
13 consist of listening to phone conversations -- several phone
14 conversations in order to identify the specific
15 conversations that were requested?
16     A.   Ask that again.
17     Q.   I certainly will.
18         Say they're looking for a specific conversation.
19     A.   Yes.
20     Q.   And I understand that you don't necessarily know
21 the logistics of how these recordings are maintained.  Is
22 that a fair statement?
23     A.   Yes.
24     Q.   Okay.  If it was necessary to listen to multiple
25 conversations in order to identify the specific conversation

**Page 42**

1 that was requested, would that be within the scope of the
2 duties of the communication director?
3         MR. SULLIVAN:  Objection.  Vague as to
4     "necessary."
5         You can answer.
6     Q.   You can answer.
7     A.   I think that typically the investigator would be
8 there with her as she listened to those conversations under
9 their direction.  But, yes, she would listen to 'em to
10 identify that particular location.
11     Q.   Okay.  And presence of the investigator, whether
12 they're there or not, would you say that that's outside the
13 scope of her duties if a specific request had been made?
14         MR. SULLIVAN:  Objection.  Vague as to who
15     would request.
16         You can answer.
17     A.   I'm just trying to think through the
18 circumstances, and I would say yes.
19     Q.   It would be outside of the scope of her duties?
20     A.   No, it would be --
21     Q.   Within the scope?
22     A.   -- within her duties, yes.
23     Q.   Thank you.
24         I can be more specific.  Let's say that the city
25 attorney's office requested Karen to listen to multiple

**Page 43**

1 conversations in order to identify specific requests for
2 conversations that were made as part of a FOIA request.
3 Would you construe that as being outside of the scope of her
4 duties and responsibilities?
5     A.   No.
6     Q.   Thank you.
7         If I understood the progression correctly, Kyle's
8 line was then assumed by Bishop.
9     A.   Yes.
10     Q.   Is that correct?
11         And then who replaced Bishop?
12     A.   Steve Richmond replaced Bishop.  But that was
13 after I had retired.
14     Q.   I understand.
15         To your knowledge, did the line associated with
16 that position continue from Kyle to Bishop to Richmond?
17         MR. PFEIFER:  Which position?
18         MS. DUERRING:  The uniform chief.
19         Or the investigative chief.  I'm sorry.
20         MR. SULLIVAN:  Objection.  Lack of
21     foundation.
22     A.   It wasn't really assigned to the position.  It was
23 assigned to the person in that position.  So, when Bishop
24 left, I mean, I can't -- I was gone.  But I would -- I would
25 think it would be -- if it was going to continue for Steve

**Page 44**

1 Richmond, that he would be advised.
2     Q.   Now, I understood from your previous testimony
3 that you were the one that actually sat Bishop down and
4 explained to him that the line was recorded.
5     A.   Yes.
6     Q.   Did you ever communicate to Karen that you were
7 having these specific conversations with the officer to
8 advise them?
9     A.   No.
10     Q.   Okay.
11     A.   No.  I never told her about Bishop.  I told her
12 when we originally set those up that those officers -- you
13 know, it was with their permission and knowledge.
14     Q.   Right.  But at the time of transition from one
15 individual to the next, did you sit Karen down and say,
16 We're doing this with Bishop's okay?
17     A.   No.  No, I didn't.
18     Q.   Did you ever communicate to Chief Boykins what the
19 policy had been with respect to these recorded lines?
20         MR. SULLIVAN:  Objection to the phrase
21     "policy."
22         Go ahead.
23     A.   When Jim Hassag was retiring -- and I think it was
24 sometime in 2005.  He hadn't left yet.  And I would have
25 conversations with Darryl and sometimes with Jim there as

11 (Pages 41 to 44)

**Page 45**

1 the transition was being made, and at one point, I did talk
2 about that there are -- that there are lines taped here, my
3 line, Kyle was still in place at that time, internal
4 affairs, and the line that -- office he was going, and that,
5 you know, it's up to him if he wants to continue.
6     I never told Karen to terminate any lines. So,
7 with just my understanding that it was being recorded and
8 if -- if I didn't request it stopped, it probably didn't. I
9 can't say that for sure. Maybe they were stopped. I never
10 really followed up on that.
11     **Q. And I appreciate the information. I want to get**
12 **back to what I had originally asked, though, and that was:**
13 **At the time of the transition -- you know, you're leaving**
14 **the chief's office and Chief Boykins is assuming that role.**
15     A. Yes.
16     **Q. -- did you sit him down and say, "These lines are**
17 **recorded. If there's any changes, it needs to be**
18 **communicated to these officers"?**
19     A. No.
20     **Q. Did you ever direct Karen to have that**
21 **communication with him?**
22     A. No.
23     **Q. And Karen had no specific knowledge that your**
24 **personal policy had been to inform these individual**
25 **officers?**

**Page 46**

1     MR. SULLIVAN: Objection. Mischaracterizes
2     as to the phrase "personal policy."
3     Go ahead.
4     A. I did tell her that they were aware of it.
5     **Q. Originally?**
6     A. Yes.
7     **Q. But not at the time of the changed admission**
8 **(sic)?**
9     A. No, I didn't tell her when Bishop assumed that
10 position and when Boykins assumed the position.
11     **Q. Were you aware that the recording system was**
12 **serviced by an outside company?**
13     A. No, I wasn't. I thought -- well, I mean --
14 serviced, you mean maintained?
15     **Q. Maintained. Any changes that were made had to be**
16 **made by an outside company.**
17     A. Changes, I thought Karen did somehow on there.
18 But maintained, I think there was a company that -- you
19 know, let's say something broke.
20     **Q. So, it's fair to say --**
21     MR. SULLIVAN: Hold on, Counsel. He answered
22     pretty quickly there, and I wanted to interpose an
23     objection as to the word "changes" in the system.
24     Vague and mischaracterizes.
25     Go ahead.

**Page 47**

1     **Q. If a line was going to be ordered or added to the**
2 **system, could Karen do that herself, to your knowledge?**
3     A. It was my understanding that it was done right
4 then. I -- I didn't -- I guess I didn't have enough
5 knowledge of the system to understand the dynamics.
6     **Q. Okay. So, you would defer to Karen with respect**
7 **to how those changes were actually made?**
8     A. Yes.
9     MS. DUERRING: Nothing additional.
10 RECROSS EXAMINATION
11 BY MR. DIXON:
12     **Q. Chief, is it your testimony that you informed**
13 **Darryl Boykins when he became the uniform division chief**
14 **that the line that he was -- the phone that he was going to**
15 **was recorded?**
16     A. Yes. I told him that line was taped, along with
17 the other ones. I said, "Just for your knowledge, here's
18 the lines that's taped, and it's up to you whether you want
19 to continue."
20     **Q. And that conversation occurred in Jim Hassag's**
21 **presence as well?**
22     A. I -- I don't remember -- we had a few
23 conversations just in general. I can't give you a definite
24 he was there or not there. I know there was a conversation.
25 It was an ongoing transition-type thing.

**Page 48**

1     **Q. Would you be able explain if -- why Jim Hassag**
2 **would say that he didn't learn about his line in the uniform**
3 **division chief position being taped until long after it had**
4 **been recorded, after you had made the decision to record it?**
5     MR. SULLIVAN: Objection. No personal
6     knowledge.
7     Go ahead.
8     A. I would not agree with that statement.
9     **Q. And --**
10     A. There was open conversation in staff meetings
11 about that with Jim -- Jim Hassag present.
12     **Q. And if Darryl Boykins said the same thing, that --**
13 **namely, that he did not learn about his line being recorded**
14 **when he became uniform division chief until long after he**
15 **became the uniform division chief, would you be able to**
16 **explain that?**
17     MR. SULLIVAN: Objection. Foundation. No
18     personal knowledge.
19     Go ahead.
20     A. I'm going from my recollection. And my
21 recollection is, in that transition period, just as I did
22 with Bishop after that, made sure that they understood. And
23 it was their decision. It was a tool for them. It wasn't
24 my tool.
25     **Q. Okay. So, when -- when -- when it came on -- I'm**

12 (Pages 45 to 48)

Page 49

1    just gonna use the term "on line." When Jim Hassag's
2    line -- and you as the uniform division chief, as I
3    understand    it -- let me step back.
4         As I understand it, the detective bureau chief
5    line, the uniform division chief line, and your line as the
6    chief of police line, the decision to record those lines
7    occurred at about the same time?
8    A.   Yes.
9    Q.   And so if Jim Hassag a month after that decided he
10   was gonna resign and go take a job somewhere else, is it
11   your testimony that that line would not have been recorded
12   any longer?
13   A.   Well, whoever followed him, I would give them the
14   option. They would be --
15   Q.   But I thought that you testified --
16        MR. PFEIFER:  Wait a minute.  Let him finish
17        answering.
18        MR. DIXON:  Oh, I'm sorry.  I thought you did
19        answer.
20   A.   I would explain to 'em and give them the option of
21   whether they wanted it to or not.  It was their tool on --
22   you know, to have the line taped.
23   Q.   I thought that you testified earlier that
24   everything around these decisions to tape these three lines
25   was -- was business-related for the department, that there

Page 50

1    was calls coming in, that there were things that needed to
2    be -- you needed backup of stuff because people weren't
3    being -- there were allegations that police officers weren't
4    being responsive, there were allegations that calls weren't
5    being responded to, complaints weren't being responded to,
6    and that as a department, you needed to have these lines --
7         MR. PFEIFER:  Object- ---
8    Q.   -- recorded.
9         MR. PFEIFER:  Object to --
10   Q.   That's what I thought your testimony was.  Is that
11   what it was?
12        MR. PFEIFER:  Object to the form of the
13        question.  Now it's compound.
14   Q.   If you understand the question, you can answer it.
15        MR. PFEIFER:  Same objection.
16   Q.   Is that what your testimony was?
17        MR. PFEIFER:  Same objection.
18   A.   Yes.  Something along that line.  It was -- it was
19   a tool for them to be able to prove that they were reacting
20   appropriately.  It was -- it was kind of a backup for that
21   person.  But as -- in their position as a police officer.
22   Q.   But it was certainly more significant that it was
23   the chief as opposed to a patrolman, right, who said "I want
24   backup on my line"?
25        MR. PFEIFER:  Objection.  That's

Page 51

1    argumentative.
2    A.   I'm not sure I understand.
3    Q.   Well, let me -- let me create a little bit of
4    foundation for where I'm going.  You understand there's a
5    limited number of lines that could be recorded.  Right?
6    A.   Yes.
7    Q.   And I think we know -- although I think it's been
8    kind of open question -- we know that there was never more
9    than 48 lines that could be recorded.  So, I'm just gonna
10   ask you if you understand that or if you have any
11   disagreement with that.
12   A.   I don't have any reason to disagree.  I thought it
13   was something like 20, but I, you know, don't know for sure.
14   Q.   So, in this period of time where you're wanting to
15   be more responsive to the public and you're wanting to have
16   more lines taped because of these calls that are maybe not
17   getting responded to or the allegations that are being made,
18   what happens if there's 50 guys who say "I want my line
19   recorded"?  Don't you have a set of priorities that, well,
20   these lines are more important to be recorded than these?
21   A.   I guess if there was a limited number of lines and
22   you needed more lines taped than what you -- you would have
23   to make a decision on which -- which priority was highest.
24   But I don't ever see that happening.
25   Q.   Now, you talked a lot about this -- about

Page 52

1    obtaining consent --
2    A.   Yes.
3    Q.   -- to get the lines -- to get the lines taped.
4    And you also talked quite a bit about without the consent,
5    the line would not be taped because the officer has a right
6    of privacy?
7    A.   I mean, that's -- that's the way I feel.
8    Q.   But can you tell me where this right of privacy
9    comes from.
10        MR. SULLIVAN:  Objection.  Calls for a legal
11        conclusion.
12   A.   It's their personal phone in their office.  I
13   think you have an expectation, if that's your phone, that
14   nobody is listening in on it.
15   Q.   How 'bout your computer?  Same expectation of
16   privacy?
17   A.   No.  Because I think there's public information
18   laws that say any e-mail on that computer is public
19   information.
20   Q.   How 'bout your car?
21   A.   Car --
22   Q.   Your squad car.
23   A.   Car is property of the department.  There's no
24   expectation of privacy in your car.
25   Q.   And this is what -- this is what I'm -- I'm not

Marilyn M. Jones & Associates    Computer-Assisted Reporters & Videographers    (888) 810-4077

Page 53

1  talking about, you know, tell me what the Seventh Circuit
2  says about what a right of privacy is. I'm talking about
3  what you understand an expectation of privacy is.
4      A.  And that's -- that's the way I understand it. I
5  mean, you know, your car is public property.
6      Q.  But what I'm trying -- what I'm grappling with is
7  this notion that any police officer would have any
8  expectation of privacy in anything in a police department.
9  That's kind of where I'm going. That's not a question. I'm
10 just letting you know where I'm going with that.
11      There's nothing in your policies and procedures
12 that say a person -- a police officer's phone line is
13 private property.
14      MR. SULLIVAN: Objection. Argumentative.
15      Q.  Right? Is there? I mean, you know --
16      A.  Not that I know of.
17      Q.  Well, you were on the department 30 years.
18      A.  Thirty-four and a half.
19      Q.  And at some point, you, as long -- with millions
20 of other guys, had the grueling task of having to go through
21 that dog-gone manual at least once. Right?
22      A.  Yes.
23      Q.  And you probably took on the task of trying to
24 revise it --
25      A.  Yes, I did.

Page 54

1      Q.  -- at some point?
2          And so you, as much as anybody, would be familiar
3  with the standard operating procedures in the duty manual of
4  the South Bend Police Department?
5      A.  Yes.
6      Q.  There's nothing in the South Bend duty manual or
7  standard operating procedures of the South Bend Police
8  Department that says officers have a right of privacy in
9  their private phones -- or in the phones in their office.
10 Right?
11      A.  Not that I can recall.
12      Q.  The only policy that we know of that deals with
13 the issue of expectations of privacy with police officers is
14 that Exhibit Four.
15      MR. SULLIVAN: Objection. Mischaracterizes.
16      Q.  Right?
17      A.  Exhibit Four?
18      MR. PFEIFER: Objection. Argumentative.
19      Q.  Well, I'm asking you, if you -- Look at Exhibit
20 Four. Do you have that in front of you?
21      A.  No.
22      Q.  You probably hadn't looked at all this deposition,
23 have you? So, take your time to look at it.
24      A.  I mean, I hadn't really -- this was made after I
25 left. This was different than the policy when I was there.

Page 55

1      Q.  Okay. Was there a policy that -- when you were
2  there, that talked about expectations of -- officers'
3  expectations of privacy or the lack of an expectation of
4  privacy?
5      MR. PFEIFER: I'm gonna object. That's a
6      compound question.
7      A.  Do we have the policy that was in effect when I
8  was there? This is a new document.
9      Q.  Okay. I don't know. I'm just asking you if you
10 remember. It also has to come from your memory.
11      A.  I don't remember anything about expectation of
12 privacy being specifically stated in there.
13      Q.  Do you remember ever seeing a document that said
14 police officers have a right of privacy in the phone -- in
15 their phones in their offices at the police department?
16      A.  Not that I can recall. But, I mean, that's a big
17 duty manual and, I mean, I'd like to read it first before I
18 make any -- give you an answer.
19      Q.  We don't have that kind of time.
20      A.  I am a slow reader. Is that what you're saying?
21      Q.  No. No. I'm saying the duty manual's this big.
22      Well, we were provided a sworn statement from
23 Brent Hemmerline. And in that statement, Brent Hemmerline
24 indicated that he did not know that his line was being
25 recorded or had been recorded. Assuming that's what Brent

Page 56

1  Hemmerline testified to or gave a sworn statement to, I'm --
2  what I'm trying to get -- I understand that would have been
3  during Chief Bennett's tenure prior to you becoming chief.
4  Right?
5      A.  Yes. He retired before I was chief.
6      Q.  Okay. So, I'm just giving you that information as
7  my way of background for these questions.
8      A.  Sure.
9      Q.  When Chief Bennett retired, did the two of you
10 talk about -- before he retired and you transitioned into
11 the position of chief, did the two of you have any
12 discussions about the policies related to recording phone
13 lines?
14      MR. PFEIFER: Object to the form of the
15      question. Move to strike your narrative.
16      MR. DIXON: Yeah, we can strike the
17      narrative. I agree to that.
18      Q.  So, back to the question. At the time when you
19 transitioned into the office of chief and Chief Bennett was
20 retiring, I'm sure that you guys met and talked from time to
21 time. Right?
22      A.  There wasn't a whole lot of transition, and I
23 don't believe we ever talked about recordings.
24      Q.  About the policies?
25      A.  No.

14 (Pages 53 to 56)

Page 57

1    Q. Okay. So, in terms of putting these new lines on
2  the recording system, Kyle's line, your line, Hassag's line,
3  those were decisions you made based on what you thought the
4  policy was or should be, what you wanted the policy to be?
5    A. I can't really say policy. It was the practice
6  that I, you know, put forth.
7    Q. But don't you think that right of privacy, that
8  expectation of privacy, is an important thing to protect?
9    A. Yes.
10   Q. And don't you think there are ways to protect that
11 expectation of privacy that were not implemented by you when
12 you were recording these lines?
13         MR. PFEIFER: Objection to the form of the
14         question. Argumentative unless you want to give a
15         specific example of how it is you claim as the
16         chief of police he didn't protect an officer's
17         right of privacy.
18         MR. DIXON: Yeah, that was gonna be my next
19         question. But I'll just rephrase the question.
20   Q. Did you have a document that these guys signed
21 that said "I understand that my phone line is being
22 recorded"?
23   A. No.
24   Q. Did you put anything on the phones that said "I
25 understand that this phone is being recorded" -- "that this

Page 58

1  line is being recorded"?
2    A. No.
3    Q. Did you implement a policy that said you can't
4  move your phone from one office to another, you can't
5  disable the phone and move it from one office to another?
6    A. No.
7    Q. Did you have a policy that said there are -- or
8  did you have something in writing that designated that "This
9  particular office, the line that's coming in here is going
10 to be a recorded line for anybody who comes in and uses
11 this"?
12   A. No, I didn't.
13   Q. And was -- when -- when Eugene Kyle was a
14 detective bureau chief, was it within the realm of
15 possibility that somebody else would have used his phone
16 line besides him?
17         MR. PFEIFER: Objection. That's
18         argumentative and speculative.
19   Q. I'm asking you to speculate as to whether or not
20 it was within the realm of possibility that somebody else
21 would have been able to use that line.
22         MR. PFEIFER: I'm gonna object as to the
23         speculative nature.
24   Q. You can answer.
25         MR. PFEIFER: Witnesses aren't supposed to

Page 59

1  speculate.
2    Q. You can answer it.
3    A. I -- Possible.
4    Q. Yeah. He didn't have a -- like a lockdown office
5  where nobody could go in there, did he?
6    A. Well, yeah, he had a locked office, but -- you
7  know. But somebody --
8    Q. Did you guys have a policy in place that any time
9  you weren't in your office it was locked up and nobody else
10 could --
11   A. No.
12   Q. -- get in there?
13   A. No.
14   Q. And when you retired as chief, you didn't leave
15 any -- anything behind in writing that indicated to Chief
16 Boykins "These are the lines that are being recorded. It's
17 your decision whether or not you want to continue recording
18 these lines." Right?
19   A. I -- no, not when I left. The only conversation I
20 ever had with Darryl was when he assumed that position, for
21 his information, and he could make a decision on his line
22 and to know that there were others that were taped.
23   Q. I've spoken with many police officers who thought
24 that all of the lines in the South Bend Police Department
25 have been recorded from a long time ago. Have you spoken

Page 60

1  with any South Bend police officers who shared that?
2          MR. PFEIFER: Object to the form of the --
3          MS. DeROSE: Object to the form of the
4          question.
5          MR. PFEIFER: Object to the form of the
6          question. Move to strike the narrative.
7    Q. You can answer the question.
8          MR. SULLIVAN: Join the objection.
9    Q. You can answer the question.
10   A. Well, I'll put it this way: Policemen are
11 suspicious people by nature, and certainly -- I mean, if I
12 talked on this phone, I'd wonder is it taped. Did they have
13 any specific knowledge or true belief? No, not that I know
14 of. But I certainly didn't discuss that with people, do you
15 think all the phones are taped. That was a question that
16 never came up.
17   Q. Why -- If the expectation of privacy is
18 important -- and I agree with you that it is -- why was
19 there never anything put out there when you were the chief
20 of police that said, for general information, these are the
21 lines that are taped?
22   A. I -- I -- the only thing I can speak of is we
23 wanted those individuals' lines that we added -- or that I
24 added -- not we -- I added -- was for those people's use,
25 and we just -- I just told Karen keep it confidential, they

15  (Pages 57 to 60)

City of South Bend vs. South Bend Common Council, et al./Scott Duerring vs. City of South Bend, et al.                                    RICK BISHOP/CHARLES AUTZ

Page 61

1  know about it. And we weren't out there to broadcast it or
2  put on the news that anybody calling into internal affairs
3  would be taped.
4      Q. I'm not talking about making a press release. I'm
5  talking about letting police officers -- all the police
6  officers on the department know which lines are recorded.
7          MR. SULLIVAN: Objection. Argumentative.
8      Asked and answered.
9      Q. Well, I mean, that's what my -- that's what my
10 question is. Is that -- is it the same answer with that
11 question?
12     A. Yeah. I mean, you know, I guess there's a lot of
13 ways -- in looking back on things, could you have done
14 things differently? Certainly. Did what we thought was
15 best at the time, and, you know, that's pretty much it.
16     Q. Well, I'm just trying to understand this
17 expectation of privacy. And it's an important issue in this
18 case. And I'm also trying to understand what procedures you
19 implemented in order to presumably protect that expectation
20 of privacy. I'm not trying to second-guess you. I'm just
21 trying to understand how things went on back then.
22         Did -- do you believe that a police officer had an
23 expectation of privacy in their own -- just in the space of
24 their own office?
25         MR. SULLIVAN: Objection. Vague. And it

Page 62

1      calls for a legal conclusion.
2      Go ahead.
3      A. I mean, you know, could you be a little more
4  specific what -- like, searching their desk or those --
5  those kinds of things? I mean -- or peeking in the window
6  or -- you know, I'm not --
7      Q. Just anything. If they -- if an officer goes into
8  his private office and closes the door, does he have an
9  expectation of privacy?
10         MR. SULLIVAN: Objection. Vague. Calls for
11     a legal conclusion.
12     Go ahead.
13     A. I don't know the legal conclusion. I would say
14 out of just common courtesy, yes.
15     Q. I've been informed that when you became chief of
16 police you had your office searched for bugs. Is that
17 correct?
18     A. I think --
19         MR. PFEIFER: Objection. Relevance.
20         MR. SULLIVAN: Lack of foundation.
21         MR. PFEIFER: And outside the scope of what
22     these depositions are intended to encompass.
23         MR. DIXON: No. It's right within the -- the
24     whole issue is the expectation of privacy. If he
25     didn't -- if the chief didn't have an expectation

Page 63

1  of privacy in his own office when he became the
2  chief of police, that runs directly to the issue
3  of whether or not a police officer has an
4  expectation of privacy on the telephone line.
5  That's the equipment of the city.
6          MR. PFEIFER: I made my objection.
7      Q. So, did you have your office searched for bugs
8  when you became the chief of police?
9      A. I think all the chiefs did. It's kind of a
10 common-type thing.
11         MR. DIXON: All right. Thank you. I don't
12     have any other questions.
13 RECROSS EXAMINATION
14 BY MR. PALMER:
15     Q. Tom, you -- you testified at great length your
16 practices regarding what you would do when you either added
17 or if a situation would come up where you were terminating a
18 line that was being taped, that you would have an officer
19 consent to it. You've testified as to your -- what your
20 practices were?
21     A. Yes.
22     Q. Were those practices ever reduced to writing?
23     A. No.
24     Q. Were those practices ever passed on from a prior
25 police chief to you?

Page 64

1      A. No.
2      Q. Were those practices ever passed on from you to
3  Chief Boykins?
4      A. No. Other than the conversation about, you know,
5  it's your option.
6      Q. You also testified as to director of
7  communications having, within the scope of that job,
8  listening to tapes in -- in respect to maintaining the
9  system or if the state police requested or if there was a
10 FOIAR -- FOIA request. If the director of communications
11 was listening to the tapes within the scope of her
12 employment and heard something that he or she believed was
13 relating to illegal contact -- illegal conduct, would it be
14 within the course and scope of her employment to inform
15 someone higher up the chain of command?
16     A. Yes.
17     Q. The same question regarding unethical conduct.
18 Would it be within her scope and course of employment to
19 relay that to someone higher in the chain of command?
20     A. Yes.
21         MR. PALMER: That's all the questions I have.
22 RECROSS EXAMINATION
23 BY MR. SULLIVAN:
24     Q. Chief, appreciate your patience a little more. Do
25 you recall the questions from -- I think it was Attorney

16  (Pages 61 to 64)

## Page 65

1  Duerring asked about the state police issues. Right? You
2  remember that?
3      A.  Yes.
4      Q.  If the Indiana State Police wanted to obtain, as
5  part of an investigation, portions of a recorded phone
6  conversation, would they call Karen Depaepe directly and ask
7  her for -- ask her to record a portion of a conversation?
8      A.  I can't speak for them, but that wouldn't be the
9  appropriate way to do it.  It should go through an
10  investigator, the detective chief, chief of police or city
11  attorney or the prosecutor.
12      Q.  Okay.  If Karen Depaepe or whoever was the
13  director of communications had to identify a call pursuant
14  to some investigatory practice of the police department, how
15  much of the conversation would you expect her to listen to?
16      A.  Well, I would expect she'd have to listen to most
17  of it to figure out where it started and ended.
18      Q.  She'd have to listen to it for the purpose of
19  identifying it?
20      A.  Yes.
21      Q.  After she had identified it, would you expect her
22  to go on to listen to other conversations?
23      A.  Unrelated to that specific request?
24      Q.  Unrelated to the request that was made of her.
25      A.  I wouldn't expect her to, but I -- I can't say in

## Page 66

1  trying to find that one she -- it wouldn't happen.
2      Q.  No.  No.  I understand.
3          There's really two different situations.  One is
4  identifying a portion of the conversation.  Right?
5      A.  Yes.
6      Q.  So that she can identify the subject matter that
7  somebody might have asked about.  Right?
8      A.  Yes.
9      Q.  And when she had heard enough to identify the
10  conversation, would you expect her to stop listening at the
11  point she had identified the proper conversation?
12      A.  Well, it's hard to answer because I don't know
13  what she has to do to hit to where it ends, you know, what's
14  involved there.  She may have to listen to all of it.  I
15  mean, that's not something that's in my area of expertise.
16      Q.  Okay.  But again, her purpose is to identify, not
17  to investigate.  Is that fair?
18      A.  Yes.
19          MS. DUERRING:  Objection.  I think that
20  mischaracterizes the prior testimony.
21      Q.  You can answer.
22          MR. PFEIFER:  I think he did.  He said yes.
23          MR. SULLIVAN:  Would you read back the last
24  question and make sure we got an answer.
25          (Record read.)

## Page 67

1      Q.  The practice that you established in regard to the
2  recording of calls was not for you personally, was it?
3      A.  Well, the one in my office was.  But the other two
4  were not.
5      Q.  All right.  Let me clarify.  When I say "you
6  personally," I mean unrelated -- unrelated to your duties as
7  chief of police.  It was not for you personally, unrelated
8  to your duties as chief of police?
9      A.  No.
10      Q.  Okay.  Are you aware either way if Chief Boykins,
11  when he took over as chief, adopted the practice that you
12  had established?  Are you aware?
13      A.  I don't know.
14      Q.  Okay.  You're not aware either way?
15      A.  Only what I read in the papers, and I don't know
16  if what I read in the papers is true.
17      Q.  I understand.  So, I'm asking whether you have an
18  awareness personally one way or the other.
19      A.  No.
20      Q.  If there were a policy in regard to recording
21  phone conversations between members of your administrative
22  staff, that policy would be contained in the duty manual,
23  wouldn't it?
24      A.  Yes.
25          MR. SULLIVAN:  Okay.  No further questions.

## Page 68

1  RECROSS EXAMINATION
2  BY MR. PFEIFER:
3      Q.  While you were the chief of police, would Steve
4  Richmond's private phone line have been recorded without his
5  knowledge and consent?
6      A.  No.  I would have given him an option.
7      Q.  Well, you were --
8      A.  If he kept that same line.  You know, if he was
9  going on out on his own, that would be up to him.
10      Q.  Or any line that he might be assigned while he was
11  an employee of the South Bend Police Department, would his
12  line have been recorded without his knowledge and consent?
13      A.  No.
14      Q.  Would Brian Young's phone line under your -- while
15  you were the chief of police, would Brian Young's phone line
16  have been recorded without his knowledge and consent?
17      A.  No.
18      Q.  You were asked by Mr. -- well, you were asked --
19  I'm sorry.  I'm drawing a blank as to who asked it.
20  Somebody asked you about the whole procedure concept when it
21  comes to privacy rights.  Do you remember that whole line of
22  questioning?
23      A.  Yes.
24      Q.  Is the procedure and the practice and the policy
25  of not recording somebody's phone line without their consent

17  (Pages 65 to 68)

## Page 69

1  in fact a policy and a procedure and a practice that you
2  followed?
3      A. I hope I'm answering this right, because people
4  working the front desk, they really don't give their
5  consent. It's part of their job duty and it's -- they're
6  made aware of it, but it's not consent.
7      Q. Bad question on my part. Let's focus -- let's
8  eliminate the 9-1-1 calls, let's eliminate the
9  communications office where for years those phone lines have
10 been recorded.
11     A. Yes.
12     Q. In terms of the lines that you added, that you
13 were now going to record, the -- your personal line, Gene
14 Kyle's line at his request, Jim Hassag's line, internal
15 affairs, was it the procedure and the policy and the
16 practice not to record those lines if, in fact, the person
17 using that line did not consent to the recording?
18         MR. DIXON: Object to the form.
19     Q. You can answer.
20     A. The first three, they would have to give their
21 consent. The last one, internal affairs, that was kind of
22 with that job position. It was made with knowledge, not
23 necessarily consent.
24     Q. So, whoever took the internal affairs position
25 took it knowing that the phone lines were gonna be recorded?

## Page 70

1      A. Yes.
2      Q. So, there was knowledge on their part, but not
3  necessarily consent?
4      A. Correct.
5      Q. Although consent could be implied by the mere
6  taking of the position?
7      A. Yes. And they had other phone lines for -- that
8  were not recorded.
9          MR. PFEIFER: Okay. Uncle.
10         THE DUERRING: Nothing for me.
11         MR. PFEIFER: I assume we want him to read
12 it -- we'd like for him to read and sign it?
13         MR. SULLIVAN: Yes.
14         MR. PFEIFER: Because unless we all consent,
15 he has to read and sign it, so . . .
16         THE REPORTER: Are all the orders on this
17 deposition the same as all the others?
18         MS. DUERRING: Yes.
19         MR. SULLIVAN: Yes.
20         MR. PFEIFER: Yes.
21         MR. PALMER: Yes.
22         MR. DIXON: Yes.
23     (Deposition concluded at 6:16 p.m. EST.)
24             ---o0o---
25

## Page 71

1          UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF INDIANA
2             SOUTH BEND DIVISION
   CITY OF SOUTH BEND,        )
3       Plaintiff,            )
           vs.                )
4  SOUTH BEND COMMON COUNCIL, )CAUSE NO.:
   ET AL.,                    )3:12:cv-475
5       Defendants.           )
   BRIAN YOUNG, SANDY YOUNG,  )
6  TIMOTHY CORBETT, DAVID WELLS, )
   and STEVE RICHMOND,        )CAUSE NO.:
7       Plaintiffs,           )3:12-cv-532-JVB-CAN
           vs.                )
8  THE CITY OF SOUTH BEND, Acting )
   Through its Police Department, )
9  DARRYL BOYKINS, Individually )
   and in his Official Capacity as )
10 Chief of Police, KAREN DEPAEPE, )
   and SCOTT DUERRING,        )
11      Defendants.           )
           DEPONENT'S CERTIFICATE
12      I, THOMAS FAUTZ, do hereby certify that I have
   read my deposition consisting of 70 pages, and that it is a
13 complete transcription of my deposition;
14      Any corrections to my deposition are reflected on
   the attached errata sheet(s). There are _____ errata
15 sheet(s) attached;
16      Dated this _____ day of _____,
17 2013.
18
19             THOMAS FAUTZ
20 Subscribed and sworn to before me this _____ day of
21                   , 2013.
22            _____
              Notary Public
23            County of Residence:
24            My commission expires:
25            _____

## Page 72

1  STATE OF INDIANA    )
                       )SS:
2  COUNTY OF LAPORTE   )
3
4          COURT REPORTER'S CERTIFICATE
5      I, Michelle A. Whitaker, RPR and duly authorized
6  to administer such oath, do hereby certify that on the 16th
7  day of April, 2013, at May, Oberfell, Lorber, 4100 Edison
8  Lakes Parkway, Mishawaka, Indiana, commencing at or about
9  the hour of 4:36 p.m., there appeared before me Thomas
10 Fautz, who was thereupon first duly sworn by me to testify
11 the truth, the whole truth and nothing but the truth during
12 the taking of his deposition;
13     I further certify that I reported said deposition
14 proceedings by the means of machine shorthand, and that I
15 have transcribed my original shorthand notes through the use
16 of computer-aided transcription into the typewritten form;
17 and that the foregoing and attached pages, or parts of
18 pages, numbered inclusively one through 70 comprise a true,
19 correct, complete and accurate transcript of said deposition
20 proceedings;
21     I further certify that present during the taking
22 of the deposition were the following attorneys: Edward A.
23 Sullivan, III; Aladean M. DeRose; Daniel Pfeifer; Robert J.
24 Palmer; Thomas M. Dixon, Marielena Duerring;
25     I further certify that I am not employed by, nor

Page 73

1  am I related to, any of the parties herein, nor their

2  attorneys; nor do I hold any guaranteed contracts with any

3  financially interested third parties or entities;

4      IN WITNESS WHEREOF, I have hereunto set my hand

5  and official seal this 28th day of April, 2013.

6

7      *Michelle A. Whitaker*

   MICHELLE A. WHITAKER, RPR

8      ASSOCIATE REPORTER

9

10      ---o0o---

11

12

13

14  THIS CERTIFICATE APPLIES ONLY TO THE ORIGINAL TRANSCRIPT

15  HEREOF AND DOES NOT APPLY TO ANY XEROX COPIES MADE OF THIS

16  TRANSCRIPT.

17

18

19

20

21

22

23

24

25