UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| CITY OF SOUTH BEND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 3:12-cv-475 |
| | ) | |
| SOUTH BEND COMMON COUNCIL, | ) | |
| *ET AL.,* | ) | |
| | ) | |
| Defendants. | ) | |

*************************************************************

| | | |
|---|---|---|
| BRIAN YOUNG, SANDY YOUNG | ) | |
| TIMOTHY CORBETT, DAVID WELLS, | ) | |
| And STEVE RICHMOND | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 3:12-cv-532 JVB-CAN |
| | ) | |
| THE CITY OF SOUTH BEND, Acting | ) | |
| Through its Police Department, DARRYL | ) | |
| BOYKINS, Individually and in his Official | ) | |
| Capacity as Chief of Police, KAREN | ) | |
| DEPAEPE, and SCOTT DUERRING, | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN OPPOSITION TO SOUTH BEND COMMON COUNCIL'S AND KAREN
DEPAEPE'S MOTIONS FOR SUMMARY JUDGMENT**

The plaintiff, the City of South Bend (the "City"), by counsel, respectfully

submits this brief in opposition to the Motions for Summary Judgment filed by defendants South

Bend Common Council (the "Council") and Karen DePaepe ("DePaepe").

**INTRODUCTION**

This Court must determine whether the Wiretap Act protects the private telephone

conversations of a detective in the South Bend Police Department made on a line assigned to him

for his particular use from being intercepted without notice, without his consent, *not* pursuant to any policy (because none existed), *not* pursuant to any routine law enforcement purpose (rather due to an initial mistake) and *not* initiated by an investigative or law enforcement officer.  The Parties do not dispute these above described facts.  Thus, when the Court applies the law (including the very cases cited by the Council and by DePeape), then it should determine that the Act affords such protection.

The motions filed by the Council and DePaepe present a single issue to the Court: whether the recording of Brian Young's assigned line can be justified under the "ordinary course of law enforcement" exclusion of the Wiretap Act.  This exclusion applies only if the non-consensual capture of telephone calls satisfies the following 2 elements:

1. They were made by an investigative or law enforcement officer.

2. The officer was acting in the ordinary course of his duties.

*See* 18 U.S.C. §2510(5)(a)(ii).  Here, the undisputed facts fail to support either element.

The Seventh Circuit has ruled that the exclusion exists for the "routine noninvestigative recording" of communications.  *Amati v. City of Woodstock*, 176 F.3d 952, 955 (7th Cir. 1999).  But, while the defendants' claim the exclusion applies to the calls captured and then placed on cassettes by DePaepe, their own designated facts establish that the line was *not* initially intercepted by a law enforcement officer and that *no* routine or policy existed that could bring the recordings within the law enforcement exclusion.  The Police Department's *ad hoc* practice of recording certain general phone lines at the direction of the Chief of Police did not involve routine recording of all individually assigned phone lines or even of specific personnel groupings that would justify recording Young's assigned line.  *Abraham v. City of Greenville*, 237 F.3d 386, 389 (4th Cir. 2001) (holding defendant violated the Act when it "did not have an established

2

policy of monitoring the plaintiffs' calls.").  Nor could it have been part of any routine since the agreed facts establish that the initial capture of Young's calls was inadvertent—at least until DePaepe discovered the error and began to listen to his recorded calls.  As a matter of law, the inadvertent capture of Young's calls cannot be excluded from the Act's definition of illegal interception by the ordinary course of law enforcement exclusion.  *Abraham v. City of Greenville*, 237 F.3d 386, 391 (4th Cir. 2001) (recordings obtained by mistake are "not a legitimate surveillance activity because [they do] not occur in the ordinary course of the [interceptor's] law enforcement duties.").

### STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

The material facts regarding recordings made by the South Bend Police Department (the "Police Department") of conversations involving Investigative Division Captain Bryan Young ("Young") are undisputed.  The underlying recordings at issue in this case were made by the Police Department's Dynamic Instruments Reliance ("DIR") recording system, a server-based analog recording system capable of recording up to forty eight radio channels and telephone lines.[2]  Exhibit A:  DePaepe Dep. Tr. 19:4-9, 11-13; 21:3, 20-23; Affidavit of Karen

---

[1] For its designation of evidence in opposition to the motions filed by DePaepe and the Council, the City refers the Court to the materials designated in support of its own Motion for Summary Judgment along with any additional materials designated with this motion.  *See* Doc. Entry No. 96 and accompanying exhibits.  The material facts in this case are undisputed, and the City contends that, as a matter of law, those undisputed facts show the City's Motion for Summary Judgment should be granted and the motions filed by DePaepe and the Council should be denied.

[2] The DIR captured all calls on whatever line was wired into it.  Thus, contained on that system are many more captured calls than exist on the cassette tapes made by DePaepe and given to former Chief Boykins.  References to the "recordings" refer to recordings of Young's assigned line initially captured by the DIR system and later placed on cassette tapes by DePaepe.

DePaepe ("DePape Aff.") ¶¶ 2, 4; Affidavit of Stephen Campbell ("Campbell Aff.") ¶ 3.[3]  To

record a particular telephone line, the Police Department would have to contact a third-party

vendor that would run wiring to the telephone closet where the DIR server was housed and

maintained.  DePaepe Dep. Tr. 20:7-15; Campbell Aff. ¶¶  4-5.  The hard wire from the

telephone line was affixed to the wall in the telephone closet and then fed into the server.

DePaepe Dep. Tr. 20:7-15; Campbell Aff. ¶¶ 4-5.  Once a line was hard-wired into the DIR

system, the system would record every conversation that occurred on that line to a hard drive and

a backup DVD system.  Horvath Dep. Tr. 53:24-54:7; Campbell Aff. ¶¶ 6-7.

      The DIR system was managed by Police Department Communications Director

Karen DePaepe, who began serving in that position on July 1, 1998.  DePaepe Dep. Tr. 12:11-

12; DePaepe Aff ¶ 2.  Included among her primary job functions was, among other things, "to

compile and maintain all . . . audio recordings created and housed within the Communications

Center as they pertain to the normal daily operations of the department" and to "manage and

maintain all physical resources used within the Communications Center to ensure that . . .

equipment failures are properly identified, repaired, and restored to full operation."  Exhibit C:

Position Description; Exhibit D:  Fautz Dep. Tr. 26:18-27:2.  DePaepe was not an officer of the

Police Department and her authorization to retrieve and listen to recordings from the DIR system

was limited to quality control for emergency operators and troubleshooting, unless she was

specifically directed otherwise.  Horvath Dep. Tr. 27:5-28:18, 30:9-14; Fautz Dep. Tr. 30:3-8;

---

[3] Exhibits A – L referred to herein were designated in support of the City's Motion.  Exhibits M and N are
    supplemental exhibits to the City's designation for the purposes of this summary judgment briefing.

DePaepe Aff ¶ 14 (noting that she was "requested by police officers, city attorney's [sic] and outside law enforcement agencies to listen and look for certain recorded conversations.").

Despite having recording equipment, at all relevant times the Police Department had no written policy regarding which lines within the Police Department would be wired into the DIR system or otherwise recorded. Horvath Dep. Tr. 47:12-16; Exhibit E: Hammerlein Dep. Tr. 21:8-21; Fautz Dep. Tr. 15-23.[4] Thus, the Police Department had no policy or practice of recording all of the incoming and outgoing lines into the Police Department. Horvath Dep. Tr. 47:12-16; Hammerlein Dep. Tr. 21:8-21; Fautz Dep. Tr. 15-23. The DIR system had a limited capacity for the number of lines that could be recorded, so that all of its lines could never have been recorded on this system. Exhibit M: Diana Scott Dep. Tr. 98:20-99:6. However, certain lines, over time, had been routinely recorded, including the front desk, the police chief's lines, the communications center, and emergency lines. Hammerlein Dep. Tr. 11:15-12:5; Fautz Dep. Tr. 5:22-6:3; 7:7-21; DePaepe Aff. ¶ 3. The rationale for recording these lines was to "record conversations from the public calling in to, say, 911, reporting of a crime that could potentially become evidence at some point" and to "document calls as an investigative tool and documentation." Fautz Dep. 9:21-10:2.

No standard practice or policy existed at any relevant time regarding the recording of other lines within the Police Department, including lines that were assigned to individual members of the Police Department. Hammerlein Dep. Tr. 7:20-23; 12:12-15; Fautz Dep. Tr.

---

[4] The Board of Public Safety, which has exclusive jurisdiction to establish policies for the Police Department, had not issued a written policy regarding the recording of telephone lines. Fautz Dep. Tr. 24:4-9; *see also* Ind. Code § 36-8-3-2. Thus, the Police Department had no policy or practice of recording all of the incoming and outgoing lines into the Police Department. Horvath Dep. Tr. 47:12-16; Hammerlein Dep. Tr. 21:8-21; Fautz Dep. Tr. 15-23.

24:17-22.  Rather, the Police Department utilized an *ad hoc* approach to determining which lines

would be recorded, pursuant to which individual members of the Police Department could elect

and consent to the recording of their lines at their own option. Fautz Dep. Tr. 13:3-19; 24:17-24;

Horvath Dep. Tr. 56:17-57:4; Exhibit F: Boykins Dep. Tr. 52:16-21; DePaepe Aff ¶¶ 3, 5-6.

        For instance, in late 2004, Chief Fautz authorized certain lines assigned to

individuals to be recorded in response to public scrutiny over the Police Department's handling

of complaints.  Fautz Dep. Tr. 10:7-24.  As a result, Investigative Division Chief Eugene Kyle,

Uniform Division Chief Jim Hassig, and John Collins of Internal Affairs requested that their

assigned lines be recorded.  Fautz Dep. Tr. 11:9-15;11:22-12:1; DePaepe Aff. ¶ 7.  But this was

not a blanket decision to record the lines of all Division Chiefs, let alone any other lines assigned

to individuals in the Police Department.  Fautz Dep. Tr. 26:4-7; DePaepe Dep. Tr. 29:11-17.

        This *ad hoc* approach was individual in nature, with each individual requesting

the recording of their assigned line.  Fautz Dep. Tr. 26:4-7.  It did not constitute a practice of

recording lines of specific types of personnel or specific ranks within the Police Department.

Fautz Dep. Tr. 24:17-24; 25:16-20.  Rather, an individual could request that their assigned line

be recorded as "a useful tool for that individual person whose office it was at to use to be able to

document conversations and anyone that called in, to show that we were responsive."  Fautz

Dep. Tr. 11:18-21; see DePaepe Aff ¶ 7.

        In late December of 2007, Darryl Boykins succeeded Faust as Chief of Police.

Boykins Dep. Tr. 7:21-8:5; DePaepe Aff ¶ 10.  Within his first year of becoming Chief of Police,

Boykins learned of the prior decisions on recording from either DePaepe or Barb Holleman,

Secretary to the Chief of Police.  Boykins Dep. Tr. 33:13-15; 34:2-3; 37:19-23; DePaepe Aff.

¶ 11.  Boykins made no changes to any of the lines that were recorded, specifically adopted the

approach of Fautz, and no written policy was implemented during his tenure.  Boykins Dep.

34:10-17; 35:16-17; 36:2-9; 52:16-21; *see* DePaepe Aff. ¶ 11.  DePaepe created a list of the lines

recorded by the DIR system and either DePaepe or Holleman would ask Boykins each year if

there were any changes to the lines to be recorded.  DePaepe Dep. Tr. 39:13-14; Boykins Dep.

Tr. 36:19-25; 38:5-17; DePaepe Aff. ¶ 11.  DePaepe believed she was only permitted to intercept

and record a telephone line at the direction of the Chief of Police.  DePaepe Dep. Tr.19:24;

Horvath Dep. Tr. 8:19-25.

 Around February 12, 2010, during Boykins tenure as Chief of Police, Steve

Richmond was promoted from a Captain in the Investigative Division to Investigative Division

Chief.  Richmond Dep. Tr. 6:23-24; Doc. Entry No. 13:  City's Answer to Compl., ¶ 21.

Richmond succeeded Rick Bishop in the position, who had succeeded Kyle.  Fautz Dep. Tr.

11:9-15; 35:6-9.  Both of the prior Investigative Division Chiefs had consented to their assigned

lines being recorded.  Fautz Dep. Tr. 11:9-15; 35:6-9.  Upon receiving his promotion, Richmond

moved into the office that had been occupied by Bishop as the former Investigative Division

Chief.  Richmond Dep. Tr. 7:11-13.  Because Richmond wanted to keep the individual phone

number that had been assigned to him as Captain—574-235-7473 (the "7473 Number")—he

contacted Holleman and asked her to switch his assigned line, the 7473 Number, so that it would

follow him to the new office he would occupy as Division Chief.  Richmond Dep. Tr. 8:5-12.

 At the same time, Young was promoted to Richmond's former position as a

Captain in the Investigative Division.  Richmond Dep. Tr. 7:14-17; Exhibit H:  Affidavit of

Brian Young ("Young Aff."), ¶ 3.  Upon receiving the promotion to Captain, Young moved into

Richmond's former office.  Richmond Dep. Tr. 7:18-19.  Because Holleman was moving

Richmond's 7473 Number away from that office to Richmond's new office, she decided

(without discussing it with Richmond or Young) to move Bishop's former assigned line, with the

number of 574-245-6031 (the "6031 Number"), from Richmond's new office[5] to Young's new

office.  Young Aff., ¶ 4; Richmond Dep. Tr. 36:11-13; 88:21-89:8.  The 6031 Number formerly

belonged to Kyle and then Bishop, and some years before had been wired to the DIR system

pursuant to their individual requests that their assigned lines be recorded.  Fautz Dep. Tr. 11:9-

15; 35:6-9.  When Holleman made the switch, she did not detach the 6031 Number from the DIR

system at its punch block location, which meant that the line continued to be connected to the

DIR system, and therefore recording calls, after the 6031 Number was assigned to Young.  No

one intended to record Young's assigned line.  DePaepe Dep. Tr. 44:2-8; Exhibit N:  Boykins

Dep. Tr. 51-52 (stating that Young's line was recorded due to a "mixup somewhere in the

lines.").

Later that year, between October and December of 2010, the DIR system

experienced a series of periodic crashes.  DePaepe Dep. Tr. 33:12-15; DePaepe Aff ¶ 10.  As a

result, some of the DIR system hardware was replaced and DePaepe was instructed by the

vendor to check the system to make sure anything that was stored on the server was properly

downloading to the DVD backups.  DePaepe Dep. Tr. 32:19-33:5; DePaepe Aff. ¶ 15.

According to DePaepe, in January of 2011, she began checking the DIR system "to see if the

system was operating after numerous repairs."  DePaepe Aff., ¶ 16.  When she was checking the

6031 Number, DePaepe "heard a conversation with Brian Young's voice, and it disturbed [her]"

because she "believed that Steve Richmond should be the one speaking on this line."  DePaepe

Dep. Tr. 43:20-25.  DePaepe listened to at least "a couple" additional recorded conversations

---

[5] Recall that Richmond's new office was Bishop's old office.

associated with the 6031 Number at that time and discovered that Young "was still speaking on it."  DePaepe Dep. Tr. 43:25-44:2.

She then returned to her office to pull up a computer personnel record for Richmond "and saw that for a telephone number they now listed 245-7473" and it "dawned on [her] that somehow this line had been switched."  DePaepe Dep. Tr. 44:2-8.  DePaepe then returned to the DIR system to "go backward" through the recordings of the 6031 Number to determine when the switch occurred.  DePaepe Dep. Tr. 44:11-13.  She proceeded to listen to "several" or around "[a] dozen" recorded conversations going back to late October, which took her approximately an hour.  DePaepe Dep. Tr. 44:23-45:1-2; 47:21-22; 51:22-52:3.  During the process of checking the recordings, DePaepe became "alarmed" by the substance of certain recordings and continued listening to additional recordings because she "did not want to make an accusation against an officer unless I had documented fact."  DePaepe Dep. Tr. 45:24-46:6.  DePaepe did not inform Young or anyone else at this time that Young's line was being recorded.  Young Aff., ¶ 7.  She further failed to report her concerns up through the chain of command or to the Office of Professional Standards at that time.  Horvath Dep. Tr. 65:12-20.

In March 2011, DePaepe informed Boykins that, in checking the recording equipment, she had discovered information that she "felt was either conduct unbecoming an officer or possibly illegal, and that [she] felt he had a need to know about it."  DePaepe Dep. Tr. 66:19-67:3.  Between May and July 2011, DePaepe listened to additional recordings of Young's 6031 Number "a couple different times."  DePaepe Dep. Tr. 61:11-25.  One of those times occurred in July 2011, when DePaepe contends she was responding to two Freedom of Information Act ("FOIA") requests for "any conversations and photos and some other information regarding two internal affairs investigations."  DePaepe Dep. Tr. 48:3-14; 69:8-13;

DePaepe Aff. ¶ 17.  Only one of the two FOIA requests sought audio recordings of any kind, and that was "911 audio" involving incidents having nothing to do with Young.  Exhibit M:  Scott Dep. Tr. 132:20-133:22 and Exhibit 14.  Chief Assistant City Attorney Aladean DeRose instructed Nancy Bruce from WBND ABC 57 News to contact Karen DePaepe to have a recording of the 911 audio made "if there was such a call."  Exhibit M:  Scott Dep. Tr. 132:20-133:22.  Despite the fact that the FOIA requests sought only 911 recordings, DePaepe checked "all telephone lines," including Young's.  DePaepe Dep. Tr. 58:12-19; DePaepe Aff. ¶ 17.

        DePaepe informed Boykins in August of further information that she had learned listening to these recordings.  DePaepe Dep. Tr. 68:16-22.  Neither Boykins nor DePaepe took any action at any time to inform Young that his line was being recorded.  Boykins Dep. Tr. 53:5-10; Young Aff. ¶ 7.  In October 2011, while DePaepe was on medical leave, a meeting occurred regarding the City's potential upgrade to a new phone system.  Horvath Dep. Tr. 12:16-13:16; 15:24-16:3.  Diana Scott, who was assuming DePaepe's responsibilities in her absence, brought to the meeting a list of the Police Department lines that were being recorded.  Horvath Dep. Tr. 12:8-15.  The 6031 Number appeared on the list and the meeting's participants were able to determine, after some deliberation, that the number was assigned to Young.  Horvath Dep. Tr. 17:2-12.  Captain Phil Trent, who was present at the meeting, informed Young that his assigned line was being recorded.  Young Aff., ¶ 5; Richmond Dep. Tr. 76:24-77:5.  Young was not aware that his assigned line was being recorded and had not provided his consent to the recording of his line.  Young Aff., ¶ 7.  He immediately requested that Trent take all necessary steps to have the recording of his assigned phone line stopped and to destroy any recordings in existence.  Young Aff., ¶ 5; Richmond Dep. Tr. 77:6-16.

dms.us.53519049.05

In late December 2011, DePaepe and Boykins had a conversation during which Boykins requested audio cassettes and written descriptions of the recordings DePaepe mentioned to him in March and August.  DePaepe Dep. Tr. 65:16-66:4; DePaepe Aff. ¶ 18.  On January 4, 2012, DePaepe submitted an Officer's Report to Boykins.  *See* Officer's Report; Boykins Dep. Tr. 73:5-8.  The Officer's Report detailed the background of her actions, provided written summaries of the recordings, and enclosed cassettes containing certain recordings of Young's 6031 Number from February 4, 2011 through August 31, 2011.  *See* Officer's Report; see DePaepe Aff. ¶ 19.  After receiving the Recordings and the memorandum, around January 10, 2012, Boykins listened to at least one of the Recordings in his office, which consisted of a conversation between Young and David Wells.  Boykins Dep. Tr. 48:19-23; 59:22-25; 67:24-68:4; Exhibit J:  Walters Dep. Tr. 11:24.  Jeffrey Walters, the Uniform Division Chief of the Police Department at the time, was present when Boykins listened to the cassette.  Boykins Dep. Tr. 94:6-8; Walters Dep. Tr. 5:25-6:1; 16:18-17:3.  Boykins and Walters were concerned with "people within the department trying to undermine [Boykins'] position of authority," including Richmond and Young.  Walters Dep. Tr. 20:11-20; 25:19-26:21.

In January 2012, the U.S. Department of Justice was presented with complaints related to the recordings and referred the matter to the Federal Bureau of Investigation for investigation.  Exhibit K:  Capp Letter; Exhibit L: DeRose Aff., ¶¶ 2-3.  The FBI's investigation revealed that no written policy for the recording of phone lines existed at the Police Department, and that the "investigation revealed a historical practice of oral instructions from Police Chief to the Director of Communications."  *Id*.  The investigation further concluded that Young's line was initially "mistakenly recorded" and that "[o]nce this was learned, recording on that line continued" and certain recorded conversations were subsequently placed on cassette tapes.  *Id*.

The Department of Justice exercised its prosecutorial discretion not to initiate a prosecution with an "understanding that the practice in question here has terminated and that the SBPD is now preparing formal policies in the area of recording police lines *so as to be in full compliance with the Wiretap Act*." *Id.* (emphasis added).  It released thirteen cassette tapes of the recordings to the City at that time.  *Id.*

Subsequently, the recordings and related events precipitated multiple lawsuits against the City as well as myriad requests for production of the recordings, including a subpoena from the Council.  As a result, the City filed a declaratory judgment action.  The purpose of the action was to determine the rights and obligations of the City with respect to the Recordings, determine whether such Recordings violated the Federal Wiretap Act, 18 U.S.C. § 2510 *et seq.* (the "Wiretap Act" or "Act"), and determine whether the Recordings may be disclosed pursuant to a valid subpoena.  Multiple motions for summary judgment have been filed regarding the legality of the Recordings under the Act, and the City now responds in opposition to the motions filed by the Common Council and DePaepe.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when there exists "no genuine dispute as too any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Once the movant has shown facts entitling it to judgment in its favor, the burden shifts to the non-movant to identify evidence that establishes a triable factual issue.  *Trentadue v. Redmon*, 619 F.3d 648, 652 (7th Cir. 2010).  In responding to a motion for summary judgment, the non-movant must come forward with affirmative evidence setting forth specific facts demonstrating that there is a genuine issue for trial.  *Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir. 2001).  "A genuine issue of material fact arises only if sufficient evidence favoring the

nonmoving party exists to permit a jury to return a verdict for that party." *Faas v. Sears,*
*Roebuck & Co.*, 532 F.3d 633, 640–41 (7th Cir. 2008) (internal quotation marks omitted).

## ARGUMENT

The Council and DePaepe present one argument to justify the capture of Capt.
Young's telephone calls—the law enforcement ordinary course exclusion. *See* 18 U.S.C. §2510
(5)(a)(ii) (definition of "interception" excludes those calls captured "by an investigative or law
enforcement officer in the ordinary course of his duties"). But the defendants' designated
undisputed facts fail to establish any Police Department routine or policy that would bring the
recordings within the law enforcement exclusion nor do they even attempt to argue that Karen
DePaepe is a law enforcement officer. Indeed, all parties agree that the SBPD had no policy
regarding which lines or officer positions should be recorded, no policy on how, when or why to
change the existing lineup of recorded lines, and no policy calling for the capture of all incoming
and outgoing phone calls. Thus, no policy existed to justify the recording of Young's assigned
line. As a matter of law, the recordings are not covered by the law enforcement ordinary course
exclusion and the motions filed by the Council and DePaepe should fail.

I.     **The designated facts submitted by the Council and DePaepe establish that the law
       enforcement exclusion does not apply because the recordings were initially made
       inadvertently, not in the ordinary course of the Police Department's activities, and
       not by a law enforcement officer.**

       a.   *All parties agree that the SBPD had no routine practice or policy of recording
            all calls into and out of the police department.*

The sole basis for the defendants' motions fails for one fundamental reason:  the
recordings at issue were not obtained in the ordinary course of the Police Department's activities
and not by a law enforcement officer. The defendants' contentions otherwise, and comparison of
the recording practices here to cases involving distinguishable facts, are without merit. For the

dms.us.53519049.05

exclusion to apply, the recordings must have been made by an investigative or law enforcement officer as part of "routine noninvestigative recording" of communications.  *Amati v. City of Woodstock*, 176 F.3d 952, 955 (7th Cir. 1999).  Indeed, each of the cases relied upon by the defendants involved police department policies of recording *all* incoming and outgoing calls on *all* police department telephone lines.  *Amati*, 176 F.3d at 956 (noting the police department "record[ed] all calls on all its lines" with a single exception for personal calls); *Jandak v. Village of Brookfield*, 520 F.Supp. 815, 817-818 (N.D. Ill. 1981) (noting the police department recorded calls on all of its lines with a single exception for personal calls); *Walden v. City of Providence*, 596 F.3d 38, 46 (1st Cir. 2010) (noting the recording system recorded "all phone lines . . .").[6] Because the departments in those cases recorded all calls on all lines pursuant to their own policy, it was within the ordinary course of their law enforcement activities to record calls made into and out of the police department.

By contrast, both the Council and DePaepe agree with the City that the Police Department *did not* record *all* incoming and outgoing calls.  Physically such a routine was impossible as the DIR recording system had a limited capacity of recording only forty eight audio channels and phone lines and could not have recorded all of the lines in the Police Department.  Thus, case law applying the law enforcement exclusion where departments recorded "all calls on all its lines" is inapposite.

---

[6] Additionally, *Walden* is inapt here because it did not involve a federal Wiretap Act claim and the court did not address the law enforcement exclusion.  Rather, the court discussed *Amati* in the context of determining whether the constitutional right allegedly violated was clearly established for the purposes of qualified immunity. *Walden*, 596 F.3d at 52, 54-55.

dms.us.53519049.05

Furthermore, as the Council and DePaepe admit, the Police Department lacked any routine or policy that would permit it to record Young's line without his consent. Indeed, it had no policy at all, but only an *ad hoc* practice of recording certain general phone lines, such as the front desk and 911 calls, at the direction of the Chief of Police. The Police Department did not routinely record lines assigned to individual members of the Police Department. Nor did it routinely record lines based on personnel groupings, such as Division Chiefs or Captains. To the extent it had any practice at all, that practice permitted the recording of individual, assigned lines only with the consent of the person to be recorded.[7] Even that practice was far from routine, as it was generally the product of impromptu decisions made by various Chiefs of Police. And, because there was no established policy that would permit the monitoring of Young's assigned line, the exclusion does not apply. *Abraham v. City of Greenville*, 237 F.3d 386, 389 (4th Cir. 2001) (holding defendant violated the Act when it "did not have an established policy of monitoring the plaintiffs' calls.").

    b.   *Even if the ad hoc decisions of the Chief of Police could qualify as a routine, the capture of Young's calls was not pursuant to that putative routine but instead was inadvertent.*

Assuming *arguendo* that the Police Department's *ad hoc* approach qualifies as a routine, the undisputed facts establish that Young's line was initially captured *inadvertently* (and not pursuant to such a putative routine) when he switched offices and was assigned a new phone

---

[7] The Police Department's lack of a policy also demonstrates why Young's lack of consent is not "irrelevant to the determination [of whether] the recordings [are] barred by the Wiretap Act." Common Council's Br., at 19. In light of the agreed fact that *no* policy of any kind existed to guide the who, how, when, and why of capturing telephone conversations, and that the cause of Young's line being recorded was not a law enforcement officer acting in the ordinary course of his duties (but, instead, was initially inadvertent), Young's lack of consent provides further evidence that his line could not have been recorded pursuant to ordinary course of law enforcement exclusion.

line.   The inadvertent recording of a single line without any purpose, of course, cannot be considered an act in the ordinary course of law enforcement duties.   *Cf.* Merriam Webster Dictionary (defining "routine" as "a regular way of doing things in a particular order.").   Indeed, recordings obtained by mistake are "not a legitimate surveillance activity because [they do] not occur in the ordinary course of the [interceptor's] law enforcement duties."   *Abraham*, 237 F.3d at 391.   Accordingly, the Fourth Circuit has expressly declined to "expand the scope of the law enforcement exception to cover [an] alleged good faith mistake."   *Id.*   Thus, the initially inadvertent nature of the recording of Young's assigned line dictates that the law enforcement ordinary course exclusion does not apply here.

The inadvertent recording in this case further distinguishes the recordings here from those that were obtained in *Amati v. City of Woodstock*.   In that case, a single line left unrecorded for personal calls was later recorded.   The recording of that line was not inadvertent but intentional and brought that line back into the general policy of recording "all calls on all lines."   As the *Amati* Court describes it:

> [T]he decision to tap [the unrecorded line] was precipitated by an official use of the line which showed it had been a mistake to leave it untapped. . . Rather than being outside the ordinary course of law enforcement, the decision brought the line within that course.

*Amati*, 176 F.3d at 956.   Here, by contrast, no law enforcement officer ever made a decision to record Young's assigned line.   Instead, the recording occurred when Holleman arbitrarily connected the "6031 Line" to an office to which Young had been assigned and therefore inadvertently began to record his calls.   Holleman, as an administrative assistant to the Chief of Police, is not a law enforcement officer as that term is defined in the Wiretap Act.   18 U.S.C.§ 2510(7) (defining "Investigative or law enforcement officer" as "any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct

16

investigations of or to make arrests for offenses enumerated in this chapter . . .").  That line she assigned to Young had originally been connected to the recording device as a result of a choice by a prior Division Chief for his own specific purpose.[8]  Thus, the unilateral, random, and arbitrary act of the Chief of Police's secretary cannot be equated with the official exercise of administrative judgment by the police department of the city of Woodstock that occurred in *Amati*.  *See id.* at 955 ("So, the *department* decided to tape record calls on [that line].") (emphasis added).  Barb Holleman's actions, without more, cannot be considered the "ordinary course" of the Police Department's duties.  *Abraham*, 237 F.3d at 389 (holding that the law enforcement exclusion does not apply to lines that were recorded by mistake).[9]  Accordingly, the defendants' motions must fail, because the law enforcement exclusion has no application here as a matter of law.

    c.   <u>The Council and DePaepe fail to identify a factual or legal basis to justify the</u> prima facie <u>violation of the Wiretap Act that concededly occurred when Capt. Young's calls were intercepted.</u>

Recognizing the fatal flaws in their arguments, the defendants raise a number of specious arguments including an attempt to characterize the City's position as focusing on the "the person" being recorded as opposed to focusing on "the equipment and why it is being

---

[8] As noted, when Young moved into the office vacated by Richmond upon their respective promotions, Holleman moved Richmond's assigned line to his new office, and then moved Bishop's former assigned line from Richmond's new office to Young's new office without disconnecting it from the recording device.  Young Aff., ¶ 4; Richmond Dep. Tr. 36:11-13; 88:21-89:8.

[9] As explained in the City's Brief in Support of Motion for Summary Judgment, the initial inadvertent recording of Young does not mean the recording of his line and the creation of the cassette tapes were not "intentional" for the purposes of establishing a *prima facie* violation of the Wiretap Act.  *See* Doc. Entry No. 96 (City's Br.), at § II.  Because DePaepe became aware of the recordings and did nothing to stop them, the subsequent recordings and the capture and creation of the cassettes were intentional for the purposes of the Act.  *See Narducci v. Moore*, 444 F. Supp. 2d 924, 935-936 (N.D. Ill. 2006) ("Nor is an affirmative act, rather than an omission, required. *It is enough to be aware that such interception is occurring and to fail to stop it*.") (emphasis added).

dms.us.53519049.05

employed."  Common Council's Br., at 18; DePaepe Br., at 10.  The exclusion by its plain terms relates to whether the recording device is "*being used . . .* by an investigative or law enforcement officer in the ordinary course of his duties."  18 U.S.C. § 2510(5)(a) (emphasis added).

The City's position clearly falls within the interpretation of this language because it argues that the use of the equipment as applied to Young was not compliant with the Act regardless of how the equipment may have been used on others. "[C]ourts 'have considered different categories of phone calls recorded by a single recording system separately for application of the law enforcement exception.'"  *Abraham*, 237 F.3d at 390.  Indeed, if only the device itself was considered, the law enforcement exclusion would swallow the rule, permitting law enforcement agencies to violate the Act with impunity so long as the device itself had some legitimate purpose.  *See id.*  (If the exclusion "looked only to the wiretapping device, then law enforcement agencies could record all of the telephone lines in a building so long as some lines were monitored in the ordinary course of the law enforcement officers' duties.").

Even if the Police Department's *ad hoc* use of the DIR system partially complied with the Wiretap for some uses, the Department's use did not comply with respect to recording Young's assigned line.  The inadvertent capture of calls which were not part of any Police Department routine cannot be justified by the fact that other purposeful uses of the recording system may not have violated the law.  The Council and DePaepe attempt to bootstrap *Amati* as providing a prospective approval of any and all capture of telephone calls as long as the initial use was compliant.  Accepting this argument, however, would vitiate the very protections of the Act by allowing the capricious recording of any line regardless of the reason or lack of reasons as long as there was some single individual use of the system for a proper purpose.  The *Amati* holding does not stand for such a proposition and Congress did not intend such a result.

Furthermore, DePaepe attempts to improperly turn the burden of proof on its head by asserting that because "[t]he recording procedure of the Department was not 'person' specific . . . it could not be established that the recording of the phone lines was an attempt to target or secretly spy on any individual." *See* DePaepe's Br., at 13.  Under the Wiretap Act, however, "what is not permitted is forbidden."  *Cf. United States v. Dorfman*, 690 F.2d 1230, 1232 (7th Cir. 1982).  Thus, it is the Common Council and DePaepe that must show that the recordings fall within the statutory exclusion.  The City is not obligated to prove that there was an attempt to "target or secretly spy" on Young.  *See Amati*, 176 F.3d at 954 (stating that the taping was a *prima facie* violation, but the jury accepted defendants' argument that it came within the statutory exclusion at 18 U.S.C. § 2510(5)(a)(ii)).  By justifying the capture solely under the law enforcement ordinary course exclusion, the Council and DePaepe concede that the recordings constitute a *prima facie* violation of the Wiretap Act, placing the burden of proof on them to prove the exclusion.  However, both have failed to designate any undisputed evidence establishing any Police Department routine that would permit the recordings of Young's assigned line.  *Abraham*, 237 F.3d at 389 (holding defendant violated the Act when it "did not have an established policy of monitoring the plaintiffs' calls.").

Finally, DePaepe's purported justifications for listening to the recordings are irrelevant to determining whether the law enforcement exclusion applies and fail to justify her listening to the recordings.[10]  Indeed, DePaepe's *use* of the captured recordings after they were

---

[10] As noted in the City's motion and supporting memorandum, DePaepe recognized that Young's line was inadvertently recorded as early as January 2011 and failed to inform anyone or take any action.  DePaepe admits that her access to those conversations continued and that she created the cassette tapes nearly a year later, in December 2011.  DePaepe Dep. Tr. 44-47, 65; Officer's Report; DePaepe Aff. ¶¶ 18-19.

obtained bears on her potential exposure for violating the Wiretap Act and not on whether the interceptions were lawful in the first instance. *See* 18 U.S.C. § 2511(c) – (d) (relating to use and disclosure of recordings). Because the manner in which the recordings of Young's assigned line were *obtained* is the sole issue before the Court at this juncture, DePaepe's later use and disclosure of the recordings is immaterial.

But even if it were relevant, DePaepe could not create the foundation necessary for the ordinary course of law enforcement exclusion by designating facts which showed she accessed the captured recordings due to a so-called "FOIA request." The FOIA request was received at least six months after DePaepe learned that Young's assigned line was being recorded. In addition, the FOIA request, by its own terms, sought only 911 audio, *not* recordings from individually assigned lines or the internal communications between the investigative detective and other officers.[11] Simply put, DePaepe cannot justify under the ordinary course exclusion the continued capture of Young's assigned line from January forward based upon a FOIA request that occurred six months after it was discovered his line was recorded in error. *See* Doc. Entry No. 96 (City's Br., at 16-17).

And not only it is undisputed that the Police Department had no policy or routine to record all lines, neither DePaepe nor the Council have designated any evidence from which the Court could conclude that the *Amati* boundary was not crossed:

> The boundary is between routine noninvestigative uses of electronic eavesdropping and its use either as a tool of investigation (which requires a warrant) or as a device for

---

[11] This fact also distinguishes the case at bar from *Amati* where the practice being examined related to calls from the public and not between officers.

> intimidation, suppression of criticism, blackmail, embarrassment, or other improper purposes. [citations omitted].

*Amati* at 956.   DePaepe broadly characterizes her purpose in listening to the recordings and subsequently placing them on cassette tapes as facilitating further investigation of "conduct unbecoming an officer."   DePaepe Dep. Tr. 66:19-67:3.   Walters further testified that he and Boykins were concerned with "people within the department trying to undermine [Boykins'] position of authority," including Richmond and Young.   Walters Dep. Tr. 20:11-20; 25:19-26:21. Because it is undisputed that the Police Department had no "routine noninvestigative uses" for recording Young and no warrant, then potentially all the "improper purposes" described in *Amati* are at play.   And because DePaepe's subsequent actions don't alter the fact that the recordings were initially inadvertent and not according to any Police Department routine, the attempt to create an ordinary course of law enforcement exclusion by pointing to the purpose of her actions must fail.   Accordingly, the motions for summary judgment filed by the Council and DePaepe should be denied.

## II.   Final judgment under Fed. R. Civ. P. 54(b) would be premature as the Court's order may not resolve all issues involving the Council.

Because the legality of the recordings is not "the only issue in the case that involves the Common Council," entry of final judgment would be improper.   *See* Council's Br., at 20.   "Proper entry of judgment under Rule 54(b) requires first that the district court reach a judgment that is final in the sense that it completely disposes of a separate claim for relief or *finally resolves all claims against a particular party or parties*."   *U.S. v. Ettrick Wood Prods., Inc.,* 916 F.2d 1211, 1217 (7th Cir. 1990) (emphasis added).   An order determining the legality of the recordings would fail to meet this requirement.   Even if the recordings could be lawful for the purposes of the Wiretap Act, they can only be used or disclosed in limited instances.   *See* 18

U.S.C. § 2517 (providing authorization for disclosure of lawfully obtained interceptions only in certain instances).   As is relevant here, lawful interceptions *may* be disclosed "to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure."   18 U.S.C. § 2517(1).   Thus, even if the recordings could be considered to fall within the law enforcement ordinary course exclusion, it must be determined whether the Council may be considered an "investigative officer" for the purposes of disclosure of the contents of the recordings, and whether the "may disclose" language in the statute gives the City discretion on whether or not to disclose the recordings.   Substantial doubt exists on these issues that will not be resolved by the Court's determination of whether the recordings violate the Wiretap Act.   Thus, entry of final judgment would be inappropriate as any order will not resolve all issues involving the Council.   *Cf. Ettrick Wood Prods., Inc.,* 916 F.2d at 1217.

**CONCLUSION**

The undisputed facts show that no routine existed at the Police Department that would permit the initially inadvertent recording of Young's assigned phone line.   Accordingly, the law enforcement ordinary course exclusion does not apply to exclude them from the Wiretap Act.   As this exclusion is the sole basis for the motions filed by both the Council and DePaepe, those motions should be denied.   And because the material facts are undisputed, and the City has established that the recordings violated the Wiretap Act as a matter of law, the City's own motion should be granted.

Respectfully Submitted,

FAEGRE BAKER DANIELS LLP


/s/ Edward A. Sullivan III
Edward A. Sullivan, III (17577-71)
J.P. Hanlon (21230-71)
Ryan G. Milligan (28691-71)
FAEGRE BAKER DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, Indiana 46601
Phone:  574.234.4149
Facsimile:  574.239.1900

Aladean DeRose (4495-71)
City Attorney
227 West Jefferson Blvd., Suite 1400
South Bend, Indiana 46601
Phone:  574.235.9241
Facsimile:  574.235.7670

*Counsel for the City of South Bend*

dms.us.53519049.05

## <u>CERTIFICATE OF SERVICE</u>

   I certify that on the 27th day of January, 2014, a copy of the foregoing was served upon the following parties and counsel of record through either the Court's electronic filing system or by U.S. Mail, postage prepaid:

Jeffrey S. McQuary
BROWN TOMPKINS LORY & MASTRIAN
608 East Market Street
Indianapolis, IN  46202
jmcquary@brown-tompkins-lory.com
*Counsel for Respondents Brian Young, Tim Corbett, Dave Wells, Sandy Young, Steve Richmond*

Robert J. Palmer
E. Spencer Walton
Christopher M. Lerner
MAY · OBERFELL · LORBER
4100 Edison Lakes Parkway, Suite 100
Mishawaka, IN  46545
rpalmer@maylorber.com
ewalton@maylorber.com
Clerner@maylorber.com
*Counsel for South Bend Common Council*

Thomas M. Dixon
Dixon, Wright & Associates, P.C.
55255 Birchwood Court
Osceola, IN  46561
574-315-6455
Fax:  574-675-7783
Email:  tdixon3902@comcast.net
*Counsel for Darryl Boykins*

Daniel H. Pfeifer
Jeffrey J. Stesiak
PFEIFER MORGAN & STESIAK
53600 N. Ironwood Drive
South Bend, IN  46635
dpfeifer@pilawyers.com
jstesiak@pilawyers.com
*Attorney for Respondents*

Marielena Duerring
Duerring Law Offices
61191 US 31 South
South Bend, IN  46614
(574) 968-0250
attymduerring@aol.com
*Counsel for Karen DePaepe and Scott Duerring*

<u>s/ Ryan G. Milligan</u>

dms.us.53519049.05