UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| CITY OF SOUTH BEND, BY ITS CORPORATION COUNSEL ALADEAN M. DEROSE. | ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | 3:12-cv- 475 |
| SOUTH BEND COMMON COUNCIL, TIM CORBETT, DAVE WELLS, STEVE RICHMOND, BRIAN YOUNG, AND SANDY YOUNG, | ) ) ) ) ) | |
| Respondents. | ) | |

## SOUTH BEND COMMON COUNCIL'S TRIAL BRIEF

Comes now Defendant, South Bend Common Council and files its Trial Brief. For the reasons set forth in this brief, together with the evidence submitted at trial, the Court should enter a declaratory judgment that the recordings at issue do not violate the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*

## PROCEDURAL BACKGROUND

By now, the Court is well aware of the procedural background of this case in which the claims of Tim Corbett, Dave Wells, Steve Richmond, Brian Young, and Sandy Young ("Individuals") against the City of South Bend, Karen DePaepe, Scott Duerring and Darryl Boykins have been, or will be, dismissed.

The various settlements have reduced this otherwise procedurally complicated case to an issue of declaratory judgment. The Individuals argue that the recordings were illegally made and, therefore, cannot be produced pursuant to the Council's subpoena. The City, although originally

simply requesting a declaration as to whether the recordings were or were not legal, has changed its position to be in line with the Individuals . The Council asserts that the recordings were legally made and must be produced pursuant to the validly issued state court subpoena. There are no remaining issues regarding liability or monetary damages.

As this lawsuit is currently positioned, it presents an overriding irony. The City filed its declaratory judgment action because it claimed uncertainty as to whether the recordings were legally made under the Wiretap Act. (Complaint for Declaratory Judgment at para. 9, 17, 18.) Despite the City's alleged uncertainty, the City has moved from a position of neutrality to a position of advocating that the actions of its own police department violated federal law. The City advances this position despite having settled with the Individuals who were allegedly recorded and having also settled with the individuals employed by the Police Department who were disciplined in amounts reportedly totaling $935,000. The City entered into the settlements despite the lack of any discovery on any alleged damages and despite the lack of any finding regarding the legality of the recordings. Intuitively, the City should be asserting that the recordings were legally made and, in an effort to promote transparency between the City's Police Department and its citizens, comply with the Common Council's subpoena. It appears, instead, that the City is now actively trying to hide whatever is contained in the recordings.

## STATEMENT OF THE ISSUES

The sole issue before this Court is whether the recordings at issue are excluded from the Wiretap Act under the Ordinary Course Exclusion. More specifically the only issue before the Court is whether the purpose behind the recording system used by the South Bend Police Department is within the ordinary course of law enforcement.

2

The City argues that other factors are relevant to the issue of whether the recordings are excluded by the Ordinary Course Exclusion. For the reasons set forth below, the Council believes that these factors are irrelevant to the resolution of the issue before the Court.

## **APPLICABLE LAW**

The Wiretap Act, 18 U.S.C. § 2510, *et seq.*, was passed by Congress essentially "to prohibit . . . all interceptions of oral and wire communications, except those specifically provided for in the Act." *United States v. Giordano*, 416 U.S. 505, 514 (1979). Specifically, the Wiretap Act provides for civil and criminal sanctions against any person who "intentionally uses…any *electronic, mechanical, or other device* to intercept any oral communications" in a manner prohibited by the Act. 18 U.S.C. § 2511(1)(b). The phrase "electronic, mechanical, or other device" is defined by 18 U.S.C. § 2510(5)(a)(ii) to exclude recordings "being used…by an investigative or law enforcement officer in the ordinary course of his duties." The Ordinary Course Exclusion constitutes a "statutory exclusion of eavesdropping 'by an investigative or law enforcement officer in the ordinary course of his duties.'" *Amati v. City of Woodstock*, 176 F.3d 952, 954 (7th Cir. 1999). *Amati* explained the term "ordinary" in the context of the exclusion as follows:

> \*\*'[O]rdinary'…is more reasonably interpreted to refer to routine noninvestigative recording of telephone conversations…Such recordings will rarely be very invasive of privacy, and for a reason that does after all bring the ordinary-course exclusion rather close to the consent exclusion: what is ordinary is apt to be known; it imports implicit notice. *To record all calls to and from a police department is…a routine police practice. If 'ordinary course' of law enforcement includes anything, it includes that. The sparsity of case law on the question suggests not that the principle is dubious but that it is too obvious to have incited many challenges.*

176 F.3d at 955-56 (emphasis added) (internal citations omitted). *See also*, *Walden v. City of Providence*, 596 F.3d 38, 54 (1st Cir. 2010). *Amati* rejected the argument that notice must be

3

provided to police officers being recorded, noting that: "There is a separate statutory exclusion for cases in which one party to the communication has consented to the interception" and, further, "if the 'ordinary course' exclusion required proof of notice, it would have no function in the statute." 176 F.3d at 955. *See also Jandak v. Brookfield*, 520 F.Supp. 815, 824-25 (N.D. Ill. 1981).

The City contends that the Ordinary Course Exclusion does not apply because the "recordings were captured mistakenly as a result of inadvertent actions taken by an administrative assistant." This argument erroneously focuses on the individual whose phone line was being recorded, not on the reasons that the recording system was implemented and used.

Whether the Ordinary Course Exclusion applies depends on whether the nature of the recordings can be "reasonably interpreted to refer to routine non-investigative recording of telephone conversations." *Amati* 176 F.3d at 955. Similarly, the court in *Jandak* also ruled that the determinative factors in whether the ordinary course exclusion applies is the underlying reasons for recording calls. Specifically, the Court explained that:

> Police departments commonly have recording systems like that of defendants, due to the need to preserve and be capable of accurately recalling messages pertaining to emergencies or to official police business. To further these purposes, defendants engaged a communication's common carrier to install a recording system, to record emergency and investigative calls, as an integral component of the communication system used by the police department performing its duties to the public. Such a decision indiscriminately and routinely records all activities on established designated lines, and is not comparable to the selective use of recording equipment to eavesdrop on a normally unmonitored telephone system in order to record specifically selected communications. There is little doubt that Congress did not intend the statute to apply to routine recording of emergency and investigative calls as an integral component of a police station telephone system like that of defendants. Accordingly, the Court concludes that the recording device used by defendants falls within the definition of telephone

>           equipment or component as used in [the ordinary course
>           exclusion].

520 F. Supp. at 822.

Furthermore, even truly inadvertent recordings fall within the Ordinary Course Exclusion if the purpose of the recording system falls within the exclusion. *See*, *generally*, *Wright v. Starke County Board of Commissioners*, 2000 U.S. App. LEXIS 25469 (6th Cir. 2000).

The City has also argued that the Ordinary Course Exclusion does not apply because Karen DePaepe was not an investigative or law enforcement officer. The City may also make the same argument with respect to Barb Holleman. This argument, however, is misplaced. *See United States v. Rivera*, 292 F.Supp.2d 838, 843 (E.D. Va. 2003) ("Title III's legislative history also confirms that monitoring and interception under the statute may be performed by government personnel or 'by individuals operating under contract with the government,' provided, . . ., that those individuals are properly authorized and supervised.") Both DePaepe and Holleman were acting as properly authorized and supervised in their roles as employees.

The City has also erroneously argued that the recordings do not fall within the exclusion because not every telephone line was being recorded. The Court held in *Jandak*, that the exclusion applied although the facts of the case established that not all lines were being recorded. Furthermore, section 2510(5)(a)(ii) contains no requirement that all telephone lines be recorded. The applicability of the exclusion does not depend on whether all calls are recorded, but rather on whether the nature of the recordings at issue can be "reasonably interpreted to refer to *routine non-investigative recording of telephone conversations.*" *Amati* 176 F.3d at 957 (emphasis added).

## ANTICIPATED TESTIMONY

### Thomas Fautz

Tom Fautz was the Chief of the Police Department from 2002 through 2007. Fautz was aware that telephone lines were recorded when he worked in the Homicide Division. After Fautz became Chief, he learned more about the recording system from Karen DePaepe. According to Fautz, the purpose of the recording system was to "document calls as an investigative tool and documentation." Fautz also stated that the recording system "provided them with a tool that they could use, again for their protection and to aid in an investigation." The purpose of the recordings was not to intimidate, harass, or embarrass anyone. Instead, the motivation was to serve as a tool for those individuals who had their lines taped to either defend themselves or for documentation. When asked if it was ever the practice of the Department, while he was chief, to designate certain positions as having a phone recorded at all times (rather than specific individuals who happened to be in the position), Fautz said it was not, and that he did not intend to establish that practice.

Fautz considered the recordings to serve legitimate business purposes. He also believed that the recordings helped the Department with transparency with the public. Fautz believes it is customary for police departments throughout the country to record their telephone lines.

The Police Department began being scrutinized because of the way of handling complaints from the public in 2004. Detective Chief Eugene Kyle requested that his line be recorded and Fautz determined that this would be a good way to document the Department's interactions with the public. Fautz believed it would be a useful tool for the individual whose office it was to use to be able to document conversations.

It would be within the scope of the duties of the Director of Communications to listen to recordings for purposes of maintaining the recording system or if there was a Freedom of Information Act request. If the Director of Communications was listening to recordings within the scope of her employment and heard something that he or she believed was related to illegal conduct, it would be within the course and scope of her employment to inform someone higher up in the chain of command. Similarly, it would be within the scope of her employment to report unethical conduct to higher authorities than the Police Department.

### Karen DePaepe

Karen DePaepe will testify about her employment history with the Police Department beginning in 1987. As Comunications Supervisor, Karen's job responsibilities included pulling tapes off the Dictaphone reel-to-reel recording system then in use at the South Bend Police Department. Karen was promoted to Director of Communications in 1998. At that time, the Dictaphone reel-to-reel recording system was replaced with a Dynamic Instrument Reliant recording system (DIR).

The Dictaphone reel-to-reel system recorded a number of telephone lines on a 24-hour basis. The purpose of the recordings was to insure that the calls being received were handled correctly and to be able to have a record of phone conversations if, in fact, a member of the public complained about not being treated appropriately, as well as preserving any information regarding on-going investigations received from anonymous tips.

After the DIR was installed, Police Chief, Darryl Gunn, directed that additional phone lines be recorded. Karen was advised that the purpose of adding these lines was to insure that calls were being handled correctly and also to be able to preserve any type of anonymous

information being received as well as to preserve information received by the public regarding complaints referencing police personnel.

Around 2003, after Thomas Fautz became Chief of Police, he directed Karen to add more lines to be recorded. The additional lines included the 6031 line. The reason again was to preserve information that was coming in through anonymous tips as well as to preserve information received from the public to insure that any complaints made be handled correctly.

In 2007, when Darryl Boykins was appointed Chief of Police, the same phone lines being recorded under Chief Fautz continued to be recorded. As part of Karen's normal procedures, she advised Chief Boykins of the lines that were currently being recorded on a 24-hour basis. From the time Chief Boykins assumed command to the date that Karen was terminated from the Police Department, there were no additions or deletions of any lines that were being recorded by the DIR.

At no time during her tenure was Karen ordered to place a particular individual's phone line on the recording system. The phone lines placed on the recording system were the lines designated by the Chief of Police and once placed on the recording system, all calls placed on that particular line were recorded continually, 24 hours a day, seven days a week regardless of who was on the line or the content of the conversation.

Karen was routinely requested by police officers, city attorneys, and outside law enforcement agencies to listen and look for certain recorded conversations that were recorded by the system for a wide variety of reasons, including criminal investigations, internal affairs investigations, citizen complaints regarding police personnel, as well as Freedom of Information Act requests.

From October 2010 to January 2011, the DIR began to have multiple DVD drive failures. Some recordings were lost due to systems failures. As part of Karen's duties, she was required to maintain the system. In that role, Karen had to check the entire recording system after the final replacement of the DVD drive in January 2011. While Karen was checking to see if the system was operating after numerous repairs she discovered the first of the conversations which were subsequently recorded and given to Chief Boykins.

In July 2011, City Attorney, Aladean DeRose, in response to a Freedom of Information Act request, advised one of the requesters, Nancy Bruce of ABC 57, to contact Karen. Pursuant to the request of the City Attorney, Karen began to look for the recordings for Nancy Bruce. Karen checked all telephone lines looking for anything related to the information requested. During this search Karen located additional conversations which she subsequently reported to Chief Boykins and which are the subject of this lawsuit. On December 30, 2011, Chief Boykins requested Karen to make copies of the recorded conversations that she had earlier advised him of, indicating that he might need to discuss them with the mayor.

To DePaepe's knowledge, no employees, including Division Chiefs, were told what lines were recorded. Furthermore, there is nothing on an individual telephone to indicate the line was recorded. There was, however, no secrecy involved in what lines were recorded as Karen would answer any questions asked by any employees regarding what lines were recorded. On occasion, Karen would even show someone the server and the hardwired recorded lines with the recorded numbers identified.

Karen discovered Young's conversations on the 6031 line while she was reviewing the system for errors following the hard drive malfunction. The 6031 line was recorded pursuant to orders from Chief Fautz and had been continuously recorded since 2004. Karen was surprised to

hear Young on the 6031 line because she thought that line was assigned to Richmond. In order to determine if there was a malfunction, Karen listened to recordings at various points in time and kept hearing Young's voice. After reviewing Richmond's personnel record, Karen discovered that his line was then the 7473 number and not the 6031 number. Karen's further investigations determined Richmond had requested Barb Holleman to switch the 6031 line from Richmond's office to the office of the Captain of the Investigative Bureau. Richmond wanted to retain his previous 7473 number. To the best of Karen's knowledge, at the time the switch was made, Young was not yet occupying the captain's office.

Based on the content of the recording, Karen believed that Young was the receiver of information concerning two incidents which Karen considered illegal.

### Barb Holleman

Barb Holleman is not available as a witness and currently resides in Louisiana. Barb's deposition will be used pursuant to F.R.C.P. 32(a).

Barb was employed as the Police Chiefs' Administrative Assistant for 13 years. Before Barb was the Administrative Assistant for the several Chiefs, she was a night secretary. While Barb was the night secretary, she was aware the secretary's line into the Investigative Division was taped. Tom Fautz, then Chief of the Investigative Bureau, would listen to the recordings and then direct her to transcribe the recordings.

Until 2012, Barb's responsibilities included working with the telephone system. If someone needed a new phone, Holleman would call the IT Department. If an individual was changing offices and wanted a phone line to move to another office, he would see Holleman about the process. Barb described the process by which the lines were switched.

Barb was not the individual to whom officers would go if they wanted a line recorded. It was the Chief of Police's responsibility to designate the lines to be recorded. Barb does not recall an individual ever requesting that his or her phone line be recorded through her.

Barb understands the policy of the Police Department to be that the recorded lines would continue to be recorded until there was authorization from the Chief to stop recording the lines.

Barb was involved in switching Richmond's phone line when he became Division Chief of the Investigative Bureau. Richmond went to Barb and stated he would be changing offices when he became Division Chief and wanted to keep his 7473 telephone number. Barb told Richmond that when he moved offices to provide her with the jack numbers and she would switch the lines. When Richmond informed Barb of the jack numbers, Barb simply went to the closet containing the phone system and switched the lines. When making the change Barb had no way of knowing whether any phone line she was switching was recorded or not. At the time Barb switched the 6031 line to the Captain of the Investigative Division's office, she had no knowledge or information as to whether the line was being recorded.

When Richmond became Division Chief, he moved into Rick Bishop's old office. Brian Young then moved into Richmond's old office. The line that previously belonged to Bishop was then in Young's office as a result of Richmond's request to switch the lines.

### Diana Scott

Diana is the current Director of Communications for the South Bend Police Department. Diana was present for a meeting in October 2011 where there was a discussion of a new phone system for the police station. The meeting was held to discuss how lines would be recorded. Shawn Delahanty from the City IT Department, Keith Crain from IT, Chief Horvath, Phil Trent, Barb Holleman, and Diana Villa were also present at the meeting.

11

It was discovered at the meeting that Young's telephone line was being recorded. After the meeting, Trent approached Diana and told her that Young did not know of the recording and that the recording needed to stop. Diana informed Trent that she did not know how to stop the recording and what the process entailed, or if she could even do it with the software. Diana told Trent she would check with Chief Boykins about changing recorded lines. After the conversation, Diana realized that it was the Chief of Police's duty to decide what lines would be recorded. She informed Trent of this fact. Diana never went to Chief Boykins because she believed Trent would follow up with him, and if Boykins wanted the recording to stop, he would contact her.

When the recording system crashed, the machine would show an error code. The machine would then have to be restarted and someone would have to fix the error code and then go through the recordings to make sure the machine was capturing data and that there was no gaps in time where data was lost. Because Karen had access to all the lines, she would have to listen to all the lines if the system crashed.

### Darryl Boykins

Boykins was Chief of the Police Department from 2008 until he was demoted in 2012. Within a year of Boykins becoming Chief of Police, he was given information as to which phone lines were being recorded. Boykins believed that the policy was that the Chief of Police was to decide which phone lines were to be recorded. When Boykins became Chief, he changed nothing and continued the recordings on the same lines that Chief Fautz had recorded. Boykins believed that Fautz's choices to record conversations had necessary and legitimate business purposes for the Police Department. Boykins never changed the practice.

Karen began listening to phone recordings because there was a malfunction in the system. Karen told Boykins how she came across the recordings at issue and gave him an overview of the recordings. Karen informed Boykins of the recordings because there was something disturbing recorded on the phone lines. Boykins listened to the recordings only because they were brought to his attention by Karen.

Boykins requested Karen to make a copy of the recordings for him. Boykins listened to only one tape. He chose the tape because the content label was more directly related to him personally. The only recording Boykins listened to was a conversation between Brian Young and Dave Wells. Boykins requested Officer Walters to listen to the tape with him.

## EVIDENTIARY ISSUES

The Council objects to several proposed exhibits and possible testimony. These objections are raised in separate motions filed with the Court. However, for the Court's convenience, the exhibits and testimony to which the Council objects, and the grounds for the objections, are summarized below.

### Hearsay

Exhibit 19 is a letter from David Capp to Aladean DeRose dated May 31, 2012. Neither Mr. Capp nor Ms. DeRose is listed as a witness. The letter, therefore, is inadmissible hearsay pursuant to F.R.E. 801 and 802. *See also*, *Friends of Milwaukee's Rivers v. Milwaukee Metropolitan Sewage District*, 556 F.3d 603.

Additionally, several sworn statements and depositions have been identified as potential exhibits. The sworn statements of Thomas H. Fautz, Brent Hemmerlein, Philip Trent, Robert Lanchsweerdt, and Richard Bishop, Exhibits 2, 8, 10, 11, and 14 respectively, are hearsay and

should not be admitted as substantive evidence. *See, e.g.*, *Perrey v. Donahue*, 703 F.Supp.2d 839, 858 (N.D. Ind. 2010).

Similarly, depositions of Karen DePaepe, Darryl Boykins, Richard Bishop, Thomas Fautz, Brent Hemmerlein, Gary Horvath, Robert Lanchsweerdt, Steve Richmond, Diana Scott, Phil Trent, Jeffery Walters, and Sandra Young, Exhibits 22, 23, 24, 25, 26, 28, 29, 30, 31, 32, 33, and 34 respectively, are also inadmissible hearsay and should not be admitted as substantive evidence other than as provided for in F.R.C.P. 32.

### Post-Recording Actions

The only issue before this Court is whether the recordings are excluded from the Wiretap Act by the Ordinary Course Exclusion. If the recordings are excluded by the Ordinary Course Exclusion, they were legally made and any subsequent use is irrelevant to the issue of legality. *United States v. Hammond*, 286 F.3d 189, 192-193 (4th Cir. 2002). *See* generally *In Re High Fructose Corn Syrup Antitrust Litigation*, 216 F.3d 621, 624-625 (7th Cir. 2000). The Council realizes that some post-recording evidence may be necessary in order to fully explain some matters to the Court. However, to the extent that any post-recording evidence is admitted for purposes of establishing whether the recording was legally made, the Council objects on the grounds that such evidence is irrelevant and immaterial.

### Testimony of Professor G. Robert Blakey

Professor G. Robert Blakey has been identified as a potential witness. It is believed that Professor Blakey intends to testify as to the meaning, intent, purpose and/or applicability of the Federal Wiretap Act. Such testimony is inadmissible under F.R.E. 702 and 704. *See Good Shepherd Manner Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003); *United States v. Sinclair*, 74 F.3d 753, 757, n. 1 (7th Cir. 1996); *Sommerfield v. City of Chicago*,

254 F.R.D. 317, 330 (N.D. Ill. 2008); *CDX Liquidating Trust v. Venrock Associates*, 411 B.R. 571, 585 (N.D. Ill. 2009). Because the interpretation of a federal statute is a question of law for the Court to decide, opinions from witnesses, expert or otherwise, are inadmissible.

### Personal Knowledge

During the course of discovery, witnesses have testified as to beliefs, assumptions, and conclusions. Many of these beliefs, assumptions, and conclusions are not based on personal knowledge. Any testimony not based on personal knowledge, is inadmissible. F.R.E. 602

### CONCLUSION

For the above reasons, the Court should enter a judgment declaring that the recordings at issue were made in the ordinary course of law enforcement and are therefore excluded from the Federal Wiretap Act by 18 U.S.C. § 2510(5)(a)(ii).

/s/Robert J. Palmer
E. Spencer Walton, Jr. (1000-71)
Robert J. Palmer (6316-71)
Attorneys for South Bend Common Council

**MAY • OBERFELL • LORBER**
4100 Edison Lakes Parkway, Suite 100
Mishawaka, IN  46545
Phone: (574) 243-4100
Fax: (574) 232-9789
rpalmer@maylorber.com

### CERTIFICATE OF SERVICE

I certify that a copy of the forgoing was served upon all attorneys of record via the Court's ECF system on August 7, 2014.

/s/Robert J. Palmer
Robert J. Palmer

F:\Clients\S1060\12001\Pleadings - Fed Ct\2015-08-06 Trial Brief.docx8/7/2014