UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| CITY OF SOUTH BEND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 3:12-cv-475 |
| | ) | |
| SOUTH BEND COMMON COUNCIL, ET AL., | ) ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| BRIAN YOUNG, SANDY YOUNG TIMOTHY CORBETT, DAVID WELLS, And STEVE RICHMOND | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Consolidated |
| v. | ) | Cause No. 3:12-cv-532 |
| | ) | |
| THE CITY OF SOUTH BEND, Acting Through its Police Department, DARRYL BOYKINS, Individually and in his Official Capacity as Chief of Police, KAREN DEPAEPE, and SCOTT DUERRING, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## CITY OF SOUTH BEND'S TRIAL BRIEF

The plaintiff, the City of South Bend (the "City"), by counsel, pursuant to the Court's July 1, 2014 Scheduling Order and Order for Bench Trial, respectfully submits its trial brief.

## INTRODUCTION AND STATEMENT OF ISSUES

This Court must determine whether certain recordings of telephone conversations between law enforcement officers (the "Recordings") which came from Captain Brian Young's assigned telephone line were captured and then recorded by a law enforcement officer in the

ordinary course of his duties.[1]  The evidence shows that in 2010 Young's line started being recorded by mistake.  Specifically, the inadvertent and unintentional act of Barb Holleman (the secretary to the Chief of Police) in re-directing a telephone line away from Division Chief Steve Richmond's office and to Captain Brian Young's office for the sole purpose of helping Richmond retain his old phone number upon a promotion and move to a new office resulted in Young's conversations being captured by the South Bend Police Department's (the "Police Department") recording device.  For over a year after the capture began, no one in the Communications Department or throughout the entire Police Department even knew that Young's calls were being captured.  Simply put, the initial recording of his line resulted from a mistake, not from a routine act of a law enforcement officer executing Department policy.

These facts alone require application of the Wiretap Act to the Recordings at issue.  However, in addition, the facts at trial will show that the Police Department had never established any policy, practice, or routine related to the regular and non-investigatory recording of all calls in the Department, or all calls to a particular rank, or all calls to a particular group of administrative officer's lines.  At most, in or around 2004, former Chief of Police Thomas Fautz sought input from his Division Chiefs about how to use the Police Department's recording device (called the "Voice Logger") and whether any one of them wanted to utilize the Voice Logger on their own assigned line.  So, to the degree that the Police Department established *any* practice regarding the recording of lines assigned to officers, that practice was an informal one in which the Chief of Police first discussed recording options with his command staff and then

---

[1] The City notes that the County Council's Trial Brief begins with a recitation of both settlement history and a political accusation about the motives of the City administration.  That recitation is wholly irrelevant to any of the issues that this Court must determine and is, quite frankly, a cheap shot.  The City will not respond to those accusations but will, rather, introduce the evidence it believes is relevant to the only question that is properly before the Court, i.e., whether the recording of Brian Young's telephone calls was done by a law enforcement officer acting in the ordinary course of his duties.

offered them a choice. Former Chief Darryl Boykins, (who succeeded Thomas Fautz), will testify that when he became the Chief he directed Communications Director Karen DePaepe to record the same lines and follow the same practice as Fautz.

Thus, when the surreptitious listening of Brian Young's line began in early 2011 by DePaepe, it did not occur as part of any prior policy, practice, or routine established by the Police Department. Nor had the Chief of Police instructed her that the Captain of the Investigative Division or Young in particular should be routinely recorded. Thus, to determine that the law enforcement exclusion applies to the Recordings in this case requires that this Court declare that the purely inadvertent and unintentional actions of the Chief's secretary constitute the actions of a law enforcement officer acting in the ordinary course of established routine police business. That result fails to comport with logic or the law. Consequently, the Wiretap Act and its terms must control access to and use of the Recordings.

## LEGAL STANDARD

The law enforcement ordinary course exclusion is a definitional exclusion for recording equipment "being used . . . by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii). For the exclusion to apply, the conversations must have been captured by an investigative or law enforcement officer as part of "routine noninvestigative recording" of communications. *Amati v. City of Woodstock*, 176 F.3d 952, 955 (7th Cir. 1999). The party invoking the exclusion—in this case the Council—bears the burden of proving the exclusion applies. *See Amati*, 176 F.3d at 954 (stating that the taping was a prima facie violation, but the jury accepted defendants' argument that it came within the statutory exclusion at 18 U.S.C. § 2510(5)(a)(ii)); *United States v. Phillips*, 540 F.2d 319, 326 n.3 (8th Cir. 1976) (holding that the proponent of the exclusion must prove that it is applicable).

3

Accordingly, the Council cannot prevail in this action without proving by a preponderance of the evidence that the Police Department captured Young's phone calls in the ordinary course of its law enforcement duties as part of a routine non-investigative recording of communications.

**EXPECTED TESTIMONY OF THE CITY'S WITNESSES**

The City anticipates testimony will be offered from the following witnesses:

City Information Technology Employee Sal Parisi.  Mr. Parisi will testify regarding the Police Department's telephone and recording systems, including a description of the layout, operation, and functionality of the phone lines.

Director of Communications Diana Scott.  Former assistant and current Communications Director Diana Scott will testify regarding the Police Department's Voice Logger system and the recorded lines in the Police Department.

Former Police Chief Thomas Fautz.  Thomas Fautz ("Fautz") was the Chief of the Police Department from September of 2002 to December of 2007.  Fautz will testify about the general use lines that were recorded during his tenure, including the front desk, the police chief's lines, the communications center, and emergency lines and the rationale for recording these lines (i.e. preserve evidence, document calls as an investigative tool, ensure the Police Department's proper response).  Fautz will further testify that during his tenure the Police Department never recorded all calls on all lines or adopted a routine, practice, or policy to routinely record the individually assigned lines of officers within the Police Department.  Any individually assigned lines were recorded only on an *ad hoc* basis with notice to the person to be recorded and a mutual agreement that recording of the individually assigned line would be beneficial to that person's law enforcement duties.

4

More specifically, in late 2004, Fautz held a command staff meeting at which he and his Division Chiefs discussed the recording of certain lines assigned to individuals in response to public scrutiny over the Police Department's handling of complaints.  After discussion, it was determined that  Investigative Division Chief Eugene Kyle, Uniform Division Chief Jim Hassig, and Internal Affairs head John Collins would have their assigned lines recorded by use of the Voice Logger.  Fautz will testify that his authorization of the recording of these lines was not a blanket decision to record lines assigned to specific types of personnel or specific ranks within the Police Department or to otherwise routinely record individually assigned lines.  Rather, these decisions were made after discussion with the individuals to be recorded and with their agreement and intended to be a useful documentary tool for the individual.

<u>Former Police Chief Darryl Boykins</u>.  Darryl Boykins ("Boykins") replaced Fautz as Chief of the Police Department in December of 2007.  Boykins is expected to testify that, within his first year of becoming Chief of Police, Karen DePaepe informed him of the lines that were being recorded in the Police Department.  Boykins will testify that he directed DePaepe to adopt the approach of Fautz and not to make any changes to the lines that were being recorded.  No written policy was implemented during Boykins' tenure.  In addition, he will testify that there was never an ordinary course established at the Police Department in which the assigned lines of the Captain of the Investigative Division would be recorded and that until informed by DePaepe he did not know Young was being recorded.

<u>Former Chief of the Investigative Division Rick Bishop</u>.  Rick Bishop was appointed Division Chief of the Investigative Division during Fautz's tenure as Chief of Police and will testify that he asked to have his assigned line recorded.

5

<u>Secretary to the Chief of Police Barbara Holleman</u>.  By deposition, Barbara Holleman ("Holleman") is expected to testify that her responsibilities as an administrative assistant included adding and changing phone lines for officers of the Police Department.  About a month before Richmond was promoted from Captain to Division Chief, he contacted Holleman to let her know that when he was promoted and changed offices he wanted to keep his current phone number (235-7473).  Holleman requested that he provide the jack numbers from the offices, which she needed to switch the 7473 number to his new office.  When Richmond was promoted and changed offices, he provided the jack numbers to Holleman.  At that time, she went into the east room phone closet (one of three telephone closets at the Police Department) and switched the line that was connected to Richmond's old office (7473) with the line that was connected to his new office (254-6031) such that his 7473 number followed him from his old office to his new office.  As a result, the 6031 number was connected to Richmond's old office, which was then recently occupied by Young, who had taken Richmond's place as Captain in the Investigative Division.  Because the 6031 number was wired into the Voice Logger in a different telephone closet, Ms. Holleman was unaware that line was connected to the Voice Logger and that it was recording Young's conversations.

<u>Investigative Division Chief Steve Richmond</u>.  Steve Richmond ("Richmond") will testify regarding the circumstances that led to the capture of the telephone conversations on Young's individually assigned line.  In addition, he will testify that there was never an ordinary course established at the Police Department in which the assigned lines of the Captain of the Investigative Division would be recorded at all times.

<u>Investigative Division Captain Brian Young</u>.  Young will testify that he had no notice or knowledge that the number assigned to him upon his promotion to Captain (245-6031) was being

6

recorded when it was assigned to him. Furthermore, Young will testify that he did not request or consent to his line being recorded and that he did not discover it was being recorded until at least October of 2011. In addition, he will testify that there was never an ordinary course established at the Police Department in which the assigned lines of the Captain of the Investigative Division would be recorded at all times.

<u>Former Communications Director Karen Depaepe</u>. Karen DePaepe ("DePaepe") was the Director of Communications from 1998- 2012. She will testify that she was never instructed to record Young's assigned lines and that she was unaware that his line was recorded until an inadvertent discovery sometime in 2011. In addition, she will testify that there was never an ordinary course established at the Police Department in which the assigned lines of the Captain of the Investigative Division would be recorded. She will also testify that upon review of recorded calls for some other purpose, she began to listen and eventually created cassette tapes of conversations on Young's line because she was investigating what she perceived was wrongdoing by Young or others.

## **LEGAL ANALYSIS**

The evidence presented at trial will show that the law enforcement ordinary course exclusion does not apply to the capture of conversations on Captain Young's individually assigned line. The Police Department did not capture the conversations pursuant to the ordinary course of its law enforcement duties. Indeed, it had no policy, practice, or routine for capturing telephone conversations on the individually assigned lines of officers. To the extent the Police Department recorded any individually assigned lines, it did so only with notice to and the mutual agreement of the individual to be recorded. Accordingly, the Council cannot carry its burden of showing that the law enforcement exclusion applies in this case.

7

> **I.      The evidence will show Captain Young's line was recorded inadvertently as a result of the actions of Ms. Holleman and inadvertent recordings do not qualify for the law enforcement exclusion.**

The parties stipulated that the recording of Young's line occurred when Holleman switched the telephone lines between Richmond's old and new offices.  Unbeknownst to her, the line that she moved to Richmond's former office had been wired into the Voice Logger at a much earlier point in time at the specific request of Former Division Chief Rick Bishop.  When Young relocated to that office, his telephone conversations were inadvertently captured by the Voice Logger.  In other words, nobody intended to record Young's individually assigned line, and thus it could not have been recorded pursuant to any putative ordinary course routine of the Police Department.

More specifically, the mistaken recording of a single individual's assigned line due to the inadvertent actions of an administrative assistant does not fit within the ordinary course exclusion.  For the exclusion to apply, the conversations must have been captured by an investigative or law enforcement officer as part of "routine non-investigative recording" of communications.  *Amati*, 176 F.3d at 955.  A mistake, however, cannot be equated with a deliberate exercise of administrative judgment that could constitute a "routine."  *Cf.* Merriam Webster Dictionary (defining "routine" as "a regular way of doing things in a particular order.").  Indeed, the Fourth Circuit has expressly declined to "expand the scope of the law enforcement exception to cover [an] alleged good faith mistake." *Abraham v. City of Greenville*, 237 F.3d 386, 391 (4th Cir. 2001).  Thus, recordings obtained by mistake are "not a legitimate surveillance activity because [they do] not occur in the ordinary course of the [interceptor's] law enforcement duties." *Id.*

For this reason, *Abraham v. County of Greenville* dictates the outcome of this case rather than *Amati v. City of Woodstock*. In *Abraham*, county officials installed a recording system in a newly constructed detention center, which contained a jail, offices for law enforcement personnel, and a judicial corridor for county and city judges. *Id.* at 388. The system did not record all calls into and out of the detention center. *Id.* Rather, it recorded all calls on a single trunk line. *Id.* Among the telephone lines that were part of the trunk line and were thus recorded were those in the judicial corridor. *Id.* The judges were not notified that their calls were being recorded. *Id.* The County asserted that the judges' lines were recorded by mistake and therefore the interception was excused by the law enforcement exception. *Id.* at 389. The court rejected the notion that a mistaken action could be taken pursuant to a policy and declined to apply the exclusion. *Abraham*, 237 F.3d at 391 (stating that mistakes are not legitimate surveillance activity).

*Amati*, by contrast, did not involve a mistaken recording, but a deliberate administrative decision to bring a single unrecorded line into an established policy of recording all calls on all lines. As the *Amati* Court describes it:

> [T]he decision to tap [the unrecorded line] was precipitated by an official use of the line which showed it had been a mistake to leave it untapped. . . Rather than being outside the ordinary course of law enforcement, the decision brought the line within that course.

*Amati*, 176 F.3d at 956. Young's Line was not brought within any "course." Rather, the evidence in this case shows that no law enforcement officer ever made a decision to record Young's assigned line. The distinction is dispositive of this case: the mistaken capture of telephone conversations that occurred in this case and in *Abraham* cannot be equated with the official exercise of administrative judgment by the police department that occurred in *Amati*. *See id.* at 955 ("So, the *department decided* to tape record calls on [that line].") (emphasis added).

9

Holleman's switching of the lines and the inadvertent capture of Young's calls cannot be considered a *department decision* to bring the line into any putative routine followed by the Police Department regardless of whether such a routine actually existed or what the contours of that routine may have been. Accordingly, even if the Council could show that *some* routine existed, it cannot carry its burden of showing that the law enforcement exclusion applied to *Young's line*. *Abraham*, 237 F.3d at 389 (holding that the law enforcement exclusion does not apply to lines that were recorded by mistake).

II.   **The Police Department did not have a "routine" that justified the capture of conversations on Young's individually assigned line.**

The evidence at trial will show that no routine existed in the Police Department that would have permitted it to capture the phone conversations on the individually assigned line of Young. The parties have stipulated and the evidence introduced at trial will show the following:

- The Police Department had no policy or procedures regarding the recording of its telephone lines.

- The Police Department did not record all incoming and outgoing calls to the Police Department as in *Amati* and other cases relied upon by the Council.

- Only certain general phone lines, such as the front desk and emergency calls, were routinely and indiscriminately recorded without regard for the user of the line.

To the extent any *informal practice* developed, the testimony of Fautz shows that such a practice related to certain administrative officers determining for themselves whether they would use the Voice Logger. The Police Department did not routinely record all lines assigned to individual members of the Police Department, nor did it routinely record lines based on personnel groupings (such as all captains in the department), nor did it record specific private offices regardless of the individual occupant. Furthermore, the testimony will show that until DePaepe's discovery in 2011 that Young's line was being recorded, no one was even aware of

10

the recording.  Certainly a prerequisite to a practice being conducted in the ordinary course of police business must be that someone in the Department is *actually aware of the practice*.

The facts show that the recording of Captain Young's line was anything but "ordinary." As the *Amati* Court has ruled, "what is ordinary is apt to be known; it imports implicit notice." *Amati,* 176 F.3d at 955.  Because no one in the Police Department intended to record Young or was even aware it was occurring, "implicit notice" to the user of the lines was simply impossible. How can anyone have implicit notice of an unknown mistake?  Because the Police Department lacked any policy or any procedure that dictated who would be recorded, the Wiretap Act requires that some type of notice needed to be given to those that were subject to being recorded. *Adams v. City of Battle Creek*, 250 F.3d 980, 984 (6th Cir. 2001) (Although actual consent is not required, "monitoring in the ordinary course of business requires notice to the person or persons being monitored.").  Normally, a police department's stated policy would serve that role, as in *Amati*.  However, since the Police Department had no policy at all but instead relied simply on the Chief's discretion in consultation with his command staff, it is clear that no ordinary course led to the recording of Captain Young.  *See Abraham v. City of Greenville*, 237 F.3d 386, 389 (4th Cir. 2001) (holding defendant violated the Act when it "did not have an established policy of monitoring the plaintiffs' calls.")

In the face of these dispositive facts, the Council argues that the Police Department's legitimate use of the Voice Logger for *some* applications legitimizes *all* uses of the system whether or not implicit notice exists to users.  However, that assertion conflicts with the plain terms of the Act, which relates to whether the recording device is "*being used . . .* by an investigative or law enforcement officer in the ordinary course of his duties."  18 U.S.C. § 2510(5)(a) (emphasis added).  In other words, different categories of calls are considered

11

separately in determining whether the exclusion applies.  Thus, the proper recording of emergency lines, or the front desk, or the secretary for the Investigative Division, for instance, cannot excuse the recording of a specific individual's line where it was never part of a routine and no notice occurred.  *Abraham*, 237 F.3d at 390[2] (stating that "courts 'have considered different categories of phone calls recorded by a single recording system separately for application of the law enforcement exception.'"); *cf. Narducci v. Village of Bellwood*, 444 F. Supp. 2d 924 (N.D. Ill 2006).

Similarly, the fact that the Young's line was initially connected to the Voice Logger years earlier at Bishop's request does not later justify the recording of a different officer, at a different time, in a different office location who was inadvertently assigned that line.  If any legitimate uses of the Voice Logger in the Police Department can be used to justify the inadvertent recording of Young's calls, then the law enforcement exclusion has swallowed the rule, permitting law enforcement agencies to violate the Act with impunity so long as the device itself had some legitimate purpose.  *See id.*  (If the exclusion "looked only to the wiretapping device, then law enforcement agencies could record all of the telephone lines in a building so long as some lines were monitored in the ordinary course of the law enforcement officers' duties.").  In short, the evidence will show that no routine existed justifying the capture of Young's conversations.

### III. The continued recording and listening to Young's assigned line after discovery of the "mistake" was not a "non-investigatory act."

Furthermore, the conversations captured on Young's assigned line could not have been made pursuant to the ordinary course exclusion because the recordings were not created as part

---

[2] "The law enforcement exception does not authorize all conversations to be recorded by a wiretapping device so long as the device captured some conversations in the ordinary course of a law enforcement officer's duties." *Id.* Rather, "some uses of the recording device are excused, while other uses are not." *Id.*

12

US.54472912.12

of a routine non-investigatory practice.  The testimony will reveal that from early 2010 until February 2011, no one knew that the Voice Logger captured Captain Young's line.  But, starting at the latest in February 2011, DePaepe discovered that Young was being recorded and she then subsequently undertook to "investigate" Young's other conversations, as she has indicated in a January 2012 communication to Boykins:

> . . . I made a decision, as Keeper of the Records, to check further conversations to see if there was more information in regard to this incident. . . I reviewed some of the audio . . .

*See* the City's Exhibit 96-9, p. 2 to Brief in Support of Motion for Summary Judgment; s*ee also*, Deposition of DePaepe, Page 25, L. 6-15 attached to the City's Brief in Support of Motion for Summary Judgment, Exhibit 96-1, p. 20.

DePaepe's discovery and realization of the mistaken recording of Young's assigned line in early 2011 obligated her to determine whether the recordings were proper and whether Young had been given at least *implicit notice* that his line was recorded.  As the testimony will reveal, DePaepe believed that only the Chief of Police could authorize the recording of a line and DePaepe herself was the person responsible for maintaining the list of authorized recorded lines.  Thus, the day she discovered that Young was being recorded, she would have known that the arrangement had never been authorized and should have been stopped.  Instead, her failure to act functions as DePaepe's own decision to record Young's line without any authorization from the Chief, without permission from Young, and without any routine or ordinary practice that would have given him notice.[3]

---

[3] In support of the Council's Memorandum in Support of Summary Judgment (DE 91), DePaepe submitted an affidavit in which she alleged that "The phone lines placed on the recording system were the lines assigned to a particular office…"  The statement is disingenuous at best.  The evidence presented at trial will show that the Police Department did not record lines assigned to particular offices without regard to the occupant of those offices.  The phone line for #6031 was not placed on the recording system because it was the line associated with office #C156. It was placed on the recording system because Rick Bishop requested it in 2004.  That line was later directed to Office #C156 by an inadvertent and unintentional act of Barbara Holleman.

13

Clearly, DePaepe made a decision to investigate Young. Over the course of the next several months, DePaepe continued to investigate Young and eventually spoke with Boykins about her investigation of Young. Boykins then asked her to give him copies and she produced five cassette tapes containing conversations that she selected as a result of culling through the recordings during her investigation.

The particular focus of DePaepe's activity coupled with her knowledge of the system and the fact that Captain Young was a "target" of her actions, reveal that the continued recording of Captain Young was not a routine non-investigatory act. *Narducci v. Village of Bellwood*, 444 F. Supp. 2d 924, 936 (N.D. Ill 2006) ("But a communication is not viewed as having been recorded in the 'ordinary course' of an officer's duties if it is done to further a particular investigation or target a particular individual") *citing Amati*, 176 F.3d at 955-56. Furthermore, even though DePaepe had no role in the initial mistake that led to Young's line being recorded, the fact that she later became aware of it and had the power to stop it but failed supports an inference that her actions were "intentional" under section 2511(1)(a). *Id.at 935-36.*[4] Indeed, DePaepe's conduct suggests that the "*Amati* boundary"—between routine non-investigative uses and a tool of investigation or a device for improper purposes—was crossed. *Amati*, 176 F.3d at 956. DePaepe's decision to continue recording Young and then investigate him further distinguishes this case from the law enforcement exclusion. Of all the people in the Police Department, DePaepe is the one person who knew (or should have known) that no Chief ever authorized the recording of Young in the ordinary course of the Police Department's law enforcement activity.

---

[4] "Even though [defendant] had no role in the initial taping decision or the initial implementation of the taping scheme, [plaintiff] has provided evidence, which must be credited for this purpose, (1) that Defendant later became aware of that scheme, (2) that he had the power to stop it and (3) that he failed to do so. That adequately supports an inference that Defendant's action, or failure to act, was "intentional" under Section 2511(1)(a)." *Narducci v. Village of Bellwood*, 444 F. Supp. 2d 924, 936 (N.D. Ill 2006).

14

## CONCLUSION

The recording of Young's line was a mistake and was not done pursuant to any routine of the Police Department. Indeed, the recording continued as an investigatory tool despite knowledge that the line was being captured improperly. Accordingly, the law enforcement ordinary course exclusion does not apply and the Wiretap Act governs the use and disclosure of the recordings in any medium.

Respectfully Submitted,

FAEGRE BAKER DANIELS LLP

s/ Edward A. Sullivan
Edward A. Sullivan, III (17577-71)
Ryan G. Milligan (28691-71)
J.P. Hanlon (21230-71)
FAEGRE BAKER DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, Indiana 46601
edward.sullivan@faegrebd.com
ryan.milligan@faegrebd.com
jphanlon@faegrebd.com
*Counsel for City of South Bend*

## CERTIFICATE OF SERVICE

I certify that on the 7th day of August, 2014, a copy of the foregoing was served upon all counsel of record via the Court's electronic filing system.

s/ Edward A. Sullivan

US.54472912.12