```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF INDIANA
                     HAMMOND DIVISION

CITY OF SOUTH BEND,            ) Cause No. 3:12cv475
                               )
          Plaintiff,           )
                               )
     vs.                       )
                               )
SOUTH BEND COMMON COUNCIL,     ) South Bend, Indiana
et al.,                        ) August 12, 2014
                               ) 11:15 a.m.
          Defendants.          )
_____    ) _____
                               )
BRIAN YOUNG, SANDY YOUNG,      )
TIMOTHY CORBETT, DAVID         )
WELLS, and STEVE RICHMOND,     )
                               )
          Plaintiffs,          )
                               ) Consolidated Case No.:
     vs.                       ) 3:12cv532
                               )
THE CITY OF SOUTH BEND,        )
Acting Through its Police      )
Department, DARRYL BOYKINS,    )
Individually and in his        )
Official Capacity as Chief     )
of Police, KAREN DEPAEPE,      )
and SCOTT DUERRING,            )
                               )
          Defendants.          )
_____    )


                        VOLUME I
              TRANSCRIPT OF BENCH TRIAL
         BEFORE THE HONORABLE JOSEPH S. VAN BOKKELEN


APPEARANCES:

For City of South Bend:    MR. EDWARD A. SULLIVAN, III
                           MR. RYAN G. MILLIGAN
                           Faegre Baker Daniels LLP
                           202 South Michigan Street
                           Suite 1400
                           South Bend, Indiana  46601
```

APPEARANCES CONTINUED:

For City of South Bend:     MS. CRISTAL BRISCO
                                 City of South Bend
                                    Attorney's Office
                                 1200 County City Building
                                 227 West Jefferson Boulevard
                                 South Bend, Indiana  46601

For South Bend Common
Council:                          MR. E. SPENCER WALTON, JR.
                                 MR. ROBERT J. PALMER
                                 May Oberfell Lorber
                                 4100 Edison Lakes Parkway
                                 Suite 100
                                 Mishawaka, Indiana 46545

For Timothy Corbett,
David Wells, Steve Richmond,
Brian Young, and
Sandy Young:                    MR. DANIEL H. PFEIFER
                                 MR. JEROME W. McKEEVER
                                 Pfeifer Morgan & Stesiak
                                 53600 North Ironwood Drive
                                 South Bend, Indiana  46635

                                 MR. JEFFREY S. McQUARY
                                 Brown Tompkins Lory & Mastrian
                                 608 East Market Street
                                 Indianapolis, Indiana  46202

*Joanne M. Hoffman*
*United States Court Reporter*
*119 Robert A. Grant Courthouse*
*204 South Main Street*
*South Bend, Indiana  46601*
*(574) 246-8038*
*Joanne_Hoffman@innd.uscourts.gov*

1                                **INDEX**

2

3        **WITNESSES FOR THE PLAINTIFF:**

4

5                            **SALVATORE PARISI**

6        DIRECT EXAMINATION
         BY MR. SULLIVAN:                            Page 14
         CROSS-EXAMINATION
7        BY MR. WALTON:                              Page 24
         CROSS-EXAMINATION
8        BY MR. PFEIFER:                             Page 26

9                              **DIANA SCOTT**

10       DIRECT EXAMINATION
         BY MR. SULLIVAN:                            Page 28
11       CROSS-EXAMINATION
         BY MR. WALTON:                              Page 72
12       CROSS-EXAMINATION
         BY MR. PFEIFER:                             Page 94
13       REDIRECT EXAMINATION
         BY MR. SULLIVAN:                            Page 108
14       RECROSS-EXAMINATION
         BY MR. WALTON:                              Page 114
15       RECROSS-EXAMINATION
         BY MR. PFEIFER:                             Page 117
16

17                           **THOMAS FAUTZ**

18       DIRECT EXAMINATION
         BY MR. SULLIVAN:                            Page 120
         CROSS-EXAMINATION
19       BY MR. WALTON:                              Page 142
         CROSS-EXAMINATION
20       BY MR. PFEIFER:                             Page 162
         REDIRECT EXAMINATION
21       BY MR. SULLIVAN:                            Page 169
         RECROSS-EXAMINATION
22       BY MR. WALTON:                              Page 171
         FURTHER REDIRECT EXAMINATION
23       BY MR. SULLIVAN:                            Page 178
         FURTHER RECROSS-EXAMINATION
24       BY MR. WALTON:                              Page 181

25

1

**INDEX CONTINUED**

2

3                                **DARRYL BOYKINS**

4      DIRECT EXAMINATION
       BY MR. SULLIVAN:                                    Page 182
5      CROSS-EXAMINATION
       BY MR. WALTON:                                      Page 197
6      CROSS-EXAMINATION
       BY MR. PFEIFER:                                     Page 210
7      REDIRECT EXAMINATION
       BY MR. SULLIVAN:                                    Page 217
8      RECROSS-EXAMINATION
       BY MR. WALTON:                                      Page 220
9

                                **RICHARD A. BISHOP**

10

11     DIRECT EXAMINATION
       BY MR. SULLIVAN:                                    Page 222
       CROSS-EXAMINATION
12     BY MR. WALTON:                                       Page 233
       CROSS-EXAMINATION
13     BY MR. PFEIFER:                                      Page 247

14
                                   *   *   *
15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  You can all be seated.

2          From time to time, I'll probably be fiddling around

3    up here.  It's not my courtroom.  Judge DeGuilio has been very

4    kind to let me mess up his desk and everything.  I will

5    probably do that by the time we're done.

6          We're scheduled today for a bench trial in Cause

7    Number 3:12cv475, *City of South Bend v. The South Bend Common*

8    *Council,* and, also, the police defendants.

9          It's set for three days.  I'm hoping we don't go

10   anything close to three days.  I'm going to push a little bit

11   later into the night tonight and I'll do the same thing

12   tomorrow, if necessary.

13         As to scheduling, I hope you aren't planning for a

14   big lunch, because there won't be a big lunch.  It will be a

15   short lunch, because I want to keep pushing through throughout

16   the course of the day.

17         First, for the record, would counsel for the City of

18   South Bend introduce themselves.

19         MR. SULLIVAN:  Good morning, Your Honor.  I'm Ed

20   Sullivan with Faegre Baker Daniels representing the City of

21   South Bend, and this is my colleague (indicating).

22         MR. MILLIGAN:  Ryan Milligan.

23         MR. SULLIVAN:  We're here with the City attorney,

24   Cristal Brisco.

25         THE COURT:  Okay.  And who else?

1          MR. SULLIVAN:  Also from my office is paralegal Liz

2    White Legg.

3          THE COURT:  Okay.  Thank you.

4          And for Defendant South Bend Common Council?

5          MR. WALTON:  Your Honor, Spence Walton from May

6    Oberfell Lorber, and Bob Palmer from May Oberfell Lorber, and

7    Cathy Cekanski-Farrand, who is in the back of the courtroom, is

8    counsel for the Council.

9          THE COURT:  Okay.  And for the defendant police

10   officers?

11         MR. PFEIFER:  Dan Pfeifer of the firm Pfeifer Morgan

12   & Stesiak; Jeff McQuary and Jerry McKeever from my office,

13   also, and then the individual defendants are here.

14         THE COURT:  Before we start, it was indicated that,

15   with regard to the 532 case, which is not before me -- it's

16   only the declaratory judgment action -- that case has been

17   settled; is that correct?

18         MR. PFEIFER:  The differences have been resolved,

19   and we're in the process of completing execution of the

20   necessary documents.  In fact, late last night, I signed a

21   document that's been forwarded to Mari Duerring, so 532 is

22   resolved.

23         +THE COURT:  Okay.  Again, I know you talked to my

24   law clerk, Vilius Lapas.  On the case in controversy, we're

25   probably at the edge a little bit, at least for this Court.  My

1  understanding is that all the parties wanted this hearing to

2  proceed forward.

3          Is that correct, for the plaintiff?

4          MR. SULLIVAN:  Yes, that's correct, Your Honor.

5          THE COURT:  Defendant Council?

6          MR. WALTON:  Yes, Your Honor.

7          THE COURT:  And the police officers?

8          MR. PFEIFER:  Yes, Your Honor.

9          THE COURT:  The reason I'm referring to you as the

10  "police officers," that's who they are.  I know some of them,

11  as a matter of fact, from my older days as U.S. Attorney.

12          The way I plan to start, it will -- obviously, the

13  complaint was filed for declaratory judgment action -- start

14  with the City.  Really, as far as rulings, I will take a lot of

15  them under advisement.

16          A judge who was a very good friend of mine, as a

17  matter of fact, I spent most of my legal life around, Judge

18  Sharp, in one form or another, sometimes nice and sometimes not

19  so good, he always said he can separate the wheat from the

20  chaff.  I'm not sure I do that as well as he did it, but I can

21  do it, so I will take a lot of the objections under advisement.

22  Make your objections where you think need to be made.  You

23  don't have to go into detail about them.

24          I have read all your briefs.  They are very good

25  briefs.  They are very helpful.  What I want to do the next few

```
 1    days is just get all the evidence in so we can do the briefing
 2    work that has to be done and so forth.  So make your objections
 3    where you think it's necessary.  Understand this is a bench
 4    trial and I can separate most of the stuff.  And at the time we
 5    do the briefing and so forth, where you think evidence is being
 6    considered that should have been inadmissible, then I can take
 7    it up at that time.
 8              MR. SULLIVAN:  Very good, Your Honor.
 9              THE COURT:  Any questions?
10              Are the parties ready to proceed?
11              MR. SULLIVAN:  Yes.  There's a few preliminary
12    matters that I might raise with the Court, Your Honor.
13              THE COURT:  Okay.
14              MR. SULLIVAN:  First of all, we would ask for a
15    separation of witness order.
16              THE COURT:  Okay.  I don't know your witnesses.
17    That motion will be granted.  Anybody who is a witness, just
18    let them be excused from the courtroom, and you have to track
19    your own witnesses, because I don't know who your witnesses
20    are.
21              MR. SULLIVAN:  I have two witnesses that are here,
22    Your Honor, that I would ask to step out in the hall and then
23    we'll come and get you when it's time.
24              THE COURT:  Are there any witnesses here that the
25    parties know to be witnesses?  I assume that's it.
```

```
 1            MR. SULLIVAN:  In addition, Your Honor, I guess I
 2   just did want to ask what time you plan to have the very brief
 3   lunch break so that we could plan for other witnesses to come.
 4            THE COURT:  I want to get at least two hours into
 5   the case, if we could.  Of course, that's kind of a fluid
 6   number, I guess, but I would like to get about that far into
 7   the case if possible.
 8            MR. SULLIVAN:  We anticipated something like that,
 9   Your Honor.
10            THE COURT:  Any time you can't hear me, tell me.  In
11   my courtroom in Hammond, if you chose to come over and try it
12   over there, I have a wireless so I don't worry so much about
13   getting away from the microphone.  Here I've got to make sure
14   I'm talking into the microphone.
15            MR. SULLIVAN:  We would have been happy to come to
16   Hammond, Your Honor.
17            THE COURT:  I know you were.
18            MR. SULLIVAN:  It's a beautiful courthouse there.
19            THE COURT:  It is a nice courthouse.
20            MR. SULLIVAN:  Your Honor, we do have a pending
21   motion that seeks to exclude any references in testimony or
22   exhibits to the content of the recordings at issue, and there
23   is a protective order that has been entered in this case from
24   very early on, so we would just ask that the Court extend that
25   protective order and instruct all counsel and all witnesses not
```

```
 1   to make any references to the content of the recordings; and
 2   then we would ask for a little leeway, if we need to sort of
 3   jump in and hold a witness up if it looks like there's going to
 4   be a reference to that.  It certainly would moot the whole
 5   issue that is at play here, Your Honor, and so we think --
 6   we've submitted a brief on that and cited U.S. v. Dorfman for
 7   the proposition that you're not going to disclose the very
 8   subject of whether it's legal to disclose.
 9              THE COURT:  Mr. Walton?
10              MR. WALTON:  Your Honor, we join in that motion.
11              MR. PFEIFER:  We're in agreement.
12              THE COURT:  Okay.
13              MR. SULLIVAN:  Thank you, Your Honor.
14              THE COURT:  So the protective order will be
15   continued.
16              MR. SULLIVAN:  I'm sorry?
17              THE COURT:  The protective order will be extended.
18              MR. SULLIVAN:  Very good.  Thank you.
19              We do have a couple of exhibits that have been
20   redacted pursuant to that protective order, so that's the ones
21   we'll use.
22              Your Honor, I would like to offer agreed exhibits to
23   be admitted into evidence, and I'd ask my co-counsel here from
24   the other parties to make sure I hit the right ones, so I'm
25   going to go through in our agreed exhibit binder, which has
```

1   been submitted to the Court, and mention the numbers of the

2   exhibits that are agreed and admitted -- moved to be admitted.

3   So it would be Exhibits 1, 5, 6, 7, 9, 12, 15, 16, 17, 18, 20,

4   21, 35, 36, 37, 38, 43, 44, 45, and 46.

5           Counsel, did I get those correctly?

6           MR. WALTON:  Yes.

7           THE COURT:  Is there any objection to that by

8   anybody?

9           MR. WALTON:  No.

10           MR. PFEIFER:  What about 47?

11           MR. SULLIVAN:  I wasn't going to offer 47.

12           THE COURT:  Exhibit Number 1, 5, 6, 7, 9, 12, 15,

13   16, 17, 18, 20, 21, 35, 36, 37, 38, 43, 44, 45, 46 are admitted

14   without objection.

15           MR. SULLIVAN:  Thank you, Your Honor.

16           Then the final preliminary matter is that we have an

17   agreement to submit testimony by deposition from Barb Holleman,

18   who was the former secretary to the chief of police of the

19   South Bend Police Department, and we have some depositions that

20   we would like to offer at this time.  Again, they're agreed,

21   comprehensive, and what all parties designated.

22           THE COURT:  Is there any objection to that,

23   Mr. Walton?

24           MR. WALTON:  No, Your Honor.  I haven't seen it, but

25   I presume -- we agreed on numbers and we exchanged them.  I

```
 1    just haven't seen the finals.
 2              THE COURT:  Okay.  Subject to that.
 3              Police defendants?
 4              MR. PFEIFER:  No objection.
 5              THE COURT:  Okay.
 6              MR. SULLIVAN:  All right.  Those are my preliminary
 7    issues, Your Honor.  I don't know if counsel has any other.
 8              MR. WALTON:  Just one.
 9              For convenience -- and Mr. Sullivan and I talked
10    about it yesterday and I think he was going to talk to
11    Mr. Pfeifer -- once a witness is called, we agree that if we
12    have any use -- or rather than recall a witness in our own
13    cases, that we would go ahead and expand our scope of
14    cross-examination to get what information we want from the
15    witness when they're here.
16              THE COURT:  The only thing I'd ask is when you go --
17    well, actually, it's a bench trial, so it's probably not that
18    big of a thing.
19              The only thing is, for the Court's benefit, to know
20    when you're moving beyond the scope of the examination of the
21    other party so I know that you've done that, if you remember to
22    tell me.  Otherwise, I'll be up here just doodling along and
23    not knowing where we are.
24              MR. WALTON:  I don't think anybody is going to
25    object when we go there, though, either.  I think that's kind
```

1    of an agreement.

2              THE COURT:  Right.  You're getting along right now.

3    That's a good thing.

4              MR. WALTON:  We will, Your Honor.

5              THE COURT:  Anything from the police defendants?

6              MR. PFEIFER:  No, Your Honor.

7              THE COURT:  Okay.  You're welcome to make opening

8    statements.  I've read everything you have.  I'm not sure how

9    much you could add to that.  So you've got to trust me that

10   I've read.  Now, whether I can remember it, that's a whole

11   different issue.  I'm getting to be old.  At the same time, you

12   can waive them and that would be fine with me.

13             MR. SULLIVAN:  Based on our discussion at the

14   pretrial hearing where you asked for briefs of lieu of opening,

15   I'm prepared to move forward, if all the other parties are,

16   too, without opening.

17             THE COURT:  Mr. Walton?

18             MR. WALTON:  We agree, Your Honor.

19             MR. PFEIFER:  We agree.

20             THE COURT:  Okay.  Tee it up.

21             MR. SULLIVAN:  Okay.  I'm going to call Diana Scott.

22   If you give me a moment, I will get her.

23             (Brief pause.)

24             MR. SULLIVAN:  Your Honor, my error.  Sal Parisi, we

25   will call to the stand first.

1           THE COURT:  Mr. Parisi, right up over here to the

2    left of me, your right.  When you get up here, face the

3    courtroom deputy, and he will place you under oath.

4           (The witness was duly sworn.)

5           THE COURT:  You can be seated.

6                       SALVATORE PARISI,

7    having been duly sworn, was examined, and testified as follows:

8                     DIRECT EXAMINATION

9    BY MR. SULLIVAN:

10   **Q.**  Good morning, Mr. Parisi.

11   **A.**  Good morning.

12   **Q.**  Would you introduce yourself to the Court and spell your

13   name, please.

14   **A.**  My name is Salvatore Parisi.  S-a-l-v-a-t-o-r-e.  Parisi,

15   P-a-r-i-s-i.

16   **Q.**  Thank you.  What is your current position of employment?

17   **A.**  I am basically the network administrator for the South Bend

18   Police Department.  I handle all the servers, network, work

19   stations, laptops for the entire department.

20   **Q.**  How long have you held that position?

21   **A.**  Roughly ten-and-a-half years.

22   **Q.**  Did you receive any training during the course of your

23   ten-and-a-half years with the South Bend Police Department?

24   **A.**  Yes.

25   **Q.**  Describe the training you received.

1    **A.**   I received training for networking, running wires, cables,

2    all that stuff, for the department and got certifications to do

3    that, as well.

4    **Q.**   During the course of your work and training with the

5    South Bend Police Department, have you had occasion to work

6    with and observe the telephone lines and systems at the

7    South Bend Police Department?

8    **A.**   Yes.

9    **Q.**   Okay.  Have you observed how those lines come into the

10   building?

11   **A.**   Yes.

12   **Q.**   How they're initially hooked up in their -- when they enter

13   the building?

14   **A.**   Yes.

15   **Q.**   And have you observed how they're run through the building

16   through the different offices?

17   **A.**   Yes.

18   **Q.**   Through your experience and training, would you have

19   knowledge on how somebody would direct a phone line and number

20   from one office and switch it with a different office in the

21   South Bend Police Department?

22   **A.**   Yes.

23   **Q.**   And did I ask you to specifically look at two lines in the

24   South Bend Police Department and note their arrangement and how

25   they're hooked up and where they run?

 1  **A.**   Yes.

 2  **Q.**   Is there a diagram that you made that would help you in

 3  explaining the physical layout of these lines?

 4  **A.**   Yes.

 5            MR. SULLIVAN:  Ryan, if you would, tell me the

 6  exhibit numbers for these diagrams so I could refer to them.

 7            MR. MILLIGAN:  36.

 8  BY MR. SULLIVAN:

 9  **Q.**   This is Exhibit 36.  Is this the diagram that you were

10  referencing?

11  **A.**   Yes.

12  **Q.**   Did you construct this diagram based upon your knowledge of

13  the system at the South Bend Police Department?

14  **A.**   Yes.

15  **Q.**   Okay.  Would it aid in your testimony?

16  **A.**   Yes.

17  **Q.**   I'd like to refer to your diagram, and what I want you to

18  do is explain to the Court how the phone lines are set up in

19  the South Bend Police Department, and, specifically, two phone

20  lines, one that ends in the number 6031 and the other line that

21  ends in the number 7473.  Okay?

22  **A.**   Okay.

23  **Q.**   If you notice, here, in the upper left-hand corner, there

24  is sort of a grayish triangular structure (indicating).

25            What does that represent?

1   **A.**   The arrow at the bottom, or in the middle, to the left,

2   that is the AT&T service that comes in.  That grayish structure

3   that you're referring to is the "D" mark, also the point where

4   all the telephone lines for the South Bend Police Department,

5   for the years as indicated, 2010-2012, come in and then proceed

6   to the rest of the department.

7   **Q.**   Okay.  So this represents all the phone lines coming into

8   the department, and they are distributed in what you have

9   termed here the "South Bend Police Department AT&T Rack"?

10  **A.**   Correct.

11  **Q.**   Now, you've got a red line here coming out of the bottom

12  and a blue line at the top (indicating).  Please describe what

13  those are.

14  **A.**   The red line indicates a recorded line corresponding to

15  phone number 6031 and the blue line indicates a non-recorded

16  line also referring to telephone number 7473.

17  **Q.**   Okay.  Now, let's first follow the red line.  You mentioned

18  it's a recorded line.  It comes off here and then splits into

19  two.

20         Why does it split into two?

21  **A.**   When I went and looked to make this diagram, I saw two

22  lines coming off of the port number 521, which is also 6031,

23  one line going to the Voice Logger in the 911 center, and one

24  of the red lines also goes to the office at the other side of

25  the building.

1  **Q.**   Okay.  Now, you've called it the "Voice Logger."  What is

2  the Voice Logger, Mr. Parisi?

3  **A.**   The Voice Logger is basically a server, a computer system,

4  that certain phone lines, to my knowledge, are recorded.

5  **Q.**   All right.  So if we follow the outermost red line, it runs

6  across the top through what you call a "punch block."

7          What's a punch block?  Just tell me what that is in

8  general layman's terms.

9  **A.**   A punch-down block is basically a block where wires come

10 into one side, and then another set of wires go out and go to a

11 different location, so basically a jumper block.

12 **Q.**   After it goes through this punch block, you've got it

13 running over into here (indicating).  What's that?

14 **A.**   That's the Voice Logger server.

15 **Q.**   So the wire that would result in 6031 being recorded starts

16 at the location where the lines first come into the police

17 department; is that correct?

18 **A.**   Correct.

19 **Q.**   What is that location?  Where is that located in the police

20 department?

21 **A.**   That's located on the west side of the building in a switch

22 closet, a room.

23 **Q.**   What do you call that switch closet?

24 **A.**   We refer to it as switch closet A or IDF-A.

25 **Q.**   Okay.  Let's quickly look at this blue line (indicating).

1   Trace that for me.  Where does that go?

2   **A.**   That blue lines goes from port 203 in that SBPD AT&T rack

3   to a punch-down block in the same room, and then, from there,

4   goes to switch closet C, also referred to as IDF-C, and that

5   switch closet C is on the east side of the building.

6   **Q.**   Now, I noticed that you've got the red line, another red

7   line, following that exact same path.  Explain that to me.

8   **A.**   Correct.  The other red line goes to the punch-down

9   block that was --

10   **Q.**   (Indicating.)

11   **A.**   -- correct, right there, and then proceeds to go to switch

12   closet C from switch closet A.

13   **Q.**   All right.  So you've got both lines coming into switch

14   closet C, and then they loop down to the bottom.  Why do they

15   do that, Mr. Parisi?

16   **A.**   The top part of the rack is where all the lines from the

17   west side of the building come in through the ceiling and go

18   into the different switch closets.  That is the top portion.

19   The bottom portion of that panel is the setup ports that go to

20   the individual offices.  To make that connection from the top

21   portion to the bottom portion, you need a jumper wire to do so.

22   **Q.**   Okay.  And does that picture fairly and accurately

23   represent what that would look like on the back side of that

24   panel (indicating)?

25   **A.**   Yes.

1   **Q.** And that is part of Group Exhibit 35.

2         Okay.  And just let's complete these lines,

3   Mr. Parisi, how they run here to the bottom.  What happens to

4   those lines there (indicating)?

5   **A.** Based on the ports that they're plugged into, the blue line

6   would then go from switch closet C through the ceiling to

7   office C156, corresponding with the phone number 7473, and the

8   red line would go to C157, corresponding with the phone number

9   6031.

10  **Q.** Okay.  And it's undisputed in this case that there was a

11  time that Steve Richmond occupied office C156 and Rick Bishop

12  occupied office C157 with those respective numbers.

13        Now, who in the South Bend Police Department, to

14  your knowledge, was capable of performing the following task:

15  We want to take phone number 7473 and now have it be used in

16  office C157?  Who knew how to do that?

17  **A.** Barb Holleman usually took care of it, but I also had

18  knowledge of how to do that.

19  **Q.** Okay.  Did you ever talk to Barb about those tasks and how

20  they're accomplished?

21  **A.** Yes.

22  **Q.** What would be the easiest way to do that if you wanted to

23  make that change?

24  **A.** The easiest way would be in switch closet C, providing that

25  they were on the same side of the building.  If we were talking

PARISI - DIRECT EXAMINATION

1  about these two offices (indicating), there's two ways.  One

2  would be to switch the wires at the top portion of panel 1 up

3  there --

4  **Q.**  (Indicating.)

5  **A.**  -- yes, or at the bottom location of IDF-C panel 1.

6  Switching those wires in one of those places would result in

7  the phone number being switched.

8  **Q.**  Now, if you just trade them in their ports, what would

9  happen to the phone numbers relative to offices 156 and 157?

10 **A.**  If you traded them in their ports, the phone numbers would

11 switch offices.

12 **Q.**  And an additional photograph from Exhibit 35.

13         MR. SULLIVAN:  Is that right, Ryan, 35?

14         MR. MILLIGAN:  Yes.

15 BY MR. SULLIVAN:

16 **Q.**  Is this a photograph that fairly and accurately depicts

17 those jumper wires as they come off at the bottom part of panel

18 IDF-C?

19 **A.**  Yes, it is.

20 **Q.**  Okay.  Did you actually look at these numbers here and

21 track what offices they go to; that is, the number 1-1-43 and

22 1-1-46?

23 **A.**  Yes, I did.

24 **Q.**  All right.  And so, again, looking at this photograph,

25 Mr. Parisi, are you saying, literally, if I just unplug those

1    and switch the wires, it would result in the phone numbers

2    switching offices (indicating)?

3    **A.**   Yes.

4    **Q.**   And now if I took one of those and put it in 44 or 45,

5    where would it go?

6    **A.**   It would go to a different office or cubicle in the

7    department corresponding with those numbers.

8    **Q.**   All right.  So if somebody performed that task because

9    Steve Richmond wanted to have his number to follow him to

10   office C157 -- I'm now showing you a demonstrative exhibit --

11          MR. SULLIVAN:  Ryan, if you could, tell me which one

12   the after picture is.

13          MR. MILLIGAN:  It's part of 36.

14   BY MR. SULLIVAN:

15   **Q.**   Part of 36, second page of 36.

16          Does this fairly and accurately depict where the

17   wires would be after performing such a switch?

18   **A.**   Yes.

19   **Q.**   Okay.  Now, let's talk about how this affects the Voice

20   Logger.

21          I noticed that you bracketed everything on the top

22   half by sort of an orange-ish line there.  Why did you do that?

23   **A.**   I did that to indicate that -- to indicate that nothing was

24   changed in that part when the phone numbers were switched when

25   they switched -- when they switched offices.  There was nothing

 1   from that point back that changed.  It all remained the same.

 2   **Q.**  All right.  The change involving these plugs down here,

 3   that I'm indicating at the bottom part of IDF-C panel 1, would

 4   result in the numbers being directed to different offices over

 5   here (indicating); is that what you're saying?

 6   **A.**  Yes.

 7   **Q.**  And I notice that you still have the same red line that

 8   runs right into the Voice Logger; is that correct?

 9   **A.**  Yes.

10   **Q.**  Making this change here doesn't do anything to the change

11   at the top part in the AT&T rack and the Voice Logger; do I

12   have that right?

13   **A.**  Right.

14   **Q.**  Now, what would that result in, in terms of which line was

15   being recorded by the Voice Logger?

16   **A.**  Are you -- could you repeat the question?

17   **Q.**  Sure.  When you make this change down here but don't make

18   any change up there (indicating), which telephone line and

19   number would be recorded by the Voice Logger?

20   **A.**  It would still be 6031.

21   **Q.**  And which office would it be in?

22   **A.**  On that diagram, it would be in C156.

23   **Q.**  Okay.  You read the deposition of Barb Holleman?

24   **A.**  I did.

25   **Q.**  And is it your view that that's how she performed the

PARISI - CROSS-EXAMINATION

1   switch, as you've described it to us?

2   **A.**   Yes.

3   **Q.**   So if I can, Mr. Parisi, the wiring to the Voice Logger is

4   upstream, so to speak, from the wiring that changed and

5   redirected the line to the office; is that fair?

6   **A.**   Yes.

7            MR. SULLIVAN:  No further questions, Your Honor.

8            THE COURT:  Mr. Walton.

9                          CROSS-EXAMINATION

10  BY MR. WALTON:

11  **Q.**   Good morning, Mr. Parisi.

12  **A.**   Good morning.

13  **Q.**   You're not offering any testimony of your own personal

14  knowledge of what happened in this case, are you?

15  **A.**   No.

16  **Q.**   And you're not offering any testimony of your own personal

17  knowledge of the timing of the recordings or when they were

18  going to be recorded or any of that sort of thing?

19  **A.**   No.

20  **Q.**   You were not personally involved in the decisions regarding

21  making recordings at the department when they were made by

22  Chief Fautz?

23  **A.**   No.

24  **Q.**   Or Chief Boykins?

25  **A.**   No.

1  **Q.**   Okay.  And you weren't personally involved in any of the

2  changes that may have occurred from 2004 to the dates

3  applicable to this case?

4  **A.**   No.

5  **Q.**   That was Barb Holleman?

6  **A.**   Yes.

7  **Q.**   Is the recording system, then, a component part of the

8  telephone system at the South Bend Police Department?

9  **A.**   Are you asking about the Voice Logger?

10 **Q.**   Yes.

11 **A.**   Yes.

12 **Q.**   Okay.  Who was the service provider of the recording

13 system?

14 **A.**   I don't know.

15 **Q.**   But the City was responsible for maintaining the recording

16 system, were they not?

17 **A.**   I assume so, but I can't say for certain.

18 **Q.**   Fair enough.

19          Was it common practice, when you were there, for

20 officers who previously had their number follow them to a new

21 office?

22 **A.**   Yes.

23 **Q.**   And was it Barb Holleman's duty to follow the directions of

24 Chief Richmond at the time when he was chief of the

25 Investigative Bureau?

1           MR. SULLIVAN:  Objection.  Lack of foundation,

2     Your Honor, and beyond the scope.

3           THE COURT:  I'm going to overrule it at this point.

4     BY MR. WALTON:

5     **Q.**  Based on your experience, when Barb Holleman -- was it her

6     duty to follow the directions of Chief Richmond when she was

7     asked to switch his old number into his office?

8     **A.**  I don't know.

9     **Q.**  Based on your experience, would that have been in the

10    ordinary course of her duties at the department when she was

11    there?

12          MR. SULLIVAN:  Objection.  No foundation.

13          THE COURT:  Do you know?

14          THE WITNESS:  I don't.

15          MR. WALTON:  All right.  Okay.  Thanks.  That's all

16    the questions I have.

17          THE COURT:  Mr. Pfeifer.

18                       CROSS-EXAMINATION

19    BY MR. PFEIFER:

20    **Q.**  The Voice Logger system was limited in terms of the number

21    of phone lines that could be recorded; is that true?

22    **A.**  I don't know.  I didn't really do anything with the

23    software.

24    **Q.**  Okay.  Not every phone line at the South Bend Police

25    Department was recorded; is that correct?

 1   **A.**   I don't know.

 2   **Q.**   Okay.  Fair enough.

 3            MR. PFEIFER:  Thank you.

 4            THE COURT:  Redirect?

 5            MR. SULLIVAN:  No, Your Honor.  Nothing further.

 6            THE COURT:  Okay.  Is this witness excused?

 7            MR. SULLIVAN:  Yes, Your Honor.

 8            THE COURT:  Thank you very much.

 9            MR. SULLIVAN:  Now we will call Diana Scott.

10            THE COURT:  Ms. Scott, this way (indicating).  When

11   you get there, turn and face the courtroom deputy, and he will

12   place you under oath.

13            (The witness was duly sworn.)

14            THE COURT:  You can be seated.

15            MR. SULLIVAN:  Your Honor, a little housekeeping

16   matter.

17            We talked about the agreed submission of the

18   deposition of Barb Holleman, and I just wanted to make sure

19   that the Court has -- Scott, did we give those to you yet?

20            THE CLERK:  No.

21            MR. SULLIVAN:  We would like to do that now to make

22   sure they're in evidence.

23            May I approach, Your Honor?

24            THE COURT:  Yes, you may.

25            (Deposition of Barb Holleman tendered to the Court.)

SCOTT - DIRECT EXAMINATION

```
 1                      DIANA SCOTT,
 2   having been duly sworn, was examined, and testified as follows:
 3                   DIRECT EXAMINATION
 4   BY MR. SULLIVAN:
 5   Q.   Good morning, Ms. Scott.
 6   A.   Good morning.
 7   Q.   How are you today?
 8   A.   Great.
 9   Q.   Okay.  What's your current position with the South Bend
10   Police Department?
11   A.   I'm the director of communications for the South Bend
12   Police Department.
13   Q.   And how long have you held that position?
14   A.   Since April of 2012.
15   Q.   What position did you hold prior to that?
16   A.   I was the assistant director of communications.
17   Q.   How long were you the assistant director?
18   A.   From 2006 until April of 2012.
19   Q.   Okay.  What did you do before that, before you were the
20   assistant director?
21   A.   I was a supervisor in the communications center.
22   Q.   How long were you a supervisor?
23   A.   Oh, approximately three years.
24   Q.   And before that?
25   A.   I was a dispatcher.
```

SCOTT - DIRECT EXAMINATION

1   **Q.**   When did you start as a dispatcher?

2   **A.**   May the 5th, 1999.

3   **Q.**   Have you been with the police department since 1999?

4   **A.**   Yes, I have.

5   **Q.**   And are those all the positions you've held with the

6   South Bend Police Department?

7   **A.**   That's correct.

8   **Q.**   Did you receive any training to be a dispatcher?

9   **A.**   Yes.

10   **Q.**   Describe what that training was.

11   **A.**   When I was a new dispatcher, we went through a small --

12   several of us in the classroom to learn how to use the software

13   programs that are used at the dispatch center.  We then did

14   one-on-one training with other dispatchers that were assigned

15   training officers, and then several certifications and

16   trainings to maintain skill level, such as emergency medical

17   dispatch, fire communications, et cetera.

18   **Q.**   How about when you were promoted as a supervisor; did you

19   receive training at that time?

20   **A.**   Yes.

21   **Q.**   Describe that.

22   **A.**   That was one-on-one training with other supervisors that

23   showed us the things that we had -- the duties that were

24   assigned to us, how to do those.  Karen worked with us, as

25   well.

1   **Q.**   By "Karen," who are you referring to?

2   **A.**   Karen DePaepe.

3   **Q.**   Thank you.  What were the differences in your job in being

4   a dispatcher versus being a supervisor?

5   **A.**   Being a supervisor, you're responsible for the day-to-day

6   operations of the shift that you're managing, which would

7   include staffing, scheduling, overtime, overseeing the

8   incidents that are going on as far as the dispatch protocols,

9   making sure that the dispatchers are getting dispatches out in

10  a timely manner, that calls are handled correctly, and that we

11  address all the needs of the citizens and responders that we're

12  responsible for.

13  **Q.**   Okay.  Now, as you were promoted to assistant director, did

14  you also receive training upon that promotion?

15  **A.**   Yes, I did.

16  **Q.**   Describe that.

17  **A.**   I had one-on-one training with then assistant director Pam

18  Kaufman, as well as training from Karen DePaepe.

19  **Q.**   During that training, were you -- did you learn about

20  what's been called the Voice Logger recording system?

21  **A.**   Yes.  That began when I became a supervisor.

22  **Q.**   Did you receive additional training when you became

23  assistant director?

24  **A.**   No.

25  **Q.**   What you knew as supervisor you just continued to use as

1   assistant director?

2   **A.**   Correct.

3   **Q.**   And through the course of being a supervisor and assistant

4   director, were you informed about the operations of the

5   communications center in general?

6   **A.**   Yes.

7   **Q.**   Did you learn the procedures and routines of the

8   communications center?

9   **A.**   Yes.

10   **Q.**   Who did you learn that from?

11   **A.**   I learned from other supervisors, from the assistant

12   director, and from Karen DePaepe.

13   **Q.**   In all that training as a supervisor and as assistant

14   director, was there a manual of some kind that you received for

15   that training?

16   **A.**   No.

17   **Q.**   Were there any written policies that you received that

18   applied to the communications center?

19   **A.**   Yes.

20   **Q.**   What policies did you receive?

21   **A.**   They were generalistic policies that had to do with

22   attendance and time and dispatching of certain types of calls.

23   **Q.**   Did any of those policies have anything to do with what

24   lines should be recorded?

25   **A.**   No.

1   **Q.**   With the procedure to put a line into the communications

2   system?

3   **A.**   No.

4   **Q.**   What about the procedure to remove it from the

5   communications system?

6   **A.**   No.

7   **Q.**   And, again, focusing on your training to be the assistant

8   director, anything that you received in writing during that

9   training process?

10  **A.**   No.

11  **Q.**   I apologize if I asked you this already.

12         Who was responsible for training you to be the

13  assistant director?

14  **A.**   Then assistant director Pam Kaufman and Karen DePaepe.

15  **Q.**   Okay.  I'm going to ask you to focus now on your time as

16  assistant director.

17         What were your duties?

18  **A.**   As assistant director, I was responsible for the training

19  of new dispatchers that were hired, as well as ongoing training

20  of the current dispatchers, maintaining their certifications.

21  I was responsible for quality control audits that are mandated

22  and required.  I filled in as a supervisor on the floor.

23  **Q.**   Did you train anybody else as an assistant director besides

24  the dispatchers in the communications center?

25  **A.**   Yes, I did.

1   **Q.**   Who else?

2   **A.**   The front desk personnel.

3   **Q.**   By "front desk," at the police department?

4   **A.**   Correct.

5   **Q.**   When did you begin to take that role?

6   **A.**   As best I can remember, sometime around 2008, 2009, we were

7   asked to take on the managing of the front desk, so that's when

8   they would have been.

9   **Q.**   By "we," you mean the communications administrative

10  personnel in the communications center?

11  **A.**   Correct.

12  **Q.**   So the front desk people at the police department became

13  the responsibility of the communications center; do I have that

14  right?

15  **A.**   Yes.

16  **Q.**   Okay.  When you trained front desk and dispatchers, did you

17  talk to them about the recorded lines in the police department?

18  **A.**   Yes.

19  **Q.**   Describe for me how you trained them on that issue.

20  **A.**   Both front desk and communications?

21  **Q.**   Yes.

22  **A.**   The communications center personnel were given a manual,

23  and there was some information in there as to recordings of

24  lines in the communications center.  We also discussed that as

25  part of our training, what lines were recorded and that there

SCOTT - DIRECT EXAMINATION

1    was a line that was available to them to use that was not

2    recorded.  A phone, I should say, that was available to them.

3              The front desk personnel, we just -- everything was

4    verbal.  There was no training manual for them, so they were

5    informed that the lines were recorded, all of them, and that

6    they should not have personal conversations on those lines.

7    **Q.**  And by "all of them," you mean all the lines where?

8    **A.**  At the front desk.

9    **Q.**  At the front desk.

10             Did the division chief ever work at the front desk

11   as a regular employee assigned to the front desk?

12   **A.**  Not regularly.

13   **Q.**  What about a captain, say, in the Investigative Division;

14   is that a regular part of the captain's duties, to sit at the

15   front desk?

16   **A.**  Not regularly.

17   **Q.**  Do they participate in the training, in your experience?

18   **A.**  No.

19   **Q.**  You mentioned a training manual when you deal with the

20   dispatchers, right?

21   **A.**  Yes.

22   **Q.**  And you said it had a reference to the recorded phone

23   lines.  Do you recall what that reference said?

24   **A.**  I couldn't tell you exactly what it says.

25   **Q.**  Would looking at that manual help refresh your

 1    recollection?

 2    **A.**   Yes.

 3            MR. SULLIVAN:   Your Honor, may I approach to show

 4    the training manual, which is not in evidence, but for purposes

 5    of refreshing her recollection?

 6            THE COURT:   Yes, you may.

 7            MR. SULLIVAN:   Okay.   This has been provided to both

 8    the parties.

 9    **Q.**   Is that a copy of the training manual that you used when

10    you trained the dispatchers?

11    **A.**   Yes, it is.

12    **Q.**   Do you think you would be able to find the reference that

13    you were referring to?

14    **A.**   I can try.

15    **Q.**   I think you might want to look toward the back.

16    **A.**   Okay.

17    **Q.**   I might have it tabbed.

18    **A.**   Oh.

19    **Q.**   I'm sorry.   I should have directed you there.

20    **A.**   That's okay.   Yes, I see it here.

21    **Q.**   Would you read the sections that you were recalling?

22            THE COURT:   Is there any objection to her reading

23    it?

24            MR. WALTON:   No, Your Honor.

25            MR. PFEIFER:   No, Your Honor.

1   **A.**   "All telephone lines placed from the communications

2   center dispatch" -- telephone calls; excuse me -- "placed from

3   the communication center dispatch floor are recorded and kept

4   on file for a period of three years.  The recorded data is

5   often pulled and used in court as part of evidence to a case.

6   At no time should communication specialists use profane

7   language on recorded lines.  Personal telephone calls on taped

8   lines will not be permitted.  Personal phone calls should be

9   made from the non-taped break room telephone.  Personal phone

10  calls should be made by the employee during their break/lunch

11  time only.  Long distance personal phone calls are not

12  permitted.  Violations are subject to disciplinary actions.

13  This does not include the receipt of emergency calls.  Should

14  you receive a family or personal emergency call, you may take

15  the call immediately from the dispatch floor.  If you have a

16  personal emergency, notify your supervisor immediately and

17  arrangements will be made to relieve you from your duties.

18  Cell phones are not permitted on the dispatch floor and should

19  be turned off while you are working."

20          MR. SULLIVAN:  May I approach, Your Honor?

21          THE COURT:  Yes, you may.

22  BY MR. SULLIVAN:

23  **Q.**   Okay.  Thank you, Ms. Scott.

24          Now, that provision that you just read was never

25  given to the personnel at the front desk, as I understand from

1    your earlier testimony?

2    **A.**   That's correct.

3    **Q.**   You didn't have a training manual like that for the

4    South Bend Police Department personnel at the front desk?

5    **A.**   Correct.

6    **Q.**   You gave an oral description of the front desk lines?

7    **A.**   Yes.

8    **Q.**   Did you ever see any such written description about the

9    phone lines at the police department for anything other than

10   the dispatchers in all your years at the South Bend Police

11   Department?

12   **A.**   No.

13   **Q.**   Did you ever do training with the dispatchers or the front

14   desk people about the Wiretap Act?

15   **A.**   No, I did not.

16   **Q.**   Did anybody ever train you on it?

17   **A.**   No.

18            MR. SULLIVAN:  Your Honor, I would like to approach

19   and hand her Exhibit 6.  Maybe we could get an exhibit binder.

20   Can we just leave an exhibit binder up at the witness table,

21   Your Honor?

22            THE COURT:  Anybody got a problem with that?

23            MR. PFEIFER:  That's fine, Your Honor.

24            MR. WALTON:  No, Your Honor.

25            THE COURT:  Okay.

1              MR. SULLIVAN:  Okay.

2              (Exhibit binder tendered to the witness.)

3              MR. SULLIVAN:  Just one moment, Your Honor.

4    **Q.**  Ms. Scott, would you refer to Exhibit 20, please.

5    **A.**  (Witness complies.)

6    **Q.**  Just to make sure we're on the same thing, is that the

7    police department telephone and voicemail list?

8    **A.**  Yes, it is.

9    **Q.**  Have you seen that before?

10   **A.**  I have.

11   **Q.**  How did you come to see a list like this?

12   **A.**  We were e-mailed them from time to time, updated voicemail

13   lists from the chief's secretary.

14   **Q.**  And who was the chief's secretary?

15   **A.**  At that time, it was Barb Holleman.

16   **Q.**  If you would look at the last page, on the very last entry

17   on the bottom of the right-hand column, it says "7/23/09 bh."

18              Do you see that?

19   **A.**  I do.

20   **Q.**  Do you know what that refers to?

21   **A.**  That this list was updated on 7/23 of 2009 by Barb

22   Holleman.

23   **Q.**  Now, there was some discussion before about the number

24   of -- the number of lines that the Voice Logger can record

25   versus the number of lines in the police department.

SCOTT - DIRECT EXAMINATION

1          Do you know how many lines the Voice Logger can

2     record?

3     **A.**   I don't know the exact count.

4     **Q.**   Can you give us an estimate?

5     **A.**   I would say 60 to 70, possibly.

6     **Q.**   Do you have an estimate on the number of what we'll call

7     assigned telephone numbers, based on looking at Exhibit 20,

8     that exist in the South Bend Police Department?

9     **A.**   Well over a hundred.

10    **Q.**   Okay.  Now, I notice that you've got all the last names,

11    first names, and then it has a voicemail number and a telephone

12    number.

13          Do you know why there's two different things there?

14    **A.**   Some officers, such as a uniform patrol officer that

15    doesn't have a specific office within the police department,

16    would only have a voicemail.  So when you see a reference to

17    235-5888, that's the general voicemail box for the police

18    department and then their voicemail number, so that would be

19    how messages would be left for those.

20    **Q.**   Okay.  So do I take it that -- let's look at the very first

21    one, Alma Alvarez, as an example.  It's 235-5888 for Alma

22    Alvarez.

23          In looking at this, would you assume that that's a

24    uniform patrol officer?

25    **A.**   She is.

1   **Q.**   And she does not have an individually assigned telephone to

2   her in the South Bend Police Department?

3   **A.**   That's correct.

4   **Q.**   She would share that number with other police officers?

5   **A.**   Correct.

6   **Q.**   But she would have a voicemail box for people to leave

7   messages for her?

8   **A.**   Correct.

9   **Q.**   Is that what the 2000 indicates there?

10  **A.**   Yes.

11  **Q.**   So I assume, like so many of us have experienced, if you

12  call in, it's menu driven?

13  **A.**   Correct.

14  **Q.**   Are you on this list, Ms. Scott?

15  **A.**   I don't know.  I would have to look.

16  **Q.**   Okay.  I think, if you look on the second-to-last-page --

17  **A.**   Yes, I am.

18  **Q.**   Does that mean that you have a line assigned to your name?

19  **A.**   I have a line assigned to my name; however, it's not

20  reflected on this list other than the voicemail number.  That

21  was my assigned line.

22  **Q.**   I'm not sure I know what you mean.

23  **A.**   Well, the number that's listed next to me, the 235-9361, is

24  the general number to the communications center.  I had an

25  assigned phone, and that number was 235-9119.

1    **Q.**  And that's shown as the voicemail number, too?

2    **A.**  It's 235-9119.

3    **Q.**  So if someone were to dial 235-9119, who would they get on

4    the other line if you were in your office?

5    **A.**  In 2009, they would have gotten me.

6    **Q.**  I think, if you look on that same page, you will see Steve

7    Richmond's name up above as you move up.

8    **A.**  Yes.

9    **Q.**  And what is his number?

10   **A.**  235-7473.

11   **Q.**  And his voicemail box is the same number?

12   **A.**  Correct.

13   **Q.**  Does that indicate to you that he had a private assigned

14   line?

15   **A.**  Yes.

16   **Q.**  And I would like you to do the same thing and look for

17   Brian Young.

18   **A.**  Okay.

19   **Q.**  What number does he have?

20   **A.**  235-5016.

21   **Q.**  And what's his voicemail number?

22   **A.**  5016.

23   **Q.**  What does that tell you about whether he had a phone and

24   phone line assigned to him?

25   **A.**  I would assume that he had that phone assigned to him.

1   **Q.**   Finally, if you would look up Richard Bishop.

2   **A.**   Okay.

3   **Q.**   What is his number?

4   **A.**   245-6031.

5   **Q.**   And his voicemail number?

6   **A.**   6031.

7   **Q.**   And at the time this list was compiled in 2009, do you know

8   what position he held?

9   **A.**   I do not.

10  **Q.**   Okay.  Let's talk about this thing we've called the "Voice

11  Logger."

12          Does it have a real name?

13  **A.**   Yes.  It's the Dynamic Instruments Digital Voice Recorder.

14  **Q.**   The Dynamic Instruments Digital Voice Recorder that you use

15  now, or the Voice Logger, when was it installed?

16  **A.**   In 2004, I believe.

17  **Q.**   2004?

18  **A.**   I believe.

19  **Q.**   And since 2004, have you changed the machine at all?  Have

20  you replaced it?

21  **A.**   No, it's the same machine.

22  **Q.**   Same one.

23          When you installed that machine -- can we just call

24  it the Voice Logger?  Is that what people refer --

25  **A.**   Yes.

1   **Q.**   Okay.  That would probably be easier.

2          When that Voice Logger was installed, did the police

3   department gain capability for recording additional lines?

4   **A.**   Yes.

5   **Q.**   Do you know how many?

6   **A.**   I don't.

7   **Q.**   I'd like you to tell me how the system works.  Describe for

8   the Court how the system works.

9   **A.**   The system is voice activated, meaning that anything that

10  is wired into it, once voice or noise is heard, it activates

11  that recording.  It lays dormant, I guess, so to speak -- it

12  doesn't record dead air, is a better phrase -- but it then

13  records anything that comes across that line that is recorded.

14  **Q.**   If the line is hooked into it?

15  **A.**   Correct, anything that is hooked into the Voice Logger.

16  **Q.**   All right.  Why does the Police Department have such a

17  system?

18  **A.**   We're often called upon for court cases, criminal matters,

19  to provide 911 recordings.  We are also required to do quality

20  assurance checks for our emergency medical dispatch, as well as

21  for other types of calls that we take to make sure that the

22  dispatchers and personnel are adhering to our policies and the

23  procedures that we have.  We do them to investigate complaints,

24  as well as requests from investigators.

25  **Q.**   Does that cover it?

1    **A.**   Pretty much.

2    **Q.**   Okay.  And what are the lines that are recorded in the

3    South Bend Police Department?

4            And let's -- we'll use the July 2009 date that was

5    on that Exhibit 20 as a reference point.

6            Do you know what was recorded in July of 2009?

7    **A.**   I could give you my best guess, but it probably wouldn't be

8    a complete list.

9    **Q.**   Let's start with this:  Are there some lines that you know

10   were recorded at that time --

11   **A.**   Yes.

12   **Q.**   -- and others that you don't know?

13   **A.**   Correct.

14   **Q.**   What did you know?

15   **A.**   I know that all of the positions within the communications

16   center were recorded.  All of the --

17   **Q.**   Let me back you up right there.

18           When you say "positions," what do you mean?

19   **A.**   Positions are different than a line.  Things are recorded

20   differently that come from the communications center, in that

21   there are many lines that go into our 911 phone equipment, and

22   so it is not recorded based on a phone number or a phone line,

23   per se, but a line that runs from that particular position

24   within our communications center to the Voice Logger, so there

25   are many lines that lie on each one of those positions.

SCOTT - DIRECT EXAMINATION

1    **Q.**   Okay.  So every position in the dispatch center -- which

2    might have multiple lines coming in from radio traffic or the

3    fire department, et cetera, right -- but every position in the

4    dispatch room is recorded?

5    **A.**   The radio is a little different.  That's wired in

6    differently.  But everything that is on -- and contained on --

7    that 911 phone, runs on one line into the Voice Logger that is

8    identified by the position.

9    **Q.**   Okay.  What else did you know in 2009 that was recorded?

10   **A.**   I knew the front desk was recorded.

11   **Q.**   When you say "the front desk," there are telephones there?

12   **A.**   Yes.

13   **Q.**   And there are several lines so that if two people call in

14   at the same time it rolls down?

15   **A.**   That's correct.

16   **Q.**   Other than the front desk and 911, what else did you know

17   that was recorded?

18   **A.**   Nothing.

19   **Q.**   Okay.  You didn't know the specific lines, but did you know

20   there were other lines that were recorded?  Were you aware of

21   the fact that there were other lines recorded; you just didn't

22   know what those lines were?

23   **A.**   Yes.

24   **Q.**   Why didn't you know what those lines were?

25   **A.**   Those were not anything that would have affected my duties

 1    or anything that I would have been involved with.

 2    **Q.**  Who handled those lines?

 3    **A.**  Karen DePaepe.

 4    **Q.**  And did she ever talk to you in general about what those

 5    lines were?

 6    **A.**  Yes.

 7    **Q.**  And in general, what was your awareness about what those

 8    other lines were that you didn't deal with as an assistant

 9    director in 2009?

10    **A.**  I knew there were lines that went to the chief's offices,

11    Internal Affairs, but didn't know specifically what lines were

12    recorded.

13    **Q.**  I take it, since you didn't know, you never saw any writing

14    in the 2009 timeframe that indicated what those lines were; is

15    that correct?

16    **A.**  No, I did not.

17    **Q.**  And did the communications department have any routine in

18    regard to what those other lines would be?

19    **A.**  Not to my knowledge.

20    **Q.**  How did Karen know what they should be?

21    **A.**  Karen was directed by the chief as to what would be

22    recorded.

23    **Q.**  Now, I was asking you to frame your questions around 2009,

24    but now I want to ask you:  Did you ever see a complete list of

25    the recorded telephones lines in the South Bend Police

1    Department?

2    **A.**    Yes, I did.

3    **Q.**    When?

4    **A.**    Around October of -- October 12th of 2011.

5    **Q.**    What were the circumstances in which you received a list

6    for the recorded telephones lines?

7    **A.**    It was for a meeting that I was in concerning the

8    conversion of the police phones from the Centrex lines to a

9    VoIP system.

10   **Q.**    What do you mean by "VoIP"?

11   **A.**    Voice over Internet Protocol phone systems.

12   **Q.**    In keeping this on about an eighth grade level for me, can

13   you tell me what's the difference between a Centrex phone and a

14   VoIP phone?

15   **A.**    A Centrex, a traditional phone, goes over a phone line, a

16   phone wire, where Voice over Internet phones go over an

17   Internet connection.

18   **Q.**    Okay.  So the City was switching from one system to

19   another?

20   **A.**    That's correct.

21   **Q.**    The police department had to be part of that switch?

22   **A.**    The police department, with the exception of the

23   communications center.

24   **Q.**    So the communications center wasn't going to go to VoIP?

25   **A.**    Correct.

1    **Q.**  And the meeting you participated in was to discuss that

2    changeover?

3    **A.**  Correct.

4    **Q.**  Just to be clear, the changeover didn't happen in October;

5    you were in a meeting about it?

6    **A.**  Correct.

7    **Q.**  So you were telling me that that -- what was it that led

8    you to receive this list for that meeting?

9    **A.**  We needed a list of the recorded lines so that the City

10   Information Technologies -- they were looking at a vendor that

11   could provide us with a recording mechanism for our front desk

12   calls and any other lines that were needed to be recorded at

13   the police department, and so we needed the official list of

14   what was currently recorded, and so that's how I called

15   Karen --

16   **Q.**  -- Karen DePaepe?

17   **A.**  -- Karen DePaepe, and she instructed me how to get on to

18   her computer on the desktop where I located the list.

19   **Q.**  It was Karen's responsibility to keep the list?

20   **A.**  Correct.

21   **Q.**  If you go to Exhibit 9, the second page, if you look at the

22   second, third, and fourth page of Exhibit 9, and just indicate

23   to me when you found that.

24   **A.**  Yes, I have it.

25   **Q.**  Okay.  Is that the list that you've been talking about?

SCOTT - DIRECT EXAMINATION

1   **A.**   Yes.

2   **Q.**   I want to briefly talk about this list.  Let's look at this

3   first page.  Describe for me what these numbers are under the

4   headings "Police, Fire, and Direct Ring-Down Lines."

5   **A.**   The lines that are listed under "Police" are all lines that

6   ring into our communications center.  The ones under "Fire," as

7   well, ring into our communications center, as well as the

8   "Direct Ring-Down Lines."

9   **Q.**   What does that mean, to have a direct ring-down line?

10  **A.**   That's a direct connection between your physical location

11  and another location.  You pick it up, and it automatically

12  rings on a dedicated phone at that location.

13  **Q.**   So that covers the first page.

14          All of these conversations that occurred on these

15  lines, did the communications department record these?

16  **A.**   Yes.  They were the ones that would have been on those

17  positions that we talked about earlier.

18  **Q.**   And, therefore, anybody who used the phones and the lines

19  that are represented on this first page -- I'm sorry -- the

20  second page of Exhibit 9, the people who used those would have

21  gone through the training that you conducted; is that correct?

22  **A.**   Correct.  There may have occasionally been an officer that

23  walked in and used a line, but --

24  **Q.**   But in the normal course --

25  **A.**   Normal course, no.  It would have all been our personnel.

1   **Q.**   And those would be called the dispatchers, right?

2   **A.**   Correct.

3   **Q.**   And they were the ones who would have received that

4   training manual that we looked at earlier?

5   **A.**   Yes.

6   **Q.**   Go to the next page, now the third page of Exhibit 9.

7   **A.**   (Witness complies.)

8   **Q.**   And the heading is "Administrative Phones."

9          What does it mean to say the "administrative

10   phones"?

11   **A.**   The heading means lines that are located outside of the

12   communications center.

13   **Q.**   And the first batch of them all say "Front Desk."

14   **A.**   Yes.

15   **Q.**   I assume that's the front desk of the police department

16   that we talked about earlier?

17   **A.**   Correct.

18   **Q.**   You did training of the people at the front desk?

19   **A.**   Correct.

20   **Q.**   These are the folks that did not receive the manual?

21   **A.**   That is correct.

22   **Q.**   But you talked to them about the fact that all the front

23   desk lines are recorded?

24   **A.**   The ones that I trained, yes.

25   **Q.**   The ones that you trained, right?

1    **A.**   Correct.

2    **Q.**   Do you have any doubt that anybody who trained people on

3    the front desk would mention that they're recorded?

4    **A.**   No, I'm certain everyone knew.

5    **Q.**   That was a regular part of how the communications center

6    trained the front desk personnel?

7    **A.**   That's correct.

8    **Q.**   Now we have a series of other numbers, and I'll just

9    mention the groups:  Internal Affairs, Chief's Office, Records,

10   Records Director, Detective Bureau numbers; is that right?

11   **A.**   Correct.

12   **Q.**   Are these the numbers you mentioned earlier that you didn't

13   have anything to do with as assistant director?

14   **A.**   That's correct.

15   **Q.**   But you came to learn that these were the numbers recorded

16   when you received this list?

17   **A.**   Yes.  I learned about some of them prior to that when Karen

18   gave me access when she went on her medical leave.

19   **Q.**   When did she go on medical leave?

20   **A.**   Around August of 2011.

21   **Q.**   In August of 2011, did you have to fulfill the role and the

22   duties that Karen DePaepe had as director?

23   **A.**   I did.

24   **Q.**   Pursuant to that, you learned about these other

25   administrative numbers?

SCOTT - DIRECT EXAMINATION

```
 1   A.   I learned there were other ones, and I was given access to
 2   them.
 3   Q.   Okay.  August 2011?
 4   A.   Correct.
 5   Q.   And how long did Ms. DePaepe's medical leave last?
 6   A.   I couldn't tell you for certain.  Somewhere close to the
 7   end of October, beginning of November of 2011.
 8   Q.   Thank you.  When you had access to these lines, and you
 9   learned the specific ones, were you surprised by any of them?
10   A.   No.
11   Q.   Had Karen, at least in general terms, discussed with you
12   that there were these other lines?
13   A.   Yes, I knew there were other lines.
14   Q.   But when you stepped into the role of director of
15   communications for Karen DePaepe's medical leave, at that time,
16   did anyone inform you that there was a routine practice with
17   regard to which lines would be recorded?
18            MR. WALTON:  Your Honor, I would like to pose an
19   objection.  This is way outside the scope of where we need to
20   be in October of 2011.
21            MR. SULLIVAN:  Your Honor, can I respond?
22            THE COURT:  Just a second.
23            Go ahead.
24            MR. SULLIVAN:  Your Honor, the relevant testimony
25   here is meant to bring out Ms. Scott's awareness of whether
```

1    there was an ordinary practice in regard to which lines were

2    recorded.  Mr. Walton's objection seems to suggest that the

3    only thing that is relevant is what people knew on the

4    particular days that the recordings in question took place.

5              The fact is, it's probative of whether this

6    operation, the communications center and the police department,

7    had any regular course, and what they were doing in 2011 is

8    probative of what was done generally in the communications

9    center and the police department, so the testimony is directly

10   on point.

11             THE COURT:  Well, the question itself can be

12   answered "yes" or "no."  It asks did she know.

13             The question said:  "...did anyone inform you that

14   there was a routine practice with regard to which lines would

15   be recorded?"

16             That can be answered "yes" or "no."  I will overrule

17   the objection at this point.

18             MR. SULLIVAN:  Thank you.

19             Can I ask that the question be read back so that we

20   know exactly what the question was?

21             THE COURT:  Can you read that back?  I normally

22   don't like that; I like you to restate your question, but

23   anyway.

24             (Record read.)

25   **A.**  Yes.

 1    BY MR. SULLIVAN:

 2    **Q.**   Who did?

 3    **A.**   Karen.

 4    **Q.**   And what did she say?

 5            MR. WALTON:  Your Honor, again, the legality of the

 6    recordings are based upon when they were recorded, and the

 7    facts in this case show that the last time anybody looked at

 8    the recorded lines was July 2011.

 9            We're now talking about what she's learning in

10    October 2011 and later, and the act of recording had already

11    taken place.  I don't know why this is relevant.

12            MR. SULLIVAN:  Actually, I think, Your Honor, what

13    we're talking about is August of 2011.  That's when Karen

14    DePaepe went on medical leave and would have had to instruct

15    the assistant director how to step into her role, and part of

16    that instruction would have been to tell her if there were any

17    procedures regarding recorded lines.  That's the first point.

18    I think we're dealing with August.

19            The second point is that the recordings at issue, we

20    have stipulated as to when the dates of those occurred, and

21    some of them were in July, so barely a month before this

22    meeting took place, and so the communication about what the

23    procedure was or wasn't would be probative on what she had done

24    up to that point.

25            Furthermore, there's undisputed testimony that

SCOTT - DIRECT EXAMINATION

1    Ms. DePaepe then accessed the underlying recordings sometime in

2    December to create cassettes to then give to Chief Boykins, and

3    those actions also are probative and reflect what was the

4    procedure, or not, and what people believed it was and what

5    their actions showed.

6            So I don't see how we can restrict testimony to some

7    arbitrary time when the sole question for the Court to answer

8    is:  Were these recordings created by a law enforcement officer

9    in the performance of their ordinary duties?

10           So the scope, to understand what those duties were,

11   may require testimony at times both before and after when the

12   recordings took place.

13           THE COURT:  Mr. Walton?

14           MR. WALTON:  Your Honor, the only probative value

15   right now would go towards the issue of damages, which has

16   already been resolved in this case.  What she did or didn't do

17   after the recordings that she put on tapes that were recorded

18   in July -- the last one was in July of 2011 -- is irrelevant

19   for the Court's consideration.

20           We're here trying to determine whether or not the

21   system, when it was set up, was set up in accordance with the

22   law and performing in a manner in which it should under the

23   law.

24           We're not here talking about what she did with the

25   tapes.  We're not here about what this witness learned later,

1    in 2011, 2012, or any other time.

2              THE COURT:  I assume this is being offered not for

3    the truth of what she told her but the effect it had on her?

4              MR. SULLIVAN:  Well, first of all, Ms. DePaepe was a

5    party-opponent in these consolidated cases, so --

6              THE COURT:  But she's not now.

7              MR. SULLIVAN:  She's currently not a party, no,

8    Your Honor, but there were statements that she made at the time

9    that would be admissible because they were made as a

10   party-opponent, so it would be an admission against interest or

11   an admission by a party-opponent when the statement was made.

12             But, in addition, they're reflective of this

13   witness' knowledge about what or whether there was an ordinary

14   course, not necessarily the truth of what Karen DePaepe may

15   have said in her statement.

16             And I think, again, it's important, Your Honor, to

17   understand that the ordinary course of conduct is what's at

18   issue here.  And if somebody does "A" all the time and then

19   does not do "A" and then does "A" again, then you can look at

20   all those actions and determine what was regular and what stood

21   out as irregular.

22             Consequently, the need to gain evidence that is

23   longitudinal, that extends over time, is critical to

24   understanding whether actions were taken as part of a regular

25   course or whether those actions were one time ad hoc, whether

SCOTT - DIRECT EXAMINATION

 1   they were extraordinary, or whether they were ordinary.

 2          I don't know how else we can get at that evidence

 3   without showing what people were doing.

 4          THE COURT:  I'm going to permit the question that

 5   was asked to be answered.  In trying to explain why you're

 6   entitled to it, we've kind of gone a ways away, but the

 7   question you asked, I'm going to overrule the objection as to

 8   that question.

 9          MR. SULLIVAN:  Okay.  I'm going to need the question

10   read back again, Your Honor.

11          THE COURT:  If she can find it.

12          COURT REPORTER:  The last question was:  "And what

13   did she say?"  Do you need more context?

14          MR. SULLIVAN:  No, I think I've got it.  I'm sorry.

15          COURT REPORTER:  I can read back more.

16          MR. SULLIVAN:  No, no.  That's fine.

17   **Q.**  Ms. Scott, you had a conversation when you took the role of

18   director -- when you acted in the role as director while Karen

19   went on medical leave and she told you whether there was a

20   regular course.

21          What did she tell you?

22   **A.**  She told me that the recorded lines were decided by the

23   chief of police.

24   **Q.**  Did she tell you anything else about what the standard

25   procedure was?

1   **A.**   No.

2   **Q.**   Stepping into her role as director, acting as director

3   during that period of time, did you feel that you would need to

4   know what the ordinary procedures were in regard to recorded

5   lines?  Did you think that was important for your job?

6   **A.**   I'm not certain I understand what you're asking me.

7   **Q.**   I just want to know if understanding the ordinary course of

8   how the communications department handled recorded lines was

9   something that you needed to know as you stepped in and

10  fulfilled Karen's role as director?

11  **A.**   Yes.

12  **Q.**   Okay.  Prior to when Ms. DePaepe went on medical leave, did

13  you have any understanding about whether all the division

14  chiefs' lines were recorded?

15  **A.**   I knew some were.  I don't know that I knew if all of them

16  were.

17  **Q.**   Okay.  What about whether there were captains, either in

18  the Uniform Division or in the Investigative Division, that

19  were recorded; did you have any understanding about that?

20  **A.**   Nothing specific.

21  **Q.**   Lieutenants?

22  **A.**   No.

23  **Q.**   Sergeants?

24  **A.**   No.

25  **Q.**   At this meeting where Karen prepares you to step into the

1   role as director, she didn't mention any of that?

2   **A.**   No.

3   **Q.**   She didn't tell you there's a regular procedure to record

4   all division chiefs, did she?

5   **A.**   No.

6   **Q.**   She didn't say there's a regular procedure to record all

7   captains?

8   **A.**   No.

9   **Q.**   And she didn't say there's a regular procedure to record

10   all lieutenants or sergeants, right?

11   **A.**   No.

12          MR. SULLIVAN:  Okay.  Your Honor, can we take a

13   five-minute break?

14          MR. PFEIFER:  Or if we can approach the bench?  I

15   have an issue that I need to bring up to the Court.

16          THE COURT:  Let's approach the bench, and I'll see

17   what you're asking for.

18          (At sidebar.)

19          MR. PFEIFER:  Commander Corbett is the director of

20   Metro Homicide, and another officer just came in and has said

21   that there's a homicide that has taken place, so Commander

22   Corbett is going to have to leave, with the Court's permission.

23   I didn't want him to get up and walk out.

24          THE COURT:  No, that's fine.

25          Any problems with that?

```
 1              MR. SULLIVAN:  Did you want to take a break or just
 2  want him to walk out?
 3              MR. PFEIFER:  He can walk out.
 4              THE COURT:  What I'm going to do, I'm going to let
 5  you break.
 6              How much time do you need?
 7              MR. PFEIFER:  Okay.
 8              MR. SULLIVAN:  Five, ten.
 9              THE COURT:  Just like passing a gas station.
10              MR. PFEIFER:  Yes, Your Honor.
11              MR. SULLIVAN:  Yes, that's exactly what we need.
12              MR. PFEIFER:  Thank you.
13              THE COURT:  All right.  We'll do that.
14              (Sidebar concluded.)
15              THE COURT:  All right.  We're going to take a
16  15-minute break and hope it stays around 15 minutes.
17              The Court will be adjourned for 15 minutes.
18              You all don't have to wait for me to get off here to
19  do what you're going to do.
20              (Brief recess taken.)
21              THE COURT:  You can all be seated.
22              MR. PFEIFER:  Judge, consistent with why we took the
23  break, there has been a homicide in this community and
24  Commander Corbett has had to leave.
25              THE COURT:  That's what I understand.  Okay.
```

1              Are you ready?

2              MR. PFEIFER:  Yes, sir.

3              THE COURT:  Everybody ready?

4              MR. WALTON:  Yes, Your Honor.

5              THE COURT:  Go ahead and continue.

6   BY MR. SULLIVAN:

7   **Q.**   Ms. Scott, you're still under oath; you understand that?

8   **A.**   Yes.

9   **Q.**   I want to talk about what the Voice Logger setup is like

10  and how you perform a search on it.  To do that, I'm going to

11  refer you to -- I will put it up on the screen here -- I think

12  it's Exhibit 17.

13             Now, is Exhibit 17 a screen shot, if you will, from

14  the computer terminal that is used to do a search of the

15  telephone conversations recorded by the Voice Logger?

16  **A.**   That's correct.

17  **Q.**   And what we're seeing here is one that you've done as a

18  random example, not part of your regular work; is that correct?

19  **A.**   Correct.

20  **Q.**   Okay.  And just take me through this here.

21             This area here (indicating), where it says "Search

22  From" and "Set Search Minutes," what does that do?  How do you

23  use that when you're trying to find a call to review?

24  **A.**   When I'm looking for a call, I set the search parameter to

25  the day that I'm looking for, and then, usually, if I have an

1    idea of a timeframe, I will, usually, go back about 15 minutes

2    before that timeframe and then I search until about 15 minutes

3    after that timeframe for the "Search To."

4    **Q.**   And that search is for all the calls recorded within the

5    timeframe; do I have that right?

6    **A.**   It would be anything that is selected then on the next

7    columns.

8    **Q.**   (Indicating.)

9    **A.**   Yes.

10   **Q.**   Would you explain what that means, to select in that area

11   of Exhibit 17?

12   **A.**   The ones that are selected are all of the dispatch

13   positions within the 911 call center.

14   **Q.**   And by "selected," you're indicating those checks in the

15   boxes?

16   **A.**   That's correct.

17   **Q.**   Okay.  What are the other unchecked boxes?

18   **A.**   The first column, 1 through 12, are all radio frequencies

19   that are recorded.  In the second column, below "Fire

20   Dispatch," the next block, those are all front desk lines.

21   **Q.**   This would be the screen that you referred to earlier that

22   you as assistant director had access to?

23   **A.**   That's correct.

24   **Q.**   The lines that were the administrative lines that you

25   referred to would not show up for you on the computer screen?

 1   **A.**   That's correct.

 2   **Q.**   Now I want to show you Exhibit 18.

 3          What does Exhibit 18 show us?

 4   **A.**   Those are the search results from that search that I

 5   conducted.

 6   **Q.**   So this would show the date of the recorded call

 7   (indicating)?

 8   **A.**   Correct.

 9   **Q.**   And the time of the recorded call (indicating)?

10   **A.**   Correct.

11   **Q.**   Would this be the channel (indicating)?

12   **A.**   That is the channel on the Voice Logger, yes.

13   **Q.**   This is the length of each call (indicating)?

14   **A.**   In some, there could be more than one call, but that's the

15   duration of the recording.

16   **Q.**   How could you get more than one call in the duration of the

17   recording?

18   **A.**   Because this is a voice activated system, if a call taker

19   or any person who used a phone ended a conversation and then

20   quickly answered another line and there was not a significant

21   interruption in their voice, it would continue on and continue

22   to record, so it's not uncommon for that to occur in a busy 911

23   center.

24   **Q.**   You might get two calls but one recording?

25   **A.**   That's correct.

1    **Q.**   Would you explain to the Court the buttons down here and

2    what this slide bar is (indicating)?

3    **A.**   It's very much just like a tape recorder.  You hit

4    "Play" -- once you've selected, at the top, one of the

5    recordings you want to listen to, you hit the "Play" button,

6    and then that will begin to play that recording.  You can

7    fast-forward, you can reverse, you can pause, or you can stop,

8    and the slide bar then indicates where -- if you look over to

9    the left of the slide bar where it says "Real," it tells you

10   the elapsed time within that recording.

11   **Q.**   Okay.  I want you to focus on one of the duties you

12   mentioned, which was maintenance of the system.

13            Did the system have any problems in the 2010/2011

14   timeframe?

15   **A.**   Yes, it did.

16   **Q.**   Describe those.

17   **A.**   It would crash.

18   **Q.**   So what did it look like when you would come in and see the

19   crash?

20   **A.**   Mostly like what you would see on any normal computer; you

21   might have the blue screen.

22   **Q.**   What did you call it in the communications center?

23   **A.**   The BSOD.

24   **Q.**   Which is the blue screen of death?

25   **A.**   The blue screen of death.

1    **Q.**   That told you what?

2    **A.**   The recording was in a crash -- the logging recording

3    computer was in a crash state, so then, usually, that

4    precipitated having to restart that.

5    **Q.**   After you restarted it, did you have any concerns about the

6    data that you were supposed to capture?

7    **A.**   Absolutely.

8    **Q.**   What were those concerns?

9    **A.**   Whether or not those recordings were captured while that

10   system was crashed.  And from looking at that screen, you could

11   not tell how long the computer had been in that state.  Since

12   that computer doesn't set somewhere where someone looks at it

13   24 hours a day, seven days a week, there could have been some

14   period of time that it sat in that state.

15   **Q.**   What did you do to determine that?

16   **A.**   Once we brought the logging recorder back up, we would then

17   troubleshoot by selecting a time to search from that we knew it

18   was okay.

19           So, for instance, if I knew, when I left at 5:00 on

20   Friday, that it was okay, and now it's Monday when I come in

21   and it's not, I would go back to Friday, prior to 5:00, and

22   search from then on all of the channels that I had access to,

23   and then I would listen to make sure that I had captured usable

24   voice.

25   **Q.**   All right.  So you would click all those boxes?

1  **A.**   That's correct.

2  **Q.**   You could not click the boxes for the administrative lines

3  when you were the assistant director prior to Karen DePaepe's

4  medical leave?

5  **A.**   That's correct.

6  **Q.**   Were you the only person who would perform that search for

7  data recovery?

8  **A.**   No.

9  **Q.**   Who else did?

10  **A.**   There were supervisors who would also have the same access

11  that I did that performed that, as well as if Karen found it in

12  a crash state.

13  **Q.**   All right.  But Karen was the only one who could really

14  search all the lines?

15  **A.**   That's correct.

16  **Q.**   Okay.  So you've got your search, and assume that

17  Exhibit 18 is the result of a search that you performed after a

18  data crash.  Okay?

19  **A.**   Uh-huh.

20  **Q.**   Each one of these rows represents a different recording; is

21  that correct?

22  **A.**   That's correct.

23  **Q.**   One's highlighted.

24          That means that's the one you're listening to?

25  **A.**   Correct.

1   **Q.**   Take me through and describe for the Court what would you

2   do to determine if the data on that particular call that's

3   highlighted was appropriately captured.

4   **A.**   I would hit the "Play" button.

5   **Q.**   And you would be hooked up to headphones?

6   **A.**   A headset, yes.

7   **Q.**   A headset.

8           And what were you listening for?

9   **A.**   Usable voice, voice that was intelligible, not garbled or

10  blank.

11  **Q.**   Obviously, if it was blank, you had a problem.

12          And if you had garbled, would you use the slide bar

13  at all to see if that garbled was throughout the whole

14  conversation?

15  **A.**   I never had any garbled.

16  **Q.**   Okay.  So it was either blank or you had usable voice?

17  **A.**   Correct.

18  **Q.**   How long did you have to listen to determine if you had

19  usable voice?

20  **A.**   I listened for a few seconds.

21  **Q.**   After listening, say, to the highlighted for a few seconds,

22  what did you do next?

23  **A.**   I would check a different time.  I would check several

24  times for each channel of the Voice Logger.  So, for instance,

25  Channel 1, I may search and check one from right after I knew

1    it was okay and then about midway through.

2             So my example I gave of leaving at Friday at 5:00, I

3    may check Friday at 6:00, I might try Saturday around noon, I

4    may try Sunday, and then Monday when I came back to work.

5    **Q.**   You were looking to establish where did I lose data, where

6    do I have data?

7    **A.**   Right, if I had lost anything; and since I had restarted

8    the system, was I now capturing usable data.

9    **Q.**   Okay.  I assume that your search for any reason was done

10   with the same process that you just described?

11   **A.**   Correct.

12   **Q.**   So if a police officer or the prosecutor wants to have some

13   evidence that came in on a 911 line, how does that process

14   start?

15   **A.**   Most of the time, we have a dispatch from our

16   computer-aided dispatch that we're able to pull, and we can

17   look at the specific call taker that took that 911 call, and I

18   can look and see what position they were working and what time

19   and date they entered that call, so then that gives me very

20   specific parameters to search.

21            There are also sometimes -- obviously, if you have

22   an accident at a very prominent intersection at 5:00, you're

23   going to get multiple phone calls.

24            So there are also sometimes, in the notes of the

25   call, indications that another call taker took some information

SCOTT - DIRECT EXAMINATION

1  on that call.  It's not always there, because if the second

2  call taker took information that was the same, obviously we

3  don't have to add another note to that call.

4  **Q.**  Okay.  Let me back you up a little bit from there.

5         I'm asking if somebody comes to you as the assistant

6  director of the communications center, like somebody from the

7  prosecutor's office, and says, "I need some evidence on a

8  call," do they just come by orally and ask for that or is there

9  a form they have to fill out?  How does the process start?

10  **A.**  There is a form that they have to fill out.

11  **Q.**  What does that form indicate?

12  **A.**  It indicates their name, their contact information, what

13  specifically they want, if they want 911 information, if they

14  want radio recordings, if they want administrative, such as the

15  front desk, and case number, incident number, date and time.

16  **Q.**  Okay.  And that request form then drives your search; is

17  that correct?  So as you look at that, that will tell you what

18  you're looking for?

19  **A.**  It will give me some general information to start.  Then I

20  take that information and plug it into our computer-aided

21  dispatch system to then actually pull the call for service.

22  **Q.**  Sometimes you might have to listen to more than one call to

23  figure out if it's what someone has asked for?

24  **A.**  That's correct.

25  **Q.**  When you do that, do you ever utilize that slide bar to get

SCOTT - DIRECT EXAMINATION

USDC IN/ND case 3:12-cv-00475-JVB-MGG   document 162   filed 08/27/14   page 70 of 250

1    to a point in the call to determine if there's the information

2    that you're looking for?

3    **A.**   No, I do not.

4    **Q.**   What do you do?

5    **A.**   I just listen.

6    **Q.**   Okay.  So for searches that were related to data, you

7    listen for a couple of seconds and then move on; do I have that

8    right?

9    **A.**   That's correct.

10   **Q.**   Okay.  If you're listening to a call in the course of

11   trying to determine if there was lost data and you heard

12   something that you believed indicated there was some wrongdoing

13   by somebody in the police department, what is your

14   responsibility upon hearing that?

15   **A.**   To report that.

16   **Q.**   To report it to who?

17   **A.**   Through my chain of command.

18   **Q.**   Who would that be, Ms. Scott?

19   **A.**   My chain of command would have been Karen DePaepe and then

20   the Services chief and then the chief of police, but that could

21   have varied based on what I had heard.

22   **Q.**   And how would it vary?

23   **A.**   Obviously, if that potential wrongdoing was Karen DePaepe,

24   I wouldn't report that to Karen.  I would have went right to

25   the Services chief.

1    **Q.**  Or if it was --

2    **A.**  Or if it was the Services chief --

3    **Q.**  -- something concerned about the Services chief, you would

4    go directly to the chief of police?

5    **A.**  Correct.

6    **Q.**  How soon after hearing that information would you report

7    it?

8    **A.**  I would do it immediately.

9    **Q.**  Is anybody in the communications department authorized to

10   conduct -- to initiate and conduct their own investigation of

11   what's on a variety of recorded calls for purposes of

12   determining if what you heard was some reportable offense?

13          Are you authorized to initiate your own

14   investigation of a police officer?  That's my question.

15   **A.**  No, I don't believe so.

16   **Q.**  Who conducts that investigation for the police department?

17   **A.**  Internal Affairs.

18   **Q.**  Okay.  During the course of performing your duties, did you

19   come to recognize the voices of various police officers who

20   worked for the police department?

21   **A.**  Absolutely.

22   **Q.**  How did you come to become familiar with people's voices?

23   **A.**  Part of being a radio dispatcher is that you become

24   familiar with the officers who are your responsibility.  Many

25   times, radio conditions are not the best when an officer is

SCOTT - CROSS-EXAMINATION

1   trying to communicate with us.  They may be out in weather,

2   there may be sirens in the background, they may be struggling

3   with someone.  So voice recognition is key to knowing who is

4   asking you for something or giving you information.

5   **Q.**  So when you were reviewing data crashes in late 2010 and

6   you were performing the tasks that you just walked us through

7   and you heard for a few seconds a call, is it your experience

8   that people who worked in the communications center could, in

9   just a few seconds, identify who was on that line?

10  **A.**  Yes.

11          MR. SULLIVAN:  Okay.  Can I have a moment,

12  Your Honor?

13          THE COURT:  Yes, you may.

14          (Brief pause.)

15          MR. SULLIVAN:  No further questions, Your Honor.

16                          CROSS-EXAMINATION

17  BY MR. WALTON:

18  **Q.**  Good afternoon.

19  **A.**  Good afternoon.

20  **Q.**  Ms. Scott, can I ask you, first, how many lines go into the

21  police department system in total as an estimate?

22  **A.**  Into the system, the Voice Logger system; is that what

23  you're referring to?

24  **Q.**  No.

25          How many phone lines go in or out of the department?

1   **A.**   I couldn't tell you an exact number.   I would say well over

2   a hundred.

3   **Q.**   Was the system that was being utilized from 2004 on capable

4   of recording all of those lines?

5   **A.**   No.

6   **Q.**   Okay.   In fact, would the department have to have purchased

7   a much larger system in order to be able to do that?

8   **A.**   Correct.

9   **Q.**   Now, when you started -- you started working with Karen

10  when, Karen DePaepe?

11  **A.**   In 1999, when I was hired.

12  **Q.**   Okay.   And during the course of the time that you worked

13  with Karen, were part of your duties listening to lines and

14  pulling requested conversations off the system and putting them

15  on cassettes for various reasons from time to time?

16  **A.**   From the time I became a supervisor, yes, sir.

17  **Q.**   Okay.   In terms of the information that came into you, were

18  you aware, during your time there, whether or not Chief Boykins

19  made any changes to the recorded lines during his tenure?

20  **A.**   I was not aware.

21  **Q.**   Weren't aware one way or another?

22  **A.**   No.

23  **Q.**   Okay.   All of the communications that are recorded on this

24  system, were they recorded 24 hours a day, seven days a week?

25  **A.**   That's correct.

SCOTT - CROSS-EXAMINATION

1  **Q.**  Okay.  And if someone would try to delete that recording,
2  what would happen?
3  **A.**  You can't delete anything on the system.  It's an all or
4  nothing.  You would have to destroy the entire contents of all
5  recordings, 911, or destroy nothing.
6  **Q.**  So whatever was recorded in 2011 is still on the system
7  itself?
8  **A.**  The system records dually to a hard drive and then to a
9  removable disk at the same time.
10  **Q.**  Okay.
11  **A.**  The system will only go back so far, and I couldn't tell
12  you the exact date that we're at right now, but then we
13  maintain the disks far longer than that.
14  **Q.**  All right.  So what's been recorded, based on your
15  experience back in 2010/2011, still exists today?
16  **A.**  Correct.
17  **Q.**  Now, the persons that were in dispatch, they were
18  civilians, as well, right?
19  **A.**  Yes, everyone in dispatch are civilians.
20  **Q.**  And you're not a police officer either?
21  **A.**  No, I'm not.
22  **Q.**  Was it the ordinary course of your business, working with
23  the people in dispatch and yourself, that you would be asked to
24  perform the duties of listening to the lines and obtaining
25  information for others at their request?

1    **A.**   Can you repeat that, please?

2    **Q.**   Yes.  I'll say it in a better way.

3              You weren't a police officer when you were

4    performing these duties of getting information off what was

5    being recorded at the request of other people, such as the

6    prosecutor or another police officer?

7    **A.**   I'm not a police officer; you're correct.

8    **Q.**   Okay.  And is that the ordinary practice that was exercised

9    at the department during the entire time you were there?

10   **A.**   Yes.

11   **Q.**   So there may be officers involved -- are any officers

12   directly involved in making recordings other than the ones that

13   may have had their own line being recorded?

14   **A.**   No officers make recordings out of our system.

15   **Q.**   Okay.  Now, when this crash occurred, you said that you had

16   to go in and start working to see that all the lines were still

17   being properly recorded; you had to check them?

18   **A.**   Correct.

19   **Q.**   Now, were you doing that in just your area that was

20   underneath your direction at the time?

21   **A.**   I did it to every line I had access to.

22   **Q.**   Okay.  And who else was involved in checking the system

23   when the crash occurred?

24   **A.**   Any supervisor, myself, or Karen.

25   **Q.**   So Karen was also involved in that?

1    **A.**   Correct.

2    **Q.**   Was that something -- was it the responsibility, when a

3    crash occurred of your department, the communications

4    department, to go in and make sure that whatever was being

5    recorded was not being lost?

6    **A.**   Yes.

7    **Q.**   And that would have been done in the ordinary course of

8    your duties at the department during the entire time you were

9    there?

10   **A.**   That's correct.

11   **Q.**   Okay.  Now, you indicated, in your examination not too long

12   ago, that if you went in to just check to see if the system was

13   capturing these recordings after this crash occurred, that you

14   would only have to listen for a few seconds --

15   **A.**   Correct.

16   **Q.**   -- in order to determine if there was a problem or not?

17   **A.**   Correct.

18   **Q.**   And then you could go forward in time and backward in time

19   to double-check that?

20   **A.**   Yes.

21   **Q.**   Would that be, as far as you know, the same procedure that

22   Karen would follow or the other supervisors would follow in

23   order to determine whether or not the crash had saved or not

24   saved the recordings?

25   **A.**   Yes, to the best of my knowledge.

SCOTT - CROSS-EXAMINATION

1   **Q.**   Okay.  Now, you were also asked if -- let me just ask you

2   this:  From time to time, in the ordinary course of your duties

3   and Karen's duties, as well, from your own personal knowledge,

4   not only may you be asked by a police officer to find

5   information on recorded lines and obtain it for them, but you

6   might be asked by a prosecutor to do the same thing?

7   **A.**   That's correct.

8   **Q.**   And from time to time, did the Indiana State Police also

9   come in and ask for information on the recorded lines that you

10  were required to obtain for their benefit?

11  **A.**   I was never involved in that, but I do know of that.

12  **Q.**   Was Karen the one involved with that?

13  **A.**   Correct.

14  **Q.**   Usually, that was at the direction of the chief?

15  **A.**   I would assume.

16  **Q.**   Also, when the media would make FOIA requests for certain

17  information, would that involve Karen, as well?

18  **A.**   Correct.

19  **Q.**   Are you aware, from your own personal knowledge, that Karen

20  may have been asked by the media or by her supervisors to go

21  into the recorded lines to obtain information that the media

22  had requested?

23  **A.**   Correct.

24  **Q.**   Now, you were asked if you heard something on the line

25  amounting to improper conduct.

1          You're placed in a position at that point in time to

2    make a judgment?

3    **A.**   That's correct.

4    **Q.**   You wouldn't just listen to a conversation -- in your own

5    judgment, if you're hearing improper conduct, you wouldn't

6    listen to just a couple seconds of that and then stop, would

7    you?

8    **A.**   I don't really know how to answer that.

9    **Q.**   Each situation may be different?

10   **A.**   Correct.

11   **Q.**   Before you're going to report improper conduct of an

12   officer, for example, you would want to make sure that, in your

13   own judgment, what you were hearing was correct?

14   **A.**   Absolutely.

15   **Q.**   So however long that took for you to be sure of what you

16   were hearing and what you would report, you would take the

17   necessary time before you would report it to anybody?

18   **A.**   Correct.

19   **Q.**   That would just be your due diligence and a call for your

20   judgment in your position at that time?

21   **A.**   Correct.

22   **Q.**   Same with Karen?

23   **A.**   Correct.

24   **Q.**   To your knowledge, during the entire time you've worked

25   there, are you ever aware of any officer that came up and asked

1   if his line was being recorded, whether or not that was ever

2   hidden by the officer from anyone?

3   **A.**   I don't have any knowledge of that.

4   **Q.**   Are you aware of different officers that would come forward

5   and ask if their line was being recorded and they were told

6   whether it was or wasn't?

7   **A.**   Yes.

8   **Q.**   That happened how often?

9   **A.**   I couldn't tell you.  I know there have been officers who

10   came to me and asked if a line was recorded because they wanted

11   something pulled from that line, and then I would tell them it

12   wasn't recorded.

13   **Q.**   And the same officer may come to you saying, you know,

14   "Would you check my line and see if you could get this

15   information for me," and the line was, in fact, recorded, so

16   you were able to obtain it?

17   **A.**   That wouldn't have been my responsibility until after Karen

18   went on her medical leave, as I would not have had access, so I

19   would have had to refer them to Karen.

20   **Q.**   All right.  But you're aware that that has occurred and you

21   did, in fact, refer people to Karen before?

22   **A.**   I have told officers that the line that they were inquiring

23   about was not recorded, yes.

24   **Q.**   Are you aware of any instance at any time since you started

25   working there back in 1999 whether or not any of the

1    information -- any request of any officer at any time, if they

2    had asked if their line was being recorded, where that

3    information would not -- where they would not have been told by

4    you whether it was or wasn't?

5    **A.**   No.  I mean, if I knew --

6    **Q.**   If you knew, you would tell them?

7    **A.**   Correct, unless someone had specifically told me not to,

8    such as Karen or the chief.

9    **Q.**   All right.  In your experience, during the entire time you

10   have worked there, has either Chief Fautz or Chief Boykins ever

11   told you not to tell an officer that his line was or was not

12   being recorded?

13   **A.**   No.

14   **Q.**   So, in your own experience, if an officer would have asked

15   you if his line was being recorded, you would have told him

16   "yes" or "no"?

17   **A.**   Correct.

18   **Q.**   Do you know of your own personal knowledge whether or not

19   that was true with Karen DePaepe?

20   **A.**   I have no knowledge.

21   **Q.**   You don't know if she did or didn't?

22   **A.**   I don't know if she did or didn't.

23   **Q.**   Are you aware of any other chief ever being asked by an

24   officer whether or not his line was being recorded or not,

25   whether or not the chief would have told him it was or wasn't?

1    **A.**  I don't know.

2    **Q.**  All right.  In terms of the testimony that's happened in

3    this case so far, Barb Holleman has testified by way of

4    deposition, and in her deposition -- can you tell us, first,

5    was she the person responsible for changing numbers, if an

6    officer would ask, during the time that you were there?

7    **A.**  She was responsible for the phone system, yes.

8    **Q.**  She would not be the one responsible for recordings,

9    though?

10   **A.**  No.

11   **Q.**  Who would that be?

12   **A.**  Karen.

13   **Q.**  Would that be at someone's specific direction?

14   **A.**  Yes.

15   **Q.**  Who?

16   **A.**  The chief of police.

17   **Q.**  All right.  In your experience, only the chief of police

18   could dictate for the department what lines would or would not

19   be recorded?

20   **A.**  Yes.

21   **Q.**  In this case, are you aware that, according to Barb

22   Holleman's testimony, that she was asked by officers hundreds

23   of times to change numbers to different officers' physical

24   locations?

25   **A.**  I don't know anything about that.

1  **Q.**   Would that surprise you if that was her testimony?

2  **A.**   No.

3  **Q.**   In your opinion, would it be a normal activity for a police

4  officer to want to keep the number that he or she had while

5  they were in their office and take it to their next office for

6  continuity?

7  **A.**   I could see why they would.

8  **Q.**   Okay.  And in this case, were you aware that when Steve

9  Richmond was promoted to chief of the Investigative Division in

10 February of 2010 that he had asked that his line be -- his old

11 number go into his office by Barb?

12 **A.**   I am aware of that now.

13 **Q.**   Okay.  And that's part of where that list came up that you

14 looked at earlier in your testimony, right?

15 **A.**   That's correct.

16 **Q.**   The list of the recorded lines?

17 **A.**   Correct.

18 **Q.**   And were you aware that Barb testified that, at the request

19 of the chief of the Investigative Division in February of 2010,

20 she did put his line 7473 into the chief's office?  Are you

21 aware of that?

22 **A.**   I am now.

23 **Q.**   And then she put -- at the request of the chief of the

24 Investigative Division, Steve Richmond, the number that was in

25 the chief's office, 6031, was put into his old office as

1  captain of the Investigative Division?

2  **A.**   Yes, I am aware of that now.

3  **Q.**   Okay.  Was there a delay after Steve Richmond was actually

4  promoted and took the office, which I understand was in

5  February of 2010, to the time Brian Young was promoted and

6  became captain of the Investigative Division?

7  **A.**   I don't know.

8  **Q.**   Okay.  It is an uncontroverted fact in this case -- I want

9  you to look at that list of recorded lines that you had before

10  there, if you have it in front of you.  I think it was

11  Exhibit 9.

12  **A.**   (Witness complies.)

13  **Q.**   It's an uncontroverted fact in this case that the lines

14  that were being recorded, as set out in Exhibit 9, were the

15  lines that were being recorded at the request of Chief Fautz

16  beginning in 2004.

17  **A.**   Okay.

18  **Q.**   Okay.  And in looking at that exhibit, you'll see that

19  245-6031 began being recorded in 2004.  Do you see that?

20  **A.**   I can see that it's on this list, yes.

21          MR. SULLIVAN:  I'm sorry.  I don't think Exhibit 9

22  says it began to be recorded in 2004.

23          MR. WALTON:  Well, we'll get there.

24          MR. SULLIVAN:  Then I object as no foundation for

25  that.

1          MR. WALTON:  And I said it was an uncontroverted

2    fact that the lines listed on Exhibit 9 have been the lines

3    that have been recorded by the department since 2004.

4          Do you have any evidence that would say that's not

5    true, before I proceed, Mr. Sullivan?

6          MR. SULLIVAN:  One second, Mr. Walton.

7          What stipulation are you referring to, Mr. Walton?

8          MR. WALTON:  No stipulation.

9          I'm saying it's an uncontroverted fact that the list

10   of recorded lines were not changed from when Chief Fautz

11   ordered the lines to be recorded in 2004, and Chief Boykins has

12   indicated that he never made any changes to the recording

13   system, that those same lines were continued to be recorded.

14         MR. SULLIVAN:  I object to the characterization that

15   it's an undisputed fact that those lines were recorded from

16   2004.  That's what I'm objecting to, not that they were

17   objected -- or not that those lines were recorded during Chief

18   Fautz's tenure and that Chief Boykins made no changes, but that

19   those lines were recorded starting in 2004.  That's my

20   objection.  There's not a stipulation as to that.

21         MR. WALTON:  Is there any evidence that they weren't

22   starting to be recorded at Chief Fautz's direction in 2004,

23   that this is the list of recorded lines?

24         MR. SULLIVAN:  Yes, this is a list --

25         THE COURT:  Let's do this.  Let's take 2004 out and

1   just say it started with Chief Fautz --

2              MR. WALTON:  Okay, Chief Fautz.

3              THE COURT:  -- and it was not changed by Chief

4   Boykins; is that correct?  Would you agree with that?

5              MR. SULLIVAN:  I believe so, yes, Your Honor.

6              THE COURT:  Okay.  Then if you want to develop that

7   further, develop it through something that he can look at.

8              MR. WALTON:  All right.  Fair enough.

9   Q.  Assuming that that's true then, that it was the practice of

10  Chief Fautz to record these lines, and 6031 was being recorded

11  starting then, I want you to now look back at Exhibit 43, which

12  is the resumé of Rick Bishop.

13             MR. PFEIFER:  I'm just going to object to the form

14  of the question.  The question has an assumption in it that it

15  was Chief Fautz's practice of recording this line, and there's

16  absolutely no testimony, in that there is nothing in the record

17  to support that assumption.

18             MR. SULLIVAN:  I'll join in that objection,

19  Your Honor.

20             THE COURT:  Could you rephrase your question?

21             MR. WALTON:  Sure.  I don't remember what I said.

22             THE COURT:  Just ask a different question.  I think

23  the point they're objecting to is the assumption that that

24  question seems to be making, so just rephrase your question.

25             MR. WALTON:  All right.

1  **Q.**  I asked you to look at Exhibit 43, the resumé of Rick

2  Bishop that's in evidence.

3  **A.**  Okay.

4  **Q.**  Do you see that?

5  **A.**  I do.

6  **Q.**  And do you see that Rick Bishop was in the Detective Bureau

7  as captain from 10-3-02 to 1-1-05?  Do you see that?

8  **A.**  I do.

9  **Q.**  I want you then to look at Exhibit 44, which is Rick

10  Bishop's card.

11  **A.**  (Witness complies.)

12  **Q.**  Do you see that?

13  **A.**  Yes, I do.

14  **Q.**  And his number was 6031 when he was captain in the

15  South Bend Police Department of the Office of Professional

16  Standards.

17  **A.**  I see that.

18  **Q.**  And then, if you look at Exhibit 45, Rick Bishop's card, he

19  was division chief of the Investigative Bureau, with 6031 as

20  his number, according to that card.

21  **A.**  Yes, I do see that.

22  **Q.**  Okay.  If Chief Fautz had ordered 6031 to be recorded, and

23  based upon what you know in this case, would 6031 have been

24  continuously recorded as long as Rick Bishop had that number?

25          MR. PFEIFER:  Object to the form of the question.

1   There's no evidence that Chief Fautz ordered 6031 to be

2   recorded, and there will be no evidence that he ordered that

3   number to be recorded, so it's an improper hypothetical.

4            MR. WALTON:  Your Honor, Rick Bishop testified that

5   he asked Chief Fautz to record his number, and Chief Fautz said

6   he recorded his number.

7            THE COURT:  I assume it's in a deposition, correct?

8            MR. WALTON:  Yes.

9            THE COURT:  Is there a disagreement with that?

10            MR. PFEIFER:  No, but the way the question was

11   formed, the form of the question, is what I object to.  If he

12   wants to get into the specifics, as he just stated, then I have

13   no objection to the question.  But whenever he starts talking

14   about Chief Fautz ordering certain lines to be recorded, that's

15   when I've got a problem.

16            The facts are the facts, and I don't think there's a

17   disagreement about the facts.  I have a disagreement with the

18   way the question is phrased as it relates to those facts.

19            MR. SULLIVAN:  Your Honor, may I be heard on this,

20   as well?

21            THE COURT:  Yes.

22            MR. SULLIVAN:  I think one of the confusions -- and

23   I think it bears some ruling or discussion on your part so that

24   the witness is not confused -- Mr. Walton has phrased it as

25   Chief Fautz ordered that number to be recorded.  The testimony

SCOTT - CROSS-EXAMINATION

```
1    by Rick Bishop was -- and we anticipate will be -- that Rick
2    Bishop asked to have his line recorded, and he was assigned
3    that number.  The difference between ordering a number to be
4    recorded for all time versus allowing someone with an assigned
5    line to be recorded is what I don't want to be confused.
6              MR. WALTON:  I can rephrase.
7    Q.  Ms. Scott, assuming that Rick Bishop asked for his line to
8    be recorded and the list that you saw with 6031, having his
9    line on it as one of the recorded lines under Chief Fautz's
10   administration, would it be your testimony, based upon how you
11   know that system works, that Rick Bishop's line would have been
12   continuously recorded for the five or six years that he was in
13   those different positions until he was demoted in 2010?
14             MR. SULLIVAN:  I'll add an additional objection.
15   She already testified that she didn't have access to the
16   Centrex assigned lines during that period of time.
17             THE COURT:  That may be her answer, but I think the
18   question can stand, if she understands it.
19             If you understand the question, you can answer.
20             THE WITNESS:  I think I understand it.
21             I would say, yes, as long as 6031 was assigned
22   to him, 6031 would be what we were capturing, unless there
23   was a change made.  6031, if it was assigned to someone
24   else, then, obviously, we would not have been capturing Rick
25   Bishop.
```

SCOTT - CROSS-EXAMINATION

1    BY MR. WALTON:

2    **Q.**  All right.  So when Brian Young came into that office in

3    2010 -- we've learned that that line was continuing to be

4    recorded -- 6031 was continuing to be recorded under the

5    Reliance system?

6    **A.**  Correct.

7    **Q.**  Okay.  Are you ever aware of any order of any chief to not

8    record that line?

9    **A.**  No.

10   **Q.**  Are you aware of whether or not Brian Young ever came to

11   you and asked you that his line not be recorded?

12   **A.**  He did not come to me and ask me that.

13   **Q.**  Did he ever come to you and ask you if his line was being

14   recorded?

15   **A.**  Yes, he did.

16   **Q.**  And when was that?

17   **A.**  Sometime after January of 2012.

18   **Q.**  So about two years after he went into that position?

19   **A.**  I'm not certain of when he went in there, but --

20   **Q.**  Assume he came into the position of captain in March of

21   2010.

22   **A.**  Yes.

23   **Q.**  Okay.  Karen DePaepe, in your opinion, as the keeper of the

24   records for the communications department, did she have

25   authority to conduct -- to listen to lines at the request of

1    the chief?

2    **A.**   Yes.

3    **Q.**   And also at the specific request of other officers,

4    prosecutors, and others?

5    **A.**   Yes.

6    **Q.**   And was it her business duty, in the ordinary course of her

7    practice while you were there, to perform those tasks?

8    **A.**   Yes.

9    **Q.**   Were officers permitted to have personal cell phones?

10           MR. SULLIVAN:  Objection, foundation, as to what the

11   South Bend Police Department's duty manual was for individual

12   officers.  There's been no foundation laid that she would know

13   that.

14           MR. WALTON:  I'm trying to lay the foundation.

15           THE COURT:  Ask her if she knew.

16   BY MR. WALTON:

17   **Q.**   In your experience, were officers permitted to have their

18   own personal cell phones?

19   **A.**   Yes.

20   **Q.**   And those cell phones, based on your experience, weren't

21   connected to your system whatsoever?

22   **A.**   No, they were not.

23   **Q.**   So if an officer wanted to have any type of conversation

24   with anybody at any time from 2010 to 2012, they could do it on

25   their own personal cell phone?

1   **A.**  Correct.

2   **Q.**  And you wouldn't have the ability to capture it?

3   **A.**  No.

4   **Q.**  Were you ever made aware at any time that the recording

5   system itself was ever used for the purpose of intimidating

6   anybody within the department?

7   **A.**  No.

8   **Q.**  Were you ever aware whether or not the recording system, at

9   any time you were there, was ever made to trick anybody within

10  the department?

11  **A.**  No.

12  **Q.**  Were you ever aware that the recording system, at any time

13  while you were there, was there to spy on anybody within the

14  department?

15  **A.**  No.

16  **Q.**  In fact, during the entire time you were there, from 1999

17  on, as far as you're aware, that never occurred?

18  **A.**  Correct.

19  **Q.**  Were you ever aware of the reasons why Chief Fautz chose to

20  record the lines that he ordered recorded?

21  **A.**  I was not.

22  **Q.**  That would be Karen?

23  **A.**  Correct.

24  **Q.**  And what about Chief Boykins?

25  **A.**  Not aware.

1   **Q.**   That would be Karen?

2   **A.**   Correct.

3             MR. WALTON:   Give me just a second, Your Honor.

4             (Brief pause.)

5   BY MR. WALTON:

6   **Q.**   When you looked at the list of lines that were being

7   recorded, Exhibit 9, and you looked at the administrative

8   numbers that were being recorded, you said you weren't

9   surprised by any of them; is that right?

10  **A.**   Correct.

11  **Q.**   Why?

12  **A.**   I knew there were lines that were recorded.  I didn't know

13  what they were specifically, but it made sense.

14  **Q.**   Okay.  In your experience there at the department,

15  including officers and the civilians, was it common knowledge

16  that lines coming into the department and going out of the

17  department were recorded, at least some lines?

18  **A.**   Yes.

19  **Q.**   Was it your job, and Karen's job as director of

20  communications, to continue to maintain the system and make

21  sure it was operating properly?

22  **A.**   Yes, it was.

23  **Q.**   Your job to make sure you maintained it in order to capture

24  evidence, anonymous tips, complaints of officers, and things of

25  that nature?

1   **A.**   Correct.

2   **Q.**   Are you aware of any times when -- well, strike that.

3         When that crash occurred in 2010 to 2011, did you

4   lose some data?

5   **A.**   I don't remember.  I don't know that I personally found any

6   lost data, but I couldn't tell you that there was no lost data.

7   I can't recall.

8   **Q.**   And who asked, at that time, for either you or Karen to go

9   in and check the lines to make sure they were still being

10  properly recorded after the system was changed?

11  **A.**   No one asked us.

12  **Q.**   Okay.  Were the technicians -- do you work with the

13  technicians that were doing the work?

14  **A.**   I don't believe any technicians came during that time.

15  **Q.**   Okay.

16  **A.**   We did the troubleshooting.

17  **Q.**   All right.  Who made the corrections to the system, the IT?

18  **A.**   I'm not certain what you mean by "corrections."

19  **Q.**   Well, there was something that caused it to crash.

20  **A.**   Uh-huh.

21  **Q.**   Who made the technical changes to that?

22  **A.**   We had some hard drive failures, and the vendor itself --

23  I'm not certain if they came or they sent parts, and then our

24  IT staff changed them out.  I couldn't tell you that for

25  certain.

1   Q.   In your memory, would it have been either the vendor or

2   someone from IT that had come to you and Karen and asked you,

3   at that time, to make sure the lines that you wanted to be

4   recorded were functioning properly after the corrections?

5   A.   No, no one asked me that.

6   Q.   You were doing that because it was something in the

7   ordinary course of your business; is that right?

8   A.   Correct, before any modifications.  As soon as we brought

9   the system back up, we would do that.

10          MR. WALTON:  All right.  Just a second, Your Honor.

11          (Brief pause.)

12          MR. WALTON:  That's all the questions I have.  Thank

13   you.

14          THE COURT:  Mr. Pfeifer.

15                  CROSS-EXAMINATION

16   BY MR. PFEIFER:

17   Q.   Ms. Scott, did you learn, during the course all of this,

18   that Captain Young's line had been mistakenly recorded?

19   A.   Yes, I did.

20   Q.   You talked about a meeting in October of 2011 where there

21   was going to be this change from the Centrex system to the VoIP

22   system, correct?

23   A.   Yes.

24   Q.   You were present at that meeting?

25   A.   I was.

1   **Q.**   I believe one of the exhibits, Exhibit 9, the third page of

2   Exhibit 9, that was one of the documents that you took to the

3   meeting, correct?

4   **A.**   I went and retrieved it to bring to the meeting, yes.

5   **Q.**   And just so we're clear, you retrieved this document from

6   Karen DePaepe's computer, correct?

7   **A.**   That's correct.

8   **Q.**   Because, I think you told us, you had had a phone

9   conversation with her, she was on medical leave, and she had

10  told you to go to her computer and told you, I assume, where

11  you could retrieve this document?

12  **A.**   That's correct.

13  **Q.**   And then you took that document to the October 2011

14  meeting, correct?

15  **A.**   Correct.

16  **Q.**   So this document that we're looking at, Exhibit 9, that's

17  not a document that you generated, correct?

18  **A.**   No, sir.

19  **Q.**   That was generated from Karen DePaepe's computer?

20  **A.**   Correct.

21  **Q.**   Now, let's talk about that October 2011 meeting.

22          It's true, is it not, that, at that meeting, that's

23  the first time that Brian Young became aware of the fact that

24  his phone line was being recorded, correct?

25          MR. WALTON:  Objection.  She wouldn't know when

SCOTT - CROSS-EXAMINATION

1   Brian Young -- the first time he knew or not knew.

2           MR. PFEIFER:  If she knows, she can answer.

3           THE COURT:  I will let her answer if she knows.

4   **A.**  I don't know.

5   BY MR. PFEIFER:

6   **Q.**  Was there a discussion at that meeting about Brian Young's

7   line being recorded?

8   **A.**  Yes.

9   **Q.**  Tell us about that discussion.

10  **A.**  As we went individually through each line, we were asked,

11  you know, "Whose line is this?  Whose line is this?  Whose line

12  is this?"

13          We got to that 6031, Captain Young's line, and the

14  question was posed -- I'm not certain if it was by Chief

15  Horvath or Captain Phil Trent -- "Does Brian Young know that

16  his line is recorded?"

17          To which I replied, "I don't know."

18  **Q.**  Did Phil Trent then come to you, at some point in time

19  after that meeting, with respect to a request for the stopping

20  or the cessation of that recording on Brian Young's phone line?

21  **A.**  Yes.  As soon as I made that statement, Captain Trent left

22  the meeting and went to Captain Young's office.  A bit after

23  the meeting was adjourned, I saw Captain Trent in the hallway,

24  and that is when he approached me concerning that line.

25  **Q.**  And what was said?

1  **A.** He told me that Captain Young did not know that his line

2  was recorded and that it needed to be stopped, in his words,

3  "like yesterday."

4  **Q.** And what was your response to Captain Trent?

5  **A.** I told him I did not know if that was possible, if I had

6  the ability to disengage, or record, a line from the software,

7  and that I would have to check and I would get back to him.

8  **Q.** Who were you going to check with?

9  **A.** I was going to go log into the voice recorder to see if

10 that function was even there.

11 **Q.** Did you log into the voice recorder?

12 **A.** I did.

13 **Q.** Did you determine if that function was there?

14 **A.** Right.  I could not disable the recording of the line from

15 the software.

16 **Q.** Did you go in and talk to Chief Boykins at all about the

17 cessation of the recording of Brian Young's private line

18 because he had made that request?

19 **A.** I did not.

20 **Q.** Is there a reason why you did not?

21 **A.** After I left the office, I, again, ran into Captain Trent.

22 At which time, I informed him that I was not able to disengage

23 that recording; and, upon further thought, that, in fact, it

24 would have to be Chief Boykins who would have to make that

25 determination and that we would, in fact, have to contact a

1   vendor to come in and disable that line.

2   **Q.**   Was any of that done, to your knowledge?

3   **A.**   No.

4   **Q.**   So did you formulate an impression -- based upon the

5   exchange or the dialogue that was taking place at the meeting

6   in October of 2011, and the subsequent conversations with

7   Captain Trent, did you formulate an impression, in your mind,

8   that Captain Young did not know his phone line being was being

9   recorded?

10  **A.**   Yes.

11  **Q.**   What was that impression?

12  **A.**   That he did not know.

13  **Q.**   You told us that his line had been mistakenly recorded.

14          Do you remember saying that?

15  **A.**   I do.

16  **Q.**   If you would, tell us the basis for that statement.

17  **A.**   It was a conversation with Karen, after she had made

18  certain discoveries during one of the crashes, where she told

19  me that that is what she discovered in troubleshooting the

20  lines, that there was a voice that was not Steve Richmond, it

21  was Captain Young.

22  **Q.**   And when was this conversation?

23  **A.**   I couldn't tell you for certain.

24  **Q.**   The conversation would have been long before October of

25  2011?

1    **A.**   Yes.

2    **Q.**   The conversation would have been something that Karen

3    DePaepe relayed to you that she had learned when she was doing

4    this troubleshooting, correct?

5    **A.**   Correct.

6    **Q.**   That's the troubleshooting that you're talking about where

7    all you have to do is go into -- and I believe the exhibit is

8    17; that's easier for you to read now.

9         The troubleshooting you're talking about, you had

10   the capacity to perform certain troubleshooting, correct?

11   **A.**   Yes.  I did not have access to everything.

12   **Q.**   You did not have access to the private lines that were

13   identified on the list that was taken to the October meeting,

14   Exhibit 9; is that correct?

15   **A.**   Correct.

16   **Q.**   So you would not have had access to the front desk phone

17   lines, correct?

18   **A.**   I had access to the front desk.

19   **Q.**   Okay.  You would not have had access to the chiefs'

20   lines --

21   **A.**   Correct.

22   **Q.**   -- to perform troubleshooting, correct?

23   **A.**   Correct.

24   **Q.**   Only Karen had that access?

25   **A.**   Correct.

1   **Q.**   You would not have had access to the records or the records

2   director, correct?

3   **A.**   Correct.

4   **Q.**   Only Karen would have had that access?

5   **A.**   Correct.

6   **Q.**   And then the three lines that are in the Detective Bureau,

7   you would not have had access to those?

8   **A.**   Correct.

9   **Q.**   Only Karen had access to those lines?

10  **A.**   Correct.

11  **Q.**   And the troubleshooting, then, that you're talking about,

12  when the system crashes, is to, basically, go to the computer

13  screen and click on the right side the numbers that you want to

14  check, you put the parameters in and, in a few seconds, you can

15  make a determination as to whether recorded phone conversations

16  had been lost, correct?

17  **A.**   Well, the entire process would take longer than a few

18  seconds.

19  **Q.**   Few seconds per individual line?

20  **A.**   Correct.

21  **Q.**   And then you would go forward in time or back in time just

22  to kind of double-check to make sure that the recorded

23  information was not lost at a different time; is that fair?

24  **A.**   We would check different time slots because we were unaware

25  of when this crash actually occurred, so, yes, there were

SCOTT - CROSS EXAMINATION

1   different samplings taken.

2   Q.  The point is -- and I think you've established this -- the

3   point is, you just have to listen to an individual line for a

4   couple of seconds to make sure that you didn't lose any

5   recording capacity, correct?

6   A.  Yes, that's what I did.

7   Q.  And the procedure that Karen would follow would be the same

8   procedure, I think you told us, that you would follow to make

9   that troubleshooting determination on individual lines,

10  correct?

11  A.  I can't tell you what procedure Karen did, but I would

12  assume so.

13  Q.  Okay.  So the troubleshooting that Karen did that caused

14  her to tell you that Brian Young's line was being recorded was

15  back in the January or February timeframe of 2011?

16  A.  I can't recall.

17  Q.  You said, in response to a question that Mr. Walton asked,

18  that it was common knowledge that there were lines that were

19  recorded in the police department, correct?  Do you remember

20  that topic of conversation?

21  A.  Yes.

22  Q.  It was common knowledge that the front desk phone lines or

23  the function of the front desk, that those lines, that

24  function, was recorded, correct?

25  A.  Yes.

1   **Q.**   That was common knowledge in the police department,

2   correct?

3   **A.**   Correct.

4   **Q.**   It was common knowledge that the function of the

5   communications room, the 911 calls, that those calls or those

6   lines were recorded?  That was common knowledge among the

7   police officers, correct?

8   **A.**   Yes.

9   **Q.**   That function of recording the 911 calls, that was common

10   knowledge, that those lines were recorded, correct?

11   **A.**   Yes.

12   **Q.**   But the capacity of the recording system, I think you said

13   on direct examination, it had the capacity to record up to 60,

14   correct?

15   **A.**   Somewhere.  That's a guesstimate.

16   **Q.**   But the South Bend Police Department did not purchase the

17   necessary component parts of that system to allow for 60 lines

18   to be recorded, did it?

19   **A.**   That's correct.

20   **Q.**   It was something less than 60?

21   **A.**   Yes.

22   **Q.**   And that 60 -- well, was it not 39, and then it went to 48,

23   if you know?

24   **A.**   I don't know.  I know that we have 48.  I don't know what

25   it went from or any of that.

1    **Q.**   And the 48 -- okay.  You know now it's 48?

2    **A.**   Correct.

3    **Q.**   And the 48 lines that the system had the capacity to record

4    would include all of the communication lines, correct?

5    **A.**   Positions in the communications center, yes.

6    **Q.**   All of the front desk lines?

7    **A.**   Correct.

8    **Q.**   All of the radio traffic, correct?

9    **A.**   Correct.

10   **Q.**   And I think probably included the 911 calls; that's

11   basically the same thing, correct?

12   **A.**   That's the same as the positions.

13   **Q.**   So after the recording of all of those functions in the

14   South Bend Police Department, there were only a handful of

15   slots or positions available that could record private lines;

16   isn't that fair?

17   **A.**   We were limited.

18   **Q.**   Okay.  And I think you've told us that the recording of the

19   private lines was being done by the direction of the chief of

20   police?

21   **A.**   Correct.

22   **Q.**   At least that's what Karen said to you?

23   **A.**   That's correct.

24   **Q.**   Okay.  You never dealt with the chief of police in terms of

25   recording individual private lines, so you would have to rely

1    upon what Karen said to you; is that fair?

2    **A.**   Yes.

3    **Q.**   Okay.  So if -- and I think you told us that Chief Fautz --

4    excuse me -- Chief Boykins, when he became the chief, basically

5    followed the same procedures and the same practice as Chief

6    Fautz, correct, at least that's what you were told?

7    **A.**   That's what I was told, yes.

8    **Q.**   Were you told that, before a private line could be

9    recorded, it was Chief Fautz's position and policy that the

10   person who was assigned to that line would need to be told that

11   the line was going to be recorded?

12   **A.**   I'm unaware of anything.

13   **Q.**   Were you aware -- were you in this position when Chief

14   Hemmerlein was the chief of police?

15   **A.**   I was not.

16   **Q.**   Or Chief Gunn?

17   **A.**   I was not.

18   **Q.**   Or Chief Hurley --

19   **A.**   Chief Hurley --

20   **Q.**   -- which is even before?

21   **A.**   Well, I was going to say Chief Hurley the second time.

22   **Q.**   Good point.  Good point.

23           The first time?

24   **A.**   No.

25   **Q.**   Okay.  Well, you were there when Chief Hurley was there the

1    second time, correct?

2    **A.**   Correct.

3    **Q.**   That was in between Chief Boykins and Chief Teachman?

4    **A.**   Correct.

5    **Q.**   So it was not -- at least to your knowledge, based upon

6    what Karen DePaepe told you, it was not a common practice and

7    procedure of the South Bend Police Department to record every

8    private line that was assigned to an officer; isn't that true?

9    **A.**   That was my understanding, once I became involved with the

10   recording system, yes.

11   **Q.**   Because the system was physically not capable of recording

12   every private line, correct?

13   **A.**   Correct.

14   **Q.**   Once you became involved, did you ever learn that it was

15   the position of Chief Fautz that private lines could only be

16   recorded if the request for the recording came from the person

17   that the private line was assigned to?

18   **A.**   I was not aware of that.

19   **Q.**   Would that surprise you?

20   **A.**   No.

21   **Q.**   I just want to be clear.

22          You were asked some questions by Mr. Walton about

23   access that officers or the prosecutor's office would have to

24   retrieve the recording of conversations that were recorded on

25   the various lines, correct?

1   **A.**   Correct.

2   **Q.**   That form that we're talking about and the retrieval of

3   that recorded information was basically the 911 calls and the

4   calls that were recorded in the communications office, correct?

5   **A.**   No.

6   **Q.**   What else did it include?

7   **A.**   The front desk.

8   **Q.**   Okay.  The front desk.

9         And there was a form that had to be completed for

10   the front desk, the communications, the 911 calls, correct?

11   **A.**   Correct.

12   **Q.**   There was no form where a police officer could come and say

13   to you, "I would like for you to retrieve the recording of

14   6031, Captain Brian Young's phone conversations," was there?

15   **A.**   Not that I'm aware of.

16   **Q.**   In fact, requests like that, to provide a copy of a

17   recording of a line that was knowingly being recorded, those

18   requests did not come from the prosecutor's office, did they?

19   **A.**   I don't know.  I wasn't involved in those.

20   **Q.**   But as long as you know -- your involvement, they did not

21   come through you in any way, correct?

22   **A.**   I was never involved in them.

23   **Q.**   Okay.  The recording system that exists at the South Bend

24   Police Department, does it have any type of noise, like a beep,

25   that the listener can hear to know that the line is being

1    recorded?

2    **A.**   No, it does not.

3    **Q.**   You understand -- that was not a very -- that was a poorly

4    worded question, I admit.

5             Do you understand what I'm talking about?

6    **A.**   Yes.  I've heard that before.

7    **Q.**   Okay.  The South Bend system does not have that beep,

8    correct?

9    **A.**   That's correct.

10   **Q.**   And that beep is basically to let the person who's on the

11   line, who is using the line -- the line is assigned to him or

12   her -- to let that person know that the recording is taking

13   place, correct?

14            MR. WALTON:  Objection, Your Honor.  It assumes a

15   fact not in evidence.

16            MR. PFEIFER:  If she knows.

17            MR. WALTON:  We don't have that kind of system.

18            THE COURT:  Well, she can answer, if she knows.  If

19   they don't have the system, she probably doesn't know.

20            You can answer the question.

21   **A.**   I don't know.

22   BY MR. PFEIFER:

23   **Q.**   Did you learn that it was actually Steve Richmond's phone

24   line, when he became the division chief of the Investigative

25   Division, that was to have been recorded, that is, 7473?

1    **A.**   Did I learn that; is that what you're asking me?

2    **Q.**   Yes.

3    **A.**   Yes.

4    **Q.**   And when the switch was made by Barb Holleman to switch the

5    line that Steve Richmond had, 7473, from his old office to his

6    new office, that 6031 then went to the office that he vacated,

7    correct?

8    **A.**   That's correct.

9    **Q.**   And in the process of making that switch, the recording of

10   6031, which had been requested by Captain Bishop when he was in

11   the Internal Affairs section, continued?

12   **A.**   Correct.

13            MR. PFEIFER:  If I could have a minute, Your Honor?

14            (Brief pause.)

15            MR. PFEIFER:  I'll pass the witness.

16            THE COURT:  Okay.  Redirect.

17                       REDIRECT EXAMINATION

18   BY MR. SULLIVAN:

19   **Q.**   Just a little follow-up, Ms. Scott.

20            You, as assistant director, Karen DePaepe, as

21   director, and any supervisors, all would share in the task of

22   taking these forms that were requesting recordings and

23   performing searches?  Did I hear that correctly?

24   **A.**   That's correct.

25   **Q.**   Okay.  The vast majority of those requests, during your

SCOTT - REDIRECT EXAMINATION

```
 1   period of time as a supervisor, assistant director, and
 2   director -- please describe for the Court -- what does the bulk
 3   of that work involve, requests from who?
 4   A.   The prosecutor's office.
 5   Q.   And what would you say is sort of next in line after the
 6   prosecutor's office?
 7   A.   Investigators.
 8   Q.   In the South Bend Police Department?
 9   A.   Correct.
10   Q.   Okay.
11   A.   Well --
12   Q.   I'm sorry.  Go ahead.
13   A.   Or in Family Violence.  Sometimes there are differing
14   officers assigned to that unit, so it could be an officer
15   from --
16   Q.   So if we took the prosecutor's office and investigators,
17   either in the police department, investigators in Family
18   Violence or Metro Homicide, or anybody from some of the other
19   jurisdictions who might be conducting investigations, if we
20   took all of the requests that related to -- that came from the
21   prosecutors or investigators, about what percentage of the
22   requests would that occupy?
23   A.   Probably 90 percent.
24   Q.   Of the remaining 10 percent, what are they?
25   A.   Internal Affairs, quality assurance, and those aren't
```

1    really requests.  That's something we perform.

2    **Q.**  Let's stick to requests from somebody outside department

3    communications.

4    **A.**  FOIA, Freedom of Information Act requests; Internal

5    Affairs; police officers involved in the initial call of

6    something often will ask.  Maybe they're in a pursuit, and they

7    want to listen to their pursuit so that their report is

8    accurate.

9    **Q.**  That would be radio traffic?

10   **A.**  Radio traffic, yes; sometimes phone calls that have to do

11   with the case that they're typing.

12   **Q.**  Of the requests that are in that final 10 percent, how many

13   of them are asking for, in your experience -- you were a

14   supervisor, assistant director, and now you're the director.

15   What percentage of those requests -- and we're talking about

16   that small sliver now, okay -- what percentage of those

17   requests wanted 911 or front desk traffic?

18   **A.**  99 percent.

19   **Q.**  In your experience as a supervisor, assistant director, or

20   director, was there ever a request for a recorded conversation

21   on one of the division chief's lines?

22   **A.**  Yes.

23   **Q.**  And what were the circumstances?

24   **A.**  There were some -- there was a person that they were

25   pursuing a case against that was filling people's -- some of

1   the chiefs' voicemails up.  We pulled -- I didn't personally,

2   but I knew of it, that they were pulling that information.

3   **Q.**   That was a request from inside the police department?

4   **A.**   Correct.

5   **Q.**   Okay.  Remember, I'm talking about that sliver of requests

6   that come from outside.

7   **A.**   Right.  I can't think of any.

8   **Q.**   Okay.  So in your whole time, no one has ever asked for

9   those?

10  **A.**   No one has asked me.

11  **Q.**   When you get these forms and you go to work on them, then

12  you, as assistant director or as supervisor, could not search

13  the lines for the division chief or the chief, right?

14  **A.**   That's correct.

15  **Q.**   Was there an assumption made that -- because you as

16  assistant director and the supervisors were accomplishing this

17  task, was there an assumption made that these requests weren't

18  looking for conversations on a division chief's line; otherwise

19  you would have had to have Karen do all of them?  Isn't that

20  right?

21  **A.**   Correct.

22  **Q.**   All right.  You remember Mr. Walton asked you about -- it

23  was a hypothetical -- what would you do if you heard something

24  that you were concerned about that might reflect wrongdoing,

25  all right, and he asked you if you wanted to be sure, and you

1   said you would want to be sure.

2   **A.**   Absolutely.

3   **Q.**   To be sure, do you think it would be within your

4   responsibility and authority, in order to be sure, to listen to

5   weeks and weeks and weeks of recorded phone calls in order to

6   be sure?  Do you think that's within your duties to investigate

7   like that?

8   **A.**   I don't think I can answer that without being specific

9   about it.  I don't know.  I never had that asked of me, so I'm

10  uncertain.  It would probably depend on what I heard.  I

11  certainly wouldn't take lightly making an accusation of someone

12  without having facts, so --

13  **Q.**   Right.  And what I'm asking you is whether, as a civilian

14  employee of the police department, you would see it within your

15  job description to conduct a law enforcement investigation on

16  an officer.

17  **A.**   My job description did not say that.

18  **Q.**   Okay.  I would like you to refer, I think, to Exhibit 1.

19          Do you have that in front of you?

20  **A.**   It says 1A.  Is that it?

21  **Q.**   It says 1A, yes.  It's under tab 1.

22  **A.**   Okay.

23  **Q.**   It's an Officer's Report.  Do you see that?

24  **A.**   Yes.

25  **Q.**   And just to the right of that, it says 01/04/2012?

1  **A.**  Yes.

2  **Q.**  That's the date the Officer's Report was issued; isn't that

3  right?

4  **A.**  I would assume so.

5  **Q.**  You've seen Officer's Reports before in your --

6  **A.**  Yes.

7  **Q.**  Okay.  This one is from Karen DePaepe, and if you look down

8  on the third line, it says, "...on February 4, 2011, I was

9  troubleshooting our Dynamic Instruments Recording System..."

10          Do you see that?

11  **A.**  I do.

12  **Q.**  So Exhibit 1, if you go on to read it, indicates -- and

13  this is undisputed -- that Karen DePaepe was performing the

14  troubleshooting on February 4th, 2011, when she discovered, as

15  she says, Chief Richmond's voice instead -- or Captain Young's

16  voice instead of Chief Richmond.

17          You agree that Exhibit 1 contains that recitation?

18  **A.**  Yes.

19  **Q.**  So it was February 4th that she would have been performing

20  the troubleshooting, right?

21  **A.**  Yes, according to this report.

22  **Q.**  Does that refresh your recollection at all about when she

23  told you about her discovery?

24  **A.**  No.

25  **Q.**  It certainly would have to have been after February 4th?

1   **A.**   Absolutely.

2   **Q.**   And sometime before she left on medical leave?

3   **A.**   Yes.

4   **Q.**   So it's kind of a wide range, but it's between February and

5   August?

6   **A.**   That's correct.

7   **Q.**   Okay.  You were asked some questions about whether the

8   system or the recordings were ever used to trick or harass --

9   actually, I think what you were asked is whether you were aware

10  of whether the recordings were ever used to trick or harass,

11  and you said you were not aware of that.

12  **A.**   That's correct.

13  **Q.**   Are you aware of any conversations that took place between

14  Chief Boykins and anybody else on his command staff concerning

15  these recordings?

16  **A.**   No.

17  **Q.**   Not aware one way or the other?

18  **A.**   No.

19              MR. SULLIVAN:  Okay.  Thank you.

20              I have no further questions, Your Honor.

21              THE COURT:  Recross?

22                        RECROSS-EXAMINATION

23  BY MR. WALTON:

24  **Q.**   Looking at Exhibit 1, again, the report from Karen, she

25  indicates that, initially, when the recording system was set

1   up, Chief of Police Thomas Fautz had ordered all incoming

2   telephone lines answered by the front desk, communications,

3   chief of police lines, all division chief lines, and Internal

4   Affair lines be recorded.  The reasoning behind this decision

5   was that should anyone receive telephone calls with information

6   regarding any criminal cases or allegations of misconduct by

7   officers, that we would have audio documentation of lead

8   information or allegations.

9            Do you see that?

10  **A.**   I do.

11  **Q.**   Was that your understanding from her when you worked with

12  her?

13  **A.**   Yes.

14  **Q.**   So part of recording some of the conversations would be so

15  that you could capture any of the public's complaints of

16  officer misconduct?

17  **A.**   Correct.

18  **Q.**   Would Internal Affairs also investigate officer misconduct?

19  **A.**   Yes.

20  **Q.**   Would that involve the possibility of retrieving recorded

21  conversations to examine whether or not officers had misconduct

22  or not?

23  **A.**   Yes, it could.

24  **Q.**   You were asked, I believe, whether or not -- I think she

25  said -- or found out that 7473 should have been recorded.

1              Did Chief Boykins ever tell you that 7473 should

2    have been recorded?

3    **A.**   No.  I had no conversation with him.

4    **Q.**   Was it common knowledge within the department that the

5    chief determined which lines to be recorded or not?

6    **A.**   I don't know.

7    **Q.**   Was that your understanding, that only the chief could

8    determine --

9    **A.**   It was my understanding, yes.

10   **Q.**   -- that only the chief could determine which lines were

11   recorded?

12   **A.**   Correct.

13   **Q.**   Ultimately, his decision?

14   **A.**   Correct.

15   **Q.**   You said, in questions asked of you, that you said you

16   found out that Mr. Young's -- Brian Young's line had been

17   mistakenly recorded.  Do you remember that?

18   **A.**   Yes.

19   **Q.**   Now, the change of lines from 7473 to Chief Richmond's

20   office was not a mistake, was it?  He specifically asked Barb

21   Holleman to do that as chief of the Investigative Division?

22   **A.**   Yes.

23   **Q.**   That was done in the ordinary course of her duties?

24   **A.**   Correct.

25   **Q.**   And it was the ordinary practice of the officers to keep

1    their lines?

2    **A.**  I don't know.

3    **Q.**  Okay.  So when 74 -- when 6031 was put back in his old

4    office, that was the number that she had to move back to Chief

5    Richmond's old office in order to give him his request of 7473,

6    right?

7    **A.**  Correct.

8    **Q.**  That wasn't a mistake; she was asked to do it?

9    **A.**  Correct.

10             MR. WALTON:  Thank you.  That's all I have.

11                         RECROSS-EXAMINATION

12   BY MR. PFEIFER:

13   **Q.**  Just so we're clear, the mistake was in the recording of

14   6031, not 7473, correct?

15   **A.**  Correct.

16             MR. PFEIFER:  Thank you.

17             THE COURT:  Anything?

18             MR. SULLIVAN:  No, sir.

19             THE COURT:  Are you finished with this witness,

20   Mr. Walton?

21             MR. WALTON:  Yes.

22             MR. SULLIVAN:  Yes, Your Honor.

23             We would like to release her from the subpoena.

24             THE COURT:  Thank you very much.

25             We're going to take our abbreviated lunch break.

```
 1   Plan to start in about a half hour.
 2               MR. SULLIVAN:  Very good.
 3               THE COURT:  We will do that.  Hope we get to close
 4   to a half hour.
 5               (Lunch recess taken from 2:08 p.m. until 2:25 p.m.)
 6               THE COURT:  You can all be seated.
 7               Before we start, let me tell you the schedule going
 8   forward, and then I'm going to ask you a question after that.
 9               We're going to go until at least 6:00 tonight.
10   Tomorrow we'll start at 9:00 and we'll do the same thing.
11               With that schedule, when do you think you will get
12   all your evidence in?  We're not going to argue it at this
13   point.  We're going to do a briefing schedule and so forth.
14               MR. SULLIVAN:  Your Honor, if you go to at least
15   6:00 today and at least 6:00 tomorrow, then I have no doubt
16   that we will finish this tomorrow.
17               MR. PFEIFER:  We've been, actually, amongst the
18   attorneys, substituting deposition excerpts instead of live
19   testimony.
20               THE COURT:  Which we can read.  I do that.
21               MR. PFEIFER:  Or we can just present them as an
22   exhibit.
23               THE COURT:  Okay.  To the extent you have documents
24   you can submit and stuff like that, that will help a whole lot.
25               What I'm going to do is probably check out of the
```

```
 1   hotel tomorrow morning --
 2             MR. SULLIVAN:  That's fine.
 3             THE COURT:  -- with the hope that I don't have to
 4   check back in right after that.
 5             MR. SULLIVAN:  No, that makes sense.
 6             THE COURT:  Okay.  Sounds good.
 7             MR. SULLIVAN:  Yes.
 8             THE COURT:  Are you ready for your witness?
 9             MR. SULLIVAN:  Yes, sir.
10             THE COURT:  Anything we need to take up before we
11   start?
12             MR. PFEIFER:  No.
13             THE COURT:  Okay.
14             MR. SULLIVAN:  We call Thomas Fautz.
15             (The witness was duly sworn.)
16             THE COURT:  You can be seated.
17             You probably all know that I know a lot of people in
18   the courtroom that are involved in this case.  Chief Fautz was
19   the chief of police when I was U.S. Attorney.
20             I don't think you're calling Dave Capp now, are you?
21             MR. SULLIVAN:  No.
22             THE COURT:  Obviously, I know Dave Capp and a lot of
23   other people.  I know some of the officers here, too.  I just
24   wanted everybody to know that.  It's not going to make any
25   difference in what I do.  I just wanted to let you know.
```

```
 1              MR. SULLIVAN:  Thank you, Your Honor.

 2              THE COURT:  You may proceed.

 3                        THOMAS FAUTZ,

 4   having been duly sworn, was examined, and testified as follows:

 5                    DIRECT EXAMINATION

 6   BY MR. SULLIVAN:

 7   Q.  Good afternoon, Chief.  I appreciate your patience in

 8   waiting.

 9          Would you introduce yourself to the Court and spell

10   your name for the record?

11   A.  Thomas Fautz, F, as in Frank, a-u-t-z, as in zebra.

12   Q.  Thank you.  Chief, you were formally the chief of police

13   for the South Bend Police Department?

14   A.  Yes.

15   Q.  I want to just get a little bit of your history.

16          How long were you with the South Bend Police

17   Department?

18   A.  Approximately 34 and-a-half years.

19   Q.  And what were the years that you were the chief?

20   A.  September of 2002 until December 28th, 2007.

21   Q.  What position did you hold before you were chief of police?

22   A.  Investigative Division chief.

23   Q.  And is that sometimes called the Detective Bureau?

24   A.  Yes.

25   Q.  So those two terms can be used interchangeably?
```

1   **A.**   Yes.

2   **Q.**   Okay.  And before you were the division chief, what

3   position did you hold?

4   **A.**   I was a captain on the police department.  The assignment

5   before I was the Investigative Division chief, I was a captain

6   with -- at that time, it was called the Special Crimes Unit.

7   Now it's the County Metro Homicide Unit.

8   **Q.**   And before that?

9   **A.**   Before that, I was captain of the NEST Unit.

10   **Q.**   Before that, if you recall?

11   **A.**   I was a shift commander and a region sector commander of

12   the west sector of South Bend when we were in that program.

13   **Q.**   I can't do the math in my head.  Tell me the year you

14   started as a police officer.

15   **A.**   1973.

16   **Q.**   Okay.  You spent a lot of years as a police officer?

17   **A.**   Yes.

18   **Q.**   During the course of your years there, and especially

19   focusing on the time that you were the division chief and chief

20   of police, were you familiar with a phonebook that would be

21   produced that would have the numbers of police officers?

22   **A.**   There was usually a sheet of paper with all of the phone

23   numbers listed with extensions.

24   **Q.**   Okay.  Yes.  I call it a phonebook.

25         Was Barb Holleman in charge of pulling that

```
 1   together?
 2   A.   I'm really not sure.
 3   Q.   But you know that individual police officers had -- some of
 4   them had their own phones assigned to them?
 5   A.   Yes.
 6   Q.   Was there a particular function in which you would get your
 7   own phone versus having the general number?  How would that
 8   break down?
 9   A.   It would usually be a detective in a certain segment of the
10   department, people with specialty-type jobs.
11   Q.   What about administrative officers who would have their own
12   offices?
13   A.   You would have to have your own office to have your
14   assigned phone number.
15   Q.   Okay.  And did officers ever have business cards with their
16   phone number on it?
17   A.   Yes.
18   Q.   Did you ever have that during the course of your time
19   there?
20   A.   Yes.
21   Q.   And what happens -- when an officer changes assignment,
22   what happens to that individually assigned line to that
23   officer?
24   A.   It just depends on the individual.  Some people like to
25   keep the same number, so they would -- their next assignment
```

1    they would request that that number follow them.  There was no

2    really set protocol for that.  It was more or less on an

3    individual's choice.

4    **Q.**  Nothing in the duty manual about that?

5    **A.**  Not that I know of.

6    **Q.**  In your experience, in all your years there, especially as

7    chief or division chief, you never saw any written procedures

8    that told people how to do that or whether they could do that?

9    **A.**  No.

10   **Q.**  Okay.  Now, the chief of police tends to have one number,

11   the same number, no matter who the chief is; is that your

12   experience?

13   **A.**  I can't say for sure.  I believe I kept the same number

14   that Chief Bennett had, who I followed.

15   **Q.**  All right.  What about at the division chief level; for

16   example, is there one number that is always associated with the

17   division chief of the Investigative Division or Detective

18   Bureau?

19   **A.**  I really -- I really can't answer that.  I can't even tell

20   you, when I took over, what that number was, but you certainly

21   would have your choice, if you wanted that number, or if you

22   had an extension before, if you wanted to keep that number, it

23   would be transferred over to your office.

24   **Q.**  Okay.  Chief, are you aware of whether it's common for

25   police departments to have some kind of recording system for

1    some of their telephone lines?

2    **A.**   I believe it's common.

3    **Q.**   Okay.

4    **A.**   I don't know that every police department has it, but I

5    believe it's a common function.

6    **Q.**   You're generally aware of that?

7    **A.**   Yes.

8    **Q.**   Would you consider yourself an expert on that in any way?

9    **A.**   No.

10   **Q.**   Have you ever reviewed policies from other departments?

11   **A.**   I have looked at policies when we were going through CALEA

12   accreditation and we started reviewing policies from other

13   departments that met the standards.

14   **Q.**   Have you ever reviewed policies for recording?

15   **A.**   I don't recall seeing anything about recording.

16   **Q.**   Okay.  I want to focus on the time period in which you were

17   the division chief of the Investigative Division, which would

18   have been prior to '02.

19           Do I have that right?

20   **A.**   Yes.  I was the division chief from '97 to 2002.

21   **Q.**   During that period of time, what was your knowledge about

22   the phone lines recorded at the South Bend Police Department?

23   **A.**   I knew the 911 phone lines, the phones at the front desk,

24   the Detective Bureau secretary, I think there was a phone in

25   the supervisor's -- this was in the old police station before

1    remodel -- behind the front desk that the front desk phones

2    rolled over to.  I think there was a line up there that was

3    taped.  I think that was the majority of it.  There may have

4    been one in Records, as well.

5    **Q.**  Okay.  Did you know about those recorded lines because you

6    had received written notice of that?

7    **A.**  No.  It was just kind of general knowledge.

8    **Q.**  All right.  Had you, in fact, ever received, as division

9    chief, any kind of written procedure which spelled out which

10   lines were recorded?

11   **A.**  No.

12   **Q.**  Had you received any kind of written notice of what the

13   procedure was to add or subtract a line from the system?

14   **A.**  No.

15   **Q.**  Did you ever issue any kind of notice, as division chief,

16   to the police officers under your command, in regard to the

17   recording of telephone lines?

18   **A.**  As a division chief, no.

19   **Q.**  Were you, at that time, between '97 and '02, aware of any

20   other division chiefs that may have issued some kind of notice

21   like that?

22   **A.**  Not that I heard.

23   **Q.**  Let me move you up now to 2002 to 2007, when you were chief

24   of police.  Okay?

25   **A.**  Yes.

1   **Q.**   When you became chief, did you learn anything about the

2   recording system?

3   **A.**   Not at first; however, I did learn that the chief's

4   secretary's line was taped.

5   **Q.**   The chief of police?

6   **A.**   Yes.  Really, she's the secretary for the Uniform Division

7   chief, the chief and the administrative offices.  But other

8   than that, no, that was pretty much my knowledge at that point.

9   **Q.**   That's coming in '02, right?

10  **A.**   Yes.

11  **Q.**   So there was a remodel that you mentioned.  Tell me about

12  how the remodeling of the police station occurred during your

13  period of time as the chief of police.

14  **A.**   During my time, there was an extensive remodeling of the

15  station, expansion of the station into the courtyard, and it

16  was a difficult process to go through because the police

17  department never closes and so we had different divisions of

18  the police departments working out of different areas.  I think

19  at one point the Detective Bureau was in the Street Department

20  or back in a garage area.  It was difficult, but it was worth

21  the results.  It came out to be a very nice station.

22  **Q.**   Do you recall when the Detective Bureau area would have

23  been finished and you brought those officers back in?  Do you

24  have a rough time frame for that, Chief?

25  **A.**   I believe it would have been sometime in 2004.  I can't

 1   say, you know, halfway through the year or in the fall, but

 2   that's when the station was getting completed, and we actually

 3   had our dedication, I believe, in May of 2005.

 4   **Q.**  Okay.  So '04 probably you start bringing back that

 5   Investigative Division.

 6          Do you recall getting a new system for recording at

 7   about that time, as well?

 8   **A.**  I can't give you an exact timeframe.  I think there was

 9   some remodeling done in the radio room, as well.  I really

10   can't give you a timeframe for that.  It was probably in that

11   same proximity.

12   **Q.**  Okay.  There should be an exhibit --

13          MR. WALTON:  Excuse me.  Are you talking about in

14   the summer to the fall of 2004?

15          THE WITNESS:  I believe so.  Somewhere in there.

16   I'm not positive, though.

17          MR. WALTON:  Thank you.

18   BY MR. SULLIVAN:

19   **Q.**  If you look, there's a binder in front of you of exhibits,

20   and there's a tab 21.

21   **A.**  (Witness complies.)

22   **Q.**  Do you see that?

23   **A.**  Yes.

24   **Q.**  The very last page of tab 21 -- there's multiple pages

25   there.  Does it look like that in your binder (indicating),

1   Chief?  Are we looking at the same thing?

2   **A.**   Yes.

3   **Q.**   So this is a purchase order, or an invoice, I should say,

4   from Stephen Campbell & Associates billing the South Bend

5   Police Department for the installation of a DI Reliant

6   48-channel system.

7           Do you see where I've read that, sir?

8   **A.**   Yes.

9   **Q.**   Does this reflect your recollection about when you might

10   have received a new system?

11   **A.**   I would say it would be sometime around September.

12   **Q.**   Okay.  That would have roughly coincided with when the

13   Detective Bureau was moving back into the remodeled police

14   station?

15   **A.**   Yes.

16   **Q.**   Now, in regard to this recording system, Chief, who

17   informed you about the installation, for example, of this new

18   system?  Who did you rely on for that information?

19   **A.**   I would rely on the Services Division chief, Chief Kilgore;

20   the radio room supervisor; the communication supervisor, Karen

21   DePaepe; and I don't know how this was paid for, but if this

22   was grant money, then I'm sure Division Chief Gary Horvath

23   would have been involved in some way.

24   **Q.**   Okay.  And who informed you, when you were chief, about

25   what lines were recorded at that time in the South Bend Police

1   Department when you became chief?

2   **A.**   Well, nobody really told me about what lines were taped.

3   My knowledge came from Karen DePaepe at one point when I asked

4   her about adding some lines.

5   **Q.**   And so Karen filled you in, at that point, about the lines?

6   **A.**   Well, I mean, I don't ever recall being told what the total

7   capacity was or anything like that.  I had requested some lines

8   be added and asked her if there was room for that and she told

9   me there was.

10  **Q.**   Did she ever present you with any kind of list of the

11  recorded lines?

12  **A.**   No.

13  **Q.**   Okay.

14  **A.**   Not that I can recall.

15  **Q.**   Okay.  During the time that you were chief -- and I'd say

16  let's focus on 2004 after, because now you've got the new

17  remodeling, you've got a new system coming in; so, if you

18  would, sir, focus on that time period.

19          Did you promulgate any written procedures or written

20  directives or memos or any kind of writing that dictated which

21  lines should be recorded?

22  **A.**   Not that I can recall, no.

23  **Q.**   What about the procedures that should be involved in

24  determining which lines?

25  **A.**   No.

FAHEY - DIRECT EXAMINATION

1  **Q.** Any writing that would have told officers to expect their

2  lines to be recorded?

3  **A.** No.

4  **Q.** Now, aside from any written communications like that, did

5  you, yourself, ever give a verbal directive -- and I'm looking

6  at you as chief of police from 2004 to 2007 -- a verbal

7  directive that only you as chief could ever determine that a

8  line should be put on the system?

9  **A.** No.

10 **Q.** Did you give any verbal direction to police officers about

11 what the standard procedure would be for recording lines?

12 **A.** No.

13 **Q.** Or verbal direction to always record a particular line?

14 **A.** No.

15 **Q.** Okay. You mentioned that you wanted to talk -- or that you

16 had discussed with Karen DePaepe some changes that you wanted

17 to make.

18        Can you tell me about that conversation and what

19 changes you wanted to make?

20 **A.** Again, I can't give you an exact date, or it would be in

21 that same general timeframe, either late 2004, early 2005.  I

22 approached her about adding my line, the line for the

23 Investigative Division chief, and the line for the Uniform

24 Division chief, along with Internal Affairs.

25 **Q.** Okay. How did Ms. DePaepe respond to your request?

FAUTZ - DIRECT EXAMINATION

1    **A.**   She said, "Fine," and there was room.  I told her what my

2    motivation was, why I wanted those lines taped.

3    **Q.**   Why did you want those lines taped?

4    **A.**   I explained to her that we were being -- we were under a

5    lot of scrutiny by the community on investigations, complaints

6    that we weren't following through, that we were not dealing

7    appropriately with uses of force, those kinds of things.  So in

8    that same vein, I instituted, like, an IA Pro system which

9    tracked all uses of force, all complaints against every

10   officer, every discipline.  It was really pretty comprehensive.

11   It got down to sick time, injured time, all those kinds of

12   things.  And, you know, we wanted a way -- it came up in a

13   discussion, and one of the division chiefs asked about having

14   his line taped, because we were under all of this scrutiny and

15   criticism, and that kind of prompted us moving forward with

16   that.

17   **Q.**   Okay.  The conversation where the division chief approached

18   you, did that come before or after you went to Karen and asked

19   to have these lines recorded?

20   **A.**   Before.

21   **Q.**   And what was the context of that discussion with that

22   division chief?

23   **A.**   Well, he asked about having his line taped, and it kind of

24   sparked a conversation amongst the entire command staff about

25   whether this would be a good way to be able to document and, I

1    guess I'll use the term, "CYA."  I don't know if you want that

2    spelled out.  Probably not.

3    **Q.**  I think I've got it, Chief.

4    **A.**  Okay.  And that if someone was making claims that we were

5    not following through or reacting to complaints, that we would

6    have some way to be able to document what we heard and what we

7    did.  Same thing with the Internal Affairs Division.  Again, we

8    were under a lot of criticism, and we tried to really address

9    any type of criticism that came up.

10          One was, for example, that people didn't want to

11   come down to the police station to file complaints, and I can

12   understand that.  So we arranged with the Human Rights

13   Commission for a remote access point in Howard Park on a bus

14   line, handicap accessible, to have a place opened up there

15   where people could come.

16          So we were looking at anything we can do to become

17   more transparent; that if people had complaints, that we could

18   listen to their complaints and respond appropriately.

19   **Q.**  This was the discussion at the command staff meeting you

20   were talking about?

21   **A.**  Yes.

22   **Q.**  Who was there?

23   **A.**  I know that Chief Kyle was there, I know that Chief Hassig

24   was there, Chief Kilgore, Chief Horvath.

25   **Q.**  When you say "chief," these are the division chiefs?

 1   **A.**   Division chiefs, yes.

 2   **Q.**   Does that constitute the command staff?

 3   **A.**   Yes.  I believe that Captain Phil Trent may have been

 4   there.  I can't say for sure.

 5   **Q.**   It was a long time ago.

 6   **A.**   And there was more than one discussion on this.

 7   **Q.**   Okay.

 8   **A.**   And it was decided that those three lines, with the

 9   knowledge and permission of the people involved -- myself,

10   Kyle, and Hassig -- that we would add those lines to the taping

11   system and that we would also add the Internal Affairs.

12   **Q.**   When you say "it was decided," did you dictate to your

13   division chiefs what would be?

14   **A.**   No.  It was there.  If they wanted it, fine.  If they

15   didn't, that's fine, too.  The other two division chiefs were

16   not really on the cutting edge of receiving complaints.  Theirs

17   were more administrative positions, and there was -- I mean,

18   they didn't ask to have theirs taped, and there was really no

19   reason for them to even consider that, I guess.

20   **Q.**   Did you offer it as a choice to the division chiefs?

21   **A.**   Yes.  Well, in Kyle's case, he had asked for it.  He had

22   asked that it be taped.  And Hassig, I can't say that Hassig

23   asked to have it done, but he was in agreement, feeling that it

24   would be a useful tool.

25   **Q.**   "A useful tool."  Was that your approach to it?

1   **A.**   Yes.

2   **Q.**   And useful for the division chiefs?

3   **A.**   Yes.

4   **Q.**   When you made that decision, after a series of

5   communications with your command staff in 2004, was it your

6   intent to establish a regular and ordinary procedure in the

7   South Bend Police Department that would record all division

8   chiefs?

9   **A.**   No.  It was a personal choice of the people in those

10   positions at that time.

11   **Q.**   And what did you intend to do if they came to the

12   conclusion that they did not want that any longer?

13   **A.**   Then it would be stopped.

14   **Q.**   Did you talk to Karen DePaepe about that approach, your

15   approach and the purpose for recording these lines?

16   **A.**   Yes.  I made it clear to her of the reason why we were

17   doing this and that those people were aware their lines were

18   taped and they may even be asking her for items from that tape

19   if the need should ever arise.

20   **Q.**   Okay.  I want you to just briefly flip to Exhibit 49, and

21   let me know when you're there, Chief.

22   **A.**   49?

23   **Q.**   Yes, sir.

24   **A.**   This goes to 47.

25   **Q.**   I'm sorry.  46.

1   **A.**  Okay.

2   **Q.**  All right.  46 is an Investigative Division set of names

3   and phone numbers.

4          And do you see, under "Administrative Staff," it

5   says "Division Chief Eugene Kyle"?

6   **A.**  Yes.

7   **Q.**  And that's the Gene Kyle that you just mentioned a few

8   minutes ago, isn't it?

9   **A.**  Yes.

10  **Q.**  So when Gene Kyle asked to have his line recorded and you

11  discussed it at a command staff meeting and then you told Karen

12  DePaepe to do it, was it your intent that line 5990 should

13  thereafter always be recorded?

14  **A.**  No.

15  **Q.**  You can see beneath there is Captain Richard Bishop, and

16  his number is 245-6031.  Do you see that?

17  **A.**  Yes.

18  **Q.**  Was there any discussion at this command staff meeting

19  about recording the line of Captain Bishop?

20  **A.**  Not that I can recall.

21  **Q.**  What about Captain Wilson?

22  **A.**  No.

23  **Q.**  What about Lieutenant Hammons?

24  **A.**  No.

25  **Q.**  Or anybody else on that whole list?  Is there anybody's

1    name -- and I would just like you to take just a couple seconds

2    and look through that.  Is there anybody else that you asked

3    Karen DePaepe to put on the recording system?

4    **A.**   No.

5    **Q.**   Okay.  Was your intent to establish any regular, repeated

6    procedure by virtue of these communications in 2004 with your

7    command staff?

8    **A.**   No.

9    **Q.**   Was it your intent to have a routine that all

10   administrative lines, lines to the administrative officers,

11   should potentially be subject to recording?

12   **A.**   No.  It was a personal choice of those officers.

13   **Q.**   Okay.  So you didn't establish a routine to record anybody

14   other than the people that chose to be recorded at that time?

15   **A.**   Yes.

16   **Q.**   Do you think that it's in the regular course of business at

17   the South Bend Police Department, or was it during your time as

18   chief, to record anybody without their knowledge?

19   **A.**   It was never my policy or practice.

20   **Q.**   Why would you not have done that?

21   **A.**   I think they have an expectation of privacy with their own

22   assigned line.

23   **Q.**   Was that what your protocol was for handling the lines when

24   you were chief?

25   **A.**   Yes.

FAHEY - DIRECT EXAMINATION

1  **Q.**  Were you clear about that to your command staff?

2  **A.**  I never really came out and said it that way, but I think

3  it was the understanding.

4  **Q.**  Do you think you were clear about that with Karen DePaepe?

5  **A.**  I told Karen DePaepe that "They are aware of it.  It's with

6  their knowledge and permission," so I can't speak for Karen

7  DePaepe, how she interpreted it.

8  **Q.**  Okay.  We talked before about how some police officers

9  change assignment and take their number with them?

10  **A.**  Yes.

11  **Q.**  What was your intent in the protocol that you were

12  following to -- how would you handle the movement of the phone

13  line and the relationship of that line to the recording system?

14  **A.**  I had no expertise or knowledge of how that was even done,

15  so I would -- I would certainly go through Karen DePaepe to

16  have it done.

17  **Q.**  Okay.

18  **A.**  Or possibly Barb Holleman.  She handled some of the phone

19  stuff.  I say Karen DePaepe, but that's not necessarily

20  correct.  It would be one or the other.

21  **Q.**  But those are the people that you would rely on to see that

22  your protocol was accomplished?

23  **A.**  Yes.

24  **Q.**  Is that fair?

25  **A.**  Yes.

FAUTZ - DIRECT EXAMINATION

1   Q.   Okay.  Did you change division chiefs at some point during

2   your tenure as chief of police?

3   A.   Yes.  Had two retirements during my tenure.  The first was

4   Chief Jim Hassig, the Uniform Division chief.  He left in 2005

5   for another department in Florida, and his position was assumed

6   by Boykins.

7   Q.   What was the other retirement?

8   A.   The other one was when Chief Gene Kyle retired, and his

9   position was assumed by Rick Bishop.

10  Q.   What was your protocol with handling new division chiefs

11  coming in and being part of your command staff?  What was your

12  protocol in regard to the recording system for the new division

13  chiefs?

14  A.   I don't know if you could even call it "protocol," but what

15  I did was, in the case of Chief Boykins when he assumed that

16  position, in the transition period, I explained to him the

17  lines that were taped.  He was part of the command staff now.

18  I told him that my line was taped, that Chief Kyle's line was

19  taped, that Jim Hassig's line was taped, and I said Internal

20  Affairs was also taped, and I explained to him that's his

21  decision if he wants to continue with it being taped or not,

22  and that's pretty much it.

23  Q.   Okay.

24  A.   When Chief Kyle retired, I went through pretty much the

25  same scenario with Rick Bishop, and I asked him, "Are you going

1    to keep your same line or are you going to take Chief Kyle's

2    line?"

3            I told him, "For your information, Chief Kyle's line

4    is taped."

5            I explained that my line was taped, Internal

6    Affairs.  He knew Internal Affairs because that's where he was

7    coming out of.  And, you know, explained to him pretty much the

8    same thing.

9            And Rick Bishop, who had come out of Internal

10   Affairs, stated that he was still going to help with Internal

11   Affairs cases, the difficult or the important ones, and that he

12   uses his personal cell phone for personal calls and that, you

13   know -- I can't remember his exact words -- but, more or less,

14   had no problem with his line being taped.

15   **Q.**   Okay.  Thank you.

16           You had some familiarity with the responsibilities

17   of the director of communications when you were the division

18   chief and the chief of police, didn't you?

19   **A.**   Responsibilities or interaction?

20   **Q.**   Well, you generally knew what she was responsible for?

21   **A.**   Yes.

22   **Q.**   She answered up through the Services chief?

23   **A.**   Yes.

24   **Q.**   And ultimately to you?

25   **A.**   Correct.

1    **Q.**   And was the director of communications ever a sworn

2    officer?

3    **A.**   No.

4    **Q.**   Or a law enforcement officer at all?

5    **A.**   No.

6    **Q.**   Any responsibilities that relate to law enforcement?

7    **A.**   Worked there.  That was --

8    **Q.**   Okay.  If a civilian working in the communications

9    department had heard something that they believed exhibited

10   some kind of wrongdoing by an employee or an officer, what

11   would you expect that person to do?

12   **A.**   Report it.

13   **Q.**   And would you expect that that person would conduct their

14   own followup investigation about that wrongdoing?

15   **A.**   That would be the role of the Internal Affairs, the chief,

16   detective, outside agency, whatever.  That's who would be

17   responsible for investigations.

18   **Q.**   You're saying not the role of civilian employees; is that

19   what you're saying?

20   **A.**   No.

21   **Q.**   How quickly would you expect that person to report?

22   **A.**   I think pretty quick.

23   **Q.**   Would you expect them to put something in writing?

24   **A.**   At some point, yes.  It depends on if they ran down there

25   just to report something to you right away, you know.

1   **Q.**   What if they put it in writing a year later; would that

2   comport with your expectations for that person?

3   **A.**   No.

4   **Q.**   Now, you mentioned some of the purposes behind offering

5   this choice to the division chiefs and the command staff, and

6   part of it was really to ensure that they had backup for their

7   interactions with the public; is that fair?

8   **A.**   Yes.

9   **Q.**   If a line was being recorded and no one knew it, could that

10  purpose be accomplished?

11  **A.**   Please repeat that.

12  **Q.**   If there was a line that was being recorded by accident and

13  no one knew it was being recorded, could that action -- could

14  that recording ever help play a role in achieving the purpose

15  that you had set out for recording these lines?

16  **A.**   Well, I think it would be improper, if not illegal, that a

17  person has to have knowledge and permission for their line --

18  one party has to give permission, and if the person didn't know

19  it, then that wouldn't be accomplished.

20  **Q.**   Okay.  And it certainly wouldn't fit with anything that you

21  were trying to get accomplished at that time?

22  **A.**   No.

23              MR. SULLIVAN:  Okay.  Would you just give me a

24  minute, Your Honor?

25              THE COURT:  Yes.

```
 1                    (Brief pause.)

 2                    MR. SULLIVAN:  Thank you, Chief.

 3               I pass the witness.

 4               THE COURT:  Cross, Mr. Walton.

 5                         CROSS-EXAMINATION

 6     BY MR. WALTON:

 7     Q.  Good afternoon, Chief.  Well, former chief.

 8               How do you want me to address you?

 9     A.  "Tom" is fine.

10     Q.  All right.  I want to talk to you, Mr. Fautz, about your

11     practice as chief when you were recording the lines.

12               Was there any secrecy involved in your command?  If

13     an officer wanted to know if his line was being recorded, could

14     he ask or she ask?

15     A.  Should have that right to ask.

16     Q.  And would you have told any officer if a line was being

17     recorded or not if they asked?

18     A.  Yes.

19     Q.  And was that common knowledge within your command staff

20     during that time, that if anybody wanted to know if their line

21     was being recorded or not, they could simply ask you, and you

22     would tell them?

23     A.  I don't recall having conversations with the command staff

24     about that.

25     Q.  All right.  Were you ever aware of any time that Karen
```

1    DePaepe was ever asked if a line was being recorded where she

2    didn't advise an officer of whether it was or was not?

3    **A.**   Not aware of that.

4    **Q.**   Okay.  Because you were talking about this open

5    transparency to the public and wanting to open up the lines of

6    communication between complaints about officers and things of

7    that nature, so you were working with your command staff in

8    order to document these types of things?

9    **A.**   It was -- like I say, it was a tool for them to use to kind

10   of be able to document, if needed, the information they

11   received or accused of not following up or responding to.

12   **Q.**   You were provided that invoice or shown that invoice in

13   September of 2004.

14          Are you aware of any other time after September 2004

15   when an outside vendor came in and installed the equipment to

16   record any other lines after the time that they had done that

17   work that you requested?

18   **A.**   I don't know that they did the work I requested.  It was

19   always my understanding that Karen just did that stuff, so I

20   didn't have a real clear understanding of how that was

21   accomplished.

22   **Q.**   Okay.  So you don't know, when the work was all done, if

23   anybody had ever come back in and made any other changes after

24   2004 to record other lines that you had requested be recorded?

25   **A.**   I don't have -- I can't recall any, no.

RAUTZ - CROSS-EXAMINATION

 1  **Q.**  Would Karen be the person to ask?

 2  **A.**  Sure.  Yes.

 3  **Q.**  All right.  I wanted to talk to you again about some of the

 4  reasons for these recordings.

 5           When your testimony was taken by deposition, you

 6  said you were not -- you didn't set up the recording system to

 7  intimidate, harass, or embarrass anyone; is that right?

 8  **A.**  Yes.

 9  **Q.**  It was to gather evidence and to serve as a tool for those

10  individuals who had their lines taped to either defend

11  themselves or document what had taken place; is that a fair

12  representation of your testimony?

13  **A.**  Yes.

14  **Q.**  Okay.  You said you considered the recordings to serve a

15  legitimate business purpose when you testified?

16           MR. SULLIVAN:  This witness should have his

17  deposition if you're asking him from his deposition.

18           MR. WALTON:  Well, if he disagrees, he can have it.

19  I don't think he's going to disagree.

20           MR. SULLIVAN:  That's fine.  He may not.

21           THE COURT:  Well, he --

22           MR. SULLIVAN:  He started his question off saying --

23           THE COURT:  Well, he is cross-examining.  He can do

24  it the way he wants to do it.  If you're objecting to it, I'm

25  overruling the objection.

FAUTZ - CROSS EXAMINATION

1              MR. SULLIVAN:  Okay.  Thank you.

2              MR. WALTON:  All right.

3    Q.  Mr. Fautz, you said you considered the recordings to serve

4    a legitimate business purpose, right?

5    A.  I can't remember my exact words, to be honest.

6    Q.  All right.  I can get your deposition, I suppose.

7              MR. WALTON:  Can I approach the witness?

8              THE COURT:  Yes, you may.

9    BY MR. WALTON:

10   Q.  Here's a copy of your deposition.

11             At page 20, I believe, down at the bottom, you were

12   asked:  "Did you consider the recordings to serve as a

13   legitimate business purpose?"

14             And what was your answer?

15   A.  Did you say page 20?

16   Q.  Yes, lines 19 to 22.  It's the highlighted part there.

17   A.  It's page 19 on this one.  19, yes.

18             My answer was "yes."

19   Q.  Okay.  And you also believed that they helped the

20   department with transparency for the public, as you've

21   testified, right?

22   A.  I would say the true purpose, above all else, was to be

23   able to document and stand up to the criticism and have a way

24   of proving that we responded.

25   Q.  All right.  Now, the recording of lines was also important

1   for the business of the police department, was it not?

2   **A.**   Yes.   There was a set of -- a group of lines that were

3   pretty much every day business and had been for years.

4   **Q.**   All right.   Would you agree with me that the recording

5   system that was being put in at that time and the decisions you

6   made for that recording system were done for legitimate

7   purposes, law enforcement purposes?

8   **A.**   Yes.

9   **Q.**   In fact, let's talk about what the -- just a second.

10          Let's talk, for a second, about the recording system

11  itself.

12          It was designed and, in part, would help -- for

13  example, Indiana State Police officers may want to get evidence

14  from recorded calls into the South Bend Police Department.   You

15  would assist the Indiana State Police in gathering that

16  information and providing it to them?

17  **A.**   Certainly.

18  **Q.**   And would your people, under your direction -- and,

19  probably, ultimately, Karen DePaepe or Diana Scott -- also help

20  retrieve recorded conversations for the Indiana State Police?

21  **A.**   Yes.

22  **Q.**   And also would retrieve 911 calls when requested to do so

23  for investigation?

24  **A.**   Yes.

25  **Q.**   And also receive anonymous -- to record anonymous tips to

1   assist the department in investigations?

2   **A.**   Yes.

3   **Q.**   Okay.  So in addition to your concern about complaints

4   about officer conduct or misconduct, the system that you had

5   installed then was being used for legitimate police business

6   purposes, in your opinion?

7   **A.**   Are you talking about the 911 and all of those or are you

8   talking about those officers' phones?

9   **Q.**   The entire system.

10          The entire system and the decisions that were made

11  to record with that system were all being done for legitimate

12  business purposes, for law enforcement purposes?

13  **A.**   Yes.

14  **Q.**   Okay.  That never changed during your time you were chief

15  with the department, did it?

16  **A.**   No.

17  **Q.**   Okay.  And, also, let's talk about what the recording

18  system was not at that time and see if you can agree with me on

19  this.

20          Is it true the system, since this time, in late

21  2004, did not record a conversation based upon its content?

22  **A.**   No.

23  **Q.**   Is it true that the system, at that time, did not record a

24  conversation based on the individual identity of the

25  participants in a conversation?

FAUTZ - CROSS-EXAMINATION

 1   **A.**   Correct.

 2   **Q.**   Is it also true that the system, at that time, did not

 3   record a conversation based on the time of day?

 4   **A.**   Correct.

 5   **Q.**   Is it true that the system, at that time, did not record a

 6   conversation to blackmail or intimidate a participant of a

 7   conversation?

 8   **A.**   Correct.

 9   **Q.**   Is it also true that the system, back at that time, did not

10   record any specific kind of conversation, whether it be a

11   private conversation or a racial conversation or any other type

12   of conversation?

13   **A.**   No, it didn't.

14   **Q.**   Isn't it also true the system that was put in place during

15   your command did not record a conversation to spy on,

16   embarrass, or threaten any participant?

17   **A.**   Correct.

18   **Q.**   So when you were in there and making these decisions and

19   discussing these things with your other officers, you indicated

20   that the officers themselves could ask for a line to be

21   recorded?

22   **A.**   In the case of Chief Kyle, he did, yes.

23   **Q.**   Right.  And Captain Bishop also asked that his line be

24   recorded, as well?

25   **A.**   Well, when I explained to him that Kyle's line was, and if

1    you want your line taped, and he responded about continuing to

2    do Internal Affairs items, I assumed that's what he was getting

3    at.

4    **Q.**  All right.  When the system was done, there was a list

5    prepared of recorded lines.

6          Do you remember that Karen DePaepe kept a list of

7    the recorded lines?

8    **A.**  I don't recall seeing that list.

9    **Q.**  Okay.  She may or may not have; you just don't recall?

10   **A.**  Correct.

11   **Q.**  You're not aware of any other time after 2004 that any

12   outside vendor came in to record another line at your direction

13   other than that fall period of 2004?

14   **A.**  Not that I can recall.

15   **Q.**  Okay.  I'll take back your deposition, if you don't mind.

16          MR. WALTON:  May I approach?

17          THE COURT:  Yes, you may.

18          MR. WALTON:  Thank you.

19   **Q.**  Mr. Fautz, in the exhibit book in front of you, at

20   Exhibit 9, if you'll turn to that, and, actually, it's the

21   second and third pages of Exhibit 9.

22   **A.**  (Witness complies.)

23   **Q.**  Do you ever recall seeing that list of recorded telephone

24   lines?

25   **A.**  I don't recall seeing it, but --

1    **Q.**  Okay.  In reviewing -- so you don't recall ever seeing it

2    or Karen ever giving it to you?

3    **A.**  I don't recall ever seeing it, but we're talking a long

4    time ago.

5    **Q.**  I understand.

6             So whatever Karen says was done with this list --

7    would you have any reason to believe that Karen DePaepe would

8    have prepared a list of recorded telephone lines and, for

9    example, added any extra lines that weren't being recorded or

10   would have deliberately left out any lines that were being

11   recorded?

12   **A.**  I don't believe she would leave out anything.  I don't know

13   what the purpose or how she prepared this --

14   **Q.**  I understand.

15   **A.**  -- or even -- there's no date on it, so I don't know when

16   it was prepared.

17   **Q.**  Can I ask you, in your opinion, when Karen worked for you

18   and with you, was she honest with you, in your opinion, at all

19   times?

20   **A.**  Yes.

21   **Q.**  She wasn't deceptive in any way?

22   **A.**  No.

23   **Q.**  Did she involve herself in any police politics or anything

24   along those lines or did she avoid it, in your opinion?

25   **A.**  Not my knowledge.

1   **Q.**   Okay.  So if Karen would have said that she prepared this
2   list, you would have no reason to believe that every line that
3   was being recorded would be -- this would be a true and
4   accurate list of the lines being recorded?
5   **A.**   I would assume that, yes.
6   **Q.**   Okay.  No reason to doubt her, based on your experience
7   with her?
8   **A.**   No.
9   **Q.**   All right.  On that list of lines is 245-6031.  There were
10  three lines showing going into the Detective Bureau, and I can
11  help you with two of them, if you don't mind, Mr. Fautz.
12         The Detective Bureau lines 9263 and 9264 were to the
13  assistants of the chief of the Detective Bureau at the time?
14  **A.**   Yes.
15  **Q.**   And then 245-6031 was also going into the Detective
16  Bureau's line, at some point in time, according to this list?
17  **A.**   Yes.
18  **Q.**   Now, you indicated in earlier testimony -- and, again, if
19  you want to refer to your deposition, I can give it back to
20  you -- but you also had discussed earlier the idea that in
21  determining which officers would want to have their lines
22  recorded, you spoke with officers that you felt had more of a
23  contact with the public to see if they would want their lines
24  recorded so that you could help document the conversations and
25  telephone calls going in and out to the department?

FAUTZ - CROSS-EXAMINATION

1   **A.**   It was a roundtable discussion where we came to that

2   agreement.

3   **Q.**   Okay.  Was a position of captain a position -- if a captain

4   had asked for his or her line to be recorded, and, say, the

5   captain was in the Detective Division, would you have honored

6   his request?

7   **A.**   I guess it would depend on the request and what it involved

8   and I would have to hear why.

9   **Q.**   Okay.  Do you remember Rick Bishop being concerned about

10  getting some threatening telephone calls on his line when he

11  was a captain and he specifically requested that his line be

12  recorded?

13  **A.**   I don't recall that, but I do -- I don't recall him asking

14  for his line to be recorded.  I do recall we had a gentleman

15  making some threats.  I don't believe Rick was assigned to the

16  Detective Bureau at the time.  I think it was when he was

17  working kind of a little bit of a hybrid position of a little

18  bit of Risk Management, assisting in Internal Affairs, but I

19  don't have a direct recall on him asking that his line be

20  taped.

21  **Q.**   Okay.  May he have and you just don't remember?

22  **A.**   It's possible.

23  **Q.**   Do you remember if it could have been close in time when

24  this remodel was taking place?

25  **A.**   I mean, that would have been the timeframe when Rick was

1    helping out in Internal Affairs.

2    **Q.**  Okay.  So Rick had indicated -- and I'm just trying to see

3    if it fits with your memory -- that he was kind of working in

4    the Detective Bureau and also working in Internal Affairs sort

5    of simultaneously?

6              MR. SULLIVAN:  Objection.  That mischaracterizes the

7    evidence.  There's no testimony to that.

8              MR. WALTON:  I'm asking if he remembers that time.

9    That's all.

10             MR. SULLIVAN:  I object, Your Honor.  He

11   mischaracterized the testimony.

12             MR. WALTON:  I'll withdraw it and start over.

13   **Q.**  Do you remember a time period when Rick Bishop was working

14   in both the Detective Bureau and in Internal Affairs?

15   **A.**  Yes.  When we put IA Pro into play, Rick played a lead role

16   in that, keeping the data flowing and maintaining that system.

17   He was working Internal Affairs, and I can't say for sure if he

18   was still assigned to the Detective Bureau but the majority of

19   his work, I believe, was in the other area.

20   **Q.**  Okay.

21   **A.**  That's to the best of my recollection, like I say.

22   **Q.**  That's fine.

23             I want you to turn to Exhibit 43, if you would.

24   **A.**  (Witness complies.)

25   **Q.**  Do you have it there, Mr. Fautz?

 1    **A.**   Yes.

 2    **Q.**   Okay.  This is the resumé of Rick Bishop that he put

 3    together.  He indicates that he was in the Detective Bureau as

 4    a captain from October 3, 2002, to January 1, 2005.

 5          Does that sound about right to you from your memory?

 6    **A.**   I would assume it was in that range, yes.

 7    **Q.**   And then he was captain of Risk Management in Internal

 8    Affairs from January 1, '05, to January 10, 2007?

 9    **A.**   Yes.

10    **Q.**   Now, if you will turn to -- well, let's just go through the

11    rest of it.

12          Then he indicates he was division chief of the

13    Investigative Division from January 5, 2007, to February 28,

14    2010?

15    **A.**   Yes.

16    **Q.**   When did you leave as captain -- I mean, as chief of the

17    police; do you recall?

18    **A.**   December 28th, 2007.

19    **Q.**   2007.

20          So Rick, just like you indicated, would have been

21    division chief under your command at some point?

22    **A.**   Yes.

23    **Q.**   Okay.  Then look at Exhibit 44, please.

24    **A.**   (Witness complies.)

25    **Q.**   That's the card of Captain Rick Bishop when he was in

1  Professional Standards with the number 6031.  Do you see that?

2  **A.**  Yes.

3  **Q.**  Then Exhibit 45, the identification card of Rick Bishop

4  with number 6031 when he was division chief of the

5  Investigative Division?

6  **A.**  Yes.

7  **Q.**  And then, if you turn to Exhibit 46, you were asked to look

8  at that before, the Investigative Division.

9  **A.**  (Witness complies.)

10  **Q.**  At that time, Captain Richard Bishop had 6031 as a captain

11  in the Investigative Division at some point when Chief Kyle was

12  the division chief?

13  **A.**  Yes.

14  **Q.**  Now, you indicated, when Rick Bishop took over of Gene

15  Kyle's position, that you had informed him that Chief Kyle's

16  line had been recorded at that time?

17  **A.**  Yes.

18  **Q.**  Okay.  And then you also testified -- and I'm just asking

19  you if this is right -- when you talked to Rick Bishop, you

20  said:  "Now, I understood from your previous testimony that you

21  were the one that actually sat Bishop down and explained to him

22  that the line was recorded?"

23        And you indicated, "Yes," you had?

24  **A.**  Yes.

25  **Q.**  And you were asked, "Did you ever communicate to Karen that

1    you were having these specific conversations with the officers

2    to advise them?"

3            You said, "No."

4    **A.**   No, I didn't.

5    **Q.**   Okay.  And then you said, "No, I never told her about

6    Bishop.  I told her, when we originally set those up with those

7    officers, you know, it was with their permission and

8    knowledge."

9            And you said you never told her about Bishop?

10   **A.**   No.

11   **Q.**   Okay.  Was there a reason for that or just your memory is

12   that you never told her that conversation?

13   **A.**   I don't know what was in my mind then, but I didn't tell

14   her.

15   **Q.**   Okay.  Then you were asked, "At the time of the transition

16   from one individual to the next, did you sit Karen down and say

17   you were doing this with Bishop?"

18           And you said, "No.  No, I didn't."

19           Is that right?

20   **A.**   Yes.

21   **Q.**   Your memory is, clearly, then, that Rick Bishop knew his

22   line was being recorded, and you asked Rick Bishop if he wanted

23   his line to continue being recorded; is that right?

24   **A.**   Not continue.  I mentioned that Chief Kyle's line was

25   taped.  I didn't know if he was going to keep this number

1    that's assigned to him or if he was going to take Kyle's

2    number.  And if he took Kyle's number, I wanted him to know

3    that that line was being taped.

4    **Q.**  All right.  As far as you are aware, after you had these

5    conversations with your entire command staff, and they

6    installed the changes in this system with the remodel, had your

7    purpose for recording the system ever changed from the time you

8    left as chief?

9           I think I maybe asked you that.

10   **A.**  No.

11   **Q.**  And were you around when Chief Fautz -- sorry -- Chief

12   Boykins came in as chief?

13   **A.**  I was there up till my last day during the transition

14   period, but his first day as chief was the day I left.

15   **Q.**  Did you ever have an opportunity to explain to him anything

16   about the recording system, or did you assume that Karen would

17   pick that up and talk to him about it?

18   **A.**  When he -- no, not when he was assuming my position.  When

19   he took the Uniform Division chief's job, yes, I said something

20   to him then.

21   **Q.**  Right.  That his line was being recorded?

22   **A.**  Yes.

23   **Q.**  Did he indicate to you that he did not want his line

24   recorded?

25   **A.**  No.

1   **Q.**   In fact, did any of these officers in your command ever

2   indicate to you that they didn't want their line recorded?

3   **A.**   No.   I mean, they felt it was a good idea.

4   **Q.**   And so did you?

5   **A.**   Yes.

6   **Q.**   The testimony has been, in this case, that the final

7   decision as to what lines are or are not recorded are up to you

8   as chief.

9            Was that your understanding while you were there at

10  the department?

11  **A.**   I think the chief had the final say, yes.

12  **Q.**   Okay.   So even if somebody didn't want their line recorded,

13  you actually could have ordered it recorded if you felt it was

14  for legitimate business purposes?

15  **A.**   If they gave me their permission.

16  **Q.**   I understand.

17           You would have told them at the time that it was

18  going to be recorded, but you could have said, "Whether you

19  want to or not, I'm going to record it," but that didn't

20  happen, right?

21  **A.**   That didn't, and I couldn't see me doing that.

22  **Q.**   Okay.   Now, in 2004, when this recording system, again, was

23  set up, and you went through your department to try to

24  determine what would be the best way in which to handle the

25  recording system, there were also civilians or people that

1    worked at the department whose lines were also being recorded;

2    is that right?

3    **A.**   Their own personal lines?

4    **Q.**   The lines where civilians worked who actually handled the

5    calls, like, at 911 and dispatch and those areas.

6    **A.**   Oh, yes, 911, radio room, those lines, yes.

7    **Q.**   And there were civilians there whose lines were being

8    recorded.

9           And so did any of those people ever complain about

10   whether or not their line should or should not be recorded

11   while you were captain?  I mean while you were chief.  I'm

12   sorry.

13   **A.**   No.

14   **Q.**   Was it common knowledge, during the time while you were

15   chief, that the officers there, in your opinion -- all the

16   officers knew that lines were being recorded into the

17   South Bend Police Department?

18   **A.**   I can't speak for everyone, but I assumed they knew that

19   911 and the front desk lines were being taped.  Other than

20   that, I don't know what their knowledge would be.

21   **Q.**   All right.

22   **A.**   I can speak as an officer on the street when I was there.

23   I didn't know.

24   **Q.**   You didn't know any lines were being recorded?

25   **A.**   Oh, you knew 911 was, you knew the front desk was, but

1    other than that, I mean, that's pretty much where your

2    knowledge would end.

3    **Q.**   You would also know that the chief could make a decision on

4    what lines could be recorded, as well, right?

5    **A.**   I'm sure, yes.

6    **Q.**   Okay.  Did you ever instruct any of your chain of command

7    to not tell any of the other officers in the department that

8    their lines were now being recorded?

9    **A.**   When I talked with Karen, I asked her to keep it discreet

10   that my line, Kyle's line, and Hassig's line were being taped,

11   and I included Internal Affairs, that I wanted that kept

12   discreet, that it was a personal tool for them.

13   **Q.**   But did you ever instruct any of those officers not to let

14   other officers know their lines were being recorded?

15   **A.**   No.  I mean, that would be up to them, but, no, I didn't

16   instruct them.

17   **Q.**   In fact, for transparency, wouldn't you think that the

18   other officers that were there, if their lines were being

19   recorded, they would let other officers know that, "Hey, if you

20   call me, you know, my line is being recorded"?

21         You wanted not just your command staff to know, but

22   you weren't trying to hide it from other officers in the

23   department, were you?

24   **A.**   Well, I wouldn't ever want to inhibit anybody from talking

25   to those people.  If they wanted people to know, I guess it

1    would be up to them to tell them.  I wasn't going to announce

2    to the entire department or the community in that respect.

3    **Q.**  I understand.

4          But you would expect that the other officers in your

5    command would let other officers know, "Hey, if you call me on

6    this line, I'm being recorded"?

7    **A.**  I can't speak for them, what they did or what they didn't

8    do.

9    **Q.**  You didn't prohibit that, though?

10   **A.**  No.

11   **Q.**  So if an officer moved into a new office during the time

12   you were captain and got a new number, could that officer come

13   to you or Karen, based on your experience, and say, "Hey, are

14   any of my lines being recorded?"

15   **A.**  Certainly they could come, and we would tell them.

16   **Q.**  You wouldn't hide it from anybody?

17   **A.**  No.

18   **Q.**  All they would have to do is ask?

19   **A.**  Correct.

20         MR. WALTON:  Just a second, Your Honor.

21         (Brief pause.)

22   BY MR. WALTON:

23   **Q.**  From looking at the exhibits that we looked at regarding

24   6031, would you agree with me that that line was Rick Bishop's

25   line?

 1   **A.**  On this document, yes, it was.  On his business card, it

 2   was.

 3   **Q.**  And on the list, when he was in the Detective Bureau, 6031

 4   was his line, as well?

 5   **A.**  Well, that's the way it appears on this line.

 6           MR. WALTON:  Okay.  Thank you.  That's all the

 7   questions I have.

 8           THE COURT:  Mr. Pfeifer.

 9                        CROSS-EXAMINATION

10   BY MR. PFEIFER:

11   **Q.**  By "this list" that you've just been referring to, what

12   exhibit number is that?

13   **A.**  46.

14   **Q.**  And those are the business cards for Rick Bishop, correct?

15   **A.**  Yes.

16   **Q.**  Taking a look back at Exhibit 9, if you would, please, the

17   third page; do you see that?  It starts out "Administrative

18   Phones" and then there's -- two, four, six -- "Front Desks" and

19   then "Internal Affairs," "Chief's Office."

20           Do you see that?

21   **A.**  Yes.

22           MR. PFEIFER:  Does the Court have a copy of that or

23   do you need it on ELMO, Your Honor?

24           THE COURT:  It would be easier, if you want, to put

25   it up on ELMO, or not.

RAMIREZ - CROSS-EXAMINATION

1      MR. PFEIFER:  I didn't know if you had a copy up

2  there or not.

3      THE COURT:  At the end of the day, I'll trust I'll

4  have copies of everything.

5      MR. PFEIFER:  Okay.

6  **Q.**  Now, with respect to that third page of Exhibit 9 -- and I

7  will put it up on ELMO -- we know that Gene Kyle's phone number

8  was 9550 (sic), correct?

9  **A.**  I'm going to have to look at this other sheet then.

10  **Q.**  I think it's Exhibit 46.

11      5990.  Excuse me.

12  **A.**  Yes.

13  **Q.**  Okay.  And Gene Kyle was the division chief in the

14  Investigative Division, and Rick Bishop took his place,

15  correct?

16  **A.**  Yes.

17  **Q.**  So going back to Exhibit 9, which is a list of lines that

18  were recorded, the number 5990, Gene Kyle's number, is not on

19  that list, correct?

20  **A.**  Yes.

21  **Q.**  So we know that, when this list was generated, either Gene

22  Kyle's number was not put on the list, if it was being

23  recorded, or it was a list that was generated after Gene Kyle

24  was no longer the division chief; would you agree with that?

25  **A.**  I would agree with it.

1    **Q.**   Okay.  So the 6031 number, that was a number that Rick

2    Bishop had when he was a captain in the Investigative Division,

3    the Detective Bureau, correct?

4    **A.**   Yes.

5    **Q.**   Then his office physically relocated from the Detective

6    Bureau over to the other side of the building, and that was the

7    Internal Affairs section?

8    **A.**   I can't be sure where his office ended up, but he

9    progressed to the Internal Affairs Division.

10   **Q.**   And the Internal Affairs Division was in a completely

11   different end of the police station, even after it was

12   remodeled, correct?

13   **A.**   Yes.

14   **Q.**   And then after being in the Internal Affairs section, when

15   Rick Bishop became the division chief, he went back to the

16   Detective Bureau, correct?

17   **A.**   Yes.

18   **Q.**   And 6031 seems to be a number that's following Rick Bishop

19   when he is in the Detective Bureau as a captain, when he goes

20   over to the Internal Affairs section, and then when he comes

21   back to the Detective Bureau; is that correct?

22   **A.**   Yes.

23   **Q.**   So when the decision was made, at Gene Kyle's request, to

24   have his phone line recorded, he was the division chief, and he

25   had the number 5990, correct?

1    **A.**  According to this sheet, yes.

2    **Q.**  When Rick Bishop took over as the division chief of the

3    Detective Bureau, his number was 6031; would you agree with

4    that?

5    **A.**  Yes.

6    **Q.**  So when the decision was made to record individual

7    officer's lines with their permission, you were not recording

8    necessarily a specific line, 5990, that would always be the

9    division chief's line of the Detective Bureau; is that correct?

10   **A.**  That's correct.

11   **Q.**  Because individual officers took their lines from location

12   to location within the building, if that was possible, with

13   this system?

14   **A.**  Yes.

15   **Q.**  You were asked questions by Mr. Walton about the law

16   enforcement purposes of recording phone lines.

17           Do you recall him asking you that question?

18   **A.**  Yes.

19   **Q.**  In terms of recording the front desk, was the front desk --

20   or were the front desk phone lines always recorded, as long as

21   you knew it, when you were the chief?

22   **A.**  Yes.

23   **Q.**  Did all the other officers know that, to your knowledge?

24   **A.**  Yes.

25   **Q.**  That's the common knowledge that you're talking about?

1    **A.**   Yes.

2    **Q.**   The 911, the communications section of the police

3    department, those lines were recorded, correct?

4    **A.**   Yes.

5    **Q.**   Those functions, the communications function and the 911

6    function, is that the recording of the phone lines, those

7    functions, that you're talking about when you talk about "law

8    enforcement purposes"?

9    **A.**   Yes.

10   **Q.**   With respect to individual lines, when you had the series

11   of meetings with your command staff, and you were making

12   decisions ultimately to make available to your division chiefs

13   the recording of their lines, was that decision that was made

14   by you and your command staff a decision that was made for the

15   benefit individually of the officer?

16   **A.**   Yes.

17   **Q.**   It wasn't a law enforcement purpose for the division chief

18   of the Investigative Bureau to have his personal line recorded;

19   it was more of an individual benefit for that officer; would

20   you agree with that?

21   **A.**   Yes.

22   **Q.**   In your experience as the chief of police, is there any law

23   enforcement purpose for the recording of a police officer's

24   phone line without his or her knowledge that the phone line is

25   being recorded?

FAUTZ - CROSS-EXAMINATION

1    **A.**   The only circumstance I could think of is if there was a

2    warrant to do something like that, but not -- not without his

3    permission or knowledge.

4    **Q.**   Absent a warrant or absent an investigation that was being

5    conducted, would there be any legitimate law enforcement

6    purpose to record an individual phone line without that

7    individual's knowledge or permission?

8    **A.**   No.

9    **Q.**   In fact, the duty manual -- take a look, if you would, at

10   Exhibit 12.

11   **A.**   (Witness complies.)

12   **Q.**   The duty manual talks about, in the "Employee Rights,"

13   paragraph A, that if an individual officer is being

14   investigated by Internal Affairs, the individual officer has

15   the right to know that the investigation is taking place; is

16   that correct?

17   **A.**   Yes.

18   **Q.**   Would Karen DePaepe, as director of the communication

19   department or division or section of the South Bend Police

20   Department, ever have any right or authority to conduct any

21   type of investigation?

22   **A.**   No.

23   **Q.**   As the chief of police, if a phone line was mistakenly

24   recorded, as in the case with Brian Young, once it is learned

25   that that line was mistakenly recorded, and Brian Young did not

1  know that the line was being recorded, what would you expect

2  the person who made that discovery to do?

3  **A.**   Notify the chief so that we could terminate it immediately.

4  **Q.**   Would you expect that person, whoever that person might be,

5  to continue to listen to phone conversations of, in this

6  illustration that I'm giving to you, Brian Young, for almost a

7  year without letting you, as the chief of police, know that

8  fact?

9           MR. WALTON:  Objection, Your Honor.  It assumes a

10  fact not in evidence.  He was no longer chief when this took

11  place.

12          MR. PFEIFER:  I said if he had been the chief of

13  police.  That's the way the question was phrased.

14          MR. WALTON:  Well, he's not entitled to hypothesize

15  what he would have done in 2010 or 2011.

16          THE COURT:  I'm going to overrule the objection;

17  however, I'm not sure how much relevancy it has because he

18  wasn't the chief at that time, but I'll overrule the objection.

19          MR. PFEIFER:  That's fine.

20  **A.**   Can you repeat that?

21  **Q.**   Yes, I will repeat it myself, for the benefit of the court

22  reporter.

23          Let me rephrase it this way:  When you were the

24  chief of police, if it was discovered by somebody in the

25  communications section that a phone line had been mistakenly

1   recorded without the knowledge of the person that that line was

2   assigned to, and the person in communications listened to those

3   phone recordings for up to a year, would that, as the chief of

4   police, when you were the chief, have been acceptable to you?

5   **A.**   No.

6   **Q.**   Why not?

7   **A.**   It should have been reported immediately, notify the

8   officer of what happened, and then talk with the City attorney

9   about what we do with that information and that tape.

10          MR. PFEIFER:  If I could have a second, Your Honor?

11          (Brief pause.)

12  BY MR. PFEIFER:

13  **Q.**   From your perspective, as the chief of police, does it

14  serve any law enforcement purpose for a phone line to be

15  inadvertently recorded and the recording of that phone line to

16  be listened to?

17  **A.**   No.

18          MR. PFEIFER:  Thank you.

19          THE COURT:  Redirect?

20          MR. SULLIVAN:  Yes, sir.

21                     REDIRECT EXAMINATION

22  BY MR. SULLIVAN:

23  **Q.**   Chief, just a few follow-up.

24          Chief Fautz, I'm going to read what is a stipulated

25  fact in this case, Stipulation Number 15.

1          "Former Chief Boykins made no changes to any of the

2     lines that were recorded and specifically adopted the approach

3     of Chief Fautz and issued no written or oral directive to

4     create a policy, procedure, practice, or routine, and none was

5     implemented during his tenure."

6          That's a stipulated fact in this case.

7          So based upon that and the fact that former Chief

8     Boykins wanted to specifically adopt your approach, would you

9     say it fits your approach to have the telephone line 6031

10    recorded, no matter who it was directed to, even without their

11    knowledge?  Would that fit your approach?

12    **A.**  No.

13    **Q.**  Okay.  And just to be clear, would there be any recording

14    of a phone line without permission or knowledge -- a privately

15    assigned phone line -- without permission or knowledge that

16    would fit your approach?

17    **A.**  No.

18    **Q.**  You recall there were some questions about the entire

19    system, This recording system was not for the purpose of

20    intimidating, et cetera.  Do you remember that line of

21    questioning by Attorney Walton?

22    **A.**  Yes.

23    **Q.**  Okay.  How much do you know about the system?

24    **A.**  Not much.

25    **Q.**  Okay.  You know it records lines?

1    **A.**   Yes.

2    **Q.**   You know it records the lines that are wired into it?

3    **A.**   Yes.

4    **Q.**   But we also now know that an officer took over a line

5    without knowledge or permission, as has been stipulated in this

6    case.

7              So if that happens, is it possible that the system

8    then could be used for improper purposes?

9    **A.**   I guess it's possible.  I would hope it wouldn't.

10   **Q.**   I understand.  I'm just trying to be sure we round out the

11   testimony about what's possible with the system.

12   **A.**   Okay.

13   **Q.**   In the case of a telephone line that is placed in an

14   office, and that officer doesn't know it's there, doesn't know

15   it's recording, but other people do know that and don't tell

16   that officer, can the system then potentially be used for

17   improper purposes?

18   **A.**   Potentially.

19              MR. SULLIVAN:  Okay.  Thank you, Chief.

20              No further questions.

21              THE COURT:  Recross?

22              MR. WALTON:  Yes.

23                          RECROSS-EXAMINATION

24   BY MR. WALTON:

25   **Q.**   Mr. Fautz, when I asked you earlier about and showed you

1    the lines going into the Detective Bureau that were on that

2    list, there were three of them.

3           Do you remember that?

4    **A.**   Yes.

5    **Q.**   One of them was 6031 that we now know is Rick Bishop?

6    **A.**   Yes.

7    **Q.**   The other two, 9263 and 9264, were the secretaries of, at

8    the time, Gene Kyle; is that right?

9    **A.**   Yes.

10   **Q.**   Because, actually, they're also noted on that exhibit, that

11   one of them is the secretary of Gene Kyle being recorded?

12   **A.**   I think the other one is, like, the rollover line that it

13   goes to.

14   **Q.**   Right.  So, in fact, 9263 and 9264 were recording lines

15   coming into Gene Kyle's secretary after this meeting that you

16   had?

17   **A.**   That was before the meeting.

18   **Q.**   Oh, okay.  They were always being recorded?

19   **A.**   Yes.  I can't say "always," but they had been recorded for

20   a number of years, I'm sure.

21   **Q.**   Now I want to talk to you about some of your other

22   testimony about these individual lines.

23          You're not really telling everybody that there's no

24   circumstances under which recorded lines into any one of your

25   chief of a division's office couldn't be used for law

1    enforcement purposes, are you?

2          I mean, can't you see somebody calling into the

3    chief of the Detective Bureau and giving them anonymous tips,

4    giving them information that might assist them in their case?

5          MR. PFEIFER:  I object.  I realize it's a bench

6    trial, but I'm going to object to the form of the question.

7          First of all, it's compound.  There was a statement

8    made at the very beginning of the question, and I don't know

9    which question he's really --

10          MR. WALTON:  I will rephrase it.

11          MR. PFEIFER:  Thank you.

12    BY MR. WALTON:

13    **Q.**  When you're recording the chiefs' lines of all your

14    divisions, at least three of your divisions, if somebody called

15    in and gave an anonymous tip to Chief Boykins when he was there

16    or Chief Kyle when he was there, that could be used for law

17    enforcement purposes, could it not?

18    **A.**  Yes.

19    **Q.**  You would have used that information to further the

20    business of the department?

21    **A.**  Yes.  If they brought it forward, yes.

22    **Q.**  Likewise, if there was a complaint about Chief Boykins when

23    were you there or Chief Kyle when you were there or someone in

24    Internal Affairs whose line you knew was being recorded, that

25    would be used to investigate whether or not that chief had

FAUTZ - RECROSS EXAMINATION

1    misconduct or whether or not there may have even been -- well,

2    let me just leave it with that.

3              Isn't it possible that that would be for law

4    enforcement purposes to determine whether or not that

5    particular person, whose line had been recorded, was acting

6    appropriately?

7    **A.**  First, I would have to know about it, and having never

8    listened to any of those lines or asked to have them listened

9    to, it would be up to them to bring that forward.

10   **Q.**  All right.  Well, you indicated, though, when the

11   individual came in and asked for it, you thought it was

12   important that these particular individuals have transparency

13   with the public because you're having a lot of misconduct or

14   things being reported in the community, so you wanted to have

15   transparency.

16             That's one of the reasons why you asked for these

17   individual lines to be recorded; is that right?

18   **A.**  I asked Karen; however, the first one, Chief Kyle's, he

19   requested.  The second one, in open discussion, we decided to

20   add my line and Chief Hassig's line.

21   **Q.**  Again, to respond to possible complaints from the public

22   about misconduct, things of that nature?

23   **A.**  In a way, yes.  Like I said, it was like an insurance

24   policy or a CYA for that person, that we did what we were told

25   and how we reacted to it.

FRITZ - RECROSS EXAMINATION

1   **Q.**  I understand.  But there could be circumstances where that

2   same recorded conversation could be used against that officer,

3   of a complaint of that officer, correct?

4   **A.**  Potentially, yes.

5   **Q.**  You don't know what's going to come into that line when

6   you're the chief of a division, do you?

7   **A.**  No.

8   **Q.**  It could be anything?

9   **A.**  Yes.

10  **Q.**  It could be about a murder?

11  **A.**  It could be.

12  **Q.**  Okay.  Then with regard to some questions you were asked

13  about Karen and her authority, it was within Karen's authority

14  to respond to requests from outside agencies to get information

15  and to look for conversations in response to that request; is

16  that right?

17  **A.**  I think you would have to be a little bit more specific on

18  conversations.

19  **Q.**  All right.  I'll give you some examples.

20  **A.**  Case related?

21  **Q.**  Case related.

22  **A.**  Okay, yes.

23  **Q.**  Indiana State Police comes in and say they want her to

24  check some lines for some information.

25          Yes?

1   **A.**   Yes, 911, those types.

2   **Q.**   And if she came upon a conversation, I think you indicated,

3   even in your deposition, she would have to listen to that

4   conversation long enough to realize if that was responsive to

5   that request?

6   **A.**   Yes.

7   **Q.**   So she did have authority to listen to conversations for a

8   specific length of time in order to determine whether or not

9   the information she was gathering for others was going to be

10  relevant or material to the investigation?

11  **A.**   I don't know that her decision was what was relevant or

12  material.  I know that when I worked in investigation, if I had

13  requested some information from a call-in into the department,

14  I would sit there with her and listen to it and tell her what

15  parts I needed.

16  **Q.**   But there were times that didn't happen, right, where she

17  was just asked -- for example, a FOIA request, if she was asked

18  for freedom of information from the press.  Somebody from the

19  press didn't sit with her and go through the lines?

20  **A.**   No.

21  **Q.**   So there were times where she had to use her discretion of

22  what was in the context of what was being sought; fair enough?

23  **A.**   I would assume so, yes.

24  **Q.**   And if she came upon a conversation -- well, let me ask you

25  this:  She was also responsible for maintaining that system to

1  make sure it was operating appropriately, correct?

2  **A.**  Yes.

3  **Q.**  So she would have authority to go into the system to

4  determine if the lines were still being appropriately recorded

5  had there been a problem with the system or a shutdown?

6  **A.**  Yes.

7  **Q.**  And in going through that process, if she came upon a

8  conversation that she felt was conduct that may be unbecoming

9  of an officer, would she have to use her judgment about how

10  much of that conversation to listen to before she decided to

11  make that kind of allegation up the chain of command against an

12  officer in the department?

13  **A.**  I'm sure it would take a lot of consideration on her part

14  to step forward and do that, yes.

15  **Q.**  Okay.  You wouldn't expect her to ignore it or only listen

16  to five seconds of it before she reported an officer for

17  misconduct; fair enough?

18  **A.**  I would feel more comfortable if she notified me right away

19  and we would have determined together what was appropriate.

20  **Q.**  I understand.  But you would have expected her to do her

21  due diligence?

22  **A.**  On checking the lines to make sure they're working, yes.

23  **Q.**  And before making an allegation against an officer to you,

24  you would also expect her to use her good judgment?

25  **A.**  To a certain extent, yes.

FAUTZ - FURTHER REDIRECT EXAMINATION

1    **Q.**  Did you ever have experience with her at any time you

2    worked with her where, in your opinion, she didn't exercise

3    appropriate judgment about such matters?

4    **A.**  No.

5            MR. WALTON:  Thank you.

6            THE COURT:  Recross?

7            MR. PFEIFER:  No, Your Honor.

8            MR. SULLIVAN:  Very briefly.

9                    FURTHER REDIRECT EXAMINATION

10   BY MR. SULLIVAN:

11   **Q.**  Let's just pick up on this last point Attorney Walton

12   asked.

13           The question had to do with how much review somebody

14   in the position of Karen DePaepe should do if she's aware of

15   some allegation.

16           Do you recall that?

17   **A.**  Yes.

18   **Q.**  There's another stipulation in this case, and it's a

19   stipulation that the telephone conversations captured by the

20   Police Department's DIR recording system and then subsequently

21   reduced to five audio cassette tapes by Karen DePaepe occurred

22   on the following dates:  February 4th, 2011, April 5th, 2011,

23   June 3rd, 2011, June 6th, 2011, June 16th, 2011, June 27th,

24   2011, July 14th, 2011, July 15th, 2011.

25           Now, do you think -- one, two, three, four, five,

FAUTZ - FURTHER REDIRECT EXAMINATION

1   six, seven, eight different days, covering a span of February

2   through July.  Would you expect your communications director to

3   conduct an investigation in which, from February through July,

4   conversations had to be reviewed and determined which ones to

5   put on a cassette tape so that they could be placed with an

6   Officer's Report a year after discovering the line was taped?

7           MR. WALTON:  Your Honor, I object.  He has no

8   personal knowledge of the circumstances that occurred at the

9   time.  He wasn't there.  He wasn't chief.  Chief Boykins was

10  there at the time.  He has no basis to answer that question.

11          MR. SULLIVAN:  Your Honor, I'm responding directly

12  to the examination that Mr. Walton made about what was proper.

13          THE COURT:  He can say what's proper on what he

14  would do.

15          MR. SULLIVAN:  My question, Your Honor -- and I

16  didn't quite get it out -- was going to be:  As chief, would he

17  consider those actions to be within the proper scope of duty of

18  the director of communications?  That was my question.

19          THE COURT:  His answer can't bind former Chief

20  Boykins, though.

21          MR. SULLIVAN:  I'm sorry, sir?

22          THE COURT:  His answer can't bind former Chief

23  Boykins.

24          MR. SULLIVAN:  No, sir.

25          THE COURT:  Okay.  You're just asking what would be

1    his opinion as to what would be appropriate conduct?

2            MR. SULLIVAN:  That's correct.

3            THE COURT:  With that caveat, I'm going to overrule.

4            MR. WALTON:  Again, Judge, just to make my record,

5    he wasn't there.  He doesn't know what Karen was telling the

6    chief.  He has no basis to answer this question.  He doesn't

7    know the facts under which these were recorded.  He doesn't

8    know the circumstances, whether they were a FOIA request or

9    under what circumstance.  He wasn't even there, so how can he

10   answer that question?

11           THE COURT:  He can answer it based on what was said

12   in the question.  He can't go beyond the question.

13           MR. WALTON:  I understand, Your Honor.  He has no

14   idea what was being recorded or why.

15           THE COURT:  And it's limited to what he would have

16   done based on the facts set forth in that question.  It's got,

17   probably, a limited relevancy.  I agree with you.

18           MR. WALTON:  Fair enough.

19   BY MR. SULLIVAN:

20   **Q.**  Can you answer my question, Chief?

21   **A.**  Unless she was directed to do that by me, no.  That should

22   have been reported at the first instance.

23           MR. SULLIVAN:  Thank you.  No further questions,

24   Your Honor.

25           THE COURT:  Mr. Walton.

FAUTZ - FURTHER RECROSS-EXAMINATION

```
 1                    FURTHER RECROSS-EXAMINATION
 2    BY MR. WALTON:
 3    Q.  Are you aware that she did report it --
 4    A.  No.
 5    Q.  -- to Chief Boykins?  You don't know whether she did or
 6    not?
 7    A.  No, I don't.
 8              MR. WALTON:  Thank you.
 9              THE COURT:  Mr. Pfeifer?
10              MR. PFEIFER:  Still no.
11              THE COURT:  Any further questions for former Chief
12    Fautz?
13              MR. SULLIVAN:  No.
14              THE COURT:  Thank you very much.
15              We're going to take our afternoon break, about a
16    15-minute break, and we'll get back.
17              How long do you think the next witness will take?
18              MR. SULLIVAN:  I was going to discuss that with
19    counsel, Your Honor, to try and determine who we should call
20    next and how much time is left.
21              THE COURT:  I would like to get as far as I can get
22    this evening without beating the court reporter up too badly.
23              MR. SULLIVAN:  Yes, sir.  We will do our best.
24              THE COURT:  Okay.  We'll take about a 15-minute
25    break.
```

 1              MR. SULLIVAN:  Thank you.

 2              (Brief recess was taken.)

 3              THE COURT:  You can all be seated.

 4              One of the things I do, one of my habits, when I

 5    adjourn, you can go ahead and do whatever you want to do, at

 6    that point, because sometimes it takes me time to get my stuff

 7    gathered up or I'll forget things and everything else and I'll

 8    have to come back in three or four times to pick it up.  So

 9    once I say it's adjourned, it's a free fire zone.  You can do

10    whatever you want to at that point.

11              MR. SULLIVAN:  Thank you, Your Honor.

12              THE COURT:  Your next witness is?

13              MR. SULLIVAN:  Yes, sir.  It's Captain Darryl

14    Boykins.

15              THE COURT:  Would you please stand, raise your right

16    hand, and face the courtroom deputy.

17              (The witness was duly sworn.)

18              THE COURT:  You can be seated.

19                          DARRYL BOYKINS,

20    having been duly sworn, was examined, and testified as follows:

21                          DIRECT EXAMINATION

22    BY MR. SULLIVAN:

23    Q.  Good afternoon, Captain Boykins.  Thank you for your

24    patience today.

25              Would you state your full name and spell it for the

1    record.

2    **A.**   Darryl Boykins, B-o-y-k-i-n-s.

3    **Q.**   What's your current position with the South Bend Police

4    Department?

5    **A.**   Captain.

6    **Q.**   How long have you been a captain?

7    **A.**   For about two years.

8    **Q.**   Prior to that, you were the chief of police of the

9    South Bend Police Department?

10   **A.**   Yes.

11   **Q.**   What year did you become chief?

12   **A.**   Let me go back.  That was about 2000 -- six years ago, so I

13   would say 2007.

14   **Q.**   Did you follow Chief Fautz?

15   **A.**   Yes, I did.

16   **Q.**   You immediately succeeded Chief Fautz?

17   **A.**   Yes, I did.

18   **Q.**   Before you became chief -- well, all told, Captain, how

19   long have you been a police officer?

20   **A.**   Right now, 30 years.

21   **Q.**   Now, when you succeeded Chief Fautz, you didn't have a full

22   understanding about the capabilities of the voice recording

23   system at the police department at that time; isn't that

24   correct?

25   **A.**   No, I did not.

 1    **Q.**  You were never presented with a list of recorded lines;

 2    rather, you had some discussion with Karen DePaepe and Barb

 3    Holleman and you learned what was recorded?

 4    **A.**  Yes.

 5    **Q.**  There was nothing written in regard to procedures for

 6    recording lines in the police department; isn't that correct?

 7    **A.**  Yes.  There was nothing to go by.

 8    **Q.**  Captain Boykins, there's a stipulation in this case, which

 9    means that all parties agree to certain facts, and I'd like to

10    read that to you.

11             "Darryl Boykins made no changes to any of the lines

12    that were recorded.  He specifically adopted the approach of

13    Chief Fautz and issued no written or oral directive to create a

14    policy, procedure, practice, or routine, and none was

15    implemented during his tenure."

16             Did you understand what I just read?

17    **A.**  Yes, I do.

18    **Q.**  So you knew that Chief Fautz had, we'll call it, a certain

19    approach to things, right?

20    **A.**  Yes.

21    **Q.**  And you didn't know everything about it, but you knew he

22    had a certain approach?

23    **A.**  I didn't know why he did it.  I know he had the lines and

24    he taped for whatever -- I think official police policy or I

25    mean -- not conduct, but what his plans were to use them for,

1    but he didn't tell me.

2    **Q.**   Well, you wanted to follow whatever he did; isn't that

3    right?

4    **A.**   I kept it the same.  Whatever he had, I kept it the same.

5    I didn't change it.

6    **Q.**   You wanted to follow his protocols?

7    **A.**   Yes.

8    **Q.**   One aspect of that was that you believed that the division

9    chief of the Detective Bureau could have his line recorded on

10   demand, meaning when he wanted it?

11   **A.**   I really, on that part of it, I knew, under the new policy

12   on the new phones we got from VoIP, we could actually have the

13   phone taped or whatever, and the detective or captain or chief

14   who may have that on their line could be able to record their

15   own phone lines knowing their line was recorded.

16   **Q.**   In front of you, there's an exhibit binder, and right next

17   to that, there is a copy of your deposition.  Do you see that?

18   **A.**   Yes.

19   **Q.**   Do you remember taking a deposition in this case?

20   **A.**   Yes, I did.

21   **Q.**   I would ask you to go to page 38, and let me know when

22   you're there.

23   **A.**   I'm there.

24   **Q.**   There is a section of the deposition I would like to read

25   to you, starting on page 2.  So why don't you follow along with

1  me.

2          (Reading.) Question:  "Okay.  When that occurred,

3  what did you learn at that time as to the phone lines that were

4  being recorded, which ones?"

5          Answer:  "I learned that there were possibly 20

6  lines in the department.  There was a set of recording lines

7  that was recorded of phones with, I believe -- I believe the

8  front desk was recorded, I believe 911 lines was recorded, I

9  believe there was a line in the Records that was recorded, I

10  believe both secretaries' lines were recorded, I believe Gene

11  Kyle's was recorded, and I believe there was on some demand the

12  chiefs' and maybe the division chiefs' was recorded, but it was

13  on demand only."

14          Did I read that correctly, sir?

15  **A.**  Yes, you did.

16  **Q.**  Now move down to line 18.

17          Question:  "When you say the division chiefs' lines

18  were recorded on demand, what did you mean by that?"

19          Answer:  "If you wanted your own line recorded -- if

20  you wanted your own line recorded, you could say, 'Yes, I want

21  that recorded for whatever reason,' so it might have came up to

22  you.  You could ask."

23          Did I read that correctly?

24  **A.**  Yes.

25  **Q.**  So in your deposition, you recall that you testified that

1    it was your belief that part of the way that things had worked

2    with Fautz is that division chiefs in the Detective Bureau

3    could have their line recorded if they wanted?

4    **A.**  Yes.

5    **Q.**  Now, again, you're not the person with the most knowledge

6    about how physically, mechanically, how to get a line recorded,

7    right?

8    **A.**  Right.

9    **Q.**  You relied on your director of communications, Karen

10   DePaepe, for that, right?

11   **A.**  Yes.

12   **Q.**  And you learned from her what line -- about the lines; and

13   if you wanted to get a line recorded, then you just asked her

14   to do that?

15   **A.**  Yes.

16   **Q.**  You didn't go get a vendor yourself and arrange for that?

17   **A.**  No.

18   **Q.**  And you never directed her at any point to record a

19   particular officer?

20   **A.**  Right, I never told her.

21   **Q.**  Or a particular office?

22   **A.**  No, never told her.

23   **Q.**  You wanted to do what Chief Fautz had done?

24   **A.**  Yes.

25   **Q.**  Okay.  Now, starting in March of 2010, Captain Young became

1    assigned to the Detective Bureau when you were the chief?

2    **A.**   Yes.

3    **Q.**   And under the Fautz approach that you wanted to follow, you

4    would agree that, when he started there, his line should not

5    have been one of those recorded?

6    **A.**   I don't think, at that time, we even paid that much

7    attention to it when they were switching.

8    **Q.**   I understand.

9    **A.**   But I think, if he wanted his line stopped being taped, he

10   could have.  I don't think he knew his line was taped.

11   **Q.**   I agree with that.  Let me ask my question again.

12           When he came in, in March of 2010, he took over a

13   recorded line, didn't he?

14   **A.**   Yes.

15   **Q.**   And that's not what the Fautz approach was, to have the

16   captain take over a recorded line; would you agree with that?

17   **A.**   I don't really -- I can't, a hundred percent, agree with

18   it.  It's close, but I can't, a hundred percent, agree with,

19   under the Fautz thing, that this was policy he did.

20   **Q.**   Well, again --

21   **A.**   Maybe I'm misunderstanding what you're trying to tell me or

22   ask me.

23   **Q.**   Why don't you go to page 49, and let me know when you're at

24   page 49 of your deposition.

25   **A.**   Go ahead.

1   **Q.**  If you go down to line 7, and let me know when you're

2   there.

3   **A.**  Yes.  Go ahead.

4   **Q.**  Question:  "You would agree, would you not, that his phone

5   line" -- meaning Brian Young's -- "his phone line should not

6   have been recorded?"

7               Answer:  "No."

8               Question:  "No, you wouldn't agree with that?"

9               Answer:  "No, I'm just saying, it was for the

10  division chiefs' phone to be recorded, division chiefs' phone

11  to be recorded."

12  **A.**  Right.

13  **Q.**  Did I read that correctly?

14  **A.**  Yes.

15  **Q.**  Then, I think, if you go to page 51, as well, line 5, and

16  let me know when you're there, Captain.

17  **A.**  Yes.

18  **Q.**  You're on line 5?

19  **A.**  Yes, I am.

20  **Q.**  Question:  "Should Brian Young's phone line have been

21  recorded?"

22               Answer:  "If it's our policy, the way we had it set

23  up, no, his line shouldn't have been recorded."

24               Did I read that correctly?

25  **A.**  Yes, you did.

1   **Q.**   Then, finally, go to page 111, and let me know when you're

2   there.

3   **A.**   Go ahead.

4   **Q.**   Okay.  On line 11, it says, Question:  "Based upon

5   paragraph -- the last paragraph of page 1 of Exhibit 1, it was

6   not the intent to tape Officer Young?"

7              Answer:  "No, it wasn't the intent."

8              Question:  "It was not the intent to tape -- "

9              Answer:  "No."

10             Question:  It was done by mistake?"

11             Answer:  "Yes."

12  **A.**   Yes.

13  **Q.**   Okay.  So that was your sworn deposition testimony?

14  **A.**   Yes.

15  **Q.**   And you still believe that, don't you?

16  **A.**   Yes.

17  **Q.**   So I guess my question is, simply, that the Fautz approach

18  that you wanted to carry on had to do with having the division

19  chiefs choose whether or not to be recorded, rather than have

20  the captain step into a recorded line?

21  **A.**   Yes.

22  **Q.**   Now, you learned that Brian Young had stepped into an

23  office and was using a recorded line, rather than Steve

24  Richmond as the division chief; you learned that from Karen

25  DePaepe, right?

1  **A.**  Yes.

2  **Q.**  She explained that there was some problem with the system?

3  **A.**  Yes.

4  **Q.**  And that it should have been Steve Richmond who had stepped

5  into the division chief's line under the approach by Fautz,

6  right?

7  **A.**  Yes.

8  **Q.**  Okay.  When you learned that from Karen DePaepe, then, you

9  didn't take any steps to stop it?  In other words, you didn't

10  tell Karen, "Go correct that"?

11  **A.**  No, I didn't.  I didn't know all the details at that time

12  on it --

13  **Q.**  Okay.

14  **A.**  -- so I couldn't tell her to change that line at that time.

15       She might have came into my office and said, "Here's

16  the same line.  That's the line we put in."

17       I don't remember having a conversation saying,

18  "We're going to do Brian Young's phone."

19  **Q.**  But it would have been around March of 2011 that she would

20  have told you about this?

21  **A.**  Yes.

22  **Q.**  All I'm trying to establish is, in March when she came to

23  you and informed you of that, you didn't tell her, "Well, go

24  correct the mistake"; isn't that right?

25  **A.**  No, I didn't.

1  **Q.**  And you didn't tell her to go inform Brian Young either, at

2  that time?

3  **A.**  No.

4  **Q.**  And you didn't go to Steve Richmond, your division chief?

5  **A.**  I think Steve changed his line -- took the other phone and

6  reconnected his own line.

7  **Q.**  That's not my question, sir.

8          I'm just talking about when you found out, in March,

9  Brian Young had stepped in and started working in an office

10  that was recorded and that it was a mistake, and you found that

11  out in March of 2011 when Karen DePaepe told you that, and all

12  I'm trying to establish is that you didn't then walk down the

13  hallway and have a conversation with Steve Richmond about all

14  of this when you found out in March of 2011.

15  **A.**  No.

16  **Q.**  Okay.  And you didn't do that with Brian Young either?

17  **A.**  No.

18  **Q.**  Okay.  Now, part of the reason you didn't do that is

19  because you learned some things that were disturbing about what

20  Karen heard; isn't that right?

21  **A.**  No.

22  **Q.**  Okay.  But she did tell you some things that disturbed you?

23  **A.**  Yes.

24  **Q.**  Now, you didn't tell her to go listen to those things?

25  **A.**  No.

1   **Q.**   She brought them to you?

2   **A.**   Yes.

3   **Q.**   All right.  Eventually, later in the year, in December of

4   2011, you came back to have some further conversation with her,

5   and then, at that point, you did ask her to go listen to the

6   conversations that disturbed her and to put them on cassette

7   tapes?

8   **A.**   I told her to go back.  She had called me and made a

9   statement that there was something on a tape she found that she

10  found very disturbing, and, at that time, it was based on one

11  of the tapes where there was something on it --

12  **Q.**   Hold on.

13  **A.**   -- that I didn't want to get that far with it.

14  **Q.**   Hold on, Captain.

15          MR. WALTON:  I just want to make sure he's aware

16  he's not to discuss the content.

17          MR. SULLIVAN:  Thank you.  I'll go through that

18  again.

19  **Q.**   Do you remember, when we took the deposition, we had all

20  this conversation about --

21  **A.**   Yeah.  That's why I was slowing down here.

22  **Q.**   I thought you were on that.

23  **A.**   Yeah.

24          So, basically, without that, I wouldn't have asked.

25  **Q.**   I understand.  That's exactly my point.

1    **A.**  Okay.

2    **Q.**  It's because of that you asked her to go listen to some

3    more and to put them on cassette tapes?

4    **A.**  I didn't tell her to listen to more.  I told her, "Give me

5    what you have, and I will take a look at it."

6    **Q.**  Okay.  Now, at that time, Captain Young was not under any

7    criminal investigation by the South Bend Police Department, was

8    he?

9    **A.**  No.

10   **Q.**  And he was not under any warrant that you were aware of?

11   **A.**  No.

12   **Q.**  There was no court order, right?

13   **A.**  No.

14   **Q.**  And there was no Internal Affairs investigation that had

15   been opened?

16   **A.**  No.

17   **Q.**  In fact, there was really no law enforcement purpose that

18   had directed the recording of Brian Young; isn't that correct?

19   **A.**  No.

20   **Q.**  No, that's not correct?

21   **A.**  There was something more that was brought to me that I

22   can't say because of what they said there.

23   **Q.**  Let's do this.  Go to page 66 of your deposition, and let

24   me know when you're there.

25   **A.**  66?

1   **Q.**   Yes, sir.  Are you there?

2   **A.**   Almost.

3   **Q.**   Okay.

4   **A.**   Okay.  Go ahead.

5   **Q.**   Okay.  Line 15, Captain.

6           Question:  "Just so I'm clear, when Brian Young's

7   phone line was being recorded, he was not under any criminal

8   investigation; is that correct?"

9           Answer:  "Correct."

10          "There was no court order that anyone had obtained

11  authorizing the recording of his phone line; is that correct?"

12          Answer:  "That's correct."

13          Question:  "There was no law enforcement purpose

14  that was being undertaken in the recording of his phone line;

15  is that correct?"

16          Answer:  "Correct."

17  **A.**   Yes.

18  **Q.**   So my question to you is:  In regard to the recording of

19  it, right, not your request to Karen DePaepe, but in the

20  recording of it, your testimony under oath in the deposition

21  was there was no lawful enforcement purpose that was being

22  undertaken in the recording of his phone line?

23  **A.**   Right.

24  **Q.**   I understand you were concerned about some things and

25  that's why you asked for the tapes; is that correct?

BOYKINS - DIRECT EXAMINATION

1   **A.**   Right.

2   **Q.**   And Karen DePaepe is not a law enforcement officer, right?

3   **A.**   Right, she's not a law enforcement officer.

4   **Q.**   She doesn't work for Internal Affairs?

5   **A.**   No.

6   **Q.**   Isn't it true that if an officer is under investigation,

7   then he has some due process rights; is that correct?

8   **A.**   Yes.

9   **Q.**   Now, Captain Boykins, you believe that, as chief, the

10  decision about how to handle the recording of lines rests with

11  you?

12  **A.**   Yes.

13  **Q.**   But you also believe that if you were going to designate

14  that someone should be recorded, you would tell that officer

15  that he's being recorded; isn't that right?

16  **A.**   Yes.

17  **Q.**   Because that's his right, in your view?

18  **A.**   Yes.

19  **Q.**   It's related to privacy, isn't it?

20  **A.**   Yes.

21  **Q.**   And you never made any kind of general announcement to the

22  police force about which lines were recorded; is that right?

23  **A.**   No.  Not general, no.

24  **Q.**   Okay.  So when Captain Young took the position with the

25  Detective Bureau, at that time, nobody knew he was being

1  recorded; isn't that right?

2  **A.**  I don't think anybody thought about it.  It was just

3  nothing that crossed their minds.

4  **Q.**  It may be that no one thought about it, but my question

5  was:  Nobody knew, because they assumed the recorded line had

6  been in a different office; isn't that right?

7  **A.**  Yes and no.  I can't answer for them.  I didn't know.

8  **Q.**  Well, you didn't know?

9  **A.**  No.

10 **Q.**  And Karen DePaepe later told you that she didn't know for a

11 time; she discovered it later?

12 **A.**  Right.

13 **Q.**  So if you didn't know during that time, and Karen DePaepe

14 didn't know, it was really impossible for Captain Young to know

15 that until Karen discovered it; isn't that right?

16 **A.**  Yes.

17            MR. SULLIVAN:  A minute, Your Honor?

18            THE COURT:  Yes.

19            (Brief pause.)

20            MR. SULLIVAN:  I'll pass the witness, Your Honor.

21            Thank you, Captain.

22            THE COURT:  Mr. Walton.

23                    CROSS-EXAMINATION

24 BY MR. WALTON:

25 **Q.**  Good evening, Captain.

 1    **A.**   Yes.

 2    **Q.**   You were testifying about the reasons about which you

 3    continued the recording of the lines after Chief Fautz decided,

 4    with Karen and others, earlier in his command as to what lines

 5    would be recorded.

 6            Do you remember that?

 7    **A.**   Yes.

 8    **Q.**   And you became a division chief under Chief Fautz before

 9    you became chief of police, right?

10    **A.**   Yes.

11    **Q.**   Were you aware your line was being recorded when you were

12    division chief?

13    **A.**   No.

14    **Q.**   Did you ever ask?

15    **A.**   No.

16    **Q.**   Were you ever told?

17    **A.**   No.  I found out later, but not then.

18    **Q.**   All right.  Did you have any expectation of a right to

19    privacy about your line being recorded or not?

20    **A.**   No.

21    **Q.**   Why not?

22    **A.**   Because I had a cell phone, and if I wanted to make a

23    personal call, I could have made a call.  If I received a call,

24    I could tell them I could call them back but not on this phone.

25    **Q.**   Now, how many years have you been in the department?

1   **A.**   Thirty years.

2   **Q.**   And in your 30 years, was it common knowledge among the

3   officers, at least starting about the time that, let's say,

4   Chief Bennett was chief of police, that lines into the

5   department and going out of the department were being recorded?

6   **A.**   There was always suspicions of lines be recorded.  When we

7   worked the front desk, you had to use a pay phone back then --

8   to actually use a pay phone to make calls, so we didn't make

9   them at the desk because we felt that they were recorded.

10  **Q.**   Was it common knowledge, then, among the officers that you

11  spoke to before you even got into a position of command?

12  **A.**   Yes.

13  **Q.**   So maybe some of you did or did not know which lines were

14  being recorded, but you could have asked, right?

15  **A.**   Yes.

16  **Q.**   Was there ever a time in your 30-some years in the

17  department, in your experience, if you would have asked if a

18  line was being recorded, that anyone at the department that you

19  know would have hidden that from you?

20  **A.**   No.

21  **Q.**   How about under Chief Fautz' time as chief; was there ever

22  a time when he was chief and you were division chief that you

23  felt, with the policies and what practices were going on at the

24  time, that if anybody wanted to know if their line was being

25  recorded, could they have asked?

1    **A.**   Yes.

2    **Q.**   And would they have been told?

3    **A.**   Yes.

4    **Q.**   Would it ever have been hidden from them?

5    **A.**   No.

6    **Q.**   Why not?

7    **A.**   Chief Fautz was, in a way, doing what he felt he needed to,

8    to have the lines taped, and I was the same way.  We were

9    always conscious about lines being taped because we even had

10   our offices cleared to just make sure that there wasn't bugs or

11   something in there, so we were always kind of paranoid about

12   being recorded or being taped.

13   **Q.**   Okay.  When Chief Fautz put this system in place, he had

14   indicated that he had done it for law enforcement purposes to

15   log complaints from the public about officers, to preserve

16   anonymous tips, et cetera.

17           Is that your understanding of what the purpose of

18   the recordings were?

19   **A.**   Yes.

20   **Q.**   And when he was chief, he also indicated that the rationale

21   for recording lines was to record conversations from the public

22   calling into 911, reporting of a crime that could potentially

23   become evidence at some point, at the front desk, the same

24   thing, and to document calls as an investigative tool and

25   documentation.

1              Was that your understanding?

2   **A.**   Yes.

3   **Q.**   And that was while you were a division chief, as well as

4   when he was chief of police?

5   **A.**   Yes.

6   **Q.**   And when you became chief, did you believe that was an

7   appropriate use of your recording system at that time?

8   **A.**   Yes, but, again, I paid no attention to it.  It was

9   something that just didn't hit my mind.  I didn't think about

10  it.

11  **Q.**   I understand.  But at least you knew when the system was

12  set up, it was set up for legitimate law enforcement purposes?

13  **A.**   Yes.

14  **Q.**   You're not aware that the system was attempting to hide

15  anything from anybody, to harass anybody, to trick anybody?

16  **A.**   No.

17  **Q.**   That wasn't true when you were chief of police either?

18  **A.**   No.

19  **Q.**   Was the system ever designed to harass anybody in the

20  department itself?

21  **A.**   No.

22  **Q.**   And the entire time you were chief of police, did you

23  continue, again, with that philosophy, that the use of the

24  recording system itself was being used for legitimate law

25  enforcement purposes?

 1  **A.**  Yes, but, again, like I say, it was never brought up.

 2  **Q.**  I understand.

 3  **A.**  Yes.

 4  **Q.**  I understand it wasn't a topic of conversation.

 5  **A.**  Okay.

 6  **Q.**  Okay.  And so when you recorded lines, sometimes chiefs'

 7  lines were recorded, as well, at their request -- I mean,

 8  captains' lines were recorded at their request, as well?

 9  **A.**  Yes.

10  **Q.**  In fact, Rick Bishop, as captain, had his line recorded?

11  **A.**  Yes.

12  **Q.**  You were aware of it?

13  **A.**  I am now aware of it, but, back then, I wasn't aware of it.

14  **Q.**  I understand.  But the purposes of recording a captain's

15  line, as opposed to a chief's line, as long as it's being done

16  for legitimate law enforcement purposes, you had no problem

17  with that?

18  **A.**  If the officer knew and didn't have a problem, no, I

19  wouldn't have a problem with it.

20  **Q.**  In Rick Bishop's case, it's my understanding he asked for

21  his line to be recorded from Chief Fautz; is that your

22  understanding?

23  **A.**  That's my understanding.

24  **Q.**  Now, you said when this thing came up with Karen, that you

25  did not go to Karen and tell her to stop recording the line of

BONKINS - CROSS-EXAMINATION

```
 1   Brian Young; is that right?
 2   A.   Right.
 3   Q.   That was your choice, at the time, as chief of police?
 4   A.   Yes.
 5   Q.   You knew that you had final say of what should or should
 6   not be recorded?
 7   A.   Yes.  When all of this came up, yes.
 8   Q.   I want to talk to you about -- there's much to have been
 9   said about what Karen heard or didn't hear in February of 2011,
10   but let's talk about why she was there to begin with.
11        Were you aware that there were malfunctions in the
12   recording system in February 2011 that led Karen into the
13   system to try to determine if the lines were still doing what
14   they were supposed to be doing?
15   A.   I didn't know there was a problem, but she informed me when
16   she called me down that this is where this came from.
17   Q.   And would that have been in accordance with her normal
18   office duties and her responsibilities as director of
19   communications to check the lines for malfunctions?
20   A.   Yes.
21   Q.   Would it have been her responsibility to make sure the
22   lines that were requested to be recorded after the malfunctions
23   were still being recorded?
24   A.   Yes.
25   Q.   Okay.  That was something she had done for years for the
```

1    department under your reign as chief and also for prior chiefs

2    prior to you?

3    **A.**   Yes.

4    **Q.**   Barb Holleman, for example, was she the person in the

5    department that somebody would go to in the ordinary course of

6    their business if they wanted to take their line with them from

7    one office to another?

8    **A.**   Yes.

9    **Q.**   Was she the person who did that in the ordinary course of

10   her duties in the department?

11   **A.**   Yes.

12   **Q.**   Now, neither Barb nor Karen were police officers; is that

13   right?

14   **A.**   Yes.

15   **Q.**   But they had the authority to do these things under your

16   direction and control?

17   **A.**   Yes.

18   **Q.**   Now, I want to talk to you about the period of March of

19   2010 to February of 2011, when Brian Young was in this office.

20           He had come in as captain of the Investigative

21   Division; is that right?

22   **A.**   Yes.

23   **Q.**   Was there a short delay between the time when Steve

24   Richmond came in as chief of the Investigative Division in

25   February of 2010 and when Brian Young was promoted to captain

1   of the Investigative Division?

2   **A.**   There was a little time between but not that much.

3   **Q.**   Okay.  Maybe three or four weeks?

4   **A.**   Maybe that or a little less.

5   **Q.**   If the records would indicate that he came in around

6   March 22nd, 2010, would that sound about right?

7   **A.**   Yes.

8   **Q.**   And Steve Richmond came in around February 15th, 2010?

9   **A.**   Yes.

10  **Q.**   Now, when he had come into that office, he came into a new

11  office, right?

12  **A.**   Yes.

13  **Q.**   And he received a number that was previously being recorded

14  by the department for Rick Bishop?

15  **A.**   Yes.

16  **Q.**   Okay.  This was a new office with a new number, correct?

17  **A.**   "This," in that you're talking about Rick Bishop's phone

18  number?

19  **Q.**   Yes.

20  **A.**   No.  It's the same number.  I don't think it was changed.

21  **Q.**   When he came into that office, did he ever come to you or

22  to Karen DePaepe, to your knowledge, and ask if his line was

23  being recorded since he received Rick Bishop's old number?

24  **A.**   Not to my knowledge, no.

25  **Q.**   Were you aware that he went into Barb Holleman and said,

1    "When I call somebody, I'm getting Rick Bishop's Caller ID

2    coming up, as if Rick Bishop is calling someone," and he wanted

3    his Caller ID changed?  Were you aware of that?

4    **A.**  No.

5    **Q.**  All right.  So during this period of time, from March 22nd,

6    2010, to the time Karen was hearing these conversations, was

7    there anything that would have ever prevented or stopped Brian

8    Young from asking if his line was being recorded?

9    **A.**  No.

10   **Q.**  If he had done so, would you have found out and told him?

11   **A.**  I would have talked to him or found out why or whatever,

12   maybe.  I'm not really sure.  It would have been part of his

13   responsibility.  If he didn't want his line taped, he wouldn't

14   have to have his line taped.

15   **Q.**  He would have to ask, though, right?

16   **A.**  Yes.

17   **Q.**  So if an officer wanted his line taped, he would have to

18   ask, because you would have to bring in an outside vendor to

19   actually get that to happen, right?

20   **A.**  Yes.

21   **Q.**  Karen didn't know how to do it herself, from your own

22   personal knowledge, right?

23   **A.**  From my own personal knowledge, no.  I don't know.

24   **Q.**  To your knowledge, did any outside vendors ever come in and

25   change any of the recorded lines from the time you took over as

1    chief of police from when the lines had been recorded from

2    Chief Fautz?

3    **A.**   No.

4    **Q.**   So whatever was being recorded under Chief Fautz continued

5    to be recorded, and no change ever occurred during your tenure?

6    **A.**   No.

7    **Q.**   Do you remember who came to you to discuss which lines were

8    being recorded after you took over as chief?

9    **A.**   Well, it would have had to have been Barb or Karen.  That

10   would have been the ones, but I don't remember when they came

11   to me.

12   **Q.**   All right.  Did you believe that Chief Fautz's choices to

13   record conversations were necessary and legitimate business

14   purposes for the police department?

15   **A.**   Yes.

16   **Q.**   And, at any time, did that philosophy change during the

17   time that you were there?

18   **A.**   No.

19   **Q.**   Was the recording system itself, as it was installed in

20   2004, ever used to record a conversation based on its content?

21   **A.**   Not that I know of.

22   **Q.**   Was the recording system itself, as was installed under

23   your command, ever used to record a conversation based on the

24   individual identity of the participants in the conversation?

25   **A.**   No.

1  **Q.**  Was the recording system, under your tenure, ever used to
2  record a conversation based on the time of day?
3  **A.**  No.
4  **Q.**  Was it ever used to record a conversation of blackmail or
5  intimidate a participant?
6  **A.**  No.
7  **Q.**  Was the system ever used to record any specific kind of
8  conversation?
9  **A.**  No.
10  **Q.**  Finally, was the system ever used to record a conversation
11  to spy on, embarrass, or threaten any participant?
12  **A.**  No.
13  **Q.**  Now, the private lines that were being recorded into the
14  individual offices, those lines could also contain information
15  that could be useful to the police development in the
16  enforcement of their duties; is that right?
17  **A.**  Yes.
18  **Q.**  Say a murder tip was called into one of the division
19  chiefs' offices, that would be important information?
20  **A.**  Yes.
21  **Q.**  And would be recorded?
22  **A.**  Yes, if their lines were being recorded.
23  **Q.**  In fact, division chiefs' lines were being recorded, and
24  your line as captain was being recorded, in order to ensure
25  that there was transparency to the public; in other words, if

1   there were complaints, you wanted to make sure that you had

2   documentation of what was happening?

3   **A.**   Yes.

4           MR. SULLIVAN:  Objection, Your Honor.  I think,

5   Spence, you said his line as captain.

6   BY MR. WALTON:

7   **Q.**   I'm sorry.  As chief; is that right?

8   **A.**   Yes, as a chief.

9   **Q.**   In fact, anonymous tips, any kind of information, could

10  have come across any one of those lines to be used for law

11  enforcement purposes?

12  **A.**   Yes.

13  **Q.**   In your experience, did that, in fact, happen while you

14  were captain?

15          MR. SULLIVAN:  You mean "chief."

16  BY MR. WALTON:

17  **Q.**   Chief, I mean.  Sorry.

18  **A.**   I have a lot of calls come in, complaints and everything

19  else.  I can't say I had a murder tip that came in on it, but I

20  would get information, from time to time, that was law

21  enforcement sensitive that was related to something that I had

22  to look into.

23  **Q.**   And those conversations may or may not be used by Internal

24  Affairs to follow up on allegations of misconduct, for example?

25  **A.**   True.

```
 1              MR. WALTON:  Okay.  Just a second.
 2              (Brief pause.)
 3  BY MR. WALTON:
 4  Q.  With regard to the three lines that were being recorded
 5  going into the Detective Bureau, would that same type of
 6  information be useful for law enforcement purposes for the same
 7  reason?
 8  A.  Yes.
 9  Q.  And, lastly, I think you indicated that Karen came to you,
10  I think you said, at the beginning of March of 2011 to advise
11  you of the conversation that she had overheard when she was in
12  the communications department; is that right?
13  A.  Yes.
14  Q.  At that point in time, did you know that Brian Young's line
15  was being recorded?
16  A.  Yes.
17  Q.  And, again, as chief, you chose to keep the line being
18  recorded and not order it stopped?
19  A.  Yes, at that time.
20              MR. WALTON:  All right.  Thank you very much.
21              THE COURT:  Mr. Pfeifer.
22                          CROSS-EXAMINATION
23  BY MR. PFEIFER:
24  Q.  Captain, I just want to see if I can clarify a couple of
25  things.
```

1           When you were the chief of police, and Brian Young
2    took the position of captain of the Investigative Division --
3    **A.**   Right.
4    **Q.**   -- it was never your intent to record his phone line,
5    correct?
6    **A.**   Correct.
7    **Q.**   And if it wasn't your intent to record his phone line, then
8    his phone line should not have been recorded; do you agree with
9    that?
10   **A.**   I agree.
11   **Q.**   And if his phone line should not have been recorded, and
12   you didn't know it was being recorded, then you would agree,
13   would you not, that Brian Young would have no way of knowing
14   that his line was being recorded?  You agree with that, don't
15   you?
16   **A.**   Yes.  I don't know if someone might have told him or not.
17   I have no idea there.
18   **Q.**   Well, the only people that would know that the phone line
19   is being recorded, under your policy, would be you and Brian
20   Young, because your policy, you told us, was you would not
21   record somebody's line without their knowledge?
22   **A.**   No, but, I mean, Rick Bishop could have told somebody or a
23   lot of people could have, same way I learned my line was taped.
24   **Q.**   You don't even know if Rick Bishop knew that Brian Young
25   was getting his line, do you?

1    **A.**   No.

2    **Q.**   So that's all speculation; would you agree with that?

3    **A.**   Okay.

4    **Q.**   So let me go back.

5             The first time you became aware of the fact that

6    Brian Young's line was being recorded was March of 2011,

7    correct?

8    **A.**   Yes.

9    **Q.**   Karen DePaepe told you?

10   **A.**   Yes.

11   **Q.**   And that was contrary to your policy that you had

12   established, correct?

13   **A.**   Yes.

14   **Q.**   And you always followed, you told us, the policy of Chief

15   Fautz, correct?

16   **A.**   Correct.

17   **Q.**   You didn't change his policy in any way, did you?

18   **A.**   No.

19   **Q.**   So your policy was, "Don't record somebody's line unless

20   you tell them," correct?

21   **A.**   Yes.

22   **Q.**   You didn't even follow your own policy after Karen DePaepe

23   told you Brian's line was being recorded, did you?

24   **A.**   A lot of these lines, as we just got through mentioning, we

25   weren't aware of.  I wasn't even aware of my own line being --

1    **Q.**  I understand that, but when --

2    **A.**  So as far as me telling Brian or telling Karen DePaepe, the

3    reason had to do -- the tape had to do with something else.

4    **Q.**  No, I'm talking about March of 2011.

5           You had no idea that Brian Young's line is being

6    recorded?

7    **A.**  Right.

8    **Q.**  It's not supposed to be recorded, correct?

9    **A.**  Correct.

10   **Q.**  Brian Young was never told it's being recorded, correct?

11   **A.**  Correct.

12   **Q.**  He never agreed to have it recorded, correct?

13   **A.**  Yes.

14   **Q.**  But, yet, you learned in March of 2011 his line was being

15   recorded, correct?  Karen DePaepe told you, correct?

16   **A.**  At that time, yes.

17   **Q.**  Now, the people that know that the line is being recorded

18   are you and Karen DePaepe, correct?

19   **A.**  Yes.

20   **Q.**  The policy that you have in place is you're not going to

21   record somebody's line unless you tell them, correct?

22   **A.**  Yes.

23   **Q.**  You never went and told Brian Young that his line was being

24   recorded?

25   **A.**  His line was taped beforehand.  I didn't change any of the

1    thing.  They changed different phones.

2    **Q.**  I'm talking about March of 2011, when you learned that

3    Brian Young's line was being recorded, and it was not supposed

4    to be recorded.  It was in violation of your policy; Brian

5    Young didn't know it.

6              When you learned that fact --

7              MR. WALTON:  Objection.  He asked about five

8    questions there, Your Honor.

9              THE COURT:  He probably did.  He's getting to it, I

10   think.

11             MR. PFEIFER:  I'm trying to, Your Honor.

12   **Q.**  You never went and told Brian Young, "Your line is being

13   recorded," did you?

14   **A.**  No.

15   **Q.**  You never told Karen DePaepe, "Wait a minute.  This line is

16   being recorded; it's not supposed to be recorded; Brian Young

17   doesn't know it's being recorded; stop recording it," did you?

18   **A.**  No.

19   **Q.**  And that's contrary to your own policy that you were

20   following and the policy of Chief Fautz that you took over for,

21   correct?

22   **A.**  Correct.

23   **Q.**  And you did tell us in your deposition when we were talking

24   about Brian Young's line being recorded, at page 66:

25             "There was no lawful enforcement purpose that was

1    being undertaken in the recording of his phone line; is that

2    correct?"

3              And you said, "Correct."

4              Do you see that?

5    **A.**   Yes.

6    **Q.**   Did I read it accurately?

7    **A.**   Yes, you did.

8    **Q.**   And you answered that question under oath, correct?

9    **A.**   Yes.

10   **Q.**   And you stand by that answer as you are here in court

11   today, correct?

12   **A.**   But I was told I could not say --

13   **Q.**   "Yes" or "no" --

14   **A.**   -- certain things.

15   **Q.**   -- do you stand by that answer as you are here in court

16   today?

17   **A.**   Yes.

18   **Q.**   Thank you.

19              THE COURT:  You can complete your answer if you want

20   to.  If you want to add anything to that answer, you can do

21   that.

22              Don't leave yet.

23              THE WITNESS:  A lot of it, it's the kind of thing

24   they don't want me to discuss.  But when Karen brought that

25   information to me, there was something I had to look at through

1    a pros -- well, whatever.  I had to go ahead and look through

2    some things that said this was the reason for me to look

3    further, and it was, so I don't know how I can explain it

4    without going into more details on that, what made me go ahead

5    and say, "I'm going to have to look into this."

6    BY MR. PFEIFER:

7    Q.   And looking into it, you never went and talked to Internal

8    Affairs, correct?

9    A.   No.

10   Q.   And if Internal Affairs starts an investigation on an

11   officer, due process rights allow that officer to know that the

12   investigation is going on, correct?

13   A.   If I get to that point where I call an investigation, yes,

14   but I had not called an investigation.  I was looking at

15   evidence that was related to whether I was going to go ahead

16   with it or not, which could have went several different ways.

17   Q.   You didn't get any of this evidence that you're talking

18   about until December of 2011 when the recordings were given to

19   you by Karen DePaepe, correct?

20   A.   No.  That was before.  That was up -- remember, if you

21   remember what I said in here, it was almost April when I first

22   got contacted by Karen referencing something she had ran

23   across.

24   Q.   You said March of '11?

25   A.   Well, March --

BOYKINS - REDIRECT EXAMINATION

1   **Q.**   Okay.

2   **A.**   -- along that time there.  I was aware of that.  I didn't

3   move on a lot of stuff because I was still thinking about it.

4   I was kind of surprised at some of the things, so I didn't make

5   a big move at that particular point.

6   **Q.**   So, if I understand what you're telling this judge now, is

7   for eight months or nine months you were thinking about all of

8   this?

9   **A.**   There were a lot of things that came up on that, but it

10  would be self-explanatory if -- well, I just can't go further

11  with it.

12          MR. PFEIFER:  All right.  I don't have anything

13  further.

14          THE COURT:  Redirect.

15          MR. SULLIVAN:  Just a couple.

16                     REDIRECT EXAMINATION

17  BY MR. SULLIVAN:

18  **Q.**   Let me see if I can clear this up a little, Captain

19  Boykins.

20          The testimony that Mr. Pfeifer was asking you about,

21  on page 66, where you said there was no law enforcement purpose

22  to recording Brian Young's line -- right?

23  **A.**   Right.

24  **Q.**   -- that was at the beginning when it was by mistake

25  directed to his office; that's what you meant?

DOWKENS - REDIRECT EXAMINATION

1   **A.**  Right.

2   **Q.**  Then it became for a law enforcement purpose after you

3   learned something?

4   **A.**  Yes.

5   **Q.**  Okay.  Now, one other thing I wanted to clear up.  Excuse

6   me one minute.

7           If you look at Exhibit 9 on that binder, Captain, no

8   longer the deposition now but the binder, and you go to the

9   third page, Attorney Walton asked you some questions about

10  there being -- that there were no changes from the time of

11  Fautz through you.

12          Do you remember that exchange, where you said

13  that?

14  **A.**  Yes.

15  **Q.**  In the microphone, sir.

16  **A.**  Yes.  Sorry.

17  **Q.**  That's okay.

18          And, in fact, that's not completely accurate,

19  because if you look at the very last line of the third page of

20  Exhibit 9, it reads, "245-6031 Detective Bureau (was Division

21  Chief now Division Captain's line)."

22          Do you see that?

23          MR. SULLIVAN:  Can we get that on, Scott?

24          THE CLERK:  Yes.

25          (Courtroom monitors on.)

1   BY MR. SULLIVAN:

2   **Q.**  Do you see right here where I'm referring to (indicating),

3   and there's a parenthetical?  You can look up at the screen if

4   it's easier.  Do you see what I'm referring to, sir?

5   **A.**  Yes, "Division Chief."

6   **Q.**  Right, "(was Division Chief now Division Captain's line."

7          Do you see that?

8   **A.**  Yes.

9   **Q.**  That's the only administrative phone line, on this page,

10  here on Exhibit 9, that has the explanation to it; none of the

11  others do, do they?

12  **A.**  No.

13  **Q.**  Because the change was -- under Fautz, the division chief

14  was using a recorded line, and the change was that, under you,

15  the division captain ended up using a recorded line, so that's

16  a change, right?

17  **A.**  Yeah, but that wasn't done, like, I said, "I want the

18  division captain or chief."  It just got messed.

19  **Q.**  Exactly.  You never directed it to Captain Young?

20  **A.**  No.

21  **Q.**  I just wanted to be clear about this question about a

22  change, because Karen DePaepe had to add that phrase because

23  everyone thought, or at least she thought, that 245-6031 was

24  going to office number C157 where the division chief resided,

25  right?

1   **A.**  Right.

2   **Q.**  That's what she thought.

3          And the change was where the recorded line ended up

4   being; that's a change from Fautz.

5          Do you agree with that?

6   **A.**  Yes.

7          MR. SULLIVAN:  Nothing further, Your Honor.

8          THE COURT:  Recross.

9                    RECROSS-EXAMINATION

10  BY MR. WALTON:

11  **Q.**  Yes, Captain, I'll be short.

12         The decision to keep this line being recorded when

13  you were chief was because of what was brought to your

14  attention at that time; is that right?

15  **A.**  Yes.  Remember now, I've been the chief for four years,

16  four years there.  This was the first incident where we had a

17  situation come up, for three or four years here.  This was

18  the last year, and then this comes up because there was just

19  some misunderstanding.  Somebody didn't get it, didn't change

20  it.

21  **Q.**  Right.  Now, to be clear, you didn't make the change so

22  that Brian Young's line was being recorded; that change

23  occurred because Chief Richmond requested Barb Holleman to take

24  his old number into that office; and then she switched the 6031

25  line into Brian Young's line office, which was a normal request

```
 1    being made within the department at that time?
 2    A.   True.
 3              MR. WALTON:  Okay.  Thank you.
 4              MR. PFEIFER:  Nothing.
 5              MR. SULLIVAN:  No, sir.
 6              THE COURT:  Is this witness excused?
 7              MR. SULLIVAN:  Yes.
 8              THE COURT:  Thank you very much.
 9              How long will your next witness be?
10              MR. SULLIVAN:  Your Honor, can I have about a
11    five-minute break?
12              THE COURT:  What if I said "no"?
13              MR. SULLIVAN:  I'd ask for three.
14              THE COURT:  You can have ten.
15              MR. SULLIVAN:  No, no.  All I need is five,
16    Your Honor.
17              THE COURT:  Okay.  Yes.  The Court will be in recess
18    for five minutes or so.
19              (Brief recess taken.)
20              THE COURT:  You can be seated.
21              I don't have a deputy, and he has to be sworn in.
22              You need to be sworn in.  I would swear you in, but
23    I don't know the dialogue.
24              I'm assuming his testimony will take more than 15
25    minutes, right?
```

BISHOP - DIRECT EXAMINATION

```
 1                MR. SULLIVAN:  It will, Your Honor, yes.
 2                THE COURT:  Does that answer your question, more
 3      than 15 minutes?  Okay.
 4                (The witness was duly sworn.)
 5                THE COURT:  You can be seated.
 6                         RICHARD A. BISHOP,
 7      having been duly sworn, was examined, and testified as follows:
 8                         DIRECT EXAMINATION
 9      BY MR. SULLIVAN:
10      Q.  Good evening, Commander.
11                THE COURT:  I'm not sure I like the way you said
12      that.
13                MR. SULLIVAN:  I know.
14      Q.  Would you introduce yourself to the Court and state your
15      name and spell it for the record?
16      A.  Richard A. Bishop, B-i-s-h-o-p.
17      Q.  What do you do for a living?
18      A.  I'm a retired South Bend police officer, and I currently
19      work part time for the St. Joseph County Police Department.
20      Q.  What's your rank with the St. Joseph County Police
21      Department?
22      A.  Deputy.
23      Q.  What do you do for the St. Joseph County Police?
24      A.  I work in their Transportation Division.
25      Q.  Can you give the Court your employment history of the
```

1    positions you've held with the South Bend Police Department?

2    **A.**  I was hired as a cadet right out of high school at the age

3    of 18 in 1975.

4           In 1977, I went to the Police Academy in Plainfield,

5    Indiana.  I was sworn in as a sworn officer in 1978, and I was

6    a patrolman, a corporal, a sergeant, lieutenant, captain,

7    division chief.

8    **Q.**  Thank you.  So all told, how many years have you been a

9    police officer?

10   **A.**  Including my St. Joe County time?

11   **Q.**  Yes, sir, including your St. Joe County time.

12   **A.**  Since 1975, so 40 years.

13   **Q.**  Now, Commander Bishop, is that your rank?

14   **A.**  No, I'm retired.  Deputy, Richard, or Mr. Bishop will do.

15   **Q.**  All right.  Mr. Bishop, we'll do that.

16          I want you to focus on the timeframe when you

17   were -- the first time when you became a captain in the

18   Investigative Division.

19          Do you recall what year that was?

20   **A.**  I believe it was in '02, 2002.

21   **Q.**  I'm going to actually point you to Exhibit 43, and that's

22   tab 43 in the binder in front of you, which is in evidence.

23   That is your resumé.  I assume that will help you identify

24   that.

25   **A.**  Okay.  October of 2002, I was promoted to captain of the

1    Detective Bureau.

2    **Q.**   Okay.  When you became a captain assigned to the Detective

3    Bureau in October of 2002, did you receive an assigned phone

4    number at that time?

5    **A.**   I'm not sure it was 2002, but it was during that time

6    period.

7    **Q.**   And what number did you get?

8    **A.**   I got 245-6031.

9    **Q.**   And, at that time, when you were a detective, prior to

10   January 1st, 2005, so that timeframe, did you have your phone

11   line -- did you ask to have your phone line recorded by the

12   South Bend Police Department?

13   **A.**   No, sir.

14   **Q.**   At that time, between October '02 and January '05, what was

15   your knowledge or understanding about recorded phone lines in

16   the police department?

17   **A.**   That some lines were recorded, the common numbers like the

18   front desk and communication rooms, and then some other lines

19   were recorded.

20   **Q.**   Did you have any idea which ones?

21   **A.**   No, sir.

22   **Q.**   Had anybody ever made a general announcement about the

23   lines that were to be recorded by the officers who had assigned

24   numbers?

25   **A.**   No, sir.

BISHOP - DIRECT EXAMINATION

1    **Q.**   So you received nothing written, right?

2    **A.**   Correct.

3    **Q.**   And I want to make sure I asked, to distinguish.  Nothing

4    written, but I want to know if anybody ever said anything to

5    you of "Here's the lines that are recorded."

6    **A.**   No, sir.

7    **Q.**   Nonetheless, did you find out if any of the administrative

8    lines were recorded between '02 and '05, when you were a

9    detective in the Investigative Bureau?

10   **A.**   No, sir.

11   **Q.**   Eventually, in January of '05, as recorded on your resumé

12   here, Exhibit 43, you became captain in Risk Management.

13   Describe for the Court what that is.

14   **A.**   Risk Management was a rank or position that was assigned

15   directly under the chief of police, and I oversaw Internal

16   Affairs.  We were introducing a new computer program that

17   tracked officer use of force and random drug testing.

18   **Q.**   And what did you do in terms of overseeing Internal

19   Affairs?  Can you describe what your duties were for that?

20   **A.**   Lieutenant John Collins was assigned as the Internal

21   Affairs officer, or Officer of Professional Standards was a

22   synonymous term for it, and I would assist him in

23   investigations or do the investigations if he was busy or on

24   vacation or -- we worked together.

25   **Q.**   Okay.  Who would you answer directly to?

1    **A.**   Chief Tom Fautz.

2    **Q.**   So is it fair to say that you were not in the Detective

3    Bureau, at that time, in the Investigative Division?  You

4    didn't answer up through Gene Kyle in the Investigative

5    Division?

6    **A.**   I did not.

7    **Q.**   When you first became captain of Risk Management in

8    overseeing Internal Affairs in January of '05, did you at that

9    time ask to have your line wired into the Voice Logger system?

10   **A.**   No, sir.

11   **Q.**   Did there come a time when you did?

12   **A.**   Yes, sir.

13   **Q.**   Would you please describe the circumstances that led to

14   that?

15   **A.**   Yes, sir.

16          We were having a problem with an individual in the

17   City who had mental problems, and he was filing complaints and

18   threatening our officers, and he would call in and would leave

19   very lengthy messages for us after hours, and sometimes he

20   would call during hours and we would deal with him.

21   **Q.**   And how did that affect your thinking about recorded phone

22   lines?

23   **A.**   What had happened was, like I said, he would call and leave

24   three hours of messages.  The recording system would actually

25   cut him off, and he would call back and he would leave two or

1   three hours' worth of messages for Lieutenant Collins and I,

2   mainly.  Sometimes I would pick up and talk to him during the

3   day, probably because I inadvertently didn't look at the phone

4   number, so there came a time when we were building a case

5   against him so that we could get some help for him and get him

6   to stop calling the police department.

7   **Q.**  Did you discuss this with John Collins at all?

8   **A.**  Yes, sir.

9   **Q.**  Okay.  Go ahead.

10  **A.**  So the messages that he left me at night, I could get

11  recordings of those, but when I talked to him on a live line --

12  **Q.**  Let me hold you up there.

13        Because they were on your voicemail?

14  **A.**  Yes, sir.

15  **Q.**  Okay.  Go ahead.

16  **A.**  But the conversations I had with him while I was working

17  when I answered the phone and talked to him, I could not record

18  those.  So, back then, we had cassette recorders with, like,

19  suction cups on them that you tried to hook up to the head

20  piece and talk to him and record it, but it wasn't working

21  properly, so I --

22  **Q.**  Again, in regard to the recorded lines, did you have any

23  discussion with Lieutenant Ross about his recorded line in

24  Internal Affairs?

25  **A.**  That would be Lieutenant Collins.

1    **Q.**  I'm sorry.  Lieutenant Collins.

2    **A.**  Yes.  He advised me that his line was recorded and he could

3    obtain recordings, but I couldn't.

4    **Q.**  So what did you do about that?

5    **A.**  So I spoke to -- well, first, I confirmed through our

6    communications director, Karen DePaepe, because she was the

7    person that made the copies of the recordings for me, that I

8    could not get recordings of my live conversations, and I had to

9    go through my commander, which was Chief Fautz.

10   **Q.**  I want to hold you up on that point for a second.

11            When you said you confirmed with Karen DePaepe, did

12   you go and ask Karen DePaepe whether your line was recorded at

13   that time?

14   **A.**  Yes, sir.

15   **Q.**  What did she say?

16   **A.**  It was not.  That's why I could not get the recordings of

17   my conversations.

18   **Q.**  All right.  So then you were saying you went to Chief of

19   Police Fautz?

20   **A.**  I talked to Chief Fautz about having my line recorded, the

21   245-6031, and, at that time, I'm assuming he talked to Karen

22   DePaepe, and it was recorded from that time on.

23   **Q.**  Okay.  Now, January 10th, 2007, you changed positions

24   again.

25            What position did you go to then?

1   **A.**   I was promoted to division chief of the Investigative

2   Division or Detective Bureau.

3   **Q.**   Okay.  What happened to your 245-6031 number?

4   **A.**   I took that number with me.  I wanted to keep that number

5   because so many people had that phone number for me, that it

6   was possible to get that phone to ring in my new office, so I

7   had that done.

8   **Q.**   When you were the captain in Risk Management, physically,

9   where was your office located?

10   **A.**   What we called the "West Wing."  It was Chief Fautz's

11   office, division chief Darryl Boykins' office, and then my

12   office.

13   **Q.**   Was that in the same wing as the Investigative Division?

14   **A.**   No, sir.

15   **Q.**   So you had to move from one end of the building to the

16   other?

17   **A.**   Correct.

18   **Q.**   But they somehow rerouted your phone line so that it

19   followed you?

20   **A.**   Yes, sir.

21   **Q.**   Now, at that point, were you aware that your phone line was

22   still being recorded when you moved in as division chief?

23   **A.**   I just forgot about it.  I should have, but I had forgotten

24   about it.

25   **Q.**   Did you talk to anybody when you made that move about the

 1    recorded lines in the police department?

 2    **A.**   No, sir.

 3    **Q.**   How long were you in that position as division chief?

 4    **A.**   Three years.

 5    **Q.**   In that entire time, did you remember that you had

 6    originally asked for that to be recorded?

 7    **A.**   No, sir.

 8    **Q.**   So did you talk to anybody when you left the police

 9    department in February of 2010 about the fact that your line

10    was being recorded?

11    **A.**   No, sir.

12    **Q.**   Because, as I take it, you didn't realize it yourself at

13    that point?

14    **A.**   Correct.

15    **Q.**   Okay.  The reason you asked to have your line recorded was

16    very specific to what you were facing at the time?

17    **A.**   Yes, sir.

18    **Q.**   Did you ask Chief Fautz to make any kind of policy or

19    procedure in which division chiefs would henceforth always be

20    recorded?

21    **A.**   No, sir.

22    **Q.**   When you asked to have your phone line recorded, was it

23    your expectation that 6031 would always be recorded no matter

24    who used it?

25    **A.**   No, sir.

1   **Q.**   Did anybody tell you that that would be the case?

2   **A.**   No, sir.

3   **Q.**   If you had recalled that 6031 was recorded when you moved

4   to the division chief's office, would you have wanted it

5   recorded?

6   **A.**   I probably would have asked to have it removed.

7   **Q.**   Why?

8   **A.**   In those positions, the higher positions, especially Chief

9   Boykins and myself, we had filed for some special clearance

10   with the federal government so that we could -- so the U.S.

11   Attorney's Office and the ATF task force and different task

12   forces could have conversations with us about certain cases

13   that was confidential information.  Knowing that they would

14   call on those lines, it would probably be not good practice to

15   have someone have access to those taped lines.

16   **Q.**   Okay.  You understand that different division chiefs felt

17   differently about that.  Some wanted their lines recorded, but

18   what you're saying is you would not have; is that fair?

19   **A.**   I don't know how they felt, but I would not have wanted it.

20   **Q.**   So you had never talked to the other division chiefs about

21   recorded lines?

22   **A.**   No, sir.

23   **Q.**   Okay.  So if you'd look at Exhibit 46 in that binder, and

24   describe what that Exhibit 46 is.

25   **A.**   This is a -- this is a sheet of all of the phone numbers in

1    the Investigative Division while I was assigned to the

2    Detective Bureau.  Investigative Division and Detective Bureau

3    are synonymous.

4    **Q.**  Based upon your resumé and in looking at Exhibit 46, can

5    you tell us what timeframe this would have captured,

6    Exhibit 46?

7    **A.**  It probably would have been in 2004.  The only reason I say

8    that is because Chief Fautz was the chief in the Detective

9    Bureau when I was promoted and then Division Chief Kyle became

10   the chief there.

11   **Q.**  It was not, however, from January 1st, '05, through

12   January 10th, 2007, because you would not have been listed in

13   the Investigative Division at that time; is that correct?

14   **A.**  That's correct.  I take that back.  I think Chief Kyle and

15   I were both promoted at the same time.  I'm not positive on

16   that, so it would have been sometime when I was assigned to the

17   Detective Bureau.

18   **Q.**  You mean Chief Fautz and you?  Chief Kyle was the division

19   chief and you were a captain, according to this, which --

20   **A.**  Right.  What I'm saying is I don't know if it was -- it

21   could have been from '02 to '05, because I can't remember if

22   Chief Fautz and Chief Kyle and myself were all promoted at the

23   same time.

24   **Q.**  I see.  But there's no doubt in your mind, when you were

25   captain of Risk Management, you would not have been included in

1    a list of captains in the Investigative Division; do I

2    understand that correctly?

3    **A.**   That's correct.

4    **Q.**   Okay.  On Exhibit 46, Gene Kyle's number ends in 5990 as

5    division chief.

6            Eventually, you became division chief, correct?

7    **A.**   Correct.

8    **Q.**   And you did not use that number?

9    **A.**   That's correct.

10           MR. SULLIVAN:  Okay.  One moment, Your Honor.

11           (Brief pause.)

12           MR. SULLIVAN:  Thank you, Mr. Bishop.

13           No further questions.  Pass the witness.

14           THE COURT:  Cross-examination.

15                        CROSS-EXAMINATION

16   BY MR. WALTON:

17   **Q.**   Good evening, Mr. Bishop.

18   **A.**   Good evening, sir.

19   **Q.**   You and I have known each other for a number of years.

20           Can I call you "Rick"?

21   **A.**   You sure can.

22   **Q.**   All right.  Rick, you indicated that you were captain in

23   the Investigative Division with number 245-6031 up until around

24   January 1, 2005, when you went to Internal Affairs?

25   **A.**   I've had that same phone number, so I've had that --

1   **Q.**  Right.

2   **A.**  Okay.

3   **Q.**  I'm just saying, when you were captain in the Detective

4   Bureau or the Investigative Division, you had 6031 at that

5   time?

6   **A.**  Correct.

7   **Q.**  During this period of time that you were captain, there was

8   a remodel going on in the department just before -- really,

9   just before your promotion in Internal Affairs?

10  **A.**  Yes.  It wasn't a promotion; it was a lateral transfer.

11  But the construction went on for several years.

12  **Q.**  And during this period of time, do you remember your

13  Division Chief Kyle having discussions with then Chief Fautz

14  regarding the recording of telephone lines in the Detective

15  Bureau?

16  **A.**  No, sir.

17  **Q.**  Division Chief Kyle had not discussed that with you?

18  **A.**  No, sir.

19  **Q.**  Okay.  Were you aware that there were meetings, in the fall

20  of 2004, trying to determine which lines should or should not

21  be recorded, that Chief Fautz had conducted?

22  **A.**  No, sir.

23  **Q.**  When did you learn that you were going to be transferring

24  into Internal Affairs as captain?

25  **A.**  It would have been early -- late in '04, beginning of '05.

1    I went there January of '05.

2    **Q.**  Would you have possibly learned about that during the time

3    of the remodel and the changeover of the recording system?

4    **A.**  No, sir.

5    **Q.**  No, all right.  So there was no prior knowledge you were

6    going to be going over to that position as a lateral prior to

7    January 1 of 2005?

8    **A.**  Not until Chief Fautz requested me to do it.

9    **Q.**  Why did he request you to go over there?

10   **A.**  It was a new position and he drafted me.

11   **Q.**  All right.  Do you know, at that time, whether or not he

12   made a decision to record your line before you actually went

13   over there?

14   **A.**  My line was not recorded before the time that I requested

15   it.

16   **Q.**  To your knowledge, right?

17   **A.**  Well, it wasn't, because I asked for recordings and they

18   couldn't produce any.  That's why I requested that it be

19   recorded.

20   **Q.**  Okay.  When you talked to John Collins when you were in the

21   Investigative Bureau, did you say his line was being recorded

22   at that time?

23   **A.**   I was in Risk Management at that time, because he worked

24   under me, for me, and that's when I learned that his line was

25   recorded.

1   **Q.**   And his rank was what, lieutenant?

2   **A.**   He was lieutenant in Internal Affairs.

3   **Q.**   He was lieutenant in Internal Affairs and his line was

4   being recorded by the department?

5   **A.**   That's what he told me.

6   **Q.**   So did it matter whether you're division chief, captain, or

7   lieutenant, at that time under Chief Fautz, whether your line

8   was being recorded or not?

9   **A.**   I don't know what Chief Fautz's protocol was for which

10  lines were being recorded and which ones were not.

11  **Q.**   Okay.  But you were aware that it was up to the chief as to

12  what lines were being recorded; is that fair?

13  **A.**   I did not know who made that decision.

14  **Q.**   You never knew the whole time you were there whether or not

15  the chief of police made the decision to record lines or not?

16  **A.**   I had no idea who made that decision to which lines were

17  recorded.

18  **Q.**   Okay.  When you decided you wanted your line recorded, you

19  went to the chief?

20  **A.**   Yes, sir.

21  **Q.**   Because that's who you reported to at that time?

22  **A.**   Yes, sir.

23  **Q.**   And the chief then directed you to Karen DePaepe?

24  **A.**   No.  I think he took my request, and then either him or his

25  secretary went to Barb and had it done.

1    **Q.**   To Barb Holleman?

2    **A.**   To Barb Holleman.

3    **Q.**   So you think Barb Holleman was in charge of getting lines

4    recorded at that time?

5             MR. SULLIVAN:   Objection.   Mischaracterizes the

6    testimony.   That's not what he said.

7    BY MR. WALTON:

8    **Q.**   Well, who was it, from your understanding, that would

9    handle the recordings at that time under Chief Fautz?

10   **A.**   Karen DePaepe.

11   **Q.**   Okay.   So starting at some point in 2005, then, your line

12   as captain started to be recorded?

13   **A.**   It was -- actually, it was in 2006 when I requested it.

14   **Q.**   You were then promoted to division chief of the

15   Investigative Division in 2007, according to your resumé,

16   right?

17   **A.**   Yes.

18   **Q.**   And, at that point, you asked that 6031 be moved to the

19   Investigative Bureau, and you went to Barb Holleman to do that;

20   is that right?

21   **A.**   Correct.

22   **Q.**   And Barb was the person responsible within the department

23   to change a person's line, so that -- you wanted to keep the

24   same line that you had?

25   **A.**   Yes.

1    **Q.**   And your reasons for that were?

2    **A.**   Because in the two positions I had before, I had given my

3    number out to several people, and everybody had that number as

4    being my number, so I wanted to keep it.

5    **Q.**   Sure.  For continuity and for continued law enforcement

6    purposes, you wanted to keep that same number so that the same

7    people you were familiar with could contact you?

8    **A.**   Yes, sir.

9    **Q.**   And then, when you were captain, did you ever have a

10   practice of asking -- you were talking about a situation where

11   you wanted to specifically ask for certain lines that may or

12   may not have been recorded for purposes of your investigation?

13   **A.**   No, sir.

14   **Q.**   I thought you were talking about getting threats and so you

15   wanted to try to capture those in some way.

16   **A.**   Right, but you used the word in the plural; it's just

17   singular.  My phone is what I requested.

18   **Q.**   I'm sorry.

19   **A.**   Besides the front desk and the communication rooms, I knew

20   those were recorded because we made several recordings during

21   this investigation.  It was my personal line in my office which

22   was not recorded.

23   **Q.**   All right.  Did you know which lines were being recorded

24   when you were captain?

25   **A.**   No, sir.

BISHOP - CROSS-EXAMINATION

1   **Q.**  Did you know which phone lines in the South Bend Police

2   Department were tied into the system?

3   **A.**  Besides the common ones that I talked about, the front desk

4   and the communication rooms and my own, I had no idea who else

5   was recorded.

6   **Q.**  Okay.  So when you were division chief, did you ask Chief

7   Fautz to record your line?

8   **A.**  I did not.

9   **Q.**  Did Chief Fautz tell you your line was being recorded?

10  **A.**  No, sir.

11  **Q.**  So at no time did Chief Fautz come to you and let you know,

12  when you became division chief, that your line was being

13  recorded?

14  **A.**  No, sir.

15  **Q.**  And it's your testimony that you forgot that your line was

16  being recorded as division chief?

17  **A.**  Yes, sir.

18  **Q.**  Was that during the entire time you were there until you

19  left in 2010?

20  **A.**  That what?

21  **Q.**  That your line was being recorded but you just forgot about

22  it.

23  **A.**  Yes, sir.

24  **Q.**  Is that because your practice had been, as you said, to use

25  your own cell phone for any personal calls that you had?

1    **A.**   I did.

2    **Q.**   Because you know your line was being recorded?

3    **A.**   I forgot, but I should have known because it was my

4    request, but I used my cell phone for personal phone calls.

5    **Q.**   Right.  It became a habit, because of knowing that your

6    line had been recorded before, is that fair, that you used your

7    cell phone for personal calls?

8    **A.**   I don't think it was because I was being recorded.  I

9    always did that, ever since cell phones were cell phones like

10   we know it today.  I always used my same number.

11   **Q.**   You were aware that the recording system in the South Bend

12   Police Department was used for law enforcement purposes; is

13   that right?

14   **A.**   Yes, sir.

15   **Q.**   And you were also aware that you could ask for your line to

16   be recorded and talk to the chief about it, and if he agreed,

17   that you would have your line recorded?

18   **A.**   Yes, sir.

19   **Q.**   Was it common knowledge with other officers at the time,

20   based upon your experience, that they knew certain lines were

21   being recorded?  Whether they knew which specific ones or not,

22   was it common knowledge that lines were being recorded by the

23   department?

24   **A.**   I can't speak for the other officers.  I can only tell you

25   what I know, which is some lines were recorded and some lines

1   were not.

2   **Q.**  So from about 2006, is your testimony, I think you said, to

3   2010, when you left, your line had been continuously recorded

4   for about four years?

5   **A.**  Yes, sir.

6   **Q.**  When you were division chief, was it common knowledge to

7   you that other division chiefs' lines were recorded?

8   **A.**  We never talked about it.

9   **Q.**  May or may not have been?  Other people may or may not have

10  been, though?

11  **A.**  Correct.

12  **Q.**  Was it a secret around there?

13  **A.**  No.  We just never talked about it.

14  **Q.**  Okay.  In your entire time that you worked with Chief

15  Fautz and then, later, you worked with Chief Boykins -- right?

16  **A.**  Correct.

17  **Q.**  -- if you had gone to them and asked if your line was being

18  recorded, in your experience, would they have told you whether

19  it was or wasn't?

20  **A.**  If I had asked them if my line was recorded?

21  **Q.**  Yes.

22  **A.**  I knew it was.  I don't know what would happen if I had

23  asked them.

24  **Q.**  Were you ever aware, any time that you were in the position

25  of division chief, that there was any intent on the part of

1  anybody in the chief's office, Chief Boykins or Chief Fautz's

2  office, where they would try to hide that fact from any of the

3  officers in the department?

4  **A.**  I don't think so.

5  **Q.**  The recording of lines was used to obtain important

6  information for law enforcement purposes, correct?

7  **A.**  The common ones, yes.

8  **Q.**  And even the private lines could be used for that purpose,

9  right?  If there was a complaint that came into you as chief of

10  the Detective Bureau or an anonymous tip that came into you,

11  that tip would have been recorded and could have been used for

12  law enforcement purposes?

13  **A.**  If it was recorded, it could be used for that, yes.

14  **Q.**  From time to time, were you aware that there were requests

15  made from, say, the Indiana State Police to Karen to come in

16  and look through the lines and try to find recorded evidence at

17  the department that they could use in their investigations?

18  **A.**  I have no knowledge of that, sir.

19  **Q.**  None?

20  **A.**  None.

21  **Q.**  What about the prosecutor's office; could they come in and

22  ask for information from the department, working with Karen to

23  obtain information that had been recorded on different lines?

24  **A.**  To my knowledge, only if it was the common lines, like the

25  911 calls and the front desk calls.

1   **Q.**  Did you ever sit down with Chief Fautz and go through his

2   philosophy as to why he recorded lines to begin with?

3   **A.**  No, sir.

4   **Q.**  Did you ever do that with Chief Boykins?

5   **A.**  No, sir.

6   **Q.**  Did you have an expectation or right of privacy with your

7   line that was being recorded while you were there?

8   **A.**  I did.

9   **Q.**  You did?

10  **A.**  Yes, sir.

11  **Q.**  So you felt that, if you used it for personal reasons, it

12  wouldn't be recorded, or what?

13  **A.**  If it was recorded, I didn't think they would be listening

14  to it or use it against me or anything like that.

15  **Q.**  All right.  That didn't happen when you were there?

16  **A.**  Did what happen?

17  **Q.**  They never used anything that you had on your line while

18  you were there against you for any reason?

19  **A.**  Not that I know of.

20  **Q.**  Did it happen to any other officer that you're aware of

21  during the time that you were there up to the time you left in

22  2010 as division chief?

23  **A.**  The only lines that I know that we used any recordings from

24  were the 911 and the front desk communication.

25  **Q.**  All right.  When you left in February of 2010, to your

1    knowledge, was 6031 still being recorded as you had originally

2    requested it would be?

3    **A.**   Apparently.  Otherwise, we wouldn't be here.

4    **Q.**   In your deposition, to refresh your memory, you indicated,

5    "All I can remember is when I left I didn't make a request not

6    to record it anymore because I had forgotten that it was being

7    recorded."

8              Is that fair?

9    **A.**   That's fair.

10   **Q.**   Okay.  And you were asked then, "So as far as you knew, it

11   was still being recorded?"

12             And you said, "Correct."

13             Does that sound correct?

14   **A.**   Yes, sir.

15   **Q.**   Okay.  Then when you left, you were aware that Captain

16   Richmond was being recorded in -- was being promoted into your

17   old position?

18   **A.**   Well, those are two different questions.

19   **Q.**   I'm sorry.  I'll start over.

20   **A.**   You said something about being recorded and being promoted

21   and took my --

22   **Q.**   I meant promoted.

23             When you left in 2010, you were aware that Captain

24   Richmond was being promoted into your old position?

25   **A.**   Yes, sir.

BISHOP - CROSS-EXAMINATION

1   **Q.**  Did you know anything at that time about his keeping his

2   own line and 6031 going into the other office?

3   **A.**  I had no knowledge of what his request was.

4   **Q.**  And, I take it, you, basically, just stayed out of anything

5   that happened once you left there in February of 2010; is that

6   fair?

7   **A.**  Yes.

8   **Q.**  Okay.

9   **A.**  As far as the phone lines were concerned.

10  **Q.**  Right.  At any time while you were chief of the

11  Investigative Division, do you remember ever telling anybody

12  your line was recorded?

13  **A.**  No, sir.

14  **Q.**  Okay.  When an officer would ask that a line would be

15  recorded, was that the officer's choice?

16  **A.**  It was my choice.  I can't speak for the other officers.

17  **Q.**  Okay.  But the captain or chief could refuse that, could

18  they not?

19  **A.**  I don't know, sir.

20  **Q.**  In your deposition -- and I can hand it to you, Rick, or

21  show it to you --

22          MR. WALTON:  Can I approach?

23          THE COURT:  Yes.

24          MR. WALTON:  Can I ask him from here, Judge, for

25  convenience?

```
 1              THE COURT:  Yes, so long as everybody in the room
 2    can hear.
 3    BY MR. WALTON:
 4    Q.  All right.  It says, "But the captain or the chief could
 5    refuse that, could they not?"
 6              And your answer is, "I would believe that's his
 7    choice."
 8    A.  Okay.  I said I believed, but I had no idea what the
 9    practice of the chief was or the --
10    Q.  I understand.
11              Then the next question was:  "In other words, the
12    ultimate decision if it's going to be recorded or not lies with
13    the chief?"
14              And you said, "I would think that's true."
15    A.  Yes, sir.
16              MR. WALTON:  Okay.  Can I have just a couple
17    minutes, Judge?
18              THE COURT:  Yes.
19              (Brief pause.)
20    BY MR. WALTON:
21    Q.  When you were promoted from captain to division chief, did
22    you talk to anyone about continuing to have your line recorded?
23    A.  No, sir.
24              MR. WALTON:  Okay.  Thank you.  That's all I have.
25              THE COURT:  Mr. Pfeifer?
```

1         MR. PFEIFER:  Less than five minutes, I promise.

2         THE COURT:  I hope so.

3                    CROSS-EXAMINATION

4    BY MR. PFEIFER:

5    **Q.**   Rick, I just want to establish a couple of things.

6         When you were a captain in the Investigative

7    Division, you had 6031, correct?

8    **A.**   Correct.

9    **Q.**   Your phone line was not recorded, correct?

10   **A.**   It was not.

11   **Q.**   You were then transferred or you took a lateral position to

12   Risk Management in the Internal Affairs Division or offices,

13   correct?

14   **A.**   Actually, it was like administrative to the chief, oversaw

15   Internal Affairs.

16   **Q.**   Okay.  That was, I believe, in 2005, correct?

17   **A.**   Correct.

18   **Q.**   Then when you went there in 2005, you took the number 6031

19   with you, correct?

20   **A.**   Yes, sir.

21   **Q.**   At that time, when you first went there, the line was not

22   recorded, was it?

23   **A.**   It was not.

24   **Q.**   You had an issue, an isolated issue, with one particular

25   person, and that was the reason why you wanted to have the line

1  recorded, correct?

2  **A.**  Yes, sir.

3  **Q.**  And that was the only purpose that you wanted to have the

4  line recorded, because of that one situation with that one

5  person?

6  **A.**  That's what brought it to light, why I wanted it done, and

7  I would have continued in that position because it was an

8  investigative tool for me for accuracy on threats or reports.

9  **Q.**  And that took place in 2006, correct?

10  **A.**  Yes, sir.

11  **Q.**  So you were there about a year before you even made this

12  request of Chief Fautz?

13  **A.**  Yes, sir.

14  **Q.**  And then, in 2007, you went back to the Investigative

15  Division as division chief, correct?

16  **A.**  Yes, sir.

17  **Q.**  You asked to have the line 6031 put back into the office

18  that you were going to occupy back in the Detective Bureau,

19  correct?

20  **A.**  Correct.

21  **Q.**  I think you've told us you forgot about the fact that the

22  line was being recorded, correct?

23  **A.**  Yes.

24  **Q.**  When you then were no longer the division chief of the

25  Investigative Division, what was your next position?

BISHOP - CROSS-EXAMINATION

1  **A.**  I was a captain doing cold case investigations over at

2  Metro Homicide.

3  **Q.**  Could you take the number 6031 with you?

4  **A.**  No, sir, because I was in a different building.

5  **Q.**  If you had been able to take 6031 with you to that other

6  building, would you have requested it?

7  **A.**  I would have.

8  **Q.**  Because that was the line that had become your little

9  personal line, correct?

10  **A.**  Yes, sir.

11           MR. PFEIFER:  Thank you.

12           THE COURT:  Mr. Sullivan?

13           MR. SULLIVAN:  No, sir.

14           THE COURT:  Can he leave?

15           MR. SULLIVAN:  Yes, sir.

16           THE COURT:  Thank you very much.

17           THE WITNESS:  Thank you.

18           THE COURT:  We'll start tomorrow at 9:00.

19           Are we going to finish tomorrow?

20           MR. SULLIVAN:  We will finish tomorrow, Your Honor.

21           THE COURT:  Okay.  So I can cancel my hotel

22  reservations for tomorrow night?

23           MR. SULLIVAN:  You can safely cancel.

24           THE COURT:  I love South Bend, but I want to go

25  home.

```
 1              MR. SULLIVAN:  I understand Hammond is calling you
 2     back.
 3              THE COURT:  No, my bed is calling me back.
 4              9:00 tomorrow morning.
 5              MR. SULLIVAN:  Very good.
 6              THE COURT:  We're adjourned for the day, and you all
 7     can do what you want to do.
 8              MR. SULLIVAN:  Thank you, Your Honor.
 9              (Proceedings adjourned at 6:20 p.m.)
10
11                        CERTIFICATION
12
13         I, JOANNE M. HOFFMAN, certify that the foregoing is a
       correct transcript from the record of proceedings in the
       above-entitled matter.
14
15
16     _____          August 26, 2014
       U.S. Court Reporter
17     United States District Court
       Northern District of Indiana
18     South Bend Division
19
20
21
22
23
24
25
```