```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF INDIANA
                             HAMMOND DIVISION

      CITY OF SOUTH BEND,              ) Cause No. 3:12cv475
                                       )
              Plaintiff,               )
                                       )
              vs.                      )
                                       )
      SOUTH BEND COMMON COUNCIL,       ) South Bend, Indiana
      et al.,                          ) August 13, 2014
                                       ) 9:00 a.m.
              Defendants.              )
      ─────────────────────────────    ) ────────────────────
                                       )
      BRIAN YOUNG, SANDY YOUNG,        )
      TIMOTHY CORBETT, DAVID           )
      WELLS, and STEVE RICHMOND,       )
                                       )
              Plaintiffs,              )
                                       ) Consolidated Case No.:
              vs.                      ) 3:12cv532
                                       )
      THE CITY OF SOUTH BEND,          )
      Acting Through its Police        )
      Department, DARRYL BOYKINS,      )
      Individually and in his         )
      Official Capacity as Chief      )
      of Police, KAREN DEPAEPE,        )
      and SCOTT DUERRING,              )
                                       )
              Defendants.              )
      ─────────────────────────────    )


                               VOLUME II
                       TRANSCRIPT OF BENCH TRIAL
                 BEFORE THE HONORABLE JOSEPH S. VAN BOKKELEN
```

APPEARANCES:

For City of South Bend:        MR. EDWARD A. SULLIVAN, III
                               MR. RYAN G. MILLIGAN
                               Faegre Baker Daniels LLP
                               202 South Michigan Street
                               Suite 1400
                               South Bend, Indiana  46601

```
APPEARANCES CONTINUED:

For City of South Bend:      MS. CRISTAL BRISCO
                             City of South Bend
                                Attorney's Office
                             1200 County City Building
                             227 West Jefferson Boulevard
                             South Bend, Indiana  46601

For South Bend Common
Council:                     MR. E. SPENCER WALTON, JR.
                             MR. ROBERT J. PALMER
                             May Oberfell Lorber
                             4100 Edison Lakes Parkway
                             Suite 100
                             Mishawaka, Indiana 46545

For Timothy Corbett,
David Wells, Steve Richmond,
Brian Young, and
Sandy Young:                 MR. DANIEL H. PFEIFER
                             MR. JEROME W. McKEEVER
                             Pfeifer Morgan & Stesiak
                             53600 North Ironwood Drive
                             South Bend, Indiana  46635

                             MR. JEFFREY S. McQUARY
                             Brown Tompkins Lory & Mastrian
                             608 East Market Street
                             Indianapolis, Indiana  46202
```

*Joanne M. Hoffman*
*United States Court Reporter*
*119 Robert A. Grant Courthouse*
*204 South Main Street*
*South Bend, Indiana  46601*
*(574) 246-8038*
*Joanne_Hoffman@innd.uscourts.gov*

```
 1                              INDEX

 2       WITNESSES FOR THE PLAINTIFF:

 3                          STEVEN RICHMOND

 4
         DIRECT EXAMINATION
 5       BY MR. SULLIVAN:                          Page 4
         CROSS-EXAMINATION
 6       BY MR. WALTON:                            Page 20
         CROSS-EXAMINATION
 7       BY MR. PFEIFER:                           Page 33
         REDIRECT EXAMINATION
 8       BY MR. SULLIVAN:                          Page 57
         RECROSS-EXAMINATION
 9       BY MR. WALTON:                            Page 58
         RECROSS-EXAMINATION
10       BY MR. PFEIFER:                           Page 60

11                            BRIAN YOUNG

12       DIRECT EXAMINATION
         BY MR. SULLIVAN:                          Page 63
13       CROSS-EXAMINATION
         BY MR. WALTON:                            Page 76
14       CROSS-EXAMINATION
         BY MR. PFEIFER:                           Page 90
15       REDIRECT EXAMINATION
         BY MR. SULLIVAN:                          Page 101
16       RECROSS-EXAMINATION
         BY MR. WALTON:                            Page 103
17       RECROSS-EXAMINATION
         BY MR. PFEIFER:                           Page 106
18
                              KAREN DePAEPE
19
         DIRECT EXAMINATION
20       BY MR. SULLIVAN:                          Page 108
         CROSS-EXAMINATION
21       BY MR. WALTON:                            Page 155
         CROSS-EXAMINATION
22       BY MR. PFEIFER:                           Page 180
         REDIRECT EXAMINATION
23       BY MR. SULLIVAN:                          Page 199
         RECROSS-EXAMINATION
24       BY MR. WALTON:                            Page 208
         FURTHER REDIRECT EXAMINATION
25       BY MR. SULLIVAN:                          Page 210
                              *   *   *
```

```
 1              THE COURT:  You can all be seated.
 2              Are you ready?
 3              MR. SULLIVAN:  I am.
 4              THE COURT:  Everybody else ready to start?
 5              MR. PFEIFER:  Yes.
 6              THE COURT:  Okay.
 7              Call your witness.
 8              MR. SULLIVAN:  Steve Richmond.
 9              (The witness was duly sworn.)
10              THE COURT:  You can be seated.
11                         STEVEN RICHMOND,
12    having been duly sworn, was examined, and testified as follows:
13                       DIRECT EXAMINATION
14    BY MR. SULLIVAN:
15    Q.  Good morning, Officer Richmond.
16    A.  Good morning.
17    Q.  Would you introduce yourself to the Court?  State your full
18    name and spell it for the record, please.
19    A.  I'm Steven Richmond.  My last name is spelled
20    R-i-c-h-m-o-n-d.
21              THE COURT:  Like "Richmond" is usually spelled,
22    right?
23              THE WITNESS:  Some people say it's "Richman."
24              THE CLERK:  Can you move the microphone closer to
25    you?
```

```
 1              THE WITNESS:  Yes.
 2              THE CLERK:  Thank you.
 3   BY MR. SULLIVAN:
 4   Q.   What's your current position of employment?
 5   A.   I am the assistant warden or captain with the St. Joseph
 6   County Police Department in the Jail Division.
 7   Q.   Would you give your employment history with the South Bend
 8   Police Department and begin with your first position with the
 9   police department and go forward from there.
10   A.   I joined the police department initially as a police cadet
11   in 1973, of which I remained part of the cadet program until I
12   was selected as an officer in training and sent to the Indiana
13   Law Enforcement Academy in the fall of 1976.
14              I was a sworn officer in January of 1977.  I worked
15   in the Uniform Patrol Division up until 1980, at which point I
16   resigned.  I went to work as an electrician for the IBEW.
17              In 1987, I had the opportunity to return to the
18   South Bend Police Department where I, again, was reinstated as
19   a corporal and was assigned to the Uniform Patrol Division
20   until 1990, in the fall, where I was then transferred into the
21   Detective Bureau, or Investigative Division, with the South
22   Bend Police Department.
23              I remained -- I did different assignments there in
24   the Detective Bureau.  I was first assigned as a burglary
25   investigator, then a fraud investigator, and then I was
```

1    assigned to the South Bend Homicide Unit until March of '93,

2    when Special Crimes first came into existence.  I remained at

3    the South Bend Police Department, in a Major Case

4    investigator's role, investigating death investigations other

5    than homicide, until October of '94, when I was transferred to,

6    then, the Special Crimes Unit where I remained until 1999.

7             I was brought back to the -- during my tenure at the

8    Special Crimes Unit, I was promoted to sergeant.  When I

9    returned to the South Bend Police Department in February of

10   '99, I was assigned back again with the Major Case Unit as a

11   sergeant, and I remained in that position until 2000,

12   September, where I was promoted to lieutenant and transferred

13   into fire investigation.

14            I remained in that position until January of 2003,

15   where I was brought back as a lieutenant to the St. Joseph

16   County, now called, Metro Homicide Unit, where I remained until

17   August of 2006.

18            In 2006, I was brought back to the Investigative

19   Division on the day shift as a case assignment lieutenant, and

20   I remained in that position for two months, until such time

21   that then Chief Tom Fautz promoted me to captain in the

22   Investigative Division.

23            I remained in that position until February of 2010

24   where I was promoted to division chief.  I remained in that

25   role until my retirement on June 29th, 2012.

1   **Q.**   Since you've retired from the South Bend Police Department,

2   you've been working with the St. Joe County --

3   **A.**   There was a year in between my retirement I worked as an

4   investigator for an insurance company in the Michigan area

5   investigating auto accident medical fraud, staged accident

6   rings, and I did clinic inspections.

7   **Q.**   Okay.  And what is your current rank?

8   **A.**   My current rank is a captain.

9   **Q.**   All right.  Captain Richmond, I want to focus on your

10   experience with the South Bend Police Department and,

11   specifically, your awareness of recording practices.  Okay?

12   **A.**   Yes.

13   **Q.**   When was the first time as a police officer you became

14   aware that there were phone lines recorded in the police

15   department?

16   **A.**   During my initial intake as a cadet in 1973.

17   **Q.**   What did they tell you?

18   **A.**   The lines in the radio room at that time -- before it was

19   remodeled and moved -- the lines in that radio room and at the

20   front desk were the areas at the police department that were

21   recorded, the phone lines in those areas.

22   **Q.**   Were there any other recorded lines that were discussed

23   with you at that time?

24   **A.**   No.

25   **Q.**   Now, moving forward in your experience as a police officer,

1   what's the next thing that you learned about the recording

2   practices at the police department?

3   **A.**   Following the remodel at the police department, I was told

4   that there was -- the areas where the phones were recorded

5   remained at the front desk, which now also included the

6   sergeant's room, which was part of the front desk, and

7   communications.  Those were the only three areas at that point

8   that I knew the Reliance recorded.

9   **Q.**   What's the first position you held as a police officer in

10  which you had your own assigned line for use as an

11  investigator?

12  **A.**   That would have been during my transfer into the South Bend

13  Homicide Unit in 1992.

14  **Q.**   Okay.  And when you had that position, did you ever feel a

15  need to record conversations in your investigative duties?

16  **A.**   From time to time, yes.

17  **Q.**   What did you do?

18  **A.**   At that time, I had a device that we attached to the phone

19  in my office, in which I used a cassette recorder to record a

20  conversation.

21  **Q.**   Was that some equipment issued to you by the police

22  department?

23  **A.**   No.

24  **Q.**   How did you come by that equipment?

25  **A.**   I purchased that equipment.

1  **Q.** And how long did you use that device to aid in your

2  investigation?

3  **A.** I used that type of device until I was transferred to the

4  Special Crimes Unit. At which time, equipment similar to that

5  was purchased again that hooks to the phone itself, that we

6  could use cassette recorders for the purpose of recording phone

7  calls.

8  **Q.** Where was that office located?

9  **A.** That office was located at 523 East Jefferson.

10  **Q.** Let me move you up now and focus on when you became a

11  captain in the Investigative Division, or Detective Bureau, as

12  it's sometimes called, right?

13  **A.** Yes.

14  **Q.** I want you to focus on that period of time. Did you

15  conduct investigations of crimes in that role?

16  **A.** From time to time, I would.

17  **Q.** Okay. What other job duties did you have in that position?

18  **A.** My job as captain was to organize and direct the detectives

19  in the Detective Bureau, assigned to the Detective Bureau

20  itself. My job at that point did not include officers assigned

21  to the satellite units, like the Homicide Unit, the Family

22  Violence Unit. I primarily had only control of those assigned

23  to the Arson Bureau, because of my experience, and I'm a

24  certified fire investigator, so I directly oversaw their work

25  at that unit.

1  **Q.**  Did you feel a need to record any of the conversations you

2  had when you held that role?

3  **A.**  Yes, I did.

4  **Q.**  How did you accomplish that?

5  **A.**  By purchasing -- at that time I moved up in time and I

6  purchased a digital recorder, my own device, which I have at

7  the table today, which I attached to the phone in my office.

8  And if I felt the need to record a conversation, I would simply

9  plug in the recorder and turn it on.

10  **Q.**  Okay.  When you were in that role, did anybody ever talk to

11  you about what the recorded lines in the police department were

12  at that time?

13  **A.**  No.

14  **Q.**  Let's be specific now.  You're a captain in the

15  Investigative Division; so if I have this right, this is

16  probably in 2006?

17  **A.**  2006, October, I started as a captain.

18  **Q.**  Okay.  So it's sometime after that point.

19      Did you ever receive any written materials that

20  stated what the policy or procedure or routine was in regard to

21  recorded lines?

22  **A.**  No.

23  **Q.**  Was there ever an announcement by the chief of the division

24  at that time or the police chief about that?

25  **A.**  No.

REDMOND - DIRECT EXAMINATION

1  **Q.**  What did you think was recorded when you were in that role

2  as captain in the Investigative Division?

3  **A.**  The front desk, which included that sergeant's room, and

4  the communications center.

5  **Q.**  Okay.  Your next position, then, after you were captain of

6  the Investigative Division was what?

7  **A.**  Division chief.

8  **Q.**  Now, when you moved up to division chief, again, did you

9  learn anything more -- this is, as I recall, January, February,

10  of 2010?

11  **A.**  February of 2010.

12  **Q.**  February of 2010.

13          When you moved into that role, did you learn

14  anything more at that time about the recording practices in the

15  South Bend Police Department?

16  **A.**  No.

17  **Q.**  Did you talk to anybody about the need for your line to be

18  recorded?

19  **A.**  No.  I believe I understood what was being recorded, and

20  that was the front desk, the sergeant's area, and the

21  communications center.

22  **Q.**  At that time you wanted to keep your phone number, which at

23  that time had 7473; do I have that right?

24  **A.**  Yes, sir.

25  **Q.**  And that's when you talked to Barb Holleman and asked her

1    to move your phone number from the office you were in as a

2    captain to the office you would occupy as division chief?

3    **A.**   Yes.   That was the second time I would have asked her to do

4    that for me.

5    **Q.**   When was the first time?

6    **A.**   When I returned in August of 2006 as a lieutenant, in those

7    two months that I worked in that position, I had changed my --

8    when I entered the police department, because I couldn't bring

9    my previously assigned number, which was 235-5016 at the

10   Homicide Unit, because it was in a different building, I was

11   given an empty office, and the telephone number in that office

12   was 235-7473.

13           Two months later -- during that time, I had notified

14   everybody that I knew of my new office line, and then two

15   months later when I was promoted to captain, instead of having

16   to go through the whole practice again, I went to Barb and

17   initially asked her if she could contact the phone company and

18   have that line switched, if that was possible.

19           She said she didn't need to contact the phone

20   company because it was something that she could do, and she

21   did.   She told me all I needed to provide her were some codes

22   off the wall plates underneath the desks where the phones in

23   those offices were plugged into.

24           I went back to my office, the lieutenant's office,

25   and got this code that she referred to, and then I walked into

1  the office I was moving to as the captain, got that code, gave

2  them to her, along with the office numbers, and she went to a

3  closet near the back of the police station.  It took her about

4  15 minutes, and she came back and asked me to verify that the

5  switch had been successful, and it was.

6  Q.  So you knew that exact process when you then moved into the

7  division chief's office?

8  A.  Yes.  I went to her again and I asked her if it was

9  possible if we could do this one more time, if there was

10  anything that prevented me from moving my phone once again, and

11  we went through the same process; however, this time it took

12  her a little longer to do so because she was busy before she

13  could get it done.  I think it took her about 45 minutes before

14  she came back and told me it was complete.

15  Q.  Okay.  You were replacing Rick Bishop in the role of

16  division chief?

17  A.  That's right.

18  Q.  Did you have any knowledge that Rick Bishop's line was

19  recorded while he was division chief?

20  A.  No, I did not.

21  Q.  So no one told you to expect that when you moved into that

22  position?

23  A.  No.

24  Q.  Did you at that time, when you moved in that position, have

25  any discussion at all with Karen DePaepe about your phone line

BEGUMOND -- DIRECT EXAMINATION

```
 1   or recorded lines in the police department?
 2   A.   No, I did not.
 3   Q.   Okay.  The device that you mentioned --
 4             MR. SULLIVAN:  Your Honor, may I request permission
 5   just to go to counsel table and show it?
 6             THE COURT:  Yes.
 7   BY MR. SULLIVAN:
 8   Q.   Is this the device you were referring to earlier
 9   (indicating)?
10   A.   Yes.
11   Q.   You used this when you were a captain?
12   A.   Yes.
13   Q.   Did you use it as division chief?
14   A.   Yes, I did.
15   Q.   If you would have known that you could have your line
16   recorded, would you have used this, or would you have wanted
17   your line recorded 24/7, 365 days a year?  Which one would you
18   have preferred?
19   A.   It wouldn't have bothered me if they had recorded my line,
20   but I would have preferred this (indicating).
21   Q.   Why?
22   A.   Because in my role as the division chief, I have -- and
23   have had for years -- a special clearance known as 6E among law
24   enforcement officers, which gives me the ability to communicate
25   with federal officers on cases that are sometimes very
```

 1   sensitive and where information doesn't need to be recorded.

 2           I also work with -- part of my responsibility at the

 3   time as chief was overseeing our Narcotics Unit, which, again,

 4   deals with very sensitive cases.  Conversations that I would

 5   have had with the captain in charge of that unit were normally

 6   done in person, but, from time to time, there were

 7   conversations on the phone that I would not have wanted

 8   recorded; so, therefore, I would have chose that method.

 9   **Q.**  But suffice to say, you had no knowledge that you could

10   even have your line recorded; is that correct?

11   **A.**  That's absolutely true.

12   **Q.**  When is the first time that you became aware that the lines

13   for either the office that you occupied, as division chief, or

14   the office that Captain Young occupied -- when was the first

15   time that you became aware that those were recorded?

16   **A.**  That would have been January 17th, 2012.

17   **Q.**  How did you become aware of that?

18   **A.**  After being notified by my captain, Captain Brian Young,

19   that he had been told that his line was being recorded, not

20   aware that there were any lines in the Detective Bureau

21   recorded, I went to Karen DePaepe to get to the bottom of

22   rumors that we had been hearing about these recorded lines.

23   During my discussions with her, I asked her if, in fact, there

24   were lines being recorded in my Detective Bureau.

25   **Q.**  How did she respond?

1    **A.**   She answered my question initially by saying, "Yes, there

2    were.  There were three lines."

3              And I asked her to identify those for me.

4    **Q.**   And what did she tell you?

5    **A.**   The first line that she identified for me she said belonged

6    to my secretary or the secretary in the Detective Bureau, the

7    9263 number.  She explained its purpose, that there are times

8    where people would call the Detective Bureau and leave messages

9    and things or talk to her about things that the department

10   might want to know about.  And I said, honestly, that actually

11   made sense.

12   **Q.**   What else did she say?

13   **A.**   The second line identified for me she said was my line.

14   She said that Chief Boykins had requested that my line be

15   recorded the day that he promoted me to division chief.

16   **Q.**   And what was the third line she mentioned?

17   **A.**   The third line she identified for me belonged to Captain

18   Brian Young.

19   **Q.**   Did she explain how that one became recorded?

20   **A.**   No, she did not.  She explained to me where -- because each

21   time I asked her on my line and on the captain's line if there

22   were recordings being made, she said there were.  I asked her

23   where they were being stored, and she identified an area in the

24   back of the communications center where this was being done.

25   Near the end of the conversation, I asked her if there had been

BEGUMOND – DIRECT EXAMINATION

1   any requests of recordings made of those conversations, and she

2   told me that, based on specific orders from the chief, Chief

3   Boykins, that she could no longer discuss the matter with me.

4   **Q.**  Okay.  In the binder in front of you under tab 9, there's a

5   list of recorded phone numbers that the South Bend Police

6   Department was using, and this list was e-mailed to Gary

7   Horvath in August of 2011.

8           The conversation that you just testified about

9   occurred in 2012?

10  **A.**  Yes, January 17th.

11  **Q.**  Okay.  Would you look at this, that's up on the screen or

12  what's in front of you under tab 9, whatever is easier for you,

13  and tell me, is the phone number that was assigned to you and

14  you used in 2011 on this list?

15  **A.**  No, it is not.

16  **Q.**  The bottom three numbers indicate Detective Bureau.  Do you

17  see that?

18  **A.**  Yes, sir.

19  **Q.**  The 9263, that's the number that Karen DePaepe mentioned is

20  the secretary in the Detective Bureau?

21  **A.**  Yes, it is.

22  **Q.**  Did she talk anything about 9264?

23  **A.**  No.  9264 is a rollover number.

24  **Q.**  So that is also controlled by the secretary in the

25  Detective Bureau?

1    **A.**   As it was explained yesterday, whoever is sitting at that

2    particular station, at the secretary's station, if they were to

3    answer the phone, it's not necessarily recording which line,

4    it's recording the device, the phone.  Any conversation being

5    had on that telephone is being recorded, regardless of what

6    number is punched up.

7    **Q.**   Okay.  Then the bottom number with the notation is, of

8    course, the number for Captain Young, but your number is not on

9    this list, is it?

10   **A.**   No, it is not.

11   **Q.**   In your entire tenure at the South Bend Police Department,

12   are you aware if there was ever an ordinary and routine

13   procedure to record the lines of all division chiefs all the

14   time?  Are you aware if that was ever the ordinary and routine

15   procedure?

16   **A.**   No, I am not.

17   **Q.**   Would you be aware of that -- given your long tenure in all

18   the positions you've occupied, would you be aware if such a

19   routine existed?

20   **A.**   I would hope so.

21   **Q.**   Okay.  And what about the same question:  Was there an

22   ordinary routine in the ordinary course of police business

23   during your entire period there to record captains in the

24   Detective Bureau?

25   **A.**   Not to my knowledge.

1   **Q.**   Okay.  Given the positions that you've held, would you be

2   aware if that had been the official procedure or routine of the

3   police department?

4   **A.**   I would have been if it was an official routine, yes.

5   **Q.**   When you were the division chief, you attended meetings of

6   what's been referred to as the "command staff"?

7   **A.**   Yes.

8   **Q.**   And the command staff is the division chiefs; is that

9   right?

10  **A.**   The command staff can include the captains and above.

11  **Q.**   Depending upon who the chief wants to be in that meeting?

12  **A.**   Correct.

13  **Q.**   But as division chief, would you normally be a part of that

14  meeting?

15  **A.**   I would.

16  **Q.**   So in all your years as division chief, was there any

17  discussion of recorded lines and what the ordinary course of

18  business should be in the South Bend Police Department for

19  recorded lines?

20  **A.**   Never.

21  **Q.**   In the time that you were captain and the division chief

22  was Rick Bishop, did you ever participate in meetings there in

23  which it was discussed?

24  **A.**   No.

25          MR. SULLIVAN:  A moment, Your Honor?

1          THE COURT:  Yes.

2          (Brief pause.)

3          MR. SULLIVAN:  No further questions.

4          Thank you, Captain.

5                    CROSS-EXAMINATION

6  BY MR. WALTON:

7  **Q.**  Good morning, Captain.

8  **A.**  Good morning, sir.

9  **Q.**  You've indicated that you didn't have any prior knowledge

10  that Rick Bishop's line as division chief was being recorded

11  when you were captain there for two-and-a-half years; is that

12  right?

13  **A.**  That's correct.

14  **Q.**  And you also indicated you didn't speak to Karen about what

15  lines had been recorded up to that point in time until you

16  testified that in -- when, January 2012; is that right?

17  **A.**  I had no conversation with her prior to January 17th, 2012.

18  **Q.**  Okay.  In terms of the evidence that you've listened to

19  here today so far, yesterday and today, how many officers so

20  far have testified that they weren't aware that their lines

21  were being recorded?

22          I can help you, I guess.

23  **A.**  I'm sorry?

24  **Q.**  I can help you.  You've indicated Brian Young didn't know.

25  **A.**  He hasn't testified yet.

1  **Q.**  I understand, but you just testified that he didn't know.

2  **A.**  Yes.

3  **Q.**  Chief Boykins indicated when he was captain he didn't know

4  his line was being recorded?

5  **A.**  That's correct.

6  **Q.**  And do you know of any other officers that, from your own

7  personal conversations with them, indicate they didn't know

8  their lines were being recorded?

9  **A.**  I never -- before this happened, I never really had a

10  reason to have that kind of conversation with anyone.

11  **Q.**  All right.  If I understand your position in this case, you

12  believe that a line -- if an officer didn't know that his line

13  was being recorded, it's being recorded illegally?

14  **A.**  My understanding is you want me to respond to the question

15  that if an officer didn't know his line was being recorded,

16  then it was being recorded illegally?

17  **Q.**  If I understand your position in this case.

18  **A.**  That would be correct.

19  **Q.**  All right.  Now, you as captain -- in the position of

20  captain of the Investigative Division, you fielded complaints

21  from the public?

22  **A.**  Generally, not from the public.  A lot of my investigations

23  concerned cases that remained that were brought to the

24  Investigative Division that I would be involved in.

25  **Q.**  Okay.  But you would, from time to time, receive

1   information of importance on your line as a captain in the

2   Investigative Bureau to assist in investigations?

3   **A.**   Yes.

4   **Q.**   You would have witnesses call you, potential witnesses call

5   you?

6   **A.**   I believe there would have been, yes.

7   **Q.**   Okay.  And you heard the reasons stated by Chief Fautz to

8   record this type of information as being for law enforcement

9   purposes, to gather information?

10  **A.**   For the areas that I knew to be recorded, yes.

11  **Q.**   All right.  And you did that as captain of the

12  Investigative Division, as well, right?

13  **A.**   I did what?

14  **Q.**   You received information daily or weekly that would be

15  important to your investigations as an officer.

16  **A.**   From time to time, most of my investigations would have

17  included a phone contact which would have invited a witness or

18  whomever involved in an investigation to come to the police

19  department so we could do a face-to-face interview that would

20  be recorded.

21  **Q.**   All right.  You indicated in prior testimony that in the

22  past you had requested recordings of the front desk and the

23  radio room?

24  **A.**   I have.

25  **Q.**   And you said you did that all the time when you were in

1   homicide for investigative purposes?

2   **A.**   Yes.

3   **Q.**   And you also agreed, did you not, that there was a

4   legitimate law enforcement reason behind the recordings at the

5   front desk and the radio room?

6   **A.**   Yes.

7   **Q.**   And you said that, based upon your training and experience,

8   it was common practice for police departments to record

9   telephone lines incoming, but it varies how they do it?

10  **A.**   That's what I testified to earlier, yes.   Departments

11  will vary -- their practices do vary from department to

12  department.   The practice here, though, at our South Bend

13  Police Department, was only the front desk, the sergeant's

14  location, and the communications center.

15  **Q.**   In fact, if I remember, during your deposition, you learned

16  of this routine practice of recording calls all the way back

17  when you started at the Northwestern Staff and Command School?

18  **A.**   I learned about the practice recording phone lines at our

19  department in 1973.

20  **Q.**   Okay.

21  **A.**   We specifically -- during my attendance at the Staff and

22  Command School in Northwestern, yes, we did discuss the

23  variations of recording phone lines and their purpose.

24  **Q.**   All right.   When you made the -- your office change, you

25  indicated you requested Barb Holleman switch your 7473 number

RICHMOND - CROSS EXAMINATION

1   from your former office as captain to your new office as

2   division chief?

3   **A.**   Yes.

4   **Q.**   That was a normal and ordinary practice of officers during

5   the time you've been at the department?

6   **A.**   I don't know if it was a practice by everyone.  As I said,

7   I went to her and asked her if there would be a problem or a

8   reason why it couldn't be done again because she did it once

9   for me from my office as a lieutenant to where I was as a

10  captain.

11  **Q.**   Well, I'm not asking you if it was for everyone.  I'm just

12  saying it was a normal thing to do.  It was done often within

13  the department?

14  **A.**   I can't respond to that.  I don't know how normal it would

15  have been for that to happen.

16  **Q.**   All right.  You had a good reason for doing it?

17  **A.**   I wanted to keep my line.

18  **Q.**   Why did you want to keep your line?

19  **A.**   Because everybody, investigators, different agencies, knew

20  my office line; and instead of trying to reinvent the wheel and

21  notify many of a new line, I just wanted to keep it consistent

22  and for continuity.

23  **Q.**   Makes sense.  Prior contacts that you're familiar with,

24  they could reach you easily?

25  **A.**   Yes.

1   **Q.**   To assist you in your law enforcement duties?

2   **A.**   Correct.

3   **Q.**   Okay.  So then, as chief -- or you were going to be

4   incoming chief of the Investigative Bureau -- you asked Barb

5   Holleman to make this switch, and she told you she would do

6   that when you actually took office; is that right?

7   **A.**   As chief, yes, she did.

8   **Q.**   And if the records indicate you took office around

9   February 15th of 2010, does that sound right?

10  **A.**   That sounds right, yes.

11  **Q.**   There was a gap in time when Brian Young was appointed or

12  promoted to captain underneath you; is that right?

13  **A.**   Yes.

14  **Q.**   If the records indicate that his promotion took effect

15  around March 22nd, 2010, would that match your memory?

16  **A.**   Yes.  I thought there was a period of four to five weeks

17  there.

18  **Q.**   So when this switch was made, was it made prior to the time

19  you actually came into that office?  You made sure your line

20  was operating before you actually took your official position?

21  **A.**   The day that former Chief Bishop vacated the office and I

22  was allowed to begin switching my personal items and paperwork

23  and things into that office, is the day I asked for that to be

24  on.

25  **Q.**   So when the switch was made and 6031 was put into your

1   former office, there was no officer in there?

2   **A.**   No.

3   **Q.**   So there wasn't an officer in there for four or five to six

4   weeks?

5   **A.**   Four or five.

6   **Q.**   And the identity of that officer at that time wasn't known?

7   **A.**   No.  The captain was not determined until sometime after.

8   **Q.**   Okay.  And it was your request, not the chief's request, to

9   change the line; is that right?

10  **A.**   It was my request.

11  **Q.**   As chief, and Barb Holleman followed your request?

12  **A.**   Like I said, I asked her if there was some reason which

13  prevented that from occurring, and she said, "No," and she

14  accomplished it.

15  **Q.**   All right.  I think your prior testimony, at least in your

16  deposition, was that you were not aware that Gene Kyle's line,

17  when he was Detective Bureau chief or investigative chief, was

18  recorded prior to the events in this case?

19  **A.**   That is true.

20  **Q.**   Okay.  Now, we asked in your deposition about the privacy

21  policy that was in existence at the time.

22        At the department there was a policy, which is

23  Exhibit 12, if you have that book in front of you, that had to

24  do with complaints and employee's rights if an officer was

25  being investigated; is that right?

1    **A.**   Yes.

2    **Q.**   And then it says under "Employee Rights, Investigated

3    Employees Provided with Notice:  When the Office of

4    Professional Standards conducts an investigation into an

5    employee, the investigator will immediately provide the

6    employee with a written statement of the allegations, and the

7    employee's rights and responsibilities relative to the

8    investigation.  This procedure does not apply in cases where

9    confidentiality is deemed necessary because of the sensitivity

10   of the investigation."

11             Did I read that correctly?

12   **A.**   Yes, you did.

13   **Q.**   It also indicates that "Employee Assigned Equipment Subject

14   to Entry and Inspection:  Personnel of the department may be

15   assigned departmentally owned property such as, but not limited

16   to:  vehicles, lockers, desks, cabinets and cases for the

17   mutual convenience of the department and its personnel.  All

18   personnel are advised that the storage of personal items in

19   such containers or facilities, are at the risk of the employee

20   and the department will not be responsible for any losses."

21             So far have I read that correctly?

22   **A.**   Yes, you have.

23   **Q.**   Okay.  It says, "This assigned equipment is subject to

24   entry and inspection during a particular internal investigation

25   being conducted by the department, where the department has a

```
 1   reasonable suspicion that evidence of work-related misconduct
 2   will be found.  Assigned personnel shall have the right to be
 3   present during such inspection and shall be served with notice
 4   as to the basis for such an inspection."
 5          Right?
 6   A.  You read that correctly.
 7   Q.  Okay.  And you also signed -- as part of this policy, each
 8   officer in the department signed off on this policy, which was
 9   required, right, everybody from top to bottom?
10   A.  Yes.
11   Q.  And the policy indicates that there's no expectation or
12   right of privacy to any of the assigned equipment?
13   A.  The assigned equipment never included phones.
14   Q.  Well, I know that's what you're -- I'm just asking what the
15   policy is.
16   A.  Okay.  Yes.
17   Q.  All right.  Now let's talk about the phone in your office.
18          Is that your phone or does it belong to the
19   department?
20   A.  It belongs to the department.
21   Q.  And your office is South Bend Police Department property?
22   A.  Yes.
23   Q.  As was Brian Young's phone and his office?
24   A.  Yes.
25   Q.  Okay.  This policy was in effect, if I'm not mistaken, in
```

1    2009, prior to the events in this case?

2    **A.**   I don't see an effective date listed here.

3            MR. WALTON:  Can we stipulate to that?  We didn't

4    have the whole policy in here.  Just a second.  I have the full

5    policy.  Excuse me for a second, Your Honor.

6            (Discussion held off the record.)

7            MR. WALTON:  In any event, Counsel, can we stipulate

8    this was in effect prior to the events in this case?

9            MR. PFEIFER:  I don't know what you're talking

10   about.

11           MR. WALTON:  The policy of privacy.  He didn't put

12   the whole policy in.

13           (Discussion held off the record.)

14           MR. WALTON:  Do you want to clarify it later for the

15   record?

16           (Discussion held off the record.)

17           MR. WALTON:  Your Honor, the problem we're having is

18   they only put the one page in the exhibit book instead of the

19   whole standard, so we will try to correct that later for the

20   record for you and provide the date that this policy is in

21   effect.

22           THE COURT:  I appreciate that.

23   BY MR. WALTON:

24   **Q.**   Officer, do you remember that every officer in the entire

25   department was required to sign off on this standard, the

 1   Internal Affairs/Office Professional Standards, so that they

 2   understood that they had read it?

 3   **A.**   Yes.

 4   **Q.**   Including yourself and all the officers involved in the

 5   current litigation?

 6   **A.**   With the exception of Tim Corbett, I believe.

 7   **Q.**   Because he was working in another area at the time?

 8   **A.**   He's not a member of the South Bend Police Department so he

 9   is not made to adhere to these policies.

10   **Q.**   I understand.   Thank you.

11          Now, would it be fair to say that if any information

12   that was obtained on the records of the department since this

13   policy that was in effect, whatever the policy was, by Chief

14   Fautz, since 2004, would it be fair to say that any evidence

15   that would have been obtained over a line that you say was

16   illegally recorded would be evidence that, over the last ten

17   years, could possibly affect prior convictions in the last ten

18   years?

19          MR. SULLIVAN:   Objection.   It calls for a legal

20   conclusion, Your Honor.

21   BY MR. WALTON:

22   **Q.**   Well, if evidence obtained over these lines of any person

23   that says they didn't know the lines were being recorded were

24   used in any investigation over the last ten years and the Court

25   finds that that was illegally obtained, that evidence would

1    have been obtained illegally by the department and could affect

2    prior convictions for the last ten years; am I right?

3           MR. SULLIVAN:  Well, in the first place, Your Honor,

4    it calls for a legal conclusion; and, secondly, it's not

5    probative of the policy of the police department and what their

6    procedure was.  So the question has no place in this

7    proceeding.

8           MR. WALTON:  It certainly does, Your Honor.  It's

9    their position that any officer that had his line recorded

10   without his knowledge, that line is being illegally recorded

11   and, therefore, that evidence violates the Wiretap Act and that

12   evidence would be illegal.

13          MR. SULLIVAN:  It's a further legal --

14          THE COURT:  Hang on just a second.

15          The question that is being objected to says:

16          "Now, would it be fair to say that if any

17   information that was obtained on the records of the department

18   since this policy that was in effect" -- which I don't know

19   when that was -- "whatever the policy was, by Chief Fautz,

20   since 2004, would it be fair to say that any evidence that

21   would have been obtained over a line that you say was illegally

22   recorded would be evidence that, over the last ten years, could

23   possibly affect prior convictions in the last ten years?"

24          That was the question, right?

25          MR. WALTON:  Yes, it was.

1          MR. SULLIVAN:  My objection, Your Honor, is that

2     it's calling for a legal conclusion.

3          THE COURT:  It's badly phrased more than anything

4     else.

5          MR. SULLIVAN:  It is complex and compound.

6          THE COURT:  Mr. Walton, would you restate your

7     question?

8          MR. WALTON:  I will.  I will restate it.

9  Q.  If a line has been illegally recorded, is it your

10    experience that the evidence -- that whatever is on that line

11    cannot be used by the department in trying to convict someone?

12         MR. SULLIVAN:  And I will object to that.  It's a

13    legal conclusion.  It's also not relevant to this proceeding.

14    The Wiretap Act has specific provisions for information to be

15    used in a testimonial --

16         THE COURT:  Let me cut this whole thing off.  I

17    don't think it's helpful to the Court.

18         MR. SULLIVAN:  I'm sorry?

19         THE COURT:  I don't think it's helpful to the Court.

20    We will leave it at that.

21         MR. WALTON:  All right.  Fair enough.

22  Q.  Officer, as far as you know, since Chief Fautz indicated

23    which lines were going to be recorded back in 2004, the purpose

24    of recording certain lines within the department was done for

25    law enforcement purposes; is that right?

1   **A.**   The areas that I was aware of that were recorded that would

2   be true, but that wasn't the case here.

3            MR. WALTON:  All right.  Thank you very much.

4            THE COURT:  Mr. Pfeifer.

5                         CROSS-EXAMINATION

6   BY MR. PFEIFER:

7   **Q.**   Captain Richmond, you were asked some questions about

8   property of police officers by Mr. Walton.

9            Do you remember that line of questioning?

10  **A.**   Yes, sir.

11  **Q.**   Now, it's true, is it not, then, that when police officers

12  were assigned or given equipment by the South Bend Police

13  Department, that the police officer had to sign a specific

14  receipt for that property; isn't that true?

15  **A.**   That's true.

16  **Q.**   And when the police officer turned in that property, then

17  you would also sign a receipt showing that the property had

18  been turned back in, correct?

19  **A.**   Correct.

20  **Q.**   While you were a police officer with the South Bend Police

21  Department, did you ever sign a receipt for the actual physical

22  phone that you were given to use?

23  **A.**   No, I did not.

24  **Q.**   In fact, it is not the phone that was being recorded; it is

25  the phone line that was being recorded; isn't that true?

1    **A.**   My understanding.

2    **Q.**   And the South Bend Police Department does not own the phone

3    lines that go into the police station, if you know, do they?

4    **A.**   To my knowledge, no.

5    **Q.**   You told us, in response to questions that Mr. Sullivan

6    asked, that you first went to Karen DePaepe on January 17th of

7    2012, and asked her if, in fact, your phone line was being

8    recorded; is that correct?

9    **A.**   Yes.   Lines in my Detective Bureau.

10   **Q.**   Before that date, did you have any reason to believe that

11   your line was being recorded?

12   **A.**   Absolutely none.

13   **Q.**   Before that date -- let me take a step back.

14          In the year 2011, there was a mayor's race in the

15   City of South Bend, correct?

16   **A.**   Yes.

17   **Q.**   And there was a primary that took place in May of 2011, and

18   then in November of 2011, there was the general election,

19   correct?

20   **A.**   Correct.

21   **Q.**   Mayor Pete Buttigieg won the general election in November

22   of 2011 and was going to become the mayor of the City of

23   South Bend in January of 2012, correct?

24   **A.**   Correct.

25   **Q.**   When that occurred, did you make application or seek out in

1    any way the position of chief of police during the interim

2    period between the election in November of '11 and when he

3    became the mayor in January of 2012?

4              MR. WALTON:  Your Honor, I'm going to pose an

5    objection to this line of questioning.  We're now in January of

6    2012, twelve months, almost, after the events in this case, and

7    I don't know why that would be relevant to the Court, whether

8    or not the recordings of the conversations that take place

9    between February of 2010 and July or June of 2011, have any

10   relevance to this line of questioning.

11             THE COURT:  What's the relevancy?

12             MR. PFEIFER:  Mr. Walton has been asking throughout

13   the course of this trial whether or not the recording system,

14   the system itself, was a device for intimidation, suppression

15   of criticism, blackmail, embarrassment, or other improper

16   purposes, which is actually language that's taken directly out

17   of the *Amati* case.

18             He's been asking about the system, whether or not it

19   was intended to be used that way.  He's opened up the door

20   because there is evidence that I intend to offer to the Court

21   to show that, maybe, while the system itself wasn't intended to

22   be used that way, it, in fact, was used that way with the

23   listening to the phone conversations of Brian Young and Steve

24   Richmond and the recording of those conversations.

25             So even though the system wasn't intended to do

 1   that, in fact, it was used in that fashion, which would, under

 2   *Amati*, cause the law enforcement exception that they're trying

 3   to establish to be overcome.

 4            MR. WALTON:  Your Honor, the issue in the case is,

 5   at the time the recordings were made, whether or not they were

 6   recorded legally or not.  He's talking about an event, if I'm

 7   hearing his question right, that may have taken place in

 8   January of 2012 or later.  It has no relevancy to whether or

 9   not these recordings, at the time they were being made, were

10   being recorded legally.

11            MR. PFEIFER:  It does have relevancy because it is a

12   foundational question to then lead to questions of Captain

13   Richmond, as to conversations that he and then Chief Boykins

14   had, who had access to the information.

15            MR. SULLIVAN:  Your Honor, if I may be heard on

16   behalf of the City?  Not on this particular issue, just on the

17   general notion --

18            THE COURT:  Hang on just a second.

19            The question that was asked is:  "When that

20   occurred" -- that's the election of --

21            MR. PFEIFER:  -- November of '11.

22            THE COURT:  -- the incumbent mayor.  "When that

23   occurred, did you make application or seek out in any way the

24   position of chief of police during the interim period between

25   the election in November '11 and when he became the mayor in

 1    January of 2012?"

 2              At that point, Mr. Walton interposed an objection.

 3    The objection, as I understand it, is outside of the time

 4    period of this case.

 5              MR. SULLIVAN:  That's his objection, Your Honor; is

 6    that what you're saying?

 7              THE COURT:  That's what I thought it was.

 8              MR. WALTON:  That's correct.

 9              THE COURT:  I mean, we're going -- we have to focus

10    back to what the question was to which the party objected, and

11    we've gone far afield of what the objection was.  The objection

12    was a timeframe objection.

13              MR. PFEIFER:  I understand.

14              Do you want to say something?

15              MR. SULLIVAN:  Yes.

16              I just wanted to renew some of the discussion we had

17    at the beginning about the timeframe issue.  People have asked

18    questions throughout about the actions of the witnesses

19    throughout 2011, because actions that took place in mid- or

20    late 2011, or even 2012, can reveal what the procedures or

21    process may have been, or were not, at an earlier time.

22              So I just want to be on the record that you can't

23    restrict the evidence to a timeframe that is so narrow, that,

24    you know, February 4th, 2011, is when we discovered that Brian

25    Young is recorded; therefore, everything after that is not

1    probative.

2            THE COURT:  That's not how I read the question.  It

3    may be Mr. Walton's intention, but that's not how I read the

4    question.  The question is, in my humble opinion, very simple.

5    It says:  "When that occurred, did you make application or seek

6    out in any way the position of chief of police during the

7    interim period between the election in November '11 and when he

8    became mayor in January of 2012?"

9            The answer is either "yes" or "no."

10           MR. PFEIFER:  I agree.  And it is a foundational

11   question to then get into other questions, which will show that

12   through the answers and the responses that were given, it sheds

13   light on the purpose and intent of the recordings.

14           So I agree with Mr. Sullivan; you cannot limit the

15   questioning to the time period and stop when the recording

16   occurred.

17           THE COURT:  I understand that.

18           MR. PFEIFER:  Okay.

19           THE COURT:  I'm going to let that question be

20   answered.  Mr. Walton may have -- when you make your next

21   question, it may come back.  I'm just saying the question

22   that's asked I think can be answered "yes" or "no."

23           MR. PFEIFER:  Exactly.

24           THE COURT:  The next question may be problematic,

25   but I'm going to let that question be asked.

1          So your objection is overruled at this time.

2          MR. WALTON:  Thank you, Your Honor.

3          THE COURT:  You don't have to thank me for anything.

4          MR. WALTON:  Excuse me?

5          THE COURT:  You don't have to thank me for anything.

6  BY MR. PFEIFER:

7  **Q.**  Steve, do you remember the question?

8  **A.**  I do.

9  **Q.**  You can answer it.

10 **A.**  The answer is "yes."

11 **Q.**  Now, having made application for the chief of police's

12 position in that timeframe, did you subsequently, in that

13 timeframe, have conversations with Darryl Boykins, the then

14 chief of police, about your having applied for or looked into

15 the position of chief of police?

16         MR. WALTON:  What timeframe?

17         MR. PFEIFER:  In the timeframe of after the election

18 until January 12th, when he learned that his line was being

19 recorded from Karen DePaepe, or at least that's what Karen

20 DePaepe told him.

21         MR. WALTON:  But the conversations you're asking him

22 about, if I'm correct, occurred in January of 2012, right?

23         MR. PFEIFER:  They occurred in November, December,

24 and January, and it goes to information that Darryl Boykins

25 would have told Steve Richmond about that he only could have

RICHMOND -- CROSS EXAMINATION

1  known by listening to the tape-recorded conversations and the

2  conversations that he would have had with Karen DePaepe.  This

3  gets directly into the using of the recordings.

4          THE COURT:  Was that a question?

5          MR. PFEIFER:  No, no.  I'm sorry.  I thought

6  Mr. Walton was making an objection.

7          THE COURT:  I haven't heard from him recently.

8          MR. WALTON:  I just asked when the conversations

9  took place.

10          MR. PFEIFER:  Okay.  I'm sorry.  I got ahead of

11  myself.

12          THE COURT:  Right.  You can ask your question.

13  BY MR. PFEIFER:

14  Q.  Tell us about the conversations you had with Chief Boykins

15  during that time period.

16          MR. WALTON:  I need him to identify the date of the

17  conversation first.

18          THE COURT:  That's what he asked for, I thought, the

19  date you're talking about.

20          MR. PFEIFER:  The time period was in the November,

21  December, January timeframe, after the election, but before

22  January 12th -- January 17th of 2012.

23          MR. WALTON:  And I want the witness to tell me what

24  month and day, because I know he knows what month and day he

25  had these conversations from prior depositions.

1           MR. PFEIFER:  The question is --

2           THE COURT:  Let me ask:  Do you know when it is,

3    what day?

4           MR. WALTON:  I believe it's in January of 2012 that

5    he spoke to Chief Boykins about these issues.

6           THE COURT:  I'm just saying I think it goes to

7    cross-examination or recross or whatever.

8           MR. WALTON:  I understand.

9           THE COURT:  But at this point, unless we're talking

10   about a year period or something like that, it's down to two or

11   three months that we're talking about, and everybody but me

12   seems to know when that was, so I'm going to let him answer the

13   question.

14   BY MR. PFEIFER:

15   **Q.**   Tell us about conversations you had with Chief Boykins, and

16   tell us the date that you would have had those conversations.

17   **A.**   The conversation that I had with Chief Boykins first began

18   on January the 3rd, during or just shortly after the morning

19   roll call.  Once all the other staff -- Captain Trent and the

20   others that attended the morning roll call meeting -- Chief

21   Boykins and the other two division chiefs and I were the only

22   ones in the room, when Chief Boykins began questioning the

23   other chiefs, asking them if they had had an interview with the

24   mayor-elect for his job as chief of police.  They both

25   responded, "No."

1        He then directed the same question to me, and I

2   seemed confused as to why he would be asking me this question,

3   but I responded, "Yes," that I had had an interview with the

4   mayor-elect for the job of chief of police.

5        MR. WALTON:  Judge, at this point in time, I need to

6   interpose an objection because I know where this is heading.

7   Again, I just need to make it for the record.

8        These officers have filed suit over the use of these

9   tapes and have settled.  Whatever the use of the tapes by

10  Officer Boykins was from or after January of 2012, has no

11  relevancy to whether or not the recordings were being made

12  legally by the department six months earlier.

13       They filed their suit, they've received their

14  compensation, and this is irrelevant to the issues before the

15  Court.  I'm sorry, but I just have to make that.

16       THE COURT:  I understand what you're saying.

17       MR. PFEIFER:  This is not a damages issue question.

18  This is a question that deals specifically with language and

19  discussion in *Amati*.  Mr. Walton has been talking about it

20  throughout the day and a half of this trial, was the recording

21  device intended to record in such a manner so as to intimidate,

22  suppress criticism, blackmail --

23       THE COURT:  I understand all of that.

24       MR. PFEIFER:  All right.  So that's what this

25  evidence is intended to show, that, in fact, it was being used

1    in this instance by the chief of police in conversations with

2    Richmond -- and I'll get into it in conversations with Young --

3    as a means of intimidation, the exceptions that are set forth

4    in *Amati*.

5            THE COURT:  But if you don't know it's even

6    happening, your line is being recorded, how can you be

7    intimidated when you don't know it's happening?

8            MR. PFEIFER:  You learn that it has been recorded

9    and you learn that the chief has listened to the recordings or

10   has information that was on the recordings and that information

11   is being used.  No, they didn't know that it was recorded.

12   When they learned it was recorded, now they're realizing that

13   the information that Chief Boykins is talking about -- of Brian

14   Young's line being recorded -- is being used by the chief in a

15   manner that is contrary to what *Amati* talks about and is

16   contrary to what the system was intended to be used for.

17           THE COURT:  I understand that.  I understand the

18   point you're making, but I tend to agree with Mr. Walton, that

19   more went to this officer's case -- or the case against

20   everybody -- than it does to whether or not the recordings here

21   violated the federal wiretap statute or listening to them or

22   whatever took place.

23           MR. PFEIFER:  And I would argue that the Common

24   Council has raised the exception --

25           THE COURT:  They have.

1          MR. PFEIFER:  -- and this language that I'm talking

2     about and referring to in *Amati* deals specifically with that

3     exception that they're raising.

4          MR. WALTON:  Judge, to make it clear, we have never

5     said that the captain or the chief was the one that was using

6     the recording device for this purpose.  We said that the device

7     and the purpose for which they're being recorded -- the use of

8     the device and the purpose for which it's being recorded -- is

9     for police enforcement purposes.  It's the use of the device.

10         He's talking about what somebody else in the

11    department may have used the recordings for later.  We're

12    talking about the exception applies to whether or not the

13    entire system was set up for law enforcement purposes under

14    *Amati*.  We're not talking about an individual.  We're talking

15    about the law enforcement system and its device.

16         And as I understand the law, if the device itself

17    and the system itself has been set up for law enforcement

18    purposes by Chief Fautz back in 2004, then the device itself is

19    exempt under Title III of the Act.  I am focusing on the device

20    and the system, not what anybody did with it six months later.

21         So when the recordings were made in February of 2011

22    and some recordings that were examined up to June or July of

23    2011, the issue before the Court is whether or not the

24    recording system itself was being used for law enforcement

25    purposes.

1          And we asked repeatedly:  Did you ever use the

2   system to intimidate anybody or was the purpose of the

3   recording device being used to harass anybody?  And they

4   indicated it was not.  That's the uncontroverted evidence so

5   far.  What somebody did with it six months later has nothing to

6   do with whether or not they're being legally recorded by the

7   department.

8          THE COURT:  I don't think you can just

9   arbitrarily -- and you're not being arbitrary -- I'm just

10  saying, you know, limit the time period which is helpful to

11  understand the issues here.

12          I'm going to allow the inquiry to a limited extent.

13  I don't want to get into an issue which is -- there's

14  underlying issues here.  Of course, I'm over in Hammond.  The

15  only thing I know about these things is what I read in the

16  papers, not that I'd read the papers.

17          We're not going to have a political fight here.  We

18  have a statute, and we're going to see where this thing falls

19  in declaratory action under the statute.  However, it's

20  probably somewhat helpful to the Court to, in fact, get a

21  little more background as to what is going on.  Mr. Walton has

22  asked those specific questions, which he has every right to do

23  that; and if I were Mr. Walton, I would do that.

24          So the door has probably been, as I think Judge

25  Sharp said, "nudged" -- not necessarily opened completely

RICHMOND - CROSS EXAMINATION

 1   wide -- but it's been nudged, so I'm going to let a reasonable

 2   inquiry go.  Now, we're not going to spend all day doing this,

 3   though.

 4            MR. PFEIFER:  I agree.

 5            THE COURT:  Because if we're going to do that, we're

 6   going to be here till midnight, and I'll stay till midnight

 7   because I have nothing better to do.

 8            MR. PFEIFER:  You've checked out of your hotel room,

 9   Your Honor.

10            THE COURT:  I've checked out, so we can be here till

11   3:00 in the morning.  So I've got some place I have to stay, so

12   if it's going to be here, I guess it can be here.

13            I will allow reasonable inquiry.  If we get way

14   going wild, it's not going to turn into a political question.

15   That's what I'm saying.

16            MR. PFEIFER:  That's fine.

17            MR. SULLIVAN:  Your Honor, may I have a brief

18   sidebar?

19            THE COURT:  Well, you've won right now.

20            MR. SULLIVAN:  I'm sorry?

21            THE COURT:  You've won the argument right now.

22            MR. SULLIVAN:  This is on a different point.

23            THE COURT:  Do you want a break?

24            MR. SULLIVAN:  No, no.  No, sir.  I need a brief

25   sidebar.

1          THE COURT:  Come on up.

2          (Discussion held at sidebar as follows:)

3          MR. SULLIVAN:  I just wanted to make sure that when

4    you go into any conversations -- some aspects of content could

5    have gone back and forth between Boykins and Richmond, and I

6    just want to renew that the witness --

7          MR. PFEIFER:  There is no content that will be

8    discussed.

9          MR. SULLIVAN:  Okay.  That's all I wanted, to make

10   sure.

11         MR. WALTON:  You want it to be inferred.

12         MR. SULLIVAN:  That's all I wanted to do, is caution

13   the witness.

14         THE COURT:  Well, Cliff Johnson is here; he can be

15   sure to bring your subpoena to you when you open that up.

16         MR. SULLIVAN:  Very good.  Thank you, Your Honor.

17         THE COURT:  Thought I'd let you know that.

18         MR. SULLIVAN:  We appreciate that.

19         MR. PFEIFER:  If there's any concern, if you want to

20   take a five-minute break, I will just remind Steve, but I don't

21   think he needs reminding that we don't get into content --

22         MR. SULLIVAN:  Okay.

23         MR. PFEIFER:  -- if there's that issue, erring on

24   the side of taking a five-minute break to remind him --

25         MR. SULLIVAN:  We don't do five minutes; we do 15,

RICHMOND - CROSS-EXAMINATION

```
 1   and then he'll be mad at me.  Just remind him of that in the
 2   question.
 3              MR. PFEIFER:  Okay.
 4              MR. SULLIVAN:  Thank you.
 5              (Sidebar concluded.)
 6   BY MR. PFEIFER:
 7   Q.  Do you remember the question?
 8              THE COURT:  Probably not.  Ask the question again.
 9   Come as close as you can to what you said before.
10              MR. PFEIFER:  I'll do my best.
11   Q.  Not talking about content of anything that may have been on
12   the tapes, but tell us, if you would, the conversations that
13   you had with Chief Boykins, and I believe you were talking
14   about roll call on January 3rd of 2012, when he had this
15   conversation with you.
16   A.  Yes.  As I explained, he asked me the question if I had had
17   an interview for the job of chief of police, and I responded
18   that I had, which confused me because of our previous
19   discussions where he actually encouraged me to prepare myself
20   in the event I would be called for an interview.
21              He told me on the morning of January 3rd, after the
22   roll call, that he wanted to speak with me privately in his
23   office.  After roll call, when I tried to seek his audience at
24   his request, he sent me away, telling me to come back that
25   afternoon.  When I went back on the afternoon of January 3rd,
```

1    he sent me away and told me to come back in the morning on

2    January the 4th.  This continued.  I went back to his office on

3    January the 4th, in the morning.  He sent me away and told me

4    to come back that afternoon.  He sent me away again on the 5th

5    and told me to come back in the afternoon on the 5th.  On the

6    6th, Friday, he said -- had me seated in his office lobby for

7    approximately an hour until he called me into the office.  Once

8    the conversation began, he asked me a couple of generic

9    questions about activity in the Detective Bureau.  Then he

10   looked at me and told me that he no longer considered me to be

11   a loyal employee; he, in fact, considered me to be a disloyal

12   employee and a backstabber.

13        He leaned forward and said that he -- and he began

14   striking himself on the back, indicating that he had arrows

15   shot into his back, and then he began telling me that he had

16   had conversations with people who told him that during my

17   interview with the mayor-elect --

18        MR. WALTON:  Your Honor, this is getting into

19   hearsay upon hearsay now.

20        THE COURT:  Well, he's just stating what he was

21   told by -- I assume it's not being admitted for the

22   truthfulness of the conversation, I mean, what was said, but

23   the effect it had on him.

24        MR. WALTON:  He's now saying what Officer Boykins

25   said other people told him.

1          THE COURT:  I agree it's hearsay, but I don't think

2     it's being used for the thing -- the effect it had on him.  If

3     I'm wrong, just let me know, and I'll grant his objection.

4          MR. PFEIFER:  No.

5          THE COURT:  Okay.

6     BY MR. PFEIFER:

7     **Q.**  You may continue.

8     **A.**  During that conversation on the morning of Friday,

9     January 6th, Chief Boykins told me that he had been told that I

10    had been disrespectful towards him during the interview with

11    the mayor.

12          I told him that -- I asked him if he would tell me

13    who those people were that were talking to him and telling him

14    these things, and he refused to disclose their identity.  I

15    asked him if he felt the people he was talking to were

16    credible.  He told me "No."

17          Then I asked him, "Why are you then listening to

18    what they're telling you?"

19          And he just smiled at me.

20          I commenced to tell him about the interview.  I

21    asked him if he had had a conversation with the mayor, if he

22    had had a conversation with his assistant, or another lady who

23    was present during the interview.

24          And he had told me "No."

25          And I continued to tell him that, you know, my

1     concern was if those were the only three people in the room

2     during our interview, then those are the people he should seek

3     information from to determine what it was I did share with him.

4            I told him that I had prepared a strategic plan that

5     mentioned our mission statement, our goals of the police

6     department, and, as chief, where I would have intended to take

7     the department.  Basically, in simple form, saying, "This is

8     where we're at, and this is where we want to be, and this is

9     how we're going to get there."

10           After talking at length about the strategy plan, I

11    asked him if he wanted to see that, a copy of it.

12           He said, "No."

13           Then he began telling me about his waiting for

14    conversations to be delivered to him, recorded conversations.

15    I began questioning him about the type of conversations,

16    because during my tenure as division chief, Boykins was always

17    concerned that individuals would walk into his office with a

18    recording device and record conversations, so I was curious as

19    to what kind of conversations he was talking about.  Then he

20    told me -- alluded to the fact that they were telephone

21    recorded conversations.

22           He told me that he was going to wait four to six

23    weeks after the mayor took office before he disclosed any dirty

24    laundry, as he called it, that he would then begin to decide

25    whether or not he was going to demote, discipline, or even fire

1    those that he considered to be disloyal and a backstabber.

2    **Q.**   Disloyal to him?

3    **A.**   Disloyal to him.

4    **Q.**   Did you ever have any other conversation with Chief Boykins

5    other than what you've told us?

6    **A.**   Yes.

7    **Q.**   When is the next conversation that you would have had about

8    this or a similar issue?  Not conversations generally, but

9    about the issue that would pertain to tape recordings; again,

10   without getting into content.

11   **A.**   I would have had subsequent conversations with him on

12   Monday, January the 9th.  It was basically a revisit of our

13   conversation on January the 6th, where he indicated that I was

14   disloyal and was disrespectful in that interview.  Then he

15   continued to threaten to demote me, to fire me, or to

16   discipline me.

17          I, again, had a conversation with him on Thursday,

18   January 12th, again, still concerned that he was misinformed as

19   to what my interview was with the mayor, in trying to resolve

20   this, and still confused about these recordings that he said he

21   was waiting to be delivered to him.

22   **Q.**   January 17th, 2012, is the day that you went to Karen

23   DePaepe and asked her, clearly, "Is my line being recorded?"

24          You testified to that in response to Mr. Sullivan's

25   questions, correct?

1   **A.**   Yes, sir.

2   **Q.**   What caused you to go down to her office on that date?

3   **A.**   The day before, Monday, January 16th, Captain Young and I

4   were informed that -- there were two different occasions that

5   happened that Monday.  One was that patrol officer Etta Jim was

6   talking with one of our task force officers and others, and he

7   was disclosing to them that the chief, Chief Boykins, had

8   recorded conversations of Captain Young, Tim Corbett, and

9   myself.

10         The second instance was one of our detectives

11   assigned to the Homicide Unit had been stopped by a patrol

12   sergeant as he passed through the supervisor's office and the

13   patrol sergeant again questioned the detective, more or less

14   stating, "I hear that the chief has recorded conversations of

15   your boss," and he felt it was quite humorous.

16   **Q.**   Is that what then prompted you to go to Karen?

17   **A.**   After talking with Brian, who had actually gone to see

18   Diana Scott earlier in the morning on January 17th, who came to

19   my office and said, as a matter of fact, that she had just

20   informed him that his line was being recorded and he had no

21   knowledge of that.

22         I was confused with all of these rumors and

23   speculations about these recordings.  Now I'm beginning to feel

24   that it's coming from within the department.  Before, the

25   recorded conversations -- the source of those recorded

 1    conversations, I didn't know where they were coming from,

 2    whether they were officers, or where the source came from.  Now

 3    I'm kind of hearing they're coming from within the building,

 4    and that's when I said, "I'm going to get to the bottom of it."

 5          MR. WALTON:  Your Honor, his interview with the

 6    mayor was in November of 2011.  The last recorded conversation

 7    in this case was in July, six months earlier.  The first one

 8    was in February, nine months earlier than this event.  I think

 9    he's gone way far enough into this without tying it back

10    specifically to any of these recordings.

11          MR. PFEIFER:  The question that was asked is why he

12    went on January 17th, 2012, to Karen DePaepe.  He's explained

13    that.  And my next question is about the January 17th, 2012,

14    conversation as to what Karen DePaepe said to him.  So I'm done

15    with all of this questioning that Mr. Walton seems concerned

16    about.

17          THE COURT:  I'm going to let him continue.  I mean,

18    the exception -- there's no exception, as you would even agree

19    with, if you're using this for an improper purpose, such as

20    harassment, intimidation, so forth.  I'm not saying that's

21    going on.  I'm just saying that I think I need to hear evidence

22    as to what did take place, how it was possibly used.  And even

23    though it goes -- that's why I say I don't think you can

24    arbitrarily freeze the time limit down.

25          So your objection is noted, which actually wasn't

1  even a question.  But to the extent you made an objection, it's

2  overruled.

3         MR. WALTON:  Thank you.  I'm sorry.

4  BY MR. PFEIFER:

5  **Q.**  January 17th, 2012, did Karen DePaepe tell you that your

6  line, 7473, was being recorded?

7  **A.**  Yes, she did.

8  **Q.**  Have you since learned that at no point in time was 7473

9  recorded?

10  **A.**  Yes, I have learned that.

11  **Q.**  During the course of your position as a captain in the

12  Investigative Bureau, would you have ever had the assignment of

13  investigating actions of a police officer by the name of Rick

14  McGee?

15  **A.**  There were two instances where I was privy to actions of

16  him, once as a captain and then again as a division chief.

17  **Q.**  Were you assigned the responsibility of investigating those

18  instances?  And I don't want to get into the investigation.

19  But did you investigate Rick McGee?

20  **A.**  The first one, no.  The second one, yes.

21  **Q.**  Okay.  Approximately when did that investigation take

22  place?  Again, I don't want to know the investigation, just

23  when did the investigation of Rick McGee take place.

24  **A.**  The incident occurred on October the 14th, 2010.

25  **Q.**  Okay.

1   **A.**   It was brought to my knowledge on the 19th.

2   **Q.**   Rick McGee is the husband of Karen DePaepe, is he not?

3   **A.**   Yes, he is.

4   **Q.**   If you know, how many phone lines are there going into the

5   Detective Bureau or the Investigative Division of the South

6   Bend Police Department?

7   **A.**   I don't have an exact number.

8   **Q.**   We've seen evidence of the fact that three lines were being

9   recorded:  the secretary, the rollover, those two, and then

10  6031.  Are there more phone lines than three that go into the

11  Detective Bureau?

12  **A.**   Many more.

13  **Q.**   Give me -- I realize you don't know the exact number.  Give

14  me an approximation.

15  **A.**   I believe we would have had 20 investigators that would

16  have had their own private line, and I had a night lieutenant,

17  two day shift lieutenants and the captain's line.  So probably

18  close to 25 to 30.

19  **Q.**   And I think that is -- is the exhibit book up there in

20  front of you?

21  **A.**   Yes, sir.

22  **Q.**   I think Exhibit 46 is a directory of the Investigative

23  Division and all the people that were assigned lines in that

24  division.

25  **A.**   Yes.  The left column for certain.

1    **Q.**   Okay.

2    **A.**   The fraud investigations would have been in our bureau.

3    The Family Violence Unit is a standalone satellite office, as

4    is the Special Crimes Unit.

5    **Q.**   So omitting Special Crimes and Family Violence, Exhibit 46

6    gives us a general idea of the number of lines going into the

7    Detective Bureau?

8    **A.**   And there are a few other units, but generally, yes.

9            MR. PFEIFER:  If I could have a minute, Your Honor?

10           THE COURT:  You may.

11           (Brief pause.)

12           MR. PFEIFER:  I'll pass the witness.

13           THE COURT:  Okay.  Redirect.

14                        REDIRECT EXAMINATION

15   BY MR. SULLIVAN:

16   **Q.**   Captain Richmond, do you remember, you were asked some

17   questions by Mr. Walton in regard -- it was in reference to

18   yesterday's testimony and the fact that Chief Boykins testified

19   that he didn't know his line was recorded?  Do you remember you

20   answered that question?

21   **A.**   Yes.

22   **Q.**   Do you also remember that yesterday he testified that

23   within a month or so of becoming division chief he was told

24   that his line was recorded?  Do you remember that testimony?

25   **A.**   Yes.

 1                MR. SULLIVAN:  Okay.  That's all I have, Your Honor.

 2                THE COURT:  Mr. Walton.

 3                MR. WALTON:  A couple of things.

 4           First, Judge, just for the record, I have the Office

 5      of Professional Standards privacy policy.  The date last

 6      reviewed on this is -- effective date was 2-23-09, if we can

 7      agree on that.

 8                THE COURT:  Do we have an agreement as to that date?

 9                MR. WALTON:  Yes.  This is the date, and he wants a

10      chance to look at it, Your Honor, I believe.

11                            RECROSS-EXAMINATION

12      BY MR. WALTON:

13      Q.   Captain Richmond, I want -- talking about this conversation

14      you had with Chief Boykins, when your deposition was originally

15      taken in this case, which was April 16th of last year, the

16      question was posed to you:  "Was there anything else in the

17      conversation that was mentioned about recordings that Chief

18      Boykins, then Chief Boykins, was waiting for pertaining to you

19      and others?"

20           Your answer was:  "Well, yes, he was waiting for

21      these to be delivered to him, but what his language didn't

22      suggest to me that he had listened to anything at that point,

23      but then he said he was going to -- once those recordings were

24      delivered to him, he was going to wait a matter of three or

25      four or six weeks after the mayor settled into his new office

1   before he would begin airing dirty laundry of the police

2   department and then would decide whether or not he was going to

3   demote me, whether or not he would discipline me, or even

4   terminate me as a police officer on the police department."

5          Did I read that correctly?

6   **A.**  Yes, sir.

7   **Q.**  All right.  So it's your testimony that when you spoke to

8   Chief Boykins about the recordings, he hadn't given you any

9   indication at that point that he had actually listened or had

10  received any recordings for which he was going to use to demote

11  you?

12  **A.**  Well, what timeframe are you talking about?  During the

13  conversations on January 6th, 9th, and 12th, he indicated he

14  was waiting.  There were other conversations that I've had, the

15  afternoon on the 17th, and then again lastly on the 24th of

16  January, and both of those occasions his language changed.  He

17  began using the terminology or the term, the afternoon of the

18  17th, that he was going to call me and Captain Young back in

19  after this four- to six-week timeframe, to see if we would man

20  up to what he heard us say on these recorded conversations.

21  **Q.**  All right.  But you don't have any evidence that, at the

22  time he had spoke to you, he had actually listened to any

23  tapes?

24  **A.**  Other than his statement that he said he heard us say and

25  he was going to see if we would man up to the statements he

RICHMOND - RECROSS-EXAMINATION

1   claimed he heard us say.

2   **Q.**  And that started with a bunch of rumors within the

3   department from people other than Chief Boykins about what was

4   going on?

5   **A.**  The rumors happened January 16th.  My conversations prior

6   to that, he indicated he was waiting for the conversations to

7   be given to him.  I didn't know where the source was that those

8   conversations or recordings were going to come from.

9   **Q.**  And you heard Chief Boykins testify that he denied that he

10  ever used any recordings to intimidate or harass you?

11  **A.**  I imagine he would.

12            MR. SULLIVAN:  Thank you.

13                      RECROSS-EXAMINATION

14  BY MR. PFEIFER:

15  **Q.**  When you had these conversations with Chief Boykins,

16  did you, in fact, feel intimidated by what he was saying to

17  you?

18  **A.**  Yes, sir.  I even made that clear to him during my

19  conversation on the 24th.  He came to my office, he closed the

20  door, he said to me he wanted to talk to me because the last

21  few days I had appeared to be upset.  And I won't specifically

22  say what I said, but, essentially, I said, "Are you kidding

23  me?"

24            I said, "You've called me into the office on four

25  different occasions.  You've accused me of being disrespectful.

1    You've accused me of being disloyal to you.  You've accused me

2    of doing things -- saying things against you."

3                 I said, "I never said anything publicly or privately

4    that would disrespect you, that would cause you embarrassment,

5    but yet you've upset me, you've upset my wife, Captain Young is

6    upset, you've threatened to discipline me, you've threatened to

7    demote me, you've threatened to fire me."

8                 I said, "I've been looking for a job in case here,

9    in a few short weeks, I find myself unemployed.  Are you

10   kidding me?"

11                He told me that I had misinterpreted what he had

12   said.

13                Again, I would bring him back to the four different

14   occasions.  I said, "I don't have trouble understanding what it

15   was you told me.  This is what you said."

16                He asked me at the end of the conversation that,

17   again, he was going to -- he made me aware that he was aware of

18   an investigation being done, and now he asked -- that he was

19   going to postpone any decisions made on these conversations for

20   a year, and then he asked that any conversations between he and

21   I would be kept between the two of us and that he wished no

22   further discussion about the matter, and he left.  That was the

23   last time I spoke to him about this matter.

24                MR. PFEIFER:  Thank you.

25                THE COURT:  Re-re-redirect, whatever it is.

```
 1            MR. SULLIVAN:  I have no further questions,
 2   Your Honor.
 3            If you would give me a moment, I want to talk to
 4   Mr. Walton to try to work out the issue with this exhibit.
 5            THE COURT:  What we're going to do is we're going to
 6   take a morning break, about a 15-minute break.
 7            Going forward, I'm going to give you a little longer
 8   lunch hour this time, understanding we're going to finish the
 9   evidence today.  And if that's 3:00 in the morning, we'll go
10   till 3:00 in the morning.  My court reporter won't be happy to
11   hear that.  So we'll take about an hour for lunch.  At 12:00,
12   I'm going to lunch with Judge Miller, so when he shows up in
13   here is about the time we're going to break.
14            MR. PFEIFER:  I think, Judge, we only have two more
15   live witnesses.  We have worked out some things between the
16   attorneys where we're going to give you excerpts of depositions
17   instead of live witnesses, and we have a stipulation to reduce
18   the number of witnesses and speed up the process.
19            THE COURT:  Can we take that up?  I assume
20   Mr. Walton is on board.
21            MR. PFEIFER:  Yes.
22            MR. WALTON:  I think we're all on board.
23            MR. SULLIVAN:  Yes, Your Honor.
24            THE COURT:  Anyway, we're going to take about a
25   15-minute break, so see you guys in about 15 minutes.  We will
```

```
 1   break at noon for about an hour lunch.

 2              MR. SULLIVAN:  Very good.

 3              THE COURT:  Court is in recess.

 4              (Brief recess was taken.)

 5              THE COURT:  You can all be seated.

 6              Mr. Sullivan, call your next witness.

 7              MR. SULLIVAN:  I would call Captain Brian Young.

 8              (The witness was duly sworn.)

 9              THE COURT:  You can be seated.

10              THE WITNESS:  Thank you.

11                         BRIAN YOUNG,

12   having been duly sworn, was examined, and testified as follows:

13                      DIRECT EXAMINATION

14   BY MR. SULLIVAN:

15   Q.  Good morning, Captain Young.

16   A.  Good morning.

17   Q.  Would you -- I assume your last name is spelled in the

18   traditional manner?

19   A.  Yes, Y-o-u-n-g.

20   Q.  Okay.  What do you do for a living right now, Captain?

21   A.  I'm employed by the St. Joseph County Prosecutor's Office

22   as a commander of the Special Victims Unit.

23   Q.  So is your title commander instead of captain?

24   A.  Yes.

25   Q.  Would you tell the Court your employment history with the
```

 1   South Bend Police Department, starting from when you first

 2   became a police officer?

 3   **A.**   Sure.

 4           I first became a police officer September 15th,

 5   1986, with the Mishawaka Police Department.

 6           I attended the Indiana Law Enforcement Academy from

 7   January 12th to April 3rd of 1987.

 8           In December of 1988, I was promoted to sergeant in

 9   charge of the K-9 unit.

10           November 23rd of 1992, I left the Mishawaka Police

11   Department and joined the South Bend Police Department.  I

12   worked in patrol on midnights until October of 2000 -- I'm

13   sorry -- October of 1993, where I was selected to be a K-9

14   handler for the South Bend Police Department.

15           I was promoted to sergeant in patrol in August of

16   1998.

17           I was selected to be an investigator with the Family

18   Violence Unit in 2001.

19           I was promoted to lieutenant and went back to patrol

20   on midnights in February of 2005.

21           And in August of 2006, I was selected to be an

22   investigator with the St. Joseph County Metro Homicide Unit.

23           That took me to March 22nd of 2010, when I was

24   promoted to captain in charge of the Detective Bureau.

25           From 1998 to 2004, I was also a member of the South

1    Bend Police Department SWAT team.

2    **Q.**  Thank you.  Much as I have with the other witnesses -- and

3    I think you've heard the testimony -- I want you to describe

4    your understanding of the recorded lines in the South Bend

5    Police Department, but why don't you focus on the timeframe

6    before you became a captain in March of 2010 in the

7    Investigative Division.  Start before that and explain what

8    your understanding was.

9    **A.**  My understanding of the recorded phone lines at the police

10   department were the front desk and the communications center,

11   the 911 lines coming into the communications center.  I later

12   learned, through conversation with a former Internal Affairs

13   investigator, that the Internal Affairs line was also recorded.

14   **Q.**  When did you learn that?

15   **A.**  That would have been in the late 1990s.

16   **Q.**  Okay.  So other than front desk and the 911 or dispatch

17   room and then the Internal Affairs line, had you been aware or

18   informed by anyone that there were other lines recorded?

19   **A.**  I was not aware of nor was I ever informed of that, no.

20   **Q.**  Again, prior to 2010, when you became captain assigned to

21   the Detective Bureau, did you learn about the capacity of

22   what's been called the "Voice Logger," the system that was

23   used?

24   **A.**  I had no information regarding that system.

25   **Q.**  Did you ever have occasion to request 911 calls or calls to

1    the front desk for purposes of your work as a police officer?

2    **A.**   Yes.  Once I became an investigator with the Family

3    Violence and Special Victims Unit, quite often in the course of

4    an investigation, I did make requests for 911 calls for

5    evidence of excited utterance in cases or trying to identify,

6    maybe, a witness who had called in.  So, yes, that was done

7    quite often in the course of an investigation.

8    **Q.**   How did you accomplish that?  Just administratively, take

9    me through that.

10   **A.**   I would simply call the radio room supervisor who happened

11   to be on duty at the time and give them -- usually, I had a

12   case number because we had an active investigation, so I would

13   give them the case number, the dispatch number, the date and

14   the time that that call was initiated, and asked them to do a

15   search for the 911 call that came in regarding that particular

16   incident, and I'd get in my car and drive over to the South

17   Bend Police Department and go into the communications center

18   and pick it up.

19   **Q.**   Okay.  Now let me take you from 2010 through, we'll say,

20   October of 2011.  Let's focus on that timeframe.

21           During that timeframe, when you came in as captain

22   of the Investigative Division, up to the point that there was

23   conversation with you about your phone line, what did you learn

24   about recorded lines during that period?

25   **A.**   I had no conversation with anyone regarding recorded phone

 1   lines in that period.

 2   **Q.**  Given your duties then as captain, did you have occasion to

 3   need 911 or front desk recordings?

 4   **A.**  As a captain, no, I never requested any calls that were

 5   recorded on those lines.

 6   **Q.**  Okay.  Now, in the entire time that you were a police

 7   officer at the South Bend Police Department, are you aware of

 8   any general announcement to officers regarding the possibility

 9   of being recorded on phones in the Police Department?

10   **A.**  No.

11   **Q.**  Did you ever receive anything in writing that gave such an

12   announcement?

13   **A.**  No, sir.

14   **Q.**  Okay.  Are you aware of any routine or ordinary course of

15   practice in the South Bend Police Department to record

16   individually assigned lines?

17   **A.**  I have no information regarding that.

18   **Q.**  When you became a captain, that's a more supervisory role,

19   as I understand it; is that correct?

20   **A.**  Yes, sir.

21   **Q.**  So in a supervisory role, were you expected to have a

22   greater knowledge of the routines and procedures of the police

23   department?

24   **A.**  I was.

25   **Q.**  If there had been such an official, routine protocol or

YOUNG - DIRECT EXAMINATION

1   procedure to record assigned lines, would you have known about
2   it as a captain?
3   **A.**   Yes, I would have.
4   **Q.**   And how would you have acquired that knowledge?  I assume
5   you know other routines and procedures in the police
6   department, so how would you have acquired that knowledge?
7   **A.**   One would have been through Division Chief Richmond, if
8   anything needed to be shared with me through meetings that he
9   may have had with the other command staff.  But another was the
10   duty manual.  And, quite frankly, I took it upon myself to try
11   and know that duty manual as well as I could because of some of
12   the issues I dealt with as a captain.  There's nothing in the
13   duty manual regarding that.
14   **Q.**   When you say some of the issues you dealt with as a
15   captain, did you have to deal with personnel issues?
16   **A.**   Yes, I did.
17   **Q.**   The personnel that you oversaw were who?
18   **A.**   Day shift and afternoon shift detectives and lieutenants,
19   as well as the school resource officers, and also, somewhat
20   indirectly, the folks that worked in the crime lab.
21   **Q.**   As far as overseeing them, did the duty manual give you
22   procedures, a routine, and a process on how to be the
23   supervisor of those officers?
24   **A.**   It lists the duties of the captain of the Detective Bureau
25   and deals with issues such as vacation selection, personal days

1  off, injuries, that kind of thing.

2  **Q.** Okay. Now, if you would have known of the capability to

3  have your line wired into the Voice Logger when you were a

4  captain, would you have wanted that?

5  **A.** Not particularly, no.

6  **Q.** Why?

7  **A.** Because in my time as an investigator with Metro Homicide,

8  right before I came over as a captain, I was involved in some

9  investigations which led to the federal level, working with ATF

10  agents, working with the U.S. Attorneys on a couple of cases,

11  and there were discussions that I was still having with those

12  agents and investigators that were still at Metro Homicide,

13  regarding cases I had worked on that had to do with things of a

14  sensitive nature, federal investigations that I didn't feel

15  appropriate that anyone else be privy to.

16           As Captain Richmond alluded to earlier, testified

17  to, we have a clearance, a 6E clearance, a document I had to

18  sign in order to obtain or share information with appropriate

19  people regarding those investigations, and it's not just for

20  anyone to hear.

21  **Q.** Okay. But if the division chief, who you answered directly

22  to, or the chief of police, had said to you, "We have made the

23  decision and it's important for police business to have your

24  line recorded," what would you have done?

25  **A.** I would have said, "You're the boss, and if my line is

 1   going to be recorded, then that's the way it's going to be."

 2   **Q.**   And did anybody have that conversation with you?

 3   **A.**   No.

 4   **Q.**   Do you recall there was some testimony -- well, actually, I

 5   think it was submitted in the Barb Holleman deposition, so I

 6   don't think it was live testimony.  I want to ask you about

 7   conversations you may have had with Barb Holleman when you

 8   first became a captain and were assigned that office, C156.

 9          Do you know what I'm referring to?

10   **A.**   Not right offhand.

11   **Q.**   Well, the office that you went into as captain.

12   **A.**   Sure, yes.

13   **Q.**   Did you talk to Barb Holleman about changing the Caller ID?

14   Do you have any recollection of that?

15   **A.**   I don't have any recollection of that.

16   **Q.**   Have you changed positions or offices in the past with the

17   South Bend Police Department?

18   **A.**   Not within the building.  Actually, that office that I

19   moved into as captain was actually my first private office

20   within the South Bend Police Department proper.

21          I had an office at the Family Violence Unit, which

22   was at 917 East LaSalle Street, housed with the CASIE Center,

23   and then I had an office at the Metro Homicide Unit at 523 East

24   Jefferson, when I worked at MHU --

25   **Q.**   Okay.

1   **A.**   -- but that office was the first one I had assigned to me

2   in the building.

3   **Q.**   There was some earlier testimony in regard to what was

4   called "assigned equipment."

5            Do you recognize that phrase from being a police

6   officer?

7   **A.**   Yes, I do.

8   **Q.**   Do you recognize that phrase as an administrative officer

9   or as a captain, something that's mentioned in the duty manual?

10  **A.**   Yes.

11  **Q.**   What's your understanding of what assigned equipment is?

12  **A.**   Assigned equipment would be sidearm ammunition, leather

13  belt gear, body armor, uniforms, laptop computer, vehicle,

14  swipe card access or swipe access card for the building, police

15  ID card, any keys that you may have that would apply to the

16  building proper, portable radio, those kinds of things.

17  **Q.**   There should be a binder in front of you, Commander.  If

18  you would go to tab 5 and then go to the third page of tab 5.

19  **A.**   Okay.

20  **Q.**   Now you have to give me a minute to get there.

21           Under Roman numeral II, "Relief From Duty/

22  Administrative Leave," and then under B, do you see where it

23  says, "If the Unit Commander places an employee on

24  administrative leave, then his/her responsibilities include:

25           1.  Notify the Chief Police or designee."

1              And then under 2, do you see the list of items?

2    **A.**   Yes.

3    **Q.**   "Badge, police ID card, security access ID card, keys to

4    department property, assigned vehicle, department firearms and

5    ammunition, police radio."

6              Would you consider that a good list of assigned

7    equipment?

8    **A.**   Yes.

9    **Q.**   These are things that an officer can possess and take home

10   with him at the end of a shift; is that correct?

11   **A.**   Absolutely.

12   **Q.**   I think that there was also some testimony in regard to

13   Exhibit 8.  And if you would go there.

14   **A.**   (Witness complies.)

15   **Q.**   Let me know when you've gotten there.

16   **A.**   There is nothing -- I'm sorry.

17   **Q.**   I'm sorry.  It's 5, I believe.  No, 12.

18   **A.**   Okay.

19   **Q.**   That's it, 12.

20   **A.**   Okay.

21   **Q.**   Have you ever seen this document before?

22   **A.**   The "Internal Affairs/Office of Professional Standards"?

23   **Q.**   That's right.

24   **A.**   Yes.

25   **Q.**   Is this a draft of a proposed revision to the duty manual?

1    If you look at the very top --

2    **A.**   Yes, it does say "draft."

3    **Q.**   All right.  Now, even understanding it's a draft, I want to

4    take you to under VII, "Employee Rights," and then C.

5            Are you following me?

6    **A.**   Yes.

7    **Q.**   And then the very last sentence there:  "Assigned personnel

8    shall have the right to be present during such inspection and

9    shall be served with notice as to the basis for such an

10   inspection."

11           Did I read that right?

12   **A.**   Yes, you did.

13   **Q.**   My question to you -- well, first I want to point out that

14   there is a stipulation in this case that there were five

15   audiocassettes prepared by Karen DePaepe, and the

16   audiocassettes captured conversations that occurred on

17   February 4th, April 5th, June 3rd, June 6th, June 16th,

18   June 27th, July 14th, and July 15th, all in 2011.  That's

19   stipulated by fact, that conversations from your phone line

20   were recorded and placed on audiocassettes.

21           My question to you is:  Did anybody have you present

22   to inspect the phone conversations that were captured on those

23   five audiocassettes from the dates that I just mentioned?

24   **A.**   No, sir.

25   **Q.**   Okay.  When did you learn that your phone line was

1  recorded?

2  **A.**   I was approached by Captain Phil Trent in October of 2011.

3  He had just come from a meeting regarding the switchover for

4  the phone system within the police department, and he came into

5  my office and asked if I was aware that my phone line was being

6  recorded.

7       I told him, "No," I wasn't aware of that.  I asked

8  him if that recording could be shut off.

9       He told me that he would go and make the request and

10 let me know.

11 **Q.**   After your conversation with him about that, did you

12 believe that it had been shut off?

13 **A.**   He told me later that afternoon that, yes, that had been

14 taken care of.

15 **Q.**   Okay.  So that was the first knowledge that you had of the

16 possibility that your phone might be recorded?

17 **A.**   Correct.

18 **Q.**   Did you subsequently learn that it had not been turned off?

19 **A.**   I did.

20 **Q.**   And when did that occur?

21 **A.**   It wasn't until January of 2012, January 17th, when we

22 began to hear rumors -- actually, the rumors within the police

23 department started on the 16th, regarding the existence of some

24 tape recordings that Boykins had.  And on the 17th, I went to

25 Diana Scott, who was then the assistant director of

1    communications, sat down with her in her office, and I asked

2    her if, in fact, my phone line was being recorded.

3    **Q.**   How did she respond?

4    **A.**   She told me, "Yes, it is."

5    **Q.**   So at that point you knew for sure it was?

6    **A.**   Yes.

7    **Q.**   All the dates that I just mentioned about the recorded

8    phone calls, you did not know that your line was recorded on

9    any of those dates; is that correct?

10   **A.**   I had no idea.

11   **Q.**   Now, Captain, when you became -- or Commander -- I'm sorry.

12   When you became captain of the Investigative Division, why

13   didn't you just go over to Karen DePaepe's office and ask her

14   if your line was recorded?

15   **A.**   It never even entered my thought process.  I mean, it's

16   just not something that ever came up in conversation.  It was

17   not something that was discussed as a regular course of

18   business within the police department.  It wasn't even on my

19   radar.  I never even considered the possibility that it would

20   be recorded, so I never gave a thought to even ask.  And it

21   would be like me asking, "Why aren't my windows tinted?"  I

22   took the office.  It is what it is.  I mean, I had no idea.

23           MR. SULLIVAN:  Okay.  A moment, Your Honor?

24           THE COURT:  Yes.

25           (Brief pause.)

1          MR. SULLIVAN:  Thank you, Commander.  I pass the

2   witness.

3          THE COURT:  Mr. Walton.

4                   CROSS-EXAMINATION

5   BY MR. WALTON:

6   Q.  Commander, when you took over this office, there was a --

7   is it correct that you came into this office around March 22nd,

8   2010?

9   A.  That's correct.

10  Q.  So there was a period of time of four or five weeks when

11  no one was in that office?

12  A.  I can't answer that because I wasn't in the building at the

13  time.

14  Q.  Weren't there.

15          At any rate, it was a new office to you?

16  A.  Yes.

17  Q.  And it was a new telephone number that you had assigned to

18  that office?

19  A.  That's correct.

20  Q.  Were you aware at that time that the number that you had

21  was the former number of the chief of the Investigative

22  Division?

23  A.  I was not.

24  Q.  There was a telephone directory there, wasn't there?

25  A.  I believe there was.

1  **Q.**  I mean, there was information available to you that you

2  could have found that out, right?

3  **A.**  Sure.

4  **Q.**  You're saying at no time you were aware that the number

5  that was assigned to you was Rick Bishop's number?

6  **A.**  I learned that later.  The day that I moved into that

7  office I was not aware of that.

8  **Q.**  How much later?

9  **A.**  Probably within that first week.

10  **Q.**  So you knew at that point you had the prior division

11  chief's telephone number?

12  **A.**  Yes.

13  **Q.**  And you're saying that you, in your entire experience as a

14  police officer, never had an understanding that lines going

15  into the police department were being recorded in any fashion?

16  **A.**  I knew that the lines to the front desk and the

17  communications center were being recorded, as well as Internal

18  Affairs.

19  **Q.**  So you knew recording was going on?

20  **A.**  Yes.

21  **Q.**  And, in fact, in your duties as captain in the

22  Investigative Bureau, you used those recordings for your own

23  investigative purposes, have you not?

24  **A.**  The ones going into the communications center?

25  **Q.**  Yes.

1  **A.**  Yes.

2  **Q.**  And you knew that the purpose of recording the lines into

3  the investigative center was to assist you as captain of the

4  Investigative Division in your investigation of your cases?

5  **A.**  As a captain, I didn't actively investigate cases.  That

6  wasn't part of what I did.

7  **Q.**  Had you done it before, used recorded conversations before

8  this time to assist you in your investigations?

9  **A.**  Yes.  The ones that came into the communications center or

10  front desk, yes.

11  **Q.**  All right.  Were you also generally aware that the

12  prosecutor's office would, from time to time, ask for recorded

13  conversations from the department to assist in prosecuting

14  people on their criminal cases?

15  **A.**  I knew that paralegals for the prosecutor's office

16  requested those 911 calls as well, yes.

17  **Q.**  And from time to time, the Indiana State Police may come in

18  and make a request for recorded information to the department

19  to assist them?

20  **A.**  I had no knowledge of that.

21  **Q.**  Okay.  Were you aware generally that if people make

22  complaints about officers those complaints may be recorded with

23  the department?

24  **A.**  If they were received at the front desk or the 911 center,

25  yes.

1   **Q.**   Okay.  So then the purpose for recording these
2   conversations, as well, for all of these things, for your use,
3   for the prosecutor's use, for other persons' use and for
4   complaints, would be for appropriate law enforcement purposes;
5   is that right?
6   **A.**   On the front desk and 911 lines, yes.
7   **Q.**   Okay.  In your job as captain, was that one where you
8   frequently came in contact with the public?
9   **A.**   Describe "frequently."
10  **Q.**   On a weekly basis, would you have conversations with
11  witnesses and things of that nature and civilians?
12  **A.**   Typically not.  Again, I didn't conduct investigations as a
13  captain.  That was delegated to the detectives.
14  **Q.**   Okay.  Did you ever get involved in handling complaints of
15  other officers or other detectives?
16  **A.**   I did.
17  **Q.**   And that was as captain and prior to this time?
18  **A.**   As captain.  Not prior.
19  **Q.**   Okay.  I take it from your testimony that you didn't know
20  that Rick Bishop's line was recorded when he was chief of the
21  Investigation Bureau?
22  **A.**   I did not.
23  **Q.**   Okay.  And I take it you were not aware that Chief Fautz
24  had ordered Rick Bishop's line number 6031 to be recorded in
25  the past?

1   **A.**   I had no information regarding that.

2   **Q.**   And you've learned now that 6031 had been recorded by the

3   department at Chief Fautz's orders for five or six years prior

4   to you getting that number?

5   **A.**   I learned that, yes.

6           MR. PFEIFER:  I'm going to object to the form of the

7   question.  I don't think there is any testimony that Chief

8   Fautz ordered the recording of that line.  He authorized it.

9           MR. WALTON:  Well, he authorized it.  I will

10  rephrase it.

11  **Q.**   That he had authorized it?

12  **A.**   I have learned that, yes.

13  **Q.**   Okay.  When the switch occurred, you weren't there then?

14  **A.**   The switch?

15  **Q.**   The switch of the numbers, from 7473 to 6031.

16  **A.**   I was not there.

17  **Q.**   Okay.  So when you arrived, the 6031 was already in your

18  office?

19  **A.**   That's correct.

20  **Q.**   The phone in your office was obviously part of the police

21  system -- was connected to the police department system; is

22  that right?

23  **A.**   I believe so.

24  **Q.**   Okay.  By the way, did you have a cell phone for your own

25  personal use in 2010?

1   **A.**  I did.

2   **Q.**  And did you use that to make your personal calls?

3   **A.**  Some personal calls.

4   **Q.**  All right.  Was that a habit of yours, to use your cell

5   phone for personal calls?

6   **A.**  Sure.  That's the purpose of having a cell phone sometimes.

7   **Q.**  All right.  Now, you were questioned about Exhibit 5.  If

8   you will turn to that, please.

9   **A.**  (Witness complies.)

10  **Q.**  The policy dated February 23, 2009.

11  **A.**  Yes.

12          MR. WALTON:  By the way, Your Honor, to clarify the

13  record, the policy we were looking for was actually Exhibit 5,

14  and it is in evidence, of the date of February 23, 2009, and

15  that was referred to, but I had read from the draft of that

16  policy to Officer Richmond when I questioned him.

17          THE COURT:  Okay.

18          MR. WALTON:  Okay.

19          THE COURT:  Thank you.

20          MR. WALTON:  And that's by agreement of the parties,

21  Judge.

22  **Q.**  This policy indicates -- first of all, this policy you had

23  to sign off on as an officer with the South Bend Police

24  Department, right?

25  **A.**  Yes.

1   Q.   They pass around this policy, and every officer within the

2   department signs a document that says they have read it and

3   understood it?

4   A.   I believe -- yeah, I believe they put this out on Power

5   DMS, is what it's called.  You actually review it on the

6   computer and sign for it online.

7   Q.   On page 4 of this policy, it indicates that "The South Bend

8   Police Department will immediately investigate all complaints

9   against the Department or its employees, to include anonymous

10  complaints, regardless if the complainant had been arrested.

11          "Employees will cooperate during any internal

12  investigation.  Refusal to cooperate will result in

13  disciplinary action, up to, and including, job dismissal."

14          Right?

15  A.   You read that correctly, yes.

16  Q.   Okay.  And then it also indicates that you're subject to

17  this policy, and it says, "The Chief of Police must authorize

18  any of the below listed investigative methods prior to use for

19  that specific incident," and it indicates that you can be

20  required to submit to a medical or laboratory examination?

21  A.   Yes.

22  Q.   You could be required to have a photograph taken of you?

23  A.   Yes.

24  Q.   You could be required and directed to participate in a

25  lineup?

1   **A.**  Correct.

2   **Q.**  You could be required to submit financial disclosure

3   statements?

4   **A.**  Yes.

5   **Q.**  And you also could be required to take a polygraph?

6   **A.**  Yes.

7   **Q.**  And then back on the next page, under "Employee Rights," it

8   indicates you will be provided a statement of the complaining

9   witness, and then it says, "The statement will notify the

10  employee of the allegation(s), their Garrity rights, and

11  responsibilities relative to the investigation.  In cases where

12  notification would interfere with the investigation, then OPS

13  will not provide written notice."

14          Is that correct?

15  **A.**  You read that correctly, yes.

16  **Q.**  Then, under section D, it says, "Employees do not have a

17  right to privacy for assigned equipment.  The Department may

18  enter and inspect any assigned equipment."

19          Right?

20  **A.**  That's correct.

21  **Q.**  And, Officer, the phone that you had in the office that you

22  were assigned and the phone that was in your office assigned to

23  you, was that South Bend Police Department property?

24  **A.**  I don't know who owns that phone.

25  **Q.**  Did you make any assumption one way or another?

1   **A.**   No.

2   **Q.**   All right.

3   **A.**   Simply used it.

4   **Q.**   If you could be required to submit to a polygraph, to be in

5   a lineup, to submit to a medical lab exam or submit to

6   financial disclosure statements if you're investigated, do you

7   believe that the department would have the right to review any

8   recorded conversations on your phone in your office during such

9   an investigation?

10  **A.**   Sure, if I was notified that I was the subject of an

11  investigation.

12  **Q.**   So you say, when you signed the document that "Employees do

13  not have a right to privacy for assigned equipment," your

14  interpretation is that doesn't apply to your phone or your

15  office?

16  **A.**   That's correct.

17  **Q.**   When you got into your office initially, did you find out

18  that Division Chief Richmond had switched his phone to his

19  office and Rick Bishop's former phone to your office, or was

20  that never discussed?

21  **A.**   It was never discussed.

22  **Q.**   During the time you've been with the department, has there

23  ever been any inkling that which lines are being recorded are

24  secret?

25  **A.**   I never had any discussion with anyone regarding any

1   recorded lines.

2   **Q.**  So, in fact, if you wanted -- do you have anything to

3   believe that if you went up to Karen DePaepe or the chief at

4   any time from the time you got in that office on March 22nd,

5   2010, onward, and asked if your line had been recorded, that

6   you would have been told, "yes, it was," or, "yes, it wasn't"?

7   **A.**  I don't know why they would have any reason not to tell me

8   that it was recorded.

9   **Q.**  And you don't have any information that that would have

10  ever been kept from you or any other officer, based upon your

11  experience at the department?

12  **A.**  It was kept from me, so based on my experience, yes, that

13  was kept from me.

14  **Q.**  Do you think it was intentionally kept from you?

15  **A.**  Yes, I do.

16  **Q.**  Well, the decision to switch 7473 and 6031 came from

17  Division Chief Richmond, did it not?

18  **A.**  I don't know who made that decision.

19  **Q.**  Now, you said you weren't aware that it was Rick Bishop's

20  number until about a week after you got in there, right?

21  **A.**  Yeah.  I mean, I can't be for certain.  At some point, I

22  understood it was his former number, yes.

23  **Q.**  And that's because your Caller ID was showing Rick Bishop's

24  name; is that right?

25  **A.**  I don't know.  I don't recall that.

1   **Q.**  Well, I'm going to read to you from Barb Holleman's

2   deposition that's in the record, starting at page 29, line 24,

3   to page 30, line 21.

4          It says, Question:  "Okay.  Did Brian Young then go

5   into Steve Richmond's old office?"

6          Answer:  "When he was appointed to captain in the

7   Investigative Division, yes."

8          Question:  "Okay.  When Brian Young was appointed

9   captain in the Investigative Bureau, did he have to come to you

10  with respect to any request about his phone number?"

11         Answer:  "No, because the phone number was in there

12  when he became the captain.  The only thing he asked me to do

13  is change the caller -- I had Caller ID changed from Rick

14  Bishop to Brian Young."

15         Question:  "What do you mean by that?"

16         Answer:  "Well, if he would have called you from

17  that phone when he first moved in that office, the Caller ID on

18  your phone would have said Captain Rick Bishop, and he wanted

19  it changed to Captain Brian Young."

20         Question:  "You were capable of making those types

21  of changes in the phone system?"

22         Answer:  "No, I would get the request and send it

23  down to IT and they would make that change."

24         Question:  Okay.  "So IT made that change?  You

25  didn't have to call Martel or any outside contractor?"

```
 1              Answer:  "Not for Caller ID."
 2              Do you remember that?
 3  A.  I may have had that conversation with her.  I don't recall
 4  it.
 5  Q.  So at some point in time, according to Barb Holleman,
 6  you're not denying that you knew your phone had the name of
 7  Captain Rick Bishop on it?
 8  A.  Again, I don't recall that, and I don't recall the
 9  conversation with her.
10  Q.  All right.  Any reason for you to believe that she's being
11  untruthful?
12  A.  No.
13  Q.  As a captain of this division, you were an important role
14  for the department, were you not?
15  A.  Some would say.
16  Q.  And you were second in command of the division?
17  A.  Yes.
18  Q.  You received, from time to time, anonymous calls or tips
19  while you were in that position?
20  A.  As a captain, I don't recall ever receiving anonymous calls
21  or tips, no.
22  Q.  But, certainly, it wouldn't be unusual or uncommon if you
23  had?
24  A.  Well, I never did, so I don't know if it would be unusual
25  or not.
```

1   **Q.**   Well, let's assume that you had received an anonymous

2   caller tip.

3             If it wasn't recorded, that information would have

4   been lost, right?

5   **A.**   No.  I would have documented it in notes, passed on that

6   information to who needed to have it, and they would have taken

7   that up as part of their course of business.

8   **Q.**   But the conversation itself would have been lost?

9   **A.**   Yes.

10  **Q.**   Okay.  And you could also receive other invaluable

11  information via your telephone while captain of the

12  Investigative Division that would aid in other investigations;

13  is that right?

14  **A.**   From time to time, yes.

15  **Q.**   And for the same question and answer, if you just simply

16  took notes of that, the conversation itself would have been

17  lost?

18  **A.**   Correct.

19  **Q.**   All right.  And if you had ever received complaints from

20  the public about another officer, if that was not recorded, it

21  would be lost?

22  **A.**   And I wouldn't take that information over the phone.  I

23  would request a face-to-face meeting.

24  **Q.**   In fact, wasn't the very purpose of the entire recording

25  system to capture and keep as potential evidence this type of

1  information for the department during the time you were there?

2  **A.**   For the front desk and the communications center, yes.

3  **Q.**   Okay.  Commander, if you were doing what you were supposed

4  to be doing as the captain of the Investigative Bureau of the

5  South Bend Police Department and you were conducting yourself

6  appropriately at all times, including the times you were on the

7  phone, why do you care if your phone was recorded or not?

8  **A.**   Had I been told that it was being recorded, I wouldn't have

9  cared.  I was never told that.

10  **Q.**   When you found out your line was being recorded then, why

11  were you upset?

12          MR. SULLIVAN:  Your Honor, I object to that question

13  because it puts him in a difficult position, not knowing what's

14  on the recordings, and it goes to the content.  I think it's

15  really irrelevant in regard to what his feelings are about it

16  one way or another.  It's a legal issue.

17          THE COURT:  Mr. Walton.

18          MR. WALTON:  Well, I think it's important to know

19  why he's worried about whether or not his phone is being

20  recorded or not as an officer of the police department.

21          THE COURT:  I'm going to sustain it on relevancy.

22          MR. WALTON:  All right.

23  **Q.**   Is it fair to say that all you had to do was ask if your

24  line was being recorded back at that time, and you would have

25  been able to find out yourself whether or not it was or was not

1   in 2010?

2   **A.**   I would expect that would have been the case, yes.

3   **Q.**   So are you saying that you had no responsibility as captain

4   of the Investigative Bureau to ask a simple question at any

5   time of whether or not your phone was being recorded when you

6   got that office and that new phone number?

7   **A.**   As I said earlier, that wasn't even on my radar.  It was

8   not even a thought that entered my head that, gee, I should

9   probably ask if somebody is listening to my conversations.  It

10  just wasn't something that I thought I had to ask, never even

11  considered asking.

12  **Q.**   But if you had asked, you could have prevented all this

13  problem, right?

14  **A.**   I suppose, yes.

15  **Q.**   Thank you.

16          THE COURT:  Mr. Pfeifer.

17                  CROSS-EXAMINATION

18  BY MR. PFEIFER:

19  **Q.**   And if your line hadn't been recorded, we wouldn't even

20  have a problem, would we?

21  **A.**   No, sir.

22  **Q.**   Exhibit 5, page 4, Mr. Walton was talking to you about all

23  of the things that you would be required to do if you were

24  under any type of investigation.

25          Do you recall that line of questioning?

1    **A.**  Yes, I do.

2    **Q.**  At any point in time while you were employed by the

3    South Bend Police Department, were you ever notified that you

4    were under any type of investigation pertaining to the use of

5    line 6031?

6    **A.**  I was never notified of anything of the sort.

7    **Q.**  You were asked if you -- you were asked by Mr. Walton if

8    you had asked whether your line was recorded, then you could

9    have avoided this problem.

10            Do you remember that question?

11   **A.**  I do.

12   **Q.**  Was there any reason at all that you felt it necessary to

13   ask whether your phone line was recorded?

14   **A.**  None whatsoever.

15   **Q.**  It's the phone line 6031 that is being recorded, not the

16   phone; isn't that correct?

17   **A.**  That's my understanding, yes.

18   **Q.**  You made a statement in response to a question that

19   Mr. Walton asked.  I think he asked something to the effect of:

20   Do you have any reason to believe, if you had asked, the

21   information would have been kept from you?

22            Do you remember that line of questioning?

23   **A.**  I do.

24   **Q.**  And I think you said, well, now you believe that

25   information would have been kept from you, correct?

1   **A.**   Yes.

2   **Q.**   Tell the Court why you say that.

3   **A.**   Well, because for the entire time that I was in that office

4   and was not aware that my line was being recorded and leading

5   up to October of 2011 when I learned it was being recorded and

6   then going into January of 2012, learning that recorded calls

7   actually existed, I felt like if nobody made me aware of that

8   up until that point, they wouldn't have made me aware of it to

9   begin with.

10  **Q.**   Were you ever told on February 4th, or shortly after

11  February 4th of 2011, that an audiocassette of your recorded

12  phone conversations had been made?

13  **A.**   I was never told that, no.

14  **Q.**   Same question with respect to all of these dates:

15  April 5th, June 3rd, June 6th, June 16th, June 27th, July 14th,

16  or July 15th; were you ever told that an audiocassette had been

17  made of recorded conversations of your line 6031?

18  **A.**   I was never told that.

19  **Q.**   You were asked questions about the assigned equipment by

20  Mr. Walsh (sic).

21        Do you remember that?

22  **A.**   Yes.

23  **Q.**   There are items that are assigned to police officers that

24  police officers have to sign for when the equipment is assigned

25  to them, correct?

1  **A.** Yes, sir.

2  **Q.** Tell the judge, if you would, those items of property that

3  you have to sign for whenever they are assigned to you.

4  **A.** It would be items such as a sidearm, when you're first

5  hired, uniforms, leather duty gear, jackets, hats, gloves,

6  flashlight, portable radio, body armor, laptop computer that

7  would go in the squad car, those kinds of things.

8  **Q.** If a vehicle is assigned to you, do you have to sign

9  documentation for that?

10  **A.** I don't recall if there's a document that you sign for a

11  vehicle.

12  **Q.** And when you turn those items that you've talked about back

13  into the police department, do you sign some type of

14  acknowledgment that you have returned those items of assigned

15  property?

16  **A.** Yes. When I retired in May of 2013, I had to meet with

17  Lieutenant Chris Voros. He had provided me a list of

18  everything that I was required to return to the department that

19  had been assigned to me approximately a week prior to my

20  retirement date, and --

21  **Q.** On -- go ahead. I'm sorry. I didn't mean to interrupt

22  you.

23  **A.** The date that I met with him to turn all that back in, he

24  checked off those items as I gave them to him and then I signed

25  that document.

YOUNG - CROSS-EXAMINATION

1   Q.   On that document that you had to sign, was the number 6031
2   included on that document?
3   A.   No, it was not.
4   Q.   Was the phone that was in the office that was connected to
5   the phone line 6031 on that list?
6   A.   No, sir.
7   Q.   You were asked by Mr. Walsh (sic) whether or not you, in
8   the course of being a captain in the Investigative Division,
9   ever had to conduct investigations pertaining to police
10  officers.
11          Do you remember that line of questioning?
12  A.   Yes, sir.
13  Q.   And I believe you said, "yes," you did?
14  A.   Yes, I did.
15  Q.   Is there a particular instance in the summer of 2011 when
16  you were assigned to investigate a situation pertaining to a
17  police officer?
18  A.   Yes.
19  Q.   Who was the officer?
20  A.   Ron Nowicki.
21  Q.   And I don't want to get into the details or the substance
22  of the investigation, but what I want to ask you is this:  When
23  you were conducting that investigation, did you ever receive
24  any phone calls on 6031 that would in any way be of assistance
25  in that investigation?

1   **A.**   No, I did not.

2   **Q.**   Did you ever make any phone calls from 6031 that would have

3   in any way been of assistance in that investigation?

4          MR. SULLIVAN:  Your Honor, I object and request a

5   sidebar.

6          THE COURT:  Okay.

7          (Discussion held at sidebar as follows:)

8          MR. SULLIVAN:  I just have a concern about this area

9   and, again, content issues, and I just wanted to ensure that

10  Mr. Pfeifer didn't stray into something that violates your

11  order.

12         MR. PFEIFER:  I'm not straying into anything.  I

13  will just say that the purpose of that is to establish or tie

14  in the FOIA request that Karen DePaepe talked about as a basis

15  for checking lines.

16         MR. SULLIVAN:  Right.

17         MR. PFEIFER:  That's all.

18         MR. SULLIVAN:  You need to connect up for me, Dan.

19  I don't see how that --

20         MR. PFEIFER:  That investigation was in July of '11.

21         MR. SULLIVAN:  The investigation of?

22         MR. PFEIFER:  Nowicki.  He just talked about it.

23         MR. SULLIVAN:  Yes.

24         MR. PFEIFER:  The FOIA came in in July of '11.

25         MR. SULLIVAN:  Yes.

1           MR. PFEIFER:  She had already been taping the lines

2     and providing cassettes prior to that.

3           MR. SULLIVAN:  Okay.  Your Honor, there are

4     documents that we discovered in this case when it was

5     originally filed that have references to taped content, and

6     they were created by Karen DePaepe, and we provided them in

7     discovery, but we provided redacted forms, so counsel -- they

8     do not have access to the unredacted forms.

9           MR. PFEIFER:  I don't know what that --

10           MR. SULLIVAN:  Right.  This is why I asked for a

11     sidebar.

12           MR. PFEIFER:  Okay.

13           MR. SULLIVAN:  So my concern is, that this question

14     creates an area that -- and I don't know if you were going to

15     say it opens the door to have to refute this by going into

16     areas that are redacted pursuant to your order.

17           MR. PFEIFER:  Here's what I can do.  I cannot get

18     into that area.  My concern is -- I was just being proactive

19     and preemptive as to anything that Karen DePaepe may say.

20           MR. SULLIVAN:  Let's see what she says.

21           MR. PFEIFER:  Brian Young is going to be here.  I

22     can always put him back up on the witness stand if I feel that

23     it is necessary from something she says.

24           MR. SULLIVAN:  I'm satisfied with that, Your Honor.

25           MR. PFEIFER:  So that addresses your concern and it

1    doesn't take us down this path, and we will see what she has to

2    say; and then, depending on what she says, I may or may not

3    have to talk about it, and we can revisit it then.

4            MR. SULLIVAN:  Okay.

5            THE COURT:  That's fine with me.

6            MR. PFEIFER:  Okay.

7            (Sidebar concluded.)

8    BY MR. PFEIFER:

9    **Q.**  I'm going to get to that topic later maybe.  Okay?

10   **A.**  Okay.

11   **Q.**  After January 17th of 2012, that's when I believe you

12   learned, again, that your phone line was being recorded and the

13   recording had not stopped as you had been told in October of

14   '11; is that correct?

15   **A.**  That's correct.

16   **Q.**  In October of '11, that's the first time you became aware

17   of the fact that your line had been recorded, and you were told

18   that by Phil Trent, correct?

19   **A.**  Correct.

20   **Q.**  You asked him immediately to have the recording stopped,

21   correct?

22   **A.**  I did.

23   **Q.**  Why did you ask to have the recording stopped?

24   **A.**  Because I didn't see a need to have my line recorded.  I

25   wasn't aware that it was being recorded, and, quite frankly, at

1   the time, I was a little irate, I guess, that that had been

2   taking place without my knowledge.

3   **Q.**  Did you still have the clearance with the federal

4   authorities to have conversations with them pertaining to

5   investigations that were ongoing with the federal government?

6   **A.**  Yes, I did.

7   **Q.**  I think one of the things that you said in terms of having

8   your line recorded was, because of the sensitive nature of

9   those conversations, you would not want to have a recording of

10  those conversations, correct?

11  **A.**  Correct.

12  **Q.**  Is that particularly true if a civilian like Karen DePaepe,

13  who doesn't have clearance to have access to the information,

14  could listen to those conversations?

15  **A.**  That's correct.

16  **Q.**  Then in January, after you had been told your line was no

17  longer recorded, you learned -- January 17th of 2012 -- you

18  learned that, in fact, the recording had not stopped and it had

19  continued; is that correct?

20  **A.**  I learned that on January 17th, yes.

21  **Q.**  As a result of -- and who did you learn that from?

22  **A.**  Diana Scott.

23  **Q.**  As a result of learning that information from that date,

24  after that date, did you ever have any conversations with Chief

25  Boykins that were, from your perspective, in the nature of some

1  type of intimidation on his part?

2  **A.**  I had two conversations with him after that conversation

3  with Diana Scott.

4  **Q.**  Tell the Court about those conversations.  Again, we're not

5  talking about content.  Tell the Court about the conversations

6  with Chief Boykins.

7          MR. WALTON:  Your Honor, can I just have my same

8  objections I did before when they got into this with --

9          THE COURT:  Relevancy or hearsay?

10          MR. WALTON:  Well, relevancy to the issue at the

11  time.

12          THE COURT:  Okay.  That ruling would be the same

13  from the Court.

14          MR. WALTON:  I understand.

15  BY MR. PFEIFER:

16  **Q.**  Go ahead.  You can answer.

17  **A.**  On the afternoon of January 17th, the same day that I had

18  spoken to Diana Scott, Chief Richmond and I went into Darryl

19  Boykins' office and asked him if, in fact, the rumors that we

20  were hearing within the building of him having tape recordings

21  from my phone line, if that were, in fact, true.

22          He wouldn't provide us an answer, although he did

23  say, "I haven't listened to them yet."

24          I asked him for the reason to have the recordings,

25  and he sat down and said that it was no fun being retained as

1    chief because -- and, again, he leaned forward and made the

2    motion of pulling arrows out of his back -- he said, "I feel

3    like I have been stabbed in the back."

4            He said, "This has nothing to do with either of your

5    job performance.  You've done a terrific job in the Detective

6    Bureau, more than I could have expected.  But, for me, this has

7    everything to do with loyalty and who I can trust."

8            And he told us that because the mayor's

9    administration was freshly in office, he was going to wait four

10   to six weeks before he aired dirty laundry to the mayor, and

11   then he was going to start disciplining, demoting and, in fact,

12   possibly terminating people.  At which time, I took that as a

13   threat to my career.

14   **Q.**  Did you feel intimidated by those comments by Chief

15   Boykins?

16   **A.**  Absolutely.

17   **Q.**  You said there were two conversations.  You've told us

18   about the one.  Tell us about the second.

19   **A.**  A week later, on January 24th, 11:00 a.m., I was in my

20   office in the Detective Bureau, and Chief Boykins showed up at

21   my door.  It took me by surprise because, quite frankly, I

22   hadn't seen him in the Detective Bureau in quite some time.  He

23   stood there in my doorway.  I stood up and greeted him.  I

24   invited him in.

25           He wouldn't sit down, but he said, "Look, I think we

YOUNG - REDIRECT EXAMINATION

```
 1   just need to put this behind us.  We need to work together for
 2   the betterment of the community.  But you need to know that a
 3   year from now I'm going to be talking to those to see if what
 4   I've heard is how they feel, and then I'm going to start
 5   demoting, disciplining, or, in fact, if I can, terminate
 6   people."
 7            Again, I took that as a direct threat to my career,
 8   not only my job, but my career as a law enforcement officer.
 9   Q.  Did you feel intimidated by that conversation?
10   A.  I did.
11            MR. PFEIFER:  If I could have a minute.
12            (Brief pause.)
13            MR. PFEIFER:  I'll pass the witness.
14            THE COURT:  Redirect.
15                      REDIRECT EXAMINATION
16   BY MR. SULLIVAN:
17   Q.  Commander, do you recall questions from Mr. Walton about
18   the conduct of investigations and how recorded lines can help
19   in those?  Do you remember that?
20   A.  Yes.
21   Q.  And he talked about how, without it being recorded, you
22   would lose the conversation, right?
23   A.  You'd lose the conversation, not necessarily the
24   information.
25   Q.  Okay.  Are you trained in how to take information over the
```

1    phone for evidentiary purposes?

2    **A.**   Yes.

3    **Q.**   Have you ever had any problem, throughout the course of

4    your career, in capturing that evidence in an oral conversation

5    to be used for investigations?

6    **A.**   No.

7    **Q.**   Certainly you would acknowledge that there's some impact in

8    an investigation if you have the actual voice on a recording;

9    isn't that right?

10   **A.**   That would be helpful.

11   **Q.**   I think if you would go to Exhibit 1, you'll see that it's

12   an officer's report from Karen DePaepe to Chief Boykins.

13          Do you see that?

14   **A.**   Yes.

15   **Q.**   And right at the beginning of it she talks about, "Per our

16   previous discussions" -- I'm looking at the second line, at the

17   end of the second line -- "Per our previous discussions on

18   February 4th, I was troubleshooting."

19          Did I read that correctly?

20   **A.**   Yes.

21   **Q.**   What we know in this case is that on February 4th, 2011,

22   Karen DePaepe discovered, as she says, that the 6031 line was

23   being used by you, not by Chief Richmond, right?

24          So from March of 2010 through February of 2011, if

25   you had captured something important on your line, isn't it the

1  case that nobody would have known anyway, because no one

2  understood that your use of that line was occurring?

3  **A.**  That's correct.

4  **Q.**  So you couldn't have fulfilled any law enforcement purpose

5  during that period of time anyway?

6  **A.**  Right.  I had no idea that was being recorded, so I didn't

7  even know it was an option to request any information from that

8  line.

9  **Q.**  Okay.  Mr. Walton had asked you "If you had just asked, we

10  wouldn't be here right now."  Do you remember when he said

11  that?

12  **A.**  Yes.

13  **Q.**  Do you agree that if you were told about it when you took

14  over as captain we wouldn't be here, as well; is that correct?

15  **A.**  That's correct.

16        MR. SULLIVAN:  Okay.  No further questions,

17  Your Honor.

18        THE COURT:  Mr. Walton.

19                     RECROSS-EXAMINATION

20  BY MR. WALTON:

21  **Q.**  Commander, if I understand your conversations with Chief

22  Boykins, he had indicated to you in the first conversation that

23  he had not yet listened to the tapes?

24  **A.**  That's what he told us.

25  **Q.**  And he said it had nothing to do with your job performance;

 1   in speaking directly to you and to Captain Richmond, that your

 2   job performance had been fantastic?

 3   **A.**   Yes.  He didn't use that word.  He said --

 4   **Q.**   What was the word?

 5   **A.**   He said, "You guys have done great things in the Detective

 6   Bureau, more than I expected."

 7   **Q.**   Okay.  He led you to believe, at that point in time, in

 8   terms of your job performance and Officer Richmond's job

 9   performance, that you were over and above what he would have

10   expected from the two of you?

11   **A.**   Job performance-wise, yes.

12   **Q.**   All right.  He never indicated to either you or Officer

13   Richmond that specifically either you or Officer Richmond would

14   be demoted, but you just took it that way?  He said that he may

15   discipline some people?

16   **A.**   He said he was going to be calling us, meaning Captain

17   Richmond and me, back to his office in four to six weeks and

18   then start demoting, disciplining, or, in fact, if he could,

19   terminate.

20   **Q.**   But your words were "I think we need to put this behind us

21   to see what happens and to see if," I heard, "we should

22   discipline people," but he did not say he was going to

23   discipline you at that time?

24   **A.**   Well, I was assuming.  From our conversation a week prior

25   to that when he said he would be calling us down, and then with

1   that subsequent conversation on the 24th, who else would he be

2   talking about?

3   **Q.**  Well, he didn't specifically point at you and say he was

4   going to discipline you or Richmond at that point in time; he

5   said you two had been performing far and above his

6   expectations?

7   **A.**  On the 17th, he told us that, yes.

8   **Q.**  All right.  And nothing in between that time changed?

9   **A.**  That wasn't discussed in our follow-up conversation on the

10  24th.

11  **Q.**  And in the second conversation, as it was in the first

12  conversation, he didn't indicate that he had listened to any

13  tapes?

14  **A.**  He said that he was going to be talking to us about what he

15  heard us say.  As an investigator, I take that to mean he's

16  listened.

17  **Q.**  I thought you said at the first conversation he said he had

18  not listened to the tapes?

19  **A.**  The first conversation that is what he told us.  And in

20  that same conversation, he said, "I will be calling you" --

21  us -- "back down here to see if what I heard you say is how you

22  feel."

23  **Q.**  Let me ask you this:  In four to six weeks, did he do

24  anything to discipline you or demote you or anything else at

25  that point in time?

1    **A.**   No.   Within about six weeks, he was demoted.

2              MR. WALTON:   All right.   Thank you.

3              That's all I have.

4              MR. PFEIFER:   Just briefly.

5                          RECROSS-EXAMINATION

6    BY MR. PFEIFER:

7    **Q.**   The second conversation that you had with Chief Boykins,

8    that conversation, is that when he called you or identified you

9    and Division Chief Richmond as backstabbers and disloyal?

10   **A.**   He referred to us in both meetings, on the 17th and on the

11   24th.

12             MR. PFEIFER:   Thank you.

13             MR. SULLIVAN:   Nothing, Your Honor.

14             THE COURT:   Thank you.

15             THE WITNESS:   Thank you.

16             THE COURT:   We're going to take our lunch break now.

17   Plan to be back here in about an hour or so, give or take five

18   or ten minutes on either side.   Obviously I don't keep time

19   very well.

20             Court's in recess.

21             (Lunch recess taken from 11:50 a.m. until 1:15 p.m.)

22             THE COURT:   You can all be seated.

23             Your next witness.

24             MR. SULLIVAN:   Your Honor, I believe Mr. Pfeifer has

25   a preliminary matter.

```
 1              MR. PFEIFER:  It has come to my attention that,
 2   through the diligence of trying to ask questions, I
 3   inadvertently referred to Mr. Walton as Mr. Walsh.
 4              THE COURT:  You said "Mr. Walsh."  You did that.
 5              MR. PFEIFER:  I apologize.  I was paying more
 6   attention to the question than the person that I was talking
 7   about.
 8              THE COURT:  I caught that.
 9              MR. PFEIFER:  I apologize.
10              MR. WALTON:  I told him I have been called much
11   worse.
12              MR. PFEIFER:  By better people.
13              MR. WALTON:  No.
14              MR. SULLIVAN:  Are you going to handle that
15   stipulation at a different time or now?
16              MR. PFEIFER:  After.
17              MR. SULLIVAN:  Okay.  We are ready to proceed,
18   Your Honor.
19              THE COURT:  Okay.
20              MR. SULLIVAN:  We would call Ms. Karen DePaepe.
21              THE COURT:  Face my courtroom deputy and he can
22   place you under oath.
23              (The witness was duly sworn.)
24              THE COURT:  Just come right up here and sit.
25              (Witness complies.)
```

DePAEPE - DIRECT EXAMINATION

1          THE COURT:  The microphone is directional, so you

2     need to make sure it's in front of you when you're talking.

3          THE WITNESS:  Okay.

4                    KAREN DePAEPE,

5     having been duly sworn, was examined, and testified as follows:

6                    DIRECT EXAMINATION

7     BY MR. SULLIVAN:

8     **Q.**  Good afternoon, Ms. DePaepe.  I appreciate your patience in

9     waiting.  I know you came this morning and we didn't get to you

10    till now.  I thank you for that.

11         Would you introduce yourself to the Court and spell

12    your last name for the record.

13    **A.**  Yes.  My name is Karen DePaepe, and it's D-e-P-a-e-p-e.

14    **Q.**  Thank you.  Now, Ms. DePaepe, in 1987, you started as a

15    communications specialist with the South Bend Police

16    Department; is that correct?

17    **A.**  Yes.

18    **Q.**  And then you became a dispatcher after that?

19    **A.**  Well, that's what a communications specialist is.

20    **Q.**  Okay.  So it's the same thing?

21    **A.**  Correct.

22    **Q.**  You were in that position for nine years?

23    **A.**  Yes.

24    **Q.**  You moved from there and you had a brief stint in the

25    Records Bureau?

BONAFEDE - DIRECT EXAMINATION

```
 1   A.   Yes, in the Data Division.
 2   Q.   Data Division.  You inputted data, police reports, that
 3   sort of thing?
 4   A.   Correct.
 5   Q.   Then you became a communications supervisor in 1996?
 6   A.   Correct.
 7   Q.   That was back with the communications department of the
 8   police department?
 9   A.   Correct.
10   Q.   Then in 1998 you became the director of communications?
11   A.   1998, July 1st.
12   Q.   July 1st, 1998.  And you held that job until April of 2012?
13   A.   Correct.
14   Q.   Now, as part of your job, listening to recorded
15   conversations and dispatch is a big part of a job in the
16   communications center, either as a supervisor or as the
17   director; is that correct?
18   A.   Yes.  As the director of the communications center, I was
19   the custodian of the records.
20   Q.   Okay.  And you had a system when you were the director that
21   you could actually access that Voice Logger right from your
22   desk; isn't that right?
23   A.   Yes.
24   Q.   I believe this is Exhibit 18.  That's what the screen --
25   the computer screen looked like on the Voice Logger; is that
```

BoRATPE - DIRECT EXAMINATION

1  correct?

2  **A.**   The first page.  There's a second page, as well.

3  **Q.**   Right.  The second page would have additional lines; is

4  that correct?

5  **A.**   Yes.

6  **Q.**   Okay.  And when you were working -- accessing the recorded

7  data, as a dispatcher, as a supervisor, and as director, you

8  got to know a lot of the voices that you heard there, didn't

9  you?

10  **A.**   Yes.

11  **Q.**   You could just recognize them; you could hear them and know

12  who it was?

13  **A.**   Correct.

14  **Q.**   Now, as director, one of the things that you did is you

15  were responsible for developing the list of the recorded lines

16  that the South Bend Police Department had; is that correct?

17  **A.**   Yes.

18  **Q.**   And Exhibit 9 here shows you the first page of a list that

19  you compiled?

20  **A.**   Correct.

21  **Q.**   That's the second page (indicating), right?

22  **A.**   Correct.

23  **Q.**   And this particular document we're looking at, you made in

24  August of 2011, before you went on medical leave?

25  **A.**   Show me the second page again.

1    Q.   Sure (indicating).

2    A.   Yes, that's correct.

3    Q.   Okay.  It was your -- it was part of your responsibility to

4    keep that list, part of your duties as the director of

5    communications?

6    A.   Yes.

7    Q.   No one else had that responsibility to keep that list up to

8    date and to know all of that; that was within your

9    responsibility as the director?

10   A.   Correct.

11   Q.   Let's look at this front page of this list for a moment.

12            Now, the police lines that are listed, the fire

13   lines, and the direct ring-down lines, the police department

14   has always had lines in its communications center that covered

15   911; is that correct?

16   A.   Yes.

17   Q.   And would you tell me what these numbers are under

18   "Police"; what does that mean?  Are these numbers for the

19   public to use to call in the police department?

20   A.   Those were numbers that were assigned to the telephones

21   that were the 911 phones that were administrative lines for

22   South Bend police, and they were listed on each of the plant's

23   equipment phones.

24   Q.   And if somebody called in and they had a nonemergency, they

25   could be routed to the dispatchers, the communication

1   specialists, on those phones?

2   **A.**   Correct.

3   **Q.**   And that's been a consistent practice for the police

4   department to have such lines recorded as long as you've been

5   there?

6   **A.**   Yes.

7   **Q.**   You don't have a policy or a manual or a written procedure

8   of any kind that tells you that; that's just how it's always

9   been done?

10  **A.**   That's correct.

11  **Q.**   So that's kind of the normal way you handle the

12  communications department?

13  **A.**   Correct.

14  **Q.**   The same for the fire numbers, right?

15  **A.**   Yes.

16  **Q.**   And these ring-down lines, there was testimony that that's

17  a line -- for example, Mishawaka PD, if I pick up on that line,

18  it calls directly to one place, Mishawaka Police Department; do

19  I have that right?

20  **A.**   Well, no -- well, yes.  If we picked it up and it was the

21  Mishawaka PD line, it would ring directly to Mishawaka PD and

22  only that.

23  **Q.**   Okay.  Could they come back the opposite way?

24  **A.**   Right.

25  **Q.**   Good.  Again, you don't have a manual -- a policy manual or

SCHAEFFE - DIRECT EXAMINATION

1    a directive from the chief or anything in writing that tells

2    you to do that; it's just the way you've done it?

3    **A.**   Correct.

4    **Q.**   That's the normal way you handle the communications office?

5    **A.**   Yes.

6    **Q.**   The dispatchers that we talked about, you had

7    responsibility as their supervisor; do I have that right?

8    **A.**   Yes.

9    **Q.**   So when you were director, you oversaw the dispatchers?

10   **A.**   Yes.

11   **Q.**   And you oversaw the front desk personnel, as well?

12   **A.**   Correct.

13   **Q.**   On this second page, it says "Administrative Phones."

14          Do you see that?

15   **A.**   Uh-huh.

16   **Q.**   And the first ones are all "Front Desk," and I assume

17   that's the front desk of the South Bend Police Department?

18   **A.**   That's correct.

19   **Q.**   Again, I want to confirm that you did not have a policy or

20   a manual or a written procedure or a directive from the chief

21   that said you should always record these front desk lines;

22   that's just always how it's been done?

23   **A.**   Correct.

24   **Q.**   That's part of the normal operations of the police

25   department?

1    **A.**   Yes.

2    **Q.**   Okay.  And then there is a line for Internal Affairs,

3    several for Chief's Office, Records, Records Director,

4    Detective Bureau, with a notation there on the last one.

5          Now, the administrative lines are really kind of

6    different from the lines that we saw here on page 1, aren't

7    they?  They're handled differently by you as the director?  And

8    I'll say, let's focus on the phone lines there from Internal

9    Affairs on down (indicating).

10          Those are handled differently than the other lines

11    that we have talked about, aren't they?

12    **A.**   Yes.

13    **Q.**   In your experience, the chief directs what he wants in

14    terms of which of those lines are recorded; is that correct?

15    **A.**   Yes.

16    **Q.**   And it could vary by chief?

17    **A.**   Yes, and it did.

18    **Q.**   And he relied on you to execute whatever -- whichever chief

19    told you to record this one or that one, he relied on you to

20    execute that?

21    **A.**   Well, the only person that would authorize me to make a

22    change would be the chief of police.

23    **Q.**   Right.  So my question had two parts, and I apologize.

24          So the first part was:  He was the only person who

25    authorized which lines he wanted recorded, right?

```
 1   A.   That's correct.

 2   Q.   In your experience?

 3   A.   Yes.

 4   Q.   And you were the person that then followed up on that to

 5   see that it was done?

 6   A.   Correct.

 7   Q.   And, again, you never saw a duty manual, a policy book, a

 8   written procedure, or a written directive that told you that;

 9   it was just verbally from the chief to you?

10   A.   That's correct.

11   Q.   Okay.  And that's always how it was done in your

12   experience?

13   A.   Yes.

14   Q.   Now, one of the things that you handled differently about

15   these lines is that the access to the recordings that came from

16   those lines was restricted while you were the director,

17   correct?

18   A.   I restricted them, yes.

19   Q.   Yes, ma'am.  That's what I mean.

20   A.   Uh-huh.

21   Q.   So, for example, this screen (indicating), you said there's

22   a page 2 that you could have; but if you were a supervisor,

23   underneath you, as director, or if you were Diana Scott, as

24   assistant director, they would not have those administrative

25   lines -- and I'm talking about the ones that are Internal
```

1   Affairs on down -- they would not have access on their screen?

2   **A.**   No, that's not correct.

3   **Q.**   They would have access to those lines?

4   **A.**   They would have access to view what lines we were

5   recording.  They did not have access to pull any recordings

6   from those lines.

7   **Q.**   Okay.  Good distinction.  Thank you.

8           They'd see it on the screen?

9   **A.**   Correct.

10  **Q.**   Would it be like they're grayed out, or is it just that

11  they could click on it and it wouldn't click?

12  **A.**   Right.

13  **Q.**   And those were different because they were more

14  confidential, in your view?

15  **A.**   Correct.

16  **Q.**   More private, in your view?

17  **A.**   Correct.

18  **Q.**   And often used by higher ranking officers?

19  **A.**   Yes, from the Internal Affairs line on down.

20  **Q.**   Because the top ones were front desk and Diana Scott had

21  access to those?

22  **A.**   And as did the supervisors.

23  **Q.**   As did the supervisors.  Okay.

24          And they were also lines -- after we get below the

25  Front Desk, the Internal Affairs, Chief's Office, the Records,

1   Detective Bureau, -- that were used by individuals.  A single

2   person sits down to use -- so, for example, 9312, the Uniform

3   Division chief might use that line -- he would be the one to

4   use that line; it wasn't like several people would use that

5   line, right?

6   **A.**  Not necessarily.

7   **Q.**  Well, certainly the records director, that person is using

8   that line, right?

9   **A.**  Yes, but they often would be on an FMLA or vacation and

10  substitutes would fill in.

11  **Q.**  Okay.  But with the exception of substitutes -- I guess,

12  here's what I'm trying do, is contrast that -- for example, the

13  front desk lines, the front desk is manned 24 hours a day at a

14  police department?

15  **A.**  Correct.

16  **Q.**  And it's not one person working a 24-hour shift; is that

17  right?

18  **A.**  That's correct.

19  **Q.**  Okay.  So suffice to say, the Internal Affairs, Chief's

20  Office, Records and the Detective Bureaus, those lines you

21  treated differently and restricted access for the recorded

22  lines there?

23  **A.**  Yes, correct.

24  **Q.**  In fact, you were the only person in the entire South Bend

25  Police Department who could access the recordings for the lines

1  that we just mentioned?

2  **A.**  I believe that I gave access to the Records line and

3  Detective Bureau 9263 and 9264 to Diana Scott at some time.

4  **Q.**  Well, you actually gave her access to all of those when you

5  went on medical leave?

6  **A.**  Right, on my FMLA.

7  **Q.**  But you're saying, before that, you may have given her

8  access to those individual lines?

9  **A.**  Correct.

10  **Q.**  The Records and the Detective Bureau secretary; is that

11  what you said?

12  **A.**  Correct.

13  **Q.**  The other ones then, which would be Internal Affairs and

14  the Chief's Office and the last Detective Bureau line, you were

15  the only person who had access to that, the only person in the

16  department; in other words, the chief didn't have --

17  **A.**  Right.

18  **Q.**  He didn't come out and have computer access to those lines?

19  Or the Services Division chief, he didn't come down and have

20  access to those lines, did he?

21  **A.**  That's correct.

22  **Q.**  And no investigative officers or uniform officers came in

23  and had access to those lines?

24  **A.**  No.

25  **Q.**  All right.  So that covers the people above you and the

1    people below you.

2            So you were the only one, with the exception of when

3    you were on your medical leave?

4    **A.**   That's correct.

5    **Q.**   Okay.  And that must have been a big part of your job,

6    since you were the only one who could have access to the

7    recordings that came from those lines.

8            Any time there needed to be a review that could

9    include those lines, you had to do it; no one else could?

10   **A.**   That's correct.

11   **Q.**   And so you got to know the voices on those lines, as well?

12   **A.**   Yes.

13   **Q.**   You referred to the machine, the computer, the Dynamic

14   Instruments Reliance machine, as the Voice Logger?

15   **A.**   Correct.

16   **Q.**   We've been calling it that.  You're comfortable with that?

17   **A.**   Sure.

18   **Q.**   There were problems with this thing back in 2010, weren't

19   there?

20   **A.**   Very much so, and before.

21   **Q.**   Even before that?

22   **A.**   Uh-huh.

23   **Q.**   So the problems had to do with some crashes, I understand?

24   **A.**   Yes.

25   **Q.**   Diana Scott called it the "blue screen of death" and you

1    would have to reboot?

2    **A.**   Right.

3    **Q.**   And when that happened, you had some fear of lost data?

4    **A.**   Yes.

5    **Q.**   And that means that you may not have captured some phone

6    calls and it may not have been backed up to the DVDs?

7    **A.**   Yes.

8    **Q.**   In order to figure that out, you had to spend some time --

9    this was one of your duties -- to spend some time finding out

10   where that crash may have occurred and what calls and which

11   ones -- or when the period of time started where you may have

12   lost data; do I have that right?

13   **A.**   Well, not necessarily at that time.  I would call the

14   technician from the company, Stephen Campbell & Associates, and

15   discuss it with him.

16   **Q.**   But there came a time when that was -- well, Diana Scott

17   testified, in late 2010, you would have to go in and see where

18   did we lose the data, right?

19   **A.**   Well, it would show where the data was lost, so we would

20   already know where that data was lost.

21   **Q.**   But there was some kind of checking of the lines to ensure

22   that you had usable data that had to be done when there were

23   problems with the system.  That's what Diana Scott testified

24   to.  She described how she would do a search and that would

25   come up with the list of recorded calls, and then you would

1    listen to a few seconds to see if you got something and then

2    you would move on to the next one.

3            Does that process sound familiar to you?  That's my

4    question.

5    **A.**   Yes.  That was done in 2011, February of 2011, by the

6    request of the technician.

7    **Q.**   And if Diana Scott testified that she had done a similar

8    process related to malfunctions in late 2010, would she be

9    wrong?

10   **A.**   Well, I don't recall that she checked each and every line.

11   She probably checked the lines that she had access to.

12   **Q.**   Of course.  She could only check the ones that she had

13   access to, right?

14   **A.**   Correct.

15   **Q.**   And you would have to check the other ones?

16   **A.**   Yes, if it was requested or if I knew about it.

17   **Q.**   Right.  And so you would perform that task in November or

18   December of 2010 during crashes, if required?

19   **A.**   No, not at that time.  The only time I checked each and

20   every line was on the final crash.  I was very frustrated.  The

21   company kept telling us it wasn't related to what was

22   downloading at that time.  They kept stating that they believed

23   it was just the backup DVD servers that were malfunctioning.

24           So we did lose data, and, at that point, I would

25   just say, "Is this data recoverable?  Can we get it back?"

1        And they stated, "No."  So they would state, "We

2   will send you a new backup DVD."

3        They would send it.  I would write a note on the CD

4   that was in the computer equipment at that time and, you know,

5   just try to get it documented that we had lost this, and they

6   would overnight it to us.

7   **Q.**  And you testified about the February 4th process that you

8   went through?

9   **A.**  Correct.

10  **Q.**  And your testimony now is that is the only time that you

11  performed the task that I just described where you had to check

12  all the lines?

13  **A.**  Right.  I would just contact the vendor, and I would say,

14  "Can we get this data back?"

15       And they would say, "We don't think so.  We'll send

16  you a backup DVD drive.  We will overnight it to you."

17  **Q.**  Okay.  I just wanted to make sure I got that.  That

18  February 4th was the only time you did that?

19  **A.**  Yes, the only time I had checked all of the lines.

20  **Q.**  Okay.  If somebody else had done it prior to that due to a

21  crash, then they would not have been able to check the lines

22  that they did not have access to?

23  **A.**  That's correct.

24  **Q.**  Okay.  So the only way to test all the lines would be to

25  have you do it?

1    **A.**   Yes.

2    **Q.**   Eventually you had to replace some components in that

3    system?

4    **A.**   Several times.

5    **Q.**   Several times.  Okay.

6            Now, you mentioned February 4th.  We're talking

7    about February 4th, 2011, doing that troubleshooting?

8    **A.**   Correct.

9    **Q.**   And, at that time, you clicked on a random stream of data

10   because you were checking it?

11   **A.**   At that time, I contacted the vendor, Stephen Campbell &

12   Associates, to speak about it to the technician, Terry.

13   **Q.**   Well, you've said that on February 4th you were

14   troubleshooting?

15   **A.**   Right.

16   **Q.**   Okay.  And you began to check recording equipment?

17   **A.**   I contacted Terry, and he -- I stated to him, "Is there any

18   way we can recover this?  I really need you to get here and

19   check this."

20           He goes, "There's one thing I can have you try."

21           I go, "What's that?"

22           And so he talked me through.  He told me how to get

23   to a particular screen and stated, "Now, I want you to do this

24   series on the F thing," and he would tell me what to type in.

25   And he said, "If we can recover that data, it will show in a

1   couple of hours." And he said, "So what I want you to do is I

2   want you to go back -- give it a couple hours, then go back and

3   check each and every line to see if it did, in fact, download."

4   **Q.** And you did that on February 4th?

5   **A.** That's correct.

6   **Q.** Okay. I appreciate all that information, but that was my

7   question to you. You were checking the data on February 4th?

8   **A.** Right, because he had to hard -- manually try to force that

9   data to come off of the hard drive onto that backup DVD.

10  **Q.** And the only thing you were trying to do when you were

11  accessing that data at that point was to confirm that you had

12  data and get it to back up?

13  **A.** To confirm that it was all downloading as he said it should

14  from the forced download.

15  **Q.** Right. That was the purpose of your actions on

16  February 4th?

17  **A.** That's correct.

18  **Q.** Okay. In listening to that, you listened to ensure that

19  you had the data, right?

20  **A.** Correct.

21  **Q.** You didn't have some garbled or some blank data; you needed

22  an audible stream of audio to perform this task?

23  **A.** Right.

24  **Q.** And all you really needed to do was listen to enough of it

25  to ensure that you had usable audio on that file?

1  **A.**  Right, but he had requested that I check what was on the

2  hard server versus the backup DVD, so I had to check it twice,

3  once on that and once on the other, to make sure the exact

4  information was downloading.

5  **Q.**  Right.  So, for example, if you were doing that with

6  somebody who answered the phone by saying -- so, if it was me,

7  "Hello, this is Ed Sullivan," and then you would flip over and

8  see if you had the same thing on the hard drive, "Hello, this

9  is Ed Sullivan," something like that?

10  **A.**  That is correct.

11  **Q.**  Did I capture it?

12  **A.**  Yes.

13  **Q.**  I'm sure it's more complicated than that and you know more

14  of it, but that generally shows it?

15  **A.**  Uh-huh.

16  **Q.**  And the "uh-huh" is a "yes"; is that right?

17  **A.**  Yes.  I'm sorry.

18  **Q.**  That's all right.

19         And you did that and in a few seconds on one of

20  those files you recognized the voice of Captain -- then Captain

21  Brian Young?

22  **A.**  Yes, I did, I recognized his voice.

23  **Q.**  And you found that odd because on the line you were

24  checking you believed it should have been at that time Division

25  Chief Richmond?

BONAPPE - DIRECT EXAMINATION

1    **A.**  Yes.

2           MR. WALTON:  Your Honor, up to this point I've

3    permitted direct examination by leading the witness, and I

4    think we're at a point where he needs to let her talk.  He's

5    been leading the witness through a lot of background

6    information, and I allowed it to go, but I think he needs to

7    stop asking leading questions.

8           THE COURT:  Okay.  Just make your objection when you

9    have one.

10          MR. WALTON:  I will.

11          THE COURT:  Thank you.

12   BY MR. SULLIVAN:

13   **Q.**  When did Chief Richmond start in the Detective Division in

14   your recollection?

15   **A.**  It was the beginning of 2010, sometime in the beginning of

16   2010.  I believe February.

17   **Q.**  And you're now sometime in the beginning of 2011?

18   **A.**  Correct.

19   **Q.**  So about a year down the road from when he started?

20   **A.**  That's correct.

21   **Q.**  And you thought Chief Richmond had taken over Rick Bishop's

22   line when Richmond began the division chief?

23   **A.**  Yes, that's correct.

24   **Q.**  Now, at the point that you recognized Brian Young's voice,

25   you already knew you had data, right?  You had confirmed what

1    you needed to confirm?

2    **A.**  Right.

3    **Q.**  But this issue of the line and who was on it confused you?

4    **A.**  Yes.  I thought --

5              MR. WALTON:  Your Honor, that's a leading question

6    again, and I really wish he would ask the question and let the

7    witness answer.

8              MR. SULLIVAN:  Your Honor, a response?

9              THE COURT:  Go ahead.

10             MR. SULLIVAN:  It's an adverse witness relative to

11   the position of the City, and, also, there was a deposition

12   taken at the point that she was a plaintiff against the City.

13   Furthermore, from the beginning of this trial, everyone has

14   asked leading questions.

15             THE COURT:  I agree, they have, but to the extent

16   you can, ask a little less leading.  I know there are not

17   degrees of leading, but just give her more of an opportunity to

18   respond versus you suggesting what the response be.  That

19   probably would be better.

20             MR. SULLIVAN:  Okay.  I will try, Your Honor.

21             THE COURT:  If you want me to declare her an adverse

22   witness, I'll do that, but you have to give me the basis to do

23   that.

24             MR. SULLIVAN:  Well, the basis is that Karen DePaepe

25   has maintained that the actions that she took and the

 1    recordings that occurred in the South Bend Police Department

 2    did not violate the Wiretap Act, and she brought suit against

 3    the City maintaining that, so she is an adverse witness to the

 4    City.

 5            MR. WALTON:  Your Honor, she's a factual witness for

 6    this case, talking about what she did.  She's not giving an

 7    opinion here about the Wiretap Act or anything else.  She is

 8    the director of communications, and they can ask her what she

 9    did and why she did it, but they can't lead her.  It's their

10    case-in-chief.

11            THE COURT:  Just do the best you can not to ask --

12            MR. WALTON:  I'm not trying to be difficult with it,

13    but there are times when she needs to explain her actions.

14            THE COURT:  No, I understand, and I think that can

15    be -- first, it's cross-examination, too, but just, to the

16    extent you don't ask over-the-top leading questions, and give

17    her a chance to answer.

18            MR. SULLIVAN:  I'll do my best.

19            THE COURT:  Whatever that is.  That's something they

20    teach in law school.

21            Don't ask what "over-the-top leading questions" are,

22    but just do the best you can do.

23            MR. SULLIVAN:  Okay.

24    Q.  Tell me why it confused you to hear Brian Young's voice?

25    A.  Well, it was actually a voicemail that was being left.

1   **Q.**   One thing I want to make sure, because I'm not sure anybody

2   has talked to you about this before --

3   **A.**   Right, no content.

4   **Q.**   Yes, ma'am.  There's an order from the Court on that, so I

5   want to make sure you are aware of that.

6   **A.**   Yes.

7   **Q.**   Go ahead.

8   **A.**   Well, my first thought was that this must be some

9   malfunction in the system.  Why would he be talking on this

10  line?  And so, as I heard it, I thought, Could this be a

11  malfunction of the system?  You know, this was Division Chief

12  Richmond's line.  So why would he be doing this?  Could,

13  somehow, these lines have got crossed?  So that's why I

14  listened.

15  **Q.**   That's why it confused you?

16  **A.**   Right.

17  **Q.**   Now, in your entire time at the South Bend Police

18  Department in communications, dealing with Voice Logger

19  systems, did you ever have a malfunction in which the

20  conversations on a channel for one telephone line simply began

21  to record the conversations on a different telephone line?  Had

22  that ever happened to you before?

23  **A.**   No, that hadn't happened.  We had had other malfunctions.

24  **Q.**   Sure.  I'm sure there's been a lot of malfunctions, but

25  that one in particular.

1      You said you originally thought, oh, maybe it's

2 recording the wrong thing, but that had never happened before?

3 **A.** Right.

4 **Q.** Okay.  So when you became confused -- I want to follow up

5 on this and what you did after that.

6      Did you go talk to Brian Young about that?

7 **A.** No, not at that point.

8 **Q.** Okay.  Now, I'm going to show you Exhibit 1.  This is an

9 Officer's Report that you authored and submitted to Chief

10 Boykins in January of 2012; is that correct?

11      Ma'am, I apologize.  I failed to tell you this.

12 There is a binder in front of you, and it's under tab 1, it's

13 1A.

14 **A.** Oh, okay.

15 **Q.** This is Exhibit 1A or Exhibit 1.  It's in evidence.  It's

16 your Officer's Report, redacted, isn't it?

17 **A.** Yes.  I'm trying to read it to recall.

18 **Q.** Take your time and let me know when you're finished.

19 **A.** Okay.

20 **Q.** And you're satisfied that this is a copy of your Officer's

21 Report?

22 **A.** Yes.

23 **Q.** At the top of the second page, it says:  "When I heard the

24 conversation on February 4, 2012 at 12:11:59 hours..."

25      Did I read that correctly?

SCHAEPE - DIRECT EXAMINATION

```
 1                    THE COURT:  It's the top line.

 2                    THE WITNESS:  Yes.

 3     BY MR. SULLIVAN:

 4     Q.   Okay.  That indicates the date of the conversation that you

 5     heard on the line being used by Captain Young, doesn't it?

 6     A.   Correct.

 7     Q.   And it's the same date that you were performing the actual

 8     data check, audio check?

 9     A.   Correct.

10     Q.   So by looking at that and knowing that Captain Young had a

11     conversation midday on the day you were checking, you knew he

12     was in the office that day?

13     A.   Yes.

14     Q.   You didn't go down and talk to him about your confusion?

15     A.   Well, what happened was, when I located that and I wasn't

16     quite sure, is this an error, you know, what kind -- what's

17     going on here, I had stated that I went back and checked lines,

18     continued to go back to see, and his voice was still on there;

19     so it was, like, well, this isn't a fluke, because I've gone

20     back and checked lines prior to this crash and stuff that was

21     recorded and housed on both.  He's obviously using this line.

22              So the first thing I did was I went to my office to

23     check and see that he -- in fact, on the CAD system, our

24     computer-aided dispatch system, it showed this line to now be

25     assigned to him.
```

DeRAFFELE - DIRECT EXAMINATION

1    **Q.**  Thank you.

2    **A.**  Okay.  And it showed --

3          MR. SULLIVAN:  Your Honor, object as nonresponsive.

4    My question was:  You didn't go to Brian Young and ask him

5    about your confusion, and I would ask for permission to lead,

6    given the fact that this witness is adverse to the City's

7    position, has sued the City on this particular issue.

8          THE COURT:  Ask it any way you want to ask it.

9          MR. SULLIVAN:  Thank you, Your Honor.

10   **Q.**  Ma'am, my question to you was:  When you had this

11   confusion, you didn't go over to Brian Young's office and ask

12   him about it?

13   **A.**  That is correct.

14   **Q.**  And you didn't go to Steve Richmond and ask him about it?

15   **A.**  That is correct.

16   **Q.**  And you didn't pick up the phone and dial the four-digit

17   number to see who answered?

18   **A.**  I went to the CAD system to check to see if the lines had

19   been switched.

20   **Q.**  And that's when you discovered that the CAD system showed

21   that 6031 was assigned to Brian Young?

22   **A.**  That's correct.

23   **Q.**  So you knew that your list, that was your responsibility to

24   keep, was wrong in who it designated as being on that recorded

25   line?

1   **A.**   At that time, it appeared to be that it had been changed

2   without my knowledge.

3   **Q.**   That's what I'm talking about, that time, February 4th,

4   2011.

5   **A.**   Correct.

6   **Q.**   So you also selected additional audio streams on that day,

7   going back in time, to confirm whether Brian Young had used

8   that line consistently rather than maybe it was just a one-time

9   thing?

10  **A.**   I was trying to determine after which, yes, was this a

11  one-time thing, and then I was like, When would this have

12  occurred?

13  **Q.**   And so you made a decision, as keeper of the records, to

14  investigate that?

15  **A.**   That's correct.

16  **Q.**   Okay.  And you have Exhibit 1 still in front of you?

17  **A.**   Yes, sir.

18  **Q.**   I think we noted already that the actual date that you

19  created Exhibit 1 was nearly a year later in 2012?

20  **A.**   Yes.

21  **Q.**   I apologize.  I did ask you that, didn't I?

22  **A.**   Yes.

23  **Q.**   And the reference line here, you show that you were

24  referencing recorded audio data from 6031 from the period of

25  February 4th, 2011, all the way through August 31st, 2011.

1          Do you see that?

2   **A.** Yes -- no, I don't.

3   **Q.** Okay.  It is right here (indicating), if you look at the

4   screen.

5   **A.** Okay.  Yes.  At the top, yes.

6   **Q.** And that reference is a signal to Chief Boykins, who you're

7   submitting this report to, it's a reference that this is what

8   your memo, your Officer's Report, concerns?

9   **A.** Yes.

10  **Q.** I want you to go in the first four lines or so, on the

11  fourth line, that starts off "all of our Police & Fire Radio

12  Channels..."

13         Do you see that?

14  **A.** The fourth line down?

15  **Q.** The fourth line down of your actual report.

16  **A.** On the first page, correct?

17  **Q.** Yes, ma'am.  Right here (indicating).  "All of our Police &

18  Fire Radio Channels as well as the majority of telephones lines

19  maintained by the South Bend Police Department."

20         Right?

21  **A.** Uh-huh.

22  **Q.** Do you see that?

23  **A.** Yes, sir.

24  **Q.** And you're referring to the Dynamic Instruments Recording

25  System, and you say that it "records all of our Police & Fire

1   Radio Channels as well as the majority of telephones lines..."

2   **A.**   Yes.

3   **Q.**   Those are the words you put in the report?

4   **A.**   Yes.

5   **Q.**   But the word "majority" is not quite accurate relative to

6   the telephone lines in the police department, is it?  You don't

7   record the majority of telephone lines in the police

8   department?

9   **A.**   That's correct.

10  **Q.**   There are well over a hundred lines in the police

11  department?

12  **A.**   Yes.

13  **Q.**   And you record, really, just a small fraction of the

14  administrative lines that people use?

15  **A.**   Yes.

16  **Q.**   All right.  I want to go down now to the bottom of that

17  first paragraph.  It's actually the second line from the bottom

18  (indicating).

19  **A.**   Okay.

20  **Q.**   You were "under the belief there may have been a problem

21  with the recording system as my records listed this line as the

22  Investigative Chief's telephone line and the conversation was

23  clearly that of Captain Brian Young."

24          I read that correctly?

25  **A.**   Yes.

1   **Q.**  And that's a reference -- when you say "my records," you

2   mean that list that you keep?

3   **A.**  Correct.

4   **Q.**  That your list showed that it should go to the division

5   chief, not the captain assigned in that division?

6   **A.**  No.  None of the records on the list that I kept stated who

7   the line belonged to, except for when I put that notation on

8   there when that particular -- what do you want to call that --

9   list was requested of me by Division Chief Horvath.  That had

10  been the only change that had taken place since Chief Boykins

11  had taken office.

12  **Q.**  So is it your testimony that you never had a list of

13  recorded lines that ever said where the lines go?

14  **A.**  No.  I had no list that stated where they went.  It was

15  just a list of the lines that were being recorded.

16  **Q.**  Okay.  And you knew which lines to record because the chief

17  told you that?

18  **A.**  Correct.

19  **Q.**  And later you say in your report that you were not aware

20  that Steve Richmond had sought to remove his 7473 line, right?

21  **A.**  That's correct.

22  **Q.**  But it's not your testimony that the chief wanted 6031

23  recorded no matter who used it?  That's not what your belief

24  was, correct?

25  **A.**  I didn't have a belief on it.  I knew that line was placed

1    on the system.  There was no belief as to what the chief

2    assumed or what the chief wanted.  That had been placed on

3    there by Chief Fautz.

4    **Q.**  Okay.  I guess maybe here is how I will get at it.

5            You probably know by now that what we believe

6    happened -- what the parties have agreed has happened -- is

7    that when Barb Holleman wanted to satisfy Steve Richmond's

8    request to move 7473 to the office he was going to be in, C157,

9    then she had Steve look up the number, and she just took the

10   two wires and switched them, right?  You understand that's

11   what's happened now?

12   **A.**  I understand that.  I did not know that could be done.

13   **Q.**  Didn't know it could be done and, certainly, at the time,

14   you had no idea that that's what was done?

15   **A.**  That's correct.

16   **Q.**  My question is this:  If Barb Holleman had taken the line

17   that carried 6031 and put it into any of these other slots, it

18   would have ended up in an office occupied by somebody other

19   than Brian Young, wouldn't it?

20   **A.**  Correct.

21   **Q.**  Are you saying your testimony is that you believe that

22   Chief Fautz wanted 6031 recorded no matter where Barb Holleman

23   decided to put that plug?  Is that what your testimony is?

24   **A.**  No.

25   **Q.**  Okay.  He wanted to record the division chief?

1   **A.**   No.   Chief -- Rick Bishop was not a division chief at the

2   time that that request was made by Chief Fautz.   He was a

3   captain.

4   **Q.**   All right.   So you think he wanted to record Rick Bishop?

5   **A.**   I know that he contacted me and stated, "Put this line on

6   recording.   It is in Rick Bishop's office."

7   **Q.**   And, at that time, Rick Bishop was the head of Risk

8   Management?

9   **A.**   I believe he was in the Detective Bureau because that's

10  where the line was placed on the recording system.

11  **Q.**   Well, do you have any information that tells -- that we

12  could determine where he was when that occurred, because

13  there's been testimony from Rick Bishop that he requested that

14  when he was in Risk Management overseeing Internal Affairs, and

15  there's been no other evidence to contradict that?   So what do

16  you base your view on that Rick Bishop sought to have that

17  recorded when he was in the Detective Bureau?

18  **A.**   Because when we would call a technician out, and they would

19  state -- they, themselves, will place them on the recording

20  system -- they would say, "Where is this telephone line

21  located," and I would tell them whether it was the Detective

22  Bureau, Office of Risk Management, which at that time was

23  sometimes referred to as Internal Affairs.

24          And if you were to look at the computer system

25  itself, the technicians tended to bunch numbers in order, such

1     as they listed all of the chiefs' lines together, they listed

2     all of the police lines together that were accessed on the

3     plant equipment, and so that's how I tried to keep my telephone

4     list that I passed on to the chief.  But if you were to look at

5     the Dynamic Instruments Recording System, the technician placed

6     it directly under 9263, 9264, right with the other Detective

7     Bureau lines.

8     **Q.**  And, of course, he was later the division chief in the

9     Detective Bureau?

10    **A.**  Yes.

11    **Q.**  Okay.  Other than your recognition of where the line was

12    placed on your system --

13    **A.**  Yes.

14    **Q.**  -- did you have anything -- any written orders from Chief

15    Fautz that indicated -- did you receive a written order when

16    Chief Fautz wanted you to place that line on the system?

17    **A.**  No.

18    **Q.**  Okay.  And your testimony is, your recollection is, that

19    Rick Bishop was in the Detective Bureau when he first requested

20    his line to be recorded?

21    **A.**  Correct.

22    **Q.**  And you don't believe that Chief Fautz was telling you to

23    record detectives in the division -- or captains in the

24    Detective Bureau from there forward, do you?

25    **A.**  Well, that's neither here nor there.  All he told me was to

1    place his line on the recording system.  He didn't say, "This

2    is my intention."  He just stated, "Do this."

3    Q.  Okay.  I'm asking what you believed by that, because you've

4    already testified that you believed, when you heard Captain

5    Young, there was a mistake.

6    A.  Correct.

7    Q.  Because you believed it should have been the division

8    chief?

9    A.  That is correct.

10   Q.  And I'm asking you whether you formed a belief when Chief

11   Fautz told you to record Rick Bishop's line, did you form the

12   belief that he was asking you to form a regular practice to

13   record the captain of the Detective Bureau?  Is that what you

14   believed at the time you received that directive?

15   A.  No.

16   Q.  Okay.  Let's go back to Exhibit 1.  If you look down at the

17   bottom of the page, the first page on Exhibit 1, in fact, Chief

18   Fautz did discuss the reasoning behind recorded lines with you,

19   didn't he?

20         And if you look there at the very last sentence that

21   starts, "The reasoning behind this decision..."

22         Have you found that?

23   A.  Uh-huh.

24   Q.  "The reasoning behind this decision was that should anyone

25   receive telephone calls with information regarding any criminal

1   cases or allegations of misconduct by officers we would have

2   audio documentation" --

3           THE COURT:  Mr. Sullivan, go a little bit slower if

4   you want this recorded.  You're going way ahead of the court

5   reporter on this.

6           MR. SULLIVAN:  I'm sorry.  What did you get to last?

7           COURT REPORTER:  It doesn't matter.  You can just

8   pick up with the next.

9   BY MR. SULLIVAN:

10  **Q.**  So you had a discussion with Chief Fautz about the

11  reasoning for the recording?

12  **A.**  The discussion had to do with the division chiefs and

13  himself.

14  **Q.**  So that's a "yes" to my question; you had a discussion

15  about the reasoning?

16  **A.**  Right.

17  **Q.**  Okay.  I want you to go to the second page, ma'am, of

18  Exhibit 1.

19          Do you see this section here where it says, "It was

20  at this point..."?

21  **A.**  Yes.

22  **Q.**  "It was at this point, I made a decision, as Keeper of the

23  Records, to check further conversations to see if there was

24  more information in regard to this incident."

25          Did I read that correctly?

1   **A.**   That's correct.

2   **Q.**   That point that you referred to is the point that you began

3   to listen to recorded conversations, not for the purpose of

4   maintenance or a data check, but to investigate something that

5   you had heard that bothered you?

6   **A.**   And to investigate when this line may have been switched.

7   **Q.**   But you investigated to see if there was more information

8   in regard to this incident?

9   **A.**   In regard to the content.

10   **Q.**   Yes.  That's my question.

11   **A.**   Yes.

12   **Q.**   That was the point that you began to listen to the lines

13   for purposes of listening for content?

14   **A.**   Correct.

15   **Q.**   Okay.  And at that point, you had not received any written

16   or verbal instruction to begin to listen for content, right?

17   **A.**   That's correct.

18   **Q.**   Now, sometime after that, like March, okay --

19   **A.**   Uh-huh.

20   **Q.**   -- you spoke to Chief Boykins about this experience that

21   you had; is that correct?

22   **A.**   It would have probably been the end of February, the

23   beginning of March, sometime in there.

24   **Q.**   I think you said in your deposition it was the beginning of

25   March.

BoRAFFE - DIRECT EXAMINATION

 1  **A.**  Yeah.

 2  **Q.**  Is that consistent?

 3  **A.**  Yeah.

 4  **Q.**  Okay.  And then, sometime after that, you also had a

 5  conversation with Diana Scott about that?

 6  **A.**  About what?

 7  **Q.**  The fact that you heard some things that bothered you and

 8  that you had reported it to Chief Boykins.

 9  **A.**  I spoke to Diana Scott about that, I believe it was, the

10  very end of the year when the federal investigation had

11  started.

12  **Q.**  Well, if she testified that you spoke to her about that

13  before your FMLA leave, would she be wrong?

14  **A.**  Before my FMLA leave?  I might have told her that, yes, I

15  had heard something that upset me, but I did not tell her what.

16  **Q.**  That's right.  My question was not whether you revealed

17  anything that you had heard, but that you had told her you had

18  heard something that disturbed you.

19  **A.**  Yes.

20  **Q.**  And I think you told Barb Holleman that, as well, no

21  content, but that you had heard something that disturbed you?

22  **A.**  Yes.

23  **Q.**  So you told Chief Boykins that you heard something that

24  disturbed you, you told Diana Scott that you heard something

25  that disturbed you, you told Barb Holleman you heard something

1    that disturbed you?

2    **A.**   Yes.  I believed it was illegal.

3    **Q.**   And in that time period, you did not tell Brian Young that,

4    correct?

5    **A.**   I discussed it with Chief Boykins at the end of February,

6    the very beginning of March.  I stated to him that I would

7    leave this in his hands.

8    **Q.**   So the answer to my question is, no, you didn't tell Brian

9    Young?

10   **A.**   No.

11   **Q.**   And you didn't go talk to Steve Richmond about it?

12   **A.**   No.

13   **Q.**   And you didn't talk to Gary Horvath, your direct

14   supervisor?

15   **A.**   No.

16   **Q.**   And you didn't talk to anybody at Internal Affairs?

17   **A.**   No.  I left that up to the chief.

18   **Q.**   It was your belief, in February of 2011, that the police

19   department should have been recording Steve Richmond; isn't

20   that correct?

21   **A.**   It was my belief the lines were switched.  It was not my

22   belief that Steve Richmond was supposed to be recorded.

23   **Q.**   It was your belief that the division chief should have been

24   recorded.  That's what you put in your memo?

25   **A.**   It had been in the past.  It had been the practice of Chief

1    Fautz.

2    **Q.**   Okay.  So when you heard Brian Young, you had the belief

3    that "We're taping the wrong person," based on what you

4    believed the arrangement of the recording should be?

5    **A.**   Not necessarily.

6    **Q.**   Because you really didn't know who should be taped; you

7    just did what the chief told you to do?

8    **A.**   I knew the line had been switched.  I had no idea who

9    authorized the line to be switched and why it was authorized.

10   **Q.**   And we talked earlier about the fact that the chief comes

11   to you.  There's nobody else that he would go to to execute his

12   protocols, his choices for recording lines, right?

13   **A.**   That's correct.

14   **Q.**   All right.  So if somebody had begun to be recorded that

15   was a surprise to you, right --

16   **A.**   Uh-huh.

17   **Q.**   -- you would want to get the recording correct, wouldn't

18   you?

19   **A.**   Yes.

20   **Q.**   Did you ever do anything to get Steve Richmond recorded?

21   **A.**   I asked Chief Boykins.  I stated, "This may have been done

22   in error.  I'm not sure.  Please let me know if you want any

23   changes made to the system."

24   **Q.**   And he did not direct you to make any changes?

25   **A.**   That's correct.

1  **Q.** So you made no changes, except for your list?  You made a

2  change on that list, didn't you?

3  **A.** Yes, I did.

4  **Q.** You made sure that people knew that it was the division

5  chief, but now it's the division captain?

6  **A.** I was requested to provide Division Chief Horvath with a

7  list of what was currently being recorded prior to my FMLA, as

8  there was going to be a meeting in October to discuss what

9  changes of recordings were being made with the new phone

10 system.

11         I sent that to the chief, and I went into the radio

12 room to look at the equipment to verify that that's what we

13 were currently recording.  I made the decision on my own to

14 place that on there, because I spoke to Chief Boykins twice in

15 that period of time, between the end of February/March and

16 August, stating, you know, "This line is still there.  Let me

17 know if you want any changes."

18         No changes were authorized.  When Chief Horvath

19 asked about the list, I put that notation on there because that

20 was the only change to the system that had taken place, to my

21 knowledge, since Chief Fautz had left and Chief Boykins took

22 over.

23 **Q.** All right.  That was a lot of information, and I'm not sure

24 what my question was, but I think it was that you put that

25 notation there to correct the mistake -- the mistaken notion

1   that 6031 was going to the division chief.

2   **A.**   That's correct.

3   **Q.**   Okay.

4   **A.**   Actually, it was going to the division captain.  It was the

5   division chief's, and it was now showing --

6   **Q.**   Right.  And that's what everybody -- even Chief Boykins

7   testified that it was a mistake to be recording Captain Young?

8   **A.**   Correct, but I asked if they needed any changes made, and I

9   was not authorized at that point to make any changes.

10  **Q.**   Okay.  Now, Ms. DePaepe, normally the chief authorizes

11  which officers will use recorded lines, right?

12  **A.**   Yes, normally.

13  **Q.**   Right.  And in the case of Brian Young, there was no chief

14  that authorized the recording of Brian Young in March of 2010,

15  was there?

16  **A.**   No.

17  **Q.**   So that didn't happen normally; the normal operation would

18  be that the chief would authorize it, right?

19  **A.**   Well, typically what would happen would be an office would

20  be recorded, not the particular person, but the -- what do I

21  want to say -- the office, such as, like, the Records director,

22  and those personnel changed periodically.

23  **Q.**   Now, you're not testifying that the regular procedure

24  itself in the South Bend Police Department was to record

25  whoever occupied C156, are you?

1  **A.**  I'm stating that once it was placed on the system, there

2  was no policy or procedure as to say, if that person left that

3  office, that the next person taking that office -- that it be

4  removed or that I be notified, you know, that they have even

5  been contacted about it.

6  **Q.**  Right.  There was nothing that told you what to do about

7  that?

8  **A.**  Correct.

9  **Q.**  Okay.  I guess what I'm asking:  The chief doesn't just

10  spin a wheel to figure out who is going to be recorded?

11  Normally, he tells you where he wants the recorded line because

12  he knows who he wants to record or the function he wants to

13  record?

14  **A.**  Yes.

15  **Q.**  All right.  Would you agree that really from late January,

16  early February, 2010, when Steve Richmond took over, until

17  February of 2011, February 4th, when you discovered the mistake

18  --

19  **A.**  Yes.

20  **Q.**  -- no one knew that Brian Young was being recorded?

21  **A.**  Correct.

22  **Q.**  And that's not normal, to have a line recorded and no one

23  even know who it's recording?

24  **A.**  If someone requested something off of it, it would be

25  pulled.

BROADDUS - DIRECT EXAMINATION

1   **Q.**  Well, how could somebody request something off of it if

2   they didn't know it was being recorded?  I guess that was kind

3   of my question.  If Brian Young had come and asked -- I'm

4   sorry -- Steve Richmond had come and asked to pull tape for a

5   call that he received --

6   **A.**  Uh-huh.

7   **Q.**  -- it wouldn't be there, would it?

8   **A.**  That's correct.

9   **Q.**  And if Brian Young didn't know he was recorded, then he

10   couldn't ask to pull a tape on something that might have been

11   valuable that he heard on a call because he didn't know he was

12   recorded?

13   **A.**  That's correct.

14   **Q.**  So it could serve no useful purpose in the police

15   department when nobody knew what was going on; isn't that

16   right?

17   **A.**  Yes, but the chief did know.

18   **Q.**  The chief knew when you told him?

19   **A.**  Right.

20   **Q.**  In March of 2011?

21   **A.**  Correct.

22   **Q.**  And that wasn't my question.  I wasn't referring to that

23   period.  I was referring to that period of time before you

24   discovered the mistake, when no one knew.

25           It could serve no useful purpose for the police

1  department if no one knew; would you agree with that?

2  **A.**  I can't say I agree with that.  I would say that the

3  recordings were held because sometimes they would ask me to go

4  back and check things from earlier.  So if you were to say,

5  "Could it serve no useful purpose," I say it probably would be

6  unusual, but I can't say that it would serve no useful purpose.

7  **Q.**  Fair enough.  It was unusual.

8  **A.**  Uh-huh.

9  **Q.**  Okay.  In your experience as director of communications,

10  when you investigate the contents of a line -- and I'm talking

11  about the administrative lines -- not for a data check, but for

12  purposes of investigation --

13  **A.**  Uh-huh.

14  **Q.**  -- you have always done that at the specific request or

15  authorization in writing from a law enforcement person; isn't

16  that correct?

17  **A.**  No.

18  **Q.**  Well, at least verbally then?

19  **A.**  Verbally I would get requests from many people.

20  **Q.**  Okay.  You had never, prior to February 4th, done it on

21  your own initiative?

22  **A.**  I would be requested to check things, and a lot of times

23  they would say, in a very blank, generic fashion, "Check and

24  see what you can find."  It was never, "Check this line," or,

25  "Check that line," but, "Please go and search and see what you

1    can find."

2    Q.   And that would be on someone else's initiative, right, they

3    would come to you and do this?

4    A.   Yes.

5    Q.   And I'm saying that, on February 4th, when you say in your

6    report, "As Keeper of the Records, I made a decision," --

7    A.   Yes.

8    Q.   -- on that day, you did that on your own initiative?

9    A.   Yes.

10   Q.   And that was the first time you had ever done that?

11   A.   No, I can't say it's the first time I've ever done it.

12   There have been times where, if I was asked to check for

13   something and in the process of checking for something I heard

14   something that the content seemed like it was either illegal or

15   improper activity, prior to making that allegation against that

16   person or that officer, I would check a little further.

17   Q.   I'm talking about on these privately assigned numbers.

18   That's what I'm talking about.

19   A.   Yes.

20   Q.   And, so, yes, that was the first time you had done that on

21   those numbers?

22   A.   Yes, to my knowledge.

23   Q.   Okay.  So that wasn't normal or usual for you, on those

24   assigned lines without anybody asking you to?

25   A.   Yes.

1              MR. SULLIVAN:  Okay.  Give me a moment, Your Honor.

2              THE COURT:  Yes.

3              (Brief pause.)

4    BY MR. SULLIVAN:

5    **Q.**   So, Ms. DePaepe, I just wanted to clarify one aspect.  We

6    were talking about Rick Bishop and where he was when he asked

7    to have his line recorded.

8    **A.**   Yes.

9    **Q.**   And I'm not sure I understood your testimony about how you

10   concluded that he was in the Detective Bureau, because you said

11   your lists never put -- it just had the numbers; it didn't list

12   the functions next to them, right?

13   **A.**   Right.

14   **Q.**   And you've testified that a tech came and asked you, "Where

15   should I put this?"

16   **A.**   They would state, "Where is this line located," and I would

17   tell them where.  And they would say, "Are there any other

18   lines related to that?"

19              And I would say, "Yes, these."

20   **Q.**   So did you tell them that that line was in the Detective

21   Bureau?

22   **A.**   Yes.

23   **Q.**   And you told them that was the Detective Bureau based upon

24   your knowledge of where Rick Bishop's office was?

25   **A.**   It was based on my knowledge of when Chief Fautz made the

 1   request.

 2   **Q.**  For Rick Bishop?

 3   **A.**  Right.

 4   **Q.**  Do you recall the year that was?

 5   **A.**  No, I don't.  I know it was right when we were doing the

 6   general remodel of the entire building.

 7   **Q.**  Do you remember that Chief Fautz asked for you to have Gene

 8   Kyle -- Division Chief Gene Kyle's line recorded?  Do you

 9   recall that?

10   **A.**  I recall that he asked for several things.  One of them was

11   lines in the chief's office, which included recording the

12   division chief of Uniform.  He wanted lines recorded in the

13   Detective Bureau, one of which was listed as Gene Kyle's

14   contact number.  He also made requests for other lines of the

15   chief's office that he stated were assigned to him, as well.

16          At that time, I asked, "Do you want to keep" -- we

17   were going over the list -- "Do you want to keep the Records

18   captain on line," and I stated that that line had been placed

19   on the recording system during an Indiana State Police

20   investigation when Captain Hemmerlein had the office.  I

21   stated, "Captain Marciniak is now in there.  Do you need that

22   still recorded?"

23          He stated, "Yes."

24   **Q.**  Is that the time that he also told you to record the line

25   being used by Rick Bishop?

1   **A.**   I don't believe it was on that same day.

2   **Q.**   Was it generally at that same time?

3   **A.**   It was in that time when those decisions were being made.

4   They also decided if they wanted to delete anything from the

5   system.

6   **Q.**   Did you delete anything from the system at that time?

7   **A.**   Yes.  At one point they were recording lines in the

8   commanding -- Uniform commanding officer's area, and he made

9   the decision that they would no longer record those.

10  **Q.**   Okay.  If Chief Fautz testified that his recollection was

11  that that was in 2004, is that consistent with your memory?

12  **A.**   I believe it was right when -- right around when we were

13  remodeling and got a replacement Dynamic Instruments equipment

14  in place.

15  **Q.**   So if you could look at a purchase order that's dated for

16  September 2004, does that refresh your recollection?

17  **A.**   Correct.

18  **Q.**   So we agree that those conversations took place in 2004?

19  **A.**   In that time.

20  **Q.**   And you think the conversation about Rick Bishop also

21  occurred during that time, not on that day but around that

22  time?

23  **A.**   Not on that day, but around that time when the remodel

24  stuff was taking place.

25  **Q.**   All right.  Thank you.

```
 1                MR. SULLIVAN:  One second.

 2                (Brief pause.)

 3                THE COURT:  Are you finished?

 4                MR. SULLIVAN:  If I may just have a moment,

 5     Your Honor?

 6                THE COURT:  Okay.

 7                MR. SULLIVAN:  I pass the witness, Your Honor.

 8                THE COURT:  Okay.  Let's take about a 15-minute

 9     break and we'll go on.

10                The Court will be in recess for 15 minutes.

11                (Brief recess taken.)

12                THE COURT:  You can all be seated.

13                Go ahead.  I'm sorry.

14                MR. WALTON:  That's all right.

15                          CROSS-EXAMINATION

16     BY MR. WALTON:

17     Q.  Karen, you were asked about the administrative lines in, I

18     believe it was, Exhibit 9, and you were asked if the lines were

19     treated differently by you in your job duties as director of

20     communications, right?

21     A.  Yes.

22     Q.  Now, the administrative lines were not treated differently

23     as to the method by which the lines were recorded by the

24     system; is that right?

25     A.  That's correct.
```

1    **Q.**  In fact, all the lines listed on Exhibit 9 were being

2    recorded by the system in an identical fashion; is that

3    correct?

4    **A.**  Yes.

5    **Q.**  Technically, from your training and experience, there was

6    no difference in the way in which the recording system treated

7    any one of those lines listed?

8    **A.**  That's correct.

9    **Q.**  Incidentally, you didn't listen to conversations live at

10   any time, did you?

11   **A.**  No, I did not.

12   **Q.**  In performance of your duties, you only listened to

13   recorded conversations?

14   **A.**  Yes, that's correct.

15   **Q.**  At no time were you ever directed to listen to any live

16   conversations by any chief of, how many, five?

17   **A.**  Yes.  I believe there were four and an interim chief, but,

18   yes, I was never asked to do that.

19   **Q.**  And it didn't happen during the timeframe of 2004 to 2012?

20   **A.**  That's correct.

21   **Q.**  You said that February 4, 2012, you were performing -- you

22   were checking the malfunctions in the system, and you said you

23   went to the CAD system and found out that it had been changed

24   without your knowledge.  Can you explain to us more of what

25   you -- I think you wanted to say more at that point, but you

1    weren't permitted to.  Can you explain that more for the Court?

2    **A.**  Yes.  When I first was checking the system and I got to the

3    line at 245-6031 and I checked the hard drive and heard this

4    conversation and then I checked the backup DVD and heard

5    something similar, but I thought that this was odd because I

6    believed that this had been in the division chief's office; so

7    I continued to check backward to see if maybe it was a fluke or

8    something, and heard other conversations as I checked both, and

9    thought, well, this is very strange, and so it seemed like,

10   somehow, these lines were switched.

11        So I went back into my office, because the system's

12   in the communications center, and my office is not, and I

13   pulled up Brian Young -- I pulled up Division Chief Richmond's

14   CAD personnel, which is a computer-aided dispatch personnel

15   record, and it showed that he had 235-7473.  So I thought,

16   okay.  So I checked Captain Brian Young's CAD record, and it

17   showed that he had 245-6031.  And I was never advised of any

18   changes, so I went back to the system to try to see, did this

19   happen recently, you know, at the beginning of the year, and

20   so --

21   **Q.**  Before you go further, that was one of the reasons -- you

22   said you were checking back into the system a second time --

23   **A.**  Right.

24   **Q.**  -- for a dual reason, right?

25   **A.**  Right.

1  **Q.**  You had found out that this change had occurred?

2  **A.**  Right.

3  **Q.**  And then, as director of communications, you were trying to

4  find out not only if it happened and who authorized it, but

5  when it happened?

6  **A.**  Correct.

7  **Q.**  So you went back to the system to check for a dual purpose

8  and what did you find then?

9  **A.**  I found that it appeared that it had been on there for some

10  time.

11  **Q.**  At the time you were checking to determine when it happened

12  and how it happened, were you performing those functions in the

13  ordinary course of your duties as director of communications?

14  **A.**  Yes.

15  **Q.**  Because you wanted to be able to go to whom to report what

16  you found out?

17  **A.**  I was going to go to the chief and state that, somehow,

18  these lines were switched and I don't know how or by whom.

19  **Q.**  So you wanted to find out as much as you could before you

20  filled the chief in on what you were finding out?

21  **A.**  That's correct.

22  **Q.**  Did the chief rely upon you -- in fact, Chief Fautz and all

23  other chiefs rely upon you for this type of technical

24  information?

25  **A.**  Yes.  I was the custodian of that equipment, and part of my

1    job was to troubleshoot and maintain it.

2    **Q.**   You indicated in your conversation with regard to the

3    listed lines in Exhibit 9 that the numbers there were not

4    associated with names, but numbers.

5            Can you explain further what you mean by that?

6    **A.**   Well, if you would see my list of things, some would just

7    have the telephone line on my list.  I would put for the record

8    of the chief or, such as in the case of Division Chief Gary

9    Horvath, that this was in the Internal Affairs Office, or this

10   was in the chief's office, but that was not listed on the

11   recording system itself.  So I just made that notation so they

12   had an idea of where this line was physically located, but

13   there were no names because nothing was assigned permanent to

14   anyone.  Duties changed and so who might be the captain of

15   Records today would not be the captain of Records tomorrow, as

16   they changed positions.

17   **Q.**   So as each chief came to you and said which line should be

18   recorded, you kept track of the exact lines that the chiefs

19   requested you to record?

20   **A.**   Yes.

21   **Q.**   And is your testimony, but for the information in the

22   parentheses that was put there, when, in October of 2011 -- was

23   it Captain Horvath at that time?

24   **A.**   No.  I was actually provided that information in August of

25   2011.

1   **Q.**   Was he Captain Horvath at that time?

2   **A.**   He was division chief.

3   **Q.**   Division Chief Horvath asked for this information.  That's

4   when you added the information in parentheses, right?

5   **A.**   That's right.

6   **Q.**   Is it your testimony that the list as it existed without

7   the parentheses, before you added it, is identical to the way

8   the list would have appeared in 2004 when Chief Fautz ordered

9   those lines to be recorded?

10  **A.**   Yes.

11  **Q.**   So the lines that are there, the lines that are listed on

12  Exhibit 9, were the same lines that Chief Fautz directed you to

13  record at or near the time of the remodel?

14  **A.**   That's correct.

15  **Q.**   Okay.  You've indicated that, in your testimony, there's no

16  doubt in your mind that Rick Bishop was captain of the

17  Detective Bureau at the time 6031 started to be recorded?

18  **A.**   Yes.

19  **Q.**   And you gave your reasons for that?

20  **A.**   Yes.

21  **Q.**   I want you to turn to Exhibit 21, which is purported to

22  be -- I don't know if you ever looked through it yet, but it's

23  purported to be what was left in your file after you left or

24  were fired from your position at the police department.

25  **A.**   (Witness complies.)

1    **Q.**  I want you to take the time to go through each of those

2    pages, because I'm not sure that you've seen it.  And we're

3    going to end up talking about the very last page, which is the

4    invoice that was referenced, but I want you to at least review

5    what's in that file.

6    **A.**  (Witness complies.)

7    **Q.**  All right.  That invoice was referenced by Mr. Sullivan

8    when he asked you when Rick Bishop's line was going to be --

9    when you believed Rick Bishop's line was being recorded.

10              Does that invoice help you put a timeframe, at

11   least, on when the lines would have been set and recorded after

12   the Dynamic Recording System was upgraded?

13   **A.**  Yes, in that time vicinity.

14   **Q.**  And what's the date of that invoice?

15   **A.**  September 27th, 2004.

16   **Q.**  And then I want you to go to Exhibit 43, if you would,

17   which is the resumé entered into evidence of Rick Bishop.

18   **A.**  (Witness complies.)

19   **Q.**  And from the resumé there, it indicates that he was captain

20   of the Detective Bureau from October 3, 2002, to January 1,

21   2005.  Do you see that?

22   **A.**  Yes.

23   **Q.**  Does that fit with your memory as to where he was when 6031

24   started to be recorded?

25   **A.**  Yes.

1   **Q.**  He would have been Detective Bureau captain at the time?

2   **A.**  Correct.

3   **Q.**  I want you then to look at Exhibit Number 44.  It's the

4   card of Captain Rick Bishop when he was in the Office of

5   Professional Standards or, I think you called it, Internal

6   Affairs, when he had the number 6031, and his resumé indicates

7   that he was in Internal Affairs from January 1, 2005, to

8   January 10, 2010.

9            Does that also match your memory?

10  **A.**  Yes.

11  **Q.**  And based upon what you know about the recording system,

12  6031 was still being recorded during that entire time?

13  **A.**  Yes.

14  **Q.**  Is it your understanding that it was also at the request of

15  Rick Bishop that his line was being recorded?

16  **A.**  It was my understanding that Chief Fautz had come to me and

17  asked me to have the line put on recording.

18  **Q.**  Okay.

19  **A.**  I don't know what Captain Bishop's --

20  **Q.**  So had Rick Bishop ever come to you at any time and ask

21  that his line be recorded?

22  **A.**  I do not recall that.  If he had, I would have quickly

23  said, "I can't make those determinations.  You need to contact

24  Chief Fautz."

25  **Q.**  Okay.  Then, next, I want you to look at Exhibit 45.

1  **A.**  (Witness complies.)

2  **Q.**  When Rick Bishop came back as division chief, his line is

3  still 6031; is that correct?

4  **A.**  Yes.

5  **Q.**  And then based upon his resumé, he was division chief in

6  the Detective Bureau from January 5, 2007, to 2/28/2010, with

7  6031 as his number; is that right?

8  **A.**  Yes.

9  **Q.**  Is it also your testimony that 6031 had still continuously

10  been recorded at the original orders of Chief Fautz?

11  **A.**  Yes.  It had never been removed.

12  **Q.**  And Chief Boykins never changed which lines were being

13  recorded?

14  **A.**  That is correct.  He never made any changes to the lines.

15  **Q.**  Now, I want you to turn quickly to the next exhibit, 46,

16  just to clarify something for us, if you would.

17  **A.**  (Witness complies.)

18  **Q.**  There's some testimony that Division Chief Eugene Kyle

19  wanted his line being recorded.

20          And do you see the numbers associated with

21  Exhibit 46 under --

22  **A.**  Yes, I do.

23  **Q.**  You do?  Do you see that?

24  **A.**  The numbers, yes.

25  **Q.**  It shows a number by Division Chief Eugene Kyle of 5990.

1    5990 doesn't appear on the list of lines being recorded.

2          Can you explain that to all of us, if his line was

3    supposedly being recorded?

4    **A.**   Yes.  At the time that Chief Fautz had requested that they

5    were going to place lines on the recording system and the

6    reasons why they wanted it done, he gave me the list of what he

7    wanted, and that was 9263 and 9264.  Gene Kyle -- that was

8    listed in the telephone directory and the City directory as the

9    contact number for him.  He had a private number to his office,

10   and, at that time, I was unaware of it.  It was not disclosed

11   to me.  As did Chief Fautz, but those lines were not requested

12   to be placed on the system.

13   **Q.**   Okay.  The actual private line of Chief Eugene Kyle and

14   Chief Fautz were not ever recorded on the system for a reason,

15   right?

16   **A.**   That's correct.

17   **Q.**   And what were the reasons?

18   **A.**   I believe that Chief Fautz just didn't authorize that, and

19   they were to be used for, perhaps, personal or unrecorded

20   conversation.

21   **Q.**   Okay.  Then the numbers that you assigned to Eugene Kyle at

22   that time, the 9263, would be numbers that the public would see

23   if they looked it up in the telephone directory if they wanted

24   to make a call into the department to speak to him?

25   **A.**   Yes.  That was in the City's telephone directory.  I can't

1    say so much for the telephone directory of AT&T, but it was in

2    the City directory and on the telephone list.

3    Q.   Okay.  And so can you explain, as well, what that second

4    number -- if we go back to Exhibit 9, the second number was, I

5    think, 9264.  What would that number have been?

6    A.   That was listed as his secretary Donna Steven's line, is

7    how it was listed.

8    Q.   And that was recorded, as well?

9    A.   Yes.

10   Q.   In your memory, did Rick Bishop ever come to you when he

11   was in Internal Affairs and ask was his line being recorded?

12   A.   No.

13   Q.   Now, I want to go back to some of your testimony and pick

14   up there.  You said in your testimony that -- let me see where

15   I am.

16          You were asked about your report that was dated in

17   January 2012, and you were asked why it was -- since you

18   started looking at these things with the malfunction in

19   February of 2011, why it was that it took so long to make this

20   actual written report.

21   A.   Well, because Chief Boykins had contacted me sometime in

22   the very last week of December 2011 and requested that I go

23   back and find these recordings, and he wanted me to find other

24   recordings that pertained to the information that we had

25   discussed.  And so to refresh his memory, I made an Officer's

1    Report to indicate when this began, and I also asked if I could

2    give him the information in increments, because it was the very

3    end of the year, and I had year-end reports.

4    Q.   Okay.  But it was your testimony that once you started

5    looking for these problems and trying to figure out what was

6    going on in the system starting February 4th, 2011, you did go

7    to Chief Boykins and speak to him verbally about what you were

8    finding out?

9    A.   Yes.  I had called him to my office to discuss it.

10   Q.   And that was either at the end of February or beginning of

11   March, 2011?

12   A.   Right.  I don't have the exact date that that was.  I

13   waited a couple weeks because I was very disturbed.

14   Q.   And so you had reported it up the chain of command?

15   A.   Yes.

16   Q.   And you had asked him at that time if he wanted to make any

17   changes?

18   A.   Yes, I did.

19   Q.   And as chief of police --

20        MR. SULLIVAN:  Objection, Your Honor.  Leading, and

21   Ms. DePaepe is not adverse to Mr. Walton.

22        THE COURT:  Well, it's cross-examination, and he

23   hadn't finished the question.

24        MR. WALTON:  Right.

25        MR. SULLIVAN:  The last several of them have been

1    leading, Your Honor, and the fact -- we discussed earlier the

2    fact that we weren't going to be strictly cross on these as

3    he's calling her in his case, as well.

4              THE COURT:  Right.  I understand, but the reality of

5    this case -- even though it's not a waiver because you haven't

6    objected previously, on the other hand, everybody has been

7    pretty liberal on leading questions; and, at some point, it

8    gets you to where you want to get to a little quicker than

9    doing it otherwise.  So nobody has objected until Mr. Walton

10   did, and he probably wishes he hadn't now.

11             MR. SULLIVAN:  I'll withdraw my objection.

12             THE COURT:  Okay.

13             MR. WALTON:  All right.

14   **Q.**  After asking him if he wanted to do anything, did he make

15   any change?

16   **A.**  No, he did not ask for any changes.

17             When he left the office, I said, "Let me know if you

18   decide you want any made."

19   **Q.**  Now, you were also asked by Mr. Sullivan if no one knew

20   this line was being recorded in the period of time between

21   March 2010 and February of 2011.  He indicated, or at least the

22   questions to you implied, that there could not possibly be any

23   information there that would be useful for the police

24   department.

25             Do you remember that line of questioning?

1   **A.**   Yes, I remember that.

2   **Q.**   Now, there were times, were there not, depending on what

3   source it was, when you would be asked to go in and search all

4   lines, even in the administrative level, right?

5   **A.**   Yes.

6   **Q.**   In the ordinary course of your duties for police

7   enforcement purposes, right?

8   **A.**   Yes.

9   **Q.**   If during that period of time you were asked by someone,

10  whether it be a FOIA request from the media or a request from a

11  prosecutor, to go through and try to find information on all

12  the lines that were there about a certain case, it is possible

13  that that line 6031 would have contained information that would

14  have been useful?

15  **A.**   Yes, if I had received something.

16  **Q.**   Admittedly, because no one was aware it was being recorded,

17  it may not have been the first choice for you to look at, but,

18  nevertheless, the information on 6031 was still being recorded

19  by the system?

20  **A.**   Yes, that's correct.

21  **Q.**   And information going into the captain of the Investigative

22  Bureau was being recorded by the department?

23  **A.**   Yes.

24  **Q.**   All right.  To your knowledge, were the employees,

25  including division chiefs, told what lines were recorded when

DePAEPE - CROSS EXAMINATION

1    Chief Fautz made this decision?

2    **A.**   To my knowledge, Division Chief Hassig was not aware of

3    that.

4    **Q.**   How do you know that?

5    **A.**   Because I spoke with him in the hall.  I had ran into him

6    in the front lobby, and I advised him that the lines had now

7    been --

8            MR. SULLIVAN:  Objection, Your Honor.  Hearsay.

9            THE COURT:  Well, again, he hadn't finished the

10   question.  I mean, she started the answer.  A portion of it has

11   hearsay in it.

12           Are you offering it for the truth of the matter or

13   just --

14           MR. SULLIVAN:  I think he is, Your Honor.  I don't

15   know that the question called for hearsay, but the answer began

16   to relate --

17           THE COURT:  What she said was not what was said to

18   her.  She said, "Because I spoke with him in the hall.  I had

19   ran into him in the front lobby, and I advised him that the

20   lines had now been," and that's where she stopped.

21           MR. SULLIVAN:  She was about to say, "He said."

22           THE COURT:  Well, I can't tell that from that

23   question.

24           MR. WALTON:  Let's pick up right there.

25   **Q.**   From the reaction that you received from him, was it your

1  belief that he knew at that time that his line was being

2  recorded?

3  **A.**  It was my belief he did not know it was being done at that

4  time.

5  **Q.**  Did you have a conversation with Division Chief Eugene Kyle

6  to see if he was aware that his line was being recorded?

7  **A.**  Yes.  After I had spoke with Division Chief Hassig --

8  **Q.**  Wait a second.  This would be back in 2004?

9  **A.**  Correct.

10  **Q.**  Both of these conversations?

11  **A.**  Yes.

12  **Q.**  Okay.  Did you ever advise Eugene Kyle his line was being

13  recorded?

14  **A.**  Yes.  I didn't actually tell him.  I just stated, "You

15  know, Chief, we record a lot of lines around here," and I

16  looked at his phone.

17  And he says, "Oh, I'm aware."

18  **Q.**  So Eugene Kyle was aware his line was being recorded, from

19  your knowledge?

20  **A.**  That's what he told me.

21  **Q.**  And based upon this time period of 2004/2005, were there

22  other lines being recorded during the time Chief Fautz was the

23  chief of the police -- that people came to you and found out

24  that their lines were being recorded?

25  **A.**  People would come to me and ask me if this line is being

1    recorded.  I do know that the Records captain's line had been

2    placed on the system on recording back when Chief Hemmerlein

3    had been placed in the Records Division as a captain.  And

4    after he left, that office was taken over by Captain Wolvis,

5    followed by Captain Marciniak, and followed by Director Diana

6    Gish.

7              And in a conversation with her --

8    Q.  Well, you can't say what she said, but you can say what you

9    told her.

10   A.  Yes.  I told her that 9212 was being recorded, which was a

11   line in the Records Division, and she acted surprised.

12             And I stated, "Are you aware that the line in your

13   office is being recorded?"

14             And she stated --

15   Q.  Don't say what she said, all right.

16             So there are other people around there that,

17   apparently, for whatever reason, during Chief Fautz's tenure,

18   didn't know their line was being recorded when you, in fact,

19   knew they were?

20   A.  That's correct.

21   Q.  Okay.  Was there ever, in that time when you were director

22   of communications, from 2004 all the way up to the time that

23   you were fired, if anybody in the department had ever come to

24   you and asked you if their line was being recorded, that you

25   would not tell them?

1   **A.**   No.

2   **Q.**   In fact, was your policy the opposite?

3   **A.**   My policy was the opposite.  If they asked me, I would tell

4   them.  And if they still questioned it, I would actually walk

5   them into the communications center and show them what lines

6   were being recorded on the system.

7   **Q.**   You could physically show someone what lines were being

8   recorded by walking them into the communications center?

9   **A.**   Yes.  It was on the screen of the system itself.

10   **Q.**   And that happened more than one occasion?

11   **A.**   I know I talked to at least two officers -- one I can

12   recall the name -- but I know that captains would often come to

13   me and ask me if their line was recorded.

14   **Q.**   So at any time -- during any of the chiefs that you worked

15   for -- was there ever any direction from any chief to you that

16   you should not be transparent or open to any officer that asked

17   if their line was being recorded?

18   **A.**   No.

19   **Q.**   In fact, was the opposite your experience under -- well,

20   the two chiefs in particular here -- Fautz and Boykins?  Was

21   that your experience with both of them?

22   **A.**   Yes.

23   **Q.**   There was no secrecy in the department?

24   **A.**   That's correct.

25   **Q.**   And why wouldn't there be secrecy?

1   **A.**  Why wouldn't there be?

2   **Q.**  Yes.  Why would it be wide open and anybody should know if

3   they asked?

4          MR. PFEIFER:  I'm going to object.  Lack of

5   foundation on her part.

6          MR. WALTON:  If you know.

7          MR. PFEIFER:  She is the communications director,

8   not the chief of police who establishes policy.

9          MR. WALTON:  I'll withdraw the question, Your Honor.

10  **Q.**  Incidentally, at any time when Brian Young got in his

11  office in March of 2010 to the time you were fired, did he ever

12  come to you and ask you if his line was being recorded, other

13  than what you already testified to?

14  **A.**  No, he did not.

15  **Q.**  Now, I want to talk to you -- well, I want to talk to you

16  about a couple other exhibits first.

17          Let's go to Exhibits 15 and 16, please.

18  **A.**  (Witness complies.)

19  **Q.**  Exhibit 15 is a letter to Nancy Bruce from the Department

20  of Law regarding a specific FOIA request at that time by

21  Channel 57?

22  **A.**  Yes.

23  **Q.**  And the date of that was?

24  **A.**  July 21st.

25  **Q.**  2011?

DeROSE - CROSS EXAMINATION

1   **A.**   Yes.

2   **Q.**   And then Exhibit 16 is what?

3   **A.**   Yes.

4   **Q.**   What is Exhibit 16?

5   **A.**   16 is a FOIA request that was requesting attached

6   information, and it had been approved by Aladean DeRose from

7   the City Attorney's office.

8   **Q.**   All right.  And as a result of these two exhibits and these

9   FOIA requests of Channel 57, at that time, what were you being

10   asked to do, without going into the specifics?  I want to know,

11   more generally, were you required to go back into the recording

12   system for any purpose?

13   **A.**   Yes, I was.

14   **Q.**   And were you required to check lines at that time?

15   **A.**   Yes.

16   **Q.**   And as a result of going back into the recording system at

17   that time, did you uncover other conversations that bothered

18   you?

19   **A.**   Yes, I did.

20   **Q.**   And when they read dates of different conversations that

21   had been recorded in this case, are some of those conversations

22   and some of those dates related to this request when you went

23   back into the system?

24   **A.**   Yes, they are.

25   **Q.**   In other words, initially, you went into the system in

1   February to check malfunctions and found some conversations

2   that you said disturbed you, made recordings of those

3   conversations, right?

4   **A.**  I did not make any recordings of those conversations until

5   requested, and that was in the last week of December 2011.

6   **Q.**  Okay.  And then when you were asked later in the year, that

7   is, in July of 2011, to go in on this request from the media,

8   is that why there would have been other later dated

9   conversations that you had found in your investigation and

10  subsequently put on cassette for the chief?

11  **A.**  I was requested by the chief to find and retrieve any

12  information related to it, and there was no time parameter

13  given, just stated to find any information related to this.

14  **Q.**  All right.  Here's my question:  So you go in February of

15  2011 and you hear something that disturbs you?

16  **A.**  Yes.

17  **Q.**  You weren't constantly monitoring these lines from

18  February 2011 up until July 2011 to constantly monitor what was

19  going on on these lines, were you?

20  **A.**  No.

21  **Q.**  Were you ever listening to any live conversations from

22  February of 2011 to July of 2011 for any purpose?

23  **A.**  No.

24  **Q.**  So the only times you went in to this system for purposes

25  of getting recordings were either because of the malfunction --

1   correct?

2   **A.**   Yes.

3   **Q.**   -- the FOIA request --

4   **A.**   Yes.

5   **Q.**   -- or the specific direction of the chief in December of

6   2011?

7   **A.**   Yes.

8   **Q.**   We know what happened when Chief Richmond -- I'm sorry --

9   Division Chief Richmond requested his line to be switched in or

10  around February of 2010, and he made that request of Barb

11  Holleman?

12  **A.**   Yes.

13  **Q.**   Was that a normal, ordinary request that officers made

14  within the department?

15  **A.**   There was no policy.

16  **Q.**   Was it Barb Holleman's normal and ordinary duties in her

17  position to perform this act at the request of the officers?

18  **A.**   Yes.

19  **Q.**   To your knowledge, she wouldn't have done this on her own?

20  **A.**   That's correct.

21  **Q.**   She would have done it at the request of the division chief

22  of the Investigative Bureau at that time, Chief Richmond, to

23  switch these lines?

24  **A.**   That's correct.

25  **Q.**   And as a result of all of that, is that when you learned

1  for the first time in this timeframe that these lines could

2  be -- the recorded lines could actually be switched upstream

3  without your knowledge?

4  **A.**  Yes.  It had never occurred to me that could happen.

5  **Q.**  Could you explain to us why you were of that belief?

6  **A.**  Well, because the way I understood the technicians to wire

7  a line to the recording system, I knew that they had to run a

8  line from the telephone hub room to that actual line into the

9  communications center, and there was wiring that was affixed to

10  the wall directly next to the server, and I just was unaware

11  that you could pull that line out, plug it into something else,

12  and that it would -- you know, it didn't matter the location.

13  **Q.**  Okay.  Was it your belief, from what you knew about the

14  technology, that since they had to hardwire lines into the

15  office where that phone was, that whoever's in that office

16  would continue to be recorded?

17  **A.**  Yes.

18  **Q.**  Okay.  So this situation that occurred around February of

19  2011 was the first time you ever even knew that that was

20  possible?

21  **A.**  That's correct.

22  **Q.**  Okay.  Now, Chief Fautz, in his testimony, when he stated

23  what the reasoning was for recording the equipment, indicated

24  that the rationale for recording lines was to record

25  conversations from the public calling into 911, reporting a

1    crime that could potentially become evidence at some point, the

2    front desk, the same thing, and to document calls as an

3    investigative tool and documentation.

4            Do you agree that that was the reasoning that the

5    chief had given to you in 2004?

6    **A.**   Yes.

7    **Q.**   And had that rationale ever changed throughout Chief

8    Fautz's tenure as chief?

9    **A.**   No.

10   **Q.**   Was that the same rationale that you understood from Chief

11   Boykins when he took over?

12   **A.**   Yes.

13           MR. SULLIVAN:  Objection.  Lack of foundation,

14   Your Honor.  There's been no testimony that she discussed that

15   with Chief Boykins.

16           MR. WALTON:  That's why I just asked her.

17           MR. SULLIVAN:  You asked --

18           MR. WALTON:  I'll withdraw it.

19           MR. SULLIVAN:  I object to leading and lack of

20   foundation.

21           MR. WALTON:  I'll withdraw it.

22   **Q.**   When Chief Boykins came in, you gave him a list of lines?

23   **A.**   That's correct.

24   **Q.**   Did he understand what the rationale was about the

25   recording system?

1              MR. SULLIVAN:  Objection.  No personal knowledge of

2       what his understanding was.

3              THE COURT:  I'll sustain about whether or not he

4       understood that.

5       BY MR. WALTON:

6       Q.  Did he tell you any reasons about the rationale of the

7       recording system?

8       A.  When I handed him the list and we discussed it, he stated,

9       "Is this how it's normally done?"

10             And I stated, "I don't know if that's how it's

11      normally done.  That's how it's been done under Chief Fautz."

12      Q.  All right.  Was that discussion ever about the rationale?

13      A.  No.

14      Q.  But he said, "Whatever was being done by Chief Fautz,

15      continue it"?

16      A.  He didn't say anything at that point.  He just stated -- I

17      asked, "If you want any changes made, you need to let me know."

18             He said, "Okay."

19      Q.  So as far as you're aware, the recording system, as it was

20      set up in 2004, continued the same throughout Chief Boykins'

21      tenure?

22      A.  Yes.  He made no changes.

23      Q.  Chief Fautz also indicated that he recorded certain lines

24      where officers were in positions that frequently dealt with the

25      public that could be subjected to complaints from the public

 1   and recording those lines provided them with a tool they could

 2   use to further their protection and to aid in investigation.

 3               Were you ever aware of that rationale from Chief

 4   Fautz?

 5   **A.**   Yes.

 6   **Q.**   From the time you were there, did the positions of captain

 7   of a division and chief of the Investigative Bureau Division

 8   fit the description of the purpose of the recordings?

 9   **A.**   Yes.

10   **Q.**   In fact, I understand that -- what did the command staff

11   consist of, what ranks?

12   **A.**   Command staff would have been division chiefs and captains.

13   **Q.**   Along with the chief of police?

14   **A.**   Right.

15               MR. WALTON:  All right.  I believe that's all the

16   questions I have.  Thank you.

17               THE COURT:  Mr. Pfeifer.

18                         CROSS-EXAMINATION

19   BY MR. PFEIFER:

20   **Q.**   Ms. DePaepe, you were just asked some questions by

21   Mr. Walton -- as opposed to Mr. Walsh -- you were asked some

22   questions about if you understood various policies of Chief

23   Fautz and Chief Boykins.

24               Do you remember that line of questioning?

25   **A.**   I remember that.

DePAEPE - CROSS EXAMINATION

1  **Q.**  Okay.  One of Chief Fautz's policies was that he would not

2  record the private line of an individual police officer without

3  that officer's knowledge.

4           Were you aware that that was his policy?

5  **A.**  There was no written policy.

6  **Q.**  That wasn't my question.  Would you answer my question,

7  please?

8  **A.**  He never discussed that with me.

9  **Q.**  My question is:  Were you aware of the fact that that was

10  his policy?

11  **A.**  No.

12  **Q.**  Chief Boykins has said that that was also his policy; he

13  would not record the phone line -- the private line of an

14  officer without the officer's knowledge or consent.

15           Were you aware of the fact that that was Chief

16  Boykins' policy?

17  **A.**  No.  It was never discussed with me.

18  **Q.**  That wasn't my question.  Were you aware of the fact that

19  that was his policy?

20  **A.**  No.

21  **Q.**  Okay.  Chief Boykins told us yesterday in court that it

22  never was his intention to record Captain Young's phone line.

23           Were you aware of that fact?

24  **A.**  Yes.

25  **Q.**  Chief Boykins told you that fact?

1   **A.** He never told me that fact.

2   **Q.** Okay. When did you become aware of the fact that Chief

3   Boykins never intended for Captain Young's line to be recorded?

4   **A.** I believe that he never mentioned any captain, meaning

5   Young or anything like that. He made no changes to the system,

6   so he never asked.

7   **Q.** That wasn't my question. You told me that you were aware

8   of the fact from Chief Boykins that Captain Young's line was

9   not to have been recorded.

10          And my question to you was: When did you become

11  aware of that fact.

12  **A.** We never had that discussion.

13  **Q.** When did you become aware of the fact?

14          You've told me you were aware of the fact. I want

15  to know when you became aware of it.

16  **A.** When Chief Boykins took over, he never made any comment --

17  let's just put it this way. He never made any comment that he

18  was going to record anyone against -- without them knowing.

19  **Q.** Let me see if I can start over.

20          You've told me that you were aware of the fact that

21  Chief Boykins never intended to record Captain Young's line,

22  correct.

23  **A.** What I'm trying to say is we didn't discuss it, but it

24  was -- what would you say -- an understanding.

25  **Q.** Okay. So you had an understanding from Chief Boykins that

1  Captain Young's line was never intended to be recorded,

2  correct?

3  **A.**   Yes.

4  **Q.**   When did you formulate that understanding?

5  **A.**   He never stated those exact words.

6          What I stated to him was, "This line has been

7  recorded.  I don't believe that he knows about it.  Let me know

8  if you want this line removed from the recording system."

9  **Q.**   Help me understand, and, if you would, just tell us,

10  please, when you formulated the understanding that Chief

11  Boykins never intended to have Captain Young's line recorded.

12  **A.**   Because he never requested it.

13  **Q.**   It's not why; it's when.

14          THE COURT:  Wait just a minute.  He's looking for a

15  date.

16          THE WITNESS:  There is no date.  I don't know of any

17  date.

18  BY MR. PFEIFER:

19  **Q.**   Okay.  Then can you help me understand how it is that you

20  formulated that impression?

21  **A.**   Because he never made any changes to the system from when

22  Chief Fautz had it.

23  **Q.**   So it's -- if I understand what you're saying, because he

24  never made any changes to the system, that was your

25  understanding that Captain Young's line was not to have been

1  recorded?

2  **A.**  We never discussed any particular captain.  He never came

3  to me and said, "Oh, I plan to record people without their

4  knowledge," neither did Chief Fautz, so it was an understanding

5  that neither of them had the intention of doing that.

6          THE COURT:  Let me try this.  What you need to do is

7  listen to his question.

8          THE WITNESS:  I'm trying to understand.

9          THE COURT:  You're playing like a card ahead.

10         THE WITNESS:  Okay.

11         THE COURT:  Listen to his question that he's asking

12 and just answer that question.  If you don't know the answer,

13 the answer is "I don't know," but just answer his question.

14         MR. PFEIFER:  Thank you, Your Honor.

15 **Q.**  So if I understand what you're saying, it was clearly your

16 understanding that Captain Young's line was not to have been

17 recorded, correct?

18 **A.**  Correct.

19 **Q.**  Okay.  But we know it was recorded?

20 **A.**  Yes.

21 **Q.**  And you had that understanding even before Captain Young --

22 or when Captain Young took office, correct, as a captain in the

23 Investigative Division?

24 **A.**  I had the understanding that there had been no changes

25 requested.

DePAEPE - CROSS EXAMINATION

1   **Q.**   And you had the understanding that when Captain Young took

2   the position of captain in the Investigative Division, his line

3   was not intended to be recorded, correct?

4   **A.**   It was my understanding at that time that it had not been

5   requested to record any captain in the Detective Bureau.

6   **Q.**   So your understanding was, because there had never been a

7   request to record any captain in the Detective Bureau, that

8   when Captain Young took the position of captain in the

9   Investigative Bureau, it was not Chief Boykins' position or

10  desire to record his phone line, correct?

11  **A.**   Yes.

12  **Q.**   And you would have become aware of that fact and you had

13  that understanding when Captain Young took the position of

14  captain of the Investigative Division, correct?

15  **A.**   Yes.

16  **Q.**   Okay.  Did you have an understanding that when Chief

17  Richmond, Division Chief Richmond, took that position, that his

18  line was intended to be recorded?

19  **A.**   I had an understanding that the division chief's line,

20  245-6031, was on recording.

21  **Q.**   Did you have an understanding that when Division Chief

22  Richmond took that position his phone line was to be recorded?

23  **A.**   Yes.  I believe that no changes were implemented when he

24  took that position.

25  **Q.**   Okay.  So in February --

1          THE COURT:  Let me ask -- I'm confused now.

2          I thought, when Richmond was a captain, his number

3    2473 was not recorded.

4          MR. PFEIFER:  I'm getting there.

5          He was a division chief.  He became division chief

6    in February of 2010, and Captain Young became captain of the

7    Investigative Division in March of 2010.

8          THE COURT:  But Richmond asked that his number be

9    transferred to him.

10          MR. PFEIFER:  I understand that.  I'm just trying to

11   understand what her understanding was as the communications

12   director.  I'm leading up to --

13          THE COURT:  I understand, but in doing that, you're

14   totally confusing me.  That's okay.  Go ahead.

15          MR. PFEIFER:  I apologize.  I'm not trying to

16   confuse you.

17   **Q.**  So if I understand your testimony, when Richmond became the

18   division chief, his line was to be recorded; and when Young

19   became the captain, his line was not intended to be recorded;

20   is that correct?

21   **A.**  When Steve Richmond took the office of the division chief,

22   245-6031 was recorded.  At no time did anyone ask me to remove

23   that, so I would believe that that line would still be intended

24   to be recorded.

25   **Q.**  You thought 6031 was Richmond's line, correct?

DePAEPE - CROSS EXAMINATION

1    **A.**   Yes.

2    **Q.**   And you thought that that was the line for the division

3    chief?

4    **A.**   That's correct.

5    **Q.**   And that's why you thought it was to continue to be

6    recorded, correct?

7    **A.**   Because I had not received any request to take it off the

8    system.

9    **Q.**   You never thought Brian Young's -- Captain Young's line,

10   when he became captain of the Investigative Division, was to be

11   recorded, whatever number it is he had, correct?

12   **A.**   Yes.

13   **Q.**   Okay.  So you have that understanding in 2010 throughout

14   the entire year, and then there are these issues that come

15   about which cause you, I think you said, "confusion," correct,

16   the confusion being you were troubleshooting --

17   **A.**   Right.

18   **Q.**   -- and you were troubleshooting what you thought was Chief

19   Richmond's line and you heard Captain Young, correct?

20   **A.**   Correct.

21   **Q.**   You did your investigation and you learned, I think -- even

22   by checking the CAD system, you learned fairly quickly that

23   6031 really wasn't going to Richmond as everyone intended and

24   thought; in fact, it was going to Brian Young, correct?

25   **A.**   Correct.

1  Q.  And you learned fairly quickly that 7473 was, in fact, the

2  line that Richmond now had, and that line was not being

3  recorded, correct?

4  A.  Correct.

5  Q.  And that information was all learned February 4th of 2011,

6  correct?

7  A.  Yes.

8  Q.  And now you have this information, what the chief wants and

9  what the chief intended -- that is, the recording of Richmond's

10  line and not recording Young's line -- you have that

11  information, and you don't even go to the chief and tell him

12  for at least a month, do you?

13  A.  No, it was about two to three weeks.

14  Q.  Okay.  You have that information, and you don't even go and

15  tell the chief for two to three weeks, do you?

16  A.  That's correct.

17  Q.  Knowing that Brian Young's line was never intended to be

18  recorded, you didn't go to Brian Young either, did you?

19  A.  No.

20  Q.  You had gone to other people and asked them, "Hey, by the

21  way, do you know if your line is recorded," hadn't you?

22  A.  Yes.

23  Q.  But now you're confronted with a situation where,

24  obviously, a mistake someplace, somewhere had occurred, what

25  was supposed to be happening wasn't happening, and what wasn't

1  supposed to be happening was happening, and, yet, you didn't go
2  and talk to Brian Young about that, did you?
3  **A.**  No, I did not.
4  **Q.**  When you did go to Chief Boykins -- now, you have told us,
5  as the director of communications, you do what the chief of
6  police tells you to do, correct?
7  **A.**  That's correct.
8  **Q.**  When you went to the chief, Chief Boykins, you knew that
9  Brian Young's line wasn't supposed to recorded, correct?
10  **A.**  I knew that his line was being recorded.  I had no clue who
11  put the switch on and if the chief had even authorized it.
12  **Q.**  You knew that his line wasn't supposed to be recorded,
13  correct?
14  **A.**  At that time, it was, to my knowledge, that it was a
15  mistake.
16  **Q.**  And you knew, I think you've told us, or you had an
17  understanding that the chief did not want to record Brian
18  Young's phone line, correct?
19  **A.**  Yes.
20  **Q.**  In fact, were you aware of Chief Boykins' policy that a
21  phone line -- a private line of a police officer should not be
22  recorded without that person's knowledge?  Were you aware of
23  the fact that that was Chief Boykins' policy?
24  **A.**  As I stated, in fact, that was never a policy.  It was what
25  I believed was his intention.

1  Q.  Okay.  So when you go to Chief Boykins, you understand his
2  intention not to record somebody's line without their
3  permission?
4  A.  Right.
5  Q.  You understand that it never was intended to record Brian
6  Young's line, but it was being recorded, correct?
7  A.  Yes.
8  Q.  And you understand that Chief Richmond's line was supposed
9  to be recorded, but it wasn't being recorded, correct?
10  A.  Yes.
11  Q.  And I assume when you went to the chief in March, you told
12  him all of that information?
13  A.  Yes, and I told him why it took me awhile to tell him that.
14  Q.  All right.  But you told the chief that his policies were
15  not being followed, what you understood his policy -- maybe not
16  in these words -- but you told the chief information to let the
17  chief know that his policies were not being followed,
18  somebody's lines were being recorded and that somebody didn't
19  know it?  You told the chief all that in March, didn't you?
20  A.  No.  I believe you're trying to put words in my mouth.  I
21  can tell you exactly what I told the chief.
22  Q.  You gave the chief information that would allow him to
23  reach that conclusion, did you not?
24  A.  That is true.
25  Q.  Okay.  You may not have said everything exactly like I am

1   saying it, but the point is, you gave the chief the information

2   that we've talked about?

3   **A.**   Correct.

4   **Q.**   And at that point in time, Chief Boykins said to you, "I'll

5   get back to you," or words to that effect?

6   **A.**   No.  I stated, "Please let me know if you want any changes.

7   Let me know."

8   **Q.**   Okay.  And he never let you know, correct?

9   **A.**   That's correct.

10  **Q.**   And because he never let you know, you never made any

11  changes?

12  **A.**   That's correct.

13  **Q.**   And you continued to allow Brian Young's line to be

14  recorded, even though it was contrary to what the chief's

15  policies were, but you did it because that's what the chief

16  told you to do?

17  **A.**   He didn't tell me to do that.

18          I stated, "If you would like a change to the system,

19  if you would like the line pulled or moved, let me know."

20          He stated, "Okay."

21  **Q.**   Okay.  What you did was, you basically said, "Chief, you

22  tell me if you want me to do something different that wouldn't

23  be violating" -- my words, not yours -- "that wouldn't be

24  violating your policies," and the chief never got back to you,

25  right?

1   **A.**   Yes.  He never told me to make any changes.

2   **Q.**   Okay.  So because he never told you to make any changes,

3   the continued violation of his policies went all the way

4   through until January of 2012, ten whole months; isn't that

5   correct?

6   **A.**   No.  Actually, the line was still on the system being

7   recorded when I was terminated as of April 10th, 2012.

8   **Q.**   Well, for ten months, policies that Chief Boykins had set

9   were not being followed because Captain Young did not know his

10  line was being recorded until he came and talked to you on

11  January 17th of 2012; isn't that true?

12  **A.**   I guess we would have to debate the word "policy."  There

13  was no policy.  It was my belief that that was his intention,

14  that Chief Boykins would not record someone without their

15  knowledge or consent, and no change was asked of me to place --

16  to take the line off of recording or to place it elsewhere.

17  **Q.**   But we know that Brian Young's line was recorded in

18  violation of Chief Boykins' -- or your belief of Chief Boykins'

19  own policy, don't we?

20  **A.**   I wouldn't call it a "violation."  It would be, like, if

21  you made a change to your policy or if you decided to do it a

22  different way, but I would not call it a violation.

23  **Q.**   Did you ever tell anyone, other than Chief Boykins, that

24  Brian Young's line was being recorded?

25  **A.**   No, I never mentioned to anyone that his line was being

1    recorded.  I do believe that it was mentioned that the lines

2    had been switched.

3    Q.   And in the process of being switched, the line that was now

4    going into Brian Young's office was being recorded, correct?

5    A.   Correct.

6    Q.   Did you ever tell anybody that a mistake had occurred,

7    lines had been switched, and Brian Young's line was being

8    recorded and he didn't know it?

9    A.   No, I never said that, except for the federal authorities

10   when they requested it.

11   Q.   I assume you're aware of the fact that in October of 2011,

12   when the meeting took place, you were actually on medical

13   leave, correct?

14   A.   Correct.

15   Q.   Did you learn after you returned from your medical leave

16   that, as a result of that meeting, Brian Young had asked to

17   have the recording on his phone line discontinued?

18   A.   I had spoke to Diana Scott.  She actually called me the day

19   of the meeting, and she stated that Division Chief Horvath did

20   not have a list of the recorded lines to present in the

21   meeting.  I stated that that was incorrect, because I had

22   e-mailed it to him and we discussed it.  I told her to go into

23   my office and that the actual list was on the desktop of my

24   computer and it was entitled recorded audio lines.  I stated,

25   "Make copies, print them out, and hand them out to everyone in

1  the meeting."

2         When she got done doing that, she called me later

3  and stated that she was contacted by Chief -- excuse me --

4  Captain Trent after the meeting and that she was very upset.

5  She said that during the meeting it was discussed that Captain

6  Trent's line was being recorded.

7  **Q.**  Captain Young, you mean?

8  **A.**  Yes.  It was discussed that --

9  **Q.**  You said "Captain Trent."  You meant "Captain Young,"

10  right?

11  **A.**  Yes, Captain Young's line was being recorded.

12         She stated that Captain Trent asked in the meeting,

13  "Is he aware of this?"

14         To which she said, "I do not know."

15         And she told me that he immediately got up, left,

16  went into Captain Young's office, which could be observed.

17         And she stated that, after the meeting, she was

18  pulled aside by Captain Trent, who advised her, "We need that

19  line removed from the system and erased immediately."

20         She stated, "I don't know if that can be done.  I

21  will check and get back with you."

22         She stated that she felt very uncomfortable with how

23  that was being requested of her, and she stated that she then

24  contacted Captain Trent and stated, "I don't think it can be

25  done.  It has to be done by a vendor that has to come in, and I

 1  don't know if those lines can be erased because the system was
 2  set up that way to protect the audio recordings."  She said, "I
 3  can't do that.  Those requests have to be made through Chief
 4  Boykins."
 5  **Q.**  Did you direct or tell Diana Scott, who was acting in your
 6  capacity as the director of communications, that based upon the
 7  fact that Chief Young just found out that his line was being
 8  recorded, didn't know his line was being recorded, she should
 9  go talk to the chief of police, Chief Boykins?
10  **A.**  I told her to write down exactly what was said to her,
11  everything that took place.  She seemed a little upset at the
12  time.  I said that, "I'm sure that they will be getting ahold
13  of you and are going to ask what transpired and when this took
14  place," and that Captain Boykins -- excuse me -- Chief Boykins
15  would probably request this information from her.
16  **Q.**  Can you answer my question now?
17  **A.**  No, I did not tell her to go, because --
18  **Q.**  Okay.  That's all I was asking.  So your answer is, "No,"
19  you didn't tell her to go?
20  **A.**  Right.  She was under the understanding that Captain Trent
21  was taking care of that.
22  **Q.**  And you learned when you returned from maternity -- excuse
23  me -- sorry, my fault -- from medical leave that, in fact, it
24  had not been taken care of, but Captain Young's line was, in
25  fact, still being recorded?

1   **A.**   That's correct.

2   **Q.**   When you learned that it hadn't been taken care of, and

3   you're the director of communications and, now, you learn and

4   realize that what Captain Young has requested hasn't gone up

5   the proper channels to the chief of police, as the director of

6   communications, did you then do that?

7   **A.**   No.  I had discussed it earlier with Chief Boykins twice.

8   I discussed it once with Division Chief Horvath and then again

9   it was discussed in the meeting.  It was well aware that that

10  had taken place, and I had yet not been contacted by either

11  Chief Boykins or Division Chief Horvath to make that change.

12  That is not my call to make.

13  **Q.**   Okay.  So if I understand what you're saying, it's well

14  aware by the people that have the knowledge -- you, Chief

15  Horvath, Diana Scott, Chief Boykins -- everyone is aware of the

16  fact it's being discussed, but nothing is being done to honor

17  the request of Captain Young to stop recording his line; isn't

18  that correct?

19  **A.**   That's correct.

20  **Q.**   The second meeting that you had with Chief Boykins, was

21  that in August before your FMLA leave?

22  **A.**   Yes, it was.

23  **Q.**   At that second meeting, I assume you, again, provided

24  information to the chief so that he would continue to know that

25  Brian Young's line was being recorded and it wasn't supposed to

1    be; Steve Richmond's line wasn't being recorded and it was

2    supposed to be; and Brian Young had no knowledge that his line

3    was being recorded.  All of these things that were what you

4    believed to be not consistent with Chief Boykins' policies, did

5    you provide information to him in that August meeting?

6    **A.**   Yes.

7    **Q.**   Did Chief Boykins, in the August meeting then, again, say

8    to you, "I'll get back to you," or words to that effect?

9    **A.**   Yes.

10   **Q.**   Okay.  Then you went on your FMLA leave, and it's my

11   understanding he did not get back to you until December of

12   2011, correct?

13   **A.**   Yes, the last week of December.

14   **Q.**   All right.  Again, you're doing everything that you're

15   doing as the director of communications, if I understand your

16   testimony, consistent with what the chief of police tells you?

17   **A.**   Yes.

18   **Q.**   If the chief of police tells you to do something, you do

19   it; if the chief of police tells you not to do something, you

20   don't do it.  Fair enough?

21   **A.**   Correct.

22   **Q.**   You are not a law enforcement officer; is that correct?

23   **A.**   That is correct.

24   **Q.**   You have no power or authority to investigate any type of

25   conduct, legal or otherwise, correct?

DePAEPE - CROSS-EXAMINATION

1   **A.**  Correct; however, I have assisted in investigations.

2   **Q.**  You, as the director of communication, had no authority

3   whatsoever to conduct an investigation of conduct, legal or

4   otherwise, on your own; isn't that correct?

5   **A.**  I wouldn't say I could conduct an investigation, but it

6   would be my responsibility to gather the information.

7   **Q.**  And if I understand what you're saying, you gathered

8   information, and then a year later, or almost a year later, you

9   gave that information to Chief Boykins?

10  **A.**  I explained to him at the very end of February what was

11  discovered.  I discovered information in July -- actually, the

12  beginning of August -- around the end of July, beginning of

13  August, when requested to look up some information; and after a

14  conversation with Lieutenant Lanchsweerdt, who did handle the

15  investigation, I spoke to Chief Boykins about that before my

16  FMLA, just to remark that I found it odd and asked what he

17  wanted done.

18  **Q.**  You're aware of the fact that at no point in time did

19  Captain Young ever have any type of Internal Affairs

20  investigation launched against him because of these phone

21  lines?  You're aware of that, aren't you?

22  **A.**  Yes, I am.

23  **Q.**  And Internal Affairs is the -- or the Division of

24  Professional Conduct or Responsibility, that division, which is

25  Internal Affairs, they're the body within the police department

```
 1   that conducts investigations of any type of wrongdoing of its

 2   own, correct?

 3   A.   Yes.

 4   Q.   You're aware of the fact -- and were aware of the fact back

 5   in 2010 and 2011 -- that Chief Richmond was the officer who was

 6   responsible for conducting an investigation against Rick McGee,

 7   your husband, correct?

 8   A.   Yes, I am.

 9            MR. PFEIFER:  If I could have a minute?

10            (Brief pause.)

11            MR. PFEIFER:  I'll pass the witness.

12            THE COURT:  Redirect.

13            MR. SULLIVAN:  May I approach, Your Honor?

14            THE COURT:  Yes, you may.

15                       REDIRECT EXAMINATION

16   BY MR. SULLIVAN:

17   Q.   This is your deposition, just in case I have questions for

18   you.

19            Ms. DePaepe, do you recall that you had some

20   discussions with Mr. Walton about when Rick Bishop would have

21   had his line recorded?  Do you recall that testimony?

22   A.   Yes.

23   Q.   And you said it was likely in '04 when he was a detective

24   in the Investigative -- or a captain in the Investigative

25   Division?
```

1  **A.**   To the best of my knowledge, that's where it was placed on

2  the recording system.

3  **Q.**   So you base that, in part, by looking at where it was

4  placed on the recording system?

5  **A.**   Correct.

6  **Q.**   Now, Rick Bishop has testified in this case that he was

7  working in the Office of Risk Management overseeing Internal

8  Affairs, and his office was at the other end of the building

9  when he asked in 2006 to have his line recorded, and you're

10  saying he's wrong in that?

11  **A.**   I'm not saying he's wrong.  I'm saying that's what I

12  remembered.  I thought that it had been placed on when he was

13  in the Detective Bureau because that's where the line was

14  placed on the system.

15  **Q.**   Well, he later moved to the Detective Bureau when he would

16  have become the chief of that Detective Bureau, right?

17  **A.**   Right.

18  **Q.**   So when his phone number went with him, 6031, then it would

19  be natural to have the 6031 located among those group of

20  numbers when he was the division chief; wouldn't that have been

21  natural?

22  **A.**   It would be natural, yes.

23  **Q.**   As between you and Rick Bishop, do you think his memory is

24  probably more accurate than yours about when he asked to have

25  his line recorded?

1  **A.**  I would believe that you're asking me to take numbers out

2  of my head, and, yes, if he has any documentation.  I don't

3  have any written documentation as to when it occurred.

4  **Q.**  Okay.  Chief Fautz also testified that he told you that,

5  when he wanted in '04 to have some division chief lines

6  recorded, it was with the knowledge and consent of the division

7  chiefs, but you don't remember that either, do you?

8  **A.**  I remember that he told me to have the line recorded.

9  **Q.**  Right.  It was the other part of the question that I was

10  focusing on, whether you recall him telling you -- now, this is

11  with their knowledge and with their consent.

12       Do you remember Chief Fautz telling you that his

13  desire to have those lines recorded was with the knowledge and

14  consent of the division chiefs?

15  **A.**  No.  He stated that it was being discussed and that these

16  were the lines we intend to record.

17  **Q.**  Okay.  So, again, you don't remember that.

18       If Chief Fautz testified that he remembered saying

19  that to you, do you disagree with Chief Fautz?

20  **A.**  I'm not disagreeing.  It's the way that you're presenting

21  it.  I knew that we had discussed that he had stated something

22  about that he wanted to have Bishop's line put on recording.  I

23  believe he said something about he was aware of it and that it

24  was requested by him.

25  **Q.**  Maybe I was unclear.  I apologize.

1          What Fautz testified to is that he talked to you

2    about Gene Kyle and Hassig's line --

3    **A.**   Right.

4    **Q.**   -- as division chiefs --

5    **A.**   Right.

6    **Q.**   -- and he wanted them recorded.

7    **A.**   Correct.

8    **Q.**   And Chief Fautz said that he informed you that it was with

9    their knowledge and consent.

10         Now, do you remember him telling you about the

11   knowledge and consent part?  That's my question, just that.

12   **A.**   Yes.

13   **Q.**   You do?

14   **A.**   Yes.

15   **Q.**   Okay.  Now, you testified about some discussion you had

16   with Division Chief Gene Kyle and that he knew that 9263 and

17   9264 were recorded, but that there was another private number

18   that he used?

19   **A.**   Right.

20   **Q.**   Did you think that was 6031?

21   **A.**   No.

22   **Q.**   I'm going to ask you to look at -- I think it's page 35 of

23   that deposition, but you have to bear with me a little to make

24   sure I find it.  Yeah, it's 35.

25         Are you at page 35?

 1  **A.**  Yes.

 2  **Q.**  I'm starting at line 16.  Question: "Okay.  So you

 3  thought -- you believed that Division Chief Richmond's line was

 4  recorded?"

 5          Answer:  "That's correct."

 6          Question:  "And that's because it had been ordered

 7  to be recorded?"

 8          Answer:  "It had -- 245-6031 had been ordered to be

 9  recorded under Chief Fautz while Chief Kyle had the office."

10          Did I read it correctly?

11  **A.**  Yes, you read it correctly.

12  **Q.**  And that's what you said in your deposition?

13  **A.**  Yes, and I was mistaken.

14  **Q.**  Okay.  You never thought that Gene Kyle had that number?

15  **A.**  I knew that number was in that detective chief's office,

16  and, at that point in the deposition, I was assuming that that

17  was the line, but I was incorrect.  The lines that were

18  actually put on recording at that time were 9263 and 9264,

19  because he had the office; and then when Bishop had the office,

20  that same number was there.  It was just a glitch.  I kept

21  thinking that was the office line number that was being

22  recorded.  I was incorrect.

23  **Q.**  Okay.  Thank you for clarifying that.

24          Now, Mr. Walton also asked you about the ability to

25  do all of those searches on all of those administrative lines,

1    if need be, and about the fact that even though you didn't know

2    that Young's line was being recorded you might happen upon some

3    valuable information, right?

4    **A.**   Yes.  If I was doing a search on something, sometimes you

5    would hear things that wasn't what you were initially looking

6    for, but it might be an issue that had to be addressed.

7    **Q.**   But it would have had to have been a search of all lines,

8    all administrative lines, right, for you to stumble across

9    something that nobody even knew was being recorded?

10   **A.**   Well, it depends on who was making the request or what you

11   were looking into.

12   **Q.**   You're making it more complicated than it is.

13   **A.**   I'm just trying to --

14   **Q.**   The all-lines search, the only way to get 6031 searched

15   when you're doing an all-lines search, you're the only one who

16   could have done that, right?

17   **A.**   Yes.

18   **Q.**   And the only way that you would have had to discover

19   inadvertently information that might be valuable is if you do

20   an all-lines search, right?

21   **A.**   It depends on what was being looked for as to what you

22   would first start; in other words, you might want to narrow

23   your search.  If there was a complaint on an officer and it was

24   a complaint that might go to the chief's office or it might go

25   to the Detective Bureau, that might be where you want to limit

 1   it to, those areas.  If it was a complaint on the front desk,

 2   you might look for those lines.  So I can't agree with your

 3   "all-lines search," because sometimes you want to narrow it

 4   down to begin your search just to save time.

 5   **Q.**  Well, all I'm really trying to establish is that if Brian

 6   Young thought he had important information he heard on the

 7   phone, he couldn't ask for anybody to recover that in March of

 8   2010 going forward, because no one in the department knew that

 9   Brian Young was being recorded during that time period?

10   **A.**  Correct.

11   **Q.**  Okay.  And you must never have listened from March 2010

12   until February 4th, 2011, to that line; otherwise, you would

13   have heard his voice?

14   **A.**  Right.  No one had requested anything.

15   **Q.**  Right.  So it didn't happen very often that a request came

16   that you needed to access those individual private lines to

17   search?  That didn't happen that often?

18   **A.**  No.

19   **Q.**  And would you agree that the handling of the recording of

20   the administrative -- those more private lines in the police

21   department -- depends on the chief -- depends on what the chief

22   wants?

23   **A.**  As to what's recorded?

24   **Q.**  Yes.

25   **A.**  Yes.

1  **Q.**  Or as to what's not recorded?

2  **A.**  Correct.

3  **Q.**  And it varies with the chief?

4  **A.**  That's correct.

5  **Q.**  If the chief changed it, you changed it?

6  **A.**  Yes.

7  **Q.**  You were not privy to the discussions about whether to

8  change or not?

9  **A.**  That's correct.  I was not involved in those discussions.

10  **Q.**  And other than the one conversation with Fautz that you

11  described in your Officer's Report about the purpose, you did

12  not sit around and discuss the purpose of recording Gene Kyle

13  versus Hassig versus Boykins versus Bishop?  You didn't discuss

14  any of that with anybody?

15  **A.**  That's correct.

16  **Q.**  In fact, you believed -- or you approached it not as

17  recording individuals, but more, "They told me they wanted this

18  line recorded"?

19  **A.**  Right.

20  **Q.**  So you recorded that line until somebody told you to stop?

21  **A.**  Correct.

22  **Q.**  And when Chief Fautz -- again, we have this disagreement

23  about the date with Rick Bishop, okay, but when he told you he

24  wanted that recorded, did he tell you, "I want 6031 recorded,"

25  or did he tell you, "I want Rick Bishop recorded," or did he

1    tell you, "I want the captain's office recorded or the division

2    chief," or how did he put it to you?

3    **A.**   Well, you're asking me to remember his exact words and that

4    would be difficult.

5    **Q.**   I don't want to force you to exact words.  I want you to

6    remember, as best as possible, in terms of that category.

7    **A.**   Yes.  To the best of my ability, I can recall that he

8    stated that Rick Bishop had come to him requesting that his

9    line be recorded, and that it was okay to go ahead and have

10   that put on the system.

11   **Q.**   Okay.  To the best of your recollection, it had to do with

12   Rick Bishop?

13   **A.**   Right, that he had discussed it with Rick Bishop and that

14   he approved it.

15   **Q.**   Right.  And that request for 6031, to the best of your

16   recollection, was not part of a general course of business in

17   the police department, that 6031, regardless of where it goes

18   or who uses it, should be recorded?  That's not what he said?

19   **A.**   Could you explain that again?

20   **Q.**   Yes.  I'm just confirming that that conversation was Rick

21   Bishop, not about the number or the line 6031.

22   **A.**   He stated that they discussed it and that Rick Bishop

23   wanted that line put on.  What the purpose for it was, I don't

24   know.

25   **Q.**   So, again, you have no knowledge of that?

```
 1  A.   That's correct.
 2  Q.   So you couldn't say one way or another whether it was part
 3  of the ordinary course of police business or not?
 4  A.   That's correct.
 5            MR. SULLIVAN:  Okay.  One moment, Your Honor.
 6            (Brief pause.)
 7            MR. SULLIVAN:  I have no further questions at this
 8  time.
 9            Thank you, Ms. DePaepe.
10            THE COURT:  Recross.
11                      RECROSS-EXAMINATION
12  BY MR. WALTON:
13  Q.   Karen, this is Exhibit 9 that's -- well, it's not on the
14  screen.
15            THE CLERK:  You covered it.
16            MR. WALTON:  Oh, I'm bad.  All right.
17  Q.   Do you see this part of Exhibit 9 here where you have this
18  parentheses here (indicating)?
19  A.   Yes.
20  Q.   That was added to that list in October, shortly before the
21  October meeting in 2011?
22  A.   It was added in August, just the day before my FMLA leave,
23  because it was requested by Chief Horvath to provide him with
24  the most current list.  And just prior to sending it to him, I
25  placed that stuff in parentheses because that was the only
```

1    change that had taken place.

2    **Q.**   Okay.  Now, if I covered up that parentheses, is that what

3    your list would have looked like prior to that time

4    (indicating)?

5    **A.**   Yes.

6    **Q.**   And you have the numbers of 9263 and 9264 and 6031 going

7    into the Detective Bureau?

8    **A.**   Yes.

9    **Q.**   And from your testimony today, those lines were recorded at

10   the direction of Chief Fautz back in 2004, late 2004?

11   **A.**   Yes.

12   **Q.**   And if you were requested to do a search of all of the

13   calls going into the Detective Bureau, would you have searched

14   those three lines, regardless of who had the line?

15   **A.**   Yes, I would.

16   **Q.**   And if I'm correct, then, what your testimony is, when

17   Chief Fautz told you what lines he wanted recorded in 2004,

18   those were those three lines?

19   **A.**   Well, that is what I believe occurred because that's where

20   it was placed on the recording system.

21   **Q.**   Okay.  And then when Steve Richmond took office in

22   February 2010 and Brian Young in March 2010, the recorded lines

23   were still the same; is that right?

24   **A.**   Yes.

25           MR. WALTON:  All right.  Thank you.

PEPABLE - FURTHER REDIRECT EXAMINATION

```
1                    That's all I have.
2                    MR. PFEIFER:  I don't have anything.
3                    THE COURT:  Mr. Pfeifer?
4                    MR. PFEIFER:  I'm sorry.  I don't have anything.
5                    THE COURT:  I thought you said that, but I was
6    probably surprised a little bit, just wasn't sure I heard you
7    right.
8                    MR. PFEIFER:  Sometimes the best cross is no cross.
9                    THE COURT:  That's usually always the best cross.
10                   Mr. Sullivan.
11                   MR. SULLIVAN:  Thank you.
12                       FURTHER REDIRECT EXAMINATION
13   BY MR. SULLIVAN:
14   Q.   Exhibit 9, which I believe Mr. Walton inadvertently walked
15   away with my copy of --
16                   MR. WALTON:  This is mine.
17                   MR. SULLIVAN:  Oh, is that yours?  I thought I left
18   mine there.
19   Q.   Exhibit 9 is the phone list.
20                   Is it your testimony that you had that document on
21   your system and then just changed it or you created that
22   document in August of 2011?
23   A.   I had several old lists of the lines that were recorded,
24   and I had pulled one up and looked at it, and then I went into
25   the communications center and I actually created it off of what
```

DEPAEPE - FURTHER REDIRECT EXAMINATION

1    I was looking at in the communications center, so it was

2    basically a revision.

3    **Q.**   Well, "basically a revision."

4          Didn't you create that Word document on August 29th,

5    2011?

6    **A.**   Yes.

7    **Q.**   So when Mr. Walton says you updated this document or you

8    changed this document, you created that document on the 29th?

9    **A.**   I believe I went looking for it in my computer system and I

10   had an older one, and then I decided that I'll just go in the

11   radio room and I will check it out in there, and so I wrote

12   down and just said, yes, I'll just recreate it, but it's just

13   the same list.  I just revised it.

14   **Q.**   But your prior documents, you told me earlier, did not list

15   the locations of the numbers, just the numbers, so that part

16   was new?

17   **A.**   Right.

18   **Q.**   And you learned where to locate those by looking at what

19   was on the system?

20   **A.**   Correct.

21   **Q.**   And the system, showing the location of a number in a list,

22   was how you determined that 6031 was the Detective Bureau,

23   because it was next to the other numbers from the Detective

24   Bureau?

25   **A.**   Well, that and because I knew that that was the line that

 1   was in the division chief's office.

 2   **Q.**   Right, going back to Rick Bishop.

 3   **A.**   Right.

 4   **Q.**   Okay.  So you looked at the screen and then created

 5   Exhibit 9?

 6   **A.**   Right, as a revision.

 7   **Q.**   Well, you keep saying "a revision."

 8           The Word document that is Exhibit 9 --

 9   **A.**   Right.

10   **Q.**   -- was created by you --

11   **A.**   Right.

12   **Q.**   -- on August 29, 2011, at 6:54 p.m., wasn't it?

13   **A.**   Right.

14   **Q.**   That Word document that is Exhibit 9 did not exist, saved

15   on your system, until August 29th, 2011, at 6:54 p.m.; isn't

16   that right?

17   **A.**   That's right.  I pulled up the existing one and I created a

18   new document --

19   **Q.**   And your existing -- I'm sorry.  Please finish.

20   **A.**   I looked at the old list, okay.  It was my knowledge, and I

21   thought I will just make a new one, basically a revision, but I

22   did not change the original one that I had.

23   **Q.**   And you're saying that your old list was a Word document or

24   was a physical document in your files?

25   **A.**   It was a Word document.

```
 1   Q.  And you had to make the changes and you created a new
 2   document on that day?
 3   A.  Right.
 4           MR. SULLIVAN:  One moment, Your Honor.
 5           (Brief pause.)
 6   BY MR. SULLIVAN:
 7   Q.  I just want to be clear.  Your old document, as you
 8   testified earlier, didn't have any of these words next to them
 9   (indicating); it just had the numbers?
10   A.  Right.
11   Q.  Okay.  So it was your new document that you created on the
12   29th where you put those names next to them?
13   A.  Right.  They were going to have a meeting, and I wanted
14   them to be clear of where these lines were.
15           MR. SULLIVAN:  Thank you.
16           That's it, Your Honor.
17           THE COURT:  Mr. Walton, any more cross?
18           MR. WALTON:  No.
19           THE COURT:  Mr. Pfeifer, you passed the last time.
20   Are you still passing?
21           MR. PFEIFER:  I'm still passing.
22           THE COURT:  Okay.  Thank you very much.
23           Call your next witness.
24           MR. SULLIVAN:  That's it, Your Honor.  We rest.
25           THE COURT:  Mr. Walton, do you have any witnesses to
```

```
 1   call?

 2              MR. WALTON:  No, Your Honor.

 3              THE COURT:  Mr. Pfeifer, do you have any witnesses

 4   to call?

 5              MR. PFEIFER:  We have reached a stipulation on

 6   certain things, so we're going to submit them by way of

 7   exhibits in lieu of additional --

 8              THE COURT:  We'll do that in a minute.

 9              Do you have any live witnesses?

10              MR. PFEIFER:  No live witnesses.

11              THE COURT:  Okay.  Go ahead on your exhibits.  Just

12   make sure we have everything before y'all walk out the door.

13              MR. PFEIFER:  I'm going to mark -- it's a

14   defendant's exhibit, but I'm continuing sequentially in the

15   numbers.

16              THE COURT:  Wait a minute.

17              MR. PFEIFER:  47.

18              THE COURT:  47?

19              MR. PFEIFER:  47.  That is excerpts of the

20   deposition of Jeffrey Walters that was taken.

21              THE COURT:  Just give that to Scott.

22              MR. PFEIFER:  48 is the deposition of former Chief

23   Brent Hemmerlein.  That's being admitted by agreement.

24              THE COURT:  I assume these are all being admitted by

25   agreement.
```

1     MR. PFEIFER:  It is.  And we have a stipulation that
2  I have written out, but it will be reduced -- it will be typed
3  up and put into the court filings either this afternoon or
4  tomorrow.
5     THE COURT:  Okay.
6     MR. PFEIFER:  And the stipulation pertains to Chief
7  Darrell Gunn and Chief Chuck Hurley.
8     Number one, they were both former chiefs of police
9  of the South Bend Police Department.
10     Number two, while they were chief of police, there
11  was no policy, written or otherwise, regarding the recording of
12  private lines of police officers.
13     Number three, they would never have recorded a
14  private line of a police officer without advising the police
15  officer that his or her line was being recorded.
16     Number four, Darrell Gunn was chief of police from
17  January of 1996 to June 1999, and Chuck Hurley was chief of
18  police from April of '84 to October of '88 and March of 2011 to
19  April of 2012.
20     I've reviewed that with both counsel.  That will be
21  typed up and their signatures will be electronically affixed to
22  the stipulation.
23     THE COURT:  That's fine.
24     MR. PFEIFER:  With that, the defendant individual
25  police officers have no further evidence.

1          THE COURT:  I assume the plaintiff has no further

2    evidence?

3          MR. SULLIVAN:  That's correct, Your Honor.

4          THE COURT:  And does the Council have any further

5    evidence?

6          MR. WALTON:  No, Your Honor.

7          THE COURT:  Here's what I'm proposing, and it's

8    subject to negotiation.  Very few things are, but this is.

9          How much time do you want to -- all of the

10   submissions are going to be simultaneous, both the initials,

11   the reply and the response.  How much time do you want to

12   submit proposed findings of fact and conclusions of law?

13         Plaintiff?  I'll let you start.

14         MR. SULLIVAN:  Your Honor, we can do it in ten days.

15         THE COURT:  Ten days?

16         MR. SULLIVAN:  Is that too much time?

17         THE COURT:  Too much time?  The practice of law has

18   changed a lot from when I was out there.  I would be asking for

19   as much as I can get.

20         Mr. Walton?

21         MR. WALTON:  Do you want 30?

22         MR. PFEIFER:  At least.

23         MR. WALTON:  Thirty days.

24         MR. SULLIVAN:  Okay.  Go ahead.

25         MR. PFEIFER:  You have 50 lawyers.  I've got --

1        MR. SULLIVAN:  It won't be 50 lawyers, Mr. Pfeifer.

2   It will be two.

3        MR. PFEIFER:  I'd say 30 or 45 days is fine.  I

4   think Mr. Palmer said 30, so I can live with 30.

5        THE COURT:  Do you want 30 days?

6        MR. SULLIVAN:  That's fine.

7        THE COURT:  Then 30 days for the submission.

8        And 14 for replies?

9        MR. PFEIFER:  That's fine.

10        THE COURT:  And five for -- 14 for responses, five

11   for replies.  I get those things turned around.

12        And we'll issue an order, right?

13        THE CLERK:  I can put it in my minute entry, if you

14   wish.

15        THE COURT:  Okay.  Just so they get it, because I

16   don't remember what I just said.  Anyway, with dates attached

17   to them.  We're starting with tomorrow being the first day of

18   counting.

19        A few things -- you can focus on anything you want

20   to focus on, but we have a few things we would like you to

21   focus on:  whether Young's line was recorded by mistake before

22   DePaepe discovered the recordings; whether Young's line

23   continued to be recorded pursuant to the department's

24   policy after -- is it "DePaepe"?  Is that how she pronounces

25   it?

```
1            MR. SULLIVAN:  "DePaepe."

2            THE COURT:  -- after DePaepe discovered the

3   recordings; what was the police department's policy, written or

4   unwritten, or customary practice for recording officers' lines;

5   did the police department have different policies or practices

6   regarding officers' lines versus recording lines going into the

7   communications center and the front desk; was Young's line

8   recorded for investigative purposes; was Young's line recorded

9   in violation of police department recording policy.

10           Then, also, on issues of law, should there be a

11  different legal treatment for the recordings of Captain Young's

12  line before and after they were found by Karen DePaepe.

13           MR. SULLIVAN:  "DePaepe."

14           THE COURT:  Whatever it is.  You know what I'm

15  talking about.  It's like "Van Bokkelen."  Sometimes it's

16  "Brooklyn," "Bookelen," whatever it is.

17           Are unintentional recordings illegal under the

18  Federal Wiretap Act; if Young's line was recorded illegally,

19  does law enforcement officer exception, nevertheless, cover the

20  recordings at issue.

21           Any questions?

22           My law clerk, if you want to, will supply you with

23  all of those questions?  Do you want it?  I'm not doing it, but

24  he'll do that.

25           MR. SULLIVAN:  Yes.  That would be helpful.
```

```
 1                THE COURT:  Okay.  Supply that and send it out
 2      tomorrow, if you could.
 3                Anything else we need to take up?
 4                MR. SULLIVAN:  I assume you don't want closing
 5      statements?
 6                THE COURT:  Well, what we can do is -- I would like,
 7      maybe, written closing statements rather than oral.  I can
 8      wander back over.  I love South Bend.  There's nothing wrong
 9      with South Bend.  I just don't like time zones.  That's my
10      problem.  Unless you want to come wandering over to Hammond.
11                Your briefs have all been good.  I think I
12      understand the case for the most part.
13                I'd suggest either briefs in support of your
14      proposed findings or call them final arguments and make it that
15      way.
16                MR. SULLIVAN:  That's fine.
17                Is that okay with you?
18                MR. PFEIFER:  Yeah, it's fine.
19                After we do our briefs, if the Court wants to
20      entertain argument, I like Hammond and I have no problem
21      driving over there.
22                MR. SULLIVAN:  Same here.
23                MR. PFEIFER:  If it's still baseball season, we can
24      go to a Cubs game.
25                THE COURT:  Well, we know why we're over here.
```

```
 1    We're over here because of Walton.  I understand that.
 2                MR. SULLIVAN:  Your Honor, whatever will be helpful
 3    to you.
 4                THE COURT:  Let's get it done the way I'm talking
 5    about.  If I think oral argument will be helpful, we'll have
 6    it.  And I have oral arguments, but just sometimes the briefs
 7    are good enough and I really don't need oral argument.
 8                Also, if we have questions, what we'll do is
 9    probably e-mail you those particular questions that we have
10    after we read everything.
11                I just hate to have you travel.  I hate to have me
12    travel any more than necessary or have you travel.  There's
13    probably been enough money spent on this case the way it is.  I
14    don't want to cause for you to spend more money.  If we do need
15    argument, though, the argument will be over here.
16                MR. SULLIVAN:  I'm often in the region, so it's no
17    problem.
18                MR. PFEIFER:  Yeah, I have no problem coming to
19    Hammond.  I really don't.  I'm over there frequently.
20                THE COURT:  I understand.  We'll see if we get to
21    that point.  If we get to that point, we'll talk about it.
22                MR. PFEIFER:  Okay.
23                THE COURT:  Anything else?
24                MR. WALTON:  No, Your Honor.
25                MR. SULLIVAN:  Nothing, Your Honor.
```

1          THE COURT:  I want to thank the attorneys for their

2   presentation.  It was done very efficiently.  I was prepared to

3   go to 3:00 in the morning.  Maybe that was the threat that got

4   it.  But it was done very well.  You're gentlemen, and you

5   represented your clients well.

6          MR. SULLIVAN:  Thank you, Your Honor.

7          THE COURT:  With that being said, court's adjourned,

8   and you can leave.

9          MR. PFEIFER:  Thank you, Your Honor.

10          MR. WALTON:  Thank you.

11          (Proceedings adjourned at 4:17 p.m.)

12

                                CERTIFICATION

13

14       I, JOANNE M. HOFFMAN, certify that the foregoing is a
    correct transcript from the record of proceedings in the
15   above-entitled matter.

16

17

    _____          August 27, 2014
19   U.S. Court Reporter
    United States District Court
20   Northern District of Indiana
    South Bend Division

21

22

23

24

25