UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| CITY OF SOUTH BEND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 3:12-cv-475 |
| | ) | |
| SOUTH BEND COMMON COUNCIL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**************************************************************************

| | | |
|---|---|---|
| BRIAN YOUNG, SANDY YOUNG TIMOTHY CORBETT, DAVID WELLS, and STEVE RICHMOND | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Consolidated |
| v. | ) | Cause No. 3:12-cv-532 |
| | ) | |
| THE CITY OF SOUTH BEND, Acting Through its Police Department, DARRYL BOYKINS, Individually and in his Official Capacity as Chief of Police, KAREN DEPAEPE, and SCOTT DUERRING, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## **SOUTH BEND OFFICERS' CLOSING ARGUMENT**

Respondents Brian Young, Sandy Young, Timothy Corbett, David Wells, and Steve

Richmond ("South Bend Officers"), by counsel, file their Closing Argument pursuant to this

Court's Order of August 13, 2014.

## I. Introduction

This case began because the South Bend Police Department communications director Karen DePaepe—a civilian—listened to the personal phone conversations of Captain Brian Young for over the course of several months without Young's knowledge or consent. The standard practice of the police department was to record private phone lines only at the user's request. Young's phone was mistakenly recorded. After the mistake came to light, the Chief of Police, Darryl Boykins, instructed DePaepe to listen to the recordings, make copies of the recordings, and summarize the contents for his personal use. He later used the information that he learned from the recordings to threaten and harass a division chief Steve Richmond and Captain Young.

Captain Young's phone line was recorded in clear violation of the Federal Wiretap Act. The South Bend City Council subpoenaed the South Bend Mayor's Office for the recordings still in its possession. Because the items requested in the Common Council's subpoena to the City of South Bend were created in violation of federal law, however, this Court should declare the Common Council's subpoena void, and permanently enjoin the City of South Bend from disclosing those items and their contents.

## II. Facts

**A.      Brian Young's phone line was recorded by mistake.**

1.      In late 2004 or early 2005, Chief Kyle, Chief Hassig, Chief Kilgore, and Chief Horvath requested that then-Police Chief Thomas Fautz add their personal phone line to the list of recorded lines in the South Bend Police Department voice logger system.  (Tr. V. I at 132.)

2.      After this discussion, Fautz approached communications director Karen DePaepe and instructed her to add the requested lines to the voice logger system. (Tr. V. I at 130.)

3.      The purpose was to promote CYA—meaning that if someone was making claims that the police department was not following through or reacting to complaints, the department had a way to be able to document what the officers heard and what they did in response to those complaints. (Tr. V. I at 131-132.)

4.      Fautz did not intend to establish an ordinary procedure to record all division chiefs' lines. (Tr. V. I at 134.)

5.      In January of 2005, Rick Bishop became captain in risk management. (Tr. V. I at 225.) He did not ask for his line, number 6031, to be recorded at that time. (Tr. V. I at 226.)

6.      In 2006, Bishop asked Fautz to record his phone line. The reason was that an individual from the public called Bishop continuously. Bishop wanted to build a case against this individual. In order to do so, Bishop thought that the phone conversations needed to be recorded, so he asked Fautz to record his line. (Tr. V. I at 226-228.)

7.      By granting Bishop's request, Fautz did not intend to record the 6031 number regardless of the officer who used that line. (Tr. V. I at 170.) Bishop likewise did not expect that the 6031 number would always be recorded no matter who used it. (Tr. V. I at 230.)

8.      The 6031 number had not been recorded on the department's recording system until Chief Fautz approved Bishop's request. (Tr. V. I at 235.)

9.      In January of 2007, Bishop became division chief and took the 6031 number with him. He forgot that it was recorded. (Tr. V. I at 228-229.)

10.     If Bishop had remembered that his number was recorded, he would have asked that it not be due to sensitive information that he had on his phone calls as division chief. (Tr. V. I at 231.)

11.    When Bishop was later demoted to captain, he could not bring the 6031 number with him because he was located in a different building. (Tr. V. I at 248-249.)

12.    In February of 2010, Steve Richmond was promoted and asked for his old 7473 number to follow him into the division chief's office. He asked Barb Holleman to switch his phone number. This move put the 6031 number into Richmond's old office. (Tr. V. II at 11.)

13.    Though Richmond took over Bishop's old office space, his 7473 number was not recorded due to the upstream change in the voice logger system that Holleman's switch activated. (Tr. V. I at 24; Tr. V. II at 55.)

14.    At the same time that Richmond was promoted, Brian Young was made a captain in 2010 to replace Richmond. Young was assigned to Richmond's old office. (Stipulations ¶19; Tr. V. II at 64.)

15.    Young inherited Bishop's old 6031 phone line that Bishop had forgotten was still being recorded. (Tr. V. I at 229.)

16.    DePaepe was not asked to record the phone line 6031. She was requested simply to record Bishop's phone line. (Tr. V. II at 201.)

17.    Nobody told Brian Young when he became captain in 2010 that his line would be recorded. (Stipulations ¶ 22; Tr. V. II at 65-67.)

18.    No chief authorized Young's line to be recorded. (Tr. V. II at 147.)

19.    No one in the South Bend Police Department was aware that Young's line was recorded. (Stipulations ¶ 22.)

20.    It was therefore a mistake for Young's line to be recorded. (Testimony of former Police Chief Darryl Boykins—Tr. V. I at 190; testimony of current communications director

Diana Scott—Tr. V. I at 94; testimony of former communications director Karen DePaepe—Tr. V. II at 147, 189.)

**B.      Young's line was not recorded according to policy after the mistake came to light.**

21.      In 2010-2011, there was a BSOD (blue screen of death) computer crash for the police department voice logger. (Tr. V. I at 64-65.)

22.      Troubleshooting was necessary following the crash. The procedure was to reboot the computer. (Tr. V. I at 65.)

23.      In February of 2011, the assisting technician requested the department to check the lines. (Tr. V. II at 121.)

24.      Only DePaepe could troubleshoot all the recorded lines. Supervisors and assistant director only had access to 911 calls and front desk. (Tr. V. I at 99.)

25.      As communications director, DePaepe could access that voice logger directly from her office desk. (Tr. V. II at 109.)

26.      On February 4, 2011, DePaepe checked every phone line, which was the only time she did so in the course and scope of her employment. The purpose was to check to see if there was "usable voice." (Tr. V. II at 122.)

27.      It took only a few seconds to ensure that data was intact. (Tr. V. I at 100.)

28.      DePaepe recognized Brian Young's voice on what she thought was division chief Steve Richmond's line. (Tr. V. II at 125.)

29.      DePaepe's first thought was that this was a "malfunction in the system." That malfunction never happened before. (Tr. V. II at 129.)

30.      It was in the ordinary course of DePaepe's duties to find out why the malfunction occurred, and when it occurred. (Tr. V. II at 158.)

31.     DePaepe did not talk to Brian Young about the malfunction. (Tr. V. II at 132.)

32.     DePaepe began to listen to Young's phone conversations. She was not listening to the conversations as part of the data check, but rather to investigate the content of his phone conversations. (Tr. V. II at 142.)

33.     DePaepe had no written or verbal instruction to listen to Young's phone conversations, or to investigate the content of Young's phone conversations. (Tr. V. II at 142.)

34.     Additionally, it was not in DePaepe's job description as communications director to perform law enforcement investigation of an officer. (Stipulations ¶10; Tr. V. I at 112.)

35.     DePaepe was checking lines on her own initiative. She claimed that it was the first time that she checked administrative lines on her own initiative. (Tr. V. II at 151.)

36.     In March of 2011, DePaepe told Boykins about the conversations that she was listening to on Young's personal phone line. (Tr. V. II at 149.)

37.     DePaepe did not tell Young or her supervisor, Gary Horvath, or internal affairs. (Tr. V. II at 144.)

38.     Boykins did not tell DePaepe to fix the malfunction, or to correct the mistake and take Young's phone line off of the voice logger. Nor did Boykins instruct DePaepe to inform Young or anybody else. (Tr. V. I at 191-192.)

39.     Boykins instead instructed DePaepe to prepare an officer's report on what she heard on those recordings. It took DePaepe a long time to make the officer's report because Boykins wanted her to find other similar recordings, requiring her to search for recordings and listen to those recordings. (Tr. V. II at 165-166.)

40.     DePaepe went on medical leave in August of 2011. (Tr. V. II at 196.)

41.     On October 12, 2011, the South Bend Police Department had a meeting about switching phone systems from Centrix to a VoIP system. Though DePaepe was on her FMLA leave, she had prepared a list of recorded phone lines for purposes of that October meeting. (Tr. V. I at 47-48.)

42.     It was at the October 12, 2011, meeting that it was discovered and discussed openly for the first time that Young's line was mistakenly recorded. (Tr. V. I at 96, 98.)

43.     Captain Phil Trent, who was at the meeting, left the meeting immediately to notify Young. (Tr. V. I at 96-97.)

44.     This was the first time that Young discovered that his line was recorded. He had not been previously notified that his phone was recorded, or that he was under investigation. (Tr. V. II at 74.)

45.     All told, for 10 months, Young did not know that his line was recorded. (Tr. V. II at 192.)

46.     Young asked Trent to discontinue the recording. (Tr. V. II at 74.)

47.     Trent reported back to assistant communications director Diana Scott and said that Young's line needed to stop being recorded immediately. The phrase that he used was that the recording needed to be stopped "like yesterday." (Tr. V. I at 96-97.)

48.     Later that afternoon, Trent told Young that it was "taken care of," and the recording was stopped (Tr. V. II at 74.)

49.     In November of 2011, South Bend held a general election. Pete Buttigieg won the election to become the mayor of the City of South Bend beginning January of 2012. (Tr. V. II at 34.)

50.     After the election, division chief Steve Richmond applied for the position of chief of police. (Tr. V. II at 34-39.)

51.     In December of 2011, Boykins told DePaepe to make cassettes of the recordings that she listened to on Young's line. (Tr. V. I at 193-194.)

52.     The eight telephone conversations captured by the recording system and subsequently reduced to five audio cassette tapes by Karen DePaepe occurred on February 4, 2011; April 5, 2011; June 3, 2011; June 6, 2011; June 16, 2011; June 27, 2011; July 14, 2011; and July 15, 2011. (Stipulations Doc. No. 155.)

53.     On January 6, 2012, Boykins used the information that he learned to tell division chief Steve Richmond that Boykins no longer considered Richmond a "loyal" employee. He considered Richmond a backstabber. Boykins told Richmond that Boykins was informed that Richmond was disrespectful during the interview with the mayor. (Tr. V. II at 49-50.)

54.     On January 17, 2012, Young learned from Diana Scott that his phone line was still being recorded, even though he asked that the recording be stopped. (Tr. V. II at 74-75.)

55.     The same day, Young asked Boykins if there was a reason for his phone line being recorded. Boykins answered that he felt stabbed in the back. Boykins said it had nothing to do with Young's job performance. Boykins said instead that it had everything to do with whom Boykins could trust. (Tr. V. II at 99-100.)

56.     Boykins told Young that in four to six weeks he would discipline or demote or terminate employees. (Tr. V. II at 100.)

57.     Young understood the things that Boykins said to him as a threat to his career. (Tr. V. II at 100.)

58.     On January 17 and 24, 2012, Boykins similarly told Richmond that Boykins listened to the tape and wanted to see if Richmond would "man up" to what Boykins heard him say. (Tr. V. II at 59.)

59.     Richmond, harassed and intimidated, started looking for a new job due to Boykins's threats. (Tr. V. II at 60-61.)

60.     On January 24, 2012, Boykins talked to Young. Boykins said that they needed "to put this behind us." Boykins also said that in a year's time, he would start to demote or discipline or terminate employees. (Tr. V. II at 101.)

61.     Young felt intimidated by this conversation. (Tr. V. II at 101.)

62.     At no time was Young informed that he was under internal investigation. (Tr. V. II at 84.)

63.     Young was never informed of any investigation launched against him because in fact there was no internal investigation by internal affairs or any other duly appointed body pursuant to any policies or procedures of the South Bend Police Department. (Tr. V. II at 198-199.)

**C.     The police department's customary practice for recording individual officers' lines was to do so "on demand"—only with the knowledge and consent of the user.**

64.     Customarily, only the chief of police can issue the order to record lines. (Tr. V. I at 81.)

65.     When former Chief of Police Thomas Fautz was a division chief in the department from 1997 through 2002, there was never written notice of which phone lines were recorded. There was never written notice of procedures for recording phone lines. (Tr. V. I at 125.)

66.     When Fautz was the police chief from September 2002 through December 28, 2007, it was the police department's practice to record any individual's phone line only with his or her knowledge or consent. (Tr. V. I at 136.)

67.     Fautz cited specifically the expectation of privacy of each individual user as his basis for requiring knowledge and consent prior to recording any individual's phone line. (Tr. V. I at 136.)

68.     In 2004, when Fautz asked DePaepe to add the division chiefs' lines to the voice logger, Fautz did not promulgate a procedure for which lines should be recorded. He did not send out memos on the same. He did not disseminate any writings on the same. He did not give any verbal directives on the same. (Tr. V. I at 129-130.)

69.     That a division chief's line could be recorded was offered as a "choice" to the individual.  (Tr. V. I at 134.)

70.     Fautz did not intend to establish a procedure to always record a certain phone number (e.g., 5990, which was Chief Kyle's phone number). (Tr. V. I at 135.)

71.     Likewise, it was specifically former Police Chief Boykins's customary practice to not record a line without the person's knowledge. (Tr. V. II at 184-185.) He recorded phone lines "on demand" only. (Tr. V. I at 186.)

72.     Boykins made no changes to the lines recorded. He specifically adopted Fautz's approach. This fact was stipulated to: "Darryl Boykins made no changes to any of the lines that were recorded. He specifically adopted the approach of Chief Fautz and issued no written or oral directive to create a policy, procedure, practice, or routine, and none was implemented during his tenure." (Stipulations ¶ 15; Tr. V. I at 184.)

73.     Under both Chief Fautz and Chief Boykins, there were no general announcements as to recording individual officers' phone lines. There were no written announcements. There were no verbal directives. (Tr. V. I at 130, 196, 224.)

**D.     It is the police department's policy to record all 911 calls and front desk calls 24/7, whereas individual officers' private phone lines are recorded by user request only.**

74.     There are over 100 phone lines in the South Bend Police Department. (Tr. V. I at 101-102.)

75.     It was never a practice of the South Bend Police Department to record every phone line. (Stipulations ¶ 12; Tr. V. I at 105.)

76.     It was common knowledge that the phone lines to the front desk and 911 phone lines were recorded. (Tr. V. I at 101-102.)

77.     Three phone lines of 25 to 30 lines in the detective bureau were recorded. (Tr. V. II at 56.)

78.     There was a manual for dispatchers. It stated, among other things, that all lines from dispatch were recorded and kept for three years. It stated that the dispatchers were not to use the dispatch lines for personal calls, and they were not to use profane language while on those lines. (Tr. V. I at 35-36.)

79.     There was no written manual for communications supervisors or directors. (Tr. V. I at 33-34.)

80.     In the communications department, only the communications director had access to the personal phone lines that were in the voice logger system because those phone lines belonged to high ranking officers. The phone lines were confidential and private. They were used

11

by individuals, unlike the front desk lines, which were manned 24 hours a day, seven days a week by different people. (Tr. V. II at 116.)

81.     Only DePaepe as communications director had access to those "admin" lines—the division chiefs' and police chief's phone lines. (Tr. V. II at 114.)

82.     Officers had no formal training, advisement, or manual regarding phone lines. (Tr. V. II at 10.)

83.     Steve Richmond's experience was representative of other officers in the police department. He first became aware that certain the radio room and the front desk were recorded as a cadet in 1973. (Tr. V. II at 7.) But during his time as a command staff officer (meaning captain and above), even Richmond was unaware of the routine and/or course of business of recording individual phone lines. (Tr. V. II at 19.)

84.     In fact, Richmond used a digital recorder when he was division chief because he did not know that he could make a request to have his personal phone line recorded. He would have preferred, however, the digital recorder to any 24/7 recording due to certain sensitive conversations that required security clearance. (Tr. V. II at 10, 14-15.)

**E.     Young's phone line was not recorded for investigative purposes.**

85.     It of course served no law enforcement purpose for a phone line to be inadvertently recorded. (Tr. V. I at 169.)

86.     Recording Young's 6031 number served no law enforcement purposes because even if important information were recorded on that line, it could not be retrieved specifically because no one in the department knew that the line was recorded. (Tr. V. II at 205.)

87.     There was no law enforcement purpose to taping Young's line *a priori*. But after listening to the recordings, Boykins determined that there might be a law enforcement purpose in continuing to record the line. (Tr. V. I at 194-196.)

**F.      Young's line was recorded in violation of the police department's recording policy because Young had no knowledge, and he gave no consent.**

88.     For 10 months, Young did not know that his line was recorded. (Tr. V. II at 192.)

89.     Even after Young asked in October of 2011 that his phone line be taken off the voice logger system, he discovered on January 17, 2012, that it was still being recorded. (Tr. V. II at 74-75.)

90.     Young was upset that his line was recorded because he was not given prior notice. (Tr. V. II at 89-90.)

91.     Young thought that it was intentionally concealed from him that his phone line was being recorded. (Tr. V. II at 85.)

92.     The practice followed by Fautz and continued by Boykins was that the department would only record private phone lines with the person's knowledge and permission. (Stipulations ¶ 15; Tr. V. I at 137.)

93.     DePaepe acknowledged that the police department's approach to recording individual officers' private phone lines—whether called a policy or practice or routine—was not adhered to in Young's case. Rather, recording Young's phone line was "making a change" or "doing it a different way." (Tr. V. II at 192.)

### III. Argument

**A.      The recordings were in violation of the Federal Wiretap Act.**

The Federal Wiretap Act states that it is illegal to intentionally intercept wire

communications, and it is illegal to intentionally disclose the contents of any wire

communications that were obtained through such an interception. 18 U.S.C. § 2511.  Here, there

is no dispute that the recordings at issue were "intercepted"[1] under the Act, and that the

recordings were made intentionally under the Act. They were therefore in done in violation of

the Federal Wiretap Act.

1.      The recordings became illegal when DePaepe discovered that Young's
        line was recorded, and she took no corrective action to stop it.

Intentionality requires that a person's act must have been the product of her conscious

objective rather than the product of a mistake or an accident.  *United States v. Townsend,* 987

F.2d 927, 930 (2d Cir. 1993). Affirmative action is not required. It is enough to be aware that

such interception is occurring and to fail to stop it. *Narducci v. Moore,* 444 F. Supp. 2d 924, 935-

936 (N.D. Ill. 2006).

Here, because no one realized that Young's phone line was recorded until approximately

February of 2011, there was no illegal conduct until DePaepe discovered that the line was

recorded. She made the discovery while she was troubleshooting in early 2011, which required

her to check every phone line in the voice logger system to see if there was "usable voice." (Tr.

V. II at 122.) She recognized Young's voice. She realized that his phone line was mistakenly

recorded. DePaepe's first thought was that this was a "malfunction in the system." That

malfunction never happened before. (Tr. V. II at 129.) To this point, there was no violation of the

---

[1] "Intercept" is a defined term meaning the aural or other acquisition of the contents of any wire,
electronic, or oral communication through the use of any electronic, mechanical, or other device.
18 U.S.C. § 2510 (4).

Federal Wiretap Act, which requires that interceptions be intentional before liability attaches. *Abraham v. County of Greenville, S.C.,* 237 F.3d 386, 392 (4th Cir. 2001).

DePaepe then committed violation of the Federal Wiretap Act because she knew that Young's private phone line was being recorded mistakenly, and yet she took no corrective action. *Narducci,* 444 F. Supp. 2d at 935-936. Having discovered the mistaken recordings, it was in the ordinary course of DePaepe's duties to find out why the malfunction occurred, and when it occurred. (Tr. V. II at 158.) Going above and beyond her duties, DePaepe took it upon herself to initiate an investigation by listening to the administrative phone line. (Tr. V. II at 151.) She listened to those recordings and reported their contents to Chief Boykins.

After DePaepe made Boykins aware of the recordings, Boykins encouraged further illegal activity. In March of 2011, DePaepe told Boykins about the conversations. (Tr. V. II at 149.) DePaepe did not tell Young or her supervisor, Gary Horvath, or internal affairs. (Tr. V. II at 144.) Boykins did not tell DePaepe to fix the mistake. Nor did he instruct her to inform Young or anybody else. (Tr. V. I at 191-192.) Boykins instead instructed DePaepe to prepare an officer's report on what she heard on those recordings. It took a long time to make the officer's report because Boykins wanted her to find other similar recordings. (Tr. V. II at 165.) Boykins further instructed DePaepe to copy the recordings onto audio cassette tapes. DePaepe did so, copying eight different recorded conversations onto five cassette tapes. (Stipulations Doc. No. 155.) All of this activity—from the time that DePaepe discovered the recordings on—met the intentionality requirement under the Act, and was therefore illegal.

> 2.   The Common Council has conceded from the outset that the recordings were intentional under the Act.

The parties agree that this case presents a *prima facie* violation of the Federal Wiretap Act. *See Amati v. City of Woodstock,* 176 F.3d 952, 954 (7th Cir. 1999) (noting that "the taping

was indeed a *prima facie* violation," though it was done in the ordinary course of business). The Common Council in its Answer to the Complaint for Declaratory Judgment alleged only that the recordings fall within the statutory exclusions from the Federal Wiretap Act under 18 U.S.C. § 2510(5). (Common Council's Answer at ¶ 17.) In similar fashion, the Common Council's Trial Brief stated that there was only one issue for the Court to decide—whether the ordinary course of business exclusion applied to this case. The brief stated: "The only issue before this Court is whether the recordings are excluded from the Wiretap Act by the Ordinary Course Exclusion." (Doc. No. 151 at 14.) The Common Council therefore waived the argument that the recordings were legal because they were purely inadvertent.

**B.      The ordinary course of business exception does not apply.**

The Common Council contends that all telephone calls that were intercepted by the Police Department were done in the ordinary course of business (also called "business use exception") under 18 U.S.C. § 2510(5). To the contrary, it was not policy of the South Bend Police Department to record every phone line. (Tr. V. I at 105.) Officers' private phone lines were recorded on demand only with the user's knowledge and consent. (Tr. V. I at 137, 186.) Young's line was mistakenly recorded. (Tr. V. I at 94, 190; V. II at 147, 189.) Nobody even knew that Young's phone line was recorded. (Stipulations ¶ 22; Tr. V. II at 205.) This was not a recording done in the ordinary course of business. This was a mistaken recording that fueled an illegal, rogue "investigation" of private phone calls.

1.      Young's 6031 line was recorded inadvertently—not in the ordinary course.

The business use exception does not apply where there is no department policy that all phone calls are recorded and/or monitored. *Abraham v. City of Greenville,* 237 F.3d 386, 389

16

(4th Cir. 2001). In *Abraham*, several state court judges in South Carolina brought suit against the County of Greenville under the Wiretap Act when they discovered that their personal phone calls made from the detention center were being recorded. The county appealed from a jury verdict in favor of the plaintiffs, which verdict the Fourth Circuit upheld because the county was recording the phone calls mistakenly. There was no policy regarding the judges' phone calls. The business use exception—which the court pointed out is not a limitless concept—did not apply. *Id.* at 391.

Here, Young's personal phone line was certainly not recorded in the ordinary course of business, or for any business use. The "ordinary course of business" is not defined in the statute, but it generally requires that the use be (1) for a legitimate business purpose, (2) routine and (3) with notice. *Adams v. City of Battle Creek,* 250 F.3d 980, 984 (6th Cir. 2001). The gold standard of the business use exception is a police department that "routinely and indiscriminately records all phone activity." *Id.* It was never a practice of the South Bend Police Department to record every phone line. (Stipulations ¶ 12; Tr. V. I at 105.) It of course served no law enforcement purpose for a phone line to be inadvertently recorded. (Tr. V. I at 169.) The recording was not routine, but rather was what DePaepe called a "malfunction" in the voice logger system. (Tr. V. II at 129.) Young was not given prior notice. (Tr. V. II at 89-90.) The recordings at issue are wholly uncharacteristic of the ordinary course, and the exception therefore does not apply.

2.      There was no policy or procedure for recording phone lines, save that the police chiefs required knowledge and consent for recording individual officers' phone lines.

Determinations as to whose private phone lines were recorded were made on an *ad hoc* basis. That a division chief's line could be recorded was offered as a "choice" to the individual. (Tr. V. I at 134.) When Fautz was a division chief from 1997 through 2002, there was never written notice of which phone lines were recorded. There was never written notice of procedures

for recording phone lines. (Tr. V. I at 125.) When Fautz was the police chief from September 2002 through December 28, 2007, it was the police department's practice to record any individual's phone line only with his or her knowledge or consent. (Tr. V. I at 136.) In 2004, when Fautz asked DePaepe to add the division chiefs' lines to the voice logger, Fautz did not promulgate a procedure for which lines should be recorded. He did not send out memos on the same. He did not disseminate any writings on the same. He did not give any verbal directives on the same. (Tr. V. I at 129-130.) Boykins followed the same practices as Fautz, recording individuals' phone lines on demand only. (Tr. V. I at 184-185.)

The business use exception does not apply here because Young's phone line was recorded in violation of the standard practice. Young did not ask for his line to be recorded, know that his line was recorded, or consent to his line being recorded. (Tr. V. II at 89-90.) Once he discovered that his line was recorded, he asked that it be stopped immediately. (Tr. V. II at 74.) He learned three months later, however, that his line was still recorded. (Tr. V. II at 74-75.) This case is in stark contrast to *Amati v. City of Woodstock,* 176 F.3d 952 (7th Cir. 1999), which involved (1) a purposeful determination by the department to tape the phone line at issue, and (2) a department policy adopted to record all of the incoming and outgoing lines into the department. *Id.* at 955. Here, (1) no one was aware when Young took over his new office that his line was recorded, and (2) the police department never adopted a procedure, practice, or routine of recording all of the incoming and outgoing lines into the department. The recordings here were anything but "the ordinary course."

3.   Boykins's and DePaepe's conduct here was akin to an illegal warrantless search.

Boykins admitted that there was no law enforcement purpose to taping Young's line *a priori*. But after listening, Boykins determined that there might be a law enforcement purpose in

continuing to record the line. (Tr. V. I at 194-196.) DePaepe similarly decided to initiate an "investigation"—meaning listening to hours of Young's personal conversations—after she discovered that it was Young's voice on the voice logger system. (Tr. V. II at 151.) Boykins's and DePaepe's retrospective justifications violated the principle of legality and intruded on Young's and others' reasonable expectations to privacy. *Abraham,* 237 F.3d at 390 (finding that there was no valid, law-enforcement related reason to record the judges' phone conversations, because the judges were not under investigation.) The actions taken here were not conducted in the ordinary course of business.

The recordings here were clearly in violation of the Federal Wiretap Act under the principles enunciated in *Amati v. City of Woodstock*. The Seventh Circuit explained: "The boundary is between routine noninvestigative uses of electronic eavesdropping and its use either as a tool of investigation (which requires a warrant) or as a device for intimidation, suppression of criticism, blackmail, embarrassment, or other improper purposes." *Amati,* 176 F.3d at 956. Here, the recordings were neither routine nor noninvestigative. Boykins and DePaepe admitting to launching an investigation. They did not, however, obtain a warrant, or contact the proper channels for conducting an internal investigation. The investigation was done in furtherance of intimidation and harassment, and it was therefore illegal.

4.     The recordings here were a device for intimidation, suppression of criticism, blackmail, and embarrassment.

Boykins revealed his motives for listening to the recordings. He learned about the recordings in March of 2011. (Tr. V. II at 149.) Pete Buttigieg won the South Bend mayoral election in November of 2011. (Tr. V. II at 34.) Richmond interviewed with the mayor-elect. On January 6, 2012, Boykins told Richmond that Boykins no longer considered Richmond a "loyal" employee. He considered Richmond a backstabber. Boykins told Richmond that Boykins was

informed that Richmond was disrespectful during the interview with the mayor. (Tr. V. II at 49.) Boykins told Richmond that Boykins listened to the tape and wanted to see if Richmond would "man up" to what Boykins heard him say. (Tr. V. II at 59.)

Boykins likewise told Young that he felt stabbed in the back. Boykins told Young that it had nothing to do with Young's job performance. Boykins said instead that it had everything to do with whom Boykins could trust. (Tr. V. II at 99-100.) Both Richmond and Young were so distressed by what Boykins told them that they assumed that their jobs were in jeopardy. (Tr. V. II at 60-61, 100.)

The facts of this case are strikingly similar to those in *United States v. Townsend,* 987 F.2d 927 (2d Cir. 1993). There, the Second Circuit upheld a criminal conviction of a sheriff who listened to employees' phone conversations to "find out who might be in the office that was betraying him" and to keep track of his employees' loyalties. *Id.* at 928. Here, too, Boykins— paranoid—used the recordings as a tool not for legitimate law enforcement purposes, but as a tool for keeping track of who was trustworthy and loyal.[2] Boykins's behavior was a prime example of what the Seventh Circuit referred to in demarcating routine noninvestigative recordings versus recordings used for intimidation, suppression of criticism, blackmail, embarrassment, or other improper purposes. *Amati,* 176 F.3d at 956. The latter are not ordinary course of business recordings under the Act, and they are therefore illegal.

---

[2] *Paranoid* is Boykins's own testimony. (Tr. V. I at 196.)

## IV. Conclusion

Respondents Brian Young, Sandy Young, Timothy Corbett, David Wells, and Steve Richmond have an important privacy interest in this action. That interest is to prevent the disclosure of conversations that they had every reason to think were private and personal. *See Gelbard v. U. S.,* 408 U.S. 41, 48 (1972). For the forgoing reasons, Corbett, Richmond, Wells, and the Youngs respectfully request that the Court declare the recordings were captured in violation of the Wiretap Act, and issue a permanent injunction prohibiting disclosure of the recordings.

Respectfully submitted,

Dated: September 15, 2014

/s/ Daniel H. Pfeifer
Daniel H. Pfeifer (5720-71)
Jeffrey J. Stesiak (16876-46)
Jerome W. McKeever (30022-71)
Attorneys for Respondents
PFEIFER, MORGAN & STESIAK
53600 North Ironwood Drive
South Bend, Indiana 46635
(574) 272-2870

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 15th day of September, 2014, a copy of the foregoing was served upon all counsel of record via the Court's electronic filing system.

/s/ Daniel H. Pfeifer_____