UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION


| | | |
|---|---|---|
| CITY OF SOUTH BEND, BY ITS CORPORATION COUNSEL ALADEAN M. DEROSE, | ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | 3:12-cv- 475 |
| UNITED STATES OF AMERICA, ERIC H. HOLDER, JR., IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STAES, SOUTH BEND COMMON COUNCIL, TIM CORBETT, DAVE WELLS, STEVE RICHMOND, BRIAN YOUNG, AND SANDY YOUNG, | ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

**SOUTH BEND COMMON COUNCIL'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Respondent, South Bend Common Council, by counsel, pursuant to this Court's

August 13, 2014 order, submits its Proposed Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

1.     The practice of recording certain, but not all, incoming telephone lines to the

South Bend Police Department dates back to at least 1998-1999. (Stipulated).

2.     The recording system at issue is a component part of the telephone system in the

South Bend Police Department. The telephone service is provided by AT&T. (Transcript Vol. 1,

p. 17, ll. 1 – 10; p. 25, ll. 7 – 11.)

3.     To record a particular telephone line, the Police Department would have to

contact a third-party vendor to connect the line to the recording system. The particular line to be

recorded had to be hardwired to the recording system. If a line was not hardwired into the system, the system would not record any conversations on that phone line. (Stipulated.)

4.      Once a particular phone line was wired into the recording system, the recording system would record everything it "heard" on that line regardless of who was speaking on the line, the content of the conversation, or the time of day of the conversation. Anything so recorded would be stored on the recording system's hard drive and would be downloaded automatically to a disk for backup and storage purposes. (Stipulated.)

5.      All the communications that are recorded on the system are recorded 24 hours a day, 7 days a week. (Transcript, Vol. 1, p. 73, ll. 23-25.)

6.      Only the Chief of Police had authority to make the decision to make any changes in the telephone lines being recorded. (Stipulated.) The Chief's authority applied to both officers' individual lines and lines going into the Communications Center and Front Desk.

7.      The recordings would continue on that particular line being recorded until the Chief of Police ordered otherwise. (Transcript, Vol.1, p. 88, l. 7 – p. 89, l. 9; Holleman dep. p. 34, ll. 9 – 12.)

8.      All of the conversations at issue were automatically intercepted by the system and recorded on its hard drive prior to any subsequent listening or recording of the conversation on cassette tapes. (Stipulated.)

9.      The recording system was maintained by Police Department Communications Director, Karen DePaepe, who began serving in that position on July 1, 1998. (Stipulated.)

10.      DePaepe was not an officer of the Police Department, nor was she an "investigative or law enforcement officer" as that term is defined by 18 U.S.C. § 2510(7). (Stipulated.)

2

11.     It would be in the ordinary course of the Director of Communications' duties to find information on recorded lines for the prosecutor and state police. (Transcript, Vol. 1, p. 77, ll. 1-15.)

12.     It would also be the responsibility of the Communications Division to obtain information for the media pursuant to Freedom of Information Act requests. (Transcript, Vol. 1, p. 77, ll. 16-23.)

13.     Karen DePaepe, as keeper of the records for the Communications Division, had the authority to listen to the lines being recorded at the request of the Chief. (Transcript, Vol. 1, p. 89, l. 23 – p. 90, l. 2.)

14.     The same applies for requests from other officers, prosecutors, and others. It was within DePaepe's ordinary course of her duties to perform such tasks. (Transcript, Vol. 1, p. 90, ll. 3-8.)

15.     Any addition or deletion of recorded lines would be coordinated through DePaepe and the Chief of Police who instructed DePaepe on any changes to the system that had been determined. (Stipulated.)

16.     Each Chief of Police since Larry Bennett has had a list of phone lines of officers being recorded. (Holleman dep. p. 7,  ll. 2 – 16; p. 14, ll. 19 – 25; p. 18, ll. 1 – 11.)

17.     In many circumstances, a police officer could retain his telephone number when he moved from one physical office to another or changed positions within the Police Department. Retention of an existing number would be through Barb Holleman, the administrative assistant to the Chief of Police. (Holleman dep. p. 25, l. 9 – p. 27, l. 3.)

18.     Darrell Gunn was Chief of Police from January 1996 to June 1999. (Stipulated.)

19.     Chuck Hurley was Chief of Police for the South Bend Police Department from April 1984 to October 1988 and from March 2011 to April 2012. (Stipulated.)

20.     While Gunn and Hurley were the Chiefs of Police, there was no policy, written or otherwise, regarding the recording of private lines of police officers. (Stipulated.)

21.     Brent Hemmerlein was the acting Chief of Police from June 6, 1999 until the end of October 1999. (Hemmerlein dep., p. 6, ll. 5-17.)

22.     Under Chief Hemmerlein, there was no written documentation with regard to what telephone lines were being recorded. (Hemmerlein dep., p. 15, ll. 16-21.)

23.     Under Chief Hemmerlein, telephone lines were recorded by the South Bend Police Department for verification and substantiation of complaints, particularly related to citizens. (Hemmerlein dep., p. 28, ll. 13-18.)

24.     Under Chief Hemmerlein, It was up to the Chief to make the determination as to which lines would be recorded. (Hemmerlein dep., p. 28, l. 25 – p. 29, l. 3.)

25.     At all relevant times, the Board of Public Safety had not promulgated and did not have any written policy regarding the recording of telephone lines within the Police Department. (Stipulated.)

26.     The Police Department never adopted a procedure, practice, or routine of recording all of the incoming and outgoing lines into the Police Department. (Stipulated.)

27.     The Office of Professional Standards in the South Bend Police Department had a general order for the purpose of receiving, investigating, and processing complaints against employees of the South Bend Police Department. Paragraph IV(D), under the heading "EMPLOYEE RIGHTS" states: "Employees do not have a right to privacy for assigned

equipment. The Department may enter and inspect any assigned equipment." (Exhibit 5,

p. 5 of 7.)

28.     South Bend police officers were required to sign off on the above policy.

(Transcript, Vol. 2, p. 28, ll. 7 - 10; p. 82, ll. 1 - 6.)

29.     There was never any secrecy regarding the recorded lines in the South Bend

Police Department.  Anyone within the Department could ask, and be told if a line was being

recorded. (Transcript, Vol. 1, p. 79, l. 4 – p. 80, l. 17; p. 142, ll. 10  -18;  p. 161, ll. 11 – 19; p.

199, l. 9 – p. 200, l. 5; p. 171,  l. 16 – p.  172, l. 24.)

30.     It was common knowledge in the Police Department that some lines going into

the Department were being recorded. (Transcript, Vol.1, p. 25, ll. 19-22; Vol. 1, p. 92, ll. 6 – 19;

p. 199, ll. 2-15.)

31.     Jeffrey Walters, who retired from the South Bend Police Department as Chief of

the Uniform Division in 2012, did not know what lines were or were not recorded. He assumed

that all lines were recorded because he did not know what was or was not recorded. (Walters

dep. p. 59, l. 13- p. 60, l. 1; p. 68, ll. 5 – 8.)

32.     Neither Darrell Gunn nor Chuck Hurley, would have recorded a private line of a

police officer without advising the police officer that his line was being recorded. (Stipulated.)

33.     As far back as 1999, the Chief of Police, Larry Bennett, ordered that the line of a

captain of the records division be recorded without his knowledge and consent. (Hemmerlein

dep., p. 8, l. 17 – p. 9, l. 15.)

34.     The lines of the secretary for the Investigative Division have been recorded for

several years. (Holleman dep. p. 9, l. 4 – p. 10, l. 18.)

35.     Thomas Fautz was the Chief of the South Bend Police Department from September 2002 until December 2007. (Transcript Vol. 1, p. 120, ll. 19-20.)

36.     Fautz is aware that  it  is common for police departments to have a recording system for some of their telephone lines. (Transcript, Vol. 1, p. 123, l. 24 – p. 124, l. 7.)

37.     As Chief of Police, Fautz did not promulgate any written procedure or written directives in determining what phone lines into the Police Department should be recorded or any other writing that would have informed police officers to expect their lines to be recorded. (Transcript Vol. 1, p. 129, l. 19 – p. 130, l. 3.)

38.     As Chief of Police, Fautz did not ever give any verbal direction to police officers about a standard procedure for recording phone lines. (Transcript Vol. 1, p. 130, ll. 4-14.)

39.     Fautz did not establish a routine to record anybody other than people that chose to have their lines recorded. It was not Fautz's policy or practice to record police officers without their knowledge. (Transcript Vol. 1, p. 136, ll. 9-19.)

40.     Fautz did not announce his policy or procedure to his command staff, but thinks that it was their understanding. (Transcript Vol. 1, p. 137, ll. 1-3.)

41.     Diana Scott, the Assistant Director of Communications, did not know that it was Fautz's position that the person assigned to a recorded line would need to be told that the line was going to be recorded. (Transcript, Vol. 1, p. 104, ll. 8-12; p. 105, ll. 14-18.)

42.     When Darryl Boykins became a Division Chief, during the transition period, Police Chief Fautz recalls that he explained to Boykins the lines that were being recorded. Boykins was part of the command staff at that point. Fautz told Boykins that Fautz's line was taped, that Division Chief Kyle's line was taped, and that Division Chief Jim Hassig's line was taped and also explained that Internal Affairs was taped. Fautz explained to Boykins that it was

6

his decision if he wanted to continue with his line being taped or not. (Transcript, Vol. 1, p. 138, ll. 10-22.)

43.     Boykins disagreed with Faust and testified that when he became a Division Chief under Chief Fautz, he was not aware that his line was being recorded. (Transcript, Vol. 1, p. 198, ll. 8-17.)

44.     One of the purposes behind offering the choice to the Division Chiefs and the command staff was to ensure they had backup for their interactions with the public. (Transcript, Vol. 1, p. 141, ll. 4-8.)

45.     The command staff includes Division Chiefs and Captains. (Transcript, Vol. 2, p. 179, l. 23 – p. 180, l. 14; Walters dep. p. 80, ll. 1-10.)

46.     Under Chief Fautz, the recording system was not set up to intimidate, harass, or embarrass anyone. Instead, the system was used to gather evidence and to serve as a tool for those individuals who had their lines taped to either defend themselves or document what had taken place. (Transcript, Vol. 1, p. 91, ll. 4-18; p. 144, ll. 5-13.)

47.     The recording system did not record a conversation based on content or individual or time of day or to blackmail or intimidate a participant. It also did not depend on the specific kind of conversation. The system was not used to spy on, embarrass or threaten any participant. (Transcript, Vol. 1, p. 147, l. 17 – p. 148, l. 17.)

48.     The decisions Fautz made regarding the recording system were done for legitimate law enforcement purposes. (Transcript, Vol. 1, p. 146, ll. 4-8.)

49.     The recording system was also designed, in part, to assist Indiana State Police officers if they wanted to obtain evidence from recorded calls into the South Bend Police

Department. The South Bend Police Department would assist the Indiana State Police in gathering that information and providing it to them. (Transcript, Vol. 1, p. 146, ll. 9-17.)

50.     The recording system was also designed to record anonymous tips to assist the Police Department in investigations. (Transcript, Vol. 1, p. 146, l. 25 – p. 147, l. 2.)

51.     The entire recording system and the decisions that were made as to what lines to record with that system were done for legitimate law enforcement purposes. That did not change while Fautz was Chief of Police. (Transcript, Vol. 1, p. 147, ll. 9-16.)

52.     Chief Boykins, when he became Chief of Police, learned about the recorded lines in discussions with Karen DePaepe and Barb Holleman. (Transcript, Vol. 1, p. 184, ll. 1-4.)

53.     When Chief Boykins became Chief of Police, there was nothing written in regard to procedures for recording lines in the Police Department. (Transcript, Vol. 1, p. 184, ll. 5-7.)

54.     In 2007, when Chief Boykins was appointed Chief of Police to succeed Fautz, the same phone lines being recorded under Chief Fautz continued to be recorded. (Stipulated.)

55.     Boykins made no changes to any of the lines that were recorded, specifically adopted the approach of Chief Fautz, and issued no written or oral directive to create a policy, procedure, practice or routine and none was implemented during his tenure as Police Chief. (Stipulated.)

56.     During Chief Boykins' tenure, he never directed Karen DePaepe to record a particular office or a particular officer. (Transcript, Vol. 1, p. 187, ll. 18-22.)

57.     Boykins never made any kind of general announcement to the police department about which lines were recorded. (Transcript, Vol. 1, p. 196, ll. 21-23.)

58.     The policy of each Police Chief with regard to recording officers' individual lines was a personal policy, more akin to a personal philosophy, which was not the policy of the South Bend Police Department.

59.     The personal policy of each Police Chief with regard to recording officers' individual lines was not communicated to members of the police department either verbally or in writing.

60.     During Boykins' 30 years with the South Bend Police Department, it was common knowledge among the police officers that some telephone lines into the Police Department were being recorded. (Transcript, Vol. 1, p. 199, ll. 1-15; Walters dep. p. 80, l. 14 – p. 81, l. 6.)

61.     Diana Scott is the current Director of Communications for the South Bend Police Department. Scott's prior position was the Assistant Director of Communications. (Transcript, Vol. 1, p. 28, ll. 9-16.)

62.     None of the policies received by Diana Scott had anything to do with what telephone lines should be recorded. (Transcript, Vol. 1, p. 31, ll. 23-25.)

63.     The recording system did not have the capacity to record all lines into the South Bend Police Department. (Transcript, Vol. 1, p. 39, ll. 1-9.)

64.     The recording system is voice activated meaning once a voice or noise is heard, the  recording system activates. (Transcript, Vol. 1, p. 43, ll. 9-15.)

65.     Lines were recorded, in part, because the Police Department is called upon in court cases to provide 911 recordings. The Police Department is also required to do quality assurance checks for emergency medical dispatches as well as for other types of calls to make sure that the dispatchers and personnel are adhering to policies and procedures. The Police

Department also investigates complaints as well as requests from investigators. (Transcript, Vol. 1, p. 43, ll. 16-24.)

66.     In July 2009, there were some lines that Diana Scott knew that were recorded and others that she did not know. (Transcript, Vol. 1, p. 44, ll. 6-13.)

67.     Other than the Front Desk and 911 calls, Scott knew that other lines were recorded, she just did not know what lines.. (Transcript, Vol. 1, p. 45, ll. 19-23p. 52, ll. 11-13.)

68.     Scott knew there were recorded lines that went to the Chief's offices and Internal Affairs, but did not know specifically what lines were recorded. (Transcript, Vol. 1, p. 46, ll. 7-16.)

69.     Prior to DePaepe going on medical leave, Scott knew that some Division Chiefs' lines were recorded but did not know if all of them were recorded. Scott had no specific understanding as to whether Captains in the Uniform or Investigative Divisions had recorded telephone lines. (Transcript, Vol. 1, p. 58, ll. 7-20.)

70.     While Boykins was Chief of Police, the system, as set up, was to be used for legitimate law enforcement purposes. (Transcript, Vol. 1, p. 201, ll. 11-13, l. 22 – p. 202, l. 1.)

71.     Whatever was being recorded under Chief Fautz continued to be recorded and there was no change during Boykins' tenure. (Transcript, Vol. 1, p. 207, ll. 4-6.)

72.     The recording system was never used to record a conversation to blackmail or intimate a participant or to spy on, embarrass, or threaten any participant. (Transcript, Vol. 1, p. 208, ll. 4-6, 10-12.)

73.     Rick Bishop, a police officer, knew that some of the police lines were recorded including common numbers like the front desk and communications room and that some other lines were being recorded. However, he had no idea which ones were being recorded. No one

ever made a general announcement about the lines that were to be recorded.. (Transcript, Vol. 1, p. 224, ll. 9-25.) He also received no written information. (Transcript, Vol. 1, p. 225, ll. 1-2.)

74.     Bishop did not know what Chief Fautz's protocol was for determining which lines were being recorded and which ones were not. (Transcript, Vol. 1, p. 236, ll. 6-10.)

75.     Although Bishop could not speak for other police officers, he knew that some lines were recorded and some lines were not. (Transcript, Vol. 1, p. 240, l. 19 – p. 241, l. 1.)

76.     Steve Richmond first became aware that phone lines were being recorded in his initial intake as a cadet in 1973. He was told that lines in the radio room and the front desk were recorded. (Transcript, Vol. 2, p. 7, ll. 13-21.)

77.     There was no discussion about other recorded lines at that time. (Transcript, Vol. 2, p. 7, ll. 22-24.)

78.     After Richmond became a Captain in the Investigative Decision in 2006, he never received any written materials that stated the policy or procedural routine in regards to recorded lines and never heard an announcement by the Division Chief or the Police Chief about recorded lines. (Transcript, Vol. 2, p. 10, ll. 14-25.)

79.     Richmond thought that the front desk and communications center were recorded. (Transcript, Vol. 2, p. 11, ll. 1-4.)

80.     Richmond did not learn anymore about the recording practices when he became a Division Chief in February 2010. (Transcript, Vol. 2, p. 11, ll. 5-16.)

81.     In Richmond's years as Division Chief, there was never any discussion of recorded lines and what the ordinary course of business should be in the South Bend Police Department for recorded lines. (Transcript, Vol. 2, p. 19, ll. 16-20.)

82.     Before Brian Young became Captain of the Investigative Division, his understanding was that the recorded lines of the Police Department were the front desk and communications center, and the 911 lines coming into the communications center. He later learned through conversation with a former Internal Affairs' investigator that the Internal Affairs' line was also recorded. (Transcript, Vol. 2, p. 65, ll. 9-13.)

83.     Young was not aware, and was not informed, that any other lines were being recorded. (Transcript, Vol. 2, p. 65, ll. 16-19.)

84.     Young was not aware of any general announcement to officers regarding the possibility of being recorded on phones in the Police Department. He also received no information in writing. He also had no information as to any routine or ordinary course of practice in the South Bend Police Department to record individually-assigned lines. (Transcript, Vol. 2, p. 67, ll. 6-17.)

85.     The telephone line at issue, 245-6031, for purposes of this litigation, was assigned to Rick Bishop when he was a Captain assigned to the Detective Bureau around 2002. (Transcript, Vol. 1, p. 224, ll. 2-8.)

86.     Bishop became Captain in Rick Management in January 2005. In that capacity, Bishop oversaw Internal Affairs. (Transcript, Vol. 1, p. 225, ll. 11-17.)

87.     At some point, Bishop requested Chief Fautz to record the 6031 telephone line due to problems Bishop was having with an individual who would call and leave lengthy messages after business hours. (Transcript, Vol. 1, p. 226, ll. 11-20.)

88.     There is a factual dispute as to when the 6031 line was first recorded. Bishop recalls his request as taking place in 2005. Karen DePaepe, based on the documentation regarding when a third-party vendor added recorded lines to the system, together with her list of

12

recorded lines, believes that the 6031 line began to be recorded in 2004 when Bishop was still a Captain in the Investigative Bureau. (Transcript, Vol. 2, p. 137, l. 25 – p. 139, l. 7; p. 139, ll. 18-21; p. 152, l. 14  – p. 154, l. 5; p. 154, ll. 10-25; p. 160, ll. 6-18; p. 161, l. 7 – p. 162, l. 2; Exhibit 6; Exhibit 10; Exhibit 21 (last page, invoice dated September 27, 2004)).  The undisputed testimony is that a third party vendor did not add or delete recorded lines after the work reflected in the September 27, 2004 invoice. (Transcript Vol. 1, p. 143, l. 12 – p. 144, l. 2; p. 149, ll.11 – 14; p. 206, l. 24 – p. 207, l. 6.)  Although the Court determines that the testimony of Ms. DePaepe is more credible, and that the 6031 telephone line was being recorded at some point in time while Bishop was Captain of the Investigative Division, the determination of when the 6031 line actually began to be recorded is immaterial to the issues before the Court.

89.     On January 10, 2007, Bishop was promoted to Division Chief of the Investigative Division. Bishop kept the 6031 telephone number. (Transcript, Vol. 1, p. 228, l. 23 – p. 229, l. 7.)

90.     At the time Bishop was promoted and changed offices, he had forgotten that the 6031 phone line was being recorded. (Transcript, Vol. 1, p. 229, ll. 21-24; p. 230, ll. 3-7.)

91.     Around February 12, 2010, Steve Richmond was promoted from a Captain in the Investigative Division to Chief of the Investigative Division. Richmond succeeded Rick Bishop in that position. (Stipulated.)

92.     Upon receiving his promotion, Richmond was assigned to the office that had been occupied by former Investigative Division Chief Bishop. (Stipulated.)

93.     Richmond wanted to maintain his assigned phone number after his promotion and new office assignment. (Stipulated.)

94.     Barb Holleman, the administrative assistant to the Chief of Police, performed the task of switching the lines that were connected to Richmond's former office and new office. In

the process of transferring Richmond's phone number (235-7473) to his new office, Holleman transferred the phone number in the office that Richmond was going to occupy (245-6031) to the office that was now assigned to Young. Neither Holleman nor Young knew that the 6031 line was wired into the recording system. (Stipulated.)

95.     At the time the 7473 and 6031 lines were switched, no one was occupying the Investigative Division Captain's office. There was a gap of two to five weeks between the time Richmond was promoted to Division Chief and the time Young was promoted to Investigative Division Captain. (Transcript, Vol. 1, p. 187, l. 25 – p. 188, l. 2; p. 204, l. 23 – p. 205, l. 9; Vol. 2, p. 25, l. 8 – p. 126, l. 7.) Richmond was promoted on February 15, 2010. Young was promoted on March 22, 2010. (Transcript, Vol. 2, p. 25, ll. 8 -17.)

96.     When Young took over the 6031 line, it continued to be recorded by the system. (Transcript, Vol. 1, p. 89, ll. 2-6.)

97.     There was no order by the Chief of Police to remove the 6031 line from the recording system. (Transcript, Vol. 1, p. 89, ll. 7-9; Vol. 2, p. 163, ll. 9-14; Stipulated.)

98.     No one was aware when Young took over his new office that his line was recorded. No one informed Young when he moved into his new office that his calls were being recorded. (Stipulated.)

99.     In February 2011, the recording system "crashed" and required DePaepe to listen to every recorded line to see if data was missing. (Transcript, Vol. 2, p. 120, l. 21 – p. 121, l. 6; p. 121, l. 17 – p. 122, l. 19; p. 123, ll. 6-8, l. 17 – p. 124, l. 14; p. 124, ll. 18-20.) When the recording system crashed, it was the responsibility of the Communications Division Director to make sure that whatever was being recorded was not lost. That responsibility was in the ordinary

14

course of the duties of the Director of the Communications Division. (Transcript, Vol. 1, p. 76, ll. 2-10.)

100.    Although Diana Scott and supervisors in the Communications Division had access to recordings of some of the lines, only Karen DePaepe had access to all of the recorded lines. (Transcript, Vol. 1, p. 66, ll. 6-15.)

101.    A Communications Director or Assistant Director, during the course of performing her duties, would come to recognize the voices of various police officers who worked in the Police Department. (Transcript, Vol. 1, p. 71, ll. 18-21.)

102.    While troubleshooting the system, DePaepe recognized the voice of Captain Young. DePaepe found it odd because she thought the line she was checking was the line of Division Chief Richmond. (Transcript, Vol. 2, p. 125, l. 19 – p. 126, l. 1.)

103.    DePaepe was confused because she thought that 6031 was Division Chief Richmond's line. She thought there must be some malfunction in the system because she heard Young on the line. (Transcript, Vol. 2, p. 129, ll. 8-16.)

104.    The initial conversation DePaepe listened to was recorded the day she was performing the troubleshooting on the system, February 4, 2011. (Transcript, Vol. 2, p. 131, ll. 4-9.)

105.    In an attempt to resolve her confusion, DePaepe went back through the recordings of the lines before the malfunction and learned that Young had been using 6031. She then went to her office to check the computer-aided dispatch system and learned that the 6031 line had been assigned to Young. (Transcript, Vol. 2, p. 131, ll. 15-25; p. 132, ll. 18-22; p. 133, ll. 6-12; p. 156, l. 21 – p. 158, l. 16.)

106.     While DePaepe was troubleshooting the recording system and attempting to resolve the issue of Captain Young's voice on the 6031 line, she heard something that disturbed her. DePaepe thought what  she heard something that was illegal. (Transcript, Vol. 2, p. 143, l. 16 – p. 144, l. 2.)

107.     If someone in the Communications Division was listening to a call in the course of trying to determine if there was lost data and she heard something that she believed indicated there was some wrongdoing by somebody in the Police Department, it was the Communications Center's responsibility to report that information through the chain of command. (Transcript, Vol. 1, p. 70, ll. 10-17.) Fautz would expect a civilian working in the Communications Division, if she heard something that she believed exhibited some kind of wrongdoing by an employee or officer, to report it. (Transcript, Vol. 1, p. 140, ll. 8-12.)

108.     If Scott heard something that she believed may reflect improper conduct, she would listen to the tape long enough to be sure of what she was hearing before she reported it. (Transcript, Vol. 1, p. 78, ll. 11-23.)

109.     When listening to recorded conversations, the Director of Communications would have to use her discretion of what the context was of what was being sought under the circumstances. (Transcript, Vol. 1, p. 176, l. 21 – p. 177, l. 14, ll. 20-25.)

110.     DePaepe waited a couple weeks before reporting the conversation to Boykins because she was very disturbed about what she heard. She then called Police Chief Boykins to her office to discuss it. (Transcript, Vol. 2, p. 166, ll. 4-15.)

111.     After the discussion, Boykins did not tell DePaepe to make any changes in the lines being recorded. (Transcript, Vol. 2, p. 167, ll. 14-18.)

16

112.     When Boykins learned from DePaepe that Young's conversations were being recorded, he did not tell DePaepe to correct it. Boykins did not know all of the details at that time so he could not tell DePaepe to make changes. (Transcript, Vol. 1, p. 191, ll. 8-12, ll. 22-25.)

113.     The recording of line 6031 continued under the policy that only the Chief of Police could change what lines were recorded.

114.     In July 2011, DePaepe was required to check the recorded lines again as a result of a Freedom of Information Act request from Nancy Bruce at Channel 57. The request was approved by the City Attorney's office. (Transcript, Vol. 2, p. 174, l. 15; Exhibits 15, 16.)

115.     As a result of listening to the recording system at that time, DePaepe discovered other conversations that bothered her. (Transcript, Vol. 2, p. 174, ll. 16-19; p. 175, l. 14 – p. 176, l. 7.)

116.     In December 2011, Boykins requested DePaepe to find the February 4, 2011 recordings and also find other recordings that pertained to that information. To refresh Boykins' memory, DePaepe created an officer's report. (Transcript, Vol. 2, p. 165, l. 21 – p. 166, l. 3.) At that time, DePaepe made five audio cassettes from the recording system of conversations that occurred on: February 4, 2011, April 5, 2011, June 3, 2011, June 6, 2011, June 16, 2011, June 27, 2011, July 14, 2011, and July 15, 2011.

117.     Young's conversations were recorded by mistake when he took over line 6031 before it was discovered by DePaepe. (Transcript, Vol. 1, p. 94, ll. 17-19; p. 98, ll. 13-21; p. 117, ll. 13-15; p. 190, ll. 4-16; Vol. 2, p. 147, ll. 6-9; p. 189, ll. 12-15.) The line was therefore not recorded for an investigative purpose.

118.    After DePaepe discovered the mistake, line 6031 continued to be recorded pursuant to the policy that only the Chief of Police could make decisions as to what lines were recorded. Chief Boykins did not instruct DePaepe to stop recording line 6031.

119.    Because, as stipulated, there was no policy, practice or routine in the South Bend Police Department with regard to recording an officers' individual line, neither the original recording of Young's line before the mistake was recorded, nor the continuing recording after DePaepe discovered the mistake, violated the police department's recording policy.

120.    It was within the ordinary course of the duties of the Communications Director and Supervisors in the Communications Division to listen to recorded conversations for various reasons, including maintaining the recording system. (Transcript, Vol. 1, p. 74, l. 22 – p. 75, l. 10; p. 76, ll. 2-10; p. 77, ll. 1-23; p. 89, l. 23 – p. 90, l. 8; p. 94, ll. 6-9; Vol. 2, p. 158, ll. 7-16; p. 168, ll. 2-8.)

121.    It was within the ordinary course of Barb Holleman's duties to transfer to switch an office's telephone number, upon request, when changing offices. (Transcript, Vol. 1, p. 116, ll. 19-24; p. 204, ll. 4-11; Vol. 2, p. 176, ll. 16-18.)

122.    Holleman and DePaepe had authority to perform their job duties under Boykins' direction and control. (Transcript, Vol. 1, p. 204, ll. 15-17.)

## CONCLUSIONS OF LAW

1.    The recording system at issue is a component part of the telephone system in the South Bend Police Department as required for the application of 18 U.S.C. § 2510(5)(a)(ii).

2.    The recordings of telephone lines in the South Bend Police Department during the relevant time period were being used by an investigative or law enforcement officer in the ordinary course of his duties.

18

3.     The recordings at issue therefore do not fall within the definition of "electronic, mechanical, or other device" as defined by the Federal Wiretap Act. 18 U.S.C. § 2510(5)(a)(ii).

4.     The recordings at issue, therefore, by definition, are excluded from the application of the Federal Wiretap Act, 18 U.S.C. § 2510 *et seq.*

5.     Karen DePaepe, the Communications Director in the South Bend Police Department at all relevant times, was acting within the scope of her employment in listening to recorded conversations and disclosing the contents of those conversations to Chief of Police Boykins. DePaepe is deemed to be an investigative or law enforcement officer because she was acting under the authority and supervision of the Chief of Police. *United States v. Rivera*, 292 F.Supp.2d 838 (U.D. Va. 2003). *See also* 18 U.S.C. § 2518.

6.     18 U.S.C. § 2510(5)(a)(ii), the ordinary course exclusion of the Federal Wiretap Act for ordinary course of law enforcement activities, does not require a formal or informal policy for recording police department telephone lines. Such a requirement would be tantamount to requiring notice to a police officer that his line is being recorded. Notice is not required for application of the ordinary course exclusion. *Amati v. City of Woodstock*, 176 F.3d 952, 955 (7th Cir. 1999).

7.     The almost universal practice of recording police department telephone lines is common knowledge among police officers and citizens alike. *Amati v. City of Woodstock*, 176 F.3d at 955. *See also Walden v. City of Providence*, 596 F.3d 38, 55 (1st Cir. 2010).

8.     Unintentional or inadvertent recordings are not illegal under the Federal Wiretap Act. 18 U.S.C. § 2511. *See also: Bllumofe v. Pharmatrak, Inc.*, 324 F.3d 9, 35 (1st Cir. 2003); *Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 742 (4th Cir. 1994); *Thompson v. Dulaney*, 970 F.2d 744, 748 (10th Cir. 1992; *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 584 (11th Cir. 1983).

9.      After the unintentional recording of line 6031 was discovered, the line continued to be recorded pursuant to the ordinary and customary practice of the South Bend Police Department to continue to record telephone lines until the Chief of Police orders otherwise.

10.     Under the circumstances, the conversations recorded on or before February 4, 2011 are to be treated under the Federal Wiretap Act as any recordings subsequent to discovery of the mistake.

11.     The ordinary course of law enforcement exclusion as set forth in 18 U.S.C. § 2510(5)(a)(ii) does not require each and every telephone call into the South Bend Police Department on every line to be recorded in order to be applicable. 18 U.S.C. § 2510(5)(a)(ii). *See also*, *Jandak v. Brookfield*, 520 F.Supp. 815 (N.D. Ill. 1981).

12.     The recording of Captain Young's conversations on line number 6031 was routine and non-investigative. *Amati*, 176 F.3d at 957.

13.     The purpose of the recording system, and of each of the recordings at issue, was not to trick anyone into making damaging admissions or as a device for intimidation, suppression of criticism, blackmail, embarrassment or other improper motives.

14.     Respondents, South Bend Common Council, are entitled to a judgment declaring that all the recordings at issue were made in the ordinary course of law enforcement and are excluded from the Federal Wiretap Act by 18 U.S.C. § 2510(5)(a)(ii).


_____
Joseph S. Van Bokkelen, Judge
United States District Court for the
Northern District of Indiana

Respectfully submitted.


/s/Robert J. Palmer
E. Spencer Walton, Jr. (1000-71)
Robert J. Palmer (6316-71)
Attorneys for South Bend Common Council

**MAY • OBERFELL • LORBER**
4100 Edison Lakes Parkway, Suite 100
Mishawaka, IN  46545
Phone: (574) 243-4100
Fax: (574) 232-9789
rpalmer@maylorber.com


## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the forgoing was served upon all attorneys of record via the

Court's ECF system on September 15, 2014.



/s/Robert J. Palmer
Robert J. Palmer



F:\Clients\S1060\12001\Pleadings - Fed Ct\2014-09-15 Proposed Findings of Fact and Conclusions of Law.docx9/15/2014