**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| CITY OF SOUTH BEND, BY ITS )<br>CORPORATION COUNSEL ALADEAN M. )<br>DEROSE, )<br> )<br>         Petitioner, )<br> )<br> v. )     3:12-cv- 475<br> )<br>UNITED STATES OF AMERICA, ERIC H. )<br>HOLDER, JR., IN HIS OFFICIAL CAPACITY AS)<br>ATTORNEY GENERAL OF THE UNITED )<br>STAES, SOUTH BEND COMMON COUNCIL, )<br>TIM CORBETT, DAVE WELLS, STEVE )<br>RICHMOND, BRIAN YOUNG, AND SANDY )<br>YOUNG, )<br> )<br>         Respondents. ) | |

**SOUTH BEND COMMON COUNCIL'S POST-TRIAL BRIEF**

Respondent, South Bend Common Council, pursuant to this Court's Order, submits its

Post-Trial Brief. This brief will first address the following questions, which were specifically

designated by the Court at the end of trial:

    a. Whether Young's Line Was Recorded By Mistake Before DePaepe Discovered The Recordings?

    b. Whether Young's Line Continued To Be Recorded Pursuant To The Department's Policy After DePaepe Discovered The Recordings?

    c. What Was The Police Department's Policy – Written Or Unwritten – Or Customary Practice For Recording Officers' Lines?

    d. Did The Police Department Have Different Policies/Practices Regarding Recording Officers' Lines Versus Recording Lines Going Into The Communications Center And The Front Desk?

    e. Was Young's Line Recorded For An Investigative Purpose?

     f.   Was Young's Line Recorded In Violation Of Police Department's Recording Policy?

     g.   Should There Be A Different Legal Treatment For The Recordings Of Captain Young's Line Before And After They Were Found by Karen DePaepe?

     h.   Are Unintentional Recordings Illegal Under The Federal Wiretap Act?

     i.   If Young's Line Was Recorded Illegally, Does Law Enforcement Officer Exception Nevertheless Cover The Recordings At Issue?

This brief will then discuss additional arguments in support of the South Bend Common Council's position. Finally, this brief will identify prior arguments raised by the City and explain why those arguments fail.

## I.    QUESTIONS RAISED BY THE COURT[1]

### a.  Whether Young's Line Was Recorded By Mistake Before DePaepe Discovered The Recordings?

The recording of line 6031 was not a mistake. The line was first recorded while it was assigned to Investigative Division Captain Rick Bishop. The line was recorded by order of former Police Chief Fautz. That recorded line went with Bishop when he became Captain in Risk Management. The recorded line continued to follow Bishop when he returned to the Investigative Division as Division Chief. The 6031 line was recorded throughout the entire time since 2004 until after Young assumed the position of Investigative Division Captain because the Chief of Police did not order it to be changed. Recorded telephone lines continued to be recorded unless otherwise instructed by the Chief of Police. There was no such instruction given by Police

---

[1] The Court has asked the parties to answer several questions that focus on whether the South Bend Police Department had a "policy" governing the recording of telephone lines and whether that policy was violated. It should be noted from the outset that nothing in the Wiretap Act, the interpreting case law, nor the administrative rules and regulations of the South Bend Police Department require a policy (written or oral; formal or informal) to exist in order for a recording to be in compliance with the Wiretap Act. In other words, the issue of whether there was a policy that governed the recording of telephone calls at the South Bend Police Department has no relevance to the ultimate issue in this case: whether the recordings are excluded from the Wiretap Act under the Ordinary Course Exclusion. (For a more detailed explanation of the irrelevance of a "policy" for purposes of assessing the applicability of the Ordinary Course Exclusion, *see* South Bend Common Council's Response in Opposition to the City of South Bend's Motion for Summary Judgment and the Motion for Summary Judgment filed by Defendants Tim Corbett, Steve Richmond, Dave Wells, Brian Young, and Sandy Young, DE# 108, pp. 12-13.)

Chief Boykins in the relevant time period. The continued recording of line 6031 was, therefore, not a mistake.

The fact that Young's conversations were being recorded was a mistake. The 6031 line was assigned to the Captain of the Investigative Division's office when Richmond was promoted to Division Chief and wanted to retain his prior telephone number. Line 6031 was therefore switched from Richmond's new office to the then vacant Captain's office. The switch was made by Barb Holleman at Richmond's request. Neither Richmond nor Young were aware that the 6031 line was being recorded. Karen DePaepe, who knew which lines were recorded, was not made aware that the line had been switched from Richmond's office to the Captain's office. Young's telephone conversations began being recorded weeks later when he was promoted and took over the Captain's office to which the 6031 line had been switched pursuant to Richmond's request that he retain his prior number.

**b. Whether Young's Line Continued To Be Recorded Pursuant To The Department's Policy After DePaepe Discovered The Recordings?**

The parties stipulated that at all relevant times, the Board of Public Safety had not promulgated and did not have any written policy regarding the recording of telephone lines within the South Bend Police Department. Furthermore, the evidence establishes that within the South Bend Police Department, there was not a written or oral policy regarding the recording of officers' phone lines and no such policy was communicated to the officers. It is a stipulated fact that decisions regarding the recording of telephone lines at the South Bend Police Department were left in the sole discretion of the Police Chief. Beyond that, the most that can be said regarding the existence of policy is that each individual police chief had his own policy, or philosophy, regarding the recording of telephone lines at the South Bend Police Department. Several of the police chiefs testified that they would not record an officer's line without his

3

knowledge and consent. One former police chief ordered the line of a captain in the Records Division be recorded without his knowledge or consent. The personal policies, or philosophies, of the individual police chiefs were not communicated to the police officers.

The police department did have other relevant written policies. The Office of Professional Standards had a General Order for the purpose of receiving, investigating and processing complaints against employees of the South Bend Police Department. Paragraph IV(D), under the heading "EMPLOYEE RIGHTS" states: "Employees do not have a right to privacy for assigned equipment. The Department may enter and inspect any assigned equipment." (Exhibit 5, Page 5 of 7.) South Bend police officers sign off on this policy. (Transcript Vol. 2, p. 28, ll. 7 – 10; p. 82, ll. 1 – 6.)

The undisputed evidence establishes that any changes in the recorded lines could be made only at the direction of the Chief of Police. Consequently, once a line began to be recorded, it would continue to be recorded until the Chief of Police authorized the removal of that line from the recording system. Police Chief Boykins did not authorize the 6031 line to be removed from the system after DePaepe discovered that Young's conversations were being recorded and informed Boykins of that fact. DePaepe specifically asked Boykins to let her know if he wanted any changes. Boykins did not authorize any changes. Therefore, the continued recording of line 6031 after DePaepe discovered that the line had been switched to Young pursuant to Division Chief Richmond's request that he retain his prior number was in compliance with the routine, practice, and procedure of the South Bend Police Department, which required authorization from the Chief of Police before any changes could be made to what telephone lines were recorded.

**c.   What Was The Police Department's Policy – Written Or Unwritten – Or Customary Practice For Recording Officers' Lines?**

As noted previously, there is no written or unwritten Police Department policy for recording officers' lines. Each individual police chief had a personal policy or philosophy that was not communicated to other police officers. One former police chief would not record lines without an officer's knowledge or consent because he erroneously believed that such recordings would be contrary to federal law. (Hemmerlein dep., p. 11, ll. 4-10; p. 16, l. 13-23.) This is also Richmond's position in this case. (Transcript, Vol. 2, p. 21, ll. 14 – 18.) The Police Chief who succeeded former Chief Hemmerlein recorded Hemmerlein's phone line without Hemmerlein's knowledge or consent. Hemmerlein was a Captain in the Records Division at the time. Several police officers testified that they had no knowledge of a policy, procedure, or practice relating to recording officers' lines.

The one consistent practice or procedure throughout all of the evidence is that all decisions regarding what lines to record or not to record rested solely with the discretion of the Chief of Police. Consequently, when a phone line such as 6031 was recorded, it continued to be recorded until the Chief of Police ordered otherwise. That is exactly what happened in the present case. The South Bend Police Department acted in conformity with this practice or procedure when it continued to record the 6031 line after discovery that it was being used by Young, absent an order from the Chief of Police to cease recording.

**d.   Did The Police Department Have Different Policies/Practices Regarding Recording Officers' Lines Versus Recording Lines Going Into The Communications Center And The Front Desk?**

The simple answer to the Court's question is no. Any phone line recorded by the South Bend Police Department was recorded 24 hours a day, 7 days a week, 365 days a year. Every sound on the recorded lines was recorded in the same manner. The Chief of Police decided what

lines would be recorded, and those lines would continue to be recorded until the Chief of Police ordered otherwise.

It was common knowledge within the Police Department that lines to the Communications Center and to the Front Desk were being recorded. With the exception of Officer Young being given that information, it was never specifically communicated to the other officers. Young obtained the information during his cadet training, several years ago.

Some officers assumed that other lines were also being recorded. They acted on the assumption that every phone line was being recorded.

Another important practice/procedure is the fact that the recording of the lines was never kept a secret. All of the evidence on the issue establishes that it was the practice and procedure of the police chiefs, Karen DePaepe, and Diana Scott, to freely and honestly answer any questions regarding what telephone lines were being recorded. Karen DePaepe testified that on occasion she actually took a police officer into the telephone system closet to show what lines were recorded. This practice or procedure applied not just to the Communications Center and Front Desk, but also to individual lines being recorded. The evidence establishes that there was no difference in the policies/practices regarding an officer's individual line and the recording of lines going into the Communications Center and the Front Desk.

### e.  Was Young's Line Recorded For An Investigative Purpose?

Young's line was not recorded for an investigative purpose. Line 6031 was first recorded in 2004 on orders of Chief Fautz. At that time, the line was assigned to Bishop as the Captain of the Investigative Division. The reasons for recording line 6031 were the same reasons that all other recorded lines in the South Bend Police Department were recorded. Those reasons included retaining information regarding anonymous tips, responding to citizen complaints, and

6

developing a system whereby an officer could prove what occurred in the conversation. Chief Fautz and Chief Boykins acknowledged that the reasons for recording the lines were legitimate law enforcement reasons. The 6031 line continued to be recorded when Bishop was assigned to be a captain in Risk Management and was again continued when he returned to the Investigative Division as Division Chief. When Bishop was demoted, line 6031 was transferred to the then vacant Investigative Division Captain's office as a result of the Division Chief Richmond's request that he retain his prior telephone number. At that time, not only was the office vacant, but also, no one knew who would eventually be occupying the office. Ultimately, Young was promoted and occupied the office weeks later.

Line 6031 was not being used for an investigative purpose after DePaepe discovered that Young was using the line.[2] The line continued to be recorded pursuant to the practice and procedure of continuing to record a line until the Chief of Police decided not to record the line. There is no evidence that line 6031 was treated differently than any other line being recorded in the Police Department. There is no evidence of continual, or even occasional, monitoring of the line, nor is there any evidence that the line was designated in any way for periodic reviews. DePaepe heard additional conversations recorded on line 6031 after her initial discovery only as a result of responding to the City Attorney, Aladean DeRose, by searching all recorded lines for information responsive to a Freedom of Information Act request by Nancy Bruce at Channel 57. At that time, the recordings from line 6031 were reviewed just as all other recordings from other recorded lines were reviewed. Young was not a target of any investigation when the

---

[2] As explained more fully herein, the only relevant inquiry regarding the applicability of the Ordinary Course Exclusion is whether the recorded calls were "routine noninvestigative recording of a telephone conversation." *Amati v. City of Woodstock*, 176 F.3d 952, 955 (7th Cir. 1999). As such, it should be noted that what is done with the content of a recording after the recording is made has no relevance to the issue of whether a recording is in compliance with the Wiretap Act. To properly determine whether a recording is in compliance with the Wiretap Act, the focus is on the *purpose* of the recording; not the subsequent use of the *content* of the recording.

conversations were recorded. It was just by chance that DePaepe heard conversations containing information that she believed should be reported to the Chief of Police.

### f.  Was Young's Line Recorded In Violation Of Police Department's Recording Policy?

As established above, the recording of 6031 was not in violation of the Police Department's recording policy. On the contrary, the recording of Young's line was in absolute compliance with the customary practice and procedure whereby a recorded line would continue to be recorded until otherwise ordered by the Chief of Police. The line was recorded continuously without regard to person, time, or substance of the conversation, just as all other recorded lines. In fact, when line 6031 was routed to the Investigative Division Captain's office, the office was vacant and no one knew who would be assigned to that office. Pursuant to the custom and practice of the South Bend Police Department, if Young wanted to know if his line was being recorded, as it had been since 2004 when Bishop, an officer in the same position as Young, was assigned to the line, Young merely had to ask either Diana Scott, Karen DePaepe, or Police Chief Boykins. He would have been told that the line was being recorded just as any other police officer in the South Bend Police Department would be told if a particular line was being recorded.

### g.  Should There Be A Different Legal Treatment For The Recordings Of Captain Young's Line Before And After They Were Found by Karen DePaepe?

The Court's legal question about the treatment of the recordings raises three different issues: (1) whether the existence of a South Bend Police Department policy regarding recording an officer's individual line is material to the Ordinary Course Exclusion of the Wiretap Act; (2) whether conversations recorded by mistake nevertheless fall within the Ordinary Course Exclusion if the recording system is utilized in the ordinary course of law enforcement; and (3)

whether the Ordinary Course Exclusion required Young to be notified that the line was being

recorded after the conversations were discovered by DePaepe. The answer to all of these issues is

the same. The recordings of all Young's conversations on line 6031 fall within the Ordinary

Course Exclusion and are therefore not subject to any provisions of the Federal Wiretap Act.

> **The proper application of the Ordinary Course Exclusion is
> not dependent on a written policy or procedure as to whose
> lines are recorded as long as the purpose of the recording
> system falls within the ordinary course of the work of the
> Police Department.**

The City has argued that the recordings do not fall within the Ordinary Course Exclusion

because they were not made pursuant to any routine, practice or policy of the Police Department.

(Pretrial order at ¶ D.) This argument was also made by the City in its summary judgment

pleadings. Notably, the City conceded in its summary judgment pleadings that there was an

ad hoc policy. That ad hoc policy is described in the Statement of Facts. That ad hoc policy is for

a new chief of police to be informed of what lines are being recorded and choosing to continue

the recordings or to change the lines being recorded. In other words, it is within the discretion of

the chief of police as to what lines would be recorded. The evidence at trial confirmed this

practice.

The City cited no authority in its summary judgment papers in support of its proposition

that the Ordinary Course Exclusion should not apply because the South Bend Police Department

did not record the calls pursuant to some sort of formal policy. Nothing in the Ordinary Course

Exclusion, (18 U.S.C. § 2510(5)(a)(ii)), or any case law interpreting the exclusion suggests that a

policy is a prerequisite to the applicability of the Ordinary Course Exclusion. The argument that

a formal written policy is necessary for the Ordinary Course Exclusion to apply is tantamount to

the argument made by the unsuccessful plaintiffs in *Amati v. City of Woodstock*, 176 F.3d 952,

955 (7th Cir. 1999)—that "wiretapping cannot be in the ordinary course of law enforcement unless there is express notice to the people whose conversations are being listened to"— because requiring a formal written policy would be the same as requiring notice. *Amati*, 176 F.3d at 955. However, as explained in *Amati*:

> The plaintiffs argue that wiretapping cannot be 'in the ordinary course of law enforcement' unless there is express notice to the people whose conversations are being listened to. The statute does not say this, and it cannot be right. If there is actual notice…there will normally be implied consent. So if the "ordinary course" exclusion required proof of notice, it would have no function in the statute because there is a separate statutory exclusion for cases in which one party to the communication has consented to the interception.

*Id*. (internal citations omitted).

Moreover, the fact that the South Bend Police Department was not recording the calls at issue pursuant to a formal written policy does not defeat the fact that the calls were "routine noninvestigative recording of telephone conversations," which is the operative inquiry with respect to the Ordinary Course Exclusion.

In its summary judgment pleadings, the City cited *Abraham v. County of Greenville*, 237 F.3d 386, 389 (4th Cir. 2001), as "holding defendant violated the act when it 'did not have an established policy of monitoring the plaintiffs' calls.'" (Docket No. 111 at p. 19.) The dispositive issue in *Abraham*, however, was not whether recording of the calls into and out of the police department fell within the Ordinary Course Exclusion. Instead, the issue was whether recording telephone calls into and out of judges' chambers was within the Ordinary Course Exclusion. Instead of holding that the exclusion did not apply because there was no established policy of monitoring the calls, the Court actually looked to the nature of the recordings in ruling that the exclusion did not apply. The Court stated:

> Greenville County claims that the law enforcement exception
> excuses its recordings of plaintiffs' telephone calls. However,
> monitoring the judge's calls simply was not part of the ordinary
> course of the county's law enforcement duties. *See* 18 U.S.C.
> § 2510(5)(a)(ii).

237 F.3d at 388. The Court then noted that "the county did not have an established policy of monitoring plaintiffs' calls." *Id.*

Placed in the proper context, the Court in *Abraham* ruled that the Ordinary Course Exclusion did not apply because recording calls into and out of the judges' chambers was not within the ordinary course of the county's law enforcement duties. *Id*. at 391. In fact, the Court ruled that the law enforcement exclusion may not be read: "To deconstruct the whole system of separation of powers and permit law enforcement officers to routinely record the daily conversations of judges who may sit in cases to which law enforcement is a party." *Id*. As the Seventh Circuit in *Amati* made clear, however, recording calls into and out of police departments is recognized as being in the ordinary course of business for police departments. No formal written policy is necessary to make such recordings fall within the ordinary course of police enforcement duties. The only relevant inquiry is whether the recorded calls were "routine noninvestigative recording of a telephone conversation." *Amati*, 176 F.3d at 955. The purposes for recording the calls in the South Bend Police Department—to retain information regarding anonymous tips; to respond to citizen complaints; and to evidence what occurred during conversations with anonymous callers and complaining citizens—are indisputably within the ordinary course of law enforcement. The calls are therefore, by definition, excluded from the Federal Wiretap Act.

**The fact that Young's conversations were mistakenly recorded on line 6031 does not affect the applicability of the Ordinary Course Exclusion.**

The fact that the recordings were captured mistakenly as a result of inadvertent actions is immaterial to the applicability of the Ordinary Course Exclusion. As noted subsequently in this brief, the Wiretap Act does not make the unintentional recording of conversations illegal. The Act itself requires intentional conduct to establish a violation. *See* 18 U.S.C. 2511(1) ("Except as otherwise specifically provided in this chapter any person who…*intentionally*…any wire, oral, or electronic communication…shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5)."(Emphasis added)).

Even if unintentional recordings were included in the Wiretap Act, focusing solely on the fact that the recordings were made unintentionally erroneously limits the analysis to the individual whose phone line was being recorded without considering the reasons that the recording system was implemented and used in the first place. Whether the Ordinary Course Exclusion applies depends instead on whether the nature of the recordings at issue can be "reasonably interpreted to refer to routine noninvestigative recording of telephone conversations." *Amati v,* 176 F.3d at 955.

Similarly, the Court in *Jandak v. Brookfield*, 520 F.Supp. 815 (N.D. Ill. 1981), also ruled that the determinative factors in whether the Ordinary Course Exclusion applies are the underlying reasons for recording calls. Specifically, the Court explained that:

> Police departments commonly have recording systems like that of defendants, due to the need to preserve and be capable of accurately recalling messages pertaining to emergencies or to official police business. To further these purposes, defendants engaged a communication's common carrier to install a recording system, to record emergency and investigative calls, as an integral component of the communication system used by the police department performing its duties to the public. Such a decision indiscriminately

and routinely records all activities on established designated lines, and is not comparable to the selective use of recording equipment to eavesdrop on a normally unmonitored telephone system in order to record specifically selected communications. There is little doubt that Congress did not intend the statute to apply to routine recording of emergency and investigative calls as an integral component of a police station telephone system like that of defendants. Accordingly, the Court concludes that the recording device used by defendants falls within the definition of telephone equipment or component as used in [the ordinary course exclusion].

*Id.* at 822.

Even truly inadvertent recordings fall within the Ordinary Course Exclusion if the purpose of the recording system falls within the ordinary course of law enforcement. One of the best examples of this proposition is *Wright v. Starke County Board of Commissioners*, 2000 U.S. App. LEXIS 25469 (6th Cir. 2000). The plaintiffs in this case were employed as "911" emergency dispatchers. The sheriff's department recorded all incoming and outgoing dispatch radio and telephone communications. The equipment, as originally installed, was designed such that each track of the recording system recorded a different radio or telephone. It was subsequently discovered, however, that the system, through the telephone headsets and radio consoles, was recording conversations that were not coming over the telephones or radios. The effect of the design was to create "open mics" within the dispatch room that recorded all conversations and activities in the room.

When the system was first installed, the dispatchers had headphones that included mute switches that would disable the recording device, thereby preventing the dispatcher's personal conversations from being recorded. The original headsets, however, were replaced by headsets that did not contain mute switches. Without the mute switches, the microphones on the headsets acted as open mics, recording all activity within the dispatch room. When this was discovered,

the dispatchers were informed that they needed to disconnect their headsets to prevent personal conversations from being recorded by the microphones on their headsets.

A plaintiff was suspended after the sheriff listened to tapes in which it was discovered that a personal conversation between the plaintiff and another dispatcher had been recorded. The plaintiff was suspended because she failed to timely dispatch an ambulance and then lied about her conduct in disciplinary conferences. It was subsequently determined that plaintiff was being recorded by an "open mic" created by a communications console in the rear of the dispatch room. Plaintiff argued that the recording of personal conversations violated the Federal Wiretap Act. The Sixth Circuit disagreed and held that the Ordinary Course Exclusion applied because the intended purpose of the recording equipment was a legitimate law enforcement purpose. 2000 U.S. App. LEXIS 25469 at *12-13. Specifically, the Court stated:

> Plaintiffs essentially ask this Court to make a distinction based upon the "type" of conversation recorded by STARCOM system. Under plaintiffs' theory, the STARCOM system's recording of a dispatch call would not run afoul of the Act, but the STARCOM system's recording of a personal conversation or personal call would. The plain wording of the Act, however, does not draw this distinction. The pertinent question under the Act is whether the equipment itself is being used in the ordinary course of the law enforcement agency's duties; not whether the conversation recorded by the equipment relates to the law enforcement agency's duties.
>
> If this Court were to adopt plaintiffs' position, any business that legitimately recorded all telephone calls as a regular course of its business, or any law enforcement agency that legitimately recorded all telephone calls in the ordinary course of its duties, would, if employees were unaware of the recording, be in violation of the Act every time they recorded a "personal" call. To avert such a result, the Act specifically focuses on the intended use of the recording "equipment." If the recording equipment is used for a legitimate business purpose, it does not qualify as an electronic, mechanical or other device under the Act. Therefore, we are satisfied that the district court did not err in finding that the

STARCOM system fell within the law enforcement exception to
the Act.

*Id*.

In the present case, the purpose of the telephone recording system was discussed at length by witnesses at trial. Karen DePaepe testified that the system was used to preserve information that was coming in through anonymous tips, as well as to preserve information received from the public to insure that any citizen complaints are properly handled. Former Chief Fautz directed DePaepe to add incoming lines of the Records Bureau to be recorded because complaints by the public that they were getting incorrect information regarding vehicular impounds. Former Chief Fautz himself testified that the purpose of the recording system was to document complaints and to use as a tool as a legitimate business purpose. Former Chief Fautz's opinion was that recording of lines into a police station is something that is ordinarily done by other police stations around the country. Chief Fautz testified that recording lines is commonplace. In the South Bend Police Department, recording telephone lines was to document complaints from the public and to be transparent with the public. Former Chief Boykins testified similarly.

Furthermore, the stipulated facts establish that in 2007, when Boykins was appointed Chief of Police to succeed Chief Fautz, the same phone lines being recorded under Chief Fautz continued to be recorded on the system. Chief Boykins made no changes to any of the lines that were recorded, specifically adopted the approach of Chief Fautz, and issued no written or oral directive to create a policy, procedure, practice or routine.

It is undisputed that the use of the recording system was for purposes consistent with the Ordinary Course Exclusion. The recordings were made for noninvestigative, routine purposes that everyone acknowledges were within the ordinary course of the Police Department's law

enforcement business. The fact that the line assigned to Young continued to be recorded after it was assigned to him does not change the purpose of the recording system.

Additionally, as noted previously, characterizing the recording of line 6031 as a mistake is not entirely accurate. That specific telephone line had been recorded since 2004 while it was assigned to Bishop. That line was assigned to the then unoccupied office of the Captain of the Investigative Division as a part of a re-shuffling of positions and offices. The line assigned to the Captain's office continued to be the same line that had been recorded for years. There was no effort made to disconnect the line from the recording system nor was any such request made by anyone. Therefore, although the recording of Young's conversations may have been inadvertent, there was nothing inadvertent about recording all of the conversations on line 6031.

> The City, in its brief in support of its motion for summary judgment, cited *Abraham v. City of Greenville*, 237 F.3d 386 (4th Cir. 2001), for the proposition that "the law enforcement exclusion does not apply to lines that were recorded by mistake." As explained above, *Abraham* was about telephone calls between judges and lawyers that were recorded by mistake. Contrary to the City's argument, the dispositive factor in *Abraham* was not that the recordings at issue were recorded by mistake. Rather, the dispositive factor in *Abraham* was the *purpose* of the recordings. *Abraham*, 237 F.3d at 388. The *Abraham* court found that there was no legitimate law enforcement purpose for recording telephone calls between judges; and therefore, the Ordinary Course Exclusion was inapplicable. *Id*. Unlike *Abraham*, the purpose of the recording system in the present case is solely for legitimate law enforcement objectives. **The Ordinary Course Exclusion does not require that notice be given to an officer whose line is being recorded.**

The fact that any individual police officer may or may not have notice that a phone line is being recorded is immaterial to the determination that the recordings are not illegal under the Wiretap Act. The argument that notice is required was made by the unsuccessful plaintiffs in *Amati*. Specifically, in *Amati*, the plaintiffs argued that "wiretapping cannot be 'in the ordinary

course of law enforcement' unless there is express notice to the people whose conversations are being listened to." 176 F.3d at 955. In rejecting this argument, the Court explained that "there is a separate statutory exclusion for cases in which one party to the communication has consented to the interception." *See Id.* (citing 18 U.S.C. § 2511(2)(c)). As such, the Court concluded that "if the 'ordinary course' exclusion required proof of notice, it would have no function in the statute" in light of the distinct exclusion contained in 18 U.S.C. § 2511(2)(c). *Id. See also Jandak v. Brookfield*, 520 F. Supp. 815, 824-25 (N.D. Ill. 1981) (holding that regardless of whether there was actual notice, there was sufficient notice under the circumstances because the recording "was not surreptitious; rather, it was routine monitoring of all calls on the investigative line, with more than adequate opportunity for [the recorded party] to know of the monitoring").

Courts have recognized that the recording of telephone lines in a police department is an almost universal practice which is commonly known. *See Amati*, 176 F.3d at 955. ("To record all calls to and from a police department is . . . a routine police practice. If 'ordinary course' of law enforcement includes anything, it includes that.") *See also*, *Walden v. City of Providence*, 596 F.3d 38, 55 (1st Cir. 2010) ("[T]he practice of 'routinely and indiscriminately record[ing] all phone activity in and out of the police department' is 'well known in the industry and in the general public.'")

The evidence establishes that the continued recording of Young's 6031 line after DePaepe discovered that it was being used by Young conformed with the routine procedure in the South Bend Police Department that recorded lines continued to be recorded until otherwise ordered by the Chief of Police. Furthermore, the recording of the lines was not surreptitious. The evidence establishes that it was common knowledge that some telephone lines were being recorded. If any officer wanted to know if his, or someone else's, line was being recorded, he

simply had to ask the Chief of Police or Karen DePaepe or Diana Scott. There was no attempt to

hide the fact that lines were being recorded and what lines were being recorded.

**h.   Are Unintentional Recordings Illegal Under The Federal Wiretap Act?**

The simple answer to the Court's question is that unintentional recordings are not illegal

under the Federal Wiretap Act. The Act, 18 U.S.C. § 2511, provides in relevant part:

> (1)    Except as otherwise specifically provided in this chapter
> [18 U.S.C. §§ 2510 et seq.] any person who –
>
>> (a)    *Intentionally* intercepts, endeavors to intercept, or
>> procures any other person to intercept or endeavor to
>> intercept, any wire, oral, or electronic communication;
>>
>> (b)    *Intentionally* uses, endeavors to use, or procures any
>> other person to use or endeavor to use any electronic,
>> mechanical, or other devise to intercept any oral
>> communication when –
>>
>>> (i)    Such device is affixed to, or otherwise
>>> transmits a signal through, a wire, cable, or other
>>> like connection used in wire communication; or
>>>
>>> (ii)    Such device transmits communications by
>>> radio, interfused with the transmission of such
>>> communication; or
>>>
>>> (iii)    Such person knows, or has reason to know,
>>> that such device or any component thereof has been
>>> sent through the mail or transported in interstate or
>>> foreign commerce; or
>>>
>>> (iv)    Such use or endeavor to use (A) takes place
>>> on the premises of any business or other commer-
>>> cial establishment the operations of which affect
>>> interstate or foreign commerce; (B) Obtains or is for
>>> the purpose of obtaining information relating to the
>>> operations of any business or other commercial
>>> establishment the operations of which affect
>>> interstate or foreign commerce; or

(v)      Such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;

(c)      *Intentionally* discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication knowing or having reason to know that the information was obtained through the interception of wire, oral, or electronic communications in violation of this subsection;

(d)      *Intentionally* uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or

(e)      (i) *Intentionally* discloses or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, intercepted by means authorized by Sections 2511(2)(a)(ii), 2511(2)(b)-(c), 2511(2)(e), 2516, and 2518 of this chapter, (ii) Knowing or having reason to know that the information was obtained through the interception of such communications in connection with a criminal investigation, (iii) Having obtained or received the information in connection with a criminal investigation, and (iv) With intent to and properly obstruct, impede, or interfere with a duly authorized criminal investigation,

shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

18 U.S.C. § 2511(1) (emphasis added).

Accordingly, the express language of the Wiretap Act indicates that intent is an element which must be proven for a party to be held criminally or civilly liable under 18 U.S.C. § 2511. *Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 742 (4th Cir. 1994) ("[S]ection 2511 prescribes only 'intentional' interceptions."); *Thompson v. Dulaney*, 970 F.2d 744, 748 (10th Cir. 1992) ("The Act thus 'requires that interceptions be intentional before liability attaches, thereby excluding inadvertent interceptions."); *Bllumofe v. Pharmatrak, Inc.*, 329 F.3d 9, 35 (1st Cir. 2003) ("Congress made clear that the purpose of the amendment was to underscore that inadvertent

interceptions are not a basis for criminal or civil liability under the ECPA [citation omitted]. An act is not intentional if it is the product of inadvertence or mistake."); *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 584, n. 9 (11th Cir. 1983) ("Inadvertent interception does not violate Section 2511(1)(b).").

The evidence is undisputed that Young's conversations were recorded by mistake, at least until the time DePaepe discovered that Young was using line 6031. The conversation of February 4, 2011 was recorded as a result of that mistake. Because that recording was not made intentionally, the recording itself is not illegal.

The South Bend Common Council asserts that all of the recordings at issue were legally made pursuant to the Ordinary Course Exclusion. However, in the event the Court determines that the Ordinary Course Exclusion does not apply, the Court must also determine whether recordings made up to the time DePaepe discovered the mistake are excluded from the Wiretap Act. This distinction was made by the Fourth Circuit in *Abraham v. County of Greenville*, *supra*, a case heavily relied on by the City in prior briefs. In noting the distinction between the Ordinary Course Exclusion and inadvertent recordings, the Court stated:

> It is important to note, however, that the questions of whether the law enforcement exception applies and whether the county 'intentionally intercepted' the judges' communications are separate inquiries. Our determination that the law enforcement exception lacks a good-faith component would not prevent the county from arguing that it did not 'intentionally intercept' these conversations as required by 18 U.S.C. 2511(1)(a); *see also*, *Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 742-43 (4th Cir. 1994) ("Holding that under the Federal Wiretap Act, civil liability only attaches to intentional interceptions not inadvertent ones.") In fact, the county made precisely this argument. The jury simply did not believe that the county's recording of the judges was inadvertent.

237 F.3d at 391.

As noted above, it is undisputed that the recording of Young's conversations was a mistake, at least until the time Karen DePaepe discovered the mistake. DePaepe's discovery that a mistake had been made did not occur until after she listened to a conversation that occurred on February 4, 2011 and DePaepe investigated whether the recording was intentional, the result of a malfunction, or the result of a mistake. The February 4, 2011 recording, therefore, is not illegal under the Federal Wiretap Act.

i.   **If Young's Line Was Recorded Illegally, Does Law Enforcement Officer Exception Nevertheless Cover The Recordings At Issue?**

If the Ordinary Course Exclusion applies, the recordings are legal. If the recordings are illegal, by definition, the Ordinary Course Exclusion does not apply.

The issue is whether the recordings are excluded from the Wiretap Act.[3] The purpose of the Wiretap Act is "to prohibit...all interceptions of oral and wire communications, except those specifically provided for in the Act." *United States v. Giordano*, 416 U.S. 505, 514 (1974). In that regard, the Wiretap Act provides that:

> (1) Except as otherwise specifically provided in this chapter any person who—
>
> (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any *electronic, mechanical, or other device* to intercept any oral communication when—
>
> > (i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or
> >
> > (ii) such device transmits communications by radio, or interferes with the transmission of such communication; or

---

[3] It is important to note that the Ordinary Course Exclusion is a statutory *exclusion* (as opposed to an *exception*) that excludes certain recordings from the substantive prohibitions of the Wiretap Act. As such, and as explained more fully herein, if the Ordinary Course Exclusion is applicable, then the recordings are not governed by the Wiretap Act and the issue of whether the recordings violated the Wiretap Act does not come into consideration.

(iii) such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or

(iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or

(v) such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States

shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

18 U.S.C. § 2511(1)(b) (emphasis added).

The phrase "*electronic, mechanical, or other device*" as used in 18 U.S.C. § 2511(1)(b) is defined in 18 U.S.C. § 2510. The statute states in relevant part:

(5) "*electronic, mechanical, or other device*" means any device or apparatus which can be used to intercept a wire, oral, or electronic communication *other than* (a) any telephone or telegraph instrument, equipment or facility, or any component thereof…(ii) being used…*by an investigative or law enforcement officer in the ordinary course of his duties*.

18 U.S.C. § 2510(5)(a)(ii) (emphasis added). The Ordinary Course Exclusion contained in 18 U.S.C. § 2510(5)(a)(ii) constitutes a "statutory exclusion of eavesdropping 'by an investigative or law enforcement officer in the ordinary course of his duties.'" *Amati,* 176 F.3d at 954. *Amati's* treatment of the Ordinary Course Exclusion as a true exclusion from the Wiretap Act was affirmed in *In re High Fructose Corn Syrup Antitrust Litigation*, 216 F.3d 621 (7th Cir. 2000). The specific issue before the Court was whether recordings excluded by the Wiretap Act because

one party consented to the recording is nevertheless subject to 18 U.S.C. § 2517. *Id*. at 622. In

ruling that excluded communications are not subject to 18 U.S.C. § 2517, the Court stated:

> The Courts (including our own) have repeatedly held this in civil
> suits under Title III, *Thomas v. Pearl*, 998 F.2d 447, 451-53
> (7th Cir. 1993); *Griggs-Ryan v. Smith*, 904 F.2d 112, 119 (1st Cir.
> 1990); *Smith v. Cincinnati Post & Times – Star*, 475 F.2d 740
> (6th Cir. 1973) (per curium); *Meredith v. Gavin*, 446 F.2d 794, 799
> (8th Cir. 1971) – which the present case is. Section 2511 exempts
> the conversations covered by it from the entirety of Title III.
> 'Since . . . the interception in the case was not obtained in violation
> of the Act, its subsequent use and disclosure was not a violation of
> the Act.' *Id.*; *see also Obron Atlantic Corp. v. Barr*, 990 F.2d 861,
> 863-64 (6th Cir. 1993); *Leitman v. McAusland*, 934 F.2d 46, 50
> (4th Cir. 1991); *United States v. Shields*, 675 N.E.2d 1152, 1157
> n. 2 (11th Cir. 1982); *United States v. Howell*, 664 F.2d 101, 105
> (5th Cir. 1981); *United States v. Head*, 586 F.2d 508, 513 (5th Cir.
> 1978). As the case last cited put it, '18 U.S.C. § 2511(2)(d)
> exempts *from the operation of the entire chapter*, of which Section
> 2518 is a part, consensual recording such as made here.' *Id.*
> (Emphasis added.)
>
> *       *       *
>
> To subject interceptions made lawful by Sections 2511(2)(c)
> and (d) to Section 2517(3) would have absurd consequences. It
> would mean that Whitacre had violated the statute by turning his
> recordings over to the FBI, since on the district court's reading of
> that section the only permissible disclosure of the contents of an
> interception made lawful by Sections 2511(2)(c) or (d) is to play a
> tape of, or testify to, those contents *in court*. Section 2517(3)
> reflects a traditional sensitivity about wiretapping and related
> methods of electronically eavesdropping on other people's
> conversations. As is implicit (and sometimes explicit) in the cases
> that hold that such eavesdropping violates the Fourth Amendment
> but that recording your own conversations does not, there is just
> not the same sensitivity about the latter practice. Title III does not
> require a warrant for such recording or regulate its use in any way.
> The matter has been left to the states, except for the flat prohibition
> of consensual recording for improper purposes.
>
> So if Whitacre's recordings were made lawful by either of these
> subsections, Title III does not restrict the use by the plaintiffs.

216 F.3d at 625.

Although the Seventh Circuit's analysis was based on the exemption of recordings under

18 U.S.C. § 2511, that same rationale was employed by the Fourth Circuit to recordings

excluded from the Wiretap Act by the Ordinary Course Exclusion in 18 U.S.C. § 2510(5)(a)(ii).

The Court, in *United States v. Hammond*, citing *In re High Fructose Corn Syrup Antitrust*

*Litigation*, ruled that recordings excluded under the Ordinary Course Exclusion are excluded for

all purposes under the Wiretap Act. 286 F.3d 189, 193 (4th Cir. 2002). The Court stated:

> However, we are persuaded by the reasoning of the Seventh
> Circuit in *In re High Fructose Corn Syrup Antitrust Litigation*, 216
> F.3d 621 (7th Cir. 2000). There, the court was asked to consider
> whether the limits on the use and disclosure of intercepted commu-
> nications imposed by Title III, 18 U.S.C. § 2517, applied to
> conversations that had been recorded by one of the participants. In
> analyzing this issue, the Court read Sections 2516 to 2519 as a
> self-contained unit within Title III to finding and implementing the
> regime for interceptions pursuant to a judicial interception order.
> *See Id.* at 624-625. Under this reading, Section 2517 only limits the
> uses of communications permitted by means of such an order. *Id.*
> Since Title III imposes no other limitations on intercepted commu-
> nications outside the warrant regime, the Seventh Circuit con-
> cluded that 'Section 2511 exempts the conversation covered by it
> from the *entirety* of Title III.' *Id.* at 625 (emphasis in original).
> Agreeing with this mode of analysis, we conclude that the FBI was
> free to use the intercepted conversations once they were excepted
> under either Section 2510(5)(a)(1) or Section 2511(2)(c).

*Id.* Therefore, if the recordings are excluded from the Wiretap Act by the Ordinary Course

Exclusion, there are no limits under the Wiretap Act on the recordings' subsequent use and

disclosure.

Although illegal recordings are mutually exclusive with respect to the applicability of the

Ordinary Course Exclusion, the Court's question does raise an issue as to whether the

conversations can be disclosed even if they were inadvertently illegally made. Under the

circumstances of this case, the answer is yes. The United States Supreme Court, in *Bartnicki v.*

*Bopper*, addressed a situation in which a telephone conversation was surreptitiously intercepted

by an unknown person. 532 U.S. 514 (2001). That unknown person left a tape recording of the

conversation with the president of a local citizens' organization. The organization president, in

turn, gave a copy of the tape to a local radio station's commentator, who played the tape on a

public affairs talk show. Another radio station also broadcast the tape and local newspapers

published the tape's contents. The two individuals whose phone conversation was intercepted

brought suit under the Federal Wiretap Act against the radio commentator, the radio stations, and

the organization president. The Supreme Court ruled that although the conversations were

illegally intercepted, the defendants were entitled to judgment based on the First Amendment.

532 U.S. at 524-25. The Court stated:

> The constitutional question before us concerns the validity of the
> statutes as applied to the specific facts of this case. Because of the
> procedural posture of the case, it is appropriate to make certain
> important assumptions about those facts. We accept petitioners'
> submission that the interception was intentional, and therefore
> unlawful, and that, at a minimum, respondents 'had reason to
> know' that it was unlawful. Accordingly, the disclosure of the
> contents of the intercepted conversation by Yokum to school board
> members and to representatives of the media, as well as the
> subsequent disclosures by the media defendants to the public,
> violated the federal and state statutes. Under the provisions of the
> federal statute, as well as its Pennsylvania analog, petitioners are
> thus entitled to recover damages from each of the respondents. The
> only question is whether the application of these statutes in such
> circumstances violates the First Amendment.
>
> In answering that question, we accept respondents' submission on
> three factual matters that serve to distinguish most of the cases that
> have arisen under Section 2511. First, respondents played no part
> in the illegal interception. Rather, they found out about the
> interception only after it occurred, and in fact never learned the
> identity of the person or persons who made the interception.
> Second, their access to the information on the tapes was obtained
> lawfully, even though the information itself was intercepted
> unlawfully by someone else. . . . Third, the subject matter of the
> conversation was a matter of public concern. If the statements
> about the labor negotiations had been made in a public arena –
> during a bargaining session for example – they would have been

25

> newsworthy. This would also be true if a third party had
> inadvertently overheard Bartnicki making the same statements to
> Kane when the two thought they were alone. (Footnotes omitted.)

*Id*.

Similarly, in this case, with respect to the February 4, 2011 recording, DePaepe played no part in the interception of the conversation. Young's conversations were mistakenly made because Division Chief Richmond instructed Barb Holleman to switch telephone lines so he could retain his prior telephone number. Second, DePaepe's access to the information on the tapes was obtained lawfully, even if the information itself was intercepted unlawfully by someone else. DePaepe obtained the information when she was checking the phone lines after the system malfunctioned, a task that is within DePaepe's scope of employment and within the ordinary course of her duties. Finally, the subject matter of the conversation is a matter of public concern as established by the South Bend Common Council's attempt to subpoena the recordings pursuant to state statute. Undoubtedly, if the conversation had been held in a public forum or overheard inadvertently, it would have been newsworthy.

The Supreme Court ruled that 18 U.S.C. § 2511 was unconstitutional as applied to the circumstances. The Court stated:

> [T]he outcome of the case does not turn on whether Section
> 2511(1)(c) may be enforced with respect to most violations of the
> statute without offending the First Amendment. The enforcement
> of that provision in this case, however, implicates the core
> purposes of the First Amendment because it imposes sanctions on
> the publication of truthful information of public concern.

> In this case, privacy concerns give way when balanced against the
> interest in publishing matters of public importance As Warren and
> Brandeis stated in their classic law review article: 'the right of
> privacy does not prohibit any publication of matter which is of
> public or general interest.' The Right to Privacy, 4 Harv. L. Rev.
> 193, 214 (1890). One of the costs associated with participation in
> public affairs is an intendant loss of privacy.

532 U.S. at 533-534.

Under the circumstances of this case, the First Amendment protects, and in fact encourages, disclosure of, at a minimum, the February 4, 2011 recording.

## II.   ADDITIONAL ARGUMENTS NOT NECESSARILY INCLUDED WITHIN THE COURT'S QUESTIONS

*Amati* remains the leading case in this Circuit, and in fact the United States, on the Ordinary Course Exclusion. In that case, sixty-three employees and former employees of the Woodstock police department filed suit under the Wiretap Act against the former police chief and other former members of the Woodstock police department. 176 F.3d at 954. The plaintiffs complained about the taping of one of the department's telephone lines. *Id*. A jury trial resulted in a verdict for the defendants. *Id*. On appeal, the plaintiffs argued that the Ordinary Course Exclusion did not apply. 176 F.3d at 955. The Seventh Circuit squarely rejected this argument.

Specifically, in affirming the judgment in favor of the defendants, the *Amati* Court found that "[i]nvestigation is within the ordinary course of law enforcement." *Id*. In that regard, Judge Posner, writing for the Seventh Circuit, provided the following explanation of the term "*ordinary*" in the context of the Ordinary Course Exclusion:

> '[O]rdinary'…is more reasonably interpreted to refer to routine noninvestigative recording of telephone conversations…Such recording will rarely be very invasive of privacy, and for a reason that does after all bring the ordinary-course exclusion rather close to the consent exclusion: what is ordinary is apt to be known; it imports implicit notice. *To record all calls to and from a police department is…a routine police practice. If 'ordinary course' of law enforcement includes anything, it includes that. The sparsity of case law on the question suggests not that the principle is dubious but that it is too obvious to have incited many challenges.*
>
> What would not be routine would be if the police, in order to trick people into making damaging admissions over the phone, announced that calls to and from the police department were not

27

> being recorded, and then recorded them anyway…The boundary is
> between routine noninvestigative uses of electronic eavesdropping
> and its use either as a tool of investigation (which requires a
> warrant) or as a device for intimidation, suppression of criticism,
> blackmail, embarrassment, or other improper purposes.

176 F.3d at 955-56 (emphasis added) (internal citations omitted). The Court concluded that

"[t]he invasion of privacy was regrettable, but if all Congress had cared about was the protection

of privacy it would not have written an exception for electronic eavesdropping in the ordinary

course of law enforcement into the statute." 176 F.3d at 956.

A significant fact in *Amati* is that the police department had announced to its officers and

employees through a departmental memorandum that a specific telephone line "was intentionally

left untapped to allow for personal calls, however, we request that you keep those calls brief and

to a minimum." From time to time in subsequent years, departmental memoranda or

correspondence referred to the line as not being tapped. 176 F.3d at 954-955. A city council

woman was dissatisfied with the police department's response to a complaint about a chlorine

leak which was made over the untapped line. An investigation was hindered, however, by the

fact that the call had not been recorded. The police department then decided to record calls on the

previously untapped line, but did not tell the employees. The taping was discovered when one of

the defendants reviewed a tape and heard one of the plaintiffs making derogatory comments

about him and complained to the president of the local police union. 176 F.3d at 955.

The Seventh Circuit ruled that despite the fact that the department had announced that the

line was not being recorded and despite the fact that the department subsequently recorded the

line without informing employees, the Ordinary Course Exclusion was applicable to recordings

made before the employees knew the line was being taped.

A similar analysis should apply in the present case where there was no announcement to anyone as to what lines at the South Bend Police Department would be recorded. Furthermore, the undisputed evidence establishes that there was no secrecy surrounding the recording of the telephone lines. If any officer wanted to know what lines were being recorded, the officer could simply ask the Chief of Police, Karen DePaepe, or Diana Scott, and the officer would be told.

The Seventh Circuit has not revisited the Ordinary Course Exclusion in depth in any published opinion since rendering its decision in *Amati*, although it has issued at least one order addressing the issue. As noted in *Amati*, "The sparsity of case law on the question suggests not that the principle is dubious but that it is too obvious to have incited many challenges." 176 F.3d at 956. However, in a recent analogous case, the First Circuit, following the rationale set forth in *Amati*, held that "other circuits' precedents in a line of cases under [the Wiretap Act] would have led reasonable officials to conclude that recording all calls into and out of a police station was neither illegal nor unconstitutional." *Walden v. City of Providence*, 596 F.3d 38, 54 (1st Cir. 2010).

In *Walden*, former employees of the police and fire departments of the City of Providence sued the city and several city employees in their personal capacities after learning that an automatic recording system at the city's public safety complex recorded telephone calls into and out of the complex. 596 F.2d at 43. On appeal, the issue was whether two individual defendants were entitled to qualified immunity. 596 F.3d at 52. After summarizing *Amati*, the First Circuit noted that:

> Other courts had also taken the view before 2002 that 'the routine and almost universal recording of phone lines by police departments . . . as well as other law enforcement institutions is exempt from the [federal wiretap statute]' and the practice of 'routinely and indiscriminately record[ing] all phone activity in

> and out of the police department' is 'well known in the industry
> and in the general public.'

596 F.3d at 55 (internal citations omitted). Accordingly, the Court held that "the individual

defendants are entitled to judgment on the basis of qualified immunity." *Id.* at 55.

*Jandak v. Brookfield*, 520 F. Supp. 815, 817 (N.D. Ill. 1981) is another case arising

within the Seventh Circuit applying the Ordinary Course Exclusion. In *Jandak*, Fred Jandak

learned his wife, Susan, was having an affair with Officer Thomas J. Capaccio of the Brookfield

Police Department. 520 F.Supp. at 817. Fred informed the police chief of the affair, and

subsequently, the police chief initiated an investigation into the situation. *Id.* During the course

of this investigation, the police chief listened to a telephone conversation between Officer

Capaccio and Susan that had been recorded by the department's telephone recording system. 520

F.Supp. at 818. Eventually, Susan filed a lawsuit against the police department alleging

violations of the Wiretap Act. *Id.* The department filed a motion for summary judgment in which

it argued the recording of the phone call between Officer Capaccio and Susan was not subject to

the Wiretap Act by virtue of the Ordinary Course Exclusion. 520 F.Supp. at 821.

In granting the department's motion for summary judgment, the Court cited the Ordinary

Course Exclusion and explained that:

> The recording in this case would not constitute an interception, and
> so would not violate the statute, if it was done through the use of a
> telephone instrument, equipment or facility, or any component
> thereof, and if the equipment was being used by a law enforcement
> officer in the ordinary course of his duties.

*Id.* Based on this language, the Court concluded, as a matter of law, that the equipment used by

the police chief to listen to the telephone conversation between Officer Capaccio and Susan fell

within the Ordinary Course Exclusion. 520 F.Supp. at 824. The Court reasoned that the

equipment was installed to improve police emergency and investigative services. *Id.* The Court

further noted that the police chief listened to the call for a proper law enforcement purpose, which was to ensure police regulations were being followed. *Id.* Accordingly, the Court granted the department's motion for summary judgment and held that:

> [R]outine, nonsurreptitious, recording of a police investigative line which results in the recording of a conversation of an officer misusing the line for private purposes, where the officer should have known that the line was monitored, was in the ordinary course of the police chief's duties as a law enforcement officer, and is exempted from the [Wiretap Act] by [the Ordinary Course Exclusion].

*Id.* at 825.

Just like the defendants in *Amati*, *Walden*, and *Jandak*, the South Bend Police Department was engaged in the routine noninvestigative recording of telephone conversations. The recorded lines were recorded 24 hours a day, seven days a week. The lines were recorded in the ordinary course of business of the South Bend Police Department to record the calls for a legitimate business purpose of documenting complaints against the police department or recording information from anonymous tips. Such recordings are common place among police departments nationwide and, as the Seventh Circuit noted in *Amati*, are well known and well established. The phone lines, in general, and line 6301 in particular, had been recorded for several years. There was never an intent to record a conversation in order to trick people into making damaging admissions over the phone or for purposes of intimidation, suppression of criticism, blackmail, embarrassment or other improper motives.

Barb Holleman, who was the administrative assistant to several police chiefs, was responsible for responding to officers' requests regarding phone lines. She routinely switched officers' phone lines to accommodate their requests to either keep or change a phone line assigned to them. Holleman was acting within the ordinary course of her responsibilities in

accommodating Richmond's request to keep his 7473 line and switching the 6031 line to the unoccupied office of the Captain of the Investigative Division. Holleman's duties, however, did not include anything with regard to the recording of lines.

The decision to record phone lines rested solely with the Chief of Police. When Chief Boykins took over the position, he continued with the recordings just as former Chief Fautz had. Boykins did not add or delete any lines from the list being recorded during his tenure as chief. The same lines that were recorded under Chief Fautz in the ordinary course of the police department's law enforcement duties continued to be recorded under Chief Boykins, also within the ordinary course of the police department's duties. The purpose of the recording system never changed from the time the first system was installed until the time the City filed its declaratory judgment action.

Furthermore, Karen DePaepe, the Director of Communications, listened to the recordings within the ordinary course and scope of her employment in maintaining the phone lines and in responding to Freedom of Information Act requests. The subject of the recordings was disclosed to Chief Boykins by DePaepe in the ordinary course and scope of her employment in learning of possible illegal or unethical conduct. There is nothing about the recordings, or their disclosure, that is outside of the Ordinary Course Exclusion.[4]

## III.     APPLICABILITY OF THE ORDINARY COURSE EXCLUSION DESPITE THE CITY'S PRIOR ARGUMENTS.

The City and the Individuals have raised several arguments throughout the litigation regarding the applicability of the Wiretap Act. None of these arguments by the City, which are

---

[4] And by extension, there is nothing about the recordings, or their disclosure, that fall within the scope of the substantive prohibitions of the Wiretap Act. *See In re High Fructose Corn Syrup Antitrust Litigation*, 286 F.3d 189, 193 (4th Cir. 2002) (indicating that recordings excluded under the Ordinary Course Exclusion are excluded from the Wiretap Act for all purposes).

discussed in turn below, defeat the fact that the recordings at issue in this case are excluded from the Wiretap Act under the Ordinary Course Exclusion.

In summary judgment pleadings, the City argued that the Ordinary Course Exclusion did not apply because not every incoming and outgoing call to the South Bend Police Department was automatically recorded. The City also argued that the recordings were not made by a law enforcement or investigative officer. These arguments have been abandoned by the City for the trial. The pretrial order limits the issues raised by the City as follows:

> The City contends that the recordings were not captured in the ordinary course of the Police Department's law enforcement duties because (a) the recordings were captured mistakenly as a result of inadvertent actions taken by an administrative assistant and (b) the recordings were not captured pursuant to any routine, practice, or policy of the Police Department.

In the event the City or the Individuals attempt to resurrect these dead arguments, for the reasons set forth below, the Ordinary Course Exclusion nevertheless applies.

The City previously argued that the Ordinary Course exclusion did not apply because Karen DePaepe and Barb Holleman were not law enforcement officers. Although this contention is not explicitly stated in the pre-trial order, the City does make reference to the Chief of Police's administrative assistant. To the extent the City will contend that the Ordinary Course Exclusion does not apply because the telephone lines were switched, at Richmond's request, by administrative assistant Barb Holleman, the City's argument is factually and legally incorrect.

The City's argument is factually incorrect because neither Barb Holleman, nor Karen DePaepe, had anything to do with the decision to record any lines. Holleman's responsibilities included processing and accommodating requests regarding assignments of telephone lines. The Chief, and the Chief alone determined what lines would be recorded and those decisions were implemented through the Director of Communications, Karen DePaepe.

The fact that neither Barb Holleman, nor Karen DePaepe was a law enforcement officer is legally immaterial. In this regard, the Federal District Court for the Eastern District of Virginia has ruled that the Ordinary Course Exclusion applies when recordings are "performed by government personnel or 'by individuals operating under contract with the government,' provided . . . that those individuals are properly authorized and supervised.' *United States v. Rivera*, 292 F.Supp. 2d 838, 843 (E.D. Va. 2003). The issue in *Rivera* arose because telephone calls going out of and into a prison were being recorded not by the prison itself, but by third-party private entities, Verizon and Global Tel*link. In rejecting the argument that the Ordinary Course Exclusion did not apply because Verizon and Global Tel*link were not investigative or law enforcement officers, the Court stated:

> Caselaw interpreting the statute [definition of investigative or law enforcement officer] broadens this definition, holding that a prison official qualifies as an investigative or law enforcement officer such that calls intercepted directly by prison personnel…need not be judicially authorized pursuant to the law enforcement exception. Although circuit caselaw does not squarely address whether an entity acting as the agent of a prison pursuant to a government contract may qualify under § 2510(7) as an investigative or law enforcement officer, another section of the statute provides that:

>> an interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

> 18 U.S.C. § 2518. Title III's legislative history also confirms that monitoring and interception under the statute may be performed by government personnel or "by individuals operating under contract with the Government," provided, as occurred here, that those individuals are properly authorized and supervised.

> It follows that Verizon's and Global Tel*link's recording of Rivera's calls pursuant to their contract with Arlington County comes within the law enforcement exception. Verizon and Global Tel*link acted exclusively under the direction of Arlington County

> prison officials. In essence, Verizon's and Global Tel*link's role was limited to providing the means and equipment used to record the calls. They did not listen to or monitor the calls; nor did they have any discretion concerning which calls to record. All monitoring of Rivera's calls was conducted by prison officials. In these circumstances, the law enforcement exception fits well.
>
> In sum…in the Arlington County facility, although all inmate calls were recorded by Verizon and Global Tel*link pursuant to a contract with the prison, Rivera's calls nonetheless fall within the law enforcement exception because Verizon and Global Tel*link recorded all inmate calls, including Rivera's, pursuant to Arlington County's contractual authorization and under the County's supervision.

292 F. Supp. 2d at 842.

Just like the recordings at issue in *Rivera*, the recordings at issue in the present case fall within the Ordinary Course Exclusion because, when Holleman switched the phone lines at Richmond's request, she was acting within the ordinary scope of her employment as the Chief's administrative assistant and under his direct supervision. Similarly, when DePaepe listened to the recordings, she was acting pursuant to her employment with the South Bend Police Department and was also acting under the supervision and direction of the Police Chief. Moreover, the argument that the Ordinary Course Exclusion should apply is even more compelling in this case than in *Rivera* because in this case, the recording equipment was owned and operated by the South Bend Police Department.

Accordingly, the Ordinary Course Exclusion should apply in this case regardless of whether Barb Holleman or Karen DePaepe was an "investigative or law enforcement officer." The undisputed evidence shows that, at all relevant times, the recordings at issue were captured by recording equipment being used by the Chief of Police in the ordinary course of his duties (namely, to document complaints against the police department and police personnel; to record and preserve information from anonymous tips; and to insure that calls being received were

handled correctly). There is no question that the Chief of Police is an "investigative or law enforcement officer."

The City also argued in its summary judgment pleadings that the Ordinary Course Exclusion does not apply because not every single telephone call into and out of the Police Department, on every single line, was recorded. Although this argument is not explicitly included in the pre-trial order, the City may try to include this argument within its argument that the recordings were not made pursuant to an official policy. Such an argument is misplaced.

Although the facts of the cases cited by the City in its summary judgment pleadings, for the most part, indicate that all calls were recorded, none of the cases make the recording of all, or even nearly all, of the telephone conversations into and out of a police department a requirement for purposes of § 2510(5)(a)(ii). The issue of whether a recording is done in the "ordinary" course of a law enforcement officer's duties does not depend on whether all calls to and from the police department be recorded. Instead, whether the Ordinary Course Exclusion applies depends on whether the nature of the recordings at issue can be "reasonably interpreted to refer to *routine non-investigative recording of telephone conversations.*" *Amati*, 176 F.3d at 957. (Emphasis added).

In the present case, not all phone calls to and from the South Bend Police Department were recorded. In fact, the equipment used by the South Bend Police Department was not capable of recording all lines. The lines that were recorded, however, were recorded 24 hours a day, seven days a week. The lines were recorded in the ordinary business of the South Bend Police Department to document the calls for legitimate business purposes, including documenting complaints against the police department and police personnel; recording and preserving information from anonymous tips; and insuring that calls being received were handled

36

correctly. Such recordings are commonplace among police departments nationwide and, as the Seventh Circuit noted in *Amati*, are well known and well established. The purpose of recording the phone calls was not to trick people in making damaging admissions over the phone or as a device for intimidation, suppression of criticism, blackmail, embarrassment or other improper motives. If those things happened, it was the result of legally-recorded information being legally disclosed, but subsequently misused. Any such misuse has no effect on whether the recordings fall within the Ordinary Course Exclusion.

The fallacy in the position that all phone calls must be recorded in order for the Ordinary Course Exclusion is evident in applying the argument to the reverse situation. Under the City's theory, unless every telephone call on every police phone line is recorded, no call falls within the Ordinary Course Exclusion. None of the parties have been so bold as to take this extreme position. Instead, the City and the Individuals inexplicably argue that only those calls on the 6031 phone line do not fall within the Ordinary Course Exclusion.

Furthermore, courts sitting in the Seventh Circuit have found that the Ordinary Course Exclusion applicable in cases where less than all lines were recorded. In *Jandak v. Brookfield*, 520 F.Supp. 815 (N.D. Ill. 1981), discussed previously, the police department's telephone system consisted of ten lines total, only nine of which were recorded. *Id.* at 817-18. In ruling that the Ordinary Course Exclusion applied, the Court explained that:

> Police departments commonly have recording systems like that of defendants, due to the need to preserve and be capable of accurately recalling messages pertaining to emergencies or to official police business. To further these purposes, defendants engaged a communications common carrier to install a recording system, to record emergency and investigative calls, as an integral component of the communication system used by the police department in performing its duties to the public. Such a system indiscriminately and routinely records all activities *on established designated lines*, and is not comparable to the selective use of

37

recording equipment to eavesdrop on a normally unmonitored telephone system in order to record specifically selected communications. There is little doubt that Congress did not intend the statute to apply to routine recording of emergency and investigative calls as an integral component of a police station telephone system like that of defendants. Accordingly, the Court concludes that the recording device used by defendants falls within the definition of telephone equipment or component as used in [the Ordinary Course Exclusion].

*Id.* at 822 (emphasis added). Thus, similar to *Amati*, the Court's rationale in *Jandak* indicates that the issue of whether the Ordinary Course Exclusion applies depends on the police department's underlying reasons for recording the calls in the first place, not the number of lines being recorded. Just as the recording equipment in *Jandak* "indiscriminately and routinely records all activities on established designated lines," the system in the present case also indiscriminately and routinely records all activities on established designated lines. Those lines were established before former Chief Boykins became chief and never changed while he was Chief.

## CONCLUSION

For the above reasons, the Court should enter a judgment declaring that the recordings at issue were made in the ordinary course of law enforcement and are therefore excluded from the Federal Wiretap Act by 18 U.S.C. § 2510(5)(a)(ii).

/s/Robert J. Palmer
E. Spencer Walton, Jr. (1000-71)
Robert J. Palmer (6316-71)
Attorneys for South Bend Common Council

**MAY • OBERFELL • LORBER**
4100 Edison Lakes Parkway, Suite 100
Mishawaka, IN  46545
Phone: (574) 243-4100
Fax: (574) 232-9789
rpalmer@maylorber.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the forgoing was served upon all attorneys of record via the

Court's ECF system on September 15, 2014.


/s/Robert J. Palmer
Robert J. Palmer


F:\Clients\S1060\12001\Pleadings - Fed Ct\2014-09-15 Post-Trial Brief.docx