UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| CITY OF SOUTH BEND, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) |
| | ) |
| SOUTH BEND COMMON COUNCIL, TIM | )   CASE NO. 3:12-CV-475-JVB-CAN |
| CORBETT, DAVE WELLS, STEVE RICHMOND, | ) |
| BRIAN YOUNG, AND SANDY YOUNG. | ) |
| | ) |
| Respondents. | ) |

## CITY OF SOUTH BEND'S POST-TRIAL BRIEF

The petitioner, the City of South Bend (the "City"), by counsel, pursuant to the Court's

post-trial briefing schedule, now submits its post-trial brief.

## INTRODUCTION

The South Bend Common Council (the "Council") bore the burden at trial to show that

Brian Young's line was recorded pursuant to the law enforcement exclusion contained in the

Wiretap Act.   In *Amati v. City of Woodstock*, 176 F.3d 952 (7th Cir. 1999), Judge Posner

delineated a line or "boundary" to determine when the actions of a police department fall within

the law enforcement exclusion and when such actions fall outside the exclusion:

> The boundary is between routine non-investigative uses of
> electronic eavesdropping and its use . . . as a tool of investigation
> (which requires a warrant) . . ." *See Amati*, 176 F.3d at 956.

The trial record now contains sufficient unopposed facts that demonstrate that the recording of

Brian Young's telephone line occurred outside the boundary of the law enforcement exclusion

because it was not recorded pursuant to a routine.  Instead, Young's line was initially recorded

inadvertently and then continued to be recorded for a targeted investigation of Young after the error was discovered.

As an initial matter, Chief Boykins explicitly testified that the recording of Young's calls from March 2010 to March 2011 (a period when no one knew the line was being recorded), had "no law enforcement purpose" (a fact that on its own violates the Wiretap Act). After the inadvertent discovery by Karen DePaepe that the Voice Logger was recording all Young's calls, Boykins shifted his viewpoint and declared that the recording of Young *after* March of 2011 did have a law enforcement purpose. The purpose, however, was not "routine," and not "non-investigatory." Indeed, the recording of Young (from the beginning) violated the directive of prior Chief Thomas Fautz, a directive explicitly adopted by his successor, Chief Boykins, that private, individually assigned lines should only be recorded with the notice and permission of the user. As Chief Boykins conceded:

> Q. You never told Karen DePaepe, "Wait a minute. This line is
> being recorded; it's not supposed to be recorded; Brian Young
> doesn't know it's being recorded; stop recording it," did you?
> A. No.
> Q. And that's *contrary to your own policy* that you were following
> and the policy of Chief Fautz that you took over for, correct?
> A. *Correct.*

Tr. Vol. I 214:15-22 (emphasis added).

Furthermore, as established by the testimony of DePaepe, Richmond, Young, and by Boykins' own admissions, Boykins' purpose in failing to stop the improper recordings despite his knowledge that they violated his own informal policy was to *investigate* Young. Specifically, the following testimony from Boykins highlights why he failed to inform Young in March 2011 and the reason he allowed the recording to continue:

> Q. Let me see if I can clear this up a little, Captain Boykins. The
> testimony that Mr. Pfeifer was asking you about, on page 66 [of

your deposition], where you said there was no law enforcement
purpose to recording Brian Young's line -- right?
A.  Right.
Q.  -- that was at the beginning when it was by mistake directed to
his office; that's what you meant?
A.  Right.
Q.  Then it became for a law enforcement purpose *after you
learned something*?
A.  Yes.

Tr. Vol. I. 217:18-25 to 218:1-4 (emphasis added); *see also* Tr. Vol. I. 215:23-25
to 216:1-5.

Under the clear guidance from *Amati*, the law enforcement exclusion cannot apply
because the recordings at issue violated Boykins' own directive and were not created pursuant to
any routine and not created for any police purpose.  But in addition, as the above quote
demonstrates, Boykins allowed the recording to continue based upon the *content* of a
conversation recorded in violation of his own directive.  Thus, when Boykins allowed the
recording to continue because he was interested in the particular content of Brian Young's
telephone conversations, Boykins' transformed the recording into a *targeted investigatory tool*,
but without a warrant.  Without question such actions place Boykins' actions beyond the *Amati*
boundary.  The record evidence from the trial proves that the Wiretap Act's restrictions must
apply to the recordings.

## **STATEMENT OF FACTS**

### The Police Department's Phone and Recording Systems

The  Police  Department  utilizes  well  over  a  hundred  telephone  lines  in  its  daily
operations.  Ex. 20; Tr. Vol. I 39:6-9.  They are NOT all recorded.  Stip. F(12); Tr. Vol. I
105:11-13.

Although no policy or written procedure designates which lines are to be recorded, the
Police Department has commonly recorded certain lines with its Dynamic Instruments Reliance

server-based analog recording system (the "Voice Logger"). Pretrial Order Stipulations ("Stip."), at ¶ F(2). The Voice Logger had the capacity to record forty-eight (48) separate channels, with each channel consisting of one phone line, one base station, or one radio channel. Stip. ¶ F(4). To record a particular telephone line, the telephone line had to be hard wired into the recording system. Stip, ¶ F(5).

<u>Police Department's Approach to Recording "General Use Lines"</u>

All witnesses and parties agree that the Police Department never had a policy that guided the use of the recording system.[1] *See, e.g.,* Tr. Vol. II 148:1-8. And, despite the fact that the Voice Logger's capacity prevented the recording of all telephone lines, the Police Department failed to develop any written policies or procedures regarding which lines would be recorded. Stip. F(11). It is clear from the testimony at trial that the *only consistent* approach of the Police Department has been to continuously record lines in the communications center (including 911 calls) and the front desk lines. Tr. Vol. I 44:9-45:18; 124:21-125:7; 224:14-21; Vol. II 65:2-13; 113:19-114:1. The recording of all other lines, *i.e.*, the lines specifically assigned to individuals ("Assigned Lines") was at all relevant times entirely dependent on the *ad hoc*, individual discretion and directive of the then-current Chief of Police. Tr. Vol. I 81:8-20; Tr. Vol. II 114:13-17.

The communications center training manual informed dispatchers that all telephone calls placed from the dispatch floor were recorded and kept on file for a period of three years. Tr. Vol. I 36:1-19. The communications center provided an unrecorded break room telephone for

---

[1] This is a fundamental fact in this case with significant implications. The Court's proposed questions (*See* Tr. Vol. II 217:19-218:24) in several places seek to determine the relationship between Police Department policy and the recording practices. However, those questions, as framed, cannot be answered since it is a stipulated fact in this record that *no policy existed* at the time of the recordings. The City will seek to apply those questions to the concept of any putative routine that the Police Department may have developed during the relevant time period and the City contends that the initial recording and the continued recording of Young violated the informal routine developed by Fautz and adopted by Boykins.

personal calls.  *Id.*  But, that training manual only addressed the communications center and was distributed only to the dispatchers that worked in the communications center.  Tr. Vol. I 36:24-37:12.  According to undisputed testimony from Diana Scott, the front desk personnel had no similar training manual but were verbally informed that the front desk lines were being recorded.  Tr. Vol. I 37:6-7.  These lines were <u>*not*</u> assigned to specific users but were instead general use lines.[2]  Diana Scott also testified that the law enforcement purpose in recording these general use lines was to:  (a) provide recordings of 911 calls for criminal matters; (b) perform quality assurance checks on dispatchers; (c) document responses of law enforcement officers; and (d) investigate complaints made by the public.  Tr. Vol. I 43:18-25.

Police Department's Approach to Recording "Assigned Lines"

In contrast to the communications center and the front desk, officers that were assigned to specific offices or specific workstation cubicles had individually Assigned Lines.  Tr. Vol. I 122:13-14.  Only a small number of these Assigned Lines in the Police Department were ever hard wired into the Voice Logger.  *See* Ex. 6 (recorded lines list identifying only ten recorded lines not including front desk and communications center lines). For example, the Investigative Division (sometimes called the Detective Division) had twenty five to thirty specifically Assigned Lines as shown by the list utilized by Rick Bishop when he was assigned to the Investigative Division.  *See* Ex. 46.  However, only the two publicly listed lines to the Division secretary had typically been recorded.[3]  *See* Ex. 6.  The remaining Assigned Lines could be

---

[2] The communications center was staffed by various personnel during different shifts, these lines were recorded regardless of user.  Tr. Vol. I 44:15-16.  Indeed, the communications center was recorded by "position," meaning that each dispatch position in the communications center might be associated with multiple phone lines but that the position was connected with a single line to the Voice Logger.  Tr. Vol. I 44:15-45:4.

[3] Testimony by Fautz indicated his belief that Division Chief Kyle had requested that his Assigned Line (shown on Exhibit 46 as 574-235-5990) be recorded.  However, the lists of recorded numbers that existed in DePaepe's files did not list his assigned number.  DePaepe testified that Kyle had the publicly listed incoming lines to the Investigative Division (574-235-9263 and 574-235-9264) recorded rather than his private Assigned Line.

recorded if requested by the officer and approved by the Chief of Police.  Tr. Vol. I 187:1-4; Tr. Vol. II 114:13-17.

<u>Chief Fautz's Approach to Recording Assigned Lines</u>

One fact has become abundantly clear from discovery and the trial record:  the Police Department handled recording in a completely *ad hoc* manner.  It had no policy.  It had no formal procedures.  There existed no written guidance on how to handle recording practices and no training was provided.  Tr. Vol. I 129:19-130:14.  Officers had no accurate knowledge concerning which Assigned Lines were recorded, which were not and how to become part of the system or be removed from the system.  *See, e.g.,* Tr. Vol. II 18:11-19:4; 148:1-8.  The Chief of Police delegated virtually all administrative function to DePaepe (who was <u>not</u> a law enforcement officer) and she was the only person in the entire Police Department that knew which numbers were recorded at any given time and even she was not sure who used those lines and why they were recorded.  Tr. Vol. II 111:3-10; 148:1-8.  The best that can be said is that Chief Fautz had discussed his approach to the recording of Assigned Lines with DePeape and created an expectation that Division Chiefs (or other Command Staff) could use the Voice Logger and that the Police Department would only record their lines with the knowledge and consent of the user.  Tr. Vol. I 130:15-131:3; 136:13-19; 141:10-16.

Under Chief Tom Fautz (and continuing under Chief Darryl Boykins) the commonly recorded General Use Lines (front desk, communications center) continued to be recorded despite the lack of any written procedures.  As for the individually Assigned Lines, Fautz made no announcement regarding which lines were recorded.  Tr. Vol. I 105:6-13; 129:19-22; 161:1-2.  At most, an *ad hoc* practice developed in the Police Department pursuant to which the Chief of

Police would inform the communications director when an Assigned Line should be added to the Voice Logger.  Tr. Vol. II 114:13-17.

Fautz testified that he explained his approach to DePaepe in 2004.  After a command staff meeting, during which Fautz discussed his approach, he requested that DePaepe add certain Assigned Lines to the Voice Logger and he informed her of his desired approach.  Tr. Vol. I 130:20-24.  DePaepe did not disagree with or contradict Fautz's testimony on this point.  Tr. Vol. II 141:10-16.

Chief Fautz testified that increased scrutiny and criticism of the Police Department from the public regarding use of force issues led him to suggest that recording calls would help the Police Department document its actions.

> I explained to her that we were being -- we were under a lot of scrutiny by the community on investigations, complaints that we weren't following through, that we were not dealing appropriately with uses of force, those kinds of things. . . .  And, you know, we wanted a way -- it came up in a discussion, and one of the division chiefs asked about having his line taped, because we were under all of this scrutiny and criticism, and that kind of prompted us moving forward with that.

Tr. Vol. I 131:4-132:18.

However, Chief Fautz was very clear on the following point:  the lines were only recorded at the officer's specific request or as a result of a "personal choice" of that officer.  Tr. Vol. I 136:9-12.  Chief Fautz considered the choice given to his command staff as a "useful tool" for those officers.  133:20-134:1; 136:12.

Fautz was equally clear that by giving the option to have their Assigned Line recorded on a case-by-case basis, Chief Fautz did not intend to establish any procedure or routine.  Tr. Vol. I 136:5-12.  He did not intend that all administrative lines could be recorded at any time.  Tr. Vol. I 136:13-15.  He did not intend to record specific lines regardless of their user because officer's

often took their lines with them when they re-located within the Police Department.  Tr. Vol. I

165:6-14.  He did not intend to establish a routine of recording anyone without their knowledge

because Chief Fautz believed the officers had "an expectation of privacy with their own assigned

line."  Tr. Vol. I 136:16-22.

Fautz testified that he specifically directed DePaepe concerning this approach, saying:  "I

told Karen DePeape that 'they are aware of it.  It's with their knowledge and permission,' . . ."

Tr. Vol. I 137:5-6.  Accordingly, the recording of a private line without the knowledge and

consent of the person being recorded violated the directive that Chief Fautz's issued on this

subject.  Tr. Vol. I 170:13-17.  Fautz further testified that he "made it clear to DePaepe of [sic]

the reason why we're doing this" and DePaepe acknowledged in her testimony and in her

Officer's Report that she had a discussion with Fautz about the reasoning for the recording.  Tr.

Vol. I 134:14-19; Tr. Vol. II 141:10-16; *see also* Ex. 1A.

<u>The Recording of Rick Bishop</u>

Around 2002, Rick Bishop was assigned the phone line at issue in this case, 574-245-

6031.  Tr. Vol. I 224:5-8.  According to Bishop's testimony, around 2005, Bishop requested that

his line be recorded in response to threatening phone calls officers were receiving from a certain

individual.[4]  Tr. Vol. I 226:13-227:6.  This was completely consistent with the Fautz approach.

In January 2007, Rick Bishop was promoted to Division Chief of the Investigative Division and

re-located to an office in the Investigative Division.  Tr. Vol. I 228:23-229:2.  At that time, he

requested that the 6031 number follow him to his new office and the line was moved

---

[4] DePaepe initially recalled that Bishop asked to be recorded while assigned to the Investigative Division based on
the grouping of his phone number with other Investigative Division numbers on her recording list, but later
conceded that her list at the time Bishop's line was added to the Voice Logger did not list the location of numbers
and that Rick Bishop's memory was probably more accurate.  Tr. Vol. II 200:1-201:3; 211:14-213:14.

accordingly.  Tr. Vol. I 229:3-20.  Bishop eventually forgot that his line was being recorded, but did not expect that it would always be recorded no matter who used it.  Tr. Vol. I 230:5-7; 22-25.

Chief Boykins Continues the Fautz Approach

When Captain Boykins began serving as Chief of Police in 2007, he also failed to establish any policy or practice regarding the lines to be recorded by the Voice Logger.  Stip. F(13)-F(15); 185:4-7.  He also made no general announcement regarding recorded lines.  Tr. Vol. I 196:21-23.  Rather, he explicitly adopted Chief Fautz's "personal choice" scheme pursuant to which an officer's Assigned Line would be recorded only with their knowledge.  Tr. Vol. I 185:4-7; 187:1-4; 190:17-21; 213:20-22.  Boykins instructed DePaepe to continue doing what Fautz had done.  Tr. Vol. I 187:9-24.  Indeed, Captain Boykins believed that any officer that was going to be recorded should be informed of that fact to protect the officer's privacy rights.  Tr. Vol. I 196:13-20.

The Promotion of Steve Richmond and the Re-directing of His Telephone Line

In February of 2010, then-captain Steve Richmond was promoted to Division Chief of the Investigative Division by Boykins, replacing Bishop.  Tr. Vol. II 6:23-25.  At that time, Bishop took a position in a separate building with Metro Homicide.  Tr. Vol. I 248:24-249:4.  Bishop accordingly could not take the 6031 number with him, and it remained in the Division Chief's office of the Investigative Division.  Tr. Vol. I 248:24-249:4.  Richmond, however, wanted to bring his own 574-235-7473 phone number with him to that office upon his promotion.  Tr. Vol. II 11:22-24.  He contacted Barbara Holleman, administrative assistant to the Chief of Police, to accomplish the transfer of his 7473 number from his captain's office to the Division Chief's office.  Tr. Vol. II 11:25-12:4.  Holleman switched the 7473 line to the Division Chief's office by moving that line to the port for that office in telephone closet C.  Ex. 36; Stip. F(21).  She

then connected the 6031 line to the port for the Captain's office in telephone closet C.  Ex. 36; Stip. F(21).  Unbeknownst to her, the 6031 line was still connected to the Voice Logger upstream of the location where she performed the switch.  Stip. F(21).

In March 2010, Brian Young was promoted to Captain of the Investigative division.  Tr. Vol. II 64:23-24.  At that time, he moved into the office to which the 6031 line had been moved and began using that line.  Stip. F(19); Tr. Vol. II 70:18-20.  Thus, from March of 2010 until February 4, 2011 (when DePaepe discovered that Young was being recorded) the Voice Logger was recording all Young's calls without anyone's knowledge.[5]  As noted, Holleman was unaware that line was being recorded, and neither she nor anyone else intended to record Young's conversations.  Stip. F(22).  Young was also unaware that the line was being recorded. Stip. F(22).

<u>DePaepe's Discovery of Brian Young's Use of Rick Bishop's Previously Recorded Line</u>

On February 4, 2011, Communications Director Karen DePaepe was troubleshooting the Voice Logger to see if any recordings were lost following a series of crashes.  Tr. Vol. II 119:18-25.  As part of that process, DePaepe checked *all* of the Police Department's recorded lines to confirm the recordings were properly downloading.  Tr. Vol. II 124:10-20.  DePaepe admitted that it took only a few seconds of listening to each recording to determine whether she had usable data on the hard drive and backup discs.  Tr. Vol. II 124:24-25.  On February 4, 2011, when listening to a certain recording, DePaepe recognized Young's voice on the recorded line 6031.  She had previously believed that line belonged to Richmond.  Tr. Vol. II 125:19-126:1. Within a few seconds of listening to that recording, DePaepe had confirmed what she needed to confirm for the purposes of her troubleshooting.  Tr. Vol. II 126:24-127:2.  Nevertheless, she

---

[5] The City will refer to this phase as the "Initial Recording."  In contrast, after February 4, 2011 the recording of Young will be referred to as the "Continued Recording."

continued listening to the recording and went on to check a series of additional recordings associated with that line to determine when Young, instead of Richmond, had taken that line.  Tr. Vol. II 131:14-25.  DePaepe testified that she "continued to check backward[s] to see if it was maybe a fluke or something, and heard other conversations" and that it appeared to her that Young had been recorded "for some time."  Tr. Vol. II 157:2-10; 158:9-10.

As a result of her continued listening, DePaepe discovered a recording of a conversation that concerned her.[6]  Tr. Vol. II 141:19-142:7; Ex. 1A.  She then continued listening to earlier recordings of Young's assigned line for the dual purpose of determining when the switch occurred and to *"investigate"* the content of Young's conversations.  Tr. Vol. II 142:2-14.

DePaepe confirmed, both by listening to recordings and consulting her computer-aided dispatch system, that the line was in fact assigned to Young.  Tr. Vol. II 131:14-25.  DePaepe knew that Boykins had not requested it be recorded, that 6031 was not a General Use Line, and that the Police Department had not established a regular practice of recording Investigative Division Captains.  Tr. Vol. II 137:21-25; 140:10-15; 185:6-11.  In other words, DePaepe knew on February 4, 2011 that the Police Department had mistakenly recorded Young and no policy, procedure, routine or directive from any law enforcement officer had approved recording Young's telephone calls.

DePaepe was the *only* individual in the Police Department that kept a list of the numbers that were recorded by the Voice Logger.  Tr. Vol. II 111:3-10.  Fautz had earlier told her how he wanted to handle the Assigned Lines and Boykins had informed her that he wanted her to

---

[6] DePaepe's Officer's Report (Agreed Exhibit 1A) indicates that the initial conversation in which she recognized Brian Young's voice was also the very same conversation that "concerned" and that conversation actually occurred on the very same day that she was troubleshooting, i.e., February 4, 2011.  In Exhibit 1, DePaepe also indicates that this first conversation was the impetus to "check further conversations to see if there was more information in regard to this incident" (i.e., the incident that "concerned" her).  This evidence shows that from the beginning, the review of Brian Young's conversations was *investigatory*.

continue the Fautz approach.  Tr. Vol. I 134:14-19; 137:5-6; 187:9-24.  But, despite these directives (really the only guidance that anyone at the Police Department had given her), she failed to inform anyone of the discovery of the erroneous recording of Young's line.  She did not inform Young (the officer who should have given his permission to be recorded), or Richmond, Young's supervisor, or the Chief of Police, or Internal Affairs. Tr. Vol. II 144:8-17.  DePaepe kept to herself both the fact of the recording and the allegedly concerning content of the recordings for 3 to 4 weeks after her discovery.  Tr. Vol. II 132:11-15.

Boykins and DePaepe Allow Recording to Continue for Purposes of Investigation.

In early March of 2011, DePaepe *finally* informed Boykins that Young's line was being recorded and that she had heard conversations on his recorded line that disturbed her.  Tr. Vol. I 192:22-23; Tr. Vol. II 144:22-143:3.  Incredibly, DePaepe attributes the delay to the fact that she was "very disturbed" by the content of the recordings.  166:12-13. However, any reasonable person in DePaepe's position having heard "illegality" (as she described it in her Officer's Report) would have and should have *immediately* reported the situation.[7]  Fautz's testimony confirmed that DePaepe should have reported this immediately.  Tr. Vol. I 178:18-179:6; 180:21-22.

In the March 2011 conversation with Boykins, DePaepe asked if he wanted any changes made. Tr. Vol. II 145:21-25.  By not correcting the mistake, Boykins used his authority to allow the recording setup to continue despite the fact that it was contrary to his own practice of not recording private lines without the officer's knowledge.  Tr. Vol. I 212:11-12.  Neither did

---

[7] DePaepe's Officer's Report (Ex. 1A) further calls into question the reasonableness of DePaepe's actions.  The review she performed on February 4 (which concerned her) must have been, of necessity, additional conversations of Brian Young on and prior to February 4, 2011.  However, the dates of the conversations that she eventually investigated and placed on cassette tapes for Boykins were all from the period of February 4, 2011 to July 2011.  Whatever concerns she discovered from her February 4 review, they did not lead her to share them with Boykins in January 2012.  And, as discussed in footnote #6 above, the Officer's Report indicates that DePaepe's concerns arose from *the very first conversation she listened to*.

Boykins open any Internal Affairs investigation—which would have triggered procedural safeguards for Young.  Tr. Vol. I 216:7-16.  Indeed, Boykins failed to *ever* notify Internal Affairs about the mistaken recording of Young, about the actions of DePaepe in investigating Young's conversations, and about the supposed "disturbing" matters on the recordings.  Tr. Vol. I 217:2-11.

Instead of following Police Department procedure in March 2011 and involving Internal Affairs, Boykins deliberately permitted the recording to continue so that the investigation DePaepe had initiated into Young's conduct could continue (the "Continued Recording").  Tr. Vol. I 216:7-16.  Specifically, Boykins testified that he allowed the recording to continue so he could "loo[k] at evidence" related to DePaepe's allegations of wrongdoing.  Tr. Vol. I 216:14-15. Indeed, Boykins stated that the decision to keep recording the line was *because of* the information that DePaepe had brought to his attention in early March regarding the content of the recordings.  Tr. Vol. I 218:2-4.  Boykins acknowledged that no police purpose was served by the recording of Young prior to DePaepe's discovery on February 4, 2011.  Tr. Vol. I 217:18-218:1. However, *investigation* of Young, according to Boykins' own testimony, *became* the law enforcement purpose for continuing to record the line.  Tr. Vol. I 218:2-4; 220:12-15.

The actions of DePaepe combined with Boykins' desire to further investigate, unguided by any policy and in violation of Boykins' own stated approach, brought about the Continued Recording of Young's line without his knowledge (and without a warrant) from February 4, 2011 until sometime in October of 2011 when Young learned from Captain Phil Trent that his

line was being recorded.[8]  Young requested the immediate cessation of the recording but nothing was done to honor his request.  Tr. Vol. I 74:2-10; Tr. Vol. II 196:13-19.

<u>Boykins' Use of the Recordings with Young and Richmond.</u>

After directing DePaepe that no changes should be made, which allowed the continued recording of Young, Boykins requested in late December of 2011 that DePaepe retrieve recordings of Young's line and "to find other recordings that pertained to the information that we had discussed."  Tr. Vol. I 220:12-15; Tr. Vol. II 165:21-166:3.  Around that timeframe, Boykins finally revealed to Young and Richmond that he had access to the recordings.  Tr. Vol. II 51:13-14.  On January 3, 2012, Boykins requested a private conversation with Richmond.  Vol. II 48:21-24.  After sending Richmond away several times, Boykins finally met with him and informed Richmond that Boykins no longer considered him a loyal employee, but "considered [Richmond] to be a disloyal employee and a backstabber."  Tr. Vol. II 49:1-12.  Boykins informed him that he was waiting for recordings to be delivered to him and that Boykins would then "decide whether or not he was going to demote, discipline, or even fire those he considered to be disloyal or a backstabber."  Tr. Vol. II 51:22-52:3.

Around January 4, 2012, DePaepe delivered cassette tape copies of several recordings to Boykins along with an Officer's Report.  Ex. 1A.  The cassette tapes contained recorded conversations that occurred on the following dates:

- February 4, 2011

- April 5, 2011

- June 3, 2011

- June 6, 2011

---

[8] All of the cassette tapes subpoenaed by the Council were recordings captured *after* DePaepe had knowledge of the improper recording of Young and all except for one contain conversations that occurred *after* Boykins approved the Continued Recording of Young's line for his investigative purpose.

- June 16, 2011

- June 27, 2011

- July 14, 2011

- July 15, 2011

*See* Stipulation of Undisputed Facts for Trial, Doc. No. 155.

On January 8, 2012, Boykins again threatened to fire or demote Richmond.  Tr. Vol. II 52:11-16.  Richmond testified that he felt intimidated by Boykins' actions.  Tr. Vol. II 60:15-18. Boykins also threatened to discipline, demote, or fire Young for the same reasons.  Tr. Vol. II 99:17-100:16.  Young took the comments as a threat to his career as a law enforcement officer and felt intimidated by the remarks.  Tr. Vol. II 99:17-100:16.  Shortly thereafter, a federal investigation was initiated into the recordings, Boykins was demoted, and DePaepe was terminated.

## ARGUMENT

Based on the evidence at trial, the Council cannot show that the law enforcement exclusion applies to the recording of Young's Assigned Line.  The law enforcement exclusion excludes recordings made by "an investigative or law enforcement officer in the ordinary course of his duties" from the Wiretap Act, 18 U.S.C. § 2510 *et seq.*  For the exclusion to apply, Young's telephone conversations must have been captured by an investigative or law enforcement officer as part of "routine non-investigative recording" of communications.  *Amati v. City of Woodstock*, 176 F.3d 952, 955 (7th Cir. 1999).  The party invoking the exclusion—in this case the Council—bears the burden of proving the exclusion applies.  *See Amati*, 176 F.3d at 954 (stating that the taping was a *prima facie* violation, but the jury accepted defendants' argument that it came within the statutory exclusion at 18 U.S.C. § 2510(5)(a)(ii)); *United States*

*v. Phillips*, 540 F.2d 319, 326 n.3 (8th Cir. 1976) (holding that the proponent of the exclusion must prove that it is applicable).  Accordingly, the Council cannot prevail in this action because it cannot show by a preponderance of the evidence that a law enforcement officer captured Young's phone calls in the ordinary course of his law enforcement duties as part of a routine non-investigative recording of communications.

>    **I.**    **The Police Department lacked any "policy," "practice," or "routine" that would support the law enforcement exclusion or allow the capture of conversations on Young's individually Assigned Line.**

The law enforcement exclusion to the Wiretap Act's restrictions was designed to ensure that the common and ordinary use of recording devices by police departments to record communications with the public would not violate the Act.  *See Jandak v. Village of Brookfield,* 520 F. Supp. 815, 822-825 (D.C. Ill).   Thus, as Judge Posner says in *Amati*, "what is ordinary is apt to be known; it imports implicit notice."  *Amati,* 176 F.3d at 955.  Police Departments are not required to prove that officers using recorded phone lines had "knowledge" of the recording.  *Id.* However, some "notice" that the line is recorded must be shown.  *Jandak,*  520 F.Supp. at  824 ("The courts have generally allowed monitoring where done for a clearly legitimate purpose with notice to the conversants, and have found violations of the statute where the parties had no notice of the possible monitoring . . .").  This is where the importance of police department policy comes in to play.  As in *Amati*, where the police department changed its policy in order to bring the one unrecorded line into the policy of recording *all* lines, a promulgated departmental policy functions as notice to users that the lines are recorded.  *See Amati* at 955, 956 ("So, the department decided . . . the decision brought the line within that course.").  Absent a formal policy or some other general announcement about *who* is being recording and *why* the Department is recording, the Council in this case must be able to show that those who use an

Assigned Lines had an opportunity to know whether or not they were being recorded.  *See Jandak,* 520 F.Supp. at 824 (noting that courts "have found violations of the statute where the parties had no notice of the possible monitoring or it was done for illicit purposes.").  The Council has failed to do so.

a. *The Police Department had no procedure or routine for recording Assigned Lines.*

The Parties stipulated that *no policy existed* concerning the use of the Voice Logger.  The evidence at trial showed that the Police Department did not have an established procedure or routine that permitted it to Initially Record Young or to approve the Continued Recording of Young.  The General Use Lines, such as the front desk and communications center, were routinely and indiscriminately recorded regardless of the user.  However, not all of the lines in the Police Department could be recorded with the Voice Logger, so no such routine was possible with respect to Assigned Lines within the Police Department.  Rather, recording decisions on these lines were handled at the discretion of the Chief of Police.

That the Chief of Police retained the freedom to make recording decisions on a case-by-case basis (nearly all witnesses confirmed this understanding within the Police Department) confirms that no procedure or routine existed.  Indeed, no written policy existed at any relevant time and the trial testimony clearly established no other guidelines existed for determining when Assigned Lines were added to or removed from the Voice Logger.  *See generally* Testimony of Fautz, Stipulation F(11)-(12), Testimony of Boykins, Testimony of Young, Testimony of Richmond.  Individual discretion, by its very definition, contrasts with the notion of a routine.  Simply relying on the Chief of Police to determine when an Assigned Line will be recorded (without notice to the user) fails to meet the most basic elements of the law enforcement exclusion. *See Abraham v. City of Greenville*, 237 F.3d 386, 389 (4th Cir. 2001) (holding

defendant violated the Act when it "did not have an established policy of monitoring the plaintiffs' calls.")

At most, an *informal practice* had developed with Fautz pursuant to which certain administrative officers using Assigned Lines had a personal choice to determine, in consultation with the Chief of Police, whether their lines would be recorded.  The intent of this practice was to provide a "useful tool" for officers requesting it and not to establish any routine or procedure. Specifically, Chief Fautz did not intend that all administrative lines could be recorded and did not intend to record specific lines regardless of their user or to record anyone without their knowledge.  He did not intend to record certain ranks of officers or certain positions within the Police Department.  *See* Tr. Vol. I 133-134.  Chief Boykins adopted this discretionary approach and also believed officers had an expectation of privacy on their administrative lines.  Stip. F(15); *see also* Tr. Vol. I 185:2-7.

As the testimony of both Fautz and Boykins established, the informal practice followed by the Chiefs of Police did not permit recording of a private line without the knowledge and consent of the person being recorded.  And, because that is precisely what happened here, Boykins had to concede at trial that the recording of Young's line *violated his own practice*:

> Q.  You never told Karen DePaepe, "Wait a minute. This line is being recorded; it's not supposed to be recorded; Brian Young doesn't know it's being recorded; stop recording it," did you?
> A.  No.
> Q.  And that's contrary to your own policy that you were following and the policy of Chief Fautz that you took over for, correct?
> A.  Correct.

Tr. Vol. I 214:15-22.

Thus, not only did the Police Department simply rely on the personal discretion of the Chief of Police in lieu of a policy (grounds enough to disqualify the application of the

exclusion), but the recording of Young's line failed to even comply with this informal personal practice of the Chief of Police. Simply put, Young's line could not have been recorded in the ordinary course of the Police Department's law enforcement activities under those circumstances. *See Abraham, id* at 389 (holding defendant violated the Act when it "did not have an established policy of monitoring the plaintiffs' calls.").

      b.  *The Police Department's failure to give notice constitutes a violation of the Act.*

Moreover, for nearly two years, Young himself had no notice that his administrative line was being recorded. As the court stated in *Amati*, "what is ordinary is apt to be known; it imports implicit notice." *Amati,* 176 F.3d at 955. Although actual consent is generally not required, "monitoring in the ordinary course of business requires notice to the person or persons being monitored." *Adams v. City of Battle Creek*, 250 F.3d 980, 984 (6th Cir. 2001). In *Amati*, notice came in the form of an announcement regarding the lines that were being recorded. *Amati*, at 955. Here, by contrast, Young never received actual or implicit notice that his line was being recorded. In fact, he had no idea his line was being recorded until October of 2011.[9] Furthermore, no policy existed pursuant to which he could have *expected* or even *suspected* that his line might be recorded and no announcement was ever made by the Police Department regarding the recording of Assigned Lines. Tr Vol. II 67-70; 73: 25 to 74: 1-17; 75: 7-22. There

---

[9] Indeed, for a time, <u>no one</u> knew because the recording of Young was initially a mistake. The initially inadvertent capture of Young's conversations, however, does not make them compliant with the Wiretap Act. As an initial matter, all of the conversations that were reduced to cassette tapes occurred *after* DePaepe had knowledge of the error (and all but one occurred after Boykins allowed the Continued Recording). Furthermore, the Council has never argued that the recordings were unintentional for the purposes of the Wiretap Act. Indeed, it has argued that the only issue in this case is whether the law enforcement exclusion applies to the recordings. But, as set forth in detail in the City's summary judgment briefing, the law enforcement exclusion does not apply to mistaken recordings. *See, e.g.,* Doc. No. 111 at 15-17. *Abraham v. City of Greenville*, 237 F.3d 386, 391 (4th Cir. 2001) (recordings obtained by mistake are "not a legitimate surveillance activity because [they do] not occur in the ordinary course of the [interceptor's] law enforcement duties."). *Id.* The mistaken capture of telephone conversations that occurred in this case and the similar mistake in *Abraham* are factually distinct from the official exercise of administrative judgment that occurred in *Amati*. *See id.* at 955 ("So, the *department decided* to tape record calls on [that line].") (emphasis added). For the year that nobody knew Young's line was recorded—from March 2010 to February 4, 2011—the recordings could not have served a legitimate law enforcement purpose. Thus, the law enforcement exclusion cannot be applied to recordings occurring prior to February 4, 2011 either.

was nothing "ordinary" about the recording of Young's line without notice to him.  For this reason too, the recordings are outside the boundary of the law enforcement exclusion.

     *c.*   <u>*The recording of Young's line must be considered separately from other lines.*</u>

As set forth above, Young's line was not recorded pursuant to the Police Department's long-standing practice for General Use Lines.  Accordingly, the recording of Young's Assigned Line must be considered separately from the way the Police Department handled other lines connected to the DIR recording system.  By its plain terms, the law enforcement exclusion relates to whether the recording device is "*being used . . . by an investigative or law enforcement officer in the ordinary course of his duties.*"  18 U.S.C. § 2510(5)(a) (emphasis added).  See *id*. "The law enforcement exception does not authorize all conversations to be recorded by a wiretapping device so long as the device captured some conversations in the ordinary course of a law enforcement officer's duties."  *Id.*  Otherwise, the law enforcement exclusion would swallow the rule by permitting "law enforcement agencies [to] record all of the telephone lines in a building so long as some lines were monitored in the ordinary course of the law enforcement officers' duties."  *Id.*

To prevent this, different categories of calls are considered separately in determining whether the exclusion applies.  *Abraham*, 237 F.3d at 390 (stating that "courts 'have considered different categories of phone calls recorded by a single recording system separately for application of the law enforcement exception.'"); *cf. Narducci v. Village of Bellwood*, 444 F. Supp. 2d 924 (N.D. Ill 2006).  "[S]ome uses of the recording device are excused, while other uses are not."  *Id.*  Thus, even if the Police Department properly recorded certain General Use Lines and even if its practice of adding additional lines in an *ad hoc* manner are assumed to comply with the Wiretap Act, such assumed compliance in those situations cannot "bleed over"

and create compliance for the recording of Young.  The Initial Recording of Young was not justified by any routine or practice, it was a mistake.  In the same vein, it cannot be justified by the fact that 6031 was initially connected to the Voice Logger years earlier at Bishop's specific request otherwise, an officer's privacy rights would be (as Young's was) at the mercy of some random act by the Chief's secretary who indiscriminately chose to direct the 6031 line to an office that eventually became occupied by Young.  Nor, for the same reasons, could the informal practice explicitly adopted by Fautz and Boykins permit the indiscriminate recording of anyone that happened to use a previously recorded line.  Thus, the random recording of a different officer, at a different time, in a different office location cannot be considered to have been the "routine" act of the Department.  And, the Council's arguments to that effect are fallacious.

> **II.     Boykins' directed the Continued Recording of Young's assigned line in order to investigate him and not pursuant to any ordinary course routine of the Police Department.**

Even if the Initial Recording of Young between March of 2010 and February 4, 2011 (which occurred inadvertently) could *somehow* be excused, the actions of DePaepe and Boykins from February 4, 2011 forward (the Continued Recording) clearly exist outside the "*Amati boundary*."  The evidence at trial demonstrated that DePaepe's discovery of the Initial Recording obligated her (and later Boykins) to immediately give Young notice or remove the line from the Voice Logger.  Instead, as the trial testimony reveals, DePaepe and Boykins continued to record Young as part of a *targeted investigation*, which is explicitly outside the *Amati* boundary.

The evidence established that DePaepe actually crossed the *Amati* boundary by continuing to listen to Young's line on February 4, 2011 after she had completed her maintenance check and had recognized that an error had occurred.  The "troubleshooting"

required only that she listen to a few seconds of each call.  But, as the following exchange and

her own "Officer's Memo" show, DePaepe took it upon herself to listen to more:[10]

> Q. . . . And you did that and in a few seconds on one of those files
> you recognized the voice of Captain -- then Captain Brian Young?
> A.  Yes, I did, I recognized his voice.

Tr. Vol. II. 125: 19-22.

> Q. Okay. I want you to go to the second page, ma'am, of Exhibit 1.
> Do you see this section here where it says, "It was at this point...?"
> A. Yes.
> Q. "It was at this point, I made a decision, as Keeper of the
> Records, to check further conversations to see if there was more
> information in regard to this incident."  Did I read that correctly?
> A. That's correct.
> Q. That point that you referred to is the point that you began to
> listen to recorded conversations, not for the purpose of
> maintenance or a data check, but to investigate something that you
> had heard that bothered you?
> A. And to investigate when this line may have been switched.
> Q. *But you investigated to see if there was more information in
> regard to this incident?*
> A. *In regard to the content.*
> Q. *Yes. That's my question.*
> A. *Yes.*
> Q. That was the point that *you began to listen to the lines for
> purposes of listening for content*?
> A. *Correct.*
> Q. Okay. And at that point, you had not received any written or
> verbal instruction to begin to listen for content, right?
> A. That's correct.

Tr. Vol. II. 141: 17-25.; 142: 1-17 (emphasis added).

Thus, the very act of discovering the "concerning conversations" occurred only because

DePaepe acted outside of the limited scope of the very authority which allowed her to stay within

the *Amati* boundary as Communications Director.  *Cf. Berry v. Funk*, 146 F.3d 1003, 1010

(D.D.C. 1998) (interpreting the switchboard operator exception and noting that the "operator is

---

[10] DePaepe admitted that such an act by her was unusual and that she had never done that on her own before.  *See*
Tr. Vol. II. 151:1-25.

authorized to overhear (and disclose and use) only that part of a conversation 'which is a necessary incident to the rendition of his service.'").

Furthermore, when DePaepe discovered conversations that "disturbed her," she failed to take appropriate action.  Indeed, she did nothing for a month.  Tr. Vol II. 142: 18-25.  She did not inform Young.  She did not inform her supervisor.  She did not inform Boykins.  Tr. Vol. II 132, 142-144.  Tr. Vol. II. 132.  But, she admits that she knew recording Young was precipitated by a mistake:

> Q.  Okay. I'm asking what you believed by that, because you've already testified that you believed, when you heard Captain Young, there was a mistake.
> A.  Correct.
> Q.  Because you believed it should have been the division chief?
> A.  That is correct.

Tr. Vol. II. 140: 3-9.

DePeape's inaction alone is enough to constitute a violation of the Act.  *See Narducci v. Moore*, 444 F. Supp. 2d 924, 935-936 (N.D. Ill. 2006) ("Nor is an affirmative act, rather than an omission, required.  It is enough *to be aware that such interception is occurring and to fail to stop it*.") (emphasis added).  DePaepe's failure to stop the Continued Recording of Young must been seen as a violation of the Act especially when considered within the context of her sole possession of the list of recorded lines, her knowledge from both Fautz and Boykins that an officer's Assigned Line can only be recorded with his consent, *and* her understanding that Young was mistakenly recorded.  Tr. Vol. I 111:3-10; 134:14-19; Tr. Vol. II 137:21-25; 140:10-15; 141:10-16; 185:6-11.

Worse yet, on February 4, 2011, DePaepe began to review additional recordings for the purpose of conducting an investigation into Young's conduct.  DePaepe had no authority to conduct such an investigation of Young as she was neither a law enforcement officer nor did she

seek approval from the appropriate channels for conducting such an investigation.  When

DePaepe finally did report her discovery to Boykins in early March, Boykins then *also* failed to

take appropriate action.  As DePaepe described it:

> A.  I asked Chief Boykins. I stated, "This may have been done in
> error. I'm not sure. Please let me know if you want any changes
> made to the system."
> Q.  And he did not direct you to make any changes?
> A.  That's correct.

Tr. Vol. II. 145: 21-25.

> Q.  After asking him if he wanted to do anything, did [Boykins]
> make any change?
> A.  No, he did not ask for any changes. When he left the office, I
> said, "Let me know if you decide you want any made."

Vol. II. 167: 14-18.

Furthermore, Boykins failed to inform Young, failed to order an end to the recording, and

failed to request the involvement of Internal Affairs to conduct an investigation of the

purportedly concerning content of the recordings.  Tr. Vol. I. 214:12-14; 216:7-9; Tr. Vol. II

145:24-25.  Instead, his failure to correct the violation of his own directive (*i.e.*, follow the Fautz

protocol he had adopted) functions as an affirmative directive to record Young.  Boykins'

testimony explicitly identified his motivation for the continued recording of Young without his

knowledge:

> A lot of it, it's the kind of thing they don't want me to discuss.   But
> when Karen brought that information to me, there was something I
> had to look at through a pros -- well, whatever.  *I had to go ahead
> and look through some things that said this was the reason for me
> to look further*, and it was, so I don't know how I can explain it
> without going into more details on that, what made me go ahead
> and say, "I'm going to have to look into this."

Tr. Vol. I. 215:23-25 to 216:1-5 (emphasis added);

> Q.  Let me see if I can clear this up a little, Captain Boykins.  The testimony that Mr. Pfeifer was asking you about, on page 66 [of your deposition], where you said there was no law enforcement purpose to recording Brian Young's line -- right?
> A.  Right.
> Q.  -- that was at the beginning when it was by mistake directed to his office; that's what you meant?
> A.  Right.
> Q.  Then it became for a law enforcement purpose after you learned something?
> A.  Yes.

Tr. Vol. I. 216:10-16; 217:18-25 to 218:1-4.

Ultimately, the Council's attempt to prove the elements of the law enforcement exclusion cannot overcome Boykins' testimony that his *particularized investigatory interest in Young's conversations* was the justification for the Continued Recording of an officer that was never given notice that his line was recorded.  Indeed, that is precisely the sort of conduct that the Act prohibits.  *Amati*, 176 F.3d 952, 955 (communications recorded to "further a particular investigation or target a particular individual" expressly do not fall within the law enforcement exclusion); c*f. Abbott*, 205 F.3d at 977 (holding the law enforcement exclusion does not apply to the surreptitious recording of telephone calls made from what the callers had reason to believe "was an untapped line at the police department."); *Narducci v. Village of Bellwood*, 444 F. Supp. 2d 924, 936 (N.D. Ill 2006) ("But a communication is not viewed as having been recorded in the 'ordinary course' of an officer's duties if it is done to further a particular investigation or target a particular individual") *citing Amati*, 176 F.3d at 955-56.

The targeted investigation of Young by recording his line without notice is clearly beyond the *Amati* boundary:

> The boundary is between routine noninvestigative uses of electronic eavesdropping and its use either as a tool of investigation (which requires a warrant) or as a device for

> intimidation, suppression of criticism, blackmail, embarrassment, or other improper purposes. [citations omitted].

If there were any doubt about the crossing of this boundary, the unchallenged testimony of Young and Richmond that Boykins used his knowledge of the recordings to intimidate and threaten their careers (without any specification by Boykins of a violation of duty or involvement of Internal Affairs) gives further evidence that the continued recording of Young was *not* part of a non-investigatory routine.  As each of them testified, Boykins informed them that he was waiting on the delivery of the cassette tapes and threatened to discipline, demote, or fire them. The recordings that he said he was waiting for were, of course, those that DePaepe was creating through her extensive search of Young's conversations between February 4 and July 15 of 2011. Those recordings were available for DePaepe to search through only because DePaepe and Boykins targeted Young for investigatory recording and *not* pursuant to any ordinary act of recording that existed in the Police Department.[11]  The investigation and subsequent intimidation of Young and Richmond—all of which occurred after DePaepe discovered Young's line was recorded in error—are in direct violation of the Act.

## <u>CONCLUSION</u>

The City seeks a declaration from this Court regarding the legality of recordings made of telephone calls on Brian Young's Assigned Line.  The Council asserts that the recordings cannot violate the Wiretap Act because they were made consistent with the law enforcement exclusion, which requires that the telephone conversations were captured by a law enforcement officer as part of routine, non-investigative recording of communications.  However, the trial evidence establishes two dispositive points: (1) the Initial Recording of Young did not occur pursuant to

---

[11] As mentioned previously, *all* of the conversations chosen by DePaepe for the cassettes came about through her thorough review of Young's telephone conversations and were NOT from the Initial Recording of Young when no one knew he was being recorded.

any law enforcement routine (it occurred due to the inadvertent actions of a secretary); and (2)

the Continued Recording of Young occurred to support Boykins' targeted investigation of

Young.  Since the law enforcement exclusion is the only defense raised to the interception of

calls on Young's line, the Court must find that the Wiretap Act applies to the recordings at issue.

Respectfully Submitted,

FAEGRE BAKER DANIELS LLP

s/ Edward A. Sullivan, III
Edward A. Sullivan, III (17577-71)
Ryan G. Milligan (28691-71)
J.P. Hanlon (21230-71)
FAEGRE BAKER DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, Indiana 46601
edward.sullivan@faegrebd.com
ryan.milligan@faegrebd.com
jphanlon@faegrebd.com

*Counsel for City of South Bend*


## CERTIFICATE OF SERVICE

I certify that on the 15th day of September, 2014, a copy of the foregoing was served
upon all counsel of record via the Court's electronic filing system.


s/ Ryan G. Milligan