# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

| | | |
|---|---|---|
| CITY OF SOUTH BEND, BY ITS CORPORATION COUNSEL ALADEAN M. DEROSE, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | 3:12-cv- 475 |
| UNITED STATES OF AMERICA, ERIC H. HOLDER, JR., IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STAES, SOUTH BEND COMMON COUNCIL, TIM CORBETT, DAVE WELLS, STEVE RICHMOND, BRIAN YOUNG, AND SANDY YOUNG, | ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

## SOUTH BEND COMMON COUNCIL'S RESPONSE TO THE CITY OF SOUTH BEND AND THE SOUTH BEND POLICE OFFICERS' POST-TRIAL BRIEFS

## LEGAL ANALYSIS[1]

"The sparsity of case law on the question suggests not that the principle is dubious but that it is too obvious to have incited many challenges." This statement from Judge Posner in *Amati v. City of Woodstock*, 176 F.3d 952, 956 (7th Cir. 1999), explaining that the "ordinary course" of law enforcement includes recording calls to and from a police department, remains as true today, if not more so, than it was in 1999 when *Amati* was decided. For this reason, neither the City, nor the police officers, has cited a single case in which an Appellate Court has ruled that recordings of police officers' telephone lines by police department equipment did not fall

---

[1] Unless otherwise indicated, the stated facts in this response are supported by the South Bend Common Council's proposed findings and conclusions filed on September 15, 2014.

within the Ordinary Course Exclusion of the Federal Wiretap Act. The City and police officers

therefore are compelled to pick isolated sentences from cases without explaining the context of

the statements. A review the cases cited by all parties establishes that the recordings at issue

were legally made and not in violation of the Federal Wiretap Act.

   *Amati* remains the leading case in this Circuit with respect to the Ordinary Course

Exclusion. *Amati* resolves several issues raised by the City and the police officers. The facts of

*Amati* establish that the police department began recording all calls on all of its lines with the

exception of calls on one (1) particular unlisted line. 176 F.3d at 954-955. The police department

issued a departmental memo to the employees explaining that the unrecorded "line was

intentionally left untapped to allow for personal calls, however, we request that you keep those

calls brief and to a minimum." 176 F.3d at 954. From time to time in subsequent years,

additional departmental memoranda and correspondence continued to refer to the line as not

being tapped. 176 F.3d at 955. Nine years after the lines were first recorded, a call was made on

the untapped line complaining about a chlorine leak in a city pool. A city councilwoman was

dissatisfied with the police department's response to the call. An investigation, however, was

hindered by the fact that the call had not been recorded. The police department therefore decided

to record the previously unrecorded line. Significantly, the police department did not tell the

employees that the previously unrecorded line was then being recorded. The taping was

discovered when one of the defendants, reviewing a tape, heard one of the plaintiffs making

derogatory comments about him and complained to the president of the local police union. 176

F.3d at 955.

The Court first addressed the plaintiffs' argument that wiretapping cannot be in the ordinary course of law enforcement unless there's express notice to the people whose conversations are being recorded. In rejecting this argument, the Seventh Circuit stated:

> The statute does not say this, and it cannot be right. If there is actual notice, as in *United States v. Sababu*, 891 F.2d 1308, 1329 (7th Cir. 1989), there will normally be implied consent. (Citations omitted.) So if the 'ordinary course' exclusion required proof of notice, it would have no function in the statute because there is a separate statutory exclusion for cases in which one party to the communication has consented to the interception.

176 F.3d at 955.

The Court next examined the meaning of "investigation." For purposes of the Ordinary Course Exclusion in ruling that recording calls to and from a police department is a routine police practice, and not an investigation, the Court stated:

> Investigation is within the ordinary course of law enforcement, so if 'ordinary' were read literally, warrants would rarely if ever be required for electronic eavesdropping, which was surely not Congress's intent. Since the purpose of the statute was primarily to regulate use of wiretapping and other electronic surveillance for investigative purposes, 'ordinary' should not be read so broadly; it is more reasonably interpreted to refer to routine non-investigative recording of telephone conversations. (This interpretation may have much the same practical effect as the interpretation mentioned earlier in which 'ordinary course' refers to recording calls on one's own line; for ordinarily when police record calls as part of an investigation they are recording on someone else's line.) Such recording will rarely be very invasive of privacy, and for a reason that does after all bring the ordinary-course exclusion rather close to the consent exclusion; what is ordinary is apt to be known; it imports implicit notice. *To record all calls to and from a police department is, for the reasons explained earlier, a routine police practice. If, 'ordinary course' of law enforcement includes anything, includes that.* (Emphasis added.)

176 F.3d at 955.

The Court noted that it would not be routine if the police, in order to trick people into making damaging admissions over the phone, announced that calls to and from the police department were not being recorded, and then recorded them anyway. The Court acknowledged that such actions would not be in the ordinary course of law enforcement, but rather, would be extraordinary. 176 F.3d at 956.

Significantly, the police department in *Amati* announced that a particular line would not be recorded and would remain open for personal calls. The police department continued to refer the line as being unrecorded for several years. After approximately nine years, the police department reversed course and recorded the previously unrecorded line. The police department, however, did not announce the change to its employees. Despite this, the Seventh Circuit ruled that a conversation taped on the previously unrecorded line nevertheless fell within the Ordinary Course Exclusion because recording calls to and from a police department was a routine police practice included within the phrase "ordinary course" of law enforcement. 176 F.3d at 955. Under the Seventh Circuit's analysis, the recording of police department lines is not within the Ordinary Course Exclusion when the police department announces that its lines are not being recorded and then records the lines in an attempt to trick people into making damaging admissions over the phone. 176 F.3d at 956.

Neither circumstance exists in the present case. There was never any type of announcement that certain phone lines would not be recorded. South Bend police officers knew that telephone lines were being recorded, including the front desk and 911 lines. Officers and employees believed that additional lines were being recorded, but did not know which lines. A significant factor, however, is that there was no secrecy involved in the recording of the lines. Any officer could ask the police chief or Karen DePaepe if a particular line was being recorded

4

and would be given a truthful answer. There is no evidence of any attempt to hide which lines were being recorded.

Similarly, there is no evidence that there was any intent to trick anyone into making an admission on a telephone line which had been announced to be unrecorded. At the time the recorded line was placed in the Investigative Division Captain's office as the result of Division Chief Richmond's request that he retain his prior number, there was no knowledge of who would be occupying that office. Young was not promoted until several weeks later. Even after it was first learned that Young's line was being recorded in February 2011, there was still no effort to trick him into making any admissions. Line 6031 continued to be recorded just as it had for several years before. Young's line was not monitored by anyone during that time. (Transcript, Vol. 2, p. 175, ll.17-20.) It was only after Karen DePaepe listened to the recordings to obtain information to respond to a Freedom of Information Act request that she heard additional conversations on line 6031 that she felt needed to be reported to Chief Boykins. (Transcript, Vol. 2, p. 175, l. 6 – p. 176, l. 7.)

Chief Boykins was operating in the ordinary course of law enforcement in continuing to record line 6031 after it was learned the line was assigned to Young. DePaepe acted within the ordinary course of law enforcement first in listening to the recordings to determine if there was a malfunction in the system, both with respect to the system's crash and in determining and investigating why Young's voice was on line 6031 and again, months later, in responding to the Freedom of Information Act request. The recording of Young's telephone line, just as the recording of any other telephone line in the South Bend police department, falls within the ordinary course of law enforcement exclusion to the Federal Wiretap Act.

The City cites *Jandak v. Village of Brookfield*, 520 F.Supp. 815 (N.D. Ill. 1981) as support for the proposition that there must be some notice that a line is being recorded in order to establish the applicability of the Ordinary Course Exclusion. (City's post-trial brief at pp. 16-17). Initially, the Court should note that *Jandak* was decided 18 years prior to *Amati*. In *Amati¸* the Court found implicit notice through a routine police practice to record calls to and from police stations. 176 F.3d at 955 ("What is ordinary is apt to be known; it imports implicit notice. To record all calls to and from a police department is, for the reasons explained earlier, a routine police practice. If 'ordinary course' of law enforcement includes anything, it includes that."). *Amati* cited *Jandak*, 520 F.Supp. at 821-825 for this proposition. In fact, the Court in *Jandak* ruled that the notice to the police officer was sufficient, in part, because the police officer had access to a chart designating which lines were recorded. The Court stated: "the record establishes that the monitoring of [the officer] was not surreptitious rather, it was routine monitoring of all calls on the investigative line, with more than adequate opportunity for [the officer] to know of the monitoring." 520 F.Supp. at 824. Similarly, in the present case, every police officer had the ability to determine what lines were being recorded by the South Bend police department by simply asking the Police Chief or Karen DePaepe. Furthermore, the mere fact that the recordings involved only lines to and from the police department is sufficient implicit notice under *Amati*.

The factual context of *Jandak* is important to understand the isolated statements from the case noted in the City's brief. The police department of the Village of Brookfield had a communications system consisting of ten telephone lines. Eight of those lines were recorded and had an audible beeping sound to notify the parties that the  lines were being recorded. A ninth line was recorded without the beeping device and was used for investigative purposes. The tenth line was provided for employees to make personal calls and was not monitored. 520 F.Supp. at

817-818. Fred Jandak suspected that his wife, Susan, was having an affair with a police officer named Capaccio. Fred requested the Chief of Police to intervene to prevent Capaccio from seeing Susan. The Police Chief agreed to investigate. After Fred reported to the Police Chief that he had seen Capaccio's squad car in front of his home, the Chief noticed that Capaccio was on the phone. The Chief called Fred on another line to see whether his home line was in use. It was. The Police Chief concluded that Capaccio was talking with Susan and directed his communications officers to log the time of the call. Capaccio made the call to Susan on the line that was recorded without a beeping device. Capaccio was suspended for conduct unbecoming an officer and for use of the police phone for personal business. 520 F.Supp. at 817.

Susan filed a claim against the Village of Brookfield. She claimed that the recording and replaying of her personal conversation caused her humiliation and embarrassment and violated the Federal Wiretap Act. The District Court entered summary judgment in favor of the Defendants based on the Ordinary Course Exclusion. The Court noted generally:

> [E]xamination of these cases reveals two factors which primarily account for the decision whether the particular monitoring is within the language of the exemption. The courts emphasize whether the equipment was installed and used for proper business or investigative purposes, and the extent to which the eavesdropping was surreptitious, rather than with reasonable notice to the parties to the conversation that calls might be monitored. The courts have generally allowed monitoring where done for a clearly legitimate purpose with notice to the conversants, and have found violations of the statute where the parties had no notice of the possible monitoring or it was done for illicit purposes. In particular, monitoring to assure that the phones were not misused for private purposes or in violation of established regulations has been considered properly within the ordinary course of business or law enforcement duties. (Footnotes omitted.)

520 F.Supp. 823-824.

The Court went on to note that the routine recording of calls made on the investigative line was within the proper scope of law enforcement. Additionally, the Police Chief's decision to listen to the particular conversation in issue, based on reasonable suspicions that police regulations concerning private use of phones and conduct unbecoming an officer were being violated, was justified by a proper law enforcement purpose. 520 F.Supp. at 824. The Court concluded that routine, non-surreptitious recording of the police investigative line which results in the recording of a conversation of an officer misusing the line for private purposes, where the officer should have known that that line was monitored, was in the ordinary course of the Police Chief's duties as a law enforcement officer, and is excluded from the Federal Wiretap Act by the Ordinary Course Exclusion. 520 F.Supp. at 825.

Under *Amati*, a police officer has implicit notice that lines to and from the police department are routinely recorded. The recording in the present case was non-surreptitious in that any police officer could determine which lines were being recorded simply by asking the Police Chief or Karen DePaepe. There was no announcement that any particular line was not being recorded. Furthermore, the personal policies of Fautz and Boykins to not record lines without an officer's consent were never communicated to the police officers. They could not have relied on uncommunicated personal policies of the Police Chiefs to assume that an individual's line was not being recorded.

*Jandak* is important for the proposition that it is a proper law enforcement purpose for a Police Chief to listen to recorded conversations based on reasonable suspicion that an officer was improperly using a telephone or guilty of conduct unbecoming an officer. If this is a proper law enforcement purpose, that purpose does not change even if a Police Chief himself subsequently

violates departmental regulations with respect to an internal affairs investigation. If a recording was legally made, it continues to be legal regardless of subsequent actions of a police chief.

The City and the police officers cite *Abraham v. City of Greenville*, 237 F.3d 386 (4th Cir. 2001) in support of the proposition that a formal policy must be in place in order for a recording to fall within the Ordinary Course Exclusion. (City's post-trial brief at pp. 17-18, 19; police officers' brief at p, 6.) The City goes so far as to cite the case as "holding defendant violated the act when it 'did not have an established policy of monitoring the Plaintiff's call.'" Again, it is necessary to look at the factual context of the case to understand the Court's statements.

*Abraham* involved a suit filed by state court judges under the Federal Wiretap Act alleging that the county illegally recorded telephone calls the judges made from their offices. The judges' offices were in the county's detention center which also housed a jail, visitation facilities, and offices for law enforcement and administrative personnel. The judges were located in a separate section of the detention center which contained office and courtroom facilities for city and county judges. 237 F.3d at 385.

When the detention center was new, the county installed a recording system. The system recorded incoming and outgoing telephone calls, seven days per week, twenty-four hours per day. The system was intended to record calls of the detention center's administrative personnel and the guards in the jail. The system did not record all calls into the detention center. It excluded phones meant for use by inmates and attorneys. It also excluded pay phones in the detention center's lobby. The system, however, did record the telephones in the separate section of the detention center which contained the offices and court- rooms for the judges. *Id.* The original recording system was subsequently replaced. The new recording system also recorded the judges' phones. When the judges learned that the calls were being recorded, they were told

by the county that because their extensions were a part of a single trunk line, their lines could not be individually removed from the system. 237 F.3d at 388-389.

The Court ruled that the Ordinary Course Exclusion did not apply because recording judges' telephone calls was not part of the ordinary course of law enforcement duties. Specifically, the Court stated:

> Greenville County claims that the law enforcement exception excuses its recording of plaintiffs' telephone calls. However, monitoring the judges' calls simply was not part of the 'ordinary course' of the county's law enforcement duties. *See* 18 U.C.S. § 2510 (5)(a)(ii). The County did not have an established policy monitoring plaintiffs' calls. Indeed, the County contends that it recorded the judges only by mistake. Likewise, several of the individuals responsible for installation and maintenance of the recording system testified that they knew that it was wrong to record the judges. Furthermore, the County has not suggested that it had any valid, law-enforcement related reason to record the judges. The judges were not under investigation and they were not suspected of breaking any law in the past.

237 F.3d at 389-390.

Contrary to the City's assertion, the dispositive issue was not whether there was a policy for recording the judges' calls, but rather that monitoring the judges' calls simply was not part of the ordinary course of law enforcement duties. Contrary to the situation in *Abraham*, the Seventh Circuit ruled in *Amati*, that recording calls to and from a police department was within the ordinary course of law enforcement duties.

The City also cites *Abraham* in support of the proposition that "different categories of calls are considered separately in determining whether the exclusion applies." (City's brief at p. 20). The context of *Abraham*, however, clarifies the statement. The Court ruled that not all recordings from a single recording device are necessarily included in the Ordinary Course Exclusion if the recording device also records conversations that are not in the ordinary course of

law enforcement. In *Abraham*, that principle meant that although calls to and from the police offices and jail were within the ordinary course of law enforcement activities, recording calls to and from the judges' offices was not, and therefore, not excluded from the Wiretap Act. Specifically, the Court stated:

> Very often, judges, attorneys, and other administrators share the same facilities with law enforcement personnel. If the law enforcement exemption looked only to the wiretapping device, then law enforcement agencies could record all of the telephone lines in the building so long as some lines are monitored in the ordinary course of the law enforcement officers' duties. This cannot be what Congress meant. The law enforcement exception may not be read to allow a single recording device to deconstruct the whole system of separation of powers and permit law enforcement officers to routinely record the daily conversations of judges who may sit in cases to which law enforcement is a party.
>
> * * *
>
> Our holding is a narrow one. We do not impugn the County's need to monitor for law enforcement purposes calls relating to detention center inmates and employees. *See Amati*, 176 F.3d 955-956 (law enforcement exception applies to the detention center's recording of calls to and from police station which captured employee's personal calls); *United States v. Van Poyck*, 77 F.3d 285 (291-92) (9th Cir. 1996) (law enforcement exception applies to detention centers recording telephone calls by inmates); *United States v. Paul*, 614 F.2d 115, 116-117 (6th Cir. 1980) (same). Likewise, we do not suggest overhearing personal conversations while conducting wiretapping activities violates Title III. Such incidental overhearing is endemic to surveillance. *See Amati*, 176 F.3d 956 ('that personal as well as official calls are made on the line is irrelevant; all employees make personal calls on company phones; if all the lines are taped, as is the ordinary practice of police departments, then the recording of personal as well as official calls is within the ordinary course.') Rather, we hold simply that the County's recording of the judges was not a legitimate surveillance activity because it did not occur in the ordinary course of the County's law enforcement duties.

237 F.3d at 390-391. In the present case, all recorded calls were to and from the police department. The recording was therefore within the ordinary course of law enforcement duties.

The City and police officers cite *Narducci v. Village of Bellwood*, 444 F.Supp.2d 924

(N.D. Ill, 2006) for the proposition that no affirmative act is required to violate the Wiretap Act

and that it is enough to be aware that an interception is occurring and to fail to stop it. (City's

brief at p. 23; police officer's brief at p. 14). This argument, however, has nothing to do with the

Ordinary Course Exclusion. Instead, *Narducci* was addressing the issue of the intent necessary to

impose civil liability under the Federal Wiretap Act for intentional interception of  a

communication. 444 F.Supp.2d at 935. Intent to intercept a communication is immaterial with

respect to the Ordinary Course Exclusion. The relevant inquiry regarding the Ordinary Course

Exclusion is not whether there was an intent to record telephone lines. The relevant issue is

whether the recording of the telephone lines was in the ordinary course of law enforcement.

The facts of *Narducci* establish that in 1990, Bellwood began to operate a 911 emergency

phone system. The calls on the emergency system were recorded. In 1994, employees of the

Bellwood Finance Department began receiving threatening calls from irate customers.

Bellwood's comptroller requested that the Finance Department lines be recorded. The

comptroller also requested the taping because the comptroller's office had received complaints

about disrespectful and unprofessional behavior by Finance Department employees. 444

F.Supp.2d at 928.

In 1997, Narducci became Bellwood's comptroller. When Narducci became aware that

the Finance Department's phones were being recorded, he informed two Trustees that the taping

was illegal and wrote a memo to the Police Chief directing him to stop the recording. The Police

Chief gave instructions to disconnect the Finance Department's phone lines and understood that

the lines were disconnected in 2000. In fact, the lines remained connected to the recording

system at least until 2002.

In rejecting the claim that the recording of the Finance Department lines fell within the Ordinary Course Exclusion, the Court ruled that the recordings were not conducted in the ordinary course of law enforcement. The Court, noting that the recordings were not on police department lines, stated:

> Here the actual recording was carried out by police Officer Modrow, and the phone lines were connected to the 911 emergency system (which was located in, and overseen by, the police department). Nevertheless, as explained below, the recordings were not conducted in the 'ordinary course' of law enforcement duties as understood in this context, so that the law enforcement exception does not insulate defendants against liability.
>
> To the extent that the recording was done in an effort to check up on asserted misbehavior by Finance Department employees, it plainly did not come under the rubric of law enforcement. *It involved Finance Department lines rather than prison or police department lines*. Relatedly, the recordings were done at the request of the Finance Department rather than a law enforcement official, and the recording was done for specific non-law-enforcement purposes. (Emphasis added.)

444 F.Supp.2d at 936.

As with many of the other cases relied upon by the City and the police officers, *Narducci* did not involve the routine recording of lines to and from the police department. That fact, along with the fact that the City the police officers cite *Narducci* for an issue regarding intent as a basis for civil liability, makes the case irrelevant to the issues before this Court.

The City cites *Adams v. City of Battle Creek,* 250 F.3d 980 (6th Cir. 2000) in support of the principle that "monitoring in the ordinary course of business requires notice to the person or persons being monitored." (City's brief at p. 19). The City then asserts: "In *Amati*, notice came in the form of an announcement regarding the lines that were being recorded" *Id. Adams* has no application to the facts of the present case. Furthermore, the City misstates the ruling in *Amati*.

13

*Adams* involved the recording of a single police officer's pager through the use of a duplicate or clone pager. *Adams* did not involve the routine recording of lines to and from a police department. The Sixth Circuit in *Adams* ruled that using the clone pager was not in the ordinary course of law enforcement duties. The Court noted that: "Defendants here did not routinely monitor officers' pagers or give notice to officers that random monitoring of the department-issued pagers was possible." 250 F.3d at 984. The City neglects to inform the Court that in the sentence following the Court's statement that advance notice in some form is necessary, the Court quoted *Amati* in saying: "what is ordinary is apt to be known; it imports implicit notice." *Id.* Contrary to the City's assertion, the notice in *Amati* was not an announcement of lines being recorded. The line at issue in *Amati* was a line that had been announced to be unrecorded and which was subsequently recorded without any notice to the police officers. The notice deemed sufficient in *Amati* was the implicit notice resulting from the ordinary and routine practice of police departments to record calls to and from the police department. The police officers in the present case had implicit notice through their actual knowledge that a recording system was in place and the universal knowledge that calls to and from police departments are routinely recorded. *Adams* therefore does not support the City's argument.

*Abbott v. Village of Winthrop Harbor,* 205 F.3d 976 (7th Cir. 1999) is cited by the City as "holding the law enforcement exclusion does not apply to the surreptitious recording of telephone calls made from what the callers had reason to believe 'was an untapped line at the police department.'" (City's brief at p. 25). Contrary to the City's assertion of the "holding" of *Abbott,* the case did not involve whether the recordings at issue violated the Wiretap Act.

Instead, the case involved the issue of whether a municipality can be held liable under the Federal Wiretap Act. 205 F.3d at 980.

The City also neglects to put its statement regarding the holding of *Abbott* in context. The Village's newly installed 911 emergency system allowed recording of previously unrecorded police department telephone lines. It was decided that six telephone lines would be recorded with one line deliberately unrecorded to be used by employees for personal calls. The Police Chief issued a memorandum to all police department employees informing them that all phone lines except one were being recorded and designated the unrecorded phone line. The memorandum specifically stated that "non-police related things would be on an unrecorded line." 205 F.3d at 979. Eleven months later, the Chief of Police had a contractor connect the unrecorded line to the system. He did so in a secretive manner, avoiding the use of the representative who made all of the service repairs to the system and asking the independent contractor who performed the hook up not to tell anyone what he had done. The Police Chief instructed his telecommunications supervisor to listen to the conversations recorded on the previously unrecorded line if she thought the conversations "might be of interest to him." 205 F.3d at 979. The Police Chief then made remarks to his employees about the substance of the recorded conversations.

At trial, the Police Chief testified that one of the reasons he began recording the previously unrecorded line was because he was concerned that employees spent too much time away from work on the phone. He also claimed to be concerned about long distance personal calls being made on the police department lines. The District Court did not rule these were not law enforcement purposes, but rather, found that the Police Chief's reasons were pretextual and that his motivation was personal "to intercept the private calls of his employees." *Id.* Consequently, the recordings were not within the Ordinary Course Exclusion because they were

not done in the ordinary course of police business. *Id.* The Police Chief did not appeal the judgment entered against him and the only issue on appeal was the Village's liability as a municipality.

In the present case, the recording of Young's telephone line was not surreptitious. There was no announcement that the line was not being recorded. Instead, the line was being recorded in the routine, ordinary course of law enforcement duties. More significantly, however, the District Court's judgment against the police chief in *Abbott* was entered on July 24, 1998, several months before the Seventh Circuit's decision defining the scope of the Ordinary Course Exclusion in *Amati*.

The police officers' assert that: "the facts of this case are strikingly similar to those in *United States v. Townsend*, 987 F.2d 927 (2nd Cir. 1993). (Police officers' brief at p. 20.) Contrary to the police officers' argument, the facts in *Townsend* are not at all similar to the facts in the present case.

*Townsend* did not involve the Ordinary Course Exclusion. A review of the facts illustrates why the Ordinary Course Exclusion was not even discussed. The recording equipment was not the recording equipment of a police department. Instead, the Sheriff purchased the recording equipment on his own, purportedly to tape only his own conversations because he had been getting harassing telephone calls at the Sheriff's complex which included his office and residence. The Sheriff claimed that he was trying to capture those conversations on tape. The Sheriff also claimed that he recorded only one conversation between third parties and that he had "accidentally" taped that conversation. The jury obviously did not believe the Sheriff, but rather, believed other witnesses and convicted the Sheriff of violating the Federal Wiretap Act. The evidence contrary to the Sheriff's testimony included evidence that the Sheriff purchased the

recording equipment to "find out who might be in the office that was betraying him." 987 F.2d at 928. Because the Sheriff purchased the equipment on his own, there was no knowledge or notice, implicit or explicit, that phone lines within the police department were being recorded. Also, because the Sheriff was acting for personal reasons, the recordings were not made in the ordinary course of law enforcement. The facts in *Townsend*, therefore do not support the police officers' claim that the case is "strikingly similar" to the present case.

Neither the City nor the police officers have cited a case in which conversations recorded on equipment purchased by the police department and used to record calls to and from the police department did not fall within the Ordinary Course Exclusion. Contrary to their arguments, the present case is controlled by *Amati*. The common knowledge that phone calls to and from a police department are routinely recorded provides the implicit notice to police officers that their calls may be recorded. There was nothing secretive about which lines were being recorded. Any police officer could have asked the Chief of Police or Karen DePaepe and be truthfully told what lines were recorded. The recordings were routine and in the ordinary course of law of enforcement business. As stated in *Amati,* any invasion of privacy is regrettable, but it was not a violation of the Federal Wiretap Act. 176 F.3d at 956.

The Court's questions at the conclusion of the trial raised the issue of the effect of the initial inadvertent recording of Young's line. The parties have all agreed that the initial recordings were inadvertent. The law is well settled that inadvertent recordings are not a violation of the Federal Wiretap Act. Therefore, the recording of February 4, 2011, recorded before it was discovered that Young's line was being recorded, is not a violation of the Federal Wiretap Act.

The City and police officers assert that the Common Council waived the issue of inadvertent recordings because it was not raised in prior pleadings. (City's brief at p. 19, n. 9; police officers' brief at p. 16.) This argument ignores F.R.C.P. 15(b)(2) which deals with an issue tried by consent. The rule provides:

> **For Issues Tried By Consent.** When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

The Seventh Circuit has noted that the rule is clear that the Court's judgment must be based on the evidence presented whether or not the issue was previously included in pleadings and, whether or not there is a formal motion to amend to conform to the evidence. *Torry v. Northrop Grumman Corp.*, 399 F.3d 876, 878-879 (7th Cir. 2005).

In the present case, both the City and the police officers elicited evidence from the witnesses that the initial recordings were inadvertent. Both the City and the police officers have argued in pretrial and post-trial briefs that the initial recording of Young's line was inadvertent. Having argued the point, the City and police officers cannot now escape the legal ramifications of the evidence they produced and the arguments they made.

Apparently recognizing the applicability of Rule 15(b)(2), the City also takes a different approach in attempting to address the inadvertent February 4, 2011 conversation. The City acknowledges that Young's line was initially recorded inadvertently. (City's post-trial brief at pp. 1-2, 19, n. 9, 21, 27.) The City, however, argues that: "The initial inadvertent capture of Young's conversations, however, does not make them compliant with the Wiretap Act." (City's brief at p. 19, n. 9.) The uncontroverted evidence, however, establishes that the initial

conversation DePaepe listened to when she was troubleshooting the recording system was recorded on the same day, February 4, 2011, that DePaepe was both troubleshooting the recording system after a crash and while DePaepe was trying to determine why Young's voice was captured on the 6031 line. Young's February 4, 2011 conversation was necessarily recorded inadvertently and, therefore, is not illegal under the Federal Wiretap Act. The Court should enter such a finding.

## FACTUAL ANALYSIS

A review of the post-trial briefs establishes that many facts are not in dispute. A recording system for calls to and from the South Bend Police Department has been in place for several years. The purpose of the recording system is essentially to create a record of incoming and outgoing telephone calls to preserve their content for law enforcement purposes. Those purposes may include preserving anonymous tips, preserving 911 calls, to establish that calls were handled appropriately, and to protect officers from unwarranted claims.

It is also undisputed that there has never been a written or oral policy with regard to which individual officers' phone lines were recorded. The recording of any officers' individual phone line was at the discretion of the chief of police. Each chief of police had his own personal philosophy as to how to handle the recording of an individual's line. One chief erroneously believed that an officer's consent was necessary to make a legal recording of the phone line. Another chief ordered the phone line of the Captain of the Records Division to be recorded without his knowledge. Other chiefs had the personal philosophy of not recording phone lines without an officer's knowledge and consent.

The facts surrounding the recording of the 6031 telephone line are also undisputed. That line was first recorded when it belonged to Captain Rick Bishop. Bishop kept that line after he

19

was promoted to Chief of the Investigative Division. When Bishop was demoted and moved to a different building, he could not keep the line. Steve Richmond was promoted to Division Chief of the Investigative Division and replaced Bishop. Richmond moved into the office that Bishop had previously occupied which included the 6031 telephone line which was being recorded. Richmond, however, wanted to keep his prior telephone number when he moved into the Division Chief's office. He asked Barb Holleman whose job responsibilities included responding to such a request if the line could be moved. As a result of Richmond's request, Holleman moved the 6031 line which had been in Richmond's new office to the vacant office of the Captain of the Investigative Division. At that time, it was not known who would be occupying that office. Several weeks later, Brian Young was promoted and took over the office. Holleman had no knowledge that the 6031 line was being recorded when she made the change. It is also undisputed that at the time the change was made, it was done without the knowledge of Karen DePaepe, the Communications Director, who was in charge of maintaining the recording system and responding to requests for recorded telephone calls.

It is undisputed that DePaepe was acting within the scope of her employment in maintaining the recording system when she checked every recorded line after the recording system crashed in February 2011. While checking the lines, DePaepe heard Brian Young's voice on a line she thought had been assigned to Richmond. In order to determine whether there was a malfunction in the system, DePaepe listened to conversations recorded on the 6031 line to see how long Young had been using that line. It was during DePaepe's checking of the lines, within the ordinary course of her employment, that she heard something in one of the conversations that disturbed her and which she later reported to Police Chief Boykins.

It is also undisputed that only the Chief of Police could make any changes in the lines being recorded. When DePaepe informed Chief Boykins that Young's line was being mistakenly recorded, she asked Chief Boykins if he wanted to make any changes. Boykins did not authorize DePaepe to stop recording the 6031 line. Pursuant to the practice and procedure of the South Bend Police Department, the recording of the 6031 line continued because the Chief of Police did not authorize the recording to stop.

It is also undisputed that several months later, Karen DePaepe, acting within the ordinary course of her employment, was reviewing recorded telephone lines to comply with a Freedom of Information Act request from Nancy Bruce at ABC Channel 57. DePaepe was instructed to find materials responsive to the Freedom of Information Act request by the acting City Attorney, Aladean DeRose. While DePaepe was reviewing the recorded lines for a response to the Freedom of Information Act request, she heard other conversations over the 6031 telephone line which she determined should be reported to Police Chief Boykins. Police Chief Boykins then ordered DePaepe to review the recording of line 6031 and to provide him with copies of the recordings on the topic that DePaepe had found to be disturbing. Pursuant to this order, DePaepe provided Chief Boykins with five cassette tapes with conversations that were recorded in 2011 on the following dates: February 4, April 5, June 3, June 6, June 16, June 27, July 14, and July 15.

It is also undisputed that there was no secrecy involved in which lines were being recorded. Although there was never an announcement by any of the police chiefs in the relevant time period that an individual officer's line was being recorded, any officer could talk to either Police Chief Fautz, Police Chief Boykins or Karen DePaepe and would be truthfully told if a particular line was being recorded. Karen DePaepe had, in fact, on at least one occasion, shown

an officer the actual phone lines connected to the recording system to show him what lines were being recorded.

Neither the City, nor the police officers, even mention in their briefs the fact that DePaepe did not monitor Young's line continuously after she learned that it was being inadvertently recorded. The City uses the phrase "targeted investigation" to describe what it wants the Court to believe happened after DePaepe discovered the mistake. (City's post-trial brief at pp. 2, 21, 25.) In fact, the next time DePaepe listened to the recordings on line 6031 was when she was reviewing all recorded conversations for a response to a Freedom of Information Act request from Nancy Bruce. (*See* Exhibits 15 and 16.) That request included a request for: "A copy and/or transcription of the 911 call or complaint" involving a police officer at two different businesses in South Bend. (Exhibit 16.) While reviewing the recorded conversations, Karen DePaepe discovered another conversation that she believed should be disclosed to Police Chief Boykins. DePaepe then acted within the course and scope of her employment in following Chief Boykins' instruction to search for additional content and provide the materials to him. DePaepe was not, however, monitoring Young's line from February 4, 2011 to July 2011, nor was she listening to any live conversations. (Transcript, Vol. 2, p. 175, ll. 17-23.)

The reason that the City and police officers ignore this undisputed evidence is that it destroys their argument that DePaepe and Boykins acted together to actively investigate all of Young's telephone calls after the inadvertent recordings were first discovered in February 2011. Instead, this evidence shows that Young's line continued to be recorded pursuant to the normal practice and procedure to continue recording a line until the Chief of Police orders otherwise. It was only after an additional conversation was discovered by DePaepe, again acting within the normal scope of her employment in responding to a Freedom of Information Act request, that a

conversation that DePaepe thought should be disclosed to the Police Chief was discovered. It was within the ordinary course of law enforcement that Chief Boykins requested DePaepe to review other recordings to search for related conversations. Contrary to the inferences the City and the police officers hope the Court draws, Young's line was not actively monitored between February 2011 and late July 2011 to provide Chief Boykins with information to use against anyone.

The City uses the word "directive" at least eight times in its brief referring to the personal policies of Chief Fautz and Chief Boykins regarding recordings that were done with the consent of the individual police officers. (*See* City's brief at pp. 2, 3, 4, 8, 24.) A "directive," as a noun, is defined as "An official order or instruction." merriam-webster.com online dictionary. Contrary to the City's argument, neither Chief Fautz nor Chief Boykins ever gave a directive based on their personal philosophies regarding the recording of individual officers' telephone lines. (*See* Transcript, Vol. 1, p. 104, ll. 8-12, p. 105, ll. 14-18, p. 129, l. 19 – p. 130, l. 14; Vol. 1, p. 137, ll. 1-3, p. 187, ll. 18-22, p. 196, ll. 21-23.) In fact, it is stipulated that Chief Boykins issued no written or oral directive to create a policy, procedure, practice or routine. The City's own brief establishes that the City is, at best, stretching the concept of "directive." On page 8 of the City's brief, the City asserts that Chief Fautz "specifically directed" DePaepe concerning his approach, saying: "I told Karen DePaepe that 'they are aware of it. It's with their knowledge and permission." (Citing Transcript, Vol. 1, p. 137, ll. 5-6.) A review of the context of this quote establishes that there was no directive by Fautz. The testimony states:

> Q.     Do you think that it's in the regular course of business at the South Bend Police Department, or was it during your time as chief, to record anybody without their knowledge?
>
> A.     It was never my policy or practice.

Q.      Why would you not have done that?

A.      I think they have an expectation of privacy with their own assigned line.

Q.      Was that what your protocol was for handling the lines when you were chief?

A.      Yes.

Q.      Were you clear about that to your command staff?

A.      *I never really came out and said it that way, but I think it was the understanding.*

Q.      Do you think you were clear about that with Karen DePaepe?

A.      *I told Karen DePaepe that 'they are aware of it. It's with their knowledge and permission,' so I can't speak for Karen DePaepe, how she interpreted it.* (Emphasis added.)

(Transcript, Vol. 1, p. 136, l. 16 – p. 137, l. 7.) Fautz's own testimony establishes that he never gave any directive regarding his personal philosophy to either Karen DePaepe or to his command staff. At best, Fautz simply told DePaepe when instructing her to add additional lines to the recording system that those lines were being recorded with the officers' consent. Fautz never told DePaepe that recording an officer's individual line required the officer's knowledge and consent. Contrary to a central theme of the City's argument, the personal philosophies of Chief Fautz and Chief Boykins were never the official policies of the South Bend Police Department and were never expressed in a directive to anyone.

Both the City and the police officers base their arguments, in large part, on alleged attempts by Boykins to intimidate Richmond and Young with the contents of the recordings. Their arguments are legally immaterial and factually unsupported.

Legally, Boykins' actions after the recordings were made are immaterial. If the recordings were legally made, they do not become subsequently illegal. The undisputed evidence is that the recording system was put in place in the South Bend Police Department and used for legitimate law enforcement purposes to record calls to and from the South Bend Police Department. The fact that a police chief may have used the recordings improperly does not make the recordings illegal. The police chief himself may be subject to claims for intimidation or harassment, but the legality of the recordings is not affected.

The City and the police officers suggest that it was improper for Boykins to request copies of recorded conversations without first going to Internal Affairs. Boykins explained his position as follows:

> Q.     And looking into it, you never went and talked to Internal Affairs, correct?
>
> A.     No.
>
> Q.     And if Internal Affairs starts an investigation on an officer, due process rights allow that officer to know that the investigation is going on, correct?
>
> A.     If I get to that point where I call an investigation, yes, but I had not called an investigation. I was looking at evidence that was related to whether I was going to go ahead with it or not, which could have went several different ways.

(Transcript, Vol. 1, p. 216, ll. 7-16.) There is no evidence that Boykins acted improperly.

Factually, Boykins denies that the recording system was used by him to blackmail or intimidate anyone or to spy on, embarrass or threaten anyone. (Transcript Vol. 1, p. 208, ll. 4-12.)

More significantly than a simple dispute in the evidence is the fact that what Richmond testified to is not possible. In the police officers' brief, they state:

25

> Boykins revealed his motives for listening to the recordings. He
> learned about the recordings in March of 2011. (Tr. V. II at 149.)
> Pete Buttigieg won the South Bend mayoral election in November
> of 2011. (Tr. V. II at 34.) Richmond interviewed with the mayor-
> elect. On January 6, 2012, Boykins told Richmond that Boykins no
> longer considered Richmond a 'loyal' employee. He considered
> Richmond a backstabber. Boykins told Richmond that Boykins
> was informed that Richmond was disrespectful during the
> interview with the mayor. (Tr. V. II at 49.) Boykins told Richmond
> that Boykins listened to the tape and wanted to see if Richmond
> would 'man up' to what Boykins heard him say. (Tr. V. II at 59.)

(Police officers' brief at pp. 19-20.) Boykins, however, could not have heard that Richmond was

disrespectful during the interview with the mayor-elect. The conversations at issue were

recorded, at the latest, on July 15, 2011. The mayoral election was not until November 2011.

Richmond could not have interviewed with the mayor-elect until months after the recorded

conversations at issue. There could have been nothing in those recorded conversations that could

have led Boykins to believe that Richmond was disrespectful in his interview with the mayor-

elect.

## CONCLUSION

For the above reasons, the Court should enter a judgment declaring that the recordings at

issue were made in the ordinary course of law enforcement and are therefore excluded from the

Federal Wiretap Act by 18 U.S.C. § 2510(5)(a)(ii).

/s/Robert J. Palmer
E. Spencer Walton, Jr. (1000-71)
Robert J. Palmer (6316-71)
Attorneys for South Bend Common Council

**MAY • OBERFELL • LORBER**
4100 Edison Lakes Parkway, Suite 100
Mishawaka, IN  46545
Phone: (574) 243-4100
Fax: (574) 232-9789
rpalmer@maylorber.com

26

## **CERTIFICATE OF SERVICE**

I certify that a copy of the forgoing was served upon all attorneys of record via the

Court's ECF system on September 29, 2014.


/s/Robert J. Palmer
Robert J. Palmer


F:\Clients\S1060\12001\Pleadings - Fed Ct\2014-09-29 Response to Post-Trial Briefs.docx9/29/2014