UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| CITY OF SOUTH BEND, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) |
| | ) |
| SOUTH BEND COMMON COUNCIL, TIM CORBETT, DAVE WELLS, STEVE RICHMOND, BRIAN YOUNG, AND SANDY YOUNG. | ) CASE NO. 3:12-CV-475-JVB-CAN |
| | ) |
| Respondents. | ) |

**RESPONSE TO SOUTH BEND COMMON COUNCIL'S POST-TRIAL BRIEF**

The petitioner, the City of South Bend (the "City"), by counsel, pursuant to the Court's post-trial briefing schedule, now submits its response to the South Bend Common Council's Post-Trial Brief.

**INTRODUCTION**

The Council knows it must identify a law enforcement routine that justified the interception of Brian Young's telephone calls in order to carry its burden to prove the existence of the law enforcement exclusion to the Wiretap Act. But, as all parties know, it was Barb Holleman's arbitrary act that initially caused the interception, not the actions of a law enforcement officer pursuing his duties. In fact, the trial revealed that no regular recording routine existed for Assigned Lines. Faced with such evidence, the Council turns the concept of an organizational routine on its head and argues in its post-trial brief that the law enforcement exclusion is really nothing more than slavishly carrying out the individual desires of Chief of Police Darryl Boykins, including the intercepting of Young's calls without notice. "Chief's discretion" has now become, for the Council, the talismanic chant to justify any recording

US.54923150.02

beyond the Front Desk or Communications Center.  In essence, the Council argues -as President Nixon once did –"Well, when the [Chief] does it that means that it is not illegal."[1]  It wasn't true for Nixon, it's not true for Boykins.

**ARGUMENT**

The Council has failed to carry its burden of proving that recordings that are the subject of this action are excluded from or can be disseminated consistent with the Wiretap Act.  The cassette tapes at issues —which hold conversations that occurred from February 4, 2011 to July 15, 2011—came from Voice Logger recordings that were initially intercepted inadvertently.  But, the interceptions continued for investigatory reasons, and were *always* in direct contravention of Police Chief Darryl Boykins' informal protocol.  The Council has now taken several bites at the apple to come up with a justification to exclude the recordings from the Act.  However, ultimately, it cannot overcome the fact that no policy or procedure or routine exists that can establish a basis to apply the law enforcement exclusion.  Accordingly, the provisions of the Wiretap Act apply to the recordings and because the recordings were not authorized under the Act, they cannot be disclosed.

**I.    The law enforcement exclusion does not apply to the recordings because the Council has not identified a routine, non-investigative purpose for recording Brian Young's Assigned Line.**

The Council concedes that no policy or procedure applied to the recording of Brian Young's telephone line.  Instead, it relies on myriad flawed theories unsupported by applicable law and the facts of this case.  The police chief's unfettered discretion to record what he pleases and the general purpose of the recording device are insufficient to establish an ordinary course justifying the surreptitious recording of Young.  Simply, the Council has failed to identify any

---

[1] www.streetlaw.org/en/Page/722/Nixons_Views_on_Presidential_Power_Excerpts_from_a_1977_Interview_with_David_Frost

US.54923150.02

routine, non-investigatory purpose for recording Young's line.  Thus, the recordings subpoenaed by the Council must be governed by the provisions of the Wiretap Act, 18 U.S.C. § 2510 *et seq.*

> a. *The discretion of the police chief, unrestrained by compliance with an acceptable policy, does not constitute a routine.*

The unfettered discretion of Darryl Boykins to record an assigned line in direct violation of his own informal protocol cannot constitute the "routine non-investigative recording" of communications under the law enforcement exclusion.  *See Amati v. City of Woodstock*, 176 F.3d 952, 955 (7th Cir. 1999).  Contending otherwise, the Council relies on the informal practice that "decisions regarding what lines to record or not to record rested solely with the discretion of the Chief of Police."  Council's Br., at 5.  However, the Seventh Circuit implicitly rejected this type of reasoning in *Abbott v. Village of Winthrop Harbor*, 205 F.3d 976 (7th Cir. 2000).[2]  In that case, the police chief issued a memo stating that all lines in the police department were recorded except a single line.  The chief, on his own, then subsequently made a decision to connect the single unrecorded line to the recording device.  *Id.* at 978-979.  The chief then informed only a limited number of people of the recording, instructed his telecommunications supervisor to listen to conversations on the recorded line that might be of interest to him, and remarked to his employees about the substance of the recorded conversations.  *Id.* at 979.  Faced with claims for the violation of the Wiretap Act and Section 1983, the police chief contended that he possessed discretionary decision-making authority regarding the telephone system.  *Id.*  The district court, assuming the chief legally possessed such authority, nonetheless concluded that he was not recording in the ordinary course of police business.  *Id.*; *see Abbott v. Vill. of Winthrop Harbor*,

---

[2] In *Abbott*, the Seventh Circuit reversed the judgment of the trial court against the Village of Winthrop Harbor (but not against its police chief) based solely on the issue of municipal liability under Section 1983.  In rendering its decision, the Seventh Circuit expressly relied on the trial court's holding that the ordinary course exclusion did not apply, stating that "we note that the District Court specifically found that Miller's purpose for taping the 3868 line was 'not related to the ordinary course of police business' . . ."  *Abbott*, 205 F.3d at 982-83.

93-cv-4642, 1998 WL 433772, at *3 (N.D. Ill. July 29, 1998) (holding that law enforcement exclusion did not apply where "a police chief surreptitiously taped a line that had been announced as an untapped line without providing any form of notice."), *rev'd on other grounds*, 205 F.3d 976 (7th Cir. 2000).  The district court found both the police chief and village liable for violating the Wiretap Act.  *Id.*

On review, the Seventh Circuit accepted the finding that "[the chief's] purpose for taping the 3868 line was 'not related to the ordinary course of police business.'"  *Id.* at 982. Considering the issue of the village's liability under Section 1983 for the police chief's actions, the court analyzed his policy-making authority.  *Id.* at 981-82.  Quoting the U.S. Supreme Court, the Seventh Circuit stated that a "federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Id.* at 982 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988)).  The court noted that the Illinois legislature had placed final policymaking authority in the hands of a public safety board, and not with the Chief of Police.  *Id.*  It found that authority to authorize the connection of a telephone line to the recording system did not rest with the police chief and, because the police chief's powers were limited by existing municipal policy, he was in effect "implementing no policy other than his own."  *Id.*

When Boykins exercised his discretion to continue recording Young in violation of his own protocol, he was "implementing no policy other than his own."[3]  Under Indiana law, the Board of Public Safety possesses the exclusive jurisdiction to establish policy for the Police Department.  *See* Ind. Code § 36-8-3-2.  And, the Council concedes "there was not a written or

---

[3] The same can be said of DePaepe.  When she investigated Young's previously captured conversations, DePaepe was "implementing no policy other than [her] own."  Even with regard to Holleman's arbitrary re-direction of the 6031 line so that it ended up in the office Young later occupied, Holleman was "implementing no policy other than [her] own."

4

oral policy regarding the recording of officers' phone lines and no such policy was communicated to the officers."[4] Council's Br., at 3. In the absence of any policy, the police chief's unfettered discretion to record an individual line outside of any discernable routine cannot trump a statutory scheme, the very purpose of which is to protect privacy interests. Otherwise, in the absence of any acceptable routine, the concept of ordinary course amounts to nothing more than the unreviewable personal discretion of a single individual. The *Abbott* decision controls the outcome in this case and without question dispatches the Councils argument based on the "chief's discretion."

But even if the police chief's unchecked discretion to record a line without any policy guidance or justification could be ordinary course, it is undisputed that Boykins violated his own informal protocol for individual officers. The evidence at trial clearly established that no police chief—including Boykins and his predecessor Tom Fautz—has taken the liberty to record an Assigned Line without first informing the officer. Tr. Vol. I 170:13-17. Fautz described his practice as a "personal choice," Boykins described his as "on demand," and both stated they would not record an officer without that officer's knowledge. Tr. Vol. I 136:9-12; 185:4-7; 187:1-4; 190:17-21; 213:20-22. But from March 2010 through October 2011, Boykins approved the recording of Young's line without his knowledge. And, from at least February 4, 2011 until October 2011 Young continued to be recorded despite the fact that DePaepe and Boykins knew

---

[4] Despite the Council's stipulation, it attempts to muddy the waters by citing a Police Department General Order stating that "[e]mployees do not have a right to privacy for assigned equipment" as a "relevant written polic[y]." Br., at 4. This General Order is not relevant to the application of the ordinary course exclusion. As the Council concedes, "there was not a written or oral policy regarding the recording of officers' phone lines and no such policy was communicated to the officers." Br., at 3. Moreover, the evidence at trial established that the General Order had no application to officers' phones, which did not come within the definition of "assigned equipment." *See, e.g.*, Tr. Vol. II 71:3-16; 84:12-16. The Council also cannot reconcile the possibility that officers could have no right to privacy in their phone conversations with evidence that the police chiefs universally exercised their discretion under the premise that officers did in fact have a privacy right in their phone conversations on Assigned Lines. Tr. Vol. I 136:16-22; 196:13-20.

he was being recorded in contravention of Boykins' protocol. The discretion to record or not record without reference to or compliance with any set of standards—formal or informal—simply cannot be a law enforcement routine. *Cf. Abbott*, 205 F.3d at 983. Instead, ordinary course requires that a recording system be used pursuant to an *indiscriminate* routine rather than a police chief "implementing no policy other than his own."

> b. *The purpose for installing the Voice Logger and its use with respect to other lines that were routinely recorded does not justify recording Young's conversations.*

Nor does the abstract purpose of the Voice Logger, detached from any evidence of how the Police Department actually used it, justify the application of the exclusion. The Council attempts to excuse the lack of *any* discernable policy by arguing that if "the purpose of the recording system falls within the ordinary course of the work of the Police Department," then anything on that system was recorded in the ordinary course. Council's Br., at 9. But the exclusion by its plain terms relates to whether the recording device is "*being used* . . . by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a) (emphasis added). Thus, if the Court concludes that the overall purpose of the recording device is consistent with the exclusion, it must *also* "determin[e] whether the equipment was *used in this case* 'by an investigative or law enforcement officer in the ordinary course of his duties.'" *Jandak v. Village of Brookfield*, 520 F.Supp. 815, 822 (N.D. Ill. 1981) (emphasis added); *Adams v. City of Battle Creek*, 250 F.3d 980, 984 (6th Cir. 2001) (noting that the first inquiry is whether the device falls within the statute and the "second part of the exception requires that the [device] be used in the 'ordinary course' of the police department's business."). Otherwise, wiretapping protections would be eviscerated for any improper uses of a recording device so long as a police department installed it for some legitimate purpose. *Cf. See Abraham v. Cnty. of Greenville*, 237 F.3d 386, 390 (4th Cir. 2001) (noting that categories of calls

US.54923150.02

must be considered separately "to prevent the law enforcement exception from swallowing the rule.").

The legitimate purpose for the Voice Logger—to document and preserve tips on general use and emergency lines—was not carried out with respect to the recording of Young's Assigned Line.[5]  The routine and indiscriminate recording of general use lines was distinct from the practice employed by police chiefs with respect to Assigned Lines.  Even DePaepe conceded at trial that the Assigned Lines were handled differently than the emergency and front desk lines at the Police Department.  Tr. Vol II 114:2-12; 116:13-17 (affirming that the Assigned Lines "are handled differently from the other lines . . ." and that they were handled differently "because they were more confidential.").  A routine that did not even apply to Young's Assigned Line cannot be used to justify the recording of his conversations.  *Abraham*, 237 F.3d at 390 (noting that "courts 'have considered different categories of phone calls recorded by a single recording system separately for application of the law enforcement exception.'").  Indeed, no plausible scenario exists under which the recording of Young could have fulfilled the legitimate objectives of the Voice Logger when he was unaware that recordings of his conversations could even be retrieved to further those objectives.  *See, e.g.*, Tr. Vol. I 217:18-218:1.

   c. <u>The initially inadvertent recording of Young further verifies that his conversations were not recorded pursuant to any putative routine.</u>

The initially inadvertent recording of Young's line, far from inconsequential to the applicability of the exclusion as the Council argues, is further proof that it was not recorded pursuant to any law enforcement routine.  *See* Council's Br., at 12.  Recording a line without anyone's knowledge can serve no legitimate law enforcement purposes.  Boykins admitted as

---

[5] The City agrees with the Council that the routine and indiscriminate recording of front desk and emergency lines excludes those recordings from the definition of "intercept" and the Wiretap Act pursuant to the law enforcement ordinary course exclusion.

US.54923150.02

much in his testimony when he stated there was initially no law enforcement purpose to recording Young inadvertently.  Tr. Vol. I. 217:18-25 to 218:1-4 (agreeing that "there was no law enforcement purpose to recording Brian Young's line . . . at the beginning when it was by mistake directed to his office.").  If the "chief's discretion" was the routine that triggered the law enforcement exclusion, and Boykins admitted that he did *not* exercise his discretion to record Young's line, then, logically, the recording of Young could not have been pursuant to any routine and, therefore, not pursuant to the law enforcement exclusion.  Nor could it accomplish any law enforcement purpose, even if one existed, when nobody even knew the line was being recorded.  Pre-Trial Order, ¶ F(22).  Simply, the inadvertent recording of Young's Assigned Line was "not a legitimate surveillance activity because [it did] not occur in the ordinary course of the [Police Department's] law enforcement duties." *Abraham*, 237 F.3d at 391.[6]

To elude this straightforward proposition, the Council relies on an unpublished, non-binding opinion that is readily distinguishable from the facts in this case because it involved the mistaken capture of incidental personal conversations in the routine, indiscriminate recording of emergency calls.  *See First v. Stark Co. Bd. of Comm'rs*, 234 F.3d 1268 (6th Cir. 2000) (unpublished disposition).  The recording system at issue in *First v. Stark Co. Bd. of Comm'rs* recorded *all* incoming and outgoing communications in the police department's dispatch room. *Id.* at *1.  Unbeknownst to the dispatchers, the system had an open microphone that captured all conversations in the dispatch room.  *Id.*  The court held that the recordings were excluded from the Wiretap Act pursuant to the law enforcement exclusion because the open microphone was being used as part of a system that indiscriminately recorded all conversations in the dispatch

---

[6] The Council's assertion that *Abraham* was decided on separation of powers grounds is unsupported by a fair reading of that case.  Instead, the recordings in *Abraham* were not ordinary course because, like here, the police department "did not have an established policy of monitoring the plaintiffs' calls." *See Abraham v. Cnty. of Greenville*, 237 F.3d 386, 389 (4th Cir. 2001).

room for a period of nearly thirty years. *Id.* at *4. The Court declined to make a distinction between personal and official conversations, noting that such a ruling would place law enforcement agencies in the position of violating the Act every time a personal call was recorded. *Id.*

Here, unlike in *First*, there was no established routine to record Assigned Lines pursuant to which personal conversations were incidentally captured. Rather, in this case, a single, Assigned Line itself was captured, contrary to the police chief's practices and contrary to the established general purpose for the recording device. Thus, the incidental recording in *First* is not like the initial inadvertent recording of Young because no one in the Police Department ever intended to record *any* of Young's conversations. By contrast, the similarities between this case and *Abraham* are undeniable and dictate that the law enforcement exclusion does not apply because Young's telephone conversations were not *incidental* to any regular routine of recording as they were in *First*.

The Council further contends that the recording of Young's *line* was intentional but the recording of Young's *conversations* was inadvertent. This distinction is both unconvincing and futile as it fails yet again to establish that the recordings were routine. Bishop requested that the line be recorded for his own specific purposes during the time that the line was assigned to him. Tr. Vol. I 226:13-227:6 (testifying he asked for the line to be recorded due to "a problem with an individual in the City who had mental problems . . ."). Bishop did not expect the line would continue to be recorded regardless of who used it. Tr. Vol. I 230:22-25. DePaepe also acknowledged that she did not believe Fautz wanted the line recorded regardless of who it was recording. Tr. Vol. II 137:21-24. When Bishop departed and Holleman assigned the line to Young, she was not even aware the line was still connected to the Voice Logger. Indeed, the

9

parties stipulated that "[n]o one was aware when Young took over his new office that his line was recorded." Pre-Trial Order, ¶ F(22). Because the application of the law enforcement exclusion turns on how the Voice Logger was being used in this case, the prior recording of the line requested by a different officer in a different office location for completely unrelated reasons simply could not apply to the recording of Young. The Council concedes as much when it acknowledges that the actual recording of Young was inadvertent. There simply was no routine law enforcement purpose for inadvertently recording Young's conversations.

    d. *The lack of a regular routine for indiscriminately recording all calls to and from the Police Department distinguishes this case from those cited by the Council.*

The lack of any regular recording routine for any Assigned Line further differentiates this case from the others relied upon by the Council. The Council creates a "straw man argument" by attributing to the City the "extreme position" that "unless every telephone conversation on every police phone line is recorded, no calls fall within the Ordinary Course Exclusion." Council's Br., at 37. The truth is that the City has taken no such position. Rather, it has properly distinguished the recording of a single Assigned Line based solely on the "police chief's discretion" to violate his own practices with cases in which the exclusion has ordinarily been applied. The *sine qua non* of the ordinary course exclusion is the recording of "a*ll calls* to and from a police department." *Amati*, 176 F.3d at 955 (emphasis added). The cases relied upon by the Council in its brief verify this. *Amati*, 176 F.3d at 956 (noting the police department "record[ed] all calls on all its lines" with a single exception for personal calls); *Jandak*, 520 F.Supp. at 817-818 (N.D. Ill. 1981) (noting the police department recorded calls on all of its lines with a single exception for personal calls); *Walden v. City of Providence*, 596 F.3d 38, 46 (1st Cir. 2010) (noting the

recording system recorded "all phone lines . . .").[7]  By contrast, there is no universal recording routine that applied to Assigned Lines that could justify the blanket recording of Young's Assigned Line at the police chief's discretion.

The simple point that the Council seeks to hide from is this: because the Police Department did not record *all lines*, then it needed to officially communicate which Assigned Lines would or would not be recorded.  The police chief's personal discretion untethered to any policy (or even in compliance with his own protocol) coupled with the random and uninformed choices of a civilian employee are insufficient.  While the deliberate carrying out of official policy to record *all* conversations in a police department is a routine, non-investigative purpose, the trial record reveals that in this case, that is not what occurred.

> e. *The recording of Young's line lacked the implicit notice required for the law enforcement exclusion to apply.*

Moreover, the lack of any recording routine necessarily means that proper notice to Young was not possible.  Misreading *Amati,* the Council contends that notice is "immaterial" to the application of the law enforcement exclusion.[8]  Council's Br., at 16.  However, the case authorities uniformly agree that implicit notice of the possibility of being recorded is required under the exclusion itself.  *See, e.g., Adams*, 250 F.3d at 984 (the exclusion "*requires* that the use be (1) for a legitimate business purpose, (2) routine and (3) *with notice*.") (emphasis added).  Simply, "monitoring in the ordinary course of business requires notice to the person or persons being monitored." *Id*.  The Seventh Circuit, thus, acknowledged in *Amati* that:

---

[7] Additionally, *Walden* is inapt here because it did not involve a federal Wiretap Act claim and the court did not address the law enforcement exclusion.  Rather, the court discussed *Amati* in the context of determining whether the constitutional right allegedly violated was clearly established for the purposes of qualified immunity.  *Walden*, 596 F.3d at 52, 54-55.

[8] As an initial matter, Boykins himself required <u>actual notice</u> for the "on demand"/"personal choice" recording protocol, yet all parties admit that it was never provided.  Tr. Vol. I 185:4-7; 187:1-4; 190:17-21; 213:20-22.

11

> . . . the ordinary-course exclusion [comes] rather close to the consent exclusion [because] what is ordinary is apt to be known; it imports *implicit notice*.

*Amati*, 176 F.3d at 955 (emphasis added).  In *Amati*, notice came in the form of an announcement regarding the lines that were being recorded and in the deliberate policy change that occurred within the police department.  *Id*.  *Abbott* and the case at bar stand in sharp contrast to *Amati* because the police chief pursued his own policy and failed to give any notice.  And, without any policy or any announcement of the possibility lines could be recorded, no implicit notice to Young or to the officers in the *Abbott* case occurred as required to come within the exclusion.

The Council, realizing that no implicit notice occurred, tries to argue that it need only show a "lack of secrecy" regarding the recorded lines.  This proposition fails for several reasons.  First, the evidence shows that the recording of Young was *in fact* surreptitious.  For nineteen months, the recording of Young's line was concealed from him.  Young testified that he believed the concealment was intentional.  Tr. Vol. II 85:9-15.  The fact that DePaepe—the sole person in the Department who maintained and possessed the recorded lines list—along with Boykins knew about the recording and did nothing supports Young's belief.  Second, even assuming their failure to notify Young was not an affirmative concealment, by placing the burden on him to ask whether some violation of the Boykins protocol (or some other violation) had taken place, it frustrated and prevented any implied notice to Young.[9]  Finally, the Council has not provided any authority that a duty of inquiry should be imposed upon Young to determine whether his line was being recorded.  Regardless, as *Abbott* reveals, compliance with the law enforcement exclusion cannot be demonstrated merely by showing that, if asked, DePaepe or the Chief would

---

[9] Silence when a duty to speak exists is tantamount to concealment or fraud under Indiana law.  *See, e.g., CoMentis, Inc. v. Purdue Research Found.*, 765 F.Supp.2d 1092, 1111 (7th Cir. 2011).

12

US.54923150.02

have told Young his line was being recorded. *Abbott v. Vill. of Winthrop Harbor*, 93-cv-4642, 1998 WL 433772, at *3 (N.D. Ill. July 29, 1998) *rev'd on other grounds*, 205 F.3d 976 (7th Cir. 2000) (holding law enforcement exclusion inapplicable when, among other things, the police chief informed his supervisor of communications "that anyone who asked them if the line was recorded could be told 'yes.'").

> f. *The Council has not established a non-investigatory purpose for the recording of Young's line, and all of the recordings were captured for investigatory purposes.*

The Council has also failed to establish any non-investigative purpose for the recording of Young's Assigned Line. Indeed, its contention that the recordings were non-investigative because all lines were recorded in accordance with the general purpose of the Voice Logger flatly ignores overwhelming evidence to the contrary. *See* Council's Br., at 6. As previously noted, the general purpose of the recording system does not end the inquiry, and the Voice Logger was not being used in conjunction with any relevant policy or even pursuant to the police chief's informal protocol. In fact, when DePaepe first discovered the line was recorded in error—something she concedes took her only a few seconds—she failed to take any appropriate action. Tr. Vol. II 125:19-22; 126:24-127:2 (testifying that she recognized Young's voice within a few seconds and at that time knew what she needed to know for the purposes of her troubleshooting). Rather, she compounded the harm by not only allowing the recording to continue, but affirmatively undertaking an investigation into Young's conduct. Tr. Vol. II. 141: 17-25; 142: 1-17. These endeavors were outside the scope of DePaepe's job duties and thus were not consistent with the general purpose of the Voice Logger but were investigatory. Tr. Vol. II 124:24-25; 178:18-179:6; 180:20-21.

After delaying from at least February 4, 2011 to early March 2011, during which time the line continued to be recorded, DePaepe finally informed Boykins of her investigation into the

content of Young's recorded conversations.  When informed, Boykins also failed to notify Young that he was being recorded.  Tr. Vol. I 214:12-14.  Boykins then took the extraordinary step of allowing the recording to continue (in violation of his own protocol) to further the investigation started by DePaepe.  Tr. Vol. I 216:23-217:5.  Indeed, Boykins testified that the continued recording of Young to investigate his conduct *was* the law enforcement purpose for recording his line.  Tr. Vol. I. 217:18-25 to 218:1-4.  Lacking any warrant, or even the procedural safeguards of a formal Internal Affairs investigation, the targeted recording of Young for the purposes of investigating him is precisely the conduct that is prohibited by the Act. *Amati*, 176 F.3d at 955 (communications recorded to "further a particular investigation or target a particular individual" expressly do not fall within the law enforcement exclusion); c*f. Abbott*, 205 F.3d at 977 (holding the law enforcement exclusion does not apply to the surreptitious recording of telephone calls made from what the callers had reason to believe "was an untapped line at the police department."); *Narducci v. Vill. of Bellwood*, 444 F. Supp. 2d 924, 936 (N.D. Ill. 2006) *aff'd sub nom. Narducci v. Moore*, 572 F.3d 313 (7th Cir. 2009) ("But a communication is not viewed as having been recorded in the 'ordinary course' of an officer's duties if it is done to further a particular investigation or target a particular individual"), *citing Amati*, 176 F.3d at 955-56.

At bottom, the Council has failed to carry its burden of establishing a routine non-investigative purpose for recording Young at any time.  The fact that from March 2010 to sometime in early 2011 the interceptions were inadvertent and then after that they were intercepted to further an investigation of Young is immaterial because *none of the interceptions* were within the law enforcement exclusion.  Thus, the ordinary course exclusion does not apply to the capture of any of Young's calls regardless of the date of capture.

US.54923150.02

## II. The subpoenaed recordings cannot be disseminated because they are governed by the Wiretap Act.

Realizing that no routine, non-investigative purpose existed to record Young, the Council now asserts for the first time in this litigation that it is nevertheless entitled to the subpoenaed cassette tapes. This assertion, however, relies on a fundamental misapplication of the Wiretap Act. As explained in further detail below, recordings that are subject to the Act cannot be freely disseminated and no public interest exception exists to rescue the Council from this failed last resort.

### a. *The subpoenaed recordings are subject to the Wiretap Act and cannot be disseminated.*

The Council for the first time contends that the cassette tape that contains the February 4, 2011 recordings of Young can be freely disclosed because that conversation was captured by the Voice Logger "unintentionally" for the purposes of the Wiretap Act. The Council, however, incorrectly conflates the liability provisions of the Wiretap Act with the Act's strict controls over "intercepted" communications. The Council correctly observes that for civil or criminal liability to arise under the Act, the interception of a communication must be intentional. *See* 18 U.S.C. § 2511(1)(a). While truly inadvertent recordings do not give rise to such criminal or civil liability, the Wiretap Act nonetheless places strict controls on *all* interceptions[10] to protect privacy rights. Specifically, interceptions are *authorized* only in accordance with the procedures set forth in the Act. 18 U.S.C. § 2516 (Authorization for interception of wire, oral, or electronic communications). Even authorized interceptions may be used or disclosed only in certain specific instances. 18 U.S.C. § 2517 (Authorization for disclosure and use of intercepted wire,

---

[10] "Intercept" is defined by the Act to mean "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Accordingly, there is no intent requirement for an interception to be subject to the provision of the Act. The parties do not dispute that the recording of Young's line constituted an interception for the purposes of the Act.

US.54923150.02

oral, or electronic communications). Thus, interceptions that are neither excluded from the provisions of the Act nor authorized under the Act might not necessarily give rise to *civil or criminal liability* if truly inadvertent. However, they cannot be freely used or disclosed in ways that are not authorized under the Act. As the Seventh Circuit stated in *United States v. Dorfman*:

> Title III makes it a crime to disclose wiretap evidence (transcripts, logs, summaries, etc.) only if the evidence was obtained in violation of Title III and the disclosure is willful. 18 U.S.C. s 2511(1)(c). But by permitting disclosure of lawfully obtained wiretap evidence *only under the specific circumstances listed in 18 U.S.C. s 2517, Title III implies that what is not permitted is forbidden*, though not necessarily under pain of criminal punishment. The implication is reinforced by the emphasis the draftsmen put on the importance of protecting privacy to the extent compatible with the law enforcement objectives of Title III.

*United States v. Dorfman*, 690 F.2d 1230, 1232 (7th Cir. 1982) (emphasis added) (internal citations omitted).

Thus, as the U.S. Supreme Court stated, "title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers engaged in the investigation or prevention of specified types of serious crimes, and only after authorization of a court order obtained after a showing and finding of probable cause." *Gelbard v. U. S.*, 408 U.S. 41, 48 (1972). Young's conversations, including those on February 4, 2011, were not excluded from the Act based on the law enforcement exclusion. Even accepting *arguendo* the February 4, 2011 recordings were truly inadvertent,[11] they were nevertheless not authorized by the Act by

---

[11] The Council cannot dispute that, if outside the law enforcement exclusion, the continued recording of Young was intentional due to DePaepe's and Boykins' inaction and subsequent investigation. *Narducci v. Vill. of Bellwood*, 444 F. Supp. 2d 924, 927 (N.D. Ill. 2006) *aff'd sub nom. Narducci v. Moore*, 572 F.3d 313 (7th Cir. 2009) ("Nor is an affirmative act, rather than an omission, required. It is enough to be aware that such interception is occurring and to fail to stop it."). Thus, the Council argues that the February 4, 2011 conversation was captured prior to her discovery and, thus, prior to any *intentional inaction* to continue recording and/or investigate. To be clear, the City contends that the timing of DePaepe's discovery is immaterial both to the application of the law enforcement exclusion and the use and disclosure of all of the recordings of Young's Assigned Line. However, the City does not concede that DePaepe discovered the February 4 conversation prior to *intentional conduct or inaction.* DePaepe is

US.54923150.02

having been obtained pursuant to 18 U.S.C. § 2516. Accordingly, even if civil or criminal liability does not attach to the inadvertent recording of some of his conversations, those conversations still cannot be used or disclosed unless the use or disclosure is specifically authorized by the Act. *See Dorfman*, 690 F.2d at 1232; 18 U.S.C. § 2517. There is simply no basis under the statute—and the Council provides none—for the disclosure of a private conversation intercepted by a third party and not authorized under the law.

    b. *The recordings are not exempted from the Wiretap Act by a First Amendment public interest exception.*

Nor does the Council have any refuge from the Wiretap Act's provisions under the First Amendment. Relying on *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the Council contends that the recordings can be disclosed even if they were "inadvertently illegally made" because the Wiretap Act is unconstitutional as applied to this case. Council's Br., at 24. However, the Supreme Court in *Bartnicki* dealt solely with the narrow question of whether a *media organization* could be held civilly liable under 18 U.S.C. § 2511 "where the punished publisher of information has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully." *Id.* at 528. No fair reading of *Bartnicki*, which never discusses the law enforcement exclusion, could render its holding applicable to the factual situation in this case.

In providing immunity to the media, the Supreme Court expressly "[did] not create a 'public interest' exception that swallows up the statutes' privacy-protecting general rule." *Id.* at

---

not credible in her testimony. She would have the Court believe that on her very first attempt to listen to the 6031 line, she discovered Young's voice on the very conversation which was also the very first conversation that alerted her to a need for investigation. Her attempt to construct that incredible coincidence is destroyed by the previous sworn testimony she provided in which she described discovering the recording error in *January* of 2011, *not* on February 4th. Tr. Ex. 38: Doc No. 108, Ex. A: Affidavit of Karen DePaepe, ¶ 16 ("It was during this period of time in January 2011 when I was checking to see if the system was operating after numerous repairs that I discovered the first of the conversations which were subsequently recorded and given to Chief Boykins."); see also Pre-Trial Order, ¶ F(23) (same).

17

540 (Breyer, J., concurring).  Rather, it provided "constitutional protection from publication of intercepted information of a special kind" despite the fact that the media acted unlawfully in disseminating the contents of the recordings.  *Id.*; *see also id.* at 536 (stating that "the radio broadcasters acted lawfully (up to the time of final public disclosure) . . .").  DePaepe and Boykins, however, are not entitled to First Amendment immunity from their own actions because they are neither members of the media nor innocent recipients of "a stranger's illegal conduct." *Id.* at 535.   On the contrary, both were employees of the Police Department that played an integral role in intercepting Young's conversations with knowledge that the interception was contrary to the police chief's own practices.  The narrow constitutional question in *Bartnicki* cannot rescue them from their own actions.

The Seventh Circuit confirms there is no "right of public access" to recordings that constitute interceptions under the Act.  *Dorfman*, 690 F.2d at 1232.  The *Dorfman* court so held even with respect to recordings that were authorized under the Act and had been offered to the judge in part for *in camera* inspection.  *Id.* at 1233.  Judge Posner articulated the rights at stake in the following manner:

> But this appeal concerns wiretap materials that may never be presented at the trial.  No law enforcement interest requires that this evidence be made public.  There is public curiosity about it, but curiosity is just the opposing force to privacy; one of them has to yield; both have constitutional dignity.
>
> Congress in Title III struck a balance between these interests that seems reasonable to us.  It put no limits on the public disclosure of lawfully obtained wiretap evidence through public testimony in legal proceedings; *but neither did it authorize wiretap evidence not made public in this manner to be made public another way without the consent of the people whose phone conversations were intercepted*.

18

US.54923150.02

*Id.* at 1234 (emphasis added).  The court concluded that "Title III does not allow public disclosure of all lawfully obtained wiretap evidence just because a few officers are privy to its contents; if it were construed to do so, much of the statute would be superfluous, for example 18 U.S.C. ss 2517(1)-(3)." *Id.* at 1234-35.  This reasoning applies with even more force here where the recordings were not authorized pursuant to 18 U.S.C. § 2516 and accordingly have not been submitted to the Court for any purpose.[12]  *Cf. U.S. v. Blagojevich*, 2009 WL 2601326, at *1 (N.D. Ill. Aug. 21, 2009) (noting that the *Dorfman* reasoning applies with more force when none of the materials were submitted to the court and finding that "CNN seeks access to materials which are rendered unavailable by an act of Congress, the constitutionality of which seems clear.").  Thus, the recordings of Young are not permitted to be disclosed under the Wiretap Act.

## CONCLUSION

The law enforcement ordinary course exclusion has no application under the facts of this case as the Council has failed to establish the existence of a routine, non-investigatory reason for the recordings.  Indeed, each of the recordings occurred in violation of the police chief's own informal policy and to further a targeted investigation of Young.  The police chief's unfettered discretion untethered to any policy and in violation of his own practices cannot override a statutory scheme designed to protect the very privacy interests that he decided to disregard.  Because the law enforcement exclusion is the only defense raised to the interception of calls on Young's line, the Court must find that the Wiretap Act applies to the recordings subpoenaed by the Council.  The Council has failed to show any authorized purpose for the use or disclosure of

---

[12] Furthermore, the Wiretap Act specifically prohibits wiretap evidence from being received in evidence in any trial, hearing, or other governmental proceeding.  18 U.S.C. § 2515.  The only exception to this testimonial prohibition permits disclosure of the contents of a communication *only* through testimony and *only* when the interception was authorized by the Wiretap Act in the first instance—it does not create a privilege to publicize or otherwise disclose unauthorized wiretaps.  18 U.S.C. § 2517(3); cf. *Dorman*, 690 F.2d at 1233 (7th Cir. 1982).

US.54923150.02

the recordings.  Accordingly, the Court should enter a declaratory judgment restricting disclosure of the recordings pursuant to and consistent with the Act.

        Respectfully Submitted,

        FAEGRE BAKER DANIELS LLP

        s/ Edward A. Sullivan, III
        Edward A. Sullivan, III (17577-71)
        Ryan G. Milligan (28691-71)
        J.P. Hanlon (21230-71)
        FAEGRE BAKER DANIELS LLP
        202 S. Michigan St., Suite 1400
        South Bend, Indiana 46601
        edward.sullivan@faegrebd.com
        ryan.milligan@faegrebd.com
        jphanlon@faegrebd.com

        *Counsel for City of South Bend*

## **CERTIFICATE OF SERVICE**

    I certify that on the 29th day of September, 2014, a copy of the foregoing was served upon all counsel of record via the Court's electronic filing system.

        s/ Ryan G. Milligan

US.54923150.02