# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

| | | |
|---|---|---|
| CITY OF SOUTH BEND, BY ITS CORPORATION COUNSEL ALADEAN M. DEROSE, | ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | 3:12-cv- 475 |
| UNITED STATES OF AMERICA, ERIC H. HOLDER, JR., IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STAES, SOUTH BEND COMMON COUNCIL, TIM CORBETT, DAVE WELLS, STEVE RICHMOND, BRIAN YOUNG, AND SANDY YOUNG, | ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

### SOUTH BEND COMMON COUNCIL'S REPLY TO THE CITY OF SOUTH BEND AND INDIVIDUAL POLICE OFFICERS' RESPONSES TO THE SOUTH BEND COMMON COUNCIL'S POST-TRIAL BRIEF[1]

The City continues to misstate the rulings and factual circumstances of the cases it cites, despite having filed a total of six prior briefs in the summary judgment, pretrial, and post-trial briefing. The City's continued misstatements emphasize that its argument is meritless.

*Amati v. City of Woodstock*, 176 F.3d 952 (7th Cir. 1999) continues to be the leading case in this Circuit, and throughout the country, on the Ordinary Course Exclusion. The Seventh Circuit there ruled that the Ordinary Course Exclusion is not dependent on any express notice to the people whose conversations are recorded. 176 F.3d at 955. The City, however, argues that implicit notice is required and, that in *Amati*, "notice came in the form of an announcement

---

[1] Because the Common Council's replies do not fit neatly into the subheadings used by the City and Police Officers, each reply argument will be separated by additional space.

regarding the lines that were being recorded and in the deliberate policy change that occurred within the police department." (Doc. 172 at p. 12.) Contrary to the City's representation, the police department in *Amati* announced that a particular line would not be recorded and would remain open for personal calls. That line remained open for approximately nine years. The police department then reversed course and recorded the previously unrecorded line. The police department, however, did not announce the change to its employees. Despite the fact that there was no announcement regarding the previously unrecorded line being recorded, the Seventh Circuit ruled that a conversation taped on that line fell within the Ordinary Course Exclusion because recording calls to and from a police department was a routine police practice included within the phrase "ordinary course" of law enforcement. 176 F.3d at 955.

The City's illogical conclusion that the police department in *Amati* provided implicit notice that the previously unrecorded line was being recorded by announcing that all other lines were being recorded and falsely leading its employees to believe that a line remained unrecorded, is contrary to the ruling in *Amati*. *Amati*, instead, clearly determined that the routine practice of recording calls to and from a police department constitutes implicit notice. Specifically, the Court stated:

> Such recording [of police department lines] will rarely be very invasive of privacy, and for a reason that does after all bring the ordinary-course exclusion rather close to the consent exclusion; what is ordinary is apt to be known; it imports implicit notice. *To record all calls to and from a police department is, for the reasons explained earlier, a routine police practice. If, 'ordinary course' of law enforcement includes anything, it includes that.* (Emphasis added.)

176 F.3d at 955.

The City refuses to address the fact that the police department in *Amati*, after approximately nine years, began recording a previously unrecorded line after announcing that the

line would not be recorded. Although the City refers to the change as a change in policy, the

change was never made known to the police department employees. The only implicit

knowledge that could be attributed to the employees was the routine practice of police

departments to record calls to and from the police department. If notice in *Amati* was in the form

of an announcement and a deliberate change in policy, as the City argues, the notice would be

express, not implicit. *Amati* is clear that express notice is not required.[2]


The City also misstates the holding in *Abbott v. Village of Winthrop Harbor*, 205 F.3d

976 (7th Cir. 2000). In a footnote, the City states:

> In *Abbott*, the Seventh Circuit reversed the judgment of the trial
> court against the Village of Winthrop Harbor (but not against the
> police chief) based solely on the issue of municipal liability under
> Section 1983. In rendering its decision, the Seventh Circuit
> expressly relied on the trial court's holding that the ordinary course
> exclusion did not apply, stating that 'we note that the district court
> specifically found that Miller's purpose for taping the 3868 line
> was "not related to the ordinary course of police business" . . . .'
> *Abbott*, 205 F.3d at 982-83.

(Doc. 172 at p. 3, n. 2.) The City neglects to inform the Court that the quote from *Abbott* is in the

discussion of only the City's liability under 42 U.S.C. § 1983, not the Ordinary Course

Exclusion. The full context of the partial quote establishes that the district court made a

credibility determination regarding the sheriff's reasons for recording employees' conversations

and determined that the sheriff's actions were done for personal reasons and not as a policy of

the Village. Specifically, the full context states:

---

[2] The City's select quotation of words and phrases out of context applies not only to the cases it cites, but
also to the South Bend Common Council's brief. The City states: "Misreading *Amati*, the Council
contends that notice is 'immaterial' to the application of the law enforcement exclusion." *Citing* the South
Bend Common Council's post-trial brief at page 16. (Doc. 172 at p. 11.) A review of the Common
Council's post-trial brief at page 16 establishes that "notice" refers to express notice. (Doc. 167 at
pp. 16-17.)

> Finally, we note that the district court specifically found that
> Miller's purpose for taping the 3868 line was 'not related to the
> ordinary course of police business,' and that his primary
> motivation was 'to intercept the private calls of his employees.' In
> other words, the district court believed that Miller's actions were
> done for personal reasons. This conclusion, that Miller was
> implementing no policy other than his own, insures victory for the
> Village.

205 F.3d at 982-983. The only issue in *Abbott* relating to the Ordinary Course Exclusion was

whether a municipality could be held liable for a violation of the Wiretap Act. The Court held, as

a matter of law, that a municipality could not. Significantly, the sheriff did not appeal the ruling

that he was liable under the Federal Wiretap Act. The sheriff's actions, as related to the Ordinary

Course Exclusion, were therefore not before the appellate court and the Court did not address the

Ordinary Course Exclusion as it applied to the sheriff.

Perhaps realizing the flaws in citing to the Court of Appeals' opinion in *Abbott*, the City

cites the unpublished district court opinion for the proposition that the Ordinary Course

Exclusion "does not apply where a police chief surreptitiously taped a line that had been

announced as an untapped line without providing any form of notice."[3] (Doc. 172 at pp. 3-4.)

Although the Court of Appeals did not address any issue regarding the Ordinary Course

Exclusion as it pertained to the sheriff in *Abbott*, the factual context is nevertheless informative

in examining the district court's credibility determination in ruling that the sheriff's actions were

personal. The Village's newly installed 911 emergency system allowed recording of previously

unrecorded police department telephone lines. It was decided that six telephone lines would be

recorded with one line deliberately unrecorded to be used by employees for personal calls. The

Police Chief issued a memorandum to all police department employees informing them that all

---

[3] Although the City is critical of the Common Council for citing an unpublished opinion (Doc. 172 at
p. 8), it has no difficulty in citing an unpublished decision from July 24, 1998, several months before the
Seventh Circuit's decision defining the scope of the Ordinary Course Exclusion in *Amati*.

4

phone lines except one were being recorded and designated the unrecorded phone line. The memorandum specifically stated that "non-police related things would be on an unrecorded line." 205 F.3d at 979. Eleven months later, the Chief of Police had a contractor connect the unrecorded line to the system. He did so in a secretive manner, avoiding the use of the representative who made all of the service repairs to the system and asking the independent contractor who performed the hook up not to tell anyone what he had done. The Police Chief instructed his telecommunications supervisor to listen to the conversations recorded on the previously unrecorded line and to inform him if she thought the conversations "might be of interest to him." 205 F.3d at 979. The Police Chief then made remarks to his employees about the substance of the recorded conversations.

At trial, the Police Chief testified that one of the reasons he began recording the previously unrecorded line was because he was concerned that employees spent too much time away from work on the phone. He also claimed to be concerned about long distance personal calls being made on the police department lines. The District Court did not rule these were not law enforcement purposes as implied by the City on page 4 of its response brief, but rather, found that the Police Chief's reasons were pretextual and that his motivation was personal "to intercept the private calls of his employees." 205 F.3d at 979. Consequently, the recordings were not within the Ordinary Course Exclusion because they were not made in the ordinary course of police business. *Id.* The Police Chief did not appeal the judgment entered against him and the only issue on appeal was the Village's liability as a municipality.

In the present case, the recording of Young's telephone line was not surreptitious. There was no announcement that any line was not being recorded. Instead, line 6031 was recorded in the routine, ordinary course of law enforcement duties. More significantly, however, the District

Court's judgment against the police chief in *Abbott* was entered on July 24, 1998, several months before the Seventh Circuit's decision defining the scope of the Ordinary Course Exclusion in *Amati*. *Amati* is the current law in this Circuit on the scope of the Ordinary Course Exclusion. Contrary to the City's argument, the *Abbott* decision does not control the outcome of this case and, in light of *Amati*, is actually irrelevant to the issues in this case.

The City's position that there must be a formal policy or procedure in place for the Ordinary Course Exclusion to be applicable cannot be examined in a vacuum.[4] All parties concede that there was no formal policy or procedure in place for recording telephone lines in the South Bend Police Department. Consequently, if the City's position is correct, every recorded call to and from the South Bend Police Department has been in violation of the Federal Wiretap Act. It does not take much imagination to realize the potential ramifications of such a ruling.

The City asserts that: "No Police Chief – including Boykins and his predecessor Tom Fautz, has taken the liberty to record an assigned line without first informing the officer." (Doc. 172 at p. 5.) The City's statement is inaccurate. As noted on page 5 of the South Bend Common Council's post-trial brief (Doc. 167), a former police chief recorded former Chief Hemmerlein's telephone line after Hemmerlein was demoted to Captain in the Records Division. The recording was without Hemmerlein's knowledge or consent. Neither the City nor the Police Officers address this undisputed fact in their response briefs.

---

[4] As noted in prior briefs, the existence of a formal policy is tantamount to express notice. *Amati* specifically states that express notice is unnecessary. 176 F.3d at 955.

The City's new favorite word for the personal philosophies of Fautz and Boykins is "protocol."[5] (*See* City's brief at pp. 2, 3, 4, 5, 6, 11, 12, 13, 14.) "Protocol," as a noun, is defined as: "A system of rules that explain the correct conduct and procedures to be followed in formal situations." (www.merriam-webster.com/dictionary/protocol.) There was no protocol for either Fautz or Boykins with respect to recording individual phone lines. The most that could be said is that they had personal philosophies with respect to recording an individual officer's telephone line. Those personal philosophies are not binding on either Fautz or Boykins, or the police department. More significantly, however, it is undisputed that these personal philosophies were never communicated to the Police Officers or to Karen DePaepe. (*See* Doc. 167 at pp. 23-24.) The uncommunicated philosophies could not have been a reasonable basis of the Police Officers' assumption that Young's line was not being recorded.

The City attempts to gloss over a police department general order stating that "[e]mployees do not have a right to privacy for assigned equipment." The City asserts that the evidence at trial established that the general order had no application to officers' phones which did not come within the definition of "assigned equipment." (Doc. 172 at p. 5, n. 4.) Contrary to the City's argument, the evidence establishes nothing of the sort. That was simply Young's interpretation of what "assigned equipment" consisted of. (Transcript Vol. 2, p. 84, ll. 12-16.) Contrary to Young's interpretation, the Common Council maintains that officers have no right to privacy in the use of police department telephone lines just as they have no right of privacy to the contents of the police department's filing cabinets or the police department's desk drawers. This

---

[5] The City's original post-trial brief used the word "directive" in describing the Police Chiefs' personal philosophies. Although the City has changed the word it uses to "protocol," the same analysis applies to establish that the Chiefs' personal policies were not communicated to the Police Officers or Karen DePaepe. (*See* Doc. 167 at pp. 23-24.)

issue, however, becomes relevant only if the Court determines that the ordinary and routine practice of recording telephone calls to and from police departments does not constitute implicit notice. In that case, the general order provides express notice.

The City attempts to limit the legitimate purpose for the Voice Logger to use only on general use and emergency lines. (Doc. 172 at p. 7.) The City then cuts and pastes parts of answers from separate pages of the transcript for the proposition that the lines were handled differently because they were more confidential. Again, when placed in context, Karen DePaepe's answer with respect to the individual officers' recorded lines was that they were handled differently because the Chief directed what he wanted in terms of which lines were recorded and that those decisions could vary by Chief. (Transcript, Vol. 2, p. 114, ll. 2-22.) When DePaepe was discussing confidentiality, she testified that the lines were handled differently only as to who had access to those lines. Some of the individuals' lines could only be accessed by the Director of Communications or a Supervisor. (Transcript, Vol. 2, p. 115, l. 14 – p. 116, l. 22.) DePaepe, however, testified that the method by which the individual lines were recorded was not handled differently. Specifically, DePaepe testified:

> Q.      Karen, you were asked about the administrative lines in, I believe it was, Exhibit 9, and you were asked if the lines were treated differently by you in your job duties as Director of Communications, right?
>
> A.      Yes.
>
> Q.      Now, the administrative lines were not treated differently as to the method by which the lines were recorded by the system; is that right?
>
> A.      That's correct.

Q.      In fact, all the lines listed on Exhibit 9 were being recorded by the system in an identical fashion; is that correct?

A.      Yes.

Q.      Technically, from your training and experience, there was no difference in the way in which the recording system treated any of those lines listed?

A.      That's correct.

(Transcript, Vol. 2, p. 155, l. 17 – p. 156, l. 8.)

The City contends that "no plausible scenario exists under which the recording of Young could have fulfilled the legitimate objectives of the Voice Logger when he was unaware that recordings of his conversations could even be retrieved to further those objectives." (Doc. 172 at p. 7.) The City repeats a similar theme on the bottom of page 7 and again on page 8 of its response brief. In making this argument, however, the City ignores what, in fact, actually happened. Karen DePaepe, in responding to a Freedom of Information Act request, reviewed all recorded lines to obtain any conversations responsive to the request. Whether there was a responsive conversation on Young's line does not depend on Young's knowledge that the line was being recorded. When requested to respond to a Freedom of Information Act request, or other requests from agencies such as the Indiana State Police, DePaepe would review conversations on all recorded lines for the relevant time period. There can be no dispute that reviewing recorded lines for such information is within the Ordinary Course Exclusion. An officer's knowledge as to whether or not his line was being recorded has no effect whatsoever on whether conversations recorded on that line should be produced in the ordinary course of law enforcement. Karen DePaepe testified that such a situation could occur. (Transcript, Vol. 2, p. 167, l. 19 – p. 168, l. 23.)

9

In a footnote, the City argues that:

> The Council's assertion that *Abraham* was decided on separation
> of powers grounds is unsupported by a fair reading of that case.
> Instead, the recordings in *Abraham* were not ordinary course
> because, like here, the police department 'did not have an
> established policy of monitoring the plaintiffs' calls.' *See Abraham
> v. County of Greenville*, 237 F.3d 386, 389 (4th Cir. 2001).

(Doc. 172 at p. 8, n. 6.) The City's argument is not supported by the case. The facts establish that

the recording system was recording telephone calls to and from judges' chambers in a section of

the detention center apart from the jail and police offices. There is nothing in *Abraham* which

suggests that in order for the Ordinary Course Exclusion to apply to calls to and from a police

department there must be an established policy for monitoring calls. Instead, the Court ruled that

the recording of calls to and from judges' chambers was simply not in the ordinary course of law

enforcement. Although the Court hinted that the recordings may be subject to the Ordinary

Course Exclusion if there had been an established policy to record the judges' calls, that

suggestion does not apply in the present case to recording calls to and from a police department

which the Seventh Circuit in *Amati* ruled to be within the Ordinary Course Exclusion. *Abraham*

stated:

> Greenville County claims that the law enforcement exception
> excuses its recordings of plaintiffs' telephone calls. However,
> monitoring the judges' calls simply was not part of the 'ordinary
> course' of the county's law enforcement duties. *See* 18 U.S.C.
> § 2510(5)(a)(ii). The county did not have an established policy
> monitoring plaintiffs' calls. Indeed, the county contends that it
> recorded the judges only by mistake. Likewise, several of the
> individuals responsible for installation and maintenance of the
> recording system testified that they knew that it was wrong to
> record the judges. Furthermore, the county has not suggested that it
> had any valid, law-enforcement related reason to record the judges.
> The judges were not under investigation and they were not
> suspected of breaking any law in the past.

237 F.3d at 389-390.

The City attempts to resurrect an argument abandoned prior to trial that in order for the Ordinary Course Exclusion to apply, "all calls" must be recorded. (Doc. 172 at p. 10.) As noted in the County Council's post-trial brief, that issue has been abandoned by the City. (Doc. 167 at p. 33.) The City should not be allowed to resurrect such dead arguments in a response brief. For reasons set forth on pages 36-38 of the Common Council's post-trial brief, the argument is without merit even if the Court gives it any consideration. (Doc. 167.) Furthermore, the cases cited on page 10 of the City's response brief establish that it is not necessary for all calls to be recorded in order for the Ordinary Course Exclusion to apply, because they did not, in fact, record all lines.

The City argues that "because the police department did not record _all lines_, then it needed to officially communicate which assigned lines would or would not be recorded." (Doc. 172 at p. 11.)[6] This unsupported argument flies in the face of _Amati_ where the police department announced that a particular line would not be recorded and later recorded that line without giving any notice to the employees. In the present case, there was no announcement that any particular lines would not be recorded. However, as noted in _Amati_, it is the routine ordinary practice of police departments to record calls to and from police departments. Because the practice is routine and ordinary, no formal policy is necessary for the applicability of the Ordinary Course Exclusion. However, when the recording device records calls other than those to and from a police department, such as the calls to and from judges' chambers in _Abraham_, a

---

[6] Official communication would constitute express notice. Express notice is unnecessary under _Amati_. 176 F.3d at 955.

formal policy may be a factor to consider in determining whether such recordings are within the Ordinary Course Exclusion.

The City asserts that the Common Council is trying to use the lack of secrecy regarding the recorded lines in place of implicit notice. That assertion is false. Implicit notice, according to *Amati*, is based on the fact that calls to and from police departments are routine and ordinary. The lack of secrecy regarding the recorded lines goes instead to the issue of whether conversations were recorded surreptitiously. The lack of secrecy was a relevant factor with respect to implicit notice prior to *Amati*. For example, *Jandak v. Village of Brookfield*, 520 F.Supp. 815 (N.D. Ill. 1981), a case decided 18 years before *Amati*, noted that the fact that a police officer "had access to a chart designating which lines are recorded" was a factor to be considered in determining whether there was sufficient notice to the police officer. 520 F.Supp. at 824. However, since the Court's decision in *Amati*, proof of such notice is no longer required.[7]

The City cites the district court opinion in *Abbott v. Village of Winthrop Harbor* to support its proposition that the Ordinary Course Exclusion was inapplicable despite the police chief informing his supervisor of communications that anyone who asked if the line was recorded could be told "yes." (Doc. 172 at p. 13.) Again, the district court judgment against the sheriff was based on credibility issues, not questions of law. That judgment was not appealed so there is no appellate court opinion affirming the judgment against the sheriff. Furthermore, the

---

[7] The City also states that "the sole person in the department who maintained and possessed the recorded lines list was DePaepe. (Doc. 172 at p. 12.) Contrary to this assertion, the evidence establishes that each Chief of Police received a list of the recorded lines. Those same lines would continue to be recorded until a Chief of Police ordered otherwise. (Transcript, Vol. 2, p. 178, ll. 22-23; Holleman dep., p. 14, ll. 19-25; p. 18, ll. 3-11.)

decision was rendered several months before the Seventh Circuit opinion in *Amati* clarified the scope of the Ordinary Course Exclusion.

The City argues that there was no non-investigatory purpose for recording Young's line and that all the recordings were captured for investigatory purposes. (Doc. 172 at p. 13.) This argument ignores the fact that Young's conversations were inadvertently recorded until DePaepe discovered the mistake on February 4, 2013. More critically, however, the City's argument ignores the fact that when DePaepe heard Young's voice recorded on line 6031 following the crash of the recording system, her job responsibilities required her to look further into the recordings on that line to determine if there was a malfunction in the system because it was her understanding that the 6031 line was assigned to Richmond, not Young. Therefore, there was a non-investigatory purpose for DePaepe listening to more than a few seconds of Young's February 4, 2011 conversation.

The City also refuses to acknowledge that the conversations recorded after February 4, 2011 were not recorded for investigative purposes. It is undisputed that in July 2011, Karen DePaepe, acting within the ordinary course of employment, was reviewing recorded telephone lines to comply with a Freedom of Information Act request from Nancy Bruce at ABC Channel 57. DePaepe was instructed to find materials responsive to the Freedom of Information Act request by the City Attorney, Aladean DeRose. While DePaepe was reviewing all recorded lines for information responsive to the Freedom of Information Act request, she heard other conversations on the 6031 telephone line which she determined should be reported to Police Chief Boykins. DePaepe's testimony establishes that DePaepe was not monitoring Young's line

from February to July, nor was she listening to any live conversations. That testimony is as follows:

> Q.    All right. Here's my question: So you go in February of 2011 and you hear something that disturbs you?
>
> A.    Yes.
>
> Q.    You weren't constantly monitoring these lines from February 2011 until July 2011 to constantly monitor what was going on these lines, were you?
>
> A.    No.
>
> Q.    Were you ever listening to any live conversations from February of 2011 to July of 2011 for any purpose.
>
> A.    No.
>
> Q.    So the only times you went into this system for purposes of getting recordings were either because of the malfunction – correct?
>
> A.    Yes.
>
> Q.    – the FOIA request –
>
> A.    Yes.
>
> Q.    – or the specific direction of the Chief in December of 2011.
>
> A.    Yes.

(Transcript, Vol. 2, p. 175, l. 14 – p. 176, l. 7.)

At the end of trial, the Court instructed the parties to address the question: "Are unintentional recordings illegal under the Federal Wiretap Act.?" The South Bend Common Council, in its post-trial brief, directly answered the question by citing the relevant statutory and case law stating that intent was a necessary element for either civil or criminal liability under the Federal

Wiretap Act. (Doc. 167 at pp. 18-21.) Not surprisingly, neither the City nor the Police Officers directly answered the Court's question.[8] The City, however, argues in its response brief that although inadvertent recordings do not give rise to criminal or civil liability, the Wiretap Act nevertheless places strict controls on all interceptions to protect privacy rights. (Doc. 172 at p. 15.) The City cites *United States v. Dorfman*, 690 F.2d 1230 (7th Cir. 1982) in support of this proposition. The City's reliance on *Dorfman* is misplaced.

The issue in *Dorfman* had nothing to do with inadvertent recordings. The issue in *Dorfman* was whether the district court erred in unsealing wiretap information prior to the defendants' criminal trials. The Seventh Circuit, based on 18 U.S.C. § 2517, ruled that the wiretap information should be kept sealed at least until it was used while giving testimony pursuant to 18 U.S.C. § 2517(3). In other words, recordings made under an authorized wiretap in a criminal investigation were suppressed until the time they fell within the exception for disclosure contained in Section 2517(3) relating to testimony in a proceeding. That statute, however, has no relevance to the present case because: (1) The inadvertent February 4, 2011 recording was not illegal despite there being no authorization for a wiretap; (2) The recording at issue in this case was not made pursuant to a criminal investigation; and (3) 18 U.S.C. § 2517 applies only to wiretaps specifically authorized by the provisions of the Federal Wiretap Act. *Dorfman*, therefore, has no application to the present case with respect to the inadvertent recording from February 4, 2011.

---

[8] The Police Officers' position with regard to whether the initial recording was inadvertent is not clear. In their first post-trial brief, the police officers argued that Young's line was recorded inadvertently or mistakenly. (Doc. 165 at pp. 2, 4, 5, 7, 14, 15, 16.) The same argument was made in places in the Police Officers' response brief. (Doc. 171 at pp. 2, 3, 5, 12, 13.) However, on page 5 of its response, the Police Officers state: ". . . Every phone line recording at issue – including the February 4, 2011 recording – was made intentionally . . . ." (Doc. 171.) (*See also*, Doc. 171 at p. 4.)

*Dorfman*, however, does support the South Bend Common Council's argument that an injunction should not be issued by this Court based upon First Amendment considerations that were stated by the United States Supreme Court in *Bartnicki v. Vopper*, 532 U.S. 514 (2001). More specifically, *Dorfman* notes that an injunction is not an available remedy under the Federal Wiretap Act. The Court stated: ". . . Title III does not provide for injunctive relief (a deliberate omission, *See* S.Rep. No. 1097, 90th Cong., 2nd Sess. 107 (1968) . . . ." 690 F.2d at 1231. Not only is an injunction not an available remedy under the Federal Wiretap Act, an injunction in the present case is improper in light of the First Amendment rights of persons with knowledge of the contents of the recordings to disclose those contents.

The City attempts to dismiss the Supreme Court's holding in *Bartnicki* by stating that the Supreme Court dealt "solely with the narrow question of whether a media organization could be civilly liable under 18 U.S.C. § 2511 . . . . (Doc. 172 at p. 17.) Contrary to this statement, not all of the respondents in *Bartnicki* were members of the media. Specifically, one of the respondents was the president of a local citizens' organization. It was the organization president who gave a copy of the tape-recorded conversations to the media. The Third Circuit Court of Appeals, in *Bartnicki v. Vopper*, 200 F.3d 109 (3rd Cir. 1999), reversed the district court's denial of the defendants', including the organization president's, motion for summary judgment, and remanded for entry of summary judgment in favor of the defendants including the organization president. The United States Supreme Court affirmed. Therefore, the City's statement that the case only involved the rights of the media is contrary to the facts of the case.

The Police Officers, in their response brief, attempt to dismiss *Bartnicki* on even more questionable grounds. Without citation to any authority, the Police Officers argue that: "The

16

Common Council has no First Amendment interest in the disclosure of the recordings whatsoever. There is no freedom of the press or freedom of expression interest that the Common Council can claim." (Doc. 171 at p. 7.) *Bartnicki* clearly refutes this unsupported proposition by holding that 18 U.S.C. § 2511 was unconstitutional as applied to matters of public importance, stating: ". . . Privacy concerns give way when balanced against the interest in publishing matters of public importance . . . ." 532 U.S. at 534.

There can be no dispute that the contents of the tape recordings in the present case are a matter of public importance. The South Bend Common Council subpoenaed the tapes to comply with its statutory duty to investigate: (1) The departments, officers, and employees of the City; and (2) Any charges against a department, officer or employee of the City. The subpoena was authorized by Ind.Code § 36-4-6-21. The Court, therefore, should not enter an injunction prohibiting disclosure of the tapes.

The Police Officers refer to the Common Council's observation that the Ordinary Course Exclusion as an exclusion as "the same tired, inconsequential observation . . . ." (Doc. 171 at p. 8.) Contrary to this statement, and the Police Officers' statement that debating the terms exclusion versus exception is sophistry *Id*, the distinction between exclusion and exception is important. The Ordinary Course Exclusion is a true exclusion which takes such recorded conversations entirely out of the Federal Wiretap Act. Those recordings can therefore be disclosed for any reason. *In re High Fructose Corn Syrup Antitrust Litigation*, 216 F.3d 621 (7th Cir. 2000).

Nor is the discussion of exclusion versus exception some kind of clever tactic to avoid the burden of proof as the Police Officers imply. (Doc. 171 at pp. 8-9.) The Common Council

has never argued that it did not have the burden of proving the applicability of the Ordinary Course Exclusion.

      The Police Officers misstate the Common Council's argument on page 9 of their brief. (Doc. 171.) The Police Officers' three-step analysis is inaccurate. The Common Council's argument is that:

> 1)    Because everybody knows that police departments around the country routinely record phone calls to and from a police department; and
>
> 2)    Because the South Bend Police Department is a police department;
>
> 3)    Under *Amati*, police officers in the South Bend Police Department had implicit knowledge of the recordings.

Implicit knowledge alone does not establish the applicability of the Ordinary Course Exclusion. However, the reasons given by all of the witnesses for the use of the recording system establish that the recordings were made for legitimate law enforcement purposes. Therefore, the fourth step in the analysis is "Because there is implicit knowledge and the recordings were made for law-enforcement purposes, the recordings fall within the Ordinary Course Exclusion."

      The Police Officers also argue that the Common Council makes a "hyper-technical distinction" of a case that is "clearly on point," *citing Abraham v. City of Greenville*, 237 F.3d 286 (4th Cir. 2001). (Doc. 171 at p. 9.) The Police Officers appear to see no difference between recording calls to and from a judge's chambers and calls to and from a police department. They state that the detention center at issue in *Abraham* contained a jail, visitation facilities, and offices for law enforcement and administrative personnel. (Doc. 171 at p. 9.) The Police

18

Officers' analysis flies in the face of the dispositive issue in *Abraham* which was the recording of conversations to and from judges' chambers was not within the ordinary course of law enforcement. The Police Officers appear, instead, to argue that because calls to and from judges' chambers located in the same building as the police department are not within the Ordinary Course Exclusion, calls to and from the South Bend Police Department, which does not house judges' chambers, are also not within the Ordinary Course Exclusion. The Police Officers' argument, however, confuses the issues of implicit notice and law enforcement duties. The fact that recording calls to and from police departments are routine and in the ordinary course of police business provides implicit notice. There is no such implicit notice with respect to calls to and from judges' chambers. Furthermore, as the Court noted in *Abraham*, there simply is no ordinary course of law enforcement duty with respect to taping calls to and from judges' chambers. To the extent that the location of the judges' chambers in the same building is relevant, the facts of *Abraham* establish that the judges' chambers were in a completely separate section of the detention center from the jail, visitation facilities, and offices for law enforcement and administrative personnel. This area was known as the Judicial Corridor. 237 F.3d at 388.

The Police Officers' brief continues to confuse the issues of implicit notice and ordinary course throughout. Implicit notice is established under *Amati* by the routine and ordinary practice of recording telephone calls to and from police stations. The law enforcement purposes are established by the reasons for using the recording system such as recording anonymous tips or complaints from citizens. When these two elements are joined, as they are in the present case, recording calls to and from a police department falls within the Ordinary Course Exclusion. There is no need for a formal policy regarding telephone lines being recorded because all the

policy could do is provide express notice. As *Amati* stated, however, express notice is not necessary and implicit notice from the routine practice of recording lines to and from the police department is sufficient. Furthermore, it is not necessary that all telephone lines to and from the police department are being recorded. Again, if it was known that all lines to and from the police department were recorded, the notice would be express, not implicit. Implicit notice is all that is necessary under *Amati*.

The Police Officers also argue that the Common Council's argument that the recording of the individual lines was not surreptitious "does not ring true." (Doc. 171 at p. 13.) The officers erroneously base this conclusion on Young's subjective feeling that the recording of his line was intentionally concealed from him and because he was "promised wrongly that it would stop." (Doc. 171 at p. 13.) Young's subjective feeling is not credible in light of the undisputed evidence that there was no secrecy involved in the lines being recorded. Anyone could ask either the police chief or Karen DePaepe and they would be told if a particular line was being recorded. With respect to the so-called promise that the recording would stop, that promise was allegedly made by Captain Trent. (Transcript, Vol. 1, p. 96, l. 6 – p. 98, l. 3; Vol. 2, p. 73, l. 25 – p. 24, l. 14; p. 194, l. 11 – p. 195, l. 4.) Trent had no authority to make such a promise. The undisputed evidence establishes that only the police chief could make changes in the lines being recorded.

Both the City and the Police Officers continue to argue that the recording of the 6031 line after it was discovered that the line was assigned to Young constituted a "targeted investigation." The City and the Police Officers, however, continue to ignore the fact that no one monitored Young's line continuously after it was learned that line 6031 was assigned to him. The next time

DePaepe listened to the recordings of line 6031 after February 4, 2011, was when she was reviewing all recorded conversations on all lines looking for information responsive to a Freedom of Information Act request from Nancy Bruce. (*See* Exhibits 15 and 16.) That request called for a copy and/or a transcription of either a 911 call *or* a complaint involving a police officer at two different businesses in South Bend. (Exhibit 16.) It was while DePaepe was reviewing the recorded lines in July 2011 to determine if a complaint had been lodged on one of the recorded lines that she heard additional conversations on Young's line which she believed should be disclosed to Police Chief Boykins. It is undisputed that DePaepe was not monitoring Young's line from February 4, 2011 to July 2011, nor was she listening to any live conversations. (Transcript, Vol. 2, p. 175, ll. 17-23.)

The reason that the City and Police Officers continue to ignore this undisputed evidence is that it destroys their argument that DePaepe and Boykins acted together to actively investigate all of Young's telephone calls after the inadvertent recordings were first discovered in February 2011. Instead, the evidence shows that Young's line continued to be recorded pursuant to the normal practice and procedure to continue recording a line until the Chief of Police orders otherwise. It was only after an additional conversation was discovered by DePaepe in July 2011, again acting within the normal scope of her employment in responding to a Freedom of Information Act request, that DePaepe thought she should disclose the conversation to Police Chief Boykins. It was within the ordinary course of law enforcement that Chief Boykins then requested DePaepe to review other recordings and to search for related conversations. Young's line was not actively monitored between February 2011 and late July 2011 to provide Boykins with information to use against anyone.

## CONCLUSION

For the above reasons, the Court should enter a judgment declaring that the recordings at issue were made in the ordinary course of law enforcement and are therefore excluded from the Federal Wiretap Act by 18 U.S.C. § 2510(5)(a)(ii).

/s/Robert J. Palmer
E. Spencer Walton, Jr. (1000-71)
Robert J. Palmer (6316-71)
Attorneys for South Bend Common Council
**MAY • OBERFELL • LORBER**
4100 Edison Lakes Parkway, Suite 100
Mishawaka, IN  46545
Phone: (574) 243-4100
Fax: (574) 232-9789
rpalmer@maylorber.com

## CERTIFICATE OF SERVICE

I certify that a copy of the forgoing was served upon all attorneys of record via the Court's ECF system on October 7, 2014.

/s/Robert J. Palmer
Robert J. Palmer

F:\Clients\S1060\12001\Pleadings - Fed Ct\2014-10-07 Reply to response to post-trial brief.docx10/7/2014

22