UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| CITY OF SOUTH BEND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 3:12-cv-475 |
| | ) | |
| SOUTH BEND COMMON COUNCIL, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

**SOUTH BEND OFFICERS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Respondents Brian Young, Sandy Young, Timothy Corbett, David Wells, and Steve Richmond ("South Bend Officers"), by counsel, file their Proposed Findings of Fact and Conclusions of Law pursuant to this Court's Orders of August 13, 2014, and September 15, 2014.

**Findings of Fact**

1. There are over 100 phone lines in the South Bend Police Department ("SBPD"). (Tr. V. I at 101-102.)

2. It was common knowledge among SBPD employees that the phone lines to the front desk and 911 phone lines were recorded. (Tr. V. I at 101-102.)

3. It was never a practice of the SBPD to record every phone line. (Stipulations ¶ 12; Tr. V. I at 105.)

4. Only three phone lines of 25 to 30 lines in the detective bureau, for example, were recorded. (Tr. V. II at 56.)

5. Only the SBPD Chief of Police could issue an order to record individual officers' private phone lines. (Tr. V. I at 81.)

6. The SBPD had an employee manual for dispatchers. It stated, among other things, that all lines from dispatch were recorded and kept for three years. It stated that the dispatchers were not to use the dispatch lines for personal calls, and they were not to use profane language while on those lines. (Tr. V. I at 35-36.)

7. The SBPD had no written manual for communications supervisors or directors. (Tr. V. I at 33-34.)

8. Officers in the SBPD had no formal training, advisement, or manual regarding phone lines. (Tr. V. II at 10.)

9. Steve Richmond's experience was representative of other officers in the SBPD. He first became aware that certain the radio room and the front desk were recorded as a cadet in 1973. (Tr. V. II at 7.) But during his time as a command staff officer (meaning captain and above), even Richmond was unaware of the routine and/or course of business of recording individual phone lines. (Tr. V. II at 19.)

10. In fact, Richmond used a digital recorder when he was division chief because he did not know that he could make a request to have his personal phone line recorded. He would have preferred, however, the digital recorder to any 24/7 recording due to certain sensitive conversations that required security clearance. (Tr. V. II at 10, 14-15.)

11. In 1998, Karen DePaepe became the SBPD Director of Communications. She held that position until 2012. (Tr. V. II at 109.)

12. Thomas Fautz was SBPD Chief of Police from September 2002 through December 28, 2007. (Tr. V. I at 120.)

13. Fautz was previously a division chief from 1997 through 2002. During that time, there was never written notice of which phone lines were recorded. There was never written notice of procedures for recording phone lines. (Tr. V. I at 125.)

14. In late 2004 or early 2005, Chief Kyle, Chief Hassig, Chief Kilgore, and Chief Horvath requested that then-Police Chief Fautz add their personal phone line to the list of recorded lines in the SBPD voice logger system. (Tr. V. I at 132.)

15. Fautz subsequently approached DePaepe and told her to add the following phone lines to the voice logger system: his own line, the line for the Investigative Division chief, the line for the Uniform Division chief, and Internal Affairs. (Tr. V. I at 130.)

16. During this time, Fautz did not promulgate a procedure for which lines should be recorded, send out memos on the same, any writings on the same, or give any verbal directives on the same. (Tr. V. I at 129-130.)

17. The purpose of adding those lines to the voice logger system was to promote CYA—meaning that if someone was making claims that the SBPD was not following through or reacting to complaints, the SBPD had a way to be able to document what the officers heard and what they did in response to those complaints. (Tr. V. I at 131-132.)

18. Access was restricted to the individuals' phone lines. (Tr. V. II at 117.)

19. In the communications department, only the communications director had access to the personal phone lines that were in the voice logger system because those phone lines belonged to high ranking officers. The phone lines were confidential and private. They were used by individuals, unlike the front desk lines, which were manned 24 hours a day, seven days a week by different people. (Tr. V. II at 116.)

20. Fautz did not intend to establish an ordinary procedure to record all division chiefs' lines. (Tr. V. I at 134.)

21. Fautz did not intend to establish a procedure to always record a certain phone number (e.g., 5990, which was Chief Kyle's phone number). (Tr. V. I at 135.)

22. That a division chief's line could be recorded was offered as a "choice" to the individual. (Tr. V. I at 134.)

23. Fautz cited specifically the expectation of privacy of each individual user as his basis for requiring knowledge and consent prior to recording any individual's phone line. (Tr. V. I at 136.)

24. Fautz would only record an individual's phone line with the person's knowledge and permission. (Tr. V. I at 137.)

25. In January of 2005, Rick Bishop became captain in risk management. (Tr. V. I at 225.) He did not ask for his line, number 6031, to be recorded at that time. (Tr. V. I at 226.)

26. In 2006, Bishop asked Fautz to record his phone line. The reason was that an individual from the public called Bishop continuously. Bishop wanted to build a case against this individual. In order to do so, Bishop thought that the phone conversations needed to be recorded, so he asked Fautz to record his line. (Tr. V. I at 226-228.)

27. By granting Bishop's request, Fautz did not intend to record the 6031 number regardless of the officer who used that line. (Tr. V. I at 170.) Bishop likewise did not expect that the 6031 number would always be recorded no matter who used it. (Tr. V. I at 230.)

28. The 6031 number had not been recorded on the SBPD's recording system until Fautz approved Bishop's request. (Tr. V. I at 235.)

29.     In January of 2007, Bishop became division chief and took the 6031 number with him. He forgot that it was recorded. (Tr. V. I at 228-229.)

30.     If Bishop had remembered that his number was recorded, he would have asked that it not be due to sensitive information that he had on his phone calls as division chief. (Tr. V. I at 231.)

31.     When Bishop was later demoted to captain, he could not bring the 6031 number with him because he was located in a different building. (Tr. V. I at 248-249.)

32.     Darryl Boykins succeeded Fautz as SBPD Chief of Police on December 28, 2007. (Tr. V. I at 183.)

33.     Boykins made no changes to the lines recorded. (Tr. V. I at 184.)

34.     Boykins specifically adopted the approach of Fautz and issued no written or oral directive to create a policy, procedure, practice, or routine, and none was implemented during his tenure. (Stipulations ¶ 15.)

35.     It was Boykins' intent to not record an individual's private phone line without the individual's intention to do so. (Tr. V. II at 184-185.)

36.     Boykins recorded phone lines "on demand" only. (Tr. V. I at 186.)

37.     Under the command of both Fautz and Boykins, there were no general announcements as to recording individual officers' phone lines. There were no written announcements. There were no verbal directives. (Tr. V. I at 130, 196, 224.)

38.     The practice followed by Fautz and continued by Boykins was that the SBPD would only record private phone lines with the person's knowledge and permission. (Stipulations ¶ 15; Tr. V. I at 137.)

39.     In February of 2010, Richmond was promoted and asked for his old 7473 number to follow him into the division chief's office. He asked Barb Holleman to switch his phone number. This move put the 6031 number into Richmond's old office. (Tr. V. II at 11.)

40.     Though Richmond took over Bishop's old office space, his 7473 number was not recorded due to the upstream change in the voice logger system that Holleman's switch activated. (Tr. V. I at 24; Tr. V. II at 55.)

41.     After Richmond was promoted, Brian Young was made a captain in 2010 to replace Richmond. Young was assigned to Richmond's old office. (Stipulations ¶19; Tr. V. II at 64.)

42.     Young inherited Bishop's old 6031 phone line that Bishop had forgotten was still being recorded. (Tr. V. I at 229.)

43.     DePaepe was not asked to record the phone line 6031. She was requested simply to record Bishop's phone line. (Tr. V. II at 201.)

44.     Nobody told Young when he became captain in 2010 that his line would be recorded. (Stipulations ¶ 22; Tr. V. II at 65-67.)

45.     No SBPD police chief authorized Young's line to be recorded. (Tr. V. II at 147.)

46.     No one in the SBPD was aware that Young's line was recorded. (Stipulations ¶ 22.)

47.     There was no legitimate law enforcement purpose to inadvertently record Young's private line. (Tr. V. I at 169.)

48.     Boykins testified expressly that it was not his intent to record Young's phone line. (Tr. V. I at 190.)

49. It was therefore a mistake for Young's line to be recorded. (Tr. V. I at 190; Tr. V. I at 94; Tr. V. II at 147, 189.)

50. Recording Young's 6031 number served no law enforcement purposes because even if important information were recorded on that line, it could not be retrieved specifically because no one in the SBPD knew that the line was recorded. (Tr. V. II at 205.)

51. In 2010-2011, there was a BSOD ("Blue Screen of Death") computer crash for the SBPD voice logger. (Tr. V. I at 64-65.)

52. Troubleshooting was necessary following the crash. The procedure was to reboot the computer. (Tr. V. I at 65.)

53. In February of 2011, the assisting technician requested the department to check the lines. (Tr. V. II at 121.)

54. Only DePaepe could troubleshoot all the recorded lines. Supervisors and assistant director only had access to 911 calls and front desk. (Tr. V. I at 99.)

55. As communications director, DePaepe could access that voice logger directly from her office desk. (Tr. V. II at 109.)

56. On February 4, 2011, DePaepe checked every phone line, which was the only time she did so in the course and scope of her employment. The purpose was to check to see if there was "usable voice." (Tr. V. II at 122.)

57. It took only a few seconds to ensure that data was intact. (Tr. V. I at 100.)

58. DePaepe recognized Young's voice on what she thought was Richmond's line. (Tr. V. II at 125.)

59. DePaepe's first thought was that this was a "malfunction in the system." That malfunction never happened before. (Tr. V. II at 129.)

60. It was in the ordinary course of DePaepe's duties to find out why the malfunction occurred, and when it occurred. (Tr. V. II at 158.)

61. DePaepe did not talk to Young about the malfunction. (Tr. V. II at 132.)

62. DePaepe began to listen to Young's phone conversations. She was not listening to the conversations as part of the data check, but rather to investigate the content of his phone conversations. (Tr. V. II at 142.)

63. DePaepe's surveillance of Young's personal phone line continued without Young's knowledge for about eight months. (Tr. V. II at 192.)

64. DePaepe had no written or verbal instruction to listen to Young's phone conversations, or to investigate the content of Young's phone conversations. (Tr. V. II at 142.)

65. Additionally, it was not in DePaepe's job description as communications director to perform law enforcement investigation of an officer. (Stipulations ¶10; Tr. V. I at 112.)

66. DePaepe was checking lines on her own initiative. She claimed that it was the first time that she checked administrative lines on her own initiative. (Tr. V. II at 151.)

67. In March of 2011, DePaepe told Boykins about the conversations that she was listening to on Young's personal phone line. (Tr. V. II at 149.)

68. DePaepe did not tell Young or her supervisor, Gary Horvath, or internal affairs. (Tr. V. II at 144.)

69. Boykins did not tell DePaepe to fix the malfunction, or to correct the mistake and take Young's phone line off of the voice logger. Boykins did not instruct DePaepe to inform Young or anybody else. (Tr. V. I at 191-192.)

70. Boykins instructed DePaepe to prepare an officer's report on what she heard on those recordings. It took DePaepe a long time to make the officer's report because Boykins

wanted her to find other similar recordings, requiring her to search for recordings and listen to those recordings. (Tr. V. II at 165-166.)

71. DePaepe went on medical leave in August of 2011. (Tr. V. II at 196.)

72. On October 12, 2011, the SBPD had a meeting about switching phone systems from Centrix to a VoIP system. Though DePaepe was on her medical leave, she had prepared a list of recorded phone lines for purposes of that October meeting. (Tr. V. I at 47-48.)

73. It was at the October 12, 2011, meeting that it was discovered and discussed openly for the first time that Young's line was mistakenly recorded. (Tr. V. I at 96, 98.)

74. Captain Phil Trent, who was at the meeting, left the meeting immediately to notify Young. (Tr. V. I at 96-97.)

75. This was the first time that Young discovered that his line was recorded. He had not been previously notified that his phone was recorded, or that he was under investigation. (Tr. V. II at 74.)

76. All told, for 10 months, Young did not know that his line was recorded. (Tr. V. II at 192.)

77. Young asked Trent to discontinue the recording. (Tr. V. II at 74.)

78. Trent reported back to assistant communications director Diana Scott and said that Young's line needed to stop being recorded immediately. The phrase that he used was that the recording needed to be stopped "like yesterday." (Tr. V. I at 96-97.)

79. Later that afternoon, Trent told Young that it was "taken care of," and the recording was stopped (Tr. V. II at 74.)

80. In November of 2011, South Bend held a general election. Pete Buttigieg won the election to become the mayor of the City of South Bend beginning January of 2012. (Tr. V. II at 34.)

81. After the election, division chief Steve Richmond applied for the position of chief of police. (Tr. V. II at 34-39.)

82. In December of 2011, Boykins told DePaepe to make cassettes of the recordings that she listened to on Young's line. (Tr. V. I at 193-194.)

83. The eight telephone conversations captured by the recording system and subsequently reduced to five audio cassette tapes by DePaepe occurred on February 4, 2011; April 5, 2011; June 3, 2011; June 6, 2011; June 16, 2011; June 27, 2011; July 14, 2011; and July 15, 2011. (Stipulations Doc. No. 155.)

84. On January 6, 2012, Boykins confronted Richmond and said that Boykins no longer considered Richmond a "loyal" employee. He considered Richmond a backstabber. Boykins told Richmond that Boykins was informed that Richmond was disrespectful during the interview with the mayor. (Tr. V. II at 49-50.)

85. On January 17, 2012, Young learned from Scott that his phone line was still being recorded, even though he asked that the recording be stopped. (Tr. V. II at 74-75.)

86. The same day, Young asked Boykins if there was a reason for his phone line being recorded. Boykins answered that he felt stabbed in the back. Boykins said it had nothing to do with Young's job performance. Boykins said instead that it had everything to do with whom Boykins could trust. (Tr. V. II at 99-100.)

87. Boykins told Young that in four to six weeks he would discipline or demote or terminate employees. (Tr. V. II at 100.)

88. Young understood the things that Boykins said to him as a threat to his career. (Tr. V. II at 100.)

89. On January 17 and 24, 2012, Boykins similarly told Richmond that Boykins listened to the tape and wanted to see if Richmond would "man up" to what Boykins heard him say. (Tr. V. II at 59.)

90. Richmond, harassed and intimidated, started looking for a new job due to Boykins's threats. (Tr. V. II at 60-61.)

91. On January 24, 2012, Boykins talked to Young. Boykins said that they needed "to put this behind us." Boykins also said that in a year's time, he would start to demote or discipline or terminate employees. (Tr. V. II at 101.)

92. Young felt intimidated by this conversation. (Tr. V. II at 101.)

93. At no time was Young informed that he was under internal investigation. (Tr. V. II at 84.)

94. Young was never informed of any investigation launched against him because in fact there was no internal investigation by internal affairs or any other duly appointed body pursuant to any policies or procedures of the SBPD. (Tr. V. II at 198-199.)

95. Young was upset that his line was recorded because he was not given prior notice. (Tr. V. II at 89-90.)

96. Young thought that it was intentionally concealed from him that his phone line was being recorded. (Tr. V. II at 85.)

97. DePaepe acknowledged that the SBPD's approach to recording individual officers' private phone lines—whether called a policy or practice or routine—was not adhered to

in Young's case. Rather, recording Young's phone line was "making a change" or "doing it a different way." (Tr. V. II at 192.)

98.  There was no law enforcement purpose to taping Young's line prior to its discovery by DePaepe. But after listening to the recordings, Boykins determined that there might be a law enforcement purpose in continuing to record the line. (Tr. V. I at 194-196; 217-218.)

## Conclusions of Law

1.  Under the Federal Wiretap Act, it is illegal to intentionally intercept wire communications, and it is illegal to intentionally disclose the contents of any wire communications that were obtained through such an interception. 18 U.S.C. § 2511.

2.  DePaepe acted intentionally under the Act because DePaepe became aware of the inadvertent recording of Young's private phone line, she had the power to stop it, and she failed to do so. *See Narducci v. Village of Bellwood,* 444 F. Supp. 2d 924, 935-936 (N.D. Ill. 2006).

3.  The City of South Bend proved by a preponderance of the evidence that the recordings at issue in this case constitute a *prima facie* violation of the Federal Wiretap Act. *See Amati v. City of Woodstock,* 176 F.3d 952, 954 (7th Cir. 1999).

4.  The law enforcement exception of the Federal Wiretap Act nevertheless excludes from the definition of "electronic, mechanical, or other device" any telephone instrument that is used by an investigative or law enforcement officer in the ordinary course of his duties. 18 U.S.C. § 2510(5).

5.  *Ordinary* refers to routine noninvestigative recording of telephone conversations. *Amati,* 176 F.3d at 955.

6.  The SBPD did not have an established policy of recording individuals' phone lines. *See Abraham v. County of Greenville, S.C.,* 237 F.3d 386, 389 (4th Cir. 2001) (holding that

the law enforcement exception did not apply where there was no department policy that all phone calls are recorded and/or monitored).

7. Recording Young's personal phone line was not "routine" under *Amati* because the SBPD's routine was to record individuals' lines on demand only, with the knowledge and consent of the user.

8. Recording Young's personal phone line was not "noninvestigative" under *Amati*. Though Boykins acknowledged that there was no law enforcement purpose to record Young's line before he discovered that it was recorded, Boykins determined that there was an investigative purpose behind continuing to record Young's line after Boykins learned of the content that was intercepted on that line.

9. The SBPD's use of electronic eavesdropping in this case was as a tool of a warrantless investigation and as a device for intimidation, suppression of criticism, blackmail, and embarrassment. *See Amati,* 176 F.3d at 956.

10. The Common Council failed to prove by a preponderance of the evidence that the law enforcement exception excuses the illegal interception of Young's private phone conversations.

11. The South Bend Officers have a substantial privacy interest in preventing the disclosure of recordings of conversations, which they had every reason to think were private and personal. This privacy interest is the very interest that the Federal Wiretap Act was designed to protect. *See Gelbard v. U. S.,* 408 U.S. 41, 48 (1972).

12. The Common Council produced no evidence that it has a countervailing Constitutional interest in the disclosure of the recordings.

13. The City of South Bend is entitled to a ruling that the Wiretap Act applies to the recordings at issue.

14. The City of South Bend and the South Bend Officers are entitled to a permanent injunction prohibiting disclosure of the recordings.

Respectfully submitted,

Dated: October 7, 2014                /s/ Daniel H. Pfeifer  
                                       Daniel H. Pfeifer (5720-71)  
                                       Jeffrey J. Stesiak (16876-46)  
                                       Jerome W. McKeever (30022-71)  
                                       Attorneys for Respondents  
                                       PFEIFER, MORGAN & STESIAK  
                                       53600 North Ironwood Drive  
                                       South Bend, Indiana 46635  
                                       (574) 272-2870  

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 7, 2014, a copy of the foregoing was served upon all counsel of record via the Court's electronic filing system.

                                       /s/ Daniel H. Pfeifer