UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| CITY OF SOUTH BEND, | ) | |
| Petitioner, | ) ) ) | |
| vs. | ) ) | |
| SOUTH BEND COMMON COUNCIL, TIM CORBETT, DAVE WELLS, STEVE RICHMOND, BRIAN YOUNG, AND SANDY YOUNG. | ) ) ) ) | CASE NO. 3:12-CV-475-JVB-CAN |
| Respondents. | ) ) | |

**REPLY IN SUPPORT OF THE CITY OF SOUTH BEND'S POST-TRIAL BRIEF**

The petitioner, the City of South Bend (the "City"), by counsel, pursuant to the Court's post-trial briefing schedule, now submits its reply in support of its Post-Trial Brief.

**INTRODUCTION**

Absent any evidence of a routine, non-investigative purpose for intercepting Young's conversations, the Council casts aside objective standards for application of the law enforcement exclusion. Instead, in order to carry its burden, it relies on the mere fact that "all recorded calls were to and from the police department." Of course, *Amati* and other legal authorities contradict this position and require routine, non-investigative recording along with implicit notice to qualify for the exclusion. Since the Council knows it cannot meet that standard, its response brief ignores the trial testimony in this case, which clearly indicates no routine, non-investigative purpose existed for intercepting Young's calls and the interception was in contravention of the police chief's own protocol because it lacked notice (explicit or implicit). Applying the law enforcement exclusion based solely on the fact that a *police department* operated the recording device and devoid of the evidence required by *Amati* strikes a blow against the very purpose of

US.54954640.03

the Wiretap Act. Accordingly, the recordings subpoenaed by the Council are subject to the protections of the Wiretap Act and cannot be disclosed.

## ARGUMENT

Despite seventy pages of argument, the Council's efforts to shoehorn this case into *Amati v. City of Woodstock* amounts to the assertion that the mere fact that it was a *police department* recording its officers constitutes compliance with the law enforcement ordinary course exclusion. Such a broad interpretation of *Amati*—which in fact requires a routine, non-investigative purpose for interceptions to qualify for the exclusion—cannot be sustained. Accordingly, the law enforcement exclusion does not apply and the recordings are subject to the Wiretap Act.

> **I. The Council has failed to establish a routine, non-investigative purpose and implicit notice regarding the interception of Young's conversations.**

All parties agree that the Council bore the burden of establishing that a law enforcement officer acting within the ordinary course of his duty intercepted Young's telephone calls. The Seventh Circuit in *Amati* makes clear that this law enforcement exclusion is satisfied where calls are intercepted pursuant to a routine, non-investigative purpose with implicit notice. The trial record utterly fails to establish that the interceptions were routine and non-investigatory and fails to prove any implicit notice existed.

> a. *That "all recorded calls were to and from the police department" is insufficient to establish an ordinary course routine for recording Young's Assigned Line.*

The Council seeks to carry its burden of establishing the law enforcement exclusion based on the mere fact that "all recorded calls were to and from the police department." *See, e.g.*, Council's Br., at 3, 11. Accepting this sweeping contention ignores the well-established

legal principles for applying the exclusion.[1]  The Council itself acknowledges the complete lack of any written or unwritten policy, procedure, routine, or announcement of any kind to guide the personal discretion of the police chief.  Moreover, the Boykins' informal protocol that existed regarding the recording of Assigned Lines was completely violated by the recording of Young's Assigned Line without his knowledge.  Tr. Vol. I 136:9-12; 185:4-7; 187:1-4; 190:17-21; 213:20-22.  These two facts alone prevent the application of the exclusion because they are logically inconsistent with the very meaning of a routine or regular course or procedure.  *Cf. In re Google Inc.*, 13-MD-02430-LHK, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013) (holding 18 U.S.C. § 2510(a)(ii) ordinary course exclusion inapplicable where the company violated its own internal policy); http://dictionary.com (defining "routine" as "a customary or regular course of procedure.").

As the Council's own authorities reveal, and particularly *Amati*, the exclusion applies when a standard exists.  And, where a department's standard includes the recording of *all* calls, the exclusion can be established.  *See, e.g., Amati v. City of Woodstock*, 176 F.3d 952, 954 (7th Cir. 1999) (stating that "[i]t is routine, standard, hence 'ordinary' for *all calls* to and from the police to be recorded" and that "[t]o record *all calls* to and from a police department is, for the reasons explained earlier, a routine police practice.") (emphasis added).  Accordingly, the *Amati* court set its "boundary" between the routine, non-investigative use of a recording device and its use as a tool for investigation or other improper purposes.  *Id.* at 956.  And it concluded only that "the evidence *did not compel the jury to find* that the defendants crossed this boundary."  *Id.* (emphasis added).  In that context, the court acknowledged that it was reasonable for the jury to

---

[1] The Council simultaneously accuses the City of "pick[ing] isolated sentences" from cases.  Council's Br., at 2.  A review of the relevant legal authorities reveals that it is the Council that "cherry picks" while the City has relied on the fundamental legal principles set forth in those cases and has applied them to the facts of this case.

3

find that the ordinary course exclusion applied when a single unrecorded line for personal calls was deliberately brought within the police department's policy of recording *all* lines.  *Id.*

Those circumstances, however, did not occur in the recording of Young's line.  The Police Department did not have a universal routine of recording all calls to and from the Police Department.  Pre-Trial Order ("Stip."), at ¶ F(1).  It did not have any written or unwritten policy or procedure with respect to Assigned Lines.  Stip., at ¶ F(11).  It made no announcement.  Tr. Vol. I 196:21-23.  It did not initially make any sort of decision to record Young's Assigned Line.  Stip., at ¶ F(22).  When DePaepe and Boykins deliberately allowed the recording to continue, they did so in direct violation of Boykins' informal protocol for recording Assigned Lines only with actual notice.  Tr. Vol. I 216:23-217:5.  And the continued recording was for an express purpose that puts the recordings squarely on the wrong side of the *Amati* boundary:  to investigate Young.  Tr. Vol. I 217:18-25; 218:1-4.  No matter how hard the Council tries, the shoe simply doesn't fit.

*Amati's* "boundary" confirms that there must be a routine, non-investigatory determination for recording calls even when the recordings involve "only lines to and from the police department."  The court in *Abraham v. Cnty. of Greenville* provides more insight into that boundary and the Council's attempt to distinguish it into irrelevancy because it involved the recording of judges must fail.  The *Abraham* court's interpretation of the law enforcement exclusion did not hinge solely on separation of powers issues as the Council suggests.  *Abraham v. Cnty. of Greenville,* 237 F.3d 386, 390 (4th Cir. 2001).  Instead, it confronts three issues that are relevant here:  an alleged mistaken recording of phone lines, a lack of any acceptable policy or routine for recording the conversations at issue, and a framework for analyzing different

4

categories of phone calls recorded on a single recording system.  *Id.* at 389-91.  All three issues are resolved in ways that dictate the law enforcement exclusion should not apply in this case.

First, the court determined that because "the law enforcement [exclusion] lacks a good faith component," inadvertent recordings are not a legitimate surveillance activity.  *Id.* at 390-91.  This reasoning comports with basic logic and is equally applicable in this case where the recordings were initially inadvertent.  Young simply could not have been recorded in the ordinary course of any routine in the absence of any intent to record the line or instruction from Boykins to record either Young or that particular office.  Tr. Vol. I 187:18-24) ("Q.  And you never directed [DePaepe] at any point to record a particular officer?  A.  Right, I never told her.  Q.  Or a particular office?  A.  No, never told her.").  As Boykins conceded, recording a line without anyone's knowledge can serve no legitimate law enforcement purpose.  Tr. Vol. I. 217:18-25 to 218:1-4 (agreeing that "there was no law enforcement purpose to recording Brian Young's line . . . at the beginning when it was by mistake directed to his office.").

Second, the *Abraham* court concluded the law enforcement exclusion did not apply where "[t]he County did not have an established policy of monitoring the plaintiffs' calls."  *Id.* at 389-90.  The mere fact that Young was not a judge does not allow the Council to escape the fact that no policy or routine justified the recording of his phone calls.

Third, *Abraham* instructs that the recording routine must apply to the category of phone call that is asserted to be subject to the law enforcement exclusion.  *Id.* at 390 ("[T]he courts 'have considered different categories of phone calls recorded by a single recording system separately for the application of the law enforcement [exclusion].'").  The Police Department had entirely different approaches to recording the front desk and emergency lines than it did for Assigned Lines.  Tr. Vol. I 33:22-34:6; 36:1-37:7 (testimony establishing that all lines as the

US.54954640.03

front desk and dispatch center were routinely recorded pursuant to written training manual and that all front desk and dispatch personnel were informed of the recording). Even DePaepe conceded at trial that the Assigned Lines were handled differently than the emergency and front desk lines at the Police Department. Tr. Vol II 114:2-12; 116:13-17 (affirming that the Assigned Lines "are handled differently from the other lines . . ." and that they were handled differently "because they were more confidential."). Thus, *Abraham* confirms that a routine applicable to communications dispatchers / front desk personnel and that does *not* apply to Young's Assigned Line cannot be used to justify the recording of his conversations. For these reasons, the Council has failed to establish an ordinary course routine justifying the recordings.

> b. *The interceptions lacked the implicit notice required under the exclusion*

Furthermore, because the Police Department lacked any discernable routine for Assigned Lines, implicit notice to Young that he might be recorded in violation of the police chief's own protocol was not possible. The Council rejects the requirement to show implicit notice, contending that "the mere fact that the recordings involved only lines to and from the police department is sufficient implicit notice under *Amati*." Council's Br., at 6. The argument might have merit where, pursuant to a policy, calls were routinely and indiscriminately recorded on all lines to and from the Police Department as in *Amati*. *Amati*, 176 F.3d at 955. It seems logical enough that when a police department follows a routine for the universal recording of all of its phone lines, "[s]uch recording will rarely be very invasive of privacy [because] what is ordinary is apt to be known; it imports implicit notice." *Id.* (emphasis added). But when routinely recording "all" lines is impossible and only a few Assigned Lines are recorded with specific consent, the mere fact that a police department intercepted the conversations imports no implicit notice at all of the possibility of a *private* Assigned Line being recorded. To hold otherwise

6

would render the law enforcement exclusion as a nationwide, federally imposed regulation, *i.e.*, all police departments have the authority to record any line at any time merely because they are police departments.  The text of the §2510(5)(a)(ii) cannot support that and the legislative history is, of course, just the opposite.

Knowing that some type of notice is required, the Council asserts that the "universal knowledge" or "common knowledge" of officers in general that calls to and from police departments are recorded functions as notice.  Council's Br., at 6, 14, 17.  Even if the Council could point to some legal authority to support this notion (which they cannot), in the case at bar the testimony establishes that some officers had knowledge of the recording of emergency and front desk lines, but only that.  *See, e.g.*, Tr. Vol. I 44:2-46:12; 200:7-12; 224:14-21; 225:3-6; Tr. Vol. II 10:8-25; 11:1-4: 65: 2-19; 67:6-17.

The trial testimony also confirmed that the Police Department made no announcement, established no procedure, routine, produced no writing, and never established an ordinary course regarding the recording of any lines other than the front desk and 911 lines.  Mere "suspicions of lines be[ing] recorded" and "paranoi[a] about being recorded or being taped" do not constitute implicit notice of a recording routine that could apply to a particular Assigned Line.  Tr. Vol. I 199:6; 200:7-12.  In the absence of any indiscriminate routine at the Police Department, Young had no reason to suspect his line might be recorded based on unspecified "common knowledge" regarding recording of police lines at unknown police departments.

Moreover, not even a generalized knowledge existed regarding the recording of *Assigned Lines* and the only protocol that would permit recording such lines required notice.  Tr. Vol. I 185:4-7; 187:1-4; 190:17-21; 213:20-27.  Thus, it is an established fact in this case that Young's

7

line was recorded without being provided such notice, first inadvertently and then for the purposes of investigating the content of his conversations.  Tr. Vol. II 73:25-74:17.

The Council attempts to turn the lack of any announcement by the Department in its favor by unjustifiably reducing *Amati* down to the proposition that a police department must "announc[e] that its lines are *not* being recorded and then recor[d] the lines in an attempt to trick people into making damaging admissions over the phone."  Council's Br., at 4 (emphasis added).  Thus, the Council reasons, with no announcement and only "uncommunicated personal policies of the Police Chiefs," notice was sufficient because no trickery was involved.  Council's Br., at 8.  This position effectively concedes what is obvious from the trial testimony—in the absence of any discernable routine, the officers also had no reason to conclude that their lines were being recorded, and therefore no notice.

The Council cannot satisfy its burden of showing a routine capable of providing adequate notice by relying on the mere fact that some calls were recorded, particularly when the recordings at issue were captured outside of that routine and in violation of the police chief's own protocol.  The Council's position places a duty of inquiry on Young who received an Assigned Line without any idea that it could be recorded.  Tr. Vol. II 67:6-17 (testifying that he was not aware of any writing, announcement or routine regarding individual lines).  Neither the text of § 2510 nor the case law interpreting it have ever suggested that the party meant to be protected from an unknown interception must ask if his calls are being intercepted in order to have his privacy protected by the Wiretap Act.[2]

---

[2] Furthermore, the Department's lack of *active* concealment cannot establish the exclusion.  *See* Council's Br., at 16.  As the undisturbed portion of the *Abbott* district court opinion reveals, the law enforcement exclusion cannot be demonstrated merely by showing that, if asked, DePaepe or the Chief would have told Young his line was being recorded.  *Abbott v. Vill. of Winthrop Harbor*, 93-cv-4642, 1998 WL 433772, at *3 (N.D. Ill. July 29, 1998) *rev'd on other grounds*, 205 F.3d 976 (7th Cir. 2000) (holding law enforcement exclusion inapplicable when, among other

> c. *The actions of Boykins and DePaepe not only fail to establish a law enforcement routine, but confirm the recordings were not in the ordinary course.*

The Council, relying on *Jandak*, asserts that it is a proper law enforcement purpose for a chief to listen to recorded conversations upon a reasonable suspicion of wrongdoing. Council's Br., at 8. It further asserts that the law enforcement exclusion applies because DePaepe was acting within the scope of her duties when she listened to the recordings and retrieved them for Boykins. Council's Br., at 5. Each of these assertions begs the question by assuming the conversations were intercepted in the ordinary course in the first instance. The Wiretap Act prohibits *interceptions* without express authorization under the statute. *See* 18 U.S.C. §§ 2510-2517. The act of listening to the recordings, of course, occurs after the recordings have been captured. Thus, the court in *Jandak* properly rejected the possibility that post-interception conduct can justify application of the exclusion to a recording *ex post facto*. *See Jandak v. Village of Brookfield*, 520 F.Supp. 815, 823 (N.D. Ill. 1981). Specifically, the court dispatched the defendants' argument that the exclusion justifies the blanket eavesdropping using a recording

---

things, the police chief informed his supervisor of communications "that anyone who asked them if the line was recorded could be told 'yes.'"). Nor does *Jandak* support the Council's argument that notice was adequate because the recording of Young's line was purportedly *not* secret. *Jandak* notes that "courts have generally allowed monitoring where done for a clearly legitimate purpose *with notice* to the conversants" and have not permitted it "where the parties had no notice of the possible monitoring or its was done for illicit purposes." *Jandak*, 520 F.Supp. at 823-24 (emphasis added). In *Jandak*, the call at issue was placed by a communications officer on one of the nine routinely recorded lines, which the court found were recorded for proper purposes. *Id.* at 824-25. Thus, unlike in this case, the call intercepted in *Jandak* was a personal call incidentally captured on a routinely recorded line. *Id.* at 824 ("[t]he routine recording of all calls made on the investigative line was thus for reasons well within the proper scope of law enforcement."). Even with routine recording of calls at the police department, the court found the issue of notice "much more troubling." *Id.* Ultimately, however, the court found that the officer had adequate notice based on the fact that he was a *communications officer* that had been assigned to the communications desk near the recording equipment as part of his regular duties. *Id.* at 818, 824. The court elaborated that "[i]n other circumstances, such as where parties who are not communications officers of the police department are using the phone with authorization, the degree of notice provided here would be *less than adequate*." *Id.* at 824 (emphasis added). Accordingly, for the additional reason that the special circumstances that were present in *Jandak* are absent here, the Council has failed to make any showing that implicit notice of a non-existent recording routine is possible.

device at a police department merely because a police chief was acting in the ordinary course of his duties when he *listened* to the recordings as follows:

> According to this theory, whenever a police officer is engaged in an investigation, and regardless of the kind of equipment he uses, he is exempted from the statute by this subsection. If the statute did not apply whenever a law enforcement officer was acting in the ordinary course of his duties as this phrase is construed by defendants, then the whole statutory scheme, providing procedures and standards for when and how law enforcement officers may get court orders for electronic eavesdropping, would be rendered meaningless.

*Jandak*, 520 F.Supp. 823. The court concluded that this interpretation of ordinary course was "unduly broad." *Id.*

Similarly here, the Council's assertion that it was within the ordinary course of Boykins' duties to review the recordings does not establish an ordinary course routine for *intercepting* them in the first instance. The Council seems to concede as much when it states that "[l]egally, Boykins' actions after the recordings were made are immaterial." Council's Br., at 25. While those actions cannot retroactively establish a routine for recording Young in the first instance, Boykins' actions were not entirely immaterial. Rather, they are probative of Boykins' improper purposes for allowing the continued recording of Young without his notice and outside of any putative routine. Boykins' subsequent use of the cassette tapes (retrieved by DePaepe at his instruction) to intimidate and threaten Young and others confirms that his interest in the continued recording was *non*-routine and investigatory. These actions are directly in contravention of the Act. Likewise, DePaepe's unmonitored "troubleshooting" and subsequent unauthorized investigation, along with her failure to inform Young or anyone else of the interceptions, confirms the law enforcement exclusion is inapplicable. *Cf. Narducci v. Vill. of Bellwood*, 444 F. Supp. 2d 924, 935 (N.D. Ill. 2006) *aff'd sub nom. Narducci v. Moore*, 572 F.3d

313 (7th Cir. 2009) (holding that awareness of a recording scheme and failure to stop it is tantamount to an intentional interception). Furthermore, DePaepe's actions *post discovery* provides ample justification to question the credibility of her various explanations.[3]

### d. The continued recording of Young in contravention of Boykins' protocol was for improper investigative purposes.

In addition to failing to comply with any routine, the interception of Young was investigatory. The Council's contention otherwise relies again on the mere fact that the recordings to and from the police department are "a routine police practice, and not an investigation." Council's Br., at 3. This is precisely the expansive interpretation of the ordinary course exclusion that *Amati* cautioned against when it established a boundary "between routine noninvestigative uses of electronic eavesdropping and its use *either* as a <u>tool of investigation</u> (which requires a warrant) *or* as a device for intimidation, suppression of criticism, blackmail, embarrassment, or other improper purposes." *Amati*, 176 F.3d at 956. The evidence that

---

[3] Nor does the City concede what the Council calls undisputed—i.e., that DePaepe performed within the scope of her employment with respect to Young's recordings. DePaepe's troubleshooting, the only task she performed consistent with her job duties, required her to listen to only a few seconds of each recording to determine if she had usable data. Tr. Vol. I 120:21-121:6; 124:2-10. She testified that she recognized Young's voice within these few seconds and, accordingly, confirmed that she had usable data on that line. Tr. Vol. II 125:19-22; 126:24-127:2 (testifying that she recognized Young's voice within a few seconds and at that time knew what she needed to know for the purposes of her troubleshooting). DePaepe had no authority or basis to continue listening to recordings on Young's line for her own purpose of investigating either the switching of the lines or the content of his conversations. Tr. Vol. II 124:24-25; 178:18-179:6; 180:20-21. There were myriad ways she could have investigated the switching of the lines without listening to improperly captured phone conversations beyond the scope of her troubleshooting duties if that was her intention—checking the phone directory, asking Young, or dialing the number, to name a few. Additionally, DePaepe had no basis to listen to *any* Assigned Lines in response to a media request that was plainly for 911 audio. Ex. 16 (FOIA request seeking "a copy and/or transcription of the 911 call or complaint . . ."); Ex. 15 (letter from City's counsel to Nancy Bruce instructing her to call DePaepe for a copy of the recording "if there was such a 911 call . . ."). She would have had no basis to disclose recordings of an investigative division captain in response to a media request. And she particularly had no basis to believe that she could have disclosed to the media Young's recordings when she had known for at least five months at that point that his line was being recorded in direct violation of Boykins' practices. As in *Abbott*, there exists sufficient evidence in the record to conclude DePaepe's explanations are pre-textual. The more credible explanation for her actions was that she discovered the additional recordings because Boykins "ordered DePaepe to review the recording of line 6031 and to provide him with copies of the recordings on the topic that DePaepe found to be disturbing." Council's Br., at 21.

11

eavesdropping was used as a "tool of investigation" in this case is undeniable. DePaepe admitted that she initiated her own, unsupervised investigation into the content of Young's recordings. Tr. Vol. II. 141: 17-25; 142: 1-17. Boykins admitted that he permitted the continued recording of Young's line to further the investigation started by DePaepe in violation of his own protocol and without informing Young. Tr. Vol. I 214:12-14; 216:23-217:5. Indeed, Boykins testified that the continued recording of Young to investigate his conduct *was* the law enforcement purpose for recording his line. Tr. Vol. I. 217:18-25 to 218:1-4. Lacking any warrant, or even the procedural safeguards of a formal Internal Affairs investigation, the targeted recording of Young for the purposes of investigating him is precisely the conduct that is prohibited by the Act. *Amati*, 176 F.3d at 955 (communications recorded to "further a particular investigation or target a particular individual" expressly do not fall within the law enforcement exclusion); *Narducci v. Vill. of Bellwood*, 444 F. Supp. 2d 924, 936 (N.D. Ill. 2006) *aff'd sub nom. Narducci v. Moore*, 572 F.3d 313 (7th Cir. 2009) ("But a communication is not viewed as having been recorded in the 'ordinary course' of an officer's duties if it is done to further a particular investigation or target a particular individual"), *citing Amati*, 176 F.3d at 955-56. The Police Department doesn't get a special pass for this type of activity merely because it is a police department.

Whether DePaepe was actively monitoring the recordings in real-time is of no moment. As noted, the relevant inquiry is whether the calls were *intercepted* by a law enforcement officer in the ordinary course of his duties. *See* 18 U.S.C. 2510(4) and (5)(a)(ii). The subsequent use of the intercepted conversations in violation of the Wiretap Act is probative of Boykins' and DePaepe's investigatory intent, but fails to establish that the interceptions themselves occurred in the ordinary course. Rather, the circumstances surrounding the interception of Young's conversations establish just the opposite. Their collective failure to give notice or stop the

recording, in violation of Boykins' protocol, confirms that no routine, non-investigative reason existed for the interceptions. Contrary to "destroy[ing the City's] argument that DePaepe and Boykins acted together to actively investigate all of Young's telephone calls," the investigation of Young and subsequent improper use of the recordings solidifies that the exclusion is inapplicable. *Amati*, 176 F.3d at 955 (communications recorded to "further a particular investigation or target a particular individual" expressly do not fall within the law enforcement exclusion); *see also* Council's Br., at 22.

> II. **Because the recordings are subject to the Wiretap Act, they may not be disseminated.**

Because the recordings were not captured in the ordinary course of the Police Department's law enforcement activities, they are subject to the protections of the Wiretap Act and cannot be disclosed. Pursuant to the Wiretap Act, interceptions are *authorized* only in accordance with the procedures set forth in the Act. 18 U.S.C. § 2516 (Authorization for interception of wire, oral, or electronic communications). Even authorized interceptions may be used or disclosed only in certain specific instances. 18 U.S.C. § 2517 (Authorization for disclosure and use of intercepted wire, oral, or electronic communications). Thus, "Title III does not forbid all nonconsensual electronic eavesdropping, of course, but it does require a warrant for electronic eavesdropping that is not within one of the exclusions." *Amati*, at 956 (citing 18 U.S.C. § 2516; *United States v. Cunningham*, 113 F.3d 289, 293-95 (1st Cir. 1997)). Because the recordings here were not authorized under the Act, they cannot be freely used or disclosed whether they were inadvertent or the product of a surreptitious investigation of Young. *United States v. Dorfman*, 690 F.2d 1230, 1232 (7th Cir. 1982) ("But by permitting disclosure of lawfully obtained wiretap evidence *only under the specific circumstances listed in 18 U.S.C. s*

*2517, Title III implies that what is not permitted is forbidden*, though not necessarily under pain of criminal punishment.") (emphasis added) (internal citations omitted).

Young's conversations, including those on February 4, 2011, cannot be excluded from the Act based on the law enforcement exclusion for the reasons set forth in the City's briefing. Even accepting *arguendo* the February 4, 2011 recordings were truly inadvertent,[4] they were nevertheless not authorized by the Act by having been obtained pursuant to 18 U.S.C. § 2516. Accordingly, even if civil or criminal liability does not attach to the inadvertent recording of some of his conversations, those conversations still cannot be used or disclosed unless the use or disclosure is specifically authorized by the Act. *See Dorfman*, 690 F.2d at 1232; 18 U.S.C. § 2517. There is simply no basis under the statute—and the Council provides none—for the disclosure of a private conversation intercepted by a third party and not authorized under the law.

## **CONCLUSION**

The law enforcement ordinary course exclusion has no application under the facts of this case as the Council has failed to establish the existence of a routine, non-investigatory reason for the recordings. Indeed, each of the recordings occurred in violation of the police chief's own informal policy and to further a targeted investigation of Young. The police chief's unfettered discretion untethered to any policy and in violation of his own practices cannot override a statutory scheme designed to protect the very privacy interests that he decided to disregard. Because the law enforcement exclusion is the only defense raised to the interception of calls on

---

[4] Recall, as detailed by the City in its response brief [Doc. Entry No. 172] that in DePaepe's previous sworn testimony she described discovering the recording error in *January* of 2011, *not* on February 4th. Tr. Ex. 38: Doc No. 108, Ex. A: Affidavit of Karen DePaepe, ¶ 16 ("It was during this period of time in January 2011 when I was checking to see if the system was operating after numerous repairs that I discovered the first of the conversations which were subsequently recorded and given to Chief Boykins."); *see also* Pre-Trial Order, ¶ F(23) (same). Thus, the Court need not and should not accept the Council's contention that the February 4 conversation was undisputedly *after* DePaepe had discovered the wrongful recording of Young.

14

Young's line, the Court must find that the Wiretap Act applies to the recordings subpoenaed by the Council. The Council has failed to show any authorized purpose for the use or disclosure of the recordings. Accordingly, the Court should enter a declaratory judgment restricting disclosure of the recordings pursuant to and consistent with the Act.

>Respectfully Submitted,
>
>FAEGRE BAKER DANIELS LLP
>
>s/ Edward A. Sullivan, III
>Edward A. Sullivan, III (17577-71)
>Ryan G. Milligan (28691-71)
>J.P. Hanlon (21230-71)
>FAEGRE BAKER DANIELS LLP
>202 S. Michigan St., Suite 1400
>South Bend, Indiana 46601
>edward.sullivan@faegrebd.com
>ryan.milligan@faegrebd.com
>jphanlon@faegrebd.com
>
>*Counsel for City of South Bend*

## CERTIFICATE OF SERVICE

I certify that on the 7th day of October, 2014, a copy of the foregoing was served upon all counsel of record via the Court's electronic filing system.

>s/ Ryan G. Milligan