UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| CITY OF SOUTH BEND, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SOUTH BEND COMMON COUNCIL, TIM | ) | CASE NO. 3:12-CV-475-JVB-CAN |
| CORBETT, DAVE WELLS, STEVE RICHMOND, | ) | |
| BRIAN YOUNG, AND SANDY YOUNG. | ) | |
| | ) | |
| Respondents. | ) | |

## THE CITY'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court for a decision on the merits following a two-day bench trial that was conducted on August 12-13, 2014. The Court, having considered the entire record, including the testimony presented at trial, exhibits, designated deposition transcripts in the records, and the parties' stipulations, now enters the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## JURISDICTION AND PARTIES

1.     The Court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331 as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as set forth in more detail in the Court's January 14, 2013 Opinion and Order [Doc. Entry No. 51] and its August 11, 2014 Order [Doc Entry No. 156].

2.     The City of South Bend (the "City") is a political subdivision located in the Northern District of Indiana. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Fed. R. Civ. P. 57, the City seeks a declaratory judgment declaring the legal status of recordings of certain phone conversations that were intercepted by the South Bend Police Department (the

US.54987424.01

"Police Department") and declaring whether disclosure of the recordings would run afoul of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.* (the "Federal Wiretap Act" or "Act").

3.     The South Bend Common Council (the "Council") is the legislative body of South Bend.   The Council has issued a subpoena to the South Bend City Administration (the "Subpoena"), requesting copies of the recordings.

## FINDINGS OF FACT

### I.     The Police Department's Phone and Recording Systems

1.     The Police Department utilizes well over one hundred telephone lines in its daily operations.  Ex. 20; Tr. Vol. I 39:6-9; 72:25-73:2.  Certain, but far from all, of those telephone lines were recorded by its Dynamic Instruments Reliance server-based analog recording system (the "Voice Logger").  Pretrial Order Stipulations ("Stip."), at ¶ F(2).

2.     The Voice Logger had the capacity to record forty-eight (48) separate channels, with each channel consisting of one phone line, one base station, or one radio channel.  Stip. ¶ F(4).  The Voice Logger was voice activated and would record any conversations that occurred on any telephone line hard wired into the Voice Logger twenty four hours a day, seven days a week.  Tr. Vol. I 43:9-15.

3.     To record a particular telephone line, the telephone line had to be hard wired into the recording system.  Stip, ¶ F(5).  To hard wire a line into the Voice Logger, dual lines would be run from the port for that particular line on the rack in telephone closet A.  *See* Ex. 36.  One of the dual lines would be routed to a punch block in the communications center and into the Voice Logger and the other to the ultimate destination for that particular phone line.   Ex. 36.

US.54987424.01

Hardwiring a line to the Voice Logger thus involved routing lines in telephone closet A and the communications center, both of which were upstream from the panel in telephone closet C.

**II.**     <u>**The Police Department's Approach to Recording Lines**</u>

4.     Although the Police Department necessarily could not and did not record all of its lines, it never developed any written or unwritten policies or procedures regarding the lines that would be recorded by the Voice Logger.  Stip. F(11).

5.     The Police Department had distinct approaches to recording its general use lines at the front desk and emergency dispatch center and its individually assigned lines.

6.     With its general use lines, the Police Department developed a routine pursuant to which it indiscriminately recorded all communications center lines (including 911 calls and a series of ring-down lines) and all front desk lines.  Tr. Vol. I 44:9-45:18; 124:21-125:7; 224:14-21; Vol. II 65:2-13; 113:19-114:1.  The communications center training manual informed dispatchers that all telephone calls placed from the dispatch floor were recorded and kept on file for a period of three years.  Tr. Vol. I 36:1-19.  The communications center provided a break room telephone for personal calls that was not recorded.  *Id.*

7.     The training manual only addressed the communications center and was distributed only to the dispatchers that worked in the communications center.  Tr. Vol. I 36:24-37:12.  As a matter of practice, however, the front desk personnel were orally informed that the front desk lines were being recorded.  Tr. Vol. I 37:6-7.  Thus, the communications center and front desk personnel were aware that these lines were routinely recorded.

8.     These general use lines were recorded in the ordinary course of police business to provide recordings of 911 calls for criminal matters, perform quality assurance checks on dispatchers, document responses, and investigate complaints.  Tr. Vol. I 43:18-25.

US.54987424.01

9.      Because the front desk and communications center were areas of the Police Department that were staffed by various personnel during different shifts, these lines were recorded regardless of user.  The communications center was recorded by "position," meaning that each dispatch position in the communications center might be associated with multiple phone lines but that the position was connected with a single line to the Voice Logger.  Tr. Vol. I 44:15-45:4.

10.      In addition to general use lines, the Police Department had "well over a hundred" individually assigned telephone lines that were provided to officers assigned to specific offices or workstations.  Tr. Vol. I 39:6-9; 122:13-14.  Only a small number of these assigned lines in the Police Department were ever hard wired into the Voice Logger.  *See* Ex. 6 (recorded lines list identifying only ten recorded lines not including front desk and communications center lines). The Investigative Division had twenty five to thirty specifically assigned lines, but only the two publicly listed lines to the Investigative Division secretary had typically been recorded.[1]  *See* Exs. 6 and 46.  Thus, the Police Department did not routinely and indiscriminately record Investigative Division lines.

11.      The parties agree, in contrast to the communications center and front desk lines, there were never any written or unwritten policies, procedures, or routines for determining which of these individually assigned lines were connected to or disconnected from the Voice Logger. Tr. Vol. I 105:6-13; 129:19-22; 161:1-2.  There existed no written guidance on how to handle recording practices and no training was provided.  Tr. Vol. I 129:19-130:14.  No announcement was ever made regarding the recording protocol for these lines and Police Department employees

---

[1] Testimony by Fautz indicated his belief that Division Chief Kyle had requested that his Assigned Line (shown on Exhibit 46 as 574-235-5990) be recorded.  However, the lists of recorded numbers that existed in DePaepe's files did not list his assigned number.  DePaepe testified that Kyle had the publicly listed incoming lines to the Investigative Division (574-235-9263 and 574-235-9264) recorded rather than his private Assigned Line.

and officers had no accurate knowledge concerning which assigned lines were recorded, which were not, and how to become part of the system or be removed from the system.  *See, e.g.,* Tr. Vol. II 18:11-19:4; 148:1-8.  The only uniform knowledge among Police Department employees and officers was that the communications center and front desk lines were routinely recorded. *See, e.g.*, Tr. Vol. I 44:2-46:12; 200:7-12; 224:14-21; 225:3-6; Tr. Vol. II 10:8-25; 11:1-4: 65: 2-19; 67:6-17.

12.      The chiefs of police delegated virtually all administrative functions related to the Voice Logger to Communications Director Karen DePaepe.  DePaepe was the only person in the entire Police Department that knew which numbers were recorded at any given time.  Tr. Vol. II 111:3-10; 148:1-8.

### III.      Discretionary Protocol for Recording Assigned Lines.

13.      In the absence of any policy or procedure in the Department for handling the recording of the individually assigned lines, the then current chief historically exercised his individual discretion regarding recording of various assigned lines.  Tr. Vol. I 81:8-20; Tr. Vol. II 114:13-17.

14.      In 2004, Police Chief Tom Fautz discussed his approach to the recording of Assigned Lines with DePaepe and created an expectation that command staff could use the Voice Logger and that the Police Department would only record their lines with the knowledge and consent of the user.  Tr. Vol. I 130:15-131:3; 136:13-19; 141:10-16.

15.      Pursuant to this protocol, Chief Fautz requested that DePaepe add certain private lines to the Voice Logger in 2004 following a command staff meeting during which Chief Fautz gave his command staff the option to have their private lines recorded.  Tr. Vol. I 130:20-24. Chief Fautz wanted these lines recorded due to scrutiny and criticism the Police Department was

US.54987424.01

facing from the public regarding investigations, complaints, uses of force, and similar things so that the Police Department could document its actions.  Tr. Vol. I 131:4-132:18.

16.     The individually assigned lines were only recorded at the officer's specific request or as a result of a "personal choice" as a "useful tool" for those officers.  133:20-134:1; 136:12.

17.     In providing officers the option to have their individual line recorded on a case-by-case basis, Chief Fautz did not intend to establish any procedure or routine.  Tr. Vol. I 136:5-12.  He did not intend that all administrative lines could be recorded at any time.  136:13-15.  He did not intend to record specific lines regardless of their user because officer's often took their lines with them when they re-located within the Police Department.  165:6-14.  He did not intend to establish a routine of recording anyone without their knowledge because Chief Fautz believed the officers had "an expectation of privacy with their own assigned line."  136:16-22.

18.     Fautz testified that he specifically directed DePaepe concerning this approach, saying:  "I told Karen DePeape that 'they are aware of it. It's with their knowledge and permission,' . . ."  Tr. Vol. I 137:5-6.  Fautz further testified that he "made it clear to DePaepe of [sic] the reason why we're doing this" and DePaepe acknowledged in her testimony and in her Officer's Report that she had a discussion with Fautz about the reasoning for the recording.  Tr. Vol. I 134:14-19; Tr. Vol. II 141:10-16; *see also* Ex. 1A.

19.     Accordingly, the recording of a private line without the knowledge and consent of the person being recorded violated the directive that Chief Fautz issued on this subject.  Tr. Vol. I 170:13-17.

US.54987424.01

IV.     **The Recording of Rick Bishop**

20.     Around 2002, Rick Bishop was assigned the phone line at issue in this case, 574-245-6031.  Tr. Vol. I 224:5-8.

21.     According to Bishop's testimony, around 2005, Bishop requested that his line be recorded in response to threatening phone calls officers were receiving from a certain individual.[2]  Tr. Vol. I 226:13-227:6.

22.     This request and the recording of Bishop's conversations was consistent with the Fautz approach of providing command staff a personal choice to record their lines as a useful tool.

23.     In January 2007, Rick Bishop was promoted to Division Chief of the Investigative Division and re-located to an office in the Investigative Division.  Tr. Vol. I 228:23-229:2.  At that time, he requested that the 6031 number follow him to his new office and the line was moved accordingly.  Tr. Vol. I 229:3-20.  Bishop eventually forgot that his line was being recorded, but did not expect that it would always be recorded no matter who used it.  Tr. Vol. I 230:5-7; 22-25.

V.      **Chief Boykins Continues the Recording Protocol**

24.     When Captain Darryl Boykins began serving as Chief of Police in 2007, he did not make any changes to the Police Department's use of the Voice Logger.  Boykins did not establish any written or unwritten policy or practice regarding the lines to be recorded by the

---

[2] DePaepe initially recalled that Bishop asked to be recorded while assigned to the Investigative Division based on the grouping of his phone number with other Investigative Division numbers on her recording list, but later conceded that her list at the time Bishop's line was added to the Voice Logger did not list the location of numbers and that Rick Bishop's memory was probably more accurate.  Tr. Vol. II 200:1-201:3; 211:14-213:14.  The precise timing of the initial recording of 6031 while it belonged to Bishop is immaterial to the issues before the Court.

US.54987424.01

Voice Logger.  Stip. F(13)-F(15); Tr. Vol. I 185:4-7.  He also made no general announcement regarding recorded lines.  Tr. Vol. I 196:21-23.

25.     The routine recording of all communications center and front desk lines continued under Boykins.  With respect to individually assigned lines, Boykins explicitly adopted Chief Fautz's "personal choice" protocol pursuant to which an officer's Assigned Line would be recorded only with their knowledge.  Tr. Vol. I 185:4-7; 187:1-4; 190:17-21; 213:20-22.

26.     Boykins instructed DePaepe to continue doing what Fautz had done.  Tr. Vol. I 187:9-24.  Boykins believed that any officer that was going to be recorded should be informed of that fact to protect the officer's privacy rights.  Tr. Vol. I 196:13-20.

**VI.     The Promotion of Steve Richmond and the Re-directing of His Telephone Line**

27.     In February of 2010, then-captain Steve Richmond was promoted to Division Chief of the Investigative Division by Boykins, replacing Bishop.  Tr. Vol. II 6:23-25.  At that time, Bishop took a position in a separate building with Metro Homicide.  Tr. Vol. I 248:24-249:4.  Bishop accordingly could not take the 6031 number with him, and it remained in the Division Chief's office of the Investigative Division.  Tr. Vol. I 248:24-249:4.

28.     Richmond, however, wanted to bring his own 574-235-7473 phone number with him to that office upon his promotion.  Tr. Vol. II 11:22-24.  He contacted Barbara Holleman, administrative assistant to the Chief of Police, to accomplish the transfer of his 7473 number from his captain's office to the Division Chief's office.  Tr. Vol. II 11:25-12:4.

29.     Holleman switched the 7473 line to the Division Chief's office by moving that line to the port for that office in telephone closet C.  Ex. 36; Stip. F(21).  She then connected the 6031 line to the port for the Captain's office in telephone closet C.  Ex. 36; Stip. F(21).

8

Unbeknownst to her, the 6031 line was still connected to the Voice Logger upstream of the location where she performed the switch.  Stip. F(21).

30.     In March 2010, Brian Young was promoted to Captain of the Investigative division.  Tr. Vol. II 64:23-24.  At that time, he moved into the office to which the 6031 line had been moved and began using that line.  Stip. F(19); Tr. Vol. II 70:18-20.

31.     The Voice Logger began recording all Young's calls without anyone's knowledge or any intent to record Young.  Stip. F(22).  Young himself was unaware that the line was recorded.  *Id.*

**VII.     DePaepe's Discovery of Young's Use of Bishop's Previously Recorded Line**

32.     At the latest, but perhaps earlier, on February 4, 2011, DePaepe was troubleshooting the Voice Logger to see if any recordings were lost following a series of crashes.[3]  Tr. Vol. II 119:18-25.  As part of that process, DePaepe checked all of the Police Department's recorded lines to confirm the recordings were properly downloading.  Tr. Vol. II 124:10-20.

33.     DePaepe testified that it took only a few seconds of listening to each recording to determine whether she had usable data on the hard drive and backup discs.  Tr. Vol. II 124:24-25.  Diana Scott, Assistant Communications Director under DePaepe, confirmed the troubleshooting process consisted of listening only to a few seconds of each recording to determine whether usable data was present.  Tr. Vol. I 65:15-68:11.

---

[3] The Court notes that there is conflicting testimony from DePaepe herself on the exact timing of her troubleshooting and discovery that Young's line was being intercepted.  DePaepe's affidavit states that she performed the troubleshooting and discovered the calls in January of 2011.  At trial, she testified that she performed her troubleshooting on February 4, 2011.  The precise date of her discovery is not material to the issues before the Court.

US.54987424.01

34.     DePaepe claims that while performing her troubleshooting, she recognized Young's voice on the recorded line 6031 within the first few seconds of listening to the recording.  Tr. Vol. II 125:19-22.  She had previously believed that line belonged to Richmond.  Tr. Vol. II 125:19-126:1.  Within a few seconds of listening to that recording, DePaepe had confirmed what she needed to confirm for the purposes of her troubleshooting.  Tr. Vol. II 126:24-127:2.  During the entire time that DePaepe had worked at the Police Department, there had never been a malfunction where the Voice Logger began recording conversations on the incorrect phone line.  Tr. Vol. II 129: 17-23.  She could have investigated the circumstances surrounding the switch without further listening to the recorded phone conversations, such as by checking the Police Department phone directory, dialing the number, or discussing the issue with Young or a supervisor.

35.     Instead, DePaepe continued listening to the recording for the stated purpose of determining when the switch occurred.  Tr. Vol. II 142:2-14.  It is unclear how continuing to listen to a recording she knew contained usable data and that she knew was captured on February 4, 2011 could shed any light on whether the Voice Logger was functioning properly or the timing of the switch.  The Court finds the continued listening to recordings of Young to investigate the switching of lines was outside the scope of her limited troubleshooting duties.

36.     The very first recording of Young that DePaepe listened to purportedly contained a conversation that was troubling to her.  Tr. Vol. II 141:19-142:7; Ex. 1A.

37.     She then went on to check a series of additional recordings associated with that line for the dual purpose of determining when Young, instead of Richmond, had taken that line and to *"investigate"* the content of Young's conversations.  Tr. Vol. II 131:14-25.  DePaepe testified that she "continued to check backward[s] to see if it was maybe a fluke or something,

and heard other conversations" and that it appeared to her that Young had been recorded "for some time." Tr. Vol. II 157:2-10; 158:9-10.

38.     DePaepe eventually confirmed, both by listening to recordings and consulting the telephone directory in her computer-aided dispatch system, that the line was in fact assigned to Young. Tr. Vol. II 131:14-25. DePaepe knew that Boykins had not requested it to be recorded, that 6031 was an individually assigned line, and that the Police Department had not established a regular practice of recording Investigative Division Captains. Tr. Vol. II 137:21-25; 140:10-15; 185:6-11. In other words, DePaepe knew at the time she discovered the recording of Young's line that the Police Department had mistakenly recorded Young and no policy, procedure, routine, or directive sanctioned the recording of Young's telephone calls.

39.     DePaepe was the only individual in the Police Department that kept a list of the numbers that were recorded by the Voice Logger. Tr. Vol. II 111:3-10. DePaepe was also the only individual in the communications center with full access to all of the recordings on the Voice Logger. Tr. Vol. I 66:6-15. DePaepe knew that Young's line was not supposed to be recorded, that Boykins had not requested it be recorded, that 6031 was not supposed to be recorded regardless of the user, and that the Police Department had not established a regular practice of recording Investigative Division Captains. Tr. Vol. II 137:21-25; 140:10-15; 185:6-11.

40.     Moreover, Fautz had earlier informed her how he wanted to handle the Assigned Lines and Boykins had informed her that he wanted her to continue the Fautz approach. Tr. Vol. I 134:14-19; 137:5-6; 187:9-24.

41.     But, despite these directives, she failed to inform anyone of the discovery of the erroneous recording of Young's line. She did not inform Young (the officer who should have

given his permission to be recorded), Richmond (Young's supervisor), the police chief, or Internal Affairs.  Tr. Vol. II 144:8-17.  DePaepe kept to herself both the fact of the recording and the allegedly concerning content of the recordings for three to four weeks after her discovery.  Tr. Vol. II 132:11-15.

## VIII.   Boykins and DePaepe Allow Recording to Continue for Purposes of Investigation.

42.    In early March of 2011, DePaepe finally informed Boykins that Young's line was being recorded and that she had heard conversations on his recorded line that disturbed her.  Tr. Vol. I 192:22-23; Tr. Vol. II 144:22-143:3.  DePaepe attributes the delay to the fact that she was "very disturbed" by the content of the recordings.  166:12-13.  The Court does not find this explanation of her conduct to be credible.  Any reasonable person in DePaepe's position having discovered the improper recording and having concern over the content of the recordings would have and should have immediately reported the situation.  Tr. Vol. I 70:10-71:17; 178:18-179:6; 180:21-22.

43.    In the March 2011 conversation with Boykins, DePaepe asked if he wanted any changes made to the recording of Young.  Tr. Vol. II 145:21-25.  Boykins did not correct the mistaken recording of Young despite the fact that it was contrary to his practice of not recording private lines without the officer's knowledge.  Vol. I 212:11-12.  Nor did he seek a warrant or open an investigation with Internal Affairs—which would have guaranteed Young certain procedural safeguards—or even notify Internal Affairs about the content of the recordings.  Tr. Vol. I 198:18-22.  Indeed, Boykins failed to ever notify Internal Affairs about the mistaken recording of Young, about the actions of DePaepe in investigating Young's conversations, and about the supposed "disturbing" matters on the recordings.  Tr. Vol. I 217:2-11.

US.54987424.01

44.     Rather, Boykins deliberately permitted the recording to continue in furtherance of the investigation DePaepe had initiated into Young's conduct.  Tr. Vol. I 216:7-16.  Boykins testified that he allowed the recording to continue so he could "loo[k] at evidence" related to DePaepe's allegations of wrongdoing.  Tr. Vol. I 216:14-15.  Indeed, Boykins stated that the decision to keep recording the line was *because of* the information that DePaepe had brought to his attention in early March regarding the content of the recordings.  Tr. Vol. I 218:2-4.

45.     Boykins acknowledged that no law enforcement purpose was served by the initially inadvertent recording of Young prior to DePaepe's discovery on February 4, 2011.  Tr. Vol. I 217:18-218:1.  However, investigation of Young, according to Boykins' own testimony, became the law enforcement purpose for continuing to record the line from that point forward.  Tr. Vol. I 218:2-4; 220:12-15.

46.     Due to the actions of DePaepe and Boykins, the surreptitious interception of Young's conversations continued from February 4, 2011 until October 11, 2011.  Young testified that he believed the concealment was intentional.  Tr. Vol. II 85:9-15.  The fact that DePaepe— the sole person in the Department who maintained and possessed the recorded lines list—knew about the recording and did nothing to inform Young supports Young's belief.  Additionally, Boykins allowed the recording to continue unguided by any policy, without informing Young, and in direct contravention of his "on demand" protocol.  The recording of Young's line was thus kept secret from him, during which time all of the subpoenaed recordings were intercepted.  *Id.*

13

47.     In October of 2011, when DePaepe was on medical leave, Young learned from Captain Phil Trent that his line was being recorded.[4]  Tr. Vol. I 95:8-97:3; Tr. Vol. II 74:2-10. Young requested the immediate cessation of the recording but nothing was done to honor his request.  Tr. Vol. I 74:2-10; Tr. Vol. II 196:13-19.

**IX.     The discovery of additional conversations and Boykins' use of the recordings.**

48.     In July 2011, a few months before Young discovered his line was being recorded, DePaepe claims that she discovered additional recordings of Young that concerned her while searching for recordings on the Voice Logger pursuant to a media request.  Tr. Vol. II:  173:19-175:13.  This explanation is questionable.

49.     DePaepe had no reasonable basis to listen to any individually assigned lines in response to a media request that was plainly for 911 audio.  Ex. 16 (FOIA request seeking "a copy and/or transcription of the 911 call or complaint . . ."); Ex. 15 (letter from City's counsel to Nancy Bruce instructing her to call DePaepe for a copy of the recording "if there was such a 911 call . . .").  She would have had no basis to disclose recordings of an investigative division captain in response to a media request.  And she particularly had no basis to believe that she could have disclosed to the media Young's recordings when she had known for at least five months at that point that his line was being recorded in direct violation of Boykins' practices. There is sufficient evidence in the record to conclude DePaepe's explanations are pre-textual.

50.     Indeed, in late December of 2011, Boykins requested that DePaepe retrieve recordings of Young's line and "find other recordings that pertained to the information that we had discussed."  Tr. Vol. I 220:12-15; Tr. Vol. II 165:21-166:3.

---

[4] All of the cassette tapes subpoenaed by the Council were recordings captured *after* DePaepe had knowledge of the improper recording of Young and all except for one contain conversations that occurred *after* Boykins approved the Continued Recording of Young's line for his investigative purpose.

US.54987424.01

51.     Around that timeframe, Boykins also revealed to Young and Richmond that he had access to the recordings and knowledge of their content.  Tr. Vol. II 51:13-14.

52.     On January 3, 2012, Boykins requested a private conversation with Richmond. Vol. II 48:21-24.  After sending Richmond away several times, Boykins finally met with him and informed Richmond that Boykins no longer considered him a loyal employee, but "considered [Richmond] to be a disloyal employee and a backstabber."  Tr. Vol. II 49:1-12.  Boykins informed him that he was waiting for recordings to be delivered to him and that Boykins would then "decide whether or not he was going to demote, discipline, or even fire those he considered to be disloyal or a backstabber."  Tr. Vol. II 51:22-52:3.

53.     Around January 4, 2012, in response to Boykins' late December request, DePaepe delivered cassette tape copies of several recordings to Boykins along with an Officer's Report. Ex. 1A.  The cassette tapes contained recorded conversations that occurred on the following dates:  February 4, 2011; April 5, 2011; June 3, 2011; June 6, 2011; June 16, 2011; June 27, 2011; July 14, 2011; and July 15, 2011.  *See* Stipulation of Undisputed Facts for Trial, Doc. No. 155.

54.     On January 8, 2012, Boykins again threatened to fire or demote Richmond.  Tr. Vol. II 52:11-16.  Richmond testified that he felt intimidated by Boykins' actions.  Tr. Vol. II 60:15-18.

55.     In January 2012, Boykins also threatened to discipline, demote, or fire Young for disloyalty.  Tr. Vol. II 99:17-100:16.  Young took the comments as a threat to his career as a law enforcement officer and felt intimidated by the remarks.  Tr. Vol. II 99:17-100:16.

56.     Shortly thereafter, a federal investigation was initiated into the recordings, Boykins was demoted, and DePaepe was terminated.

US.54987424.01

## CONCLUSIONS OF LAW

57.     The Federal Wiretap Act generally prohibits wiretapping in the absence of probable cause and a warrant.  *See Alderman v. United States*, 394 U.S. 165, 175 (1969); *Amati v. City of Woodstock*, 176 F.3d 952, 956 (7th Cir. 1999) ("Title III . . . does require a warrant for electronic eavesdropping that is not within one of the exclusions.").

58.     The Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).   The Police Department recorded Young's phone conversations with its Voice Logger beginning in March of 2010 and continuing through approximately January of 2012.   The capture of Young's conversations constitutes an interception for the purposes of the Wiretap Act.

59.     The Council contends, however, that the interception of Young's line and any subsequent use and disclosure of the contents of the recordings came within the statutory exclusion of recording equipment "being used . . . by an investigative or law enforcement officer in the ordinary course of his duties."  18 U.S.C. § 2510(5)(a)(ii).

60.     Ordinary course in the context of the law enforcement exclusion can be "reasonably interpreted to refer to routine noninvestigative recording of telephone conversations."  *Amati*, 176 F.3d at 955.  Thus, the boundary for applying the exclusion lies between "routine noninvestigative uses of electronic eavesdropping and its use either as a tool of investigation (which requires a warrant) or as a device for intimidation, suppression of criticism, blackmail, embarrassment, or other improper purposes."  *Id.* at 956; *see also Adams v. City of Battle Creek*, 250 F.3d 980, 984 (6th Cir. 2001) (stating that application of the law enforcement

US.54987424.01

ordinary course exclusion "requires that the use be (1) for a legitimate business purpose, (2) routine and (3) with notice.").

61.     The party invoking the exclusion—in this case the Council—bears the burden of proving the exclusion applies. *See Amati*, 176 F.3d at 954 (stating that the taping was a *prima facie* violation, but the jury accepted defendants' argument that it came within the statutory exclusion at 18 U.S.C. § 2510(5)(a)(ii)); *United States v. Phillips*, 540 F.2d 319, 326 n.3 (8th Cir. 1976) (holding that the proponent of the exclusion must prove that it is applicable).

62.     The Council has failed to carry its burden of showing a routine, non-investigative purpose for the recording of Young's assigned line and therefore the interception of his conversations is not excluded from the provisions of the Wiretap Act.

63.     It is the indiscriminate recording of all police department phone lines that is the hallmark of the law enforcement exclusion. *See, e.g., Amati*, 176 F.3d at 954) (stating that "[i]t is routine, standard, hence 'ordinary' for *all calls* to and from the police to be recorded" and that "[t]o record *all calls* to and from a police department is, for the reasons explained earlier, a routine police practice.") (emphasis added).  It is undisputed that the Police Department did not indiscriminately record all incoming and outgoing calls to and from the Police Department. Rather, the Police Department only routinely recorded communications center and front desk lines and had an entirely distinct approach to recording individually assigned lines.

64.     All of the communications center and front desk lines were routinely and indiscriminately recorded.  The communications center training manual informed dispatchers that all telephone calls placed from the dispatch floor were recorded and kept on file for a period of three years.  The communications center provided a break room telephone for personal calls that was not recorded.  The training manual only addressed the communications center and was

distributed only to the dispatchers that worked in the communications center.  As a matter of practice, however, the front desk personnel were orally informed that the front desk lines were being recorded.  Thus, the communications center and front desk personnel had notice that the lines were being routinely recorded.  These general use lines were recorded in the ordinary course of police business to provide recordings of 911 calls for criminal matters, perform quality assurance checks on dispatchers, document responses, and investigate complaints.  Tr. Vol. I 43:18-25.   Thus, the Court concludes that the Department's recording of the communications center and front desk lines was precisely the type of routine and non-investigatory recording that is identified under 18 U.S.C. § 2510(5)(a)(ii).

65.     By contrast, individually assigned lines were handled differently by the Police Department.  Consequently, the Court analyzes these assigned lines differently and the fact that the communications center and front desk lines may be excluded under 18 U.S.C. § 2510(5)(a)(ii) does not affect the analysis of the assigned lines.

66.     The Council acknowledges that the Police Department lacked any written or unwritten policy, procedure, or routine of any kind regarding the recording of individually assigned lines.  At most, the various police chiefs formed a protocol pursuant to which command staff, in consultation with the police chief, had a personal choice to determine whether their lines would be recorded.  This protocol was not announced or formalized.  The intent of this protocol was to provide a "useful tool" for officers requesting it and not to establish any routine or procedure.  Chief Boykins expressly adopted this discretionary approach and also believed officers had an expectation of privacy on their administrative lines.

67.     Because the recording practices for general use lines was distinct from the recording of assigned lines, the Police Department's routine for indiscriminately recording front

18

desk and dispatch center lines did not apply to Young's line.  By its plain terms, the law enforcement exclusion relates to whether the recording device is "*being used* . . . by an investigative or law enforcement officer in the ordinary course of his duties."  18 U.S.C. § 2510(5)(a) (emphasis added).  "The law enforcement exception does not authorize all conversations to be recorded by a wiretapping device so long as the device captured some conversations in the ordinary course of a law enforcement officer's duties." *Id.*  Accordingly, different categories of calls are considered separately in determining whether the exclusion applies. *Abraham v. Cnty. of Greenville*, 237 F.3d 386, 390 (4th Cir. 2001) (stating that "courts 'have considered different categories of phone calls recorded by a single recording system separately for application of the law enforcement exception.'").  "[S]ome uses of the recording device are excused, while other uses are not." *Id.*  A routine that did not even apply to Young's Assigned Line cannot be used to justify the recording of his conversations.  Thus, under 18 U.S.C. § 2510(5)(a)(ii), the interception of Young's line is not justified by the routine, non-investigatory recording that took place at the communications center and front desk.

68.    The parties do not dispute that from March 2010 through up to February 4, 2011 at the latest, Young's conversations were inadvertently captured.  Because "the law enforcement [exclusion] lacks a good faith component," inadvertent recordings are not a legitimate surveillance activity. *Abraham,* 237 F.3d at 390-91.  Young could not have been recorded in the ordinary course of any routine in the absence of any intent to record the line or instruction from Boykins to record either Young or that particular office.  As Boykins conceded, recording a line without anyone's knowledge can serve no legitimate law enforcement purpose.

69.    When the recording error was discovered, the continued recording of Young without any policy guidance or justification, in violation of the police chief's informal protocol

US.54987424.01

for recording individual officers, and for the purposes of investigating Young was not in the ordinary course of the Police Department's law enforcement activities.

70.     The evidence at trial established that no police chief—including Boykins and his predecessor Tom Fautz—has taken the liberty to record an Assigned Line without first informing the officer.[5]  Fautz described his practice as a "personal choice," Boykins described his as "on demand," and both stated they would not record an officer without that officer's knowledge.  But from March 2010 through at least October 2011, Boykins approved the recording of Young's line without his knowledge.  And, from at least February 4, 2011 until October 2011, Young continued to be recorded despite the fact that DePaepe and Boykins knew he was being recorded in contravention of Boykins' protocol.  The discretion to record or not record without reference to or compliance with any set of standards—formal or informal—simply cannot be a law enforcement routine.

71.     When DePaepe first discovered the line was recorded in error—something she concedes took her only a few seconds—she failed to take appropriate action.  Rather, she not only allowed the recording to continue, but affirmatively undertook an unsupervised and unauthorized investigation into the origin of the error and the content of the recordings.  These endeavors were outside the scope of DePaepe's job duties and thus were not consistent with the general purpose of the Voice Logger but were investigatory.

72.     After delaying from at least February 4, 2011 to early March 2011, during which time the line continued to be recorded, DePaepe finally informed Boykins of her investigation into the content of Young's recorded conversations.  When informed, Boykins also failed to

---

[5] To be clear, even if a prior chief of police had recorded an Assigned Line without notice to the user of that line, that would not constitute evidence of an acceptable routine under the law enforcement exclusion but only evidence of a violation by that particular chief.

notify Young that he was being recorded.  Boykins then allowed the recording to continue in violation of his own protocol to further the investigation started by DePaepe.  Indeed, Boykins testified that the continued recording of Young to investigate his conduct *was* the law enforcement purpose for recording his line.  Lacking any warrant, or even the procedural safeguards of a formal Internal Affairs investigation, the targeted recording of Young for the purposes of investigating him is precisely the conduct that is prohibited by the Act.  *Amati*, 176 F.3d at 955 (communications recorded to "further a particular investigation or target a particular individual" expressly do not fall within the law enforcement exclusion); *Narducci v. Vill. of Bellwood*, 444 F. Supp. 2d 924, 936 (N.D. Ill. 2006) *aff'd sub nom. Narducci v. Moore*, 572 F.3d 313 (7th Cir. 2009) ("But a communication is not viewed as having been recorded in the 'ordinary course' of an officer's duties if it is done to further a particular investigation or target a particular individual"), *citing Amati*, 176 F.3d at 955-56.

73.     Because the Police Department lacked any routine and did not announce its informal protocol, implicit notice to Young of the recording of his line was not possible.  The case authorities uniformly agree that implicit notice of the possibility of being recorded is required under the exclusion itself.  *See, e.g., Adams*, 250 F.3d at 984 (the exclusion "requires that the use be (1) for a legitimate business purpose, (2) routine and (3) with notice.") (emphasis added).  Thus, "monitoring in the ordinary course of business requires notice to the person or persons being monitored." *Id*.

74.     When a police department follows a routine for the recording of all of its phone lines, "[s]uch recording will rarely be very invasive of privacy [because] what is ordinary is apt to be known; it *imports implicit notice*."  *Amati*, 175 F.3d at 955 (emphasis added).  But when routinely recording "all" lines is impossible, only a few assigned lines are recorded, no

21

discernable recording routine exists for those lines, and the police chief directly violates the only protocol that could apply, the mere fact that a police department intercepted the conversations imports no implicit notice at all of the possibility of lines being recorded.

75.     A purported "lack of secrecy" regarding the recorded lines is insufficient under the facts of this case to constitute implicit notice.  The evidence when taken as a whole shows that the recording of Young was in fact surreptitious.  For nineteen months, the recording of Young's line was concealed from him.  Young testified that he believed the concealment was intentional.  The fact that DePaepe—the sole person in the Department who maintained and possessed the recorded lines list and had access to the recordings from assigned lines—concealed this fact from Young supports Young's belief.  So does the fact that Boykins learned about the recording in March 2011 and took no affirmative action.

76.     Additionally, compliance with the law enforcement exclusion cannot be demonstrated under the circumstances of this case merely by showing that, if asked, DePaepe or Boykins would have told Young his line was being recorded.  *Abbott v. Vill. of Winthrop Harbor*, 93-cv-4642, 1998 WL 433772, at *3 (N.D. Ill. July 29, 1998) *rev'd on other grounds*, 205 F.3d 976 (7th Cir. 2000) (holding law enforcement exclusion inapplicable when, among other things, the police chief informed his supervisor of communications "that anyone who asked them if the line was recorded could be told 'yes.'"); *Jandak v. Village of Brookfield*, 520 F.Supp. 815, 823 (N.D. Ill. 1981) (holding that "the degree of notice here would be less than adequate" had the conversant not been communications officer previously assigned to the communications desk).

77.     "[T]he mere fact that the recordings involved only lines to and from the police department" is insufficient to establish a routine, non-investigatory purpose for the interception

of Young's conversations or to import implicit notice.  The Police Department did not routinely and indiscriminately record all lines to and from the Police Department as in *Amati*.  *Amati*, 176 F.3d at 955.  Routinely recording all lines was not possible and the Police Department lacked any policy, procedure, or routine for indiscriminately recording individually assigned lines.  Moreover, Young's assigned line was recorded in violation of the only protocol that could have applied to the recording of his line.

78.     The police chief's unconstrained discretion to record employees and officers, uninformed by any policy or procedure and in violation of his own informal protocol for recording only with actual notice, is not sufficient to constitute an ordinary course with respect to Young's assigned line under the circumstances of this case.

79.     Because the recordings were not captured by an investigative or law enforcement officer in the ordinary course of his duties, they are subject to the protections of the Wiretap Act and use and disclosure of the recordings is prohibited under the Act.

80.     Pursuant to the Wiretap Act, interceptions are *authorized* only in accordance with the procedures set forth in the Act.  18 U.S.C. § 2516 (Authorization for interception of wire, oral, or electronic communications).  Thus, "Title III does not forbid all nonconsensual electronic eavesdropping, of course, but it does require a warrant for electronic eavesdropping that is not within one of the exclusions."  *Amati*, 176 F.3d at 756 (citing 18 U.S.C. §  2516; *United States v. Cunningham*, 113 F.3d 289, 293-95 (1st Cir. 1997)).  Even authorized interceptions may be used or disclosed only in certain specific instances.  18 U.S.C. § 2517 (Authorization for disclosure and use of intercepted wire, oral, or electronic communications).

81.     As the Seventh Circuit also stated in *United States v. Dorfman*:

> Title III makes it a crime to disclose wiretap evidence (transcripts, logs,  summaries,  etc.)  only  if  the  evidence  was  obtained  in

> violation of Title III and the disclosure is willful. 18 U.S.C. s 2511(1)(c). But by permitting disclosure of lawfully obtained wiretap evidence *only under the specific circumstances listed in 18 U.S.C. s 2517, Title III implies that what is not permitted is forbidden*, though not necessarily under pain of criminal punishment. The implication is reinforced by the emphasis the draftsmen put on the importance of protecting privacy to the extent compatible with the law enforcement objectives of Title III.

*United States v. Dorfman*, 690 F.2d 1230, 1232 (7th Cir. 1982) (emphasis added) (internal citations omitted).  Thus, in the absence of an applicable exclusion, "title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers engaged in the investigation or prevention of specified types of serious crimes, and only after authorization of a court order obtained after a showing and finding of probable cause." *Gelbard v. U. S.*, 408 U.S. 41, 48 (1972).

82.    Because no exclusion applies to the recording of Young, the Wiretap Act prohibits use and disclosure of the recordings.  Even if the February 4, 2011 recordings were inadvertent, and therefore may not give rise to civil or criminal liability, they were nevertheless neither excluded from the Act pursuant to 18 U.S.C. § 2510(5)(a)(ii) nor authorized by the Act by having been obtained pursuant to 18 U.S.C. § 2516.  Thus, all of the intercepted conversations on Young's line from March 2010 onward cannot be used or disclosed.  *See Dorfman*, 690 F.2d at 1232; 18 U.S.C. § 2517.  There is simply no basis under the statute for the disclosure of a private conversation intercepted by a third party and not authorized under the law.

## **ORDER**

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED and the Court declares as follows:  (a) Young's telephone conversations were not intercepted by an investigative or law enforcement officer in the ordinary course of his duties; (b) the intercepted conversations are not excluded from the Wiretap Act pursuant to 18 U.S.C. § 2510(5)(a)(ii); (c) the cassette tape

24

copies of the recordings that are the subject of the Council's Subpoena are therefore not excluded from the Wiretap Act; (d) the interception of Young's conversations was not authorized under the Wiretap Act pursuant to 18 U.S.C. § 2516; (e) the use and disclosure of recordings of Young's intercepted conversations, including the cassette tape copies that are the subject of the Council's Subpoena, is prohibited by the Wiretap Act.

SO ORDERED this _____ day of _____, 2014.


_____
Hon. Joseph Van Bokkelen
Judge, United States District Court
Northern District of Indiana


## CERTIFICATE OF SERVICE

I certify that on the 7th day of October, 2014, a copy of the foregoing was served upon all counsel of record via the Court's electronic filing system.


s/ Ryan G. Milligan_____

US.54987424.01